**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

MICHAEL BRIGGS,

     Plaintiff,

v.                                Case No.:  1:20-cv-00651 KWR-JMR

THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GICK, individually and
in his official capacity

     Defendants.

**PLAINTIFF'S RESPONSE IN OPPOSITION TO**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The Court should deny the UNM Defendant's Motion to Dismiss and for Summary

Judgment (the "Motion") (Doc. 129).  In August 2018, Plaintiff Michael Briggs was fired from his

longstanding job at the University of New Mexico ("UNM) based on UNM's investigation of a

false report of sexual assault.  The undisputed evidence will be that: (1) there was enormous

pressure from the public and the United States Department of Justice ("DOJ") that UNM more

aggressively investigate and discipline reports of sexual assault at the same time that Plaintiff was

falsely accused; (2) there was material exculpatory evidence contradicting the false report of

sexual, all of which was ignored by UNM; (3) UNM's investigation and discipline of Plaintiff was

both biased and suffered from serial procedural defects; and (4) analysis of 371 complaints of

sexual misconduct to UNM from show that a male respondent accused of sexual misconduct is 6.8

1

more times more likely to be investigated by UNM,  29% more likely to be found to have violated UNM policy, and far more likely to suffer severe discipline (only one female was disciplined at all).[1]

"While a one-sided investigation, standing alone, might only raise a reasonable inference of anti-complainant bias, where there is a one-sided investigation plus some evidence that sex may have played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines." *Doe v. Univ. of Denver* ("*Doe II*"), 1 F.4th 822, 829–30 (10th Cir. 2021) (holding that a Title IX plaintiff can demonstrate gender bias by statistical disparity in the gender make up of a university's sexual misconduct investigations, determinations, and discipline).  In *Doe II*, the Tenth Circuit held, *inter alia*, that "procedural deficiencies in [a] sexual-assault investigation, combined with additional statistical evidence of sex bias," are sufficient to show an inference of sex discrimination under Title IX.  1 F.4th 822, 831-835 (10th Cir. 2021) (reversing grant of summary judgment by district court).  The evidence here is stronger than the evidence in *Doe II*.

The Court should also deny the Motion to the extent it seeks to dismiss Plaintiff's claim against the individual defendants brought under the New Mexico Human Rights Act, NMSA 1978 § 28-1-1 *et seq.*, ("NMHRA").  Plaintiff acknowledges that Title VII does not permit claims against the individual defendants.  *See e.g., Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996). However, the NMHRA does permit a plaintiff to bring claims against individuals.  *Lobato v. State Env't Dep't*, 2012-NMSC-002, ¶ 8, 267 P.3d 65, 67.  The Court's prior Order on this topic already

---

[1] *See* Declaration of Hubert A. Allen, Jr. ("Allen Decl.") at 2-3 (Exhibit 1); *See* 1st Declaration of Michael Briggs (the "Briggs Decl.") at ¶¶ 1-4 (Exhibit 3)

found that Plaintiff has properly asserted individual claims under the NMHRA. (Doc 39).[2]
Further, as discussed below, Plaintiff has standing to seek injunctive relief, including the
expungement of records from his personnel file. For all of these reasons, Plaintiff respectfully
requests that the Court deny the Motion.

## I.    BACKGROUND AND PROCEDURAL HISTORY

### A.    MR. BRIGGS WAS A LONGSTANDING "EXEMPLARY" UNM EMPLOYEE

From 2006 until 2018, Mr. Briggs worked in medical research at UNM's Health Sciences
Center ("UNM HSC").[3]  Mr. Briggs received multiple pay raises, promotions, and only positive
performance reviews.[4]  At all times, Mr. Briggs worked in medical research and had no
involvement in or oversight of UNM HSC's clinical operations or the delivery of health care by
UNM USC, including the Department of Orthopedics where Ms. Van Meter was employed until
she resigned in September 2017.[5]

Prior to the false report of sexual assault by Joy Van Meter, no one had ever complained
to anyone at UNM about Mr. Briggs for any reason during his 12-year career.[6]  All of the
testimony, including that from the highest-level executives at UNM HSC, acknowledged that Mr.
Briggs had at all times been an exemplary employee throughout his long career at UNM HSC.

> [M]y experience with Mr. Briggs up to that point had been one in which he was an
> exemplary employee, he had conducted himself very professionally in all areas, all
> venues that I was familiar with. And -- and I had felt that the decision for
> termination seemed a little more harsh than what was absolutely necessary.".

---

[2] Order at 8 (Doc. 39) ("At the hearing on August 24, 2021, both Briggs and the Defendants conceded that the Court
should grant the NMHRA MTD with respect to Gick, because Briggs did not identify him as part of the NMHRA
administrative complaint. *See* Tr. at 63:11-14 (Hunteman). The parties also agreed to deny the NMHRA MTD with
respect to the remaining Defendants."
[3] *See* Affidavit of Catherine Penick ("Penick Aff.") (Exhibit 4) at ¶ 2; Answer at ¶ 28 (Doc. 43).
[4] *See* Penick Aff. at ¶¶ 2-5; Declaration of Dr. Richard S. Larson ("Larson Decl.") at ¶¶ 4-8  (Exhibit 2); Answer at
¶ 30 (Doc. 43).
[5] *See* Penick Aff. at ¶¶ 7, 15, 17-19, 22, 24 (Ex. 4); Larson Decl. at ¶¶  4-8 (Ex. 2); Briggs Decl. at ¶ 3 (Ex. 3).
[6] *See* Penick Aff. at ¶ 2 (Ex. 4) ("I never had occasion to discipline Mr. Briggs for any reason."); Larson Decl. at ¶
¶¶ 4-8 (Ex. 2) ("I found Mr. Briggs's work to be outstanding and exceptional."); Answer at ¶ 30 (Doc. 43).

Excerpts of Deposition Dr. Paul Roth ("Roth Dep.") at 99, ll 6-12 (Exhibit 5); *see also* Larson Decl. at ¶¶ 4-8 (Ex. 2); Penick Aff. at ¶ 2 (Ex. 4) ("Mr. Briggs is an exemplary UNM employee.").

**B.    UNM WAS UNDER HEAVY PRESSURE FROM THE PUBLIC AND DOJ TO MORE AGGRESSIVELY INVESTIGATE AND DISCIPLINE SEXUAL ASSAULT**

In 2014, the United States Department of Justice (DOJ) received "complaints from multiple students alleging that UNM did not adequately respond to their reports of sexual assault."[7]  Among them, in April 2014, three students, including two UNM football players, were accused of kidnapping and raping a female UNM student. [8]  In December 2014, DOJ launched an investigation into UNM's handling of reports of student sexual assault.  *Id.*  In 2015, a former UNM student filed a lawsuit against UNM alleging that UNM officials and administrators failed to conduct proper, appropriate or timely investigations of the alleged sexual assault.[9] During DOJ's investigation, UNM remained under public scrutiny because reports of sexual assault and sexual harassment tripled.[10]  In April 2016, DOJ issued a report "accus[ing] the state's flagship university of failing to respond to incidents of sexual assault and harassment."[11]

In April 2016, DOJ issued findings highly critical of UNM's handling of student reports of sexual on-campus sexual assault:

> Our investigation found that [UNM] remains out of compliance with Title IX and Title IV in key respects. Based on our review, UNM must do more to address and respond to sexual harassment that creates a hostile environment, including sexual assault, by effectively stopping harassment, preventing its recurrence, eliminating the hostile environment, and remedying its harms.

---

[7] *See* Department of Justice, Letter of Findings re Title IX and Title IV Investigation of University of New Mexico (issued April 22, 2016) (the "DOJ Findings") (Exhibit 6)

[8] Bush, Mike, *DOJ to Investigate UNM's Sexual Assault Response*, The Albuquerque Journal, December 6, 2014 (Exhibit 7); Bush, Mike, *DOJ's Probe of UNM is Second in Nation*, The Albuquerque Journal, January 5, 2014 (Exhibit 8).

[9] Bush, Mike, *Ex-Student Sues UNM Over Alleged Rapes*, The Albuquerque Journal, February 20, 2015 (Exhibit 9).

[10] Quintana, Chris, *TITLE IX AT UNM: Sex Assault, Harassment Reports Triple*, The Albuquerque Journal, April 10, 2016 (Exhibit 10).

[11] Quintana, Chris, *DOJ Hits UNM on Sexual Assault Policies*, The Albuquerque Journal, April 23, 2016 (Exhibit 11).

DOJ Findings Against UNM at 2 (Ex. 6). "[W]e found that UNM must take additional steps to ensure prompt and equitable resolutions of reports of sexual harassment and assault, protect and support students who have reported sexual harassment/assault, and improve campus climate and culture." *Id.* at 4.[12]

To avoid losing federal funding, DOJ required that UNM take certain measures, including to "[a]dequately investigate or respond to all allegations by students who have alleged sexual assault . . . ." DOJ's criticism focused in particular on OEO's handling of investigations of sexual assault: "UNM fails to ensure impartial resolution of Title IX complaints." *Id.* at 17. DOJ notably criticized UNM for "fail[ing] to adequately weigh all the known evidence in reaching its determination" and failing to "acknowledge other evidence in its possession." *Id.* at 19. "[M]ultiple witnesses stated that they informed OEO about the existence of text messages, social media messages, and recorded images that were relevant to investigations, but OEO did not follow through in requesting or viewing this evidence." *Id.* at 20. DOJ was also highly critical of high-level administrative officers involving themselves in and directing the outcomes of OEO investigation:

> Title IX investigations and adjudications must be impartial and equitable. The United States learned that in at least two instances, high-level administrative offices pressured the OEO to get the investigation "done" . . . . Such intervention by university administrators is entirely improper.

*Id.* at 22. "Students, faculty, staff, and community members also expressed a belief that UNM's approach to sexual assault is driven primarily by concerns about image-building." *Id.* at 31.

---

[12] DOJ's report also notified UNM of several deficiencies in its compliance with federal law, including but not limited to: (a) UNM's confusing "labyrinth" of outdated and often conflicting policies and procedures as to sexual assault; (b) UNM's minimal and inconsistent training of University officials; (c) UNM's wholly inadequate staffing of UNM's Office of Equal Opportunity (OEO) and training on how to conduct sexual misconduct investigations and adjudications, which resulted in inconsistent and unreliable determinations of credibility during investigations; and (d) UNM's failure to ensure impartial resolution of Title IX complaints; and UNM's ineffective evidence gathering, among other deficiencies.

DOJ also criticized UNM OEO's delays in investiging complaints.  *Id*. at 23.[13]  "UNM's investigations of sexual harassment complaints often take far too many months, and occasionally years, to complete."  *Id.*  "[W]hile investigations are pending, important information necessary for making a reliable final determination, such as physical evidence or witness statements, is often lost or overlooked."  *Id.*  "Such delay impedes OEO's ability to conduct a thorough investigation, as material evidence, such as security videos, social media content, or text messages iidentified in the complainants' and respondents' statements, may be recorded over and deleted in the intervening time."  *Id.*

To avoid litigation and potential loss of federal funding, DOJ required, *inter alia*, that UNM: (a) "[r]evise the University's policies, procedures, and investigative practices to provide a grievance procedure that ensures prompt and equitable resolution of sexual harassment and sexual assault allegations;" (b) "[a]dequately investigate or respond to all allegations by students who have alleged sexual harassment, including sexual assault"; and (c) "[t]ake prompt and effective steps to eliminate a hostile environment, prevent its recurrence, and address its effects."  *Id.* at 36. In short, DOJ found that UNM violated Title IX by failing to adequately investigate and "eliminate" incidents of sexual assault.

For the next year and a half, UNM and DOJ negotiated a settlement agreement in which UNM would be required to more aggressively investigate and discipline student reports of sexual assault.  During that time, UNM remained under heavy public criticism for its handling of reports of sexual assault.[14]  UNM attempted to to convince the public that it would more aggressively

---

[13] "Of the 13 investigations conducted by OEO for which findings had been issued as of June 30, 2015, the entire process, from receipt of complaint to issuing of the Final letter of Determination, took an average of 137 days. Ten investigations took over 100 days; the longest took 266 days." DOJ Findings at 23 (Ex. 6).

[14] See *Sagbakken, May and Kim Alaburda*, "Op. Ed: UNM Must Apologize for Inaction."  The Albuquerque Journal, August 10, 2016 (Exhibit 12); *Dyer, Jessica*.  "Woman Settles for $200k in UNM Suit Over Rape Case." The Albuquerque Journal, September 24, 2018 (Exhibit 13).

investigate and discipline sexual assaut, including through an Op Ed titled "UNM serious about sexual assault issue" authored by UNM's then-President Bob Frank: "Sexual assault is arguably the most disturbing issue on our college campuses nationwide. <u>At UNM, it has become a primary focus over the past few years</u>, beginning with some high-profile cases involving our students, and culminating in a Department of Justice review of our policies and procedures."[15]  "As we pursue our discussions with the DOJ, <u>we are moving aggressively ahead with major changes in our campus wide response</u>."[16]

On October 17, 2016, UNM entered into an agreement with DOJ that required, *inter alia*, that UNM "make all necessary and appropriate revisions to its policies, procedures, and practices regarding campus sexual harassment, including sexual violence."[17]  "In return, DOJ will not initiate litigation regarding its Title IX and Title IV findings . . . ."[18]  The DOJ Agreement required that UNM remain under federal supervision for three (3) years, during which time DOJ would monitor UNM's investigations and discipline of reports of sexual assault.[19]  UNM agreed that it would be monitored by DOK, and that UNM was required to report:

> Detailed data on the number of sexual harassment reports received by the University, whether the University investigated each report, and, if investigated, the findings, the sanctions imposed (if applicable) and the dates of all relevant events in each report, including but not limited to the date of the complaint and the date findings were communicated to the complainant and respondent;

*Id.* at 14-15 (Ex. 15); *id.* at 18 ("The University understands that the Department will monitor this Agreement until it determines that the University has fulfilled the terms of this Agreement . . . .").

---

[15] *Frank, Robert*, "Op. Ed: UNM Serious About Sexual Assault Issue."  The Albuquerque Journal, July 30, 2016 (Exhibit 14) (emphasis added)
[16] *Id.* (emphasis added).
[17] *See* Agreement between the United States Department of Justice and the Board of Regents of the University of New Mexico (entered into on October 17, 2016) (the "DOJ Agreement") at 2.  (Exhibit 15).
[18] *Id.*
[19] *Id.* at 14-16.

The DOJ Agreement provided that: "If the Department determines that the University has failed to comply with the terms of this Agreement or has failed to comply in a timely manner with any requirement of this Agreement, [and such breach is not resolved within 60 days], the Department may initiate civil enforcement proceedings in federal court." *Id.* at 17-18.

UNM and DOJ entered into the Agreement on October 17, 2016.

## C.    STATISTICAL EVIDENCE OF GENDER BIAS BY UNM

As a direct consequence of the pressure on UNM to more aggressively "eliminate" sexual assault, male respondents became far more likely to be investigated, found to have violated UNM policy, and were more severely disciplined than female respondents. On October 4, 2023, Plaintiff served discovery requests and later a subpoena[20] on UNM seeking, *inter alia*, records and information relating to past complaints to UNM alleging sexual misconduct, appeals to UNM's Presidents, disciplinary proceedings, and peer review hearings. UNM moved to quash or modify the subpoena (Doc. 93), including on grounds that producing all responsive records would be burdensome. *See* Motion at 5, ¶ B (Doc. 93). Plaintiff then stipulated that UNM need not produce the entire OEO file for each complaint but could instead limit the production of records to the core records for each file (e.g. complaint, a "Gender Identification Document,"[21] PLOD, FLOD, appeal, discipline, etc.). *See* Response Br. at 5-6 (Doc. 101). Plaintiff also agreed to limit the time frame for production to January 1, 2017, to December 31, 2022. Reply. Br. at 2 (Doc. 104). While UNM agreed to produce records relating to appeals and peer review hearings, UNM objected to the

---

[20] UNM initially objected on grounds of privacy, including to protect students' confidential information in accordance with the Family Educational Rights and Privacy Act ("FERPA"). UNM requested that Plaintiff instead issue a subpoena for such information because, "[p]ursuant to a lawfully issued subpoena, federal regulations allow BORUNM to release education records protected by FERPA without written consent" so long as BORUNM "makes a reasonable effort to notify the parent or eligible student of the order or subpoena in advance of compliance, so that the parent or eligible student may seek protective action." Motion at 3, ¶ 11 (citing 34 C.F.R. § 99.31(a)(9)(i) and (ii)). To cooperate with UNM's efforts to protect confidential student information, Plaintiff issued a subpoena for the same information sought in discovery.

[21] "A record relating to a Complaint that is sufficient to identify the gender of the complainant and respondent."

production of all OEO files on grounds that: (1) 1,701 complaints were filed with OEO during that timeframe; (2) production of all files would create an unreasonable burden; and (3) production of all files would require that 1300 students be notified under FERPA.  Reply Br. at 3-6 (Doc. 14).  UNM noted that, of the total cases, only 130 were investigated. Reply at 5 (Doc. 104).

On April 10, 2024, the Court held a discovery hearing during which the Court determined that, under *Doe II*, Plaintiff was entitled to discovery of UNM's files regarding uninvestigated cases but limited that production to reduce the administrative burden claimed by UNM.  Rather than require that UNM produce all files, the Court ordered that: (1) UNM produce the files for the 130 cases <u>investigated</u> by OEO; and (2) that Plaintiff narrow its request to 250 of the remaining <u>uninvestigated</u> cases.  On April 11, 2024, the Court entered an Order Granting in Part [UNM's] Motion to Quash Subpoena.  (Doc. 110) ("[UNM] is ordered to produce the files for all the subject complaints that were fully investigated within the parties' stipulated timeframe, which is approximately 130 cases. Plaintiff is ordered to further narrow his request for files of uninvestigated complaints to 250 cases.").  UNM ultimately produced 371 OEO files.

Those files confirm and provide overwhelming evidence that UNM discriminated against male respondents compared to female respondents.  *See* Allen Decl. at ¶¶ 2-9 (Ex. 1); Briggs. Decl. at ¶¶ 1-4 (Ex. 3).  The 371 OEO files produced by UNM include 269 male and 102 female respondents.  UNM identified 133 of the files as "Investigated" and 238 as "Uninvestigated."  Of the 269 complaints made against male respondents, 126 (or 46.9%) were investigated by OEO.  By contrast, of the 102 complaints made against female respondents, only 7 (or 6.9%) were investigated by OEO.  Male respondents were investigated by UNM at a rate <u>6.8 times greater than female respondents</u>.

UNM also discriminated against male respondents with respect to findings of policy violations. Of the 269 complaints made against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. By contrast, of the 102 complaints made against female respondents, only 1 (or <1%) resulted in a policy violation against a female respondent. Male respondents were found to have violated UNM policy at a rate <u>29.6 times greater than female respondents</u>.

The UNM files also confirm that male respondents were disciplined more severely than female respondents. Of the 371 complaints, 52 resulted in the most severe disciplinary actions (termination, sanctions, suspension, or expulsion) against male respondents. Of those 371 complaints – 102 of which were made against female respondents – <u>only one female respondent received any discipline (expulsion)</u>. The indisputable evidence is that UNM investigates, finds against, and disciplines male respondents at significantly higher rates than female respondents.

## D.    JOY VAN METER'S FALSE REPORT OF SEXUAL ASSAULT TO UNM

On October 26, 2016, nine (9) days after UNM signed the Agreement, Joy Van Meter falsely reported to UNM that Mr. Briggs had sexually assaulted her.[22] Under the pressure of the days-old settlement agreement with DOJ requiring that UNM be more aggressive in responding to student reports of sexual assault, UNM conducted a biased investigation, ignored all exculpatory evidence (including negative drug and DNA tests), ignored Ms. Van Meter's destruction of key evidence (deletion of exculpatory texts), failed to interview key witnesses (including another colleague she falsely accused of sexual assault), and made all credibility and other findings against Mr. Briggs.

---

[22] Answer at 40 (Doc. 43).

At the time of the alleged sexual assault, Mr. Briggs and Joy Van Meter had known each other for a little over two years.[23] The two initially met while participating in UNM's Executive MBA Program from which both had already graduated in July 2016.[24] The two thereafter began to meet alone for drinks after work once or twice a month. On October 14, 2016, the two agreed to meet for drinks after Ms. Van Meter and her then husband, Michael Ellis, fought over Mr. Ellis kissing another woman.[25]

### 1.    The Fight: "How Would You Like It if I Kissed Michael Briggs?"

The undisputed evidence is that, in the weeks leading up to the false report of sexual assault, Ms. Van Meter and her Ex-Husband fought extensively because he kissed another woman in a play in which he was performing.[26] This fight between Ms. Van Meter and her Ex-Husband dramatically escalated on October 14, 2016 – the day of the alleged sexual assault.

That morning, Ms. Van Meter became aware that a local magazine had published a picture of her Ex-Husband kissing the woman.[27] "[S]tarting at midday," Ms. Van Meter and her Ex-Husband exchanged multiple texts fighting about the picture and the kiss.[28] Starting "around 11:30 or 12:00," Ms. Van Meter and her Ex-Husband fought "probably like off and on for four hours, three, four hours."[29] The timing of the fight is important because, as discussed below, the fight escalates at the same time that Ms. Van Meter proposed to meet with Mr. Briggs for drinks that same day.

---

[23] *See* Excerpts of Deposition of Michael Briggs ("Briggs Depo.") at 26:1-4; id. at 31:12-13 (Exhibit 19).
[24] *Id.* at 26:1-7 (Ex. 19).
[25] *See* 2/17/17 Letter from OEO re Briggs Statement at 2(Ex. 22).
[26] *See, e.g.,* Transcript of APD Interview of Michael Ellis ("Ellis APD Interview") at 3:14-4:6 (Exhibit 20); Transcript of Deposition of Michael Ellis at 47: 9-14 ("Ellis Depo.") (Exhibit 26).
[27] Transcript of Deposition of Joy Van Meter ("Van Meter Depo.") at 48: 18-20 (Exhibit 25). .
[28] Ellis APD Interview at 3:13-15 (Ex. 20) ("MR. ELLIS: Okay. You know, so, you know, she and I had had fight a that day, starting about midday.").
[29] Van Meter Depo. at 225-26. (Ex. 25).

According to the Ex-Husband, on the morning of October 14, 2016, "she had seen . . . a promotional picture of the play . . . it was a picture of this girl kissing me on the cheek and it pissed her off."[30] According to her Ex-Husband, Ms. Van Meter "had been battling bouts of depression," was on prescription medications, and her physician told him that something was wrong with her "brain chemicals" that made her unable to deal with stress:

> And what the psychiatrist at the MHC told me was that it was – you know, it was something inside her head that she was not – you know, she was not – she's not in control over it. It's brain chemicals making her – making her pissed off or whatever and making her unable to deal with stress. And then my kissing this girl was a stressor.

Ellis APD Interview at 44:15-23 (Ex. 20).  "I'm kissing this girl and her brain chemicals are off so she gets really upset and kind of fixates on me kind of kissing this girl." *Id.* at 45:2-5.

The fight on October 14, 2016, was by far the worst fight that Ms. Van Meter and her Ex-Husband had ever had during their marriage (they are now divorced).[31] During the argument, the Ex-Husband accused Ms. Van Meter of "overreacting," being "jealous" and being "abusive."  In fact, the fight was so severe that the Ex-Husband decided that, for the first time during their marriage, he would take a "time out" and spend the night away from the family home at his mother's house.[32] "On that Friday afternoon [October 14, 2016], I decided to take a timeout. I didn't want to have that argument again. So I decided to go stay the night at my mom's."[33]

> Q.    And you told [Ms. Van Meter] you were going to take the timeout?
> A.    Yeah.
> Q.    At any point during your text message did she tell you, How would you like -- How would you feel if I did something like this to you, or something to that effect?
> A.    She did, yeah.

---

[30] Ellis APD Interview at 4:2-6 (Ex. 20).
[31] Ellis Depo. at 48 (Ex. 26) ("Q. Was it the biggest fight you'd ever had during your marriage? A. I would say so."). According to Ms. Van Meter: "I got upset about how everywhere I turned, there's pictures of him and her, and I can't seem to get away from them. And he got defensive, and it escalated quickly." Van Meter Depo. at 49 (Ex. 25).
[32] Ellis Depo. at 46 (Ex. 26).
[33] *Id.* at 47.

Q.      What did she say?
A.      Something like, How would you -- how would you like it if I kissed Mr. Briggs.
Q.      And she told you that she was going to have drinks with him that afternoon?
A.      Yes, which was not uncommon.

Ellis Depo. at 80 (Ex. 26)

The undisputed evidence is that, in making statements to both UNM and APD, Ms. Van Meter never disclosed that, before meeting Mr. Briggs for drinks (1) she fought with her Ex-Husband about him kissing another woman; or (2) she sent text messages threatening her Ex-Husband that she would kiss Mr. Briggs that afternoon. Those facts only came to light because APD pressed to recover <u>deleted</u> texts from Ms. Van Meter's phone, as discussed more fully below. The withholding of this information and the deletion of her text messages is evidence from which a reasonable fact-finder could determine that Ms. Van Meter intentionally misled investigators, withheld material information, and destroyed exculpatory evidence. UNM's biased investigator was aware of, but never asked about or questioned any of this conduct.

Near the end of the Ex-Husband's APD interview, the detective highlighted that Ms. Van Meter had not disclosed to law enforcement the reason for their fight, and pressed the Ex-Husband about it:

DETECTIVE SPINKS: [W]ith regard to you and your wife's argument and she was upset with you about kissing this other girl in the play -- and that's not something she mentioned to me in the interview. I knew you guys had an argument. I don't know what it's about. But I could easily see that the defense argument is going to be that she was just trying to, you know, get even --

MR. ELLIS: Right.

DETECTIVE SPINKS: -- and maybe things went further than she wanted but that she put herself in that situation. Is there anything in your wife's past or anything that your wife has -- during your argument, would you have any reason to believe that she purposefully put herself in that position even if it did go further than she wanted?

13

APD Ellis Interview at 42:8-23 (Ex. 20).  Ms. Van Meter's Ex-Husband then acknowledged the following:

> I'll just go ahead and come out and say it . . . because you're going to end up reading all of her text messages anyway, and this was kind of our concern.  And I do understand that this is something that the defense could discover and so just to kind of preempt any of that, one of the things that bothered her – two things were going on and this will be corroborated by the MHC medical report.  One, she was having a major depressive episode, which I don't know if she disclosed that to you or not.  . . . .
>
> And then my kissing this girl was a stressor. . . . I'm kissing this girl and her brain chemicals are off so she gets really upset and kind of fixates on me kind of kissing this girl.
>
> And she asked me in some text messages to me, you know, like how would you feel – things like how would you feel if I went and kissed some guy from work?  And she even said, how would you feel if I went and kissed Michael?  You know, I'm going and having a beer with him. How would you feel if I did that?

APD Ellis Interview at 44:2-45:12 (Ex. 20)

> And to read those text messages you might think, oh, well, here she's implicating herself that she's going to go like anger fuck this guy, you know, just to get back at her husband for kissing this girl and all this.

*Id.*

The APD detective acknowledged: "[T]hose messages that you were describing could be considered exculpatory, so I would be obligated to provide those too – as part of my report."  APD Ellis Interview at 49:10-13 (Ex. 20).  "I would be obligated at the very least to provide them to the DA so that they can consider that when they're trying to decide if they're going to file a charge against him."  *Id.* at 50:14-18 (Ex. 20).  Neither Ms. Van Meter nor her Ex-Husband produced any of these exculpatory texts because, as they later admitted when deposed under oath, both had purposely deleted the texts *before* Ms. Van Meter made any report to APD and UNM.  APD never charged Mr. Briggs with a crime, and the Bernalillo County District Attorney's Office declined to prosecute due to lack of evidence.[34]

---

[34] *See* 4/14/17 Letter from Office of District Attorney (Exhibit 27).

UNM OEO's investigator possessed both the APD Police Report and the audio recording of the Ex-Husband's APD interview – both of which discuss the fight, her threat to kiss Mr. Briggs that afternoon, and the deleted text messages.  But UNM's reports and findings against Mr. Briggs purposely ignored this exculpatory evidence.  UNM's investigator also ignored the fact that both Ms. Van Meter and her Ex-Husband deleted the texts before she made the false report of sexual assault to APD and to UNM.[35] UNM's investigator never asked about the content or deletion of the exculpatory texts, or even acknowledged that Ms. Van Meter had deleted texts.  Nor did UNM's investigator consider, much less find, that the intentional destruction of exculpatory evidence should weigh against Ms. Van Meter's credibility.

At the same time that Ms. Van Meter was arguing with her Ex-Husband and suggesting that she would kiss Mr. Briggs that afternoon, Ms. Van Meter texted Mr. Briggs the photo of her Ex-Husband kissing the other woman in the play and stated: "Yup let's go drinking.".




---

[35] OEO Draft Report dated August 18, 2017 at 12, fn 18 ("Text messages between Complainant and [her husband] were not submitted to the OEO.")

Ms. Van Meter then met Mr. Briggs at a restaurant named Matanza where they drank beer together. The two adult UNM employees met off-campus, after work, in a setting that had nothing whatsoever to do with their employment at UNM.

### 2.    Meeting at Mr. Briggs' Home

It is undisputed that, while at Matanza, Ms. Van Meter continued to complain about her Ex-Husband.  During this off-campus encounter, Ms. Van Meter told Mr. Briggs that her Ex-Husband and daughter would be staying at her mother-in-law's home that evening, and then Ms. Van Meter asked when she could see Mr. Briggs' new home in the far northeast heights.  Mr. Briggs responded that Ms. Van Meter was invited to see his home anytime, and Ms. Van Meter suggested they go to his home.  It is undisputed that the two left Matanza and drove in separate vehicles to Mr. Briggs's home.

Ms. Van Meter admitted to APD (but not to UNM) that she proposed that the two continue to drink at his house:

> So I asked him, you know, do you want – do you want me to pick up a couple of beers so we can have a beer at your house? He said, no, I have Blue Moon, don't worry about it. I said, okay.

*Id.* [36]

At this point, their stories diverge completely.  According to Mr. Briggs, while at his home, the two drank beers, talked, and flirted. Ms. Van Meter's conduct and words that afternoon indicated to him that she was romantically interested in him. Ultimately, these two middle-aged adults ended up nude in the shower at his home (they did not have sexual intercourse) only hours after she had fought with her Ex-Husband and threatened to kiss Mr. Briggs.  According to Mr. Briggs, Ms. Van Meter never exhibited any signs of intoxication, lack of capacity, lack of balance,

---

[36] *See also* APD Report at 3:13-17 ("Joy suggested they purchase beer to consume at Michael's residence and he told her he had Blue Moon in his refrigerator at home.").

or inability to speak. Nor did she express that she was having any such difficulties. To the contrary, she verbally and physically responded to him.

Mr. Briggs admits that Ms. Van Meter told him that she had vomited once. Mr. Briggs offered a new toothbrush for her, and when she later raised that she thought that she could smell vomit in her hair, Mr. Briggs offered to let her use his shower to wash it out. Ms. Van Meter responded "[t]hat's a good idea," at which point Mr. Briggs showed Ms. Van Meter the bathroom attached to his master bedroom, where she started to untie her dress in front of him. This prompted Mr. Briggs to ask Ms. Van Meter if he could join her in the shower. Ms. Van Meter said "sure." Mr. Briggs got into the shower with Ms. Van Meter and started kissing her on the mouth, which progressed to both of them "french kissing" each other. Mr. Briggs then kissed various parts of her body. It is undisputed that the two never had sexual intercourse. The initial allegation was that Mr. Briggs performed oral sex on Ms. Van Meter, but after she filed a lawsuit, Ms. Van Meter's story evolved to include a claim of digital penetration (contradicted by DNA testing, Ms. Van Meter's initial statements, and other evidence).[37] Ms. Van Meter also claimed that Mr. Briggs had drugged her, but that claim was contradicted by multiple drug tests.[38]

It is undisputed that, as soon as Ms. Van Meter told Mr. Briggs she needed to go home, he stopped all sexual activity. The evidence will be that Ms. Van Meter then requested that Mr. Briggs drive her home, and he agreed to her request. Mr. Briggs then drove Ms. Van Meter home, where her Ex-Husband was waiting. Mr. Briggs had an awkward interaction with her Ex-Husband in the front of their home while Ms. Van Meter went inside.

---

[37] *See* Forensic Case Report (Exhibit 28) (reporting that all tests negative for the presence of male DNA).
[38] *See* UNMH Negative Drug Screen (Exhibit 29); Excerpt of APD Police Report Confident Negative FBI Drug Screen (Exhibit 30) ("Nothing was found in Joy's urine sample that she did not advise she takes."); FBI Laboratory Report (Exhibit 31).

Ms. Van Meter and her Ex-Husband did not talk about "what happened" until the morning of Saturday, October 15, 2016. When the APD detective asked her "How did that go?" – Ms. Van Meter only responded: "Not well." The Ex-Husband separately admitted to APD that:

> [O]n Saturday when she kind of described events to me on the phone . . . I started to freak out and I got mad, and I was like, you know, this happened because you were pissed at me and you did, you know, *whatever*. I kind of was a dick and lost my cool a little bit. And then – and I said, you know, whatever, like *we need a break* or something like that.
>
> And I hung up and I texted her a little bit later and I started to – I forget if I texted her or called her or something later in the afternoon because I was just planning on keeping Chloe with me again at mom's house for the night on Saturday.

APD Ellis Interview at 13:13-14-1.

Ms. Van Meter admitted to APD that her Ex-Husband "started questioning whether or not something [sexual] had happened," and that she told him that Mr. Briggs "certainly tried." The Ex-Husband then asked "did you reciprocate?" and she told him "no, I did not reciprocate."[39] Her Ex-Husband did not believe her.

> [H]e wouldn't talk to me for a little while. And then in a few hours – I asked him if I could call him, and he said, no, I'm busy. And so a few hours later, I said, I really want – I really want to talk to you about this. And I called him and I explained it to him. And he got very upset generally, not necessarily at me, although he was very angry and he yelled at me about something else, not this. And then we just argued a little bit, and I said, you just don't seem to care about this at all. And we hung up and then he called back and he said, I'm sorry, *I want you to file a police report*.

APD Ellis Interview 57:17-58:4.

It was not until after her Ex-Husband threatened to "take a break" from the marriage that Ms. Van Meter accused Mr. Briggs of "drugging and raping her" rather than face the consequences of her infidelity. When Ms. Van Meter told her Ex-Husband that she had been drugged and raped, he repeatedly questioned whether that was true and challenged her to report it to the police if it

---

[39] APD Van Meter Interview at 57:11-17.

was.  Ms. Van Meter initially refused, but when her Ex-Husband continued to threaten to leave the

marriage, Ms. Van Meter made a false report to APD four days later, on October 18, 2016.

### 3.    Ms. Van Meter Deleted Exculpatory Evidence

During APD's interview of Ms. Van Meter and her Ex-Husband, they repeatedly referred

to text communications between themselves, with friends, and with Mr. Briggs himself – all of

which Ms. Van Meter had already purposely deleted – including the texts where she fought with

her Ex-Husband and threatened to kiss Mr. Briggs. The detective asked: "Do you have those text

messages?" *Id.* at 15: 5-6. When Ms. Van Meter responded "No," the officer asked whether

"they've been deleted?" at which point Ms. Van Meter reluctantly admitted they had been deleted.

*Id.* at 15:7-11.

> Q.    And do you have any of these text messages between you and your husband?
> A.    No.
> Q.    Did you delete all of these text messages between you and your husband?
> A.    Yes.

Van Meter Depo.n at 53.

> Q.    October 14, 2016, is an important day in your life, correct?
> A.    It is now.
> Q.    And you deleted all of the text messages between you and your husband from that day; is that correct?
> A.    Yeah.

Van Meter Depo. at 57.  It is also undisputed that Ms. Van Meter also deleted all of the text

messages she exchanged with her Ex-Husband the day <u>after</u> the alleged assault.

> Q.    You deleted all of the text messages between you and your husband on October 15th – that you were sending between you and your husband on October 15, 2016; is that correct?
> A.    I deleted all of the text messages that were sent in that timeframe, yes.

*Id.* at 96.

It is also undisputed that Ms. Van Meter deleted all of her text communications with Mr.

Briggs.

> Q.    And when did you delete the texts between you and Briggs?
> A.    Sometime on Saturday.
> Q.    Do you mean Saturday, October 15, 2016?
> A.    Yes.

*Id.* at 58.

It is also undisputed that Plaintiff deleted text messages from other witnesses.

> Q.    [H]ave you ever deleted any text messages to or from Nathan Horn that relate in any way to your allegations of sexual assault?
> A.    Just this one.

*Id.* at 127.

> Q.    So are you saying you deleted the text messages between you and Zach Dillenback relating to the problems you and your husband were having?
> A.    I don't recall exactly what I texted him and when, but, yes, I don't have them. I did not have them.
> Q.    I'm asking whether you deleted them.
> A.    Yes.

*Id.* at 44.

The undisputed evidence is that (1) that Ms. Van Meter and her Ex-Husband fought via text message on October 14, 2016 over him kissing another woman; (2) that Ms. Van Meter threatened her husband that she would kiss Mr. Briggs at or around the same time she invited Mr. Briggs to meet her for drinks and then drove to meet him at his home; (3) that Ms. Van Meter and her Ex-Husband continued to fight via text on October 15, 2016 during which time her Ex-Husband questioned whether she had been sexually assaulted and pressured her to report it to the police and to UNM if true; and (4) that Ms. Van Meter deleted all of the texts with her Ex-Husband, Mr. Briggs, and with other key witnesses before making any report against Mr. Briggs to APD or

UNM.[40]   There is undisputed evidence from which a jury could find that Mr. Briggs did not sexually assault Ms. Van Meter, and that he was falsely accused.

### E.    BIASED INVESTIGATION BY UNM

Ms. Van Meter made her false report to UNM on or about October 26, 2016.  UNM did not notify Mr. Briggs of the false report until January 5, 2017.  *See* Allegations Notice (Exhibit 21).   The only "Applicable University Policy" identified by OEO in its notice to Mr. Briggs was "University Policy #2740 Sexual Violence and Sexual Misconduct."  UNM would later terminate Mr. Briggs' employment based on multiple policies, most of which he never received any notice that he was alleged to have violated.

UNM made no attempt to promptly collect or preserve any evidence at the time of the report.  UNM made no attempt to timely interview any potential witnesses.  UNM did not complete its investigation until December 2017 – well over a year after the alleged sexual assault.  The investigation was conducted by a single person, Laura Vele Buchs.  Ms. Buchs was the sole adjudicator of facts and credibility.  Her conclusions were never independently reviewed or tested by anyone at UNM.  Every decision maker at UNM who participated in the firing of Mr. Briggs would later testify that they relied entirely on Ms. Buch's findings made in UNM OEO's Preliminary Letter of Determination (the "PLOD").[41]

The PLOD prepared by Ms. Buch does not address the two drug tests conducted after the false report: (1) a preliminary drug screen for common "date rape" drugs conducted by the UNM Mental Health Clinic (MHC); and (2) a more comprehensive drug screen conducted by the FBI

---

[40] *See* Van Meter Depo at 48, 49 (Ex. 2) ("Q. Did you and your husband have an argument about the picture that day? A.On that same Yes. Q. Did you have that argument by phone or by text? Or both? A. There was definitely text message (sic). I can't recall if we had a phone conversation."); *see also* Ellis Depo. at 49 ("Q. Did you guys communicate about this argument by text? A. I believe so.").
[41] The PLOD is attached to Defendants' Motion as Exhibit A-1.

Crime Lab in Quantico, VA at APD's request.  *See* Exs. 29, 30. 31.  Both tests came back negative (i.e. no drugs except for prescription drugs Ms. Van Meter was already taking herself to treat anxiety and depression).  UNM's report never discloses their existence and UNM never produced copies to Mr. Briggs.  The negative drug screens were both directly relevant to Ms. Van Meter's claim that she was drugged and also constitute exculpatory evidence that support Mr. Briggs' statements that he never drugged Ms. Van Meter.  The PLOD ignored the exculpatory reports.

UNM also wholly ignored Ms. Van Meter's fight with her husband that drove the events of October 14, 2016.  UNM also failed to consider or mention the fact that Ms. Van Meter had suggested to her Ex-Husband that she would kiss Mr. Briggs at or around the time she proposed to meet him at his home for drinks.  UNM also ignored that Ms. Van Meter had deleted countless text messages with her husband, Mr. Briggs, and others from the day of and the days after the alleged assault.  UNM further ignored that a DNA test found no DNA from Mr. Briggs in or around Ms. Van Meter's vaginal area.  Ex 28.. The negative DNA test was both directly relevant to Ms. Van Meter's claim that she was sexually assaulted and exculpatory evidence that supported Mr. Briggs' testimony that he never sexually assaulted Ms. Van Meter.

Mr. Briggs has consistently and adamantly maintained that his sexual activity with Ms. Van Meter was consensual. Except for Ms. Van Meter's false report, it is undisputed that Mr. Briggs was never previously accused of any crime, much less arrested or convicted.[42]   It is also undisputed that Mr. Briggs was not arrested or charged with any crime in connection with Ms. Van Meter's false report.  Ex. 27. UNM had knowledge of, but ignored, all of this.

---

[42] *See* UNM Police Department email to OEO (Exhibit 32) ("Francie we did not find anything on Michael Briggs.")

Retired APD Sergeant Damon Fay reviewed the records of UNM's investigation of Mr. Briggs and highlighted facts demonstrating why it was grossly inadequate, defective, suffered from confirmation bias, and came to an erroneous outcome. *See* D. Fay Report (Exhibit 23).

UNM's investigation and discipline of Mr. Briggs was also replete with other procedural irregularities, including the delation of the email account of Laura Vele Buchs, the UNM OEO investigator who investigated and made fact findings against Plaintiff. *See* Answer at ¶ 2 (Defendants admit [that] the UNM OEO investigator's email account was deleted."). Ms. Buchs entire email account was deleted despite a litigation hold and in violation of UNM Policy.

As described more fully below, UNM also purposely deleted emails of the UNM HSC executive who was initially supposed to discipline Mr. Briggs – emails in which that executive was attempting to document his concerns about UNM's highly irregulary process and questionable conduct. Larson Decl. at ¶ 18 (Ex. 2).

> The email attached as Exhibit B, as well as other similar emails documenting my concerns about Mr. Briggs' disciplinary process, initially resided on my email account within UNM HSC's email system. I then became aware that my emails documenting Mr. Briggs' disciplinary process were selectively deleted from my UNM HSC email account. Because I supervised and acted (on an interim basis) as UNM HSC's CIO, I was aware that only a high level UNM administrator could authorize or direct the deletion of emails from my UNM HSC account. I became concerned that UNM was intentionally destroying evidence relating to my involvement in Mr. Briggs' discipline, and I therefore forwarded the emails to my personal account to ensure that these communications were preserved.

*Id.*

There exists sufficient evidence from which a jury could reasonably find that UNM's investigation of Mr. Briggs was both procedurally defective and led to an erroneous outcome.

F.   *EX PARTE* APPEAL TO UNM'S PRESIDENT

On December 4, 2017, Ms. Vele Buchs notified Plaintiff that she had completed her investigation and issued a Preliminary Letter of Determination (PLOD). Ex. A-1 at 1.  Making virtually all fact findings and credibility determinations against Mr. Briggs, Ms. Vele Buchs found that Mr. Briggs "more likely than not" subjected Ms. Van Meter to unwelcome sexual activity. *Id.* at 27. But Ms. Vele Buchs then also found that "there is no objective evidence of unreasonable interference in [the accuser's] work performance and/or environment." *Id.*  In other words, UNM initially found that there was "No Policy Violation" because there was "not sufficient evidence to show more likely than not [that Mr. Briggs] subjected [Ms. Van Meter] to unwanted conduct of a sexual nature that unreasonably interfered with [her] work performance and work environment . . . ." *Id.* at 28. On December 12, 2017, UNM/OEO confirmed its preliminary determination in its Final Letter of Determination ("FLOD").[43]

UNM then gave both parties five (5) business days, or until December 17, 2017, to appeal that decision. *Id.* at 2. While Mr. Briggs submitted a letter challenging Ms. Vele Buch's fact "findings," there was no need for him to appeal the decision because UNM's investigator had ultimately found "No Policy Violation" and recommended closure of the file without further action.[44]  Unbeknownst to Mr. Briggs, UNM then extended only the time for Ms. Van Meter to file an ex parte appeal on January 2, 2018, which she did through a civil lawyer whom later filed a lawsuit on her behalf.[45]

Mr. Briggs was not provided with a copy of Ms. Van Meter's appeal, nor given any opportunity to respond to it. Mr. Briggs was provided no information about the substance of the

---

[43] *See* FLOD issued on 12/12/17 (Exhibit 33).
[44] *See* 12/6/17 Ltr from M. Schmidt-Nowara re Briggs response to PLOD (Exhibit 34).
[45] *See* Ms. Van Meter Appeal dated 1/2/18 (Exhibit 35).

appeal until after UNM's new President, Garnett Stokes, abruptly reversed the finding of "No Policy Violation" by letter decision issued on March 29, 2018.[46]

Importantly, President Stokes first confirmed that "the October 14, 2016, incident itself was not work-related." *Id.* at 1. UNM's President nevertheless reversed the finding of "No Policy Violation" based on her view that one off-campus encounter between two adult employees (not students) that was "not work related" <u>might</u> create a hostile work environment based on Mr. Briggs' "potential negative influence in [Ms. Van Meter's] work environment." *Id.* (emphasis added).

Testimony from long-standing executives at UNM-HSC questioned how that could be possible. "The Department of Orthopedics is organizationally and physically separate from the Office of Research, where Mr. Briggs work[ed]."[47] "Ms. Van Meter [did] not work in the same building as Mr. Briggs." *Id.* Mr. Briggs has no supervisory authority over Ms. Van Meter; she [was] completely outside of Mr. Briggs's chain of command at UNM." *Id.*

> Prior to April 2018, no one at UNM raised any concerns with me about Mr. Briggs potentially interfering with Ms. Van Meter's work while she was employed at UNM HSC. I was not asked by UNM OEO, nor the UNM President, nor Ms. Van Meter nor anyone else at UNM to take any interim action to limit Mr. Briggs' movements on campus or to protect against any potential interaction between Ms. Van Meter and Mr. Briggs. No one at UNM ever raised any concern that Mr. Briggs' employment at UNM HSC might create a hostile work environment for Ms. Van Meter while she was employed at UNM HSC.

Larson Decl. at ¶ 28 (Ex. 2); *id.* at ¶ 6 ("In my twelve (12) years working with Mr. Briggs, no one ever complained that (a) they felt uncomfortable around Mr. Briggs; (b) that he had sexually harassed any person; (c) that he had interfered with any one's employment or work in any other department; or (d) that he had created a hostile work environment.").

---

[46] *See* UNM President Decision reversing OEO finding of "No Policy Violation" (Exhibit 36)
[47] *See* Pennick Decl. at 15-19, 22, 24, 25 (Ex. 4).

Moreover, Ms. Van Meter had resigned from her employment at UNM months earlier on September 15, 2017.[48]  That fact also made it impossible that Mr. Briggs "might create a hostile work environment based on Mr. Briggs' 'potential negative influence in [Ms. Van Meter's] work environment.'"  From the time that Ms. Van Meter made her report in November 2016 through the date of her resignation, UNM never discussed or imposed any restriction on Mr. Briggs' movement or activities – because there was no need.  Merits aside, Mr. Briggs and Ms. Van Mater had jointly agreed to a mutual protective order in which each would stay away from the other, and there was never any claim that either had done anything to the contrary.

The UNM President cited no authority whatsoever for this extraordinary position. Controlling federal law is the opposite.  *Hansen v. SkyWest Airlines*, 844 F.3d 914, 923 (10th Cir. 2016). ("A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice . . . . it takes place over time, and in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.").  There was no evidence whatsoever that Mr. Briggs had engaged in series of acts to create a hostile work environment for Ms. Van Meter, nor could he at that point.

Ignoring that and accepting all of the factual and legal arguments made in Ms. Van Meter's *ex parte* appeal, and without giving Mr. Briggs any opportunity to respond, President Stokes instructed UNM to reverse its earlier conclusion and to discipline (i.e., terminate) Mr. Briggs. Id. at 1-2.  Mr. Briggs requested the opportunity to appeal the President's ex parte reversal, but UNM ignored his request.   A jury could reasonably find that the UNM President's reversal of OEO's finding of No Policy was a prextext for his termination.

---

[48] See Van Meter Resignation dated 9/15/17 (Exhibit 37)

### G.    BIASED IMPOSITION OF DISCIPLINE

Mr. Briggs was then subjected to a highly irregular discipline process, which UNM policy requires be imposed by an employee's immediate supervisor.  Mr. Briggs' immediate supervisor was Dr. Richard Larson, who served as the Executive Vice Chancellor for UNM HSC (the second highest position at UNM HSC) and Vice Chancellor for Research.  Dr. Larson's declaration details at length a disciplinary process in which was pressured by multiple female adminstrators outside of the normal chaing of comment to terminate Mr. Briggs' employment.  *See* Larson Decl. at ¶ 11 (Ex. 2).

Dr. Larson's declaration details the highly irregular process, in which he was provided an incomplete file and was misled to believe that Mr. Briggs had not disputed the fact findings in OEO's PLOD.

> I was not provided the attachments referenced in the PLOD, which I understood to include the evidentiary support for those findings.  I requested that OEO provide me with the complete file, including the attachments referenced in the PLOD and any interim documents received by OEO between the PLOD and Final Letter of Determination (FLOD). This would have included any response by Mr. Briggs to the fact findings in the PLOD.  The UNM Administrators refused my request.

Larson Decl. *at* at ¶ 11.

> Because I was being pressured to terminate a long-standing, exemplary employee with no prior complaint of any kind after UNM's President reversed OEO's initial finding of "no policy violation," I felt strongly that it was important and appropriate to have the complete file and to have a written finding of a policy violation from OEO.  To protect myself against potential legal claims if I terminated Mr. Briggs employment – as Ms. Anderson, Ms. Cordova, and Ms. Cowan pressed me to do – I wanted to make sure that I had thoroughly reviewed the file, facts, and evidence against Mr. Briggs.  The UNM Administrators refused to provide me with the requested records.

*Id.* at ¶ 12.

> I told the UNM Administrators that "[g]iven that I was being told I needed to sanction on OEO's finding in the PLOD of 'sexual misconduct of severe type' and that I was only to see a very limited set of documents. I asked if that finding was disputed and if the respondent had been given appropriate appeal opportunities- or

that I could be given an assurance that appropriate appeal rights had been offered."
The UNM Administrators "indicated that there was no written or established appeal
process regarding situation presented by the complexities of this case." The UNM
Administrators "further indicated that the respondent had not appealed the PLOD,
and that the respondent and his lawyer should have known to appeal a PLOD which
had a favorable determination but underlying findings that would be harmful if the
determination was reversed." The UNM administrators "stated that because the
respondent did not appeal the findings, I should view this as evidence that he did
not dispute the finding." The UNM Administrators "admitted that the respondent
was not informed of the appeal of the complainant and that there was some
'exposure' there."

*Id.* at ¶ 23. After Mr. Briggs' employment was terminated, Dr. Larson became aware that "Mr.

Briggs had in fact disputed the findings in the PLOD contrary to the UNM Administrators'

representations to me." *Id.* at ¶ 24.

Dr. Larson's declaration explains that he ultimately felt compelled to recuse himself

because, *inter alia*, he "was increasingly concerned that the disciplinary process for Mr. Briggs

was irregular and biased." *Id.* at ¶ 17. 15. After he recused himself from the disciplinary

process, Dr. Paul Roth – who was then the Dean of the School of Medicine and the Executive Vice

President and Chancellor of UNM HSC – was directed by the UNM Administrators to discipline

Mr. Briggs. *Id.* at ¶ 15.

When I later discussed Mr. Briggs' potential discipline with Dr. Roth, he
acknowledged that UNM's Administrators were insistent that Mr. Briggs be
terminated. Dr. Roth told me, inter alia, that another administrator involved in the
process, Chamiza Pacheco de Alas (UNM HSC Chief of Staff to the Executive Vice
President), told him that **she wanted to "cut Michael's dick off."** It became clear
to me that the UNM Administrators, as well as UNM's President and other
administrators – all of whom were female – were intent on firing Mr. Briggs
regardless of the evidence or procedural problems.

*Id.* at ¶ 15 (emphasis added). Dr. Roth testified that he did not want to terminate Mr. Briggs, but

that he was pressured by UNM's VP of Human Resources, Dorothy Anderson, to do so.[49]

---

[49] *See* Roth Depo. at 99-100 (Ex. 5).

At the urging of Dorothy Anderson and others, Dr. Roth terminated Mr. Briggs employment in August 2018.

## II.    RESPONSE TO DEFENDANTS' UNDISPUTED MATERIAL FACTS

Plaintiff responds below to Defendants Undisputed Material Facts ("UMF"s), but disputes that these facts are relevant to or could dispose of the merits Plaintiff's claims.

1.    Plaintiff does not dispute Defendant's Undisputed Material Fact ("UMF") Nos. 3, 4, 6, 8, 9, 11, 12, 13, 14, 17, 18, 19, 21, 22, 23, 24, 25, 26, and 28.

2.    Plaintiff disputes UMF No. 1 because Ms. Van Meter did not initially claim that that Plaintiff "raped" her - her version of events changed over time.  Ms. Van Meter's report to APD, and the transcripts of her interviews with APD detail the actual substance of her initial claim. *See* APD Report (Exhibit 16); Van Meter Interview with APD (Exhibit 17).

3.    As to UMF No. 2, Plaintiff disputes that Defendants have accurately or completely stated the contents of the FLOD or Ms. Van Meter's statements about the events in dispute.  Ex. A-1, Ex. 16, Ex. 17.

4.    As to UMF No. 5, Plaintiff disputes that (a) the OEO investigation considered or weighed all evidence; (b) disputes that the OEO investigator interviewed all relevant witnesses. Ex. 23; Exhibit 38.

5.    Plaintiff disputes UMF No. 7 and its subparts because Mr. Briggs has adamantly maintained that the the sexual activity at issue was consensual and that Ms. Van Meter reciprocated and demonstrated affirmative consent to the activity.  *See, e.g.*, PLOD at 7 (Ex. A-1) (Respondent kissed Complainant and she "responded"; they "made out"); PLOD at 20  (Ex. A-1) (Respondent reported Complainant "responded" to him kissing her and they "'made out/French kissed,") APD interview of Briggs, p. 12, lines 7-12 (Ex. 18) ("And Joy and I made out. I would consider it making out. We kissed."); *id*. at p. 48, 14-23 ("So you took it one step up? She didn't pull away?

A. No, she kissed me back. We kissed together."); *id.* at 9; 22-25 ("So we proceeded to go into my bathroom, and she proceeded to undress herself. And I said -- I looked at her, and I said, can I join you? And she kind of brightly smiled and said, sure. And so, she had undressed herself."); *id.* at 32; 15-23 (We French kissed for -- you know, we French kiss. And I kiss her -- I kiss her all over. Q.Okay. And just for clarification, French kissing would imply your tongue is in her mouth? A.·Yes. Q. Her tongue is in your mouth? A. Yes. Q. Okay. We both -- we engaged in French kissing together."); *id.* at 19-25 and 36; 1-8 ("And Joy was able to dress herself after the shower? She was able to dry herself off first? A. Right, yes. Q. Okay. Didn't need any assistance getting dressed -- A. No. Q.-- or anything? A. Not at all. Q. Okay. So how does -- how does Joy seem to you at this point with regard to her level of intoxication? I mean, she was just fine? A. She didn't appear intoxicated to me, at all. At this point she seemed more like, oh, shit, I've got to get home. She seemed a little bit nervous and flustered. Q. Right"); *id.* at 47; 13-16 (Okay How was -- I mean, you've been around her enough, how was her conversation? Did she appear intoxicated? A. No. No. At no point did she appear intoxicated").

6. With respect to UMF Nos. 8 and 10, Plaintiff does not dispute the policies referred to include the language selectively quoted from them, but Plaintiff disputes that he ever received noticed that he was alleged to have violated Policy 2720 or Policy 2730. Ex. 21.

7. With respect to UMF No. 15 and 16, Plaintiff disputes that the Order of Protection was obtained "against plaintiff" or that is a "concession" that he was likely to interact with Mr. Van Meter. This was not a court imposed order. Both parties stipulated to the order to avoid interactions with the other. Exhibit A-6. The Protective Order cited by Defendants had long since expired before OEO issued its PLOD and President Stokes reversed OEO's finding of no policy violation. *Id.* After the expiration of the protective order, UNM took no interim measures to restrict

Mr. Briggs' activity or movement, Larson Decl. at ¶ 28 (Ex. 2), thus conceding that Plaintiff did not objectively or subjectively create a hostile work environment for Ms. Van Meter.

8.    With respect to UMF No. 20, Plaintiff does not dispute that President Stokes letter attempted to support its conclusion with the cited factual and legal arguments, but Plaintiff disputes that President Stokes' *ex parte* appeal gave Plaintiff opportunity to present contrary evidence, and disputes that he had influence at her department level or that he worked in closed proximity to each Ms. Van Meter, or that he was present in her work environment.   Exs. 2, 4, and 22.

## III.    STANDARD OF REVIEW

A court may grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences in the light most favorable to the party opposing summary judgment. *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). "Once the moving party has met its burden, the burden shifts back to the nonmoving party to show that there is a genuine issue of material fact." *Jensen v. Kimble*, 1 F.3d 1073, 1077 (10th Cir. 1993) (cites omitted). Disputes are genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and they are material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (further citation and internal quotation marks omitted).

## IV.    DISCUSSION

### A.    UNM DISCRIMINATED AGAINST PLAINTIFF IN VIOLATION OF TITLE IX

Title IX of the Education Amendments of 1972 ("Title IX") was enacted to "avoid the use of federal resources to support discriminatory practices" and "to provide individual citizens effective protection against those practices." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 704, 99

S. Ct. 1946, 60 L. Ed. 2d 560 (1979). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681. Where sex-based discrimination is intentional, Title IX is enforceable through a cause of action for which money damages are available." *Doe v. Univ. of Denver*, 1 F.4th 822, 828 (10th Cir. 2021) (hereinafter "*Doe II*") (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005)). It is undisputed that UNM receives federal funds. Ex. 6.

UNM's termination of Plaintiffs' employment is an adverse action for which UNM can be held liable under Title IX. "[T]he provision implying Title IX's private cause of action, 20 U.S.C. § 1681(a), encompasses employees, not just students." *Doe v. Mercy Catholic Med. Ctr.*, 850 F.3d 545, 562 (3d Cir. 2017) (citing *North Haven Board of Education v. Bell*, 456 U.S. 512, 520, 102 S. Ct. 1912, 72 L. Ed. 2d 299 (1982) (holding that Section 1681(a)'s "broad directive" that no "person" may be discriminated against based on sex, encompasses "employees as well as students.")). "Because § 1681(a) 'neither expressly nor impliedly excludes employees from its reach,' we're to interpret it as 'covering and protecting these persons,' for Congress easily could have substituted 'student' or 'beneficiary' for the word 'person' if it had wished to restrict § 1681(a)'s scope." *Mercy Catholic Med. Ctr.*, 850 F.3d at 562 (quoting *North Haven*, 456 U.S. at 521); *see also Jackson v. Birmingham Board of Education*, 544 U.S. 167, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005).[50]

---

[50] The Department of Education (DOE) regulations specifically recognize that Title IX applies to employees of universities who receive financial assistance. For example, 34 C.F.R. § 106.51(a)(1) specifically relates to "Employment" and provides that: "No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in employment . . . under any education program or activity operated by a recipient which receives Federal financial assistance." 34 C.F.R. § 106.51(a)(2) requires that "[a]

Generally, to succeed on a claim under Title IX, "'a plaintiff must show: (1) that he or she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the exclusion from the program was on the basis of [gender].'" *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189-1190 (10th Cir. 2020) ("*Doe I*") (quoting *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996) (determining that to survive summary judgment, a plaintiff needs to introduce sufficient evidence to raise a genuine dispute that gender was a motivating factor in the decision to expel him from school due to a sexual assault claim)).

The three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applies to "Title IX sex discrimination claims." *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017). "The shifting burdens of proof set forth in *McDonnell Douglas* are designed to assure that the plaintiff has his day in court despite the unavailability of direct evidence." *Doe II*, 1 F.4th 822, 829 (10th Cir. 2021) (quoting *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985)).

Under the *McDonnel Douglas* framework, Plaintiff bears the initial burden of showing that "his sex was a motivating factor in the school's investigation and disciplinary decision." *Doe II*, 1 F.4th at 829 (citing *Hiatt*, 858 F.3d at 1316). If Plaintiff "clears that hurdle, then the burden shifts to the University to articulate a legitimate, nondiscriminatory reason for its decision." *Doe II*, 1 F.4th at 829 (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000)). If the University does so, then the burden shifts back to Plaintiff to show "a genuine issue of

---

recipient shall make all employment decisions in any education program or activity operated by such recipient in a nondiscriminatory manner and shall not limit, segregate, or classify applicants or employees in any way which could adversely affect any applicant''s or employee's employment opportunities or status because of sex." The regulation goes on to make clear that "[t]he provisions of this subpart apply to" . . . "termination" and "[a]ny other term, condition, or privilege of employment." 34 C.F.R. § 106.51(b)(2) and (10).

material fact as to whether the proffered reason is pretextual." *Id.* To prove pretext, Plaintiff must produce evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [University's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [University] did not act for the asserted nondiscriminatory reasons." *Doe II*, 1 F.4th at 829 (quoting *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997)).

### 1.    Sex Was a Motivating Factor in UNM's Decision Investigation and Termination of Plaintiff

"The Tenth Circuit and other courts have regocognized that a plaintiff may establish a prima facie case of Title IX discrimination in several ways, including but not limited to, "erroneous outcome" and "selective enforcement" theories of Title IX liability. *Doe II*, 1 F.4th at 829–30 (cites omitted). The Tenth Circuit has recognized that these are not the only analytical tests from which a Plaintiff may show Title IX sex discrimination, but rather that "evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision." *Id.*; *see also Doe v. Rollins Coll.*, 77 F.4th 1340, 1351 (11th Cir. 2023) ("these two tests 'do not capture the full range of conduct that could lead to liability under Title IX,' but instead 'simply describe [two] ways in which a plaintiff might show that sex was a motivating factor in a university's decision.'"); *see also Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018) (recognizing "at least four different theories of liability" in this context: "(1) 'erroneous outcome,' (2) 'selective enforcement,' (3) 'deliberate indifference,' and (4) 'archaic assumptions'").

> We see no need to superimpose doctrinal tests on the statute. All of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student. We prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John "on the basis of sex"?

*Doe v. Purdue Univ.*, 928 F.3d 652, 667–68 (7th Cir. 2019).

The Tenth Circuit has not limited Title IX to specific theories, and instead adopted a straightforward approach: "the operative question for summary judgment [is]: Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary decision?" *Doe II*, 1 F.4th at 829–30 (cites omitted).

### a.    *Erroneous Outcome*

"Under the 'erroneous outcome' test, a plaintiff must set forth '(1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding' and (2) 'a particularized causal connection between the flawed outcome and gender bias.'" *Doe II*, 1 F.4th at  829–30 (quoting *Yusuf*, 35 F.3d at 715).   "To state a Title IX erroneous outcome claim, a plaintiff must plausibly allege 'both that he was innocent and wrongly found to have committed an offense and that there is a causal connection between the flawed outcome and [sex] bias.'" *Doe v. Rollins Coll.*, 77 F.4th at 1354 (11th Cir. 2023) (quoting *Samford Univ.*, 29 F. 4th at 686). "At the summary judgment stage, a plaintiff must present sufficient evidence for a jury to make both of these findings." *Id.* (citing *Doe II*, 1 F.4th at 830).

Since 2018, Mr. Briggs has consistently and adamantly denied that he engaged in sexual activity with Ms. Van Meter without her consent. "[H]is first-hand version of events, if believed, [is] sufficient to create an issue of fact on the first prong of the erroneous outcome standard." *Doe v. Rollins Coll.*, 77 F.4th 1340, 1354 (11th Cir. 2023) (citing *United States v. Stein*, 881 F.3d 853, 857–58 (11th Cir. 2018)).

### i.    Evidence of External Pressure on UNM Supports Inference of Sex Discrimination

"External pressure on a university to demonstrate that it acted vigorously in response to complaints by female students may support an inference that a university is biased based on sex,

although not necessarily in a particular case." *Doe v. Univ. of Arkansas - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020); *see also Doe v. Purdue Univ.*, 928 F.3d at 668-69. External pressure can "provide[ ] a backdrop that, when combined with other circumstantial evidence of bias in [a plaintiff's] specific proceeding, gives rise to a plausible claim." *See, e.g., Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018). As detailed in Section I(B) *supra*, there can be no genuine dispute that UNM was under extraordinary pressure from both the public and DOJ to more aggressively investigate and discipline alleged sexual assault.

In *Doe v. Columbia*, the court concluded that given the University administration's cognizance and sensitivity of similar criticisms, "it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault." 831 F.3d 46, 57 (2nd Cir. 2016) (overturning dismissal of case where allegation that, during the period preceding the disciplinary hearing, there was substantial criticism of the University not taking seriously complaints of female students alleging sexual assault by male students gave plausible support to a bias with respect to sex).

In *Doe v. Miami University*, the plaintiff alleged that "pressure from the government to combat vigorously sexual assault on college campuses and the severe potential punishment—loss of all federal funds—if it failed to comply, led Miami University to discriminate against men in its sexual-assault adjudication process." 882 F.3d at 594. The Sixth Circuit held that this allegation, combined with others, "support[ed] a reasonable inference of gender discrimination." *Id.*[51]

---

[51] *See also Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) (explaining that the pressure of a Department of Education investigation and the resulting negative publicity "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim."); *Does 1-2 v. Regents of the Univ. of Minnesota*, 999 F.3d 571, 578 (8th Cir. 2021) ("external pressure from public attention and the threatened loss of federal funding 'provides a backdrop that, when combined with other circumstantial evidence of

In *Lee v. Univ. of N.M.*, the Court determined that a plaintiff adequately pled a Title IX claim against UNM because he had alleged that "more than just the 'Dear Colleague' letter contributed to UNM's anti-male motivations." 449 F. Supp. 3d at 1144 (emphasis added). Based on the allegation that that "there was substantial criticism that Defendants failed to take seriously complaints of female students alleging sexual assault by male students," the court determined that Lee's specific "allegation that UNM faced pressure to better respond to female complaints against male students, and not all sexual misconduct complaints against all students" supported his allegation of UNM's anti-male motivations. *Id.* at 1143-44.   "UNM's investigation and disciplinary process occurred after the Department of Justice had launched its own investigation into UNM's handling of sexual misconduct claims." *Lee*, 449 F. Supp.at 1143-1144 (emphasis added). Given the additional scrutiny and criticism arising from DOJ's investigation of UNM, "Lee's Complaint suggests non-trivial reasons why UNM and its employees handling his disciplinary proceeding may have adopted an anti-male bias." *Id.*

While evidence of external pressure is relevant to and can support a Title IX claim, Plaintiff acknowledges that external pressure "alone is not enough to [prove] that the university acted with bias in a particular case." *Doe v. Coastal Carolina Univ.*, 522 F. Supp. 3d 173, 179 (D.S.C. 2021) (quoting *Baum*, 903 F.3d at 586). However, the indisputable pressure on UNM should be weighed

---

bias in [the Does'] specific proceeding, gives rise to a plausible claim' of intentional bias"); *Doe v. Lynn Univ., Inc.*, 235 F. Supp. 3d 1336, 1341-42 (S.D. Fla. 2017) ("Plaintiff, having alleged that Defendant's representatives were cognizant of criticism levied at Defendant's handling of sexual assault complaints by female students against males and having coupled those allegations with (albeit more general) assertions about similar nationwide pressure, has done enough."); *Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402, (W.D. N.Y. Sept. 20, 2017); *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-475, 2018 U.S. Dist. LEXIS 230848, at *26, (S.D. Ohio, Jan. 23, 2018) (Dlott, S.) (allegation that UC faced pressure not only from the OCR's Dear Colleague Letter, but by the fact the OCR opened a Title IX investigation into whether UC "discriminated against students based on sex" is a relevant allegation suggesting that the university might be induced to discriminate against males in disciplinary hearings for alleged sexual assault).

heavily here this Title IX claim arises from a complaint made days after UNM entered into a settlement agreement with DOJ.

        ii.      <u>Evidence of Procedural Irregularities in UNM's Proceeding Against Plaintiff Supports Inference of Sex Discrimination</u>

Multiple circuits have recognized that procedural irregularities support an inference of gender bias in Title IX claims. *See, e.g., Schwake*, 967 F.3d at 951 (finding sex discrimination claim plausible based in part on allegations that the university failed to consider the male accused's version of the alleged assault or to follow up with witnesses and evidence offered in his defense); *Purdue Univ.*, 928 F.3d at 669 (finding sex discrimination claim plausible based in part on allegations that the university's Title IX investigator credited the story of the female accuser over the accused male student although the investigator had never spoken with the accuser); *Baum*, 903 F.3d 575, 86 (6th Cir. 2018) (finding sex discrimination claim plausible based in part on allegations that the appeals board exclusively credited female testimony and rejected all male testimony); *Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019); *Columbia Univ.*, 831 F.3d at 56–57; *Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020) ("Procedural irregularities provide strong support for Doe's claim of bias here."), *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 865 (8th Cir. 2020) (finding that a complaint which alleged both "a dubious decision in [the plaintiff's] particular case taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" was sufficient to survive a motion to dismiss); *Doe v. Univ. of Denver*, 1 F.4th 822, 831–32 (10th Cir. 2021) (rejecting a university's argument that its employees "were biased against sexual-misconduct respondents, regardless of their sex" where the plaintiff alleged that the university's "investigation was replete with procedural deficiencies, all of which favored Jane [Roe] and disfavored him, despite substantial reasons to discount her allegations").

UNM's wholesale adoption of Ms. Van Meter's evidence and failure to consider significant exculpatory evidence that favored Mr. Briggs demonstrates UNM's anti-male bias. In *Doe II,* the Tenth Circuit held, *inter alia*, held that the University's decisions to ignore and misrepresent inconsistencies in the accuser's account, disregard John Doe's witnesses and favor the accuser's witnesses, and omit or downplay exculpatory evidence raised a plausible inference that the University discriminated on the basis of sex. 1 F.4th 822, 831- 832 (10th Cir. 2021) (reversing grant of summary judgment by district court). "Adopt[ion] of the complainant's statements as true, 'even though the statements were illogical, inconsistent, or contrary to other witnesses,' and decision to ignore 'all evidence exculpatory to plaintiff" supports an inference of gender bias.'" *Id*. (rejecting a university's argument that its employees "were biased against sexual-misconduct respondents, regardless of their sex" where the plaintiff alleged that the university's "investigation was replete with procedural deficiencies, all of which favored Jane [Roe] and disfavored him, despite substantial reasons to discount her allegations.").[52]

Here, UNM's one-sided investigation is similarly "replete with procedural deficiencies that all disfavor Mr. Briggs and favor Ms. Van Meter, despite substantial reasons to discount her allegations." *Id*. UNM purposefully ignored all evidence exculpatory to Mr. Briggs, including, but not limited to: (1) the fact that although Ms. Van Meter's claims were investigated by APD,

---

[52] *See also Rolph v. Hobart & William Smith Colls.,* 271 F. Supp. 3d at 402 (allegations that HWS helped Jane Roe prepare her case and the panel questioned plaintiff extensively about whether he was intoxicated and whether he perceived Jane Roe as intoxicated, but failed to question her about whether he appeared intoxicated (as consistent with a view of men as predators and women as 'guardians of virtue'), coupled with the allegations of public pressure, established gender bias); *see also Doe v. Rollins College*, 352 F. Supp. 3d 1205, 1210-1211 (D. Fla., Jan. 16, 2019) (Dalton, R.) (evidence of bias in Plaintiff's specific proceeding, such as crediting the testimony of witnesses who were friends or sorority sisters of Jane Roe while rejecting testimony from friends or fraternity brothers of Plaintiff's, based, in part, on the male witnesses' fraternity associations without making the same leap about the female witnesses' sorority associations and excusing any inconsistencies in Jane Roe's account concerning whether she verbalized consent but entirely disregarding Plaintiff's assessment of consent on account of Plaintiff's prior sexual history, which Plaintiff contends should not have been considered); *see also Doe v. Purdue Univ*., 928 F.3d 652, 669 (6th Cir. 2019)(evidence of gender bias where the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account).

Mr. Briggs was never arrested nor accused of any crime, and the District Attorney declined to prosecute due to a lack of evidence; (2) the negative DNA and drug tests that UNM intentionally omitted; and (3) the fact that Mr. Briggs's accuser intentionally destroyed communications exculpatory to him. UNM completely ignored Ms. Van Meter's failure to inform either UNM or APD that, before meeting Mr. Briggs for drinks, she fought with her Ex-Husband about him kissing another woman and sent text messages threatening her Ex-Husband that she would kiss Mr. Briggs and her subsequent deletion of those texts. Indeed, UNM's biased investigator failed to address, much less investigate, the fact that Ms. Van Meter intentionally misled investigators, withheld material information, and destroyed exculpatory evidence, all substantial reasons to discount her allegations and question her credibility.

Ms. Buch's finding that the sexual activity between Mr. Briggs and Ms. VanMeter was "unwelcome" ignored and mispresented all inconsistencies in Ms. Van Meter's account, including Ex-Husband's admission that Ms. Van Meter threatened to kiss Mr Briggs that same morning.[53] In addition to  wrongfully failing to consider this statement as evidence that Ms. Van Meter may have welcomed sexual contact with Mr. Briggs, OEO also failed to consider this statement as relevant to Ms. Van Meter's credibility.[54] OEO should have noted that it was her Ex-Husband, not Ms. Van Meter, who revealed Ms. Van Meter's threat to kiss Mr. Briggs. Further, given that APD considered the text messages between Ms. VanMeter and Ex-Husband to be exculpatory evidence, it was incumbent upon OEO to explain why or how it found it so easy to completely disregard both the fact of Ms. Van Meter's very specific threat to kiss Mr. Briggs and the impact upon her credibility in failing to provide any information about this threat to OEO and deleting these text

---

[53] PLOD at 19 ("The OEO finds [VanMeter's] statement to her husband in the heat of an argument is insufficient to show any intent on Complainant's part to engage in sexual conduct with Respondent.").
[54] *Id*. at 23-26 (weighing credibility).

message communications from her phone. No such explanation was provided. UNM's election to ignore substantial exculpatory evidence clearly raises a plausible inference that UNM discriminated against Mr. Briggs because of his gender.

Defendant Buchs also failed to give any weight to the fact that it was Ms. Van Meter, not Mr. Briggs, who initiated meeting at Matanza at 2:30 p.m. on Friday, October 14, 2016.[55] Likewise, Defendant Buchs did not consider it "flirting" when Ms. Van Meter texted Mr. Briggs a picture of her husband being kissed in his play and made it clear she was available to meet Mr. Briggs earlier for drinks.[56] Defendant Buchs further considered it irrelevant that even by Ms. Van Meter's own account, it was Ms. Van Meter who brought up the idea of going to Briggs' new home.[57] The fact that Ms. Van Meter, again by her own admission, also offered to pick up beers on her way to Mr. Briggs' home was similarly discounted by Defendant Buchs.[58] It was also apparently irrelevant to Defendant Buchs that Ms. Van Meter failed to inform OEO that she brought beer to Mr. Briggs' home.[59]

In Mr. Briggs' police interview, which was recorded (unlike the OEO interview of Ms. Vann Meter), APD Detective Spinks asked Mr. Briggs whether his conversation with Ms. VanMeter at his home was "ever flirtatious in nature."[60] Mr. Briggs responded, stating, "You know, I felt—she was up on the couch with her shoes off, and you know, her feet kind of toward me, and I was kind of—I was close with her."[61] Detective Spinks offered, "just reading the writing

---

[55] Exhibit 25(b) to OEO's Draft Report- OEO#I-2016-11-66 at p. 119 (Joy: Matanza Friday at 2:30? Or do you need later?).
[56] *Id*. at p. 127-129 (JVM: So you are my last "work" mee[t]ing today"; MB: Indeed; JVM: I'm actually done because I started at 6 this morning.).
[57] PLOD at p.3.
[58] Transcript of APD interview of Ms. Van Meter at 3:13-17 ("So I asked him, you know, do you want—do you want me to pick up a couple of beers so we can have a beer at your house? He said, no, I have Blue Moon, don't worry about it. I said, okay.")
[59] PLOD at 3 (making no mention of VanMeter's offer to pick up beers).
[60] Audio Transcript of APD Interview of Mr. Briggs at 23:16.
[61] *Id*. at 23:17-19.

on the wall, she's complaining about her husband, she's texted you the struggle of him kissing another girl, it's obviously a sore spot for her. Now you guys are alone at your house, there's alcohol involved. I mean, it seems flirtatious to me."[62] Defendant Buchs completely ignored this evidence and appears to have relied entirely on Ms. Van Meter "den[ying] having any sexual interest in [Mr. Briggs]."[63] Defendant Buchs also discounted other evidence that contradicted Ms. Van Meter's denial of any flirtation, including the fact that Ms. Van Meter had told at least one other person that she found Mr. Briggs attractive.[64]  Defendant Buchs simply took all of Ms. Van Meter's statements as true even though they were often illogical, inconsistent and contrary to other witnesses, including her Ex-Husband. Her decision to draw all credibility and other conclusions against Mr. Briggs is evidence that UNM discriminated against Mr. Briggs because he is a man.

Instead, the sole investigator, Defendant Buchs, effectively acted as an advocate for Ms. Van Meter, made virtually all fact and credibility findings in her favor.  Moreover, Ms. Buchs went to extraordinary lengths to document alleged sexual misconduct despite ultimately finding "no policy violation" - a determination Ms. Buchs and others may have suspected (or known) would be overturned on appeal after Mr. Briggs had elected against challenging the fact findings in the FLOD in light of the outcome.

Had OEO properly investigated, it would have learned that Ms. Van Meter shared not only a room with another EMBA classmate, Zack Dillenback, in Europe, but also shared a bed with him.[65] Had Defendant Buchs interviewed Mr. Dillenback, OEO would also have learned that just before the EMBA trip to Europe, Ms. Van Meter kissed Mr. Dillenback after having drinks with

---

[62] *Id*. at 23:20-25.
[63] PLOD at 19.
[64] *Id*. at 19 ("Complainant reported to the police that she and Witness 8 had a text conversation during class where they rated their classmates as being attractive or not attractive, and Complainant stated she rated Respondent as being attractive with many other classmates.").
[65] Deposition of Dillenback at 35:8-36:11 (Exhibit

him at a bar, much like she did with Mr. Briggs on October 14, 2016.[66] Significantly, Ms. Van

Meter lied when asked in her deposition whether she had ever kissed Mr. Dillenback.[67] Even more

significant, OEO claims that Mr. Dillenback, who was named as Witness 8 in its investigation

report, declined to provide a statement to OEO.[68] But Mr. Dillenback has testified under oath that

OEO never even contacted him.[69]

OEO also rejected Mr. Briggs' statement as to what happened in the shower, while

accepting Ms. VanMeter's statement in its entirety, despite her credibility issues identified above.

Mr. Briggs told OEO that when he kissed Ms. Van Meter in the shower, she kissed him back.[70]

OEO further rejected Mr. Briggs' statement that Ms. Van Meter never exhibited any signs of

intoxication, lack of capacity, lack of balance, or inability to speak, nor did she express that she

was having any such difficulties. Defendant Buchs discounts this entirely, while seemingly basing

her entire credibility assessment on the archaic assumption that Ms.Van Meter would not have

engaged in such conduct because she is a mother. Both Mr. Briggs and Ms. Van Meter have

children, yet only Ms. Van Meter's status as a mother is considered in Defendant Buchs' credibility

analysis. Specifically, Defendant Buchs concluded that "the evidence shows more likely than not

Complainant was unlikely to consume more alcohol than would allow her to safely drive home or

knowingly engage in any conduct that would prevent her from being able to take care of her

child."[71] Completely absent from this analysis is any comparable reference to the fact that Mr.

---

[66] *Id*. 24:5-22.
[67] Deposition of Ms. Van Meter at 176:10-19. *See also* Exhibit 39 (Email from VanMeter's attorney noting "corrections" she intends to make to her deposition, including that "During the time in which Ms. VanMeter and her husband had an open relationship, she kissed Mr. Dillenback."); Exhibit 40 ("The kissing incident was remembered after the fact and reported to Travis Jackson.").
[68] PLOD at 16n.32.
[69] Dillenback deposition at 59:3-21.
[70] PLOD at 20.
[71] PLOD at 24.

Briggs is a father, described in equally glowing terms by his ex-wife as "mellow, kind, loving, level-headed, and an amazing father."[72]

Mr. Briggs was summarily determined to be "not credible" and Defendant Buchs interpreted evidence, made credibility determinations, and manufactured unreasonable inferences to support only that result. Inconsistencies in witnesses' statements, including the accuser's, were also never analyzed, or followed up on.  These allegations, when viewed in the light most favorable to Plaintiff, clearly demonstrate that UNM accepted all evidence from Mr. Briggs' accuser as true and rejected all evidence exculpatory to Mr. Briggs.

The fact that UNM failed to follow its own policies and procedures as it adjudicated his case also supports an inference that Defendants allowed gender bias to affect Mr. Briggs's disciplinary proceedings and termination. *See Lee v. UNM*, 449 F. Supp. 3d 1071 (noting that the plaintiff's factual allegations that UNM failed to follow its procedures indicated that UNM allowed gender bias to affect Lee's disciplinary proceedings) (quoting *Doe v. Columbia Univ.*, 831 F.3d at 56-57) (identifying failing "to act in accordance with University procedures designed to protect accused students" as an allegation supporting the inference of sex discrimination).  Dr. Larson's declaration describes at length how UNM engaged in a highly irregular disciplinary process against Mr. Briggs.

The undisputed fact that UNM destroyed the email account of its sole investigator in violation of its own policies, state law, and despite a preservation demand from Mr. Briggs also supports Plaintiff's Title IX claim.  *See Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d 386, 402 (W.D. N.Y. Sept. 20, 2017) (Wolfrod, E.) (motion to dismiss Title IX claim denied

---

[72] APD Report at 7-8.

because, inter alia, university failed to review or preserve electronic evidence or conduct any follow-up interviews to resolve inconsistencies between witnesses' statements).

Here, UNM accepted all evidence from Ms. Van Meter as true and rejected all evidence exculpatory to Mr. Briggs. Allegations that a university "adopted the complainant's statements as true, 'even though the statements were illogical, inconsistent, or contrary to other witnesses,' and ignored 'all evidence exculpatory to plaintiff" also supports an inference of gender bias. *Lee,* 449 F. Supp. at 1144.

"[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the Regents' protests otherwise." *Doe v. Regents of Univ. of California*, 23 F.4th 930, 941 (9th Cir. 2022). "Taken together, Doe's allegations of external pressures and an internal pattern and practice of bias, along with allegations concerning his particular disciplinary case, give rise to a plausible inference that the University discriminated against Doe on the basis of sex." *Doe v. Regents of Univ. of California*, 23 F.4th 930, 941 (9th Cir. 2022).[73]

---

[73] *See also Doe v. Columbia Univ.*, 831 F.3d at 57 ("the alleged fact that Sessions-Stackhouse, and the panel and the Dean, chose to accept an unsupported accusatory version over Plaintiff's, and declined even to explore the testimony of Plaintiff's witnesses, if true, gives plausible support to the proposition that they were motivated by bias in discharging their responsibilities to fairly investigate and adjudicate the dispute.")); *see also Rolph v. Hobart & William Smith Colls.*, 271 F. Supp. 3d at 402 (allegations that HWS helped Jane Roe prepare her case and the panel questioned plaintiff extensively about whether he was intoxicated and whether he perceived Jane Roe as intoxicated, but failed to question her about whether she appeared intoxicated (as consistent with a view of men as predators and women as ''guardians of virtue''), coupled with the allegations of public pressure, were sufficient to survive a motion to dismiss); *see also Doe v. Rollins College*, 352 F. Supp. 3d 1205, 1210-1211 (D. Fla., Jan. 16, 2019) (Dalton, R.) (evidence of bias in Plaintiff's specific proceeding, such as crediting the testimony of witnesses who were friends or sorority sisters of Jane Roe while rejecting  testimony from friends or fraternity brothers of Plaintiff's, based, in part, on the male witnesses'' fraternity associations without making the same leap about the female witnesses'' sorority associations and excusing any inconsistencies in Jane Roe''s account concerning whether she verbalized consent but entirely disregarding Plaintiff's assessment of consent on account of Plaintiff's prior sexual history, which Plaintiff contends should not have been considered); *see also Doe v. Purdue Univ.*, 928 F.3d 652, 669 (6th Cir. 2019)(evidence of gender bias where the majority of the panel members appeared to credit Jane based on her accusation alone, given that they took no other evidence into account).

"[S]tatements by 'pertinent university officials,' not just decisionmakers, can support an inference of gender bias." *Doe v. Regents of Univ. of California*, 23 F.4th 930, 939 (9th Cir. 2022) (reversing dismissal of Title IX claims).  "A plaintiff may illustrate gender bias by identifying 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender.'" *Doe v. Wash. Univ.*, 434 F. Supp. 3d 735, 758 (E.D. Mo. 2020) (quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)).  Here, there is evidence that a high level university administrator told the executive disciplining Mr. Briggs that "she wanted to Michael's dick off."  Larson Decl. at ¶ 15.

Additionally, the fact that UNM OEO initially found "no policy violation" does not make the indisputable evidence of irregularties in the UNM proceedings any less relevant.    *Doe v. Regents of Univ. of California*, 23 F.4th 930, 941 (9th Cir. 2022) ("The fact that the Regents ultimately found Doe not responsible for twelve of the thirteen allegations made against him does not make the allegations of irregularities in the proceedings any less relevant to our inquiry."

In *Doe I*, the Tenth Circuit held that generalized evidence of pressure, standing alone, could not satisfy a Title IX plaintiff's summary judgment burden "unless combined with a particularized something more ... that would indicate that [the University's] decision in his particular case was based on his gender." 952 F.3d at 1192–93; *see also, e.g., Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough to state a claim that the university acted with bias in this particular case. Rather, it provides a backdrop that, when combined with other circumstantial evidence of bias in John's specific proceeding, gives rise to a plausible claim.").

In *Doe II*, the plaintiff argued that, external pressure, "procedural deficiencies in his sexual-assault investigation, combined with additional statistical evidence of sex bias, distinguish this case from *Doe I*," and the Tenth Circuit agreed. 1 F.4th at  831.  In *Doe II*, the Court found that

the plaintiff had " raised a reasonable inference that the University's one-sided investigation establishes a prima facie case of sex discrimination," including by highlighting evidence of procedural irregularities in the university's investigation and discipline of the plaintiff. *Id.*, 1 F.4th at 831.[74]

In *Doe II*, the Tenth Circuit he;d that a Title IX plaintiff can also demonstrate gender bias by statistical disparity in the gender make up of a university's sexual misconduct investigations, determinations, and discipline. As described in detail supra Section C, the indisputable evidence is that UNM investigates, finds against, and disciplines male respondents at significantly higher rates than female respondents. *See* Exs. 1 and 3.

For all of these reasons the Court should deny Defendants' motion for summary judgment as Plaintiff's Title IX Claim. These same arguments, evidence, and the same burden-shifting analys apply to Plaintiff's Title VII and NMHRA claims. The Court should deny defendants motion seeking summary judgment against those claims for the same reasons.

**B.    THE NEW MEXICO HUMAN RIGHTS ACT PERMITS PLAINTIFFS TO BRING CLAIMS AGAINST THE INDIVIDUAL DEFENDANTS**

Count III of the Complaint alleges that Defendants discriminated against Plaintiff on the basis of his sex in violation of both Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 *et seq.*, ("Title VII") and the New Mexico Human Rights Act, NMSA 1978 § 28-1-1 *et seq.*,

---

[74] *Doe II*, 1 F.4th at 831. "In other words, John has sufficiently shown evidence of differential conduct that plausibly was on the basis of his sex. *See, e.g., Menaker v. Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("It is precisely because procedural irregularity alone already suggests bias that even minimal evidence of sex-based pressure on the university is sufficient to establish bias on account of sex."); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir. 2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear procedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a systemic investigation of the College's policies," and the "facts of the case cast ... doubt on the accuracy of the disciplinary proceeding's outcome."); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865 (8th Cir. 2020) (concluding a "dubious [disciplinary] decision ... taken against the backdrop of substantial pressure on the University to demonstrate that it was responsive to female complainants" supports "an inference that a university is biased based on sex.").

("NMHRA")." Complaint at ¶ 174 (Doc. 1). Defendants' Motion seeks dismissal of the individual defendants entirely, arguing that the individuals are not proper parties under Title VII. *See* Motion at 24-25 (Doc. 129). Plaintiff acknowledges that Title VII does not permit claims against both the employer (BORUNM) and the individual defendants. *See e.g., Haynes v. Williams*, 88 F.3d 898, 901 (10th Cir. 1996).  Defendants Motion purposely ignores that Count III also brings individual claims under the NMHRA, which are proper.

"Unlike the Civil Rights Act [Title VII], the NMHRA permits unlawful discrimination claims against individuals." *Lobato v. State Env't Dep't*, 2012-NMSC-002, ¶ 8, 267 P.3d 65, 67 (citing § 28-1-7(I) (defining unlawful acts by "any person" as well as any employer); *Sonntag v. Shaw*, 2001 NMSC 15, ¶ 12, 130 N.M. 238, 22 P.3d 1188 (recognizing individual liability for NMHRA discrimination claims). Defendants previously acknowledged that the NMHRA permits claims against individual defendants, but argued that Plaintiff's charge failed to identify Mr. Gick. Motion to Dismiss Count III at 6 (Doc. 16).  Plaintiffs conceded the point, stipulated to the dismissal of Mr. Gick, and the Court denied Defendants' Motion to Dismiss as to the remaining Defendants.  *See* Order at 8 (Doc. 39).[75]  Plaintiff does not oppose dismissal of his Title VII claims against the individual defendants, but does not oppose dismissal of his NMHRA claims against the individual defendants for the reasons already ruled on by the Court.

## C.    PLAINTIFF HAS STANDING TO SEEK INJUNCTIVE RELIEF

Mr. Briggs has standing to seek reinstatement at UNM and expungement of his disciplinary record. These are proper prospective remedial actions not subject to dismissal. Indeed, in the very case cited by Defendants, *Buchwald v. Univ. of New Mexico Sch. of Med.*, 159 F.3d 487, 495 (10th

---

[75] Order at 8 ("At the hearing on August 24, 2021, both Briggs and the Defendants conceded that the Court should grant the NMHRA MTD with respect to Gick, because Briggs did not identify him as part of the NMHRA administrative complaint. See Tr. at 63:11-14 (Hunteman). The parties also agreed to deny the NMHRA MTD with respect to the remaining Defendants."

Cir. 1998), the Tenth Circuit found that the plaintiff, a rejected applicant for admission to medical

school, had standing to seek damages and prospective injunction ordering her admission into

school. Like Defendants here, the UNM School of Medicine attempted to argue that the plaintiff

did not have standing because she only sought to remedy past wrongs, such as the school's refusal

to admit her. The court disagreed with the assertion that the relief requested was exclusively non-

prospective:

> We disagree. The existence of a past harm does not convert a prospective injunction
> into retrospective relief barred under the Eleventh Amendment. See *Russell v.
> Dunston*, 896 F.2d 664, 668 (2d Cir.1990). Just as claims for reinstatement are
> treated as prospective relief when the plaintiff alleges that he or she was terminated
> for unconstitutional reasons, *see id*.; *Warnock v. Pecos County*, 88 F.3d 341, 343
> (5th Cir.1996), so is the claim for an injunction seeking admission to a school that
> has allegedly denied admission on unconstitutional grounds, *cf. Regents of the
> Univ. of Cal. v. Bakke*, 438 U.S. 265, 320, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)
> (affirming order directing plaintiff's admission to the medical school because
> school could not establish that plaintiff would have been denied admission but for
> the unlawful special admissions program).

*Id*. at 495, fn 5. Mr. Briggs' claim for reinstatement is clearly a claim for prospective relief for his

unlawful termination without due process and in violation of Title IX.

Mr. Briggs also has standing because his documented termination is a continuing harm.

*See Johnson v. Western State Colorado University*, 71 F. Supp. 3d 1217, 318 Ed. Law Rep. 845

(D. Colo. 2014) (where disciplinary action was taken against a male student of a public university,

who also worked as a teaching assistant, for allegedly engaging in sexual misconduct with a female

former student, student could seek prospective injunctive relief in the form of expungement of his

academic record). In *Doe v. Purdue Univ*., 928 F.3d 652, 666 (7th Cir. 2019), the Seventh Circuit

held that a state university student who was suspended for one year for sexual misconduct had

standing to seek injunction requiring university officials to expunge the finding of guilt from his

disciplinary record. "For this relief, John [Doe] has standing: John's marred record is a continuing

harm for which he [could] seek redress." *Id.* citing *Flint v. Dennison*, 488 F.3d 816, 825 (9th Cir. 2007) (pursuing expungement of university records "serve[s] the purpose of preventing present and future harm"); *Doe v. Cummins*, 662 F. App'x 437, 444 (6th Cir. 2016) (seeking to "remove the negative notation from appellants' disciplinary records" is "nothing more than prospective remedial action"); *Shepard v. Irving*, 77 F. App'x 615, 620 (4th Cir. 2003) (an "F" grade and a plagiarism conviction "constitute[d] a continuing injury to the plaintiff" and an action to remove them was "prospective in nature").

As in *Doe v. Purdue Univ*. and other relevant cases addressing expungement of records, Mr. Briggs meets the elements of standing because he (1) suffered an injury –his inability to continue his longstanding career at UNM; (2) the injury was caused by the university when they accused him of sexual misconduct in his disciplinary record and terminated him; and (3) his inability to continue his career at UNM and retire in New Mexico with his family would be readdressed by university removing the guilty finding off his record and reinstating him. Mr. Briggs is clearly entitled to this prospective relief.

## V.    CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny the Motion in its entirety.

JACKSON LOMAN DOWNEY &
STEVENS-BLOCK, P.C.

By: */s/ Travis G. Jackson*
    Travis G. Jackson
    Sarah K. Downey
201 Third St. N.W., Ste. 1500
Albuquerque, NM 87102
Telephone: (505) 767-0577
Email: travis@jacksonlomanlaw.com
Email: sarah@jacksonlomanlaw.com
*Attorneys for Plaintiff Michael Briggs*

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 5, 2025, I filed the foregoing response through Court's electronic filing system, which caused all counsel of records to be served electronically, including the following counsel of record:

John S. Stiff
STIFF, GARCIA & ASSOCIATES, LLC
500 Marquette Ave., NW, Suite 1400
Albuquerque, New Mexico 87102
Telephone: (505) 243-5755
Email: jstiff@stifflaw.com
Counsel for Defendants

By: */s/ Travis G. Jackson*
     Travis G. Jackson