**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

MICHAEL BRIGGS,

     Plaintiff,

v.                              Case No.:  1:20-cv-00651 KWR-JMR

THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GICK, individually and
in his official capacity

     Defendants.

## PLAINTIFF'S APPENDIX OF EXHIBITS FOR CORRECTED RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

     Plaintiff hereby submits this appendix of Exhibits 1 through 46 in support of his

Plaintiff's corrected Response to Defendants Motion for Summary Judgment (Doc. 148).[1]

                     JACKSON LOMAN DOWNEY &
                     STEVENS-BLOCK, P.C.

                     By: */s/ Travis G. Jackson*
                           Travis G. Jackson
                           Sarah K. Downey
                     201 Third St. N.W., Ste. 1500
                     Albuquerque, NM 87102
                     Telephone: (505) 767-0577
                     Email: travis@jacksonlomanlaw.com
                     Email: sarah@jacksonlomanlaw.com
                     *Attorneys for Plaintiff Michael Briggs*

---

[1] Plaintiff re-filed the corrected response pursuant to the Court's Order striking Plaintiff's initial response. (Doc. 142).

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on February 21, 2025, I filed the foregoing appendix through Court's electronic filing system, which caused all counsel of records to be served electronically, including the following counsel of record:

John S. Stiff
STIFF, GARCIA & ASSOCIATES, LLC
500 Marquette Ave., NW, Suite 1400
Albuquerque, New Mexico 87102
Telephone: (505) 243-5755
Email: jstiff@stifflaw.com
Counsel for Defendants

By: */s/ Travis G. Jackson*
　　Travis G. Jackson

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PLAINTIFF'S
EXHIBIT

**1**
_____

MICHAEL BRIGGS,

      Plaintiff,

v.                            Case No.:  1:20-cv-00651 KWR-JMR

THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GICK, individually and
in his official capacity

      Defendants.

## DECLARATION OF HUBERT A. ALLEN, JR.

     I, Hubert A. Allen, Jr., hereby provide this declaration in support of Plaintiff's Response

in Opposition to Defendants' Motion for Summary Judgment in the above-referenced civil action,

and state as follows:

     1.     I have a Bachelor of Science (BS) in Applied Math - Biology from Brown

University and a Master of Science (MS) Biostatistics from Johns Hopkins Bloomberg School of

Public Health.  I have been a practicing applied biostatistician for forty-five (45) years.

     2.     This declaration is based on my personal knowledge following review of 371 files

produced by the University of New Mexico ("UNM") arising from complaints of sexual

misconduct and sexual harassment considered by UNM's Office of Equal Opportunity ("UNM

OEO") during the period from January 1, 2017, to December 31, 2022.  The UNM OEO files

produced by UNM and reviewed by me are hereinafter referred to as the "Files."

3.     I personally reviewed each of the 371 Files.  My review of the Files indicates that, after receipt of a complaint of sexual misconduct or sexual harassment, UNM OEO conducts a preliminary review to determine whether a case should be referred for investigation. Of the 371 Files produced, UNM marked 133 of the Files as "Investigated" and 238 as "Uninvestigated" in the footer of each document.

4.     My review of the Files indicates that, if investigated, the UNM OEO investigator may make certain factual "Findings" first presented to both the complainant and respondent in a "Preliminary Letter of Determination" ("PLOD"). Both the complainant and respondent are allowed to respond to the PLOD, after which UNM OEO issues a "Final Letter of Determination" ("FLOD") adjudicating whether the respondent's alleged conduct reflects a violation of the specified UNM policy. If UNM OEO determines that the respondent's alleged conduct violates UNM policy, the respondent is then subject to a disciplinary process by UNM.

5.     My review of the Files confirmed that there was sufficient information in all of the Files to determine the sex of the respondent.  The Files include 269 complaints against male respondents and 102 complaints against female respondents.

6.     I personally reviewed each File and observed that, of the 269 complaints made against male respondents, 126 (or 46.8%) were investigated by UNM OEO.  Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by UNM OEO.  Using simple arithmetic, I calculate that male respondents were investigated by UNM OEO at a rate 6.8 times greater than female respondents.

|  | *Complaints* | *Investigations* | *Investigation Rate* |
|---|---|---|---|
| **Males** | 269 | 126 | 46.84% |
| **Females** | 102 | 7 | 6.86% |
| **Total** | 371 | 133 | |

7.    I personally reviewed each File and observed whether UNM OEO found that a respondent's conduct was a violation of UNM policy. By use of simple arithmetic, I calculate that, of the 269 complaints made against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a policy violation against the female respondents. Male respondents were found to have violated UNM policy at a rate 29.6 times greater than female respondents.

|  | Complaints | Policy Violations | Rate of Finding of Policy Violation |
|---|---|---|---|
| **Males** | 269 | 78 | 29.00% |
| **Females** | 102 | 1 | 0.98% |
|  | 371 | 79 |  |

8.    I personally reviewed each File and observed the severity of discipline imposed after UNM OEO found that a respondent's conduct violated UNM policy. Of the 371 files, 52 resulted in the most severe disciplinary actions against male respondents (termination, sanctions, suspension, or expulsion). Of those 371 complaints – 102 of which were made against female respondents – only one female respondent received discipline (expulsion).

9.    Attached as Figure 1 is a demonstrative illustration reflecting the numbers described above.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 4, 2025

Hubert A. Allen Jr.

3



FIGURE 1:   Diagram of the University of New Mexico, Office of Equal Opportunity Sample Data
In the Matter of *Michael Briggs v. UNM et al. – 1:20-cv-00651 KWR-JMR*

Reported Incidents of Sexual Violence and Sexual Misconduct Broken Down by Investigated and Uninvestigated, Gender
of Respondents and Violations and No Violations.

* Two females were referred to hearings.  The outcomes of the hearings are unknown.

PLAINTIFF'S
EXHIBIT

2
_____

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

MICHAEL BRIGGS,

     Plaintiff,

v.                           Case No.:  1:20-cv-00651 KWR-JMR

THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GICK, individually and
in his official capacity

     Defendants.

## DECLARATION OF DR. RICHARD S. LARSON

     My name is Dr. Richard S. Larson and I am providing this declaration based on my personal knowledge of the facts, events and communications described below:

     1.     I previously served as both Executive Vice Chancellor for the University of New Mexico Health Sciences Center ("UNM HSC") – the second highest position at UNM HSC.  I simultaneously served as the Vice Chancellor for Research at UNM HSC.  I retired from UNM HSC on January 15, 2023.

     2.     I was employed by UNM HSC for approximately 26 years.  My longest-standing role was leading and building the research mission from 2005 until my retirement, first as Senior Associate Dean and then Vice Chancellor/Vice President for Research at UNM HSC.  I also served as a tenured professor in the UNM School of Medicine's Department of Pathology.  Since 2005, I

1

also served as principal investigator and director of the UNM Clinical & Translational Science Center (CTSC).

3.      In my role as Executive Vice Chancellor, I served a number of functions, including supervising and coordinating the activities of the other UNM HSC Vice Chancellors.  That included supervising UNM HSC's Chief Information Officer (CIO) and stepping in to serve as interim CIO on multiple occasions when that position was vacant.  UNM HSC's CIO supervises UNM HSC's data and information systems, including UNMHSC's email systems.  As the Vice Chancellor for Research for UNM HSC, I oversaw a broad range of research activities at New Mexico's flagship university for medical research.

4.      Before he was terminated by UNM, I worked with Michael Briggs for approximately twelve (12) years.  I initially hired Mr. Briggs to work for UNM HSC in or around 2006 when I served as Senior Associate Dean of Research at the UNM School of Medicine.  I hired Mr. Briggs to serve as the Director of the Institutional Review Board (IRB) in the Office of Research.  Shortly thereafter, Mr. Briggs and I worked together to build up the CTSC.  UNM HSC received the Clinical and Translational Science Award (CTSA) from the National Institutes of Health.  The CTSA Program supports a national network of approximately 60 medical institutions to translate biomedical research discoveries into improved health care and treatments.  The CTSA Program is considered one, if not the most, prestigious award an institution like UNM HSC can receive for medical research.

5.      During our twelve (12) years working together, I found Mr. Briggs's work to be outstanding and exceptional.  Mr. Briggs was an exemplary employee and received only positive performance evaluations.  Mr. Briggs was repeatedly promoted, including to become the Director of the Office of Human Research Protections, and later to be the Chief Administrative Officer of

the CTSC. As CAO of the CTSC, Mr. Briggs supervised a substantial number of staff (approximately 50 employees) and his work in that role was excellent. In or around 2015, Mr. Briggs was again promoted to be the Executive Research Operations Officer, which is effectively the head of the Office of Research. As Vice Chancellor for Research, I became Mr. Briggs' direct supervisor.

6.     Prior to the off-campus incident at issue in this lawsuit, I never received nor heard of anyone making any complaint of any kind about Mr. Briggs or his conduct. To the contrary, I observed that Mr. Briggs at all times acted professionally and appropriately with everyone that he interacted with. As Mr. Briggs' direct supervisor and as the Executive Vice Chancellor of UNM HSC, I would been notified if anyone had complained about Mr. Briggs. In my twelve (12) years working with Mr. Briggs, no one ever complained that (a) they felt uncomfortable around Mr. Briggs; (b) that he had sexually harassed any person; (c) that he had interfered with any one's employment or work in any other department; or (d) that he had created a hostile work environment.

7.     When I conducted performance reviews for Mr. Briggs, I would seek input from colleagues, including UNM HSC employees who directly reported to Mr. Briggs. All of his colleagues and direct reports described Mr. Briggs' work as outstanding. I routinely received positive verbal comments about Mr. Briggs from UNM HSC staff and faculty. I never received any negative feedback about his work or conduct.

8.     Based on Mr. Briggs' conduct, professionalism, consistently strong performance, achievement of his Executive MBA in 2016, and otherwise unblemished record, it is highly likely that Mr. Briggs would have continued to enjoy a long career at UNM HSC through retirement. Based on my experience as Executive Vice Chancellor, it is highly likely that Mr. Briggs would

3

have received additional promotions within UNM HSC over time, and that he would have received commensurate pay increases as his career progressed.

9.    On or about April 3, 2018, I received a packet from UNM's Office of Equal Opportunity (OEO) regarding its investigation of allegations made against Mr. Briggs by Joy Van Meter.  The OEO packet included a memo directing that I discipline or sanction Mr. Briggs after UNM's new President, Garnett Stokes, conducted an appeal and reversed OEO's finding of no policy violation.

10.    On or about April 11, 2018, I was asked to meet with three administrators from UNM, including (a) Dorothy Anderson, who was then UNM's Vice President of Human Resources; (b) Francie Cordova, who was then UNM's Director of OEO; and (c) Heather Cowan, who was then UNM's Title IX Coordinator (collectively referred to below as the "UNM Administrators").  Exhibit A.

11.    During that meeting with the UNM Administrators on April 11, 2018 (referred to below as the "Meeting"), I was pressured to terminate Mr. Briggs' employment.  I was told that, as Mr. Briggs direct supervisor, UNM policies required that I impose discipline, which I was prepared to do.  Prior to the Meeting, OEO had provided me with an incomplete file that included the OEO investigator's Preliminary Letter of Determination (PLOD).  In the PLOD, the OEO investigator made certain fact findings against Mr. Briggs.  I was not provided the attachments referenced in the PLOD, which I understood to include the evidentiary support for those findings. I requested that OEO provide me with the complete file, including the attachments referenced in the PLOD and any interim documents received by OEO between the PLOD and Final Letter of Determination (FLOD). This would have included any response by Mr. Briggs to the fact findings in the PLOD.  The UNM Administrators refused my request.

12.    I also did not receive any final document from OEO finding a policy violation by Mr. Briggs, and I requested that one be provided before I imposed discipline. The UNM Administrators also refused this request.

13.    Because I was being pressured to terminate a long-standing, exemplary employee with no prior complaint of any kind after UNM's President reversed OEO's initial finding of "no policy violation," I felt strongly that it was important and appropriate to have the complete file and to have a written finding of a policy violation from OEO. To protect myself against potential legal claims if I terminated Mr. Briggs employment – as Ms. Anderson, Ms. Cordova, and Ms. Cowan pressed me to do – I wanted to make sure that I had thoroughly reviewed the file, facts, and evidence against Mr. Briggs. The UNM Administrators refused to provide me with the requested records.

14.    I also wanted clear documentation from OEO finding a policy violation. I have been involved in a number of HR actions over my career at UNM HSC and I have learned it's important when you're the one who's going to sanction an employee that you have proper documentation and follow policy and procedures before you do. The UNM Administrators also refused to provide me with a memo stating the policy violation for which I was supposed to sanction Mr. Briggs. I then recused myself from the process.

15.    After I recused myself from the disciplinary process, Dr. Paul Roth – who was then the Dean of the School of Medicine and the Executive Vice President and Chancellor of UNM HSC – was directed by the UNM Administrators to discipline Mr. Briggs. When I later discussed Mr. Briggs' potential discipline with Dr. Roth, he acknowledged that UNM's Administrators were insistent that Mr. Briggs be terminated. Dr. Roth told me, *inter alia*, that another administrator involved in the process, Chamiza Pacheco de Alas (UNM HSC Chief of Staff to the Executive

Vice President), told him that she wanted to "cut Michael's dick off." It became clear to me that the UNM Administrators, as well as UNM's President and other administrators – all of whom were female – were intent on firing Mr. Briggs regardless of the evidence or procedural problems. I also became concerned that these UNM Administrators wanted a male supervisor – either myself or Dr. Roth – to be seen as the decision-maker that terminated Mr. Briggs employment in the likely event that litigation followed.

16.     When I raised questions about OEO's refusal to provide the requested information, UNM's Title IX Coordinator, Heather Cowan challenged my ability to be fair and neutral:

> Based on conversations with you, and this subsequent email, I am concerned about your ability to approach the sanctioning role neutrally and not colored by personal beliefs about the incident or the Respondent. When we met to discuss sanctions, you indicated that the Complainant 'said yes' to the conduct, a fact clearly in opposition to OEO's findings and the President's decision. Your recent email of April 18, 2018, sounds much like an attorney advocate would provide for Respondent. Please strongly consider your ability to be fair and neutral in any sanction given.

4/19/18 Email from H. Cowan to R. Larson (Exhibit B).

17.     Before I recused myself, I felt it was important to contemporaneously document the process (a) in the event that I or another administrator at UNM HSC was sued for wrongful termination by Mr. Briggs; (b) because I felt pressured to terminate Mr. Briggs; and (c) because I was increasingly concerned that the disciplinary process for Mr. Briggs was irregular and biased. Attached as Exhibits A and B to this Declaration are true and correct copies of emails that I contemporaneously sent to myself at the time of these events to preserve my notes and communications with UNM Administrators. The emails and notes contained in Exhibit B reflect my concerns that:

  a. "There is a carefully worded directive issued by the [UNM] president to OEO that requires OEO to amend the FLOD in writing with regard to the incident being off-campus." Ex. B.

  b. "[S]uch a carefully worded document by the [UNM] president and the resistance of OEO to issue a letter of determination that indicates there has been a policy violation by Mr. Briggs gives the appearance that there is a coordinated effort to achieve an end besides giving me the proper documentation to begin a sanctioning procedure with Mr. Briggs. More concerning to me, it is possible to construe these actions as an attempt to shift liability and future legal action away from OEO, the president, and/or the university to me- since I would be taking sanctioning action without any written documentation of the policy violations committed by Mr. Briggs from OEO." Ex. B.

  c. "OEO will only allow me to be aware of a limited number of facts related to the case." Ex. B;

  d. "OEO is intentionally producing obtuse documents." Ex. B.

  e. "Their reluctance to explain and their tactics to prevent documentation to be produced seems to confirm my impression that something more is at play here." Ex. B.

  f. "I remain concerned about the Title IX officer's emails stating that she is concerned about my neutrality and that I indicated the [complainant] said 'yes'. The implication of her statement reflects a substantial misinterpretation of the conversation that occurred. Furthermore, this action by her further heightens my concern about her willingness, either intentionally or through unconscious bias, to seek retaliatory action toward me in the future- since she perceives me as not 'going along' with the process she is demanding." Ex. B.

g.    "At this point, I intend to recuse myself from sanctioning and this case if OEO cannot provide a written document indicating that Mr. Briggs has violated UNM policy on the basis of their investigation."  Ex. B.

h.    "It did not escape me at this point that the Title IX officer seems to have a strong role in the interpretation of the findings in this case, how the letters of determination were issued, and now how the notices of contemplative and final action will be issued."  Ex. B.

18.    The email attached as Exhibit B, as well as other similar emails documenting my concerns about Mr. Briggs' disciplinary process, initially resided on my email account within UNM HSC's email system.  I then became aware that my emails documenting Mr. Briggs' disciplinary process were selectively deleted from my UNM HSC email account.  Because I supervised and acted (on an interim basis) as UNM HSC's CIO, I was aware that only a high level UNM administrator could authorize or direct the deletion of emails from my UNM HSC account. I became concerned that UNM was intentionally destroying evidence relating to my involvement in Mr. Briggs' discipline, and I therefore forwarded the emails to my personal account to ensure that these communications were preserved.

19.    During the Meeting with UNM Administrators, I was told that "[t]he maximum sanction for a first-time violation of 2720, 2730 or 2740 is suspension per the HR disciplinary matrix. The next step is to consider a set of mitigating and aggravating factors which are listed in a table. Almost all of the mitigating factors applied to the respondent in this case. The severity of the violation was the one aggravating factor that was identified in this discussion."  Ex. B.

20.    Attached as Exhibit D is a document titled "Disciplinary Considerations and Guidelines" provided by the UNM Administrators during the Meeting (referred to below as the "Guidelines").  These Guidelines describe the escalating and mitigating factors I understood I was

supposed to consider.  I communicated to the UNM Administrators that, in my view, virtually all of the mitigating factors weighed in favor of Mr. Briggs, including: (a) "No prior disciplinary history;" (b) "No pattern of similar offenses;" (c) "Length of employment (with no recent issues);" and (d) "Minimal impact to University operations, environment, clients/customers, etc."  UNM's Vice President of Human Resources, Dorothy Anderson, directed that I essentially ignore the Guidelines' mitigating factors and told me that I should terminate Mr. Briggs' employment based on a single escalating factor: "nature, severity, and frequency." I was told that I could not suspend Mr. Briggs and that I must fire him.

21.    Notably, the Guidelines require that a supervisor imposing discipline review "evidence" of whether a policy violation was willful, intentional or grossly negligent.   As described above, the UNM Administrators refused my requests for the evidence cited in the PLOD.

22.    During the Meeting with UNM Administrators, "I inquired about whether my observation that there is considerable ambiguity to this case and the determination of OEO based on a 'predominance of evidence' could be considered. I pointed out that there were aspects of the facts that gave some merit to the respondent's case- such as they had been going out for drinks for some time, she followed him back to his house, and she said 'yes' when he asked if he could come in the shower. They responded with the observation that she had 'threw up' 8 times and was not in a state to consent. But in general, I was not allowed to look at any of the ambiguities of the case and solely needed to sanction based on OEO's findings."  Ex. B.

23.    During the Meeting, I told the UNM Administrators that "[g]iven that I was being told I needed to sanction on OEO's finding in the PLOD of 'sexual misconduct of severe type' and that I was only to see a very limited set of documents. I asked if that finding was disputed and if the respondent had been given appropriate appeal opportunities- or that I could be given an

assurance that appropriate appeal rights had been offered." Ex. B. The UNM Administrators "indicated that there was no written or established appeal process regarding situation presented by the complexities of this case." *Id.* The UNM Administrators "further indicated that the respondent had not appealed the PLOD, and that the respondent and his lawyer should have known to appeal a PLOD which had a favorable determination but underlying findings that would be harmful if the determination was reversed." *Id.* The UNM administrators "stated that because the respondent did not appeal the findings, I should view this as evidence that he did not dispute the finding." *Id.* The UNM Administrators "admitted that the respondent was not informed of the appeal of the complainant and that there was some 'exposure' there." *Id.*

24.    During my testimony at a later Peer Review Hearing, I was provided with a letter dated December 6, 2017, from Mr. Briggs' attorney, which indicated that Mr. Briggs had in fact disputed the findings in the PLOD contrary to the UNM Administrators' representations to me. *See* 12/6/17 Letter (attached Exhibit C). UNM never provided this letter to me and told me that Mr. Briggs had not disputed the findings in the PLOD.

25.    During the April 11, 2018 Meeting with the UNM Administrators, "I pointed out that the respondent had provided a document by email to Dr. Roth and I dated April 8, 2018. That letter appeared to indicate that the respondent did dispute OEO's findings. They asked if that letter contained 'new' information. I indicated that it did to me but I had limited information relating to the case" because the UNM Administrators had refused to provide me with the complete file. Ex. B.

26.    "I was prepared to issue a sanction of termination to the respondent- although this was going to be emotionally difficult for me since he had been an exemplary employee. But I was

concerned about the process, particularly the lack of documentation that would be provided to me that would support the action of termination." Ex. B.

27.     During the Meeting with UNM Administrators, "I was told that I would have to meet with the respondent (with the VP of HR present) . . . ." Exhibit B. "The Title IX officer indicated that there would be a new step in this process. Both the notice of contemplative action and the notice of final action would need to be approved by her prior to their issue. This appeared to by a surprise to the VP of HR who indicated that hadn't been done before." *Id.*

28.     Prior to April 2018, no one at UNM raised any concerns with me about Mr. Briggs potentially interfering with Ms. Van Meter's work while she was employed at UNM HSC. I was not asked by UNM OEO, nor the UNM President, nor Ms. Van Meter nor anyone else at UNM to take any interim action to limit Mr. Briggs' movements on campus or to protect against any potential interaction between Ms. Van Meter and Mr. Briggs. No one at UNM ever raised any concern that Mr. Briggs' employment at UNM HSC might create a hostile work environment for Ms. Van Meter while she was employed at UNM HSC.

29.     During the Meeting with UNM administrators on April 11, 2018, I asked whether OEO had independently taken any steps to protect against any claimed hostile work environment as a result of the UNM President's reversal of OEO's finding of no policy violation:

> I asked for clarification around the president's decision to reverse the decision of OEO that there was not an objectively hostile work environment. The OEO director pointed out that there was not an objectively hostile environment, but the president found that "subjectively" there was a hostile work environment due to the position that the respondent held within the office of research and therefore reversed the decision. I asked if there was any obligation during this time for the institution to assure that a hostile work environment was not created. For instance, were the complainant and the respondent responsible for assuring that a hostile work environment was not created, or should the institution had done something to prevent it?

11

Exhibit B.  I received no clarification and was not asked to restrict Mr. Briggs' movements

or activities.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on: _02-05-2025_

_[signature]_

Dr. Richard S. Larson



**From:** Richard Larson
**Sent:** Wednesday, April 11, 2018 8:36 PM
**To:** Dorothy Anderson
**Subject:** Re: Meeting request

Thanks

**From:** Dorothy Anderson <dtanderson@unm.edu>
**Sent:** Wednesday, April 11, 2018 8:24 PM
**To:** Richard Larson
**Subject:** Re: Meeting request

575-644-8913

Sent from Dorothy's iPhone

On Apr 11, 2018, at 8:02 PM, Richard Larson <RLarson@salud.unm.edu> wrote:

    505-469-2670;  please send yours so it is not inadvertently blocked if you call.
    Richard

**From:** Dorothy Anderson <dtanderson@unm.edu>
**Sent:** Wednesday, April 11, 2018 6:23 PM
**To:** Richard Larson
**Subject:** Re: Meeting request

Richard - please send me your cell number. Dorothy

Sent from Dorothy's iPhone

On Apr 11, 2018, at 12:20 PM, Richard Larson <RLarson@salud.unm.edu> wrote:

> Thanks all,
> RIchard
>
> ---
>
> **From:** Heather Cowan [mailto:hbcowan@unm.edu]
> **Sent:** Wednesday, April 11, 2018 12:20 PM
> **To:** Richard Larson <RLarson@salud.unm.edu>
> **Cc:** Francie Cordova <fcordova3@unm.edu>; Dorothy Anderson <dtanderson@unm.edu>
> **Subject:** Re: Meeting request
>
> Yes, Francie and I will be there at 3.
>
> Thanks!
> Heather
>
> Sent from my iPhone
>
> On Apr 11, 2018, at 12:15 PM, Richard Larson <RLarson@salud.unm.edu> wrote:
>
>> Heather, can you make it?
>> Richard
>>
>> ---
>>
>> **From:** Francie Cordova [mailto:fcordova3@unm.edu]
>> **Sent:** Wednesday, April 11, 2018 12:05 PM
>> **To:** Dorothy Anderson <dtanderson@unm.edu>
>> **Cc:** Richard Larson <RLarson@salud.unm.edu>; Heather Cowan <hbcowan@unm.edu>
>> **Subject:** Re: Meeting request
>>
>> I'll be there at 3.
>>
>> Sent from my iPhone
>>
>> On Apr 11, 2018, at 12:03 PM, Dorothy Anderson <dtanderson@unm.edu> wrote:
>>
>>> 3:00 works for me, also.
>>>
>>> ---
>>>
>>> **From:** Richard Larson <RLarson@salud.unm.edu>
>>> **Sent:** Wednesday, April 11, 2018 11:56 AM
>>> **To:** Francie Cordova <fcordova3@unm.edu>;

2

Heather Cowan <hbcowan@unm.edu>; Dorothy
Anderson <dtanderson@unm.edu>
**Subject:** RE: Meeting request

Actually I can do 3:00 if that then works for all 4 of
us.  I am free until 4.
Richard

---

**From:** Francie Cordova
[mailto:fcordova3@unm.edu]
**Sent:** Wednesday, April 11, 2018 11:55 AM
**To:** Heather Cowan <hbcowan@unm.edu>;
Richard Larson <RLarson@salud.unm.edu>;
Dorothy Anderson <dtanderson@unm.edu>
**Subject:** RE: Meeting request

My intake is from 2-3. If you want to touch base
after you all talk, I can call in. Just let me know.

Thanks so much,

Francie

---

**From:** Heather Cowan
**Sent:** Wednesday, April 11, 2018 11:54 AM
**To:** Richard Larson <RLarson@salud.unm.edu>;
Dorothy Anderson <dtanderson@unm.edu>
**Cc:** Francie Cordova <fcordova3@unm.edu>
**Subject:** RE: Meeting request

Francie has another appointment but my 2:30
canceled, so I will join you. Is your office on the 3rd
floor as well where we saw you this morning?

Thanks,
Heather

---

**From:** Richard Larson <RLarson@salud.unm.edu>
**Sent:** Wednesday, April 11, 2018 11:22 AM
**To:** Dorothy Anderson <dtanderson@unm.edu>
**Cc:** Francie Cordova <fcordova3@unm.edu>;
Heather Cowan <hbcowan@unm.edu>
**Subject:** RE: Meeting request

Francie and Heather,

Dorothy and I were already scheduled to meet this
afternoon in my office at 2:30. Would that work for
you?  I would appreciate the guidance.

Richard

---

**From:** Dorothy Anderson
[mailto:dtanderson@unm.edu]

3

**Sent:** Wednesday, April 11, 2018 11:20 AM
**To:** Richard Larson <RLarson@salud.unm.edu>
**Subject:** RE: Meeting request

Should we invite them to our meeting this
afternoon?

---

**From:** Richard Larson <RLarson@salud.unm.edu>
**Sent:** Wednesday, April 11, 2018 11:19 AM
**To:** Chamiza Pacheco de Alas
<Chamiza1@salud.unm.edu>; Francie Cordova
<fcordova3@unm.edu>; Heather Cowan
<hbcowan@unm.edu>; Dorothy Anderson
<dtanderson@unm.edu>
**Subject:** RE: Meeting request

Ok,
Richard

---

**From:** Chamiza Pacheco de Alas
**Sent:** Wednesday, April 11, 2018 11:16 AM
**To:** Richard Larson <RLarson@salud.unm.edu>;
Francie Cordova <fcordova3@unm.edu>; Heather
Cowan <hbcowan@unm.edu>; Dorothy Anderson
<dtanderson@unm.edu>
**Subject:** Meeting request

Hi, we met with Francie and Heather today for
our regular OEO update meeting and the case
we discussed Monday came up. Dr. Roth
indicated he would like you all to sit together in
a face to face meeting to discuss sanctions
and what OEO's standards usually.

Best, Chamiza

Chamiza Pacheco de Alas, JD
Executive Project Director
Office of the Chancellor
UNM Health Sciences Center
chamiza1@salud.unm.edu



---

**From:** Richard Larson
**Sent:** Sunday, April 22, 2018 11:24 AM
**To:** Richard Larson
**Subject:** Additional notes

Additional documentation related to my interactions with OEO, Title IX and HR officers.

4/22/18 11:00 am

I remain concerned about the Title IX officer's emails stating that she is concerned about my neutrality and that I indicated the compliant said "yes".  The implication of her statement reflects a substantial misinterpretation of the conversation that occurred.  Furthermore, this action by her further heightens my concern about her willingness, either intentionally or through unconscious bias, to seek retaliatory action toward me in the future- since she perceives me as not "going along" with the process she is demanding.  So, I am documenting the meeting that I had with the Title IX officer, OEO director, and HR director on April 11, 2018 at 3:00 pm in my office HSSB 302.  These typed notes amplify the written notes that I took during that meeting.

Only Dorothy Anderson and I took notes during the meeting.

This email documents the content of the discussions of this recent meeting and my state of mind and motivations.

This meeting was called to give me guidance to sanctioning in this case.   The meeting included Dorothy Anderson, Heather Cowan, Francie Cordova and myself.

The meeting opened with a reminder to me that I could not recuse myself from issuing sanctions "without good reason", since I was respondent's supervisor.  I was also told that the Provost had recused himself since the respondent's ex- wife worked for him several years ago.  [I did not respond to this statement, but it did seem to me to be a rather weak justification for recusal.  Also, the fact that they were bringing this up indicated that they were concerned that I may recuse myself and either the Chancellor or the Provost would then have to issue sanctions.  In addition, the timeline of events in the materials that had been provided to me by OEO in an email dated April 3, 2018 indicated that the provost, while interim president, had the complaint's appeal but chose to take no action and pass action on the appeal to the new president.]

I then stated that I had very limited knowledge of this case prior to receiving the sanctioning communication from OEO on April 3, 2018.  The respondent had told me some time in 2017 that there was OEO investigation of an allegation of sexual misconduct but it occurred off campus.  He wanted me to know in case legal released something publicly due to an IPRA, but he provided no additional details.  In January of 2018, he again mentioned to me that the "OEO case" had been "cleared" and that there wouldn't be any additional action.   He reiterated his concern that the OEO report, although an HR action, would be released publicly due to the willingness of our OUC to release OEO documents as they did in a previous case.  The next communication related to this case that I received was the email from Laura Vele Buchs on April 3, 2018 indicating that I needed to sanction the respondent.  I forwarded that note to the respondent with no other information, since I was out of town.  Later that week I saw the respondent, told him I could not discuss the case, and that I would be meeting with him in the future.  That email had attachments which included the PLOD dated December 4, 2017 (without any of its attachments), a FLOD dated December 12, 2017 (which indicated there were no policy violations) , the letter from the president to consul of the complainant OEO to reverse its determinations, and a letter from OEO dated April 3, 2018 instructing me to sanction the respondent.  [To date, I have not met with the respondent related to this case- Dorothy and I scheduled a meeting but I canceled it since I was hoping for an amended FLOD that stated the policy violations].

I asked for clarification around the president's decision to reverse the decision of OEO that there was not an objectively hostile environment.  The OEO director pointed out that there was not an objectively hostile environment, but the president found that "subjectively" there was a hostile work environment due to the position that the respondent held within the office of research and therefore reversed the decision.  I asked if there was any obligation during this time for the institution to assure that a hostile work environment was not created.  For instance, were the complainant and the respondent responsible for assuring that a hostile work environment was not created, or should the institution had done something to prevent it?  OEO and Title IX officers indicated that the process was confidential, so this was not possible.  [note-in reviewing the letter from the president subsequent to this meeting, the president does state that she found an " objectively hostile work environment" so there appears to be a difference in interpretation- in addition, OEO is under no obligation to produce a written document reversing their previous determination, but still must reverse their determination. Again, why is all of this so carefully crafted? ]

The complainant did obtain a restraining order to prevent a hostile work environment.  The respondent asked for there to be a clause that prevented "accidental" contact from being interpreted as hostile.  The Title IX officer quickly pointed out that the respondent seeking such an exception was evidence that he knew he would create a hostile work environment.  [Note-  It is also apparent to me that if he didn't seek such an exception, then an accidental contact such as being cc'd on an email would have been interpreted as by OEO and Title IX officers as creating a hostile work environment. I also did not respond to the Title IX officer's comment, since I did not wish to further heighten her emotion.]

We then discussed the sanctioning process.  I was told that I would have to meet with the respondent (with the VP of HR present), and we would explain the process to the respondent.  The process would include issuing a notice of contemplative action which he could respond and then a notice of final action.  He had the ability to appeal the notice of final action through arbitration or a peer review board. [I drew a diagram of this process in my notes].

The Title IX officer indicated that there would be a new step in this process.  Both the notice of contemplative action and the notice of final action would need to be approved by her prior to their issue.  This appeared to by a surprise to the VP of HR who indicated that hadn't been done before.  The Title IX officer indicated it was federal requirement and that she would send regulation to VP of HR.

[Note- It did not escape me at this point that the Title IX officer seems to have a strong role in the interpretation of the findings in this case, how the letters of determination were issued, and now how the notices of contemplative and final action will be issued]

We then reviewed the policy and sanctioning grid that was to guide what sanction I issued.

The maximum sanction for a first-time violation of 2720, 2730 or 2740 is suspension per the HR disciplinary matrix.  The next step is to consider a set of mitigating and aggravating factors which are listed in a table.  Almost all of the mitigating

factors applied to the respondent in this case. The severity of the violation was the one aggravating factor that was identified in this discussion.

I needed clarification on the violation that I was sanctioning. If I was sanctioning a hostile work place then suspension seemed in order. However, they pointed out that I must sanction on the finding of "sexual misconduct of severe type leading to the creation of a hostile workplace."

I inquired about whether my observation that there is considerable ambiguity to this case and the determination of OEO based on a "predominance of evidence" could be considered. I pointed out that there were aspects of the facts that gave some merit to the respondent's case- such as they had been going out for drinks for some time, she followed him back to his house, and she said "yes" when he asked if he could come in the shower. They responded with the observation that she had "threw up" 8 times and was not in a state to consent. But in general, I was not allowed to look at any of the ambiguities of the case and solely needed to sanction based on OEO's findings. This discussion was to understand what I was supposed to consider when sanctioning. [it is clear from the later email from the Title IX officer that she perceived this as a lack of neutrality]

I was further told that I had to connect all the findings in the PLOD (but not the reversed determination by the president) with the first FLOD and the president's letter. I asked if I could have a document that stated the findings, determinations and policy violation on which I was sanctioning. The weakness in this approach in my mind was that it meant I did not have a letter of determination from OEO that indicated there was any policy violation by the respondent- I thought it prudent to have such a document since my sanctions needed to be on the letter issued by OEO. I also wanted such a document to protect myself legally from action by either the complainant or respondent, and since I was sanctioning on the basis of OEO, Title IX, and the president's findings and determinations- I needed a document that made it clear what I was sanctioning and could be used to justify may actions when/if future legal action occurred. I was told that "they didn't do that". I then requested that I have at least an amended FLOD that clearly stated the policy violations that I had to sanction, since my sanctioning was to be based on OEO's FLOD. The President's letter reversing OEO's determination was directed to the complainant's counsel, not me. OEO and Title IX indicated that they did not wish to do this either. I indicated that I was willing to sanction appropriately but that I wanted the appropriate written documentation. They indicated I had the appropriate documentation, even though it was unclear.

[Note- I am very aware of the Howard case and how the departmental chairs involved were chastised for not appropriately documenting their actions. My observation that the compliance officers in this case are reluctant to clearly document findings, determinations, and policy violations is a "red flag" and that additional motives are being considered].

Given that I was being told I needed to sanction on OEO's finding in the PLOD of "sexual misconduct of severe type" and that I was only to see a very limited set of documents. I asked if that finding was disputed and if the respondent had been given appropriate appeal opportunities- or that I could be given an assurance that appropriate appeal rights had been offered. They indicated that there was no written or established appeal process regarding situation presented by the complexities of this case. They further indicated that the respondent had not appealed the PLOD, and that the respondent and his lawyer should have known to appeal a PLOD which had a favorable determination but underlying findings that would be harmful if the determination was reversed. Further, it was stated that because the respondent did not appeal the findings, I should view this as evidence that he did not dispute the finding. Furthermore, they admitted that the respondent was not informed of the appeal of the complainant and that there was some "exposure" there. [I did not respond to this discussion]

Then, I pointed out that the respondent had provided a document by email to Dr. Roth and I dated April 8, 2018. That letter appeared to indicate that the respondent did dispute OEO's findings. They asked if that letter contained "new" information. I indicated that it did to me but I had limited information relating to the case. They indicated that they would have to send the complainant and the respondent a letter and give them both the opportunity to provide additional information. [Again, I did not respond]

At the end of the meeting, I was prepared to issue a sanction of termination to the respondent- although this was going to be emotionally difficult for me since he had been an exemplary employee. But I was concerned about the process, particularly the lack of documentation that would be provided to me that would support the action of termination. I wanted to have a document that clearly spelled out the findings, determination by OEO, and the policy violation that I needed to sanction. It was clear that OEO and Title IX officers would not issue a document that had findings, determination and policy violation in a single summary document. So, I indicated that I needed a letter of determination from OEO (who I was taking direction from) that spelled out the policy violation.

Subsequent communications were an attempt to get a letter of determination from OEO and or the Title IX officer that clearly spelled out the policy violation that I needed to sanction in a letter of determination from them. As indicated in

those communications, OEO and Title IX (along with a carefully worded document from the president that was not addressed to me) are designed to not issue a final or amended final letter of determination that explicitly states the violations that need to be sanctioned. I do not understand the motivation. The motivation is being hidden. It does not appear that a clear letter of determination will be issued. It will be interesting to see if OEO and Title IX change their posture, actions and/or documentation now that Dr. Roth will be issuing sanctions.

I am relieved that I will no longer be involved in this case. But I am documenting this as a precautionary measure to protect myself.

---

**From:** Richard Larson
**Sent:** Friday, April 20, 2018 7:36 AM
**To:** Richard Larson <RLarson@salud.unm.edu>
**Subject:** Further notes

---

**From:** Richard Larson
**Sent:** Thursday, April 19, 2018 7:36 AM
**To:** Richard Larson <RLarson@salud.unm.edu>
**Subject:** OEO Briggs

This email serves to document my situation, Richard Larson, with OEO, HR and OUC with regard to the Michael Briggs case. I am writing this email on 4/19/18 on 7:30 am.

There is a carefully worded directive issued by the president to OEO that requires OEO to amend the FLOD in writing with regard to the incident being off-campus. The directive then states that they must also amend the FLOD to determine that Mr. Briggs violated UNM policies 2720,2730 and 2740. However, the president did not state that this change was required in writing. This leaves it to OEO's discretion on whether they would amend the FLOD to state there was a violation of UNM policy by Mr. Briggs.

On 4/18/2018, I received an email from Heather Cowan amending the FLOD to indicate the incident was off-campus, but did not address the whether there was a violation of UNM policy by Mr. Briggs.

In interpreting the the FLOD (that I received in an email dated 4/3/18) and amended FLOD, there does not appear the be any determination by OEO in writing that that indicates there was a policy violation by Mr. Briggs.

On the evening of 4/18/18, I sent an email to OEO and HR requesting an explanation of why OEO will not produce an amended letter of determination that indicates there has been a policy violation by Mr. Briggs. I am waiting for their reply.

I am further concerned that such a carefully worded document by the president and the resistance of OEO to issue a letter of determination that indicates there has been a policy violation by Mr. Briggs gives the appearance that there is a coordinated effort to achieve an end besides giving me the proper documentation to begin a sanctioning procedure with Mr. Briggs. More concerning to me, it is possible to construe these actions as an attempt to shift liability and future legal action away from OEO, the president, and/or the university to me- since I would be taking sanctioning action without any written documentation of the policy violations committed by Mr. Briggs from OEO.

In addition to not issueing a written letter of determination indicating that Mr. Briggs violated UNM policy, I am further documenting that OEO will only allow me to be aware of a limited number of facts related to the case. This puts me in an impossible position of being directed by OEO and HR to issue sanctions, but not to have a letter of determination from OEO that indicates there has been a policy violation.

Furthermore, given the power of OEO and HR in this institution, I am very concerned that OEO has additional motivations than properly documenting in writing the determinations of policy violations against Mr. Briggs. Why else would they be reluctant? Therefore, my request to have written documentation of the OEO's determination of a policy violation could potentially lead to retaliatory efforts toward me on the part of OEO in the future.

At this point, I intend to recuse myself from sanctioning and this case if OEO cannot provide a written document indicating that Mr. Briggs has violated UNM policy on the basis of their investigation.

I will continue to update this log.

Here is the subsequent email that I received shortly after writing the paragraph above and my response.

Heather,

I don't interpret my actions in the manner that you do below, and I don't agree with your interpretation or intent of my statements, actions, or emails.  I have only been trying to get a clear set of documents on which to act.  It appears that you have misinterpreted my actions.

Nonetheless,  given you have raised concerns about the perception of my neutrality and  my requests for documentation, I am recusing myself from this case.

Regards,
Richard

**From:** Heather Cowan [mailto:hbcowan@unm.edu]
**Sent:** Thursday, April 19, 2018 8:01 AM
**To:** Richard Larson <RLarson@salud.unm.edu>
**Cc:** Laura Vele Buchs <laurabuchs@unm.edu>; Dorothy Anderson <dtanderson@unm.edu>; Paul B Roth M.D. <PRoth@salud.unm.edu>; Chamiza Pacheco de Alas <Chamiza1@salud.unm.edu>; Francie Cordova <fcordova3@unm.edu>
**Subject:** Re: OEO Case Referral for Sanctioning

Dear Dr. Larson:

In response to your email, the simple answer is that President Stokes remanded the case to OEO for two reasons: 1) The discrete issue of further clarifying that the sexual misconduct was not work related (did not happen in the context of a work setting or relationship), and she overturned OEO's NO POLICY finding (thus the President determined there was a policy violation in regard to 2720, 2730 and 2740).

In the April 3, 2018, letter to the parties, OEO provided notice that the President had overturned OEO's decision (thus making it a policy violation), and that the matter was being sent to you and Dr. Roth for sanctioning.  The April 3, 2018, letter inadvertently did not reflect the first issue from President Stokes (further clarifying that the conduct was not work related). The April 13, 2018, amended further amended the FLOD to address discrete number issue 1.

Thus, both documents (April 3 and April 13, 2018) should be read together to indicate that you are sanctioning in regard to a violation of 2720, 2730 and 2740. The April 3, 2018 document further clarifies that the conduct was not work related (the document further clarifies what OEO documented in their original findings), but is more specific in language.

Hopefully that is clear to you.

Based on conversations with you, and this subsequent email, I am concerned about your ability to approach the sanctioning role neutrally and not colored by personal beliefs about the incident or the Respondent. When we met to discuss sanctions, you indicated that the Complainant "said yes' to the conduct, a fact clearly in opposition to OEO's findings and the President's decision. Your recent email of April 18, 2018, sounds much like an attorney advocate would provide for Respondent. Please strongly consider your ability to be fair and neutral in any sanction given.

I have not heard from either from the Complainant nor the Respondent regarding further impact information they would like considered at sanctioning. I have given them until Tuesday COB to provide such information.

Please contact me if you have further questions.

Heather

4/20/2018  7:34 am

Here is my documentation related to her allegation and her perception of my lack of neutrality:

My statement about the Complainant saying "yes" was in the context of a broader discussion of trying to understand how OEO concluded that the predominance of evidence indicated that there was severe sexual misconduct.  I was listing

evidence that supported both the complainant as well as the respondent's case.   I believe this to be evidence of the willingness of the Title IX officer to take something out of context and re-cast the nature of the conversation.

She further interpreted my email related to trying to understand why OEO would not issue a final letter of determination that stated the policy violation of the respondent as "attorney advocate" like.   This further heightens my suspicion that OEO is intentionally producing obtuse documents.  I don't fully understand the legal implications, but neither OUC (in a April 9, 2018) or OEO will provide an explanation for their actions in terms of an unwillingness to produce an amended final letter of determination that states the policy violations that must be sanctioned.  Their reluctance to explain and their tactics to prevent documentation to be produced seems to confirm my impression that something more is at play here.

I am very concerned that if I had sanctioned without proper documentation that the liability and law suits would be directed at me rather than bring in OEO.  There may be additional or alternative explanations for the actions of OEO and the president (under the advisement of OUC) for producing obtuse documents, but they have not been willing to communicate it.

I recused myself after this email- and denied all her allegations.

I will further state that it appears to me that in other compliance areas with federal oversight there is usually a "checklist" that requires there be a statement of:
1)   Allegation
2)   Findings
3)   Determinations
4)   Documentation that any appeals process occurred
5)   Affirmation that the proper federal or other regulatory bodies were informed as required.

Since I have recused myself, I hope that I will not be drawn into this case anymore.

EXHIBIT

C



GARCIA IVES NOWARA

**Molly Schmidt-Nowara**
924 Second Street NW, Suite A
Albuquerque, NM 87102
505.899.1030
molly@ginlawfirm.com
www.ginlawfirm.com

<u>**VIA ELECTRONIC MAIL**</u>

December 6, 2017

Laura Vele Buchs
EEO Compliance Manager
laurabuchs@unm.edu

Dear Ms. Vele Buchs:

I write in response to your Preliminary Letter of Determination in OEO#I-2016-11-66. We agree with your conclusion there was no policy violation connected to the allegations in this matter. However, we strongly disagree with your conclusion that a preponderance of the evidence suggested that the Complainant's version of events is true. Given that there is a finding of no policy violation, we believe the appropriate steps in this matter would be dismissal of the Complaint and that it not be forwarded to any other parties.

Mr. Briggs, as he has consistently and credibly done throughout this investigation, categorically denies that the sexual contact he had with the Complainant was improper. The sexual activity was consensual. Moreover, we again reiterate our concern that the OEO has extended its jurisdiction in this matter beyond its natural conclusion. This was not a work-related incident, Mr. Briggs did not work with the Complainant, and the Complainant does not work at UNM anymore. Contrary to your findings, Mr. Briggs had verbal consent to join the Complainant in the shower, and non-verbal cues suggesting consent when the two began to kiss. As soon as the Complainant indicated she needed to go home, the two immediately stopped with the consensual sexual contact and preceded to get dressed. Thus, your analysis that Mr. Briggs should have inferred there was not consent is without merit.

We also believe it is important for your report to include specific reference to the Complainant's inconsistencies regarding her drinking on the day in question. It is my understanding that the Complainant told the detective she had four beers, but she also stated she had three. Moreover, Mr. Briggs never saw her physically vomit and he did not understand her to have vomited multiple times—just one time. The two continued to have another hour-long conversation after she had

1

initially vomited and brushed her teeth. She never appeared impaired to the point of slurred speech. She drank water, while Mr. Briggs had another beer. It is also our understanding, based on witness testimony, that the Complainant sent a text message to a friend that she would not be able to go out later that night. That text message was sent after 5:00 PM, according to the witness. This was also the time that the complainant testified she was not coherent and did not remember activity leading up to getting into the shower. But the objective evidence shows she was aware of the time and her schedule. This is not consistent with a person who was profoundly impaired.

Mr. Briggs submits that the Complainant did indeed undress herself, and she also took off her own pantyhose. She was able to stand on her own and get into the shower on her own initiative. She was also able to dress herself after the shower. At no time did Mr. Briggs find her impaired to the point of staggering or with the inability to speak. Also, according to text message - while inadvertently sent to her friend, and not her husband, she was able to text "I'm on my way!". This action further demonstrates she was coherent and aware of the situation and time.

The parties' text messages the following day also suggest that the Complainant understood that the two parties had engaged in consensual contact and was worried about what her husband would say. "I hope I don't have to explain anything", and "Just so you know, that was a first - never done that before" suggest that she was aware of what transpired. The two kept up a normal exchange of texts with each other the next day, and there was not any suggestion that Mr. Briggs had done anything inappropriate. It was not until she had to confront her husband that her recollection of events changed. The Complainant's regret for what transpired does not mean that Mr. Briggs engaged in misconduct.

Finally, we must raise what we believe is evidence of bias in the investigation. It is my understanding that you told Mr. Brigg's former supervisor (Catherine Penick) that "Mr. Briggs admitted to wrong-doing". This statement is categorically false (Mr. Briggs has always maintained his innocence in these matters), violated the confidentiality promised to the parties, and suggests that the review of the evidence in the case was not impartial. On this basis alone, we ask the Complaint be dismissed and your report not further disseminated in any manner.

Thank you for your attention to these matters.

<div style="text-align:right">

Very truly yours,

Molly Schmidt-Nowara

</div>

Copies to:

Michael Briggs
Francie Cordova
Heather Cowan





## Disciplinary Considerations and Guidelines

***The work violations and suggested responses in this resource contain general guidelines for examining and responding to employee conduct and work performance issues and is intended to be read in conjunction with the Disciplinary Matrix.***

The guide is a tool to help supervisors evaluate and respond to employee performance problems and workplace issues in a fair and effective manner. It does not stand alone, nor does it constitute legal advice regarding action specific infractions.  These Guidelines are not intended to create contractual rights or obligations regarding the level of disciplinary action which may be imposed on an employee.

Personnel hired under employment contracts are governed by the conditions of their contracts and other University disciplinary provisions may apply. For Unionized staff, please refer to the appropriate Collective Bargaining Agreements for additional information outside of this matrix.

***Employee Expectations of Management***

Employees play a valuable and critical role in helping the University fulfill its mission. Supervisors have a responsibility to train and support each employee in understanding job requirements and to assist employees in improving performance and addressing issues negatively affecting the workplace. Employees of the University have the following reasonable expectations of management:

- A clear understanding of the individual job description, standards, expectations and work rules
- Annual performance appraisal based upon job-related competency criteria
- A safe and healthy work environment
- Willingness to respond to employees' concerns and complaints
- To be treated with dignity and respect
- Fair and non-discriminatory application of policies and procedures

In turn, providing quality programs and services requires cooperation by employees and adherence to established policies, procedures, regulations, practices, and high standards of job performance. In an effort to maximize the contribution of every employee, the University has adopted Policy #3215: Performance Improvement and Discipline and provided the following guidelines.

***Using these Guidelines***

This document provides general guidelines for the proper level of discipline depending on particular infractions and is to be used to help promote consistency in the level of discipline for similarly-situated employees. Specific case information must be considered which may change the recommended level of disciplinary action from what is noted on this matrix. The following section outlines considerations that should be taken into account prior to initiating a disciplinary action.

***Considerations Prior to Action***

- Did the supervisor give the employee forewarning of the possibility or probability of disciplinary action for the employee's conduct?
- Was the supervisor's rule/expectation reasonably related to the orderly, efficient and safe operation of the establishment?
- Did the supervisor investigate whether the employee violated the rule/order?
- Was the fact finding process fair and objective?

- Did the fact finding reveal substantial evidence of proof of violation of the rule/order?
- Has the supervisor applied the rule/expectation and the penalties even handedly to all employees?
- Is the degree of discipline reasonably related to the violation?
  (See accompanying matrix for a suggested response that may be considered reasonable for a given offense)

***Escalating and Mitigating Factors***

When using this guide, consideration should always be given to the nature of the incident, the frequency of the violation, and the employee's overall work record before disciplinary action is taken. A corrective process of progressive discipline is generally used but some violations could be of such a serious nature that disciplinary action could lead directly to a suspension or discharge. The following table outlines important factors to be taken into consideration, which may result in increased or decreased sanctions:

The final outcome must be determined based on specifics of the case. Contact your HR Consultant when determining any level of discipline.

| ESCALATING FACTORS<br>*Factual information or evidence regarding the violation that might result in an increased sanction.* | MITIGATING FACTORS<br>*Information or evidence regarding the violation that might result in a decreased sanction.* |
|---|---|
| <ul><li>Nature, severity, and frequency</li><li>Relationship of offense to employee's position</li><li>Prior notice given to the employee</li><li>Prior disciplinary history</li><li>Brief period of time since the last violation</li><li>Pattern of similar violations</li><li>Number of total violations</li><li>Evidence that violation was willful or intentional</li><li>Evidence that the violation was grossly negligent</li><li>Impact to University operations, environment, clients/customers, etc.</li><li>Impacts health or safety of customers and/or campus community</li></ul> | <ul><li>Significant period of time since the last violation</li><li>Technical or inadvertent error</li><li>No prior notice given to the employee</li><li>No prior disciplinary history</li><li>Extensive period of time since the last violation</li><li>No pattern of similar offenses</li><li>No evidence that the violation was willful or intentional</li><li>No evidence that the violation was grossly negligent</li><li>Length of employment (with no recent issues)</li><li>Minimal impact to University operations, environment, clients/customers, etc.</li><li>The potential of rehabilitation</li><li>Other mitigating factors such as disability etc.</li></ul> |

***Important Considerations***

These Guidelines do not take into account individual circumstances relating to the Family Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), or Workers' Compensation. If you have reason to believe an employee has a medical condition impacting their performance, attendance or behavior, contact your HR Consultant to help guide you appropriately on these issues.

Administrative Leave is only to be used in extreme situations and only after consultation with HR and prior approval by the EVP.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**PLAINTIFF'S EXHIBIT**

**3**
_____

MICHAEL BRIGGS,

      Plaintiff,

v.                                 Case No.:  1:20-cv-00651 KWR-JMR

THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GICK, individually and
in his official capacity

      Defendants.

## <u>FIRST DECLARATION OF MICHAEL BRIGGS</u>

I, Michael Briggs, hereby provide this declaration in support of Plaintiff's Response in Opposition to Defendants' Motion Summary Judgment in the above-referenced civil action, and state as follows:

1.      I personally and independently reviewed 371 files produced by the University of New Mexico ("UNM") arising from complaints of sexual misconduct and sexual harassment considered by UNM's Office of Equal Opportunity ("UNM OEO") during the period from January 1, 2017, to December 31, 2022 (the "Files").  Of the 371 Files produced, UNM marked 133 of the Files as "Investigated" and 238 as "Uninvestigated."

2.      In reviewing the Files, I was able to find information sufficient to determine the sex of the respondent.  The Files include 269 complaints against male respondents and 102 complaints against female respondents. Of the 269 complaints made against male respondents, 126 (or 46.9%)

1

were investigated by UNM OEO.  Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by UNM OEO.

3.      I personally reviewed each File and observed that, of the 269 complaints made against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent.  Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a policy violation against the female respondents.

| | Complaints | Policy Violations | Rate of Finding of Policy Violation |
|---|---|---|---|
| **Males** | 269 | 78 | 29.00% |
| **Females** | 102 | 1 | 0.98% |
| | 371 | 79 | |

4.      I personally reviewed each File and observed the severity of discipline imposed after UNM OEO found that a respondent's conduct violated UNM policy.  Of the 371 files, 52 resulted in the most severe disciplinary actions against male respondents (termination, sanctions, suspension, or expulsion).  Of those 371 complaints – 102 of which were made against female respondents – only one female respondent received discipline (expulsion).

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: 2/5/2025 _____

*Michael Briggs* _____
Michael Briggs

PLAINTIFF'S
EXHIBIT

**4**

## AFFIDAVIT OF CATHERINE PENICK

I, Catherine Penick, being over the age of 18 and competent to make this declaration based on my personal knowledge, declare as follows:

1.     I have worked in and for the Health Sciences Center at the University of New Mexico ("UNM") for 16 years.  Currently, I serve as the Strategic Planner for Economic Development.  In 2015, I held the position of Executive Research Operations Officer.  This is the same position that Michael Briggs currently holds.  In fact, he succeeded me in that position.

### Briggs' History of Positive Contributions to His Work Environment

2.     From 2006, when Mr. Briggs was first hired by UNM, until 2015, I was Mr. Briggs' immediate supervisor.  In my capacity as Mr. Briggs' supervisor, I never had occasion to discipline Mr. Briggs for any reason.  To the contrary, Mr. Briggs is an exemplary UNM employee.  *See* Briggs' Performance Evaluations, attached as Ex. A (all signed by me, as Mr. Briggs' immediate supervisor, all reflecting exemplary performance).

3.     His 2012 performance evaluation demonstrates the quality of Mr. Briggs' work and his positive contributions to his work environment.  In that evaluation, I characterize Mr. Briggs as "nothing short of amazing" and note that "his performance during the past year easily exceeds expectations."  *See* 2012 Performance Evaluation, attached as Ex. B.

4.     Others within Mr. Briggs' work environment felt the same way.  Mark Burge, M.D. stated that Mr. Briggs was "[o]utstanding in every respect."  *Id.*  Shiraz Mishra, MBBS, PhD called Mr. Briggs "an invaluable asset" to the team.  *Id.*  Robert Rhyne, M.D. responded that Mr. Briggs "is very pleasant to work with.  He has a friendly demeanor and does not get rattled easily.  He listens and is open to other people's input and works very well with the staff.

He is responsive to suggestions and is prompt in responding to requests. The staff enjoy working with him and he keeps them informed." *Id.*

  5. In 2014, I recommended Mr. Briggs as a candidate for the UNM Anderson School of Management Executive MBA program. I stated then and continue to believe that

> Mr. Briggs has been tasked with enormous challenges during his tenure at UNM, and in all cases he has demonstrated integrity, professionalism, excellence in his work and strong leadership. He has been able to lead the Human Research Protections Office, play a herculean role in our nationally recognized Clinical and Translational Science Center, and take on leadership of significant institutional initiatives as they arise. … Mr. Briggs has a strong future as a leader and manager at UNM.

*See* 2014 Recommendation, attached as Ex. C.

### Evidence of Bias in the OEO Investigation of Briggs

  6. I am aware that an individual working at UNM Hospital within the Department of Orthopedics alleged policy violations against Mr. Briggs and that the UNM Office of Equal Opportunity (OEO) undertook an investigation into the matter.

  7. I only recently learned the name of the individual who made allegations against Mr. Briggs, Joy Van Meter. I have never met Ms. Van Meter, nor is she an employee over whom either I or Mr. Briggs had any supervisory authority.

  8. Given my personal knowledge of Mr. Briggs' character and his work environment, including whether Mr. Briggs had influence over Ms. Van Meter's position and whether Mr. Briggs worked in close proximity to Ms. Van Meter, an OEO investigator interviewed me as part of its investigation.

  9. Although I do not independently recall the name of the investigator, I have since learned that the OEO investigator who interviewed me was Laura Vele-Buchs.

10.     I am very familiar with the OEO investigation process, having served as a witness (in my capacity as a supervisor of multiple employees) in several prior investigations.

11.     During my interview, I expressed some surprise at Ms. Van Meter's allegations against Mr. Briggs given my knowledge of his character over such a long period of time. Investigator Vele-Buchs responded, "Well, you may have that view of Michael, but he has admitted to wrong-doing."

12.     In my prior experience with OEO investigations, I have never observed an investigator make such a comment on a pending investigation.

13.     Because I knew Mr. Briggs had absolutely not admitted to wrong-doing of any kind, I found Investigator Vele-Buchs' statement shocking.  I therefore became concerned that Mr. Briggs was not going to get a fair investigation, as it appeared to me that Investigator Vele-Buchs had already concluded that Mr. Briggs did something wrong.

### Briggs' Work Environment is Completely Separate From the Department of Orthopedics, where Complainant Worked

14.     In any case, I provided Investigator Vele-Buchs with information concerning Mr. Briggs' work environment, with which I am very familiar.

15.     The Department of Orthopedics is organizationally and physically separate from the Office of Research, where Mr. Briggs works and where I worked up until 2015.

16.     Ms. Van Meter does not work in the same building as Mr. Briggs.

17.     Mr. Briggs has no supervisory authority over Ms. Van Meter; she is completely outside of Mr. Briggs' chain of command at UNM.

18.     I understand that Ms. Van Meter claims to have worked in some capacity with research compliance committees and further claims that Mr. Briggs "oversees all research compliance committees."

3

19.     Ms. Van Meter's reported understanding of Mr. Briggs' position is inaccurate.

20.     At UNM, there are multiple committees that might be characterized as "research compliance committees."

21.     UNM is fully committed to ensuring the autonomy of its research compliance committees.  The committees that review and decide whether to approve or disapprove research projects presented to them do so independently, without influence by Mr. Briggs.

22.     Mr. Briggs is not a member of any research compliance committee.

23.     Individuals who are members of research compliance committees have both the obligation and right to report any attempts at undue influence upon them to make decisions with respect to matters, actions, or decisions within their delegated authority.

24.     Mr. Briggs has no influence over decisions made by any research compliance committee.

25.     I explained all of the above to OEO Investigator Laura Vele-Buchs.  Mr. Briggs' role—a role which I myself held until 2015—does not have any direct or indirect influence upon Ms. Van Meter's position or her department.  I simply cannot see how Mr. Briggs could create a hostile work environment for Ms. Van Meter.

Date: _6/15/2018_

_____
Catherine Penick

PAUL ROTH   1/9/2020

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**PLAINTIFF'S EXHIBIT 5**

JOY VAN METER

      Plaintiff/Counter-Defendant,

 -vs-               NO:  1:18-cv-00970 RB/JHR

MICHAEL BRIGGS,

        Defendant/Counterclaimant.

VIDEO DEPOSITION OF PAUL ROTH, M.D.

        January 9, 2020
        9:03 a.m.
        Suite 1500
        201 Third Street, Northwest
        Albuquerque, New Mexico

      PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  TRAVIS JACKSON, ESQ.
          ATTORNEY FOR DEFENDANT/COUNTERCLAIMANT

REPORTED BY:  KENDRA D. TELLEZ
          CCR #205
          Kendra Tellez Court Reporting, Inc.
          302 Silver, Southeast
          Albuquerque, New Mexico  87102

1    Briggs?

2        A.    Yes.

3        Q.    Was Dorothy Anderson the person that

4    primarily advised you with respect to the discipline

5    of Michael Briggs?

6        A.    Yes.

7        Q.    So I now want to talk about the period

8    after the NCA was issued.  Okay?

9        A.    (Witness nods head.)

10       Q.    Okay.  And so I showed you the --

11   Mr. Briggs' response to the NCA that's dated July 3,

12   2018, that's marked as Deposition Exhibit 190 in

13   this case.  Between the time that the NCA was issued

14   on June 6, 2018, and Mr. Briggs submitted his

15   response to it on July 3, 2018, did you have any

16   additional meetings relating to the discipline of

17   Michael Briggs?

18       A.    I don't recall.

19       Q.    Okay.  Would your calendar reflect any

20   additional meetings that you had during that time

21   period?

22       A.    Yes.

23       Q.    During that time period between the

24   issuance of the NCA on June 6 and Mr. Briggs'

25   submission of his response to the NCA on July 3,

81

1   2018, did you have any further e-mail communications

2   with anybody relating to the discipline of Michael

3   Briggs?

4       A.   I might have.

5       Q.   Earlier we talked about the testimony that

6   you gave during the peer review hearing, correct?

7       A.   Yes.

8       Q.   And we talked about how you -- you

9   testified that -- give me a moment.

10          "In making the sanction decision, I

11  consulted with the vice president of Human

12  Resources, Dorothy Anderson; the Title IX

13  coordinator, Heather Cowan."

14      A.   Um-hmm.

15      Q.   Now, we've gone through several meetings,

16  and you've never mentioned Heather Cowan.  So was

17  there a time at which you met with Heather Cowan

18  about the discipline of Mr. Briggs?

19      A.   I don't recall specifically, but I do

20  remember understanding that the O- -- the Title IX

21  coordinator felt that termination was appropriate.

22      Q.   And how did you come to know -- how did

23  you come to understand that the Title IX coordinator

24  recommended termination?

25      A.   Again, that would have been either through

83

1   a couple of follow-ups.  During your peer review

2   testimony, you said, quote, "I can disclose that

3   both Ms. Anderson and Ms. Cowan advised me that

4   termination was the most appropriate sanction for

5   Mr. Briggs."

6           And you can't -- it sounds like you cannot

7   recall whether you actually received direct advice

8   from Ms. Cowan; is that correct?

9               MR. SMITH:  Object to the form.

10              MS. ANDERSON:  And, Travis, can I

11  please get a page and line number.  Do you have the

12  transcript?

13              MR. JACKSON:  Sure.  Page 156.

14      Q.    So did you answer my question?  I'm sorry.

15      A.    Could you repeat that again?

16      Q.    Sure.  During your testimony at the peer

17  review hearing, you testified that, "I can disclose

18  that" -- quote, "I can disclose that both Ms.

19  Anderson and Ms. Cowan advised me that termination

20  was the most appropriate sanction for Mr. Briggs,"

21  close quote.

22          Do you recall saying that during the peer

23  review hearing?

24      A.    Yes.

25      Q.    And so all I'm asking is:  Did you ever

89

1   later Notice of Final Action, the one that was

2   issued on August 27, 2018, was the document that

3   officially terminated Mr. Briggs' employment?

4        A.    I believe I understand that, yes.

5        Q.    Okay.  And what I want to know is:  In

6   between the time that you received the PLOD,

7   whenever that was --

8        A.    Um-hmm.

9        Q.    -- and the date of the August 27, 2018,

10  Notice of Final Action that finally terminated

11  Mr. Briggs' employment, did you ever request any of

12  the 15 items of documentary evidence referred to in

13  the PLOD?

14       A.    I don't believe I did.

15       Q.    And why not?

16       A.    Because it was part of the investigation.

17  My job, as I understood it, was not to reassess the

18  investigation or re-evaluate it, but simply take the

19  results of the investigation and the appeal as fact

20  and then come to a determination of what the

21  disciplinary action should be.

22       Q.    Okay.  And was that understanding based on

23  advice given to you by Dorothy Anderson?

24       A.    Yes.

25       Q.    When you were considering the discipline

99

1    one way or the other?

2        A.    Not entirely, no.

3        Q.    And why not?

4        A.    For the reasons that I had been struggling

5    with a decision all along, and that was that my

6    experience with Mr. Briggs up to that point had been

7    one in which he was an exemplary employee, he had

8    conducted himself very professionally in all areas,

9    all venues that I was familiar with.  And -- and I

10   had felt that the decision for termination seemed a

11   little more harsh than what was absolutely

12   necessary.

13       Q.    Okay.  In your discussions with

14   Ms. Anderson, did she express to you that she had

15   formed an opinion about what the appropriate

16   discipline should be after receiving Mr. Briggs'

17   response to the NCA?

18       A.    I think Dorothy Anderson maintained pretty

19   constant opinion that termination was really the

20   only reasonable option.

21       Q.    Okay.  So during your conversation with

22   Dorothy -- and it sounds like there's this tension,

23   I'll call it, in which you were trying to find

24   discipline to something less than termination and

25   she is recommending termination.  Is that fair?

100

```
 1              MR. SMITH:  Object to the form.
 2       A.    That's -- that's pretty fair.
 3       Q.    Okay.  After the Notice of Contemplated --
 4  after Mr. Briggs' notice -- response to the Notice
 5  of Contemplated Action was sent to you, did you
 6  discuss it with anyone other than Ms. Anderson?
 7       A.    Again, I may have.  Whether I had met or
 8  had a conversation with Heather Cowan or have had --
 9  had had some discussions with Chamiza, those would
10  have been possible.  I just don't recall specifics.
11       Q.    Okay.  Is there any way for us to
12  determine -- for the Court to determine whether you
13  had any further meetings with anyone else relating
14  the -- to Mr. Briggs' response to the NCA?
15       A.    Other than checking my electronic calendar
16  for a specific meeting, that would be the only way
17  of knowing if I had a formal meeting.  But -- but I
18  think if we had hallway conversations or something
19  short of a formal meeting on the calendar, you would
20  have to ask those individuals.
21       Q.    Okay.  I may have already asked this
22  question, but -- so I apologize -- I'll apologize if
23  I'm repeating myself.
24              But after Mr. Briggs submitted his
25  response to the NCA, did you have any e-mail
```

101

1  communications about it?

2      A.    I don't recall.

3      Q.    Okay.  If the Court wanted to determine

4  whether or not you had done so, we would need to

5  look at the e-mails that Emily collected, correct?

6      A.    Yes.

7      Q.    After you received Mr. Briggs' response to

8  the NCA, during discussion with Ms. Anderson, did

9  she reemphasize to you that it was not your role to

10  reweigh the evidence?

11          MS. ANDERSON:  Object to form.

12      A.    I don't recall if it was -- if Dorothy had

13  explicitly restated that, but it was clearly my

14  understanding at the time.

15      Q.    During the peer review hearing, you

16  presented sworn testimony by reading from a prepared

17  written statement, correct?

18      A.    Yes.

19      Q.    Did you prepare that written statement by

20  yourself?

21      A.    No.

22      Q.    Who participated in the preparation of

23  that written statement?

24          MR. SMITH:  Travis, I think you're

25  wading into attorney/client privileged

103

1     Q.    Okay.  Who wrote the written statement --

2  the written sworn testimony that you provided during

3  the peer review hearing?

4     A.    I think it was a joint effort.

5     Q.    And it was a joint effort between who?

6     A.    Counsel and myself.

7     Q.    So you didn't solely author the sworn

8  testimony that you presented at the peer review

9  hearing; is that correct?

10     A.    Correct.

11     Q.    And this is going over some ground that

12  we've already covered, so I apologize in advance,

13  but I want to talk about your testimony during the

14  peer review hearing.  Okay?

15         During the peer review hearing, you

16  testified that, quote, "It was not my role to decide

17  whether Mr. Briggs engaged in sexual misconduct."

18  Do you recall that?

19     A.    Yes.

20     Q.    And how did you determine that it was not

21  your role to determine whether Mr. Briggs engaged in

22  sexual misconduct?

23     A.    That's what I understood to be my role

24  through Dorothy Anderson.

25     Q.    Okay.  And during the peer review hearing,

104

1  you also testified that, quote, "It was not my role

2  to reanalyze and reweigh the evidence that was

3  collected and considered during the OEO process."

4  Do you recall that?

5       A.    Yes.

6       Q.    And how did you come to understand your

7  role with respect to that statement?

8       A.    In the same way.

9       Q.    Through Dorothy Anderson?

10      A.    Dorothy Anderson.

11      Q.    Did Dorothy Anderson ever point you to any

12 UNM policy that prohibited you from

13 analyzing/reanalyzing the evidence considered by OEO

14 when imposing discipline?

15      A.    I don't recall.

16      Q.    Would you have relied on -- did you rely

17 on Dorothy Anderson to identify the applicable

18 policies --

19      A.    Yes.

20      Q.    -- with respect to the discipline of

21 Mr. Briggs?

22      A.    Yes.

23            MR. JACKSON:  What time is it?

24            MR. SMITH:  I've got 11:34.

25            MR. JACKSON:  So I'm about to get

156

1      A.      Um-hmm.

2      Q.      Did Dorothy Anderson, did she actually

3  emphasize to you that your role was not to

4  re-evaluate the evidence?  Is that how you would

5  characterize her conversation with you?

6      A.      Yes.

7      Q.      What about the terminology about this

8  tension that existed between your interest in

9  pursuing some type of a settlement with Michael

10  Briggs that would allow him to stay on as an

11  employee with the University and Ms. Anderson's

12  decision -- or feeling that he should be terminated,

13  would you characterize that as a tension between you

14  two?

15      A.      Yeah.  I think it -- we were not in full

16  agreement initially that termination was the proper

17  course of action.  And I had specifically asked to

18  have her and OEO consider an alternative, which I

19  believe they were willing to do, but that would not

20  have been their initial recommendation.

21      Q.      I guess when I hear the word "tension," I

22  think of kind of an aggressive disagreement.  Was

23  that disagreement aggressive in any way or --

24      A.      Oh, no.

25      Q.      -- contested?

159

1  anything having to do with that particular incident.

2  And -- and so I did not see this as a -- as a

3  realistic counteroffer.  It was -- it was a complete

4  rejection of -- of what we had offered.

5       Q.    And I think you testified about your

6  desire for Mr. Briggs to take some type of

7  responsibility at the peer review; is that correct?

8       A.    Yes.

9       Q.    And why was that important to you?

10      A.    Well, it -- it speaks to, I think in

11 general, a factor that I had considered when

12 agreeing to -- to the termination of Mr. Briggs,

13 that he took no responsibility at all.  And it also

14 spoke to the concern, I think, that we briefly

15 touched on earlier in the deposition about the sense

16 of safety for the rest of the University community;

17 in that, if -- since Michael took no responsibility

18 for his actions at all, that that could have been

19 perceived by him as enabling him to repeat that

20 behavior with others.

21      Q.    And I think you were alluding to that, and

22 I just want to confirm that in your peer review

23 testimony, when you said that, quote, "I believe

24 that a person who refuses to accept responsibility

25 for misconduct is a person likely to reengage in the

160

1    same conduct."  Is that -- does that convey your

2    concerns about Michael potentially reoffending?

3         A.    Yes.

4         Q.    Or reengaging in that type of sexual

5    misconduct?

6         A.    Yes.

7         Q.    With regards to -- and I'm jumping around

8    a little bit, so I appreciate you bearing with me.

9              With regards to Exhibit 185, this is going

10   to be the December 4th PLOD, the Preliminary Letter

11   of Determination.  And I just want to draw you to --

12   your attention back to page 17 of 28.  And my

13   questions are going to relate to the documentary

14   evidence portion of it.  Okay?

15             You were asked earlier in the deposition

16   whether or not you reviewed any of the documentary

17   evidence; is that correct?

18        A.    Yes.

19        Q.    And you did not recall specifically

20   whether or not you reviewed this information?

21        A.    Correct.

22        Q.    And it wasn't necessary -- or was it

23   necessary, in your opinion, to actually review the

24   underlying evidence?

25        A.    No.

161

1    Q.    Why not?

2    A.    It -- it was not my job to actually

3 revisit the investigation.  It was mostly to

4 consider the outcome and the findings of OEO.  And I

5 was -- my understanding of my role was not to

6 reinvestigate or question the findings, but to

7 accept the findings as fact and then to determine

8 the appropriate disciplinary action.

9    Q.    I understand.  And did the peer review

10 panel, did they have the opportunity to review this

11 documentary evidence that's pointed out in page 17

12 of Exhibit 185?

13   A.    Did they have the opportunity to?  I think

14 the policy -- or the process we undertook -- you

15 know, I don't know if -- from a procedural

16 perspective, whether they did or didn't.

17   Q.    Let me ask a better question.  Was the

18 peer review panel, were they allowed to make

19 determinations about the evidence?

20        MR. JACKSON:  Object to form.

21   A.    I don't know.

22   Q.    Are you aware of whether or not the peer

23 review panel could reweigh the evidence that was

24 initially indicated in the PLOD?

25   A.    You know, I don't recall if they were

164

```
 1   of the evidence a lack of consent and ability to

 2   consent to the sexual activity in question, and thus

 3   the activity was unwelcome."

 4           Did I read that correctly?

 5       A.   Yes.

 6       Q.   When you referred to "critical admissions"

 7   by Michael Briggs, can you tell me what you were

 8   referring to?

 9       A.   Critical admissions?

10       Q.   Yes.

11       A.   What was the context in which I said that?

12       Q.   I'll just point your attention back to

13   that last sentence, and then if you could just

14   explain to me what those critical admissions were.

15       A.   Now, I'm not sure I wrote this.  I think

16   this was a form that was either written by OEO or

17   the HR Department.

18       Q.   Okay.  And I would just ask you to flip

19   the page over to page 2.

20       A.   Okay.  That's got my signature on it.

21       Q.   Well, sitting here today, do you recall --

22       A.   Yes.

23       Q.   -- what those critical admissions were?

24       A.   I -- I don't recall what those were.  I

25   think it might have had to have been relating to the
```



PLAINTIFF'S
EXHIBIT

6
_____

**U.S. Department of Justice**
Civil Rights Division
Educational Opportunities Section

---

SAS:TBC:CMP:RS
169-49-69

*U.S. Mail: 950 Pennsylvania Avenue, NW*
*Patrick Henry Building, Suite 4300*
*Washington, D.C. 20530*
*Overnight: 601 D Street, NW, Suite 4300*
*Washington, D.C. 20004*
*Phone: (202) 514-4092*
*Fax: (202) 514-8337*

April 22, 2016

President Robert G. Frank
Office of the President
1 University of New Mexico
Albuquerque, NM 87131

        Re: Title IX and Title IV Investigation of University of New Mexico

Dear President Frank:

The Department of Justice (the "Department" or "the United States") has completed its investigation regarding the University of New Mexico's ("the University" or "UNM") handling of reports by students of sexual harassment, including sexual assault, at its Albuquerque campus. The United States conducted its investigation under Title IV of the Civil Rights Act of 1964 ("Title IV"), 42 U.S.C. § 2000c-6, which prohibits discrimination based on sex, among other bases, by public colleges and universities, and Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. §§ 1681–1688, and its implementing regulations, 28 C.F.R. pt. 54, which prohibit sex discrimination by recipients of federal financial assistance. UNM is a recipient of financial assistance from the Department's Office of Justice Program's National Institute of Justice and Bureau of Justice Statistics.

The Department initiated its investigation in December 2014, after receiving complaints from multiple students alleging that UNM did not respond adequately to their reports of sexual assault. The complaints raised a range of issues, including confusion regarding where and how to report, lengthy delays in UNM's investigative and resolution processes, insensitive and sometimes re-traumatizing investigative techniques by UNMPD and other UNM employees, failure to provide effective interim safety measures, supports and services, and a perception that the campus culture affords preferential treatment to certain students, particularly athletes or those affiliated with fraternities, while approaching reports of sexual assault with skepticism or indifference.

As part of the investigation, the Department reviewed the University's policies and grievance procedures; training for staff, students and faculty, including training of those responsible for coordinating Title IX enforcement; responses to reports by students of sexual harassment, sexual assault, and retaliation; coordination of Title IX enforcement; and notice of nondiscrimination. During site visits to campus, we conducted dozens of interviews of campus administrators and

police officers, current and former students and their families, faculty members, and community partners who provide services and supports to UNM students who have been sexually assaulted. UNM cooperated from the outset and throughout the process.

Our investigation found that although UNM has strengthened its response to sexual harassment and sexual assault of students over the past year, it remains out of compliance with Title IX and Title IV in key respects. Based on our review, UNM must do more to address and respond to sexual harassment that creates a hostile environment, including sexual assault, by effectively stopping harassment, preventing its recurrence, eliminating the hostile environment, and remedying its harms. This letter constitutes notice of the Department's findings, and of the minimum steps that the University must take to bring policies, practices, and procedures into compliance with federal law, and to remedy past violations.

The United States appreciates the University's cooperation, its proactive efforts to date, and its stated commitment to addressing sexual harassment, including sexual assault, to ensure a safe campus and access to educational opportunities for all students. We also extend our thanks to each member of the UNM and greater Albuquerque community who met with us in the course of the investigation – especially the many current and former students who came forward to share their perspectives and personal experiences with sexual assault and campus response at UNM.

## BACKGROUND

The University of New Mexico is a large public research university located in Albuquerque, with branch campuses in Gallup, Los Alamos, Taos and Valencia County. In the fall of 2015, 27,353 students were enrolled in undergraduate, graduate and professional degree programs at the main campus in Albuquerque, which also retains approximately 16,000 employees. Among these employees are the 40 sworn peace officers of the University of New Mexico Police Department (UNMPD). UNMPD officers hold the authority to enforce all applicable laws, ordinances, and campus traffic regulations, and to make arrests for criminal behavior that occurs on the UNM campus. The Chief of UNMPD reports directly to the University's Executive Vice-President for Administration Office.

On December 5, 2014, the Department notified UNM by phone and by letter that it was initiating an investigation and compliance review under Title IV and Title IX based on multiple complaints, and requested that UNM produce documents and other information for review. From the start of our investigation, the University President pledged his cooperation and that of his staff. The University responded promptly to all of the United States' requests for information and provided access to all University employees with whom the United States requested to meet.

In the course of the investigation, the United States reviewed thousands of pages of documents and conducted site visits to the University and the Albuquerque community in January, April and May of 2015. We reviewed the University's policies prohibiting sexual harassment, including sexual assault; the Student Conduct Code ("SCC"), the Discrimination Claims Procedure ("DCP"), and the Student Grievance Procedure ("SGP"); UNMPD policies, procedures and practices for responding to, and investigating incidents of, sexual assault; and training and

education materials on Title IX, sexual harassment, and sexual assault that UNM provided to members of the campus community.

We also reviewed copies of all complaints filed with the University and UNMPD alleging sexual harassment or sexual assault for six full academic years, from the 2009-2010 school year through the end of the 2014-15 school year.[1]  The complaints included, but were not limited to, allegations involving student-on-student sexual harassment and sexual assault, and employee-on-student sexual harassment and sexual assault.  In addition, the United States analyzed how the University and/or UNMPD responded to each of these complaints and how UNM policies, training, and grievance procedures affected how they were processed and resolved.  In total, we, together with expert consultants in sexual assault response and campus law enforcement, reviewed UNM's administrative response to 173 complaints of sexual harassment, including sexual assault, domestic violence and stalking, and 55 campus police investigation reports.  The United States also conducted more than 50 interviews with current and former students and their parents, current and former faculty and staff, community members, and University officials, and held six focus group meetings and multiple open office-hours sessions in Albuquerque to hear directly from students, staff and faculty.

At the outset of our investigation, the University had in place a labyrinth of 17 outdated policies and procedures related to sexual assault and sexual harassment, many in conflict with each other and with federal regulations and guidance on Title IX.[2]  Faculty and staff did not understand when or how to report sexual harassment that they observed, learned about, or themselves experienced.  The University provided virtually no training on sexual assault or sexual violence to students.  Students told us they had no idea where or how to report or where to get help.  Those who were able to report encountered a confusing process, rife with roadblocks and delays.  Further, UNM officials responsible for addressing and remedying complaints of sexual harassment, including sexual assault, had received minimal and inconsistent training and demonstrated a lack of understanding of trauma-informed interviewing and investigative techniques.

Similarly, most UNMPD officers had not received adequate law enforcement training in how to respond to sexual assault incidents, including how to appropriately conduct victim and witness interviews and effectively gather evidence following a sexual assault.  The various individuals and organizations handling different aspects of sexual assault response at the University did not communicate with each other, leading to fractured and incomplete service provision and failure to make appropriate referrals.  Without appropriate supports in place, numerous students saw

---

[1] This letter of findings focuses on the policies, procedures and practices in place at the beginning of the 2009-10 school year through the 2014-2015 school year.  We did not review complaints or investigations filed, processed, or completed after July 1, 2015.  With respect to trainings, policies, and procedures, we requested and reviewed updates as of November 2015, as reflected throughout this letter.

[2]  Title IX prohibits sex-based discrimination in all schools, colleges, and universities that receive federal financial assistance, while Title IV prohibits sex-based discrimination *only* in public schools, colleges and universities.  As Title IX is the more expansive statute, the phrase "Title IX" has evolved as short hand for discussing a school's obligation to respond to, eliminate, prevent the recurrence of, and remedy the harm of sex-based discrimination in educational programs. All references to a school's Title IX obligations should be read to include its parallel Title IV obligations.

promising academic careers derailed – experiencing lasting and serious emotional and mental health consequences; suspending their academic coursework; dropping out of extracurricular activities; losing scholarships; and/or leaving the University altogether. And troublingly, in interview after interview, UNM students expressed reluctance to report sexual assault to UNM because they feared retaliation or because they lacked confidence in the University's response.

From the start of our investigation, the University openly acknowledged gaps in its response to sexual assault and sexual harassment and, to its credit, engaged in an ongoing and major effort to begin addressing those gaps. UNM expanded the mandate and raised the profile of the University's Presidential Task Force on Sexual Assault, which President Frank had first asked his staff to create in Spring 2014. As chair of the Presidential Task Force, UNM's Dean of Students ("DoS") reconvened UNM's Sexual Assault Response Team ("SART"), which had first formed in 2013 but by the following year was no longer meeting regularly. In 2015, SART was renamed the Sexual Misconduct and Assault Response Team ("SMART"), and its focus broadened to also include sexual misconduct. SMART includes representatives from campus and community-based stakeholders and organizations, including medical, counseling, law enforcement, and the student conduct office.

In September 2014, UNM commissioned consultants from Pilgrim & Associates to review and evaluate the climate regarding sexual violence in UNM's student housing and athletics programs. Pilgrim provided the University with a report on December 4, 2014, making recommendations for changes to UNM's policies, climate, training, and security. UNM publicly released the report in January 2015. In May 2015, UNM adopted a new sexual violence policy, streamlining its existing assortment of inconsistent policies into a clearer document that better complies with federal requirements. UNM also expanded training for undergraduate students, with an initial focus on student athletes and members of campus fraternities and sororities. In June 2015, the University launched a website called LoboRESPECT to publicize and provide information about its sexual harassment policies and procedures, and in September 2015 UNM opened the LoboRESPECT campus advocacy center to consolidate services and resources under one roof.

The Department commends UNM for these significant and proactive efforts. And we note that these initial measures may already be lifting student confidence in UNM's response: During the 2014-15 school year, the University received 109 administrative complaints of sexual harassment, sexual assault, domestic violence and stalking, in which at least one UNM student was party to the complaint.[3] By contrast, UNM had received a total of 57 complaints for the same acts in the previous five years combined. Increased reporting is a positive signal that UNM's efforts are improving students' awareness of, and confidence in, the University's procedures to address sexual harassment and sexual assault. Nonetheless, we found that UNM must take additional steps to ensure prompt and equitable resolutions of reports of sexual harassment and assault, protect and support students who have reported sexual harassment/assault, and improve campus climate and culture.

---

[3] For purposes of this letter, the school year starts on July 1st. Of the 109 complaints, 36 were classified as sexual assault, 41 as sexual harassment, 15 as domestic violence, 14 as stalking, and one each of sexual exploitation, hazing, and battery.

## LEGAL STANDARDS

The United States conducted this investigation and review of the University under its Title IX and Title IV authority. Title IX and its implementing regulations, 28 C.F.R. Part 54, prohibit discrimination on the basis of sex in education programs and activities operated by recipients of federal financial assistance. Title IV prohibits discrimination against students in public schools and colleges and universities based on sex, race, color, religion, and national origin. The University is a public school that receives federal financial assistance and therefore is subject to the requirements of both Title IX and Title IV. In the context of court actions for injunctive relief and administrative enforcement actions, the United States interprets Title IX and Title IV as applying the same standard to allegations of sex-based harassment. Thus, in the context of this investigation and compliance review of the University, the United States applied the same legal standards under Title IX and Title IV to conduct its legal analysis and reach its findings.[4]

Under Title IX and Title IV, colleges and universities that receive federal financial assistance are responsible for providing students with a nondiscriminatory educational environment. Sexual harassment is unwelcome conduct of a sexual nature and can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence. Sexual harassment that is sufficiently serious to interfere with or limit a student's ability to participate in or benefit from the school's program, i.e. creates a hostile environment, is a form of sex discrimination prohibited by Title IX and Title IV.

To determine whether a hostile environment exists, the United States considers whether there was harassing conduct based on sex that was sufficiently serious—that is, severe, persistent or pervasive—to deny or limit a student's ability to participate in or benefit from the school's program. The United States examines all the relevant circumstances from an objective and subjective perspective, including: the type of harassment (e.g., whether it was verbal or physical); the frequency and severity of the conduct; the age, sex, and relationship of the individuals involved (e.g., teacher-student or student-student); the setting and context in which the harassment occurred; whether other incidents have occurred at the college or university; and other relevant factors. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single instance of rape is sufficiently severe to create a hostile environment.

When a school knows or reasonably should know of possible sexual harassment, it must take immediate and appropriate steps to investigate or otherwise determine what occurred. If an investigation reveals that sexual harassment created a hostile environment, the school must then

---

[4] For consistency in federal administrative compliance reviews, the Department follows the legal standards established by the Department of Education's Office of Civil Rights in the Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, *available at*: http://www.ed.gov/about/offices/list/ocr/docs/shguide.html (Jan. 19, 2001); and its subsequent interpretive documents: the Dear Colleague Letter on Sexual Violence, *available at*: http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html (Apr. 4, 2011), and "Questions and Answers on Title IX and Sexual Violence" (Apr. 29, 2014), *available at*: http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

take prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects. A school should not wait to take steps to protect its students until students have already been deprived of educational opportunities. The school has responsibility to respond to allegations of sexual harassment of which they are or should have been aware, regardless of whether a student has complained, asked the school to take action, or identified the harassment as a form of discrimination.

The United States evaluates the appropriateness of a university's responsive action by assessing whether it was prompt and effective. What constitutes an appropriate response to harassment will differ depending upon the circumstances. In all cases, however, the college or university must conduct a prompt, thorough, and impartial inquiry designed to reliably determine what occurred. A school must protect the complainant and ensure his or her safety as necessary, including taking interim steps before the final outcome of any investigation.[5] The school should take these steps promptly once it has notice of a sexual harassment allegation and should provide the complainant with periodic updates on the status of the investigation. The school should also ensure that the complainant is aware of any available resources, such as victim advocacy, housing assistance, academic support, counseling, disability services, health and mental health services, and legal assistance. If a school delays responding to allegations of sexual harassment or responds inappropriately, the school's own inaction may subject the student to a hostile environment. If it does, the school will also be required to remedy the effects of the sexual violence that could reasonably have been prevented had the school responded promptly and appropriately.

Sexual harassment of a student by a faculty member or other school employee also violates Title IX and Title IV. A school should take steps to protect its students from sexual abuse by its employees by developing policies prohibiting inappropriate conduct by school personnel and procedures for identifying and responding to such conduct. Whether a school had notice or not, a school is nonetheless responsible for remedying any effects of the sexual harassment on the student, as well as for ending the sexual harassment and preventing its recurrence, when an employee engaged in the sexual activity in the context of the employee's provision of aid, benefits, or services to students (*e.g.*, teaching, counseling, supervising, advising, or transporting students).

In addition, if there is an incident involving potential criminal conduct, a school should notify a complainant of the right to file a criminal complaint, and should not dissuade a complainant from doing so. While schools may honor law enforcement's request to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation. A law enforcement investigation, whose purpose is to determine whether a person violated the state's penal code, differs from an administrative

---

[5] For the purpose of this letter, complainant refers to the person allegedly subjected to the harassing conduct. However, as already noted, a school must respond to complaints of alleged sexual harassment whether it learns of the harassment from the person subjected to the harassment, a third party, or an alternative source of information, e.g. a news report.

complaint investigation under Title IX, the purpose of which is to ensure a student's access to education is not limited or denied due to discrimination.  A law enforcement investigation (and any subsequent prosecution) is independent of and does not relieve a university of its Title IX and Title IV obligation to ensure that a student's access to the education program is not limited or denied.  While universities are encouraged to enter into agreements coordinating campus and community law enforcement investigations, a university should not wait for the conclusion of a criminal investigation or criminal proceeding to begin its own Title IX investigation.

Title IX also requires universities to adopt and publish grievance procedures providing for prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by Title IX, including sexual harassment and sexual assault.  28 C.F.R. § 54.135(b).  Title IX does not require a university to provide separate grievance procedures for sexual harassment complaints than other disciplinary procedures; however, a university's grievance procedures for handling discrimination complaints through their administrative process must comply with the prompt and equitable requirements of Title IX.  To ensure individuals can invoke these grievance procedures without fear of reprisal, Title IX also prohibits the university and others, including students, from retaliating against any individual "for the purpose of interfering with any right or privilege secured by [Title IX]," or because that individual "has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" under Title IX.[6]  Prohibited retaliatory acts include intimidation, threats, coercion, or discrimination against any such individual.  Universities therefore should take steps to prevent any retaliation against a student who makes a complaint or any student who provides information regarding the complaint.  At a minimum, under Title IX and Title IV, a university must ensure that complainants and their parents, if appropriate, know how to report any incidents of retaliation or new incidents of harassment, and should follow up to determine whether those incidents occurred.

A university may also need to take steps to address campus climate and the educational environment for students, including: training; the dissemination of information about how to report sexual harassment; adoption of new policies; and other steps designed to clearly communicate that the university does not tolerate, and will be responsive to any reports of, sexual harassment.

Further, a university must designate at least one employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX.  28 C.F.R. § 54.135(a).  All students and employees must be notified of the name (or title), office address, email address, and telephone number of the designated Title IX Coordinator(s).  The Title IX Coordinator(s) must have adequate training on what constitutes sexual harassment, including sexual violence, and understand how the grievance procedures operate.

---

[6] 28 C.F.R. § 42.107(e); *see* 28 C.F.R. § 54.605 (adopting enforcement procedures of Title VI of the 1964 Civil Rights Act at 28 C.F.R. §§ 42.106-42.111 and applying them to the Title IX regulations).

Lastly, a university must notify all parties that, pursuant to Title IX, it does not discriminate on the basis of sex in the education programs or activities that it operates.  28 C.F.R. § 54.140.  The notice must state: the requirement not to discriminate in the recipient's education programs and activities extends to employees and students; inquiries concerning the application of Title IX may be referred to the Title IX Coordinator or employee designated pursuant to 28 C.F.R. § 54.135(a); and the name, office address, email address, and telephone number of the designated coordinator.

## DISCUSSION OF FINDINGS

Based on the standards above, the United States reviewed the University's policies on sexual harassment, including sexual assault, and trainings regarding those policies to determine whether they provide adequate and clear notice to students and employees of conduct prohibited by law. We also carefully reviewed the adequacy of the University's Title IX grievance procedures, whether students have sufficient notice of these procedures and how to file complaints, and how the University has used these procedures to respond to sexual assault and sexual harassment complaints since the 2009-2010 school year.

Additionally, we evaluated the University's compliance with its duties to designate coordinator(s) under Title IX, to train those responsible for Title IX coordination and enforcement, and to provide a notice of nondiscrimination.

Below we explain in detail each area in which the University's compliance with Title IX and Title IV fell short of its legal obligations.

## I.     University Policies Prohibiting Sexual Harassment and Sexual Assault

At the time the Department initiated its investigation, UNM had in place 17 overlapping, and often conflicting, policies related to sexual harassment and sexual assault.  Most had not been updated in over 15 years, and as such did not reflect more recent federal interpretive guidance related to sexual harassment and sexual assault, such as the U.S. Department of Education's 2011 guidance on Title IX.[7]  Collectively, UNM's policies failed to provide members of the UNM community with a clear understanding of the parameters of prohibited conduct, where to report, options for confidential and non-confidential reporting, procedures for adjudication, and where to seek help and support.  For example, the University's Sexual Assault Policy (which was in effect until May 2015) had not been updated since 1995, used inconsistent and confusing terminology, contained multiple cross-references to other policies, and provided  incomplete information on reporting and adjudication procedures.  A UNM student, particularly one seeking help and guidance after experiencing a traumatic assault, would likely have found the University's policies to be daunting and inscrutable.

UNM's adoption of the new Sexual Violence and Sexual Misconduct Policy ("SVSMP" or "Policy 2740") in May 2015 has alleviated many, but not all, of these deficiencies.  Although the

---

[7]  *See 2011 Dear Colleague Letter on Sexual Violence*, U.S. Department of Education, Office for Civil Rights, (April 4, 2011) *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

University still has 17 policies that, at least in part, apply to incidents of sexual harassment, including sexual assault, the SVSMP consolidates much of the information, making it easier for users to find conduct requirements and procedures without navigating multiple disparate policies. UNM does not, however, explain how the policies interrelate, or which of the 17 policies, if any, have been withdrawn or are no longer in effect.  For example, in addition to the SVSMP, three additional primary policies relate to Title IX: the Equal Opportunity, Non-Discrimination, and Affirmative Action ("Policy 2720"); Sexual Harassment ("SHP" or "Policy 2730"); and Whistleblower Protection and Reporting Suspected Misconduct and Retaliation ("Policy 2200").[8] Not only do the four policies contain various inconsistencies, but faculty, staff and students receive no guidance as to which policy governs when there are areas of conflict.

The policies, for example, still fail to define sexual harassment in a consistent manner, and conflate the definition of harassment with the definition of a hostile environment.  Policy 2720 defines sex-based harassment as "unwelcome verbal or physical behavior, which is directed at persons because of their … sex … when these behaviors are sufficiently severe or pervasive to have the effect of unreasonably interfering with their educational experience, working conditions, or student housing by creating an intimidating, hostile, or offensive environment." Policy 2730 and Policy 2740 define sexual harassment differently:  "sexual harassment, a form of sex discrimination, is defined as unwelcome conduct of a sexual nature.  There are two typical types of sexual harassment: quid pro quo and hostile environment."  Policy 2730 then goes on to note that sexual misconduct may be "offensive, but not sufficiently severe, pervasive or persistent as to constitute a hostile environment."  These definitions differ in multiple and significant respects: under Policy 2730, *persistent* sexual misconduct would constitute a hostile environment, whereas under Policy 2720, it would not.  Policy 2720 suggests that an offensive environment is different from a hostile environment and can independently rise to the level of harassment, while Policy 2740 suggests that an offensive environment is just a lesser form of a hostile environment that does not independently constitute harassment.  As a result, these policies fail to provide students, faculty, and staff with clear and consistent notice of prohibited conduct.

In addition, each of these policies mistakenly indicates that unwelcome conduct of a sexual nature does not constitute sexual harassment until it causes a hostile environment or unless it is quid pro quo.  Unwelcome conduct of a sexual nature, however, constitutes sexual harassment regardless of whether it causes a hostile environment or is quid pro quo.  Indeed, federal guidance defines sexual harassment as "unwelcome conduct of a sexual nature.  It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature, such as sexual assault or acts of sexual violence."[9]

Hostile environment is not part of the definition of sexual harassment, nor is it required for "unwanted conduct of a sexual nature" to be deemed sexual harassment.  Instead, hostile

---

[8]  Policy 2215: *Consensual Relationships and Conflicts of Interest*, which requires any UNM staff, faculty, or student engaged in a relationship with a subordinate to report said relationship to their supervisors, is also relevant to Title IX matters.

[9]  *See 2011 Dear Colleague Letter on Sexual Violence*, U.S. Department of Education, Office for Civil Rights, (April 4, 2011) *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

environment is the threshold for determining the school's obligation under Title IX: when a school knew or should have known about sexual harassment that is sufficiently severe, persistent or pervasive as to create a hostile environment, the school has an obligation to end the harassment, prevent its reoccurrence, and remedy its harm.[10]  The school, therefore, carries the responsibility to investigate complaints of sexual harassment to determine whether a hostile environment exists that requires further action.  In conflating the definitions of sexual harassment and hostile environment, UNM shifts this responsibility to UNM staff, faculty, and students, by suggesting that a complainant must determine whether, and then specifically allege, a hostile environment exists for a report to constitute sexual harassment.

Compounding the confusion created by inconsistencies among the policies is the absence of any explanation regarding how the policies relate to one another and when each applies.  For example, Policy 2200, which governs how employees should report suspected misconduct, including sexual harassment, provides no definition for sexual harassment and does not reference or link to any UNM policy that does define sexual harassment.  Employees referencing this policy may fail to report allegations of sexual harassment as required, because they have no clear examples or explanation of prohibited behavior.

## II.    Campus Awareness of Sexual Harassment Policies

UNM posts all relevant policies on its website, and publishes some in the Student Handbook distributed at Orientation.  However, based on our interviews and focus groups, we found that with those efforts UNM had not effectively publicized its policies on sexual harassment to students, faculty, staff, and the wider UNM community.  First, most students had never heard of the Office of Equal Opportunity ("OEO"), the office tasked with processing sexual harassment complaints.  Second, when asked where they would report a sexual assault, most students said they did not know where to report or that they would call Agora, a student-run, confidential telephone hotline that offers support and referral services.  Contacting Agora, however, does not constitute a report to the University or initiate UNM's investigation procedures, as Agora volunteers are not responsible employees of the University with a duty to provide information about the reports it receives.[11]  Third, students did not understand when a report of a sexual assault would be confidential and when it would not.  Fourth, unless they had actually reported a sexual assault, students generally did not know that there are two reporting options: criminal and university administrative.  While most students were only aware of the criminal option, those who were aware of the UNM reporting option didn't understand how the two processes differed.  Students were also generally unfamiliar with UNM resources available to those who have been sexually assaulted, apart from Agora and the Student Health and Counseling Center ("SHAC").

In June 2015, UNM took a step toward addressing these gaps by launching a website called LoboRESPECT to publicize and provide information about its sexual harassment policies and procedures.  We commend UNM for consolidating information in a central and easily accessible

---

[10]  *Id.*

[11]  Agora is a highly visible service that provides students with an option for seeking confidential support. Confidential support options are important as many complainants need someone to speak to before they determine whether they wish to officially report their assaults.

location, and for continuing to review and strengthen the website for both content and clarity. The Reporting Options page, which provides important information regarding on campus and off campus reporting options for victims or bystanders, could be further enhanced to clarify the implications of using each of those options. For example, the Reporting Options page does not include a link to the DCP, which governs the OEO investigation and adjudication process, so students considering reporting to OEO have no readily clear explanation about what each step in the reporting process.

UNM policies compound the confusion as to where students should report sexual harassment, including sexual assault. For example, the first section of the new SVSMP, "Reporting Sexual Violence," encourages students to report sexual violence or misconduct, but states that "**all** UNM staff and faculty…who receive information about a person who has experienced sexual violence or misconduct must report the information to OEO within 24 hours." This section never states or encourages students themselves to report directly to OEO. A student looking to report sexual harassment may mistakenly interpret this section of the SVSMP to mean that they should tell a staff or faculty member first and cannot contact OEO directly.

UNM has acknowledged the need to expand training provided to undergraduate students to address gaps in students' knowledge and understanding of its sexual harassment policies and reporting procedures, and as part of its general prevention efforts. Prior to 2015-16, UNM's only training on sexual harassment, including sexual assault, for the general undergraduate body took place during first year orientation. In recent years, this training consisted of upper class students performing a skit that included a scenario of potential sexual assault and situations involving drugs, alcohol, and other behaviors common among college students. When asked, most students did not recall receiving any information about sexual harassment or sexual assault during freshman orientation. Those students that did remember receiving information on sexual assault described the skit as imparting the message that "girls shouldn't drink." Many students described their perception, based on these skits, that UNM's focus was not on condemning sexual assault, but on blaming women for putting themselves in dangerous situations by choosing to drink alcohol. Such messaging can lead to self-blaming by students who may have been sexually assaulted, as well as reluctance to report out of fear of discipline for underage drinking.

In August 2014, UNM began to provide targeted sexual harassment prevention training to specific student groups, including athletes, fraternity and sorority members, and resident advisors.[12] These trainings were largely developed and presented by the Women's Resource Center ("WRC") on campus. In addition, UNM mandates that all employees complete a single, online module about sexual harassment in the work place at the beginning of each year. We, along with our experts in sexual assault prevention and training, reviewed the WRC trainings, other sexual harassment trainings developed by outside consultants or guest speakers and

---

[12] While all first-year students are required to attend orientation over the summer prior to the start of the school year, transfer students and those who enroll in the spring are not, so a significant number of UNM students have never received any training on sexual harassment or sexual assault. Unless students are part of other specific groups they would not receive any training from UNM on sexual harassment, including sexual assault, in the four or more additional years they attend UNM after freshman orientation.

provided to a few student groups, and information about Campus Clarity, which UNM has retained to provide future online trainings to the campus community. Our review included interviews of trainers and students, as well as focus group data. Based on this review, we found that much of UNM's trainings on sexual harassment, including sexual assault, were lacking in content and depth, and did not reflect current research or align with best practices in the field. Consequently, even after receiving training, students we spoke with lacked basic understandings about consent, reporting, and Title IX process and procedure.

First, UNM has not provided adequate resources to support the development and dissemination of sexual harassment prevention training. In 2014-15, the majority of the sexual harassment prevention training was administered through the WRC by a graduate student who works part-time. This graduate student trained all orientation leaders, handled mandatory training for resident assistants, and oversaw the delivery by administrators (or delivered) sexual assault prevention programs in groups of 10 to 400 for athletics, housing, fraternities and sororities, and international students (a total of 19,000 students). The graduate student is now employed by the Advocacy Center to provide the same services. The need for sexual harassment prevention training at a school the size of UNM is too great for a part-time position.

Second, we found UNM's sexual harassment prevention programs from 2014 to be dated in both content and delivery methodology, in ways that limited their effectiveness. The programs, for example, do not provide practical experiences to develop skills required for prevention. They also impart information on sexual harassment through "myths and facts," rather than through more current methodologies, which emphasize interaction with participants and use of current case examples to generate discussion and disseminate facts about sexual harassment.[13] UNM's bystander intervention program materials are similarly lacking in content, specific instruction, and practice on bystander intervention strategies. Bystander intervention prevention requires a comprehensive program that teaches knowledge and skills and provides the target audience with opportunities to practice.[14]

Further, UNM does not consistently use evidence-based curricula, evaluation, or pilots for any of its sexual harassment prevention training. UNM told us that while they intend to pilot a new online sexual harassment prevention training, there is no current plan to evaluate the new online modules, or any of its other sexual harassment or misconduct training. Evaluation is key to determining the effectiveness of any training, and for providing guidance to the constituencies who are participating in the trainings (e.g., athletics, housing). Program evaluations provide important information on effectiveness and should be used to both enhance the content of the program and the training of the facilitators.

---

[13] For more information, *see* the systematic review of primary prevention strategies for reducing campus sexual assault conducted by the Centers for Disease Control and Prevention, (April 2014), *available at* https://www.notalone.gov/assets/preventing-sexual-violence-on-college-campuses-lessons-from-research-and-practice.pdf.

[14] For more information, *see* the description of effective programs and promising practices focused on bystander prevention efforts prepared by the Centers for Disease Control and Prevention, (April 2014), *available at* https://www.notalone.gov/assets/bystander-summary.pdf.

Finally, the sexual harassment prevention training and programming that we reviewed lacked sufficient information about to whom students should report and how UNM handles sexual harassment cases.  As a result, students do not understand where to report or what will happen when they report.  In particular, students said they did not know there were different ways to report a sexual assault (i.e., law enforcement and university) and they did not understand the implications around who they choose to report the incident (e.g., a university official with or without confidentiality).  A number of students discussed filing reports with UNMPD and not being informed of their reporting options on campus.  Others reported confusion as to whether a report made to UNMPD constituted a report to the University.  Some assumed that any information provided to UNMPD would be shared with the University.  Other students expressed frustrations to learn that information in UNMPD's possession would be shared with OEO.  Last, numerous students reported confusion about the University's jurisdiction over sexual harassment or assault that occurs off-campus.[15]  This is important because the vast majority of UNM students live off campus.

In August 2015, UNM introduced a new small group participatory training for incoming first year students.  This sexual harassment prevention training, called the Grey Area, addresses issues such as incapacitation and consent. Although we have reviewed the materials and found them to be much more aligned with best practices in the field, we have not fully assessed their implementation or effectiveness.  UNM also contracted with education provider Campus Clarity to offer online trainings on sexual harassment for students, faculty, and staff. However, UNM had not provided these online trainings to students as of November 18, 2015.

### III.    Campus Administrative Investigations

The University's grievance procedures, both as written and as implemented, violate Title IX and Title IV.  The grievance procedures do not ensure prompt and equitable resolution of students' complaints of sexual harassment, including sexual assault, and have impeded the University's ability to take remedial action against the discrimination.  *See* 28 C.F.R. §§ 54.135(b), 54,110(a).

In evaluating whether a university's Title IX grievance procedures are prompt and equitable, the United States considers the following:

- notice to students and employees of the procedures, including where complaints may be filed;
- application of the procedures to complaints alleging harassment of students;
- adequate, reliable, and impartial investigations of complaints, including the opportunity for the complainant and respondent to present witnesses and other evidence;
- designated and prompt timeframes for the resolution of the complaint process;
- written notice to the parties of the outcome of the complaint; and

---

[15] *See 2011 Dear Colleague Letter on Sexual Violence*, U.S. Department of Education, Office for Civil Rights, (April 4, 2011) *available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html. ("Under Title IX, a school must process all complaints of sexual harassment, regardless of where it occurred, to determine if the conduct happened in the context of an educational program or activity or had continuing effects on campus or in an off-campus education program or activity.")

- evidence of prompt and effective steps taken to prevent recurrence of any harassment and to correct its discriminatory effects on the complainant and others, if appropriate.

UNM has two grievance procedures that apply to sexual harassment, including sexual assault: the Discrimination Claims Procedure ("DCP") and the Student Grievance Procedure ("SGP").[16] Prior to May 21, 2014, when a student was accused of sexual harassment, the SGP governed how the DoS handled adjudications and sanctioning. The SGP currently applies to student conduct matters that do not involve allegations of sexual harassment. The DCP governs the adjudication process of the OEO which, prior to May 21, 2014, held intermittent jurisdiction over allegations of sexual harassment.[17] Since May 21, 2014, UNM has applied the procedures laid out in the DCP to all Title IX adjudication processes, e.g. investigation of and findings regarding sexual harassment allegations, whether they occur between students or in a work setting.[18] After OEO makes a finding that an undergraduate student has engaged in sexual harassment that violates UNM policy, the Student Conduct Office in the DoS imposes discipline under the SGP.[19] UNM's policies provide for a spectrum of possible sanctions, from an educational conference to expulsion.

The DCP, which defines procedural requirements for all Title IX investigations and adjudications at UNM, does not constitute an adequate grievance procedure for Title IX complaints because it has not afforded a prompt and effective means for responding to sexual harassment, including sexual assault.

These conclusions were reinforced by our interviews with numerous students, parents, and faculty members who had contact with OEO as complainants, respondents and witnesses. Uniformly, these individuals complained of confusion, frustration and stress caused by the length of investigations and lack of communication by the institutional body conducting the investigation; the failure to provide accurate information about the OEO process, the appeals process, and academic accommodations and supports; and delays in investigations and discipline. Indeed, some complainants reported that OEO's process was more upsetting and traumatizing than the initial sexual harassment that was the subject of their complaint. As a result, almost all complainants with whom the United States spoke said that they wished they had

---

[16] While the SVSMP, published on May 15, 2015, provides information on UNM's grievance procedures, the SVSMP is an Administrative Policy, not a grievance procedure, and it specifically states that the DCP governs the processing of allegations of sexual harassment, including sexual violence.

[17] For example, prior to May 21, 2014, work-related allegations of sexual harassment, including incidents involving residents and interns at the Medical School, were to be "resolved in the workplace or with the aid of a second-level supervisor." If complaints could not be resolved internally, they were referred to OEO. There is no evidence that the incidents handled internally followed any set procedures or guidelines, creating a risk of unreliable and potentially partial determinations.

[18] UNM failed to provide adequate notice to students of policy changes. For example, although the Sexual Harassment Policy was updated on May 21, 2014, the New Student Orientation Handbook for the 2014-2015 school year still contained the pre-amended Sexual Harassment Policy.

[19] According to interviews with the DoS and OEO offices, matters involving faculty, staff, and students in the professional schools, upon a finding of probable cause that sexual harassment has occurred, disciplinary matters are turned over to the Human Resources Department or the department/division in which the respondent is employed. Generally, we found that University officials do not follow up with these departments to ensure they take immediate action to eliminate the harassment, prevent its recurrence, and address its effects.

never gone through the process and would not refer another student who had experienced sexual assault to OEO.

In the discussion below, we address overall support for and training for OEO, notice of the DCP, and how the DCP functions in practice when students report sexual harassment, including sexual assault, to UNM.

### A. UNM's Office of Equal Opportunity (OEO)

Although UNM has expanded the role of OEO in addressing campus sexual harassment complaints in recent years, it has not adequately expanded the training and resources to that office to support OEO in carrying out its mandate effectively. OEO employs a Director, a Title IX Coordinator/manager, and three investigators assigned to Title IX matters, with each investigator handling between ten and twelve open matters. Turnover within OEO is exceedingly high. Since May 2014, OEO has had three different Directors, three investigators have resigned, and three new investigators have been hired. Such high turnover results in long delays during which cases are reassigned. One complainant's case was transferred three times as a result of OEO staff turnover. In addition, despite a nine-fold increase in the number of reports received, OEO has not increased its total staffing, but instead has eliminated administrative and data manager positions.

Throughout the time period we reviewed, OEO investigators received only intermittent and inconsistent training on how to conduct sexual harassment investigations and adjudications, resulting in inadequate, unreliable and potentially biased investigations and resolutions.[20] For example, UNM does not provide OEO investigators with sufficient training on making reliable findings of responsibility or non-responsibility. While OEO investigator training includes information on the Equal Employment Opportunity Commission's ("EEOC") five-factors to determine credibility (Inherent Plausibility, Past Record, Motive to Falsify, Corroboration, and Demeanor), investigators do not receive effective training on how to collect and analyze evidence, including witness statements, using these five factors, resulting in inconsistent and unreliable determinations of credibility.[21]

---

[20] UNM does not have a written policy or procedure on training requirements for investigators with the OEO, who since May 2014 are tasked with investigating all Title IX complaints. OEO orally stated that it trains its new investigators by giving them information on Title IX, having them review old case files, complete an online training, and shadowing an experienced instructor for 3-6 months. However, two OEO investigators stated that they received cases within three to six weeks of starting in the position and some had not yet completed the online trainings.

[21] While Title IX does not require a specific type of training for individuals that handle sexual harassment, one OEO investigator independently chose to attend trauma-informed forensic interview training in their personal time to better understand how trauma affects the brain and how to not re-traumatize a witness. This training is considered best practice in the field of sexual harassment and sexual assault investigations. Another chose to sit in on LoboRESPECT task force meetings to develop a deeper understanding of UNM's policies and grievance procedures. These employees should be commended for their initiative to obtain a greater understanding of their work.

### B.  Notice of Grievance Procedures

UNM's policies fail to consistently provide clear information on where to report complaints of sexual harassment, including sexual assault, and how those complaints will be handled. Specifically, UNM does not readily bring the DCP, which directs members of the campus community to bring sexual harassment complaints to OEO, to students' attention in an obvious or accessible manner.  For example, the DCP is not readily accessible in this year's "Pathfinder," the student handbook that contains the name and/or text of most University policies and which UNM provides to all incoming students.  By contrast, almost all other UNM policies that, at least in part address sexual harassment, are individually indentified and linked in Pathfinder.  Students reported not being aware of the DCP until provided a copy by OEO after a complaint is made to the office.

The LoboRESPECT website similarly does not provide clear notice of UNM's grievance procedures.  The Policies and Sanctions page of the LoboRESPECT website refers to the SGP, but fails to explain that students should refer to the DCP for information on the filing, investigation and adjudication of complaints.  Further, while LoboRESPECT contains hyperlinks to the DCP, SHP, and SVSMP, it provides no information as to how the policies interrelate. Finally, many of the hyperlinks on the LoboRESPECT website did not work at the time of launch, potentially thwarting visitors to the site, especially students in crisis.  While UNM is slowly fixing these issues as it become aware of them, more attention should be spent on making the website user-friendly at the time of initial publication.

We also note that while the SVSMP meets many of the requirements of Title IX, the SVSMP is classified as an Administrative Policy and specifically states that the DCP governs the processing of allegations of sexual harassment, including sexual violence.  Consequently, UNM must also include all relevant information in the DCP itself as the procedural document that governs Title IX complaints.  For example, while the SVSMP includes a section listing the rights of complainants and respondents during the OEO grievance process, that same section is not included in the DCP.[22]  In fact, the DCP does not contain any assurance of a prompt, equitable and impartial process.

### C.  Processing of Complaints

A school's Title IX investigation must be adequate, reliable, impartial, and prompt and include the opportunity for both parties to present witnesses and other evidence.  Between May 2014 and June 20, 2015, OEO received 115 complaints of sexual harassment and sexual assault; 35 of which resulted in investigations.[23]  In seven matters, the complainant requested an Educational Conference with the respondent instead of a formal investigation.  As of June 20, 2015, OEO had

---

[22]  UNM issued a revised SGP on January 13, 2016, which we have not fully evaluated.  We also understand there are plans to revise the DCP. UNM should be cognizant of the need to explain how the policies inter-relate and affect each other.

[23]  In an internal report, OEO reported receiving 138 Title IX complaints in calendar year 2015, of which 81 were accepted for investigation. This reflects a substantial increase from calendar year 2014, during which OEO reported to receive a total of 46 Title IX complaints, of which they investigated 32.

made finding in 13 matters; seven of which resulted in determinations that sexual harassment that violated the SCC had occurred.  Based on a review of the 35 investigations, we found that OEO's investigatory process does not meet the requirements of Title IX.  The DCP's written procedures effectively prevent investigators from conducting a thorough investigation, collecting corroborating evidence or making effective determinations regarding credibility.  Consequently, OEO cannot make accurate determinations as to whether sexual harassment creating a hostile environment has occurred and/or address the sexual harassment, as is required by Title IX.  *See* 28 C.F.R. § 54.110(a).  The DCP also lacks written procedures to ensure that UNM adequately investigates and responds to additional allegations of harassment that arise during an investigation.

Last, UNM fails to ensure impartial resolution of Title IX complaints, in contravention of Title IX.  As a result, the DCP process often fails to eliminate, and sometimes exacerbates, the discrimination experienced by students.

## 1. Ineffective Initial Evidence-Gathering

The DCP does not require OEO to ask a respondent (1) any question about the incident(s) at issue, or (2) to explain his or her own version of events.  Instead, during their initial meeting, the DCP requires OEO only to advise the respondent about the investigative process and provide him or her with a written copy of the complainant's specific allegations.  The respondent then has seven working days to provide a written response to the allegations.

This default procedure – that respondents are asked only provide a written response to a complainant's statement – effectively prevents OEO from pursuing and collecting important additional evidence during the initial stages of an investigation.  Because most incidents of sexual harassment, including sexual assault, occur in private with no witnesses, initial interviews of both complainants and respondents are important to determining what occurred.  Witness accounts of events often diverge as to location, statements made, and/or actions taken.  If one witness is not solicited to provide an independent account before being provided with a written copy of the other witness' statement, important physical evidence or potential additional witness testimony pertaining to the incident, or surrounding events, may be overlooked.

For example, in one case we reviewed, the respondent's written response to each paragraph of the complainant's statement contained assertions such as "I agree generally with the content of this paragraph."  Occasionally, the respondent provided a "correction, clarification and elaboration."  Not requiring investigators to request the respondent provide an independent account of the events prevents the OEO from getting a full picture of what occurred, may deprive the respondent of the opportunity to tell his or her version of events, if desired, and curtails OEO's ability to assess a respondent's account of the events, credibility and demeanor.  Further, the wording of the DCP does not clearly inform the respondent that he or she can choose to offer an independent account of the events as part of the investigation.

Indeed, in-person interviews allow both complainants and respondents to provide their own accounts of what occurred and give investigators the opportunity to gather information, identify evidence that corroborates the different accounts, and assess each person's credibility and

reliability.  Yet after OEO's initial in-person interview of a complainant and meeting with the respondent to explain the process and provide the complainant's written statement, OEO communicates to all parties almost exclusively in writing, rarely conducting follow-up interviews.  Not only does that practice limit the information OEO receives, if inconsistent written information is provided, OEO has no means of ascertaining the reason for, or resolving, the inconsistency.  For example, in one case OEO noted that the respondent provided inconsistent information in his written response to the complainant's statement, but determined that the existence of inconsistent statements alone was not evidence of lack of credibility; a follow-up interview would have given OEO an important opportunity to more fully and effectively assess the information provided by respondent and his credibility

### 2.  Inconsistent Application of Credibility Assessment

OEO written policy requires a finding of "probable cause" based on a preponderance of the evidence that the alleged harassment occurred.  However, OEO adheres to an unwritten policy that a finding of probable cause requires corroboration of the alleged incident by an eyewitness, tangible evidence, or admission by the respondent of the offending behavior, including a lack of consent.  OEO rarely attempts to identify witnesses or obtain physical evidence on its own, and does not alert complainants to the need for, and value of, witness testimony.  As a result, in cases where complainants did not suggest any potential witnesses, OEO appears not to credit the complainant's allegation.  Even in matters where complainants do offer relevant witness testimony, OEO typically does not credit the information unless it is direct eyewitness information.

For example, a complainant expressed reservations about going through the OEO process because she did not have physical evidence to corroborate her allegation of sexual assault.  The OEO investigator assured the complainant that corroborating physical evidence was only one factor considered in making a finding, and that OEO would consider factors such as the complainant immediately reporting the assault to a friend and a text message the complainant sent to the respondent within hours of the assault confronting him about his alleged actions.  However, upon receipt of the OEO's findings, the complainant learned that OEO did not give weight to those factors, despite having corroborated them, and concluded that "because there were no witnesses or evidence to show one version was more likely to have occurred than the other, there is insufficient evidence to demonstrate that the sexual intercourse was nonconsensual."

In another case, OEO's letter of findings noted that a witness who spoke with the complainant the morning after an alleged assault described how the complainant was "shaking" as she relayed how the respondent initiating sex while she "told him 'no' over and over again."  The witness also described the complainant as "so different" since the incident, "pushing people away" and "panicky."  A separate internal OEO report described this respondent's use of his position as an academic advisor to contact "multiple female undergraduates who were not his advisees" and escalate the professional interactions to personal ones – including two incidents of sexual intercourse – as potentially "predatory" behavior that could lead to further allegations.  Yet OEO did not consider this evidence in assessing either the complainant's or the respondent's credibility or in considering whether to make a finding of responsibility, instead making a determination that "because there were no witnesses or evidence to show one party's version is

more likely to have occurred than the other, it is determined that there is insufficient evidence to demonstrate that the sexual intercourse was non-consensual."

Additionally, OEO investigators either fail to implement the five-factor credibility assessment, implement it inequitably as between the complainant or the respondent, or apply it inconsistently from case to case. In one case, the complainant reported inappropriate sexual contact by the respondent, and witnesses to whom complainant immediately reported the alleged assault corroborated complainant's story. OEO found both the complainant and the witnesses credible with no motive to lie. However, OEO did not engage in a similar credibility assessment of the respondent, except to note that there were inconsistencies in his written response to the complainant's statement and that his supervisor reported receiving a prior complaint against him. As a result, OEO determined that there was not enough information to make a finding of probable cause that a sexual assault had occurred, despite noting that "OEO has serious concerns regarding the investigation" and that "because Complainant had no clear reason to report something that did not occur, it can be reasonably determined that something happened in Respondent's office which made her uncomfortable."

In a second case involving an alleged sexual assault, OEO failed to adequately weigh all the known evidence in reaching its determination that there was "insufficient evidence to demonstrate" non-consensual sexual contact. OEO considered the respondent's proffer of an alibi witness as credible "evidence that it is likely he was not with the complainant at the time." However, OEO did not acknowledge other evidence in its possession including that: (1) respondent originally stated that he was not with and "never touched" the complainant - a statement contradicted by a number of eyewitnesses and physical evidence; (2) respondent then changed his statement and admitted being with the complainant but stated the sexual activity was consensual; (3) the alibi witness admitted that she was only with respondent for one hour and that was not the hour during which the alleged assault would likely have occurred. In addition, OEO did not give weight to evidence of the complainant's credibility, despite the availability of substantial information to consider and assess, including the complainant's demeanor immediately after the alleged assault, physical evidence and witness corroboration.

Similarly, in another case involving a respondent alleged to have engaged in a pattern of sexual harassment, OEO determined no civil rights violation had occurred because, while a number of incidents were corroborated, some of them were not. OEO made this finding despite the fact that at least four other students reported witnessing or being affected by the same or similar offending behavior by the respondent, and the respondent had been dismissed from his prior school for sexual harassment.

### 3. Inconsistent Collection and Consideration of Corroborating Evidence

Throughout a school's Title IX investigation, the parties must have equal opportunity to present relevant witnesses and other evidence. Where parallel investigations of an incident are being conducted, a school should coordinate with the other ongoing school or criminal investigations, particularly where the investigations include or may include forensic evidence. However, OEO rarely attempts, and investigators are inadequately trained, to identify witnesses or obtain physical evidence of its own accord. For example, in one case, a respondent's supervisor shared

with OEO that there had been a previous sexual harassment complaint made against the respondent.  Without verifying or learning the facts of that complaint, OEO issued a finding of no probable cause in the matter before it.  In doing so, OEO ignored the possibility that the prior complaint may have revealed additional witnesses or provided evidence of pattern behavior.

In addition, multiple witnesses stated that they informed OEO about the existence of text messages, social media messages, and recorded images that were relevant to investigations, but OEO did not follow through in requesting or viewing this evidence.  One complainant reported being so frustrated by OEO's non-responsiveness that she contacted OEO asking how she could provide the information to them.  In another case, the complainant, respondent and a number of witnesses informed UNM that videos of the incident had been shared with respondent's social circle through social media.  At least one witness identified the videos as having come from the respondent's phone.  Despite this knowledge, OEO did not attempt to conduct a wider investigation among respondent's classmates, friends and acquaintances to ascertain the contents or whether the distribution of said videos implicated a violation of the Student Code of Conduct.

OEO investigators are not effectively trained on how to identify and weigh evidence that corroborates allegations of sexual assault, including medical records.  For example, in one case the complainant alleged that the respondent strangled her during a sexual assault; the respondent denied ever placing his hands on or around her neck.  The medical records, which were made the same day as the assault, indicated that redness and bruising was observed on the complainant's neck.  Despite having copies of the medical records, the OEO investigator misstated the medical record, writing, "Complainant herself reported strangulation, but the report did not demonstrate that evidence of such was found."  Ultimately, the OEO investigator found that, due to a lack of "tangible evidence," there was insufficient evidence to make a finding of probable cause.

Finally, OEO and UNMPD do not have a written agreement regarding the sharing of information or evidence collected during parallel investigations.  (*See* infra at Section IV.)  While the United States' investigation revealed that OEO investigators and UNMPD officers occasionally call each other to discuss a case with parallel investigations, OEO rarely requests to view the evidence for their own investigatory purposes.  Indeed, OEO reported that the prior Chief of UNMPD was reluctant to provide OEO with access to evidence.  As a result, OEO occasionally makes a determination in a case knowing that potentially material evidence exists but without viewing or gathering that evidence.

### 4.  Inconsistent Investigations and Poor Recordkeeping regarding Additional Complaints of Harassment

UNM fails to investigate or keep adequate records of all known allegations of sexual assault, which prevents the school from determining whether a violation of Title IX has occurred.  This failure is partly attributable to the DCP's silence on how OEO should handle additional complaints of harassment against a single respondent by additional complainants that arise during the course of an investigation.  As a result, OEO investigations of multiple allegations of sexual harassment against a single respondent result in inconsistent processes and conclusions.

For example, OEO became aware of six separate allegations of sexual harassment, including assault and retaliation, against a single respondent. OEO only fully investigated one complaint, despite the fact that UNMPD found probable cause to refer two additional complainants' case to the Bernalillo County (Albuquerque) District Attorney's Office. OEO also failed to adequately record the additional five allegations. Internal records include an entry regarding only one of the additional complainants – with the name of the respondent blank.

By contrast, in another case, OEO became aware of four additional complaints of sexual harassment against the same respondent. All five complaints were recorded in OEO's internal records, including one report where the complainant asked OEO not to initiate an investigation. One of the complainants had reported to the DoS the prior year and the investigation resulted in a finding of no probable cause. Once OEO received the new complaint against the same respondent, the report from the prior investigation and its findings were submitted to OEO. As the allegations of all five of the complaints against the respondent were virtually identical, OEO properly took account of the prior complaints in relation to each other.

Once a school knows about an alleged incident of unwanted sexual conduct, Title IX requires it to initiate an investigation to determine whether the harassment was sufficiently serious as to cause limitations or denial of educational benefits. This is true whether UNM becomes aware of harassment through a formal complaint or during an investigation. The lack of established guidelines and procedures regarding how to proceed upon receipt of additional complaints against a single respondent has impeded UNM's compliance with this requirement. UNM must keep full and accurate records of complaints to identify repeat offenders and examine patterns of sexual harassment. For every sexual harassment complaint, OEO should record the respondent's and complainant's names; and the time, location, and description of events, even when the complainant requests that an investigation not be conducted or a finding of no probable cause is made.

### 5. Inconsistent Consideration of Power Dynamics

Schools must consider the identity of and relationship between the harasser and subject when evaluating whether a hostile environment exists, especially in allegations of sexual harassment of a student by a school employee. OEO investigators do not consistently consider or assign value to power dynamics in relationships, an important consideration on a University campus where a number of complaints may involve faculty-on-student or staff-on-student harassment. In some cases, OEO ignored or completely dismissed the power differential. For example, in one case OEO noted that the respondent employee "is responsible for knowing UNM policy prohibiting sexual harassment," but in the letter of findings did not engage in analysis of the role of an employee's "authority" or "power" over students, or how knowledge of the UNM policy was evidence that the employee knew or should have known when conduct was unwelcome or non-consensual. After finding a lack of probable cause of sexual harassment, OEO internally recommended that respondent's staff and management receive training related to sexual harassment and Title IX in order to ensure that they are aware of and understand the importance of the policies and related procedures.

In another case where the respondent was a both a university employee and graduate student, in the letter of findings OEO ignored the respondent's role as an employee with authority over complainant and the fact that other students described the respondent as using his professional position to initiate contact and develop sexual relationships. OEO formally concluded that the facts of the case were insufficient to make a determination, but again internally noted that the respondent's "behavior could be viewed as 'predatory' and could lead to further allegations that [he] used his position as an advisor to engage female undergraduate students in sexual activity." OEO recommended that the respondent's supervisor and UNM Human Resources "follow up" and "take action as appropriate under University policy." There is no evidence of a follow-up response by either Human Resources or the respondent's supervisor.

## 6. Lack of Procedures to Ensure Impartiality

Title IX investigations and adjudications must be impartial and equitable. The United States learned that in at least two instances, high-level administrative offices pressured the OEO to get the investigation "done" – in one case, because it was in the media and in another, because the respondent in a case was "well positioned, politically, in the state." In another case, a UNM Dean requested an internal audit delay because a high profile guest was visiting the respondent (who was an employee), stating that, should the guest become aware of the investigation it would cause embarrassment to the University. Such intervention by university administrators is entirely improper. Further, the United States learned that students at UNM were aware of the pressure placed on OEO in one of the cases described above, undermining the confidence of students in the University's response to complainants that come forward to report sexual harassment, including sexual assault.

Additionally, we note that, until the current school year, OEO reported directly to the Office of University Counsel ("OUC"), which had final review authority over Title IX investigations.[24] This management structure created a conflict between OEO's stated goal of eliminating and redressing harassment and OUC's role in limiting the University's liability. For example, when a medical licensing board contacted UNM for information regarding a former UNM student who had been the subject of a sexual misconduct investigation, OUC noted that the respondent's lawyer had threatened legal action and therefore recommended that UNM limit its liability by not informing the medical board that the misconduct allegation involved harassment of a sexual nature.

## 7. Inadequate Procedures to Convey Information to Prevent Recurrence

Imposing sanctions against the respondent, without additional remedies, is often insufficient to eliminate the hostile environment and prevent recurrence as required by Title IX. To ensure that additional or continuing harassment does not occur, schools should develop specific materials that include the schools' policies, rules, and resources that explain protocol for steps that staff, faculty, and administrators should take when they learn of an allegation of sexual harassment.

---

[24] UNM informed the United States that OEO now reports directly to the Office of the President, a change we have not had the opportunity to assess.

The United States found that after UNM received an allegation of sexual harassment, effective follow-through procedures were largely absent, both during OEO's investigative period and after it issued findings.  In addition, UNM does not have established protocols to ensure that information regarding investigations and findings are effectively conveyed to other departments and divisions on campus.  For example, a respondent was suspended during the pendency of a sexual assault investigation, but applied for graduate school at UNM and was granted admission prior to the time OEO completed the investigation.  The graduate school admissions office did not know about the respondent's sexual assault-related investigation or suspension, or the ultimate finding that a sexual assault had occurred, until an advocate for the complainant called and notified that office.  In another matter, the department that employed the respondent attempted to remove him from his teaching position with access to students during the pendency of the investigation, but was unable to do so because the administrative head of the department was not aware of UNM's procedure to remove an employee.  OEO ultimately found probable cause that the respondent in that matter sexually assaulted a student.  In a third matter, OEO learned of additional complainants against a single respondent.  Two of the complainants reported being harassed and threatened by other students in the respondent's department.  OEO never conveyed this information to the administrators of the department so they could respond effectively, and UNM provided no immediate training on its prohibitions against sexual harassment and retaliation as a means to stop the behavior.

### D.  Inadequate Timeframes for Resolution of Complaints

School grievance procedures must provide for prompt and equitable resolution of sexual harassment complaints; and an unduly long appeals process may impact whether a school's response was prompt and equitable as required by Title IX.  UNM's investigations of sexual harassment complaints often take far too many months, and occasionally years, to complete.  Of the 13 investigations conducted by OEO for which findings had been issued as of June 30, 2015, the entire process, from receipt of complaint to issuing of the Final letter of Determination, took an average of 137 days.[25]  Ten investigations took over 100 days; the longest took 266 days.

In addition, while investigations are pending, important information necessary for making a reliable final determination, such as physical evidence or witness statements, is often lost or overlooked.  One reason for UNM's inappropriately long timeframes for investigations is that the DCP, as written, delays the evidence-collecting phase of an investigation until both a complainant and a respondent have reviewed and replied to a preliminary Investigative Issues Letter ("IIL"), which occurs one to two months after OEO receives an initial complaint.

First, the DCP states that OEO will not initiate an investigation until a minimum of 19 to 24 days after receiving a complaint, and OEO often extends that time upon a respondent's request.  Such delay impedes OEO's ability to conduct a thorough investigation, as material evidence, such as security videos, social media content, or text messages identified in the complainants' and respondents' statements, may be recorded over and deleted in the intervening time.  For example,

---

[25]  Federal guidance recommends that a school's investigation and adjudication process take approximately 60 days.  *See* "Questions and Answers on Title IX and Sexual Violence" (Apr. 29, 2014), *available at*: http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf.

in one case, by the time OEO initiated the investigation, potentially critical video evidence from UNM security cameras had long since been recorded over, even though the complainant's statement informed OEO of its existence.  OEO could have easily obtained this type of evidence while granting the respondent a request for an extension of time and ensuring the respondent had the opportunity to provide evidence and testimony in support of their case.

Second, the DCP allows for either party to request extensions of time throughout the investigatory process, but does not establish how OEO should respond to a request for an extension of time.  Further, there is no guidance as to what OEO should do when a party fails to meet a required deadline, causing further delays and creating the risk of unreliable determinations.  In one case, the respondent requested an extension of time for a meeting with OEO and in providing a response to the IIL. Internal emails from OEO reflected confusion about how to respond and whether the investigation could proceed.  Ultimately, when the investigation was initiated three months after Complainant reported to UNM and two months after OEO received the Complainant's verified IIL, OEO reached out to an important eyewitness only to discover the witness had left the country and would not return.[26]

Even after the initial intake, UNM does not have a written protocol establishing internal timelines for promptly conducting, reviewing, issuing and communicating investigative progress and findings, and conducting appeals.  Nor does OEO have a set protocol for communicating with complainants and respondents regarding the progress of or delays in investigations, which results in stress and uncertainty to both parties.  First, the DCP states that the investigation will not commence until after the complainant and respondent have reviewed the IIL, which does not occur until between one and two months after the receipt of the complaint.  The OEO investigation takes between two weeks and four months, after which OEO issues a Preliminary Letter of Determination ("PLOD"), and, approximately one month later, a Final Letter of Determination ("FLOD").

The United States' investigation revealed that, despite assurances that they would be informed of the progress of their matters, on multiple occasions both complainants and respondents inquired about the status of their cases due to a prolonged lack of communication from OEO.  In one case, after receiving a final IIL to a complainant, three weeks passed without further communication from OEO.  The lack of communication prompted the complainant to send an e-mail noting, "It's been a while since I've heard from you so I wanted to check in to see what's happening."  The following month, the respondent also had to email OEO for an update.  In another case, the complainant grew frustrated with the lengthy investigation and withdrew from the process, explaining that "this is taking too long and the emotional toll on me is too great."  On occasion, OEO has authored internal memoranda documenting delays and the reasons for the delays, such as a respondent's health issues or scheduling conflicts with a respondent's attorney.  However, more often OEO provides no explanation of or reason for the delays.

---

[26]  OEO initially delayed reaching out to respondents for one month at the request of law enforcement who was conducting a simultaneous investigation. Such a delay is reasonable and allowed under Title IX. Universities and law enforcement are encouraged to have MOUs in place to govern accommodating investigatory delay requests and information sharing processes.

The lack of internal deadlines and communication protocols causes confusion and frustration for the greater University community.  For example, in one case involving a UNM employee, OEO informed the employee's supervisor that it had completed the investigation approximately two months after opening it, and that a report would follow.  The supervisor contacted OEO five times over seven months seeking the report and expressing concerns regarding "timely follow through," as OEO had asked the Department not to make personnel decisions while the report was pending.  At one point OEO informed the supervisor that the report was being reviewed by OUC, but that office informed the supervisor that "no one in the OUC is reviewing anything for OEO at this time."  The report was released eight months after the investigation opened.

In another case, the chair of the academic department brought allegations of misconduct, including sexual harassment, by a faculty member to UNM's Internal Audit Office.  The Internal Audit Office turned the sexual harassment portion of the complaint over to OEO two weeks later without appearing to have informed the department chair who brought the complaint.  One week after that, the chair emailed Internal Audit about the timeframe of the investigation, expressing concern about a delay in the ability of the department to address the faculty member.

Last, the DCP lacks timelines for the appellate process, which can lead to months of delay in submitting a determination to the DoS for disciplinary measures and leaves both complainants and respondents waiting without any communication regarding the final outcome of their case.  For example, in one case, OEO released the FLOD 209 days after the complainant reported an assault.  The appeals process took an additional 127 days, resulting in increased stress and anxiety for all parties.

The delays in UNM's adjudication and sanction process reinforce the perception that UNM does not take complaints of sexual harassment seriously.  Of the seven investigations that resulted in a finding that sexual harassment had occurred, four had completed the appeals process by June 30, 2015.  Three resulted in suspension, expulsion or denial of renewed employment.  However, due to the length of the investigative and appeals process – an average 128 days for the three – disciplinary measures were so delayed that they had no effect.  For example, the United States' investigation revealed that in one case, prior to any sanction announcement, the respondent employee completed his employment contract with the university and moved out of state.  Thus, UNM's sanction on the respondent was of limited or no consequence.

### E.  Procedures to Prevent Further Harassment and Remedy its Effects

When a school knows or should have known of sexual harassment that causes a hostile environment and limits or denies educational opportunities, Title IX requires that the school remedy the harm and prevent its recurrence.  UNM's SGP gives the DoS the authority to both ensure student safety by issuing interim suspensions and no-contact orders for complaints of student-on-student harassment, and providing interim measures to complainants by assisting students with academic and remedial accommodations.  However, UNM's grievance procedures do not adequately ensure that the University complies with either requirement, and the procedures are not sufficiently transparent to explain the process, resulting in some students experiencing further harassment and denial of educational opportunities.

### 1. Inadequate Procedures for Issuing and Enforcing Safety Measures

UNM has no policy setting forth the factors the DoS should consider during the OEO investigatory process to determine whether a respondent is a safety threat and therefore should be suspended or have limited access to the campus during the investigation. This absence of policy results in inconsistent and confusing application of immediate measures to protect student safety. For example, in one matter involving an alleged sexual assault, the DoS contacted OEO after an alleged sexual assault asking whether "an interim suspension" was necessary. OEO responded that it was not because "there is so much attention on [the respondent] right now." The DoS took no steps to determine whether the respondent posed an ongoing threat to the campus, even after additional complainants came forward to lodge complaints of sexual harassment against the same respondent. Unfortunately, after OEO and DoS were aware of the multiple allegations against him, the respondent remained on campus and allegedly continued to sexually harass students.

While UNM orally informed the United States that a respondent cannot ask for reconsideration of an immediate safety measure, the SGP states any student who has been banned from campus on an emergency basis may request an informal meeting requesting that the ban be reassessed. The SGP does not set out the factors it considers in lifting the ban; require the complainant to be notified of the informal hearing or be provided the opportunity to share information regarding why the respondent may remain a potential risk; or require the complainant be informed of any changes to the emergency ban.

The result can be confusion and frustration for the complainant as well as the respondent. In one example, a respondent was suspended from campus for the pendency of the investigation, but requested an informal hearing on the suspension. One month later, the DOS lifted the interim suspension, but failed to inform the complainant or explain the reason. When the complainant became aware of the respondent's return to campus through third parties, she felt "powerless and destroyed." In another matter, UNM suspended the respondent from campus during the pendency of the investigation, but told him that he could continue with his course work at home. However, no arrangement was made for him to take his tests off campus, and respondent did not know who to reach out to for assistance. As a result, he dropped all his classes and lost a semester of course work.

### 2. Inadequate Procedures to Enforce No-contact Orders

UNM lacks the proper procedures to adequately enforce no-contact orders. On several occasions, UNM did not provide notice of the no-contact orders to necessary enforcement parties. For example, in a matter of alleged student-on-student harassment, the DoS issued a no-contact order, but failed to inform UNMPD of the order. When the complainant approached UNMPD to complain that the respondent was violating the no-contact order, she was informed that UNMPD was not aware of the order and could do nothing in response to her complaint. In another matter, the complainant requested a no-contact order from OEO, who informed her that they would send her request to the DoS, which issues such orders. When a no-contact order was not issued, the Complainant went to the DoS and was informed that OEO never forwarded the request. Indeed, UNM employees in the DoS and OEO offices noted in internal communications

26

that "there were (potentially) multiple gaps in process and communication," and a need to "revisit the conversation regarding the protocol of Title IX cases."

UNM also lacks effective procedures to ensure that its no-contact orders are issued in a way that prevents harassment instead of encouraging it.  For example, in a matter involving an alleged sexual assault where the complainant and respondent did not know each other's names, the DoS Office automatically issued a no-contact order without informing the complainant that doing so would reveal her name to the respondent and that she had the choice not to have a no-contact order.  As a result, the respondent and his friends found the complainant and allegedly harassed and threatened her for reporting the assault.  In another case involving a non-student's alleged stalking of a student on campus, the DoS did not issue a no-contact order because the complainant had requested that her name not be revealed.  However, DOS failed to inform UNMPD of the stalking complaint or the request for anonymity, resulting in UNMPD revealing the complainant's name to the respondent after it responded to a call of harassment.

### 3.  Inadequate Procedures to Ensure Academic Accommodations

UNM's DoS Office lacks adequate authority or procedures to institute appropriate academic accommodations for complainants, resulting in insensitive and inappropriate communications between the DoS and complainants.  In one matter, the DoS staff stated they would email the complainant's professors to inform them that she should receive accommodations following an incident, but the DoS failed to do so.  When the complainant approached her professors to request the accommodations, they did not know what she was talking about, making the situation awkward and uncomfortable for all involved.  In another matter, DoS told a complainant that she could take medical leave for the remainder of the current semester and the entire following semester, as a result of documented medical conditions resulting from a sexual assault.  A month after completing the required paperwork, the complainant was informed she had been given a "leave of absence" and not a medical leave, which meant that she could only take part of the current semester off and had to return to campus for the following semester.

In a third matter, a complainant reported being sexually assaulted by another student with whom she had no prior relationship.  The DoS staff member who was assisting her to obtain interim safety accommodations repeatedly referred to the respondent as her "ex-lover."  The complainant reported feeling humiliated and demeaned by this language.

## IV.    Campus Law Enforcement Investigations

Law enforcement agencies should recognize that explicit and implicit biases, including stereotypes about gender roles and sexual assault, can affect law enforcement officers' perceptions of sexual assault incidents and prevent them from effectively handling allegations of these crimes.  Eliminating gender bias in policing practices can have a real and immediate effect on the safety of individuals and communities as a whole, and foster victim confidence, which makes complainants more likely to report future incidents.  In order to reduce potential gender bias, law enforcement agencies should have (1) clear, unequivocal policies about the proper handling of sexual assault crimes; (2) training for officers about these policies and about effective responses to sexual assault crimes more generally; and (3) supervision protocols and

systems of accountability to ensure that officers responding to sexual assault crimes act in accordance with these policies and trainings.[27]  In addition, where a law enforcement agency is employed by and housed at a college or university, sexual violence complaints are often filed with the school's law enforcement unit.  Therefore, all school law enforcement unit employees should receive training on the school's Title IX grievance procedures in addition to training on the law enforcement response to and investigation of sexual assault.

UNMPD has the authority to investigate complaints of sexual harassment and assault within their jurisdiction.  OEO often received and sometimes relied on UNMPD investigations in making determinations in Title IX enforcement matters.  On August 9, 2013, UNMPD issued policies and procedures for sexual assault investigations that encompass many of the principles for proper handling of sexual assault crimes.[28]  However, UNMPD officers who handle sexual assault have received inconsistent and intermittent training on responding to sexual harassment, including sexual assault, resulting in incomplete investigations and leaving complainants and respondents feeling confused and alienated with respect to the UNM investigatory process.  In addition, UNMPD does not have the means or training necessary to independently collect and manage evidence, which delays and impedes their ability to independently investigate these crimes.

Prior to the 2014-15 school year, UNMPD did not require training on sexual assault investigations for members of its SMART.[29]  Commanding officers noted that most members of the then-SMART team were former Albuquerque Police Department ("APD") officers with experience investigating sexual assaults.  However, prior experience is not analogous to nor a substitute for training in effective investigatory techniques in sexual assault cases.  Such training assists officers to obtain evidence in an unbiased manner and helps officers recognize where assumptions and stereotypes influence their judgments as to the credibility of a complainant.

Notably, several individuals who reported sexual harassment to UNMPD told us felt they were treated in an insensitive and humiliating manner.  Complainants described being asked why they

---

[27]  For additional guidance, see *Identifying and Preventing Gender Bias in Law Enforcement Response to Sexual Assault and Domestic Violence* U.S. Department of Justice (December 2015); *available at:* http://www.justice.gov/opa/file/799366/download.

[28]  As part of its practice, UNMPD referred a number of sexual assault cases to the Bernalillo County District Attorney's Office, but individuals in UNMPD command expressed frustration as they believed that the District Attorney rarely prosecuted sexual assault cases unless the assaults were committed by strangers and the cases were presented "in a neat little package tied up in a bow."  This frustration was echoed by members of the community who had interacted with the District Attorney's Office on sexual assault matters. While not the focus of this investigation, the United States has concerns that this perceived unwillingness to prosecute sexual assault crimes involving victims known to the offenders may discourage some victims from reporting their assaults.

[29]  In 2014-15, all five members of the team attended conferences on Investigating Strangulation/Sexual Assault or Sexual Assault Nurse Examiners ("SANE"), or both. However, it is unclear if this was a one-time occurrence or a mandated annual training. One of the detectives on the SMART team took it upon himself to attend the SANE conference in two previous years, and in 2015 attended three additional trainings: the New Mexico Sexual Assault Coalition's training on Effective Investigative strategies, including trauma-informed and forensic interview training; the Rape Crisis Center of Central New Mexico's sexual assault training; and the Crime Victims Reparations training. This detective was able to articulate a best practice, trauma-informed approach to investigating sexual assault cases, and illustrate how he and another SMART officer used the approach in a recent investigation. These officers should be commended for their proactive approach to pursuing best practice training in the field, which also reflected in their work.  Complainants who interacted with this detective described him as caring and supportive.

didn't do more to fight off their attackers or being lectured on why young women should not drink in public; approaches that suggest either explicit or implicit gender bias on the part of the investigating officer.

Along with our experts in investigations of sexual assault by law enforcement, we reviewed UNMPD investigation reports for complaints of sexual assault and harassment. Many reports reflected relatively short and dismissive complainant interviews which focused the investigation on the complainant, not the accused, and claims of consent by the accused were taken on face-level and rarely challenged. Reports rarely reflected observations of demeanor or deduced or documented psycho-physiological evidence, all of which illustrates a deficiency in training and understanding of the complexities of sexual assault cases. The majority of the reports reflected a lack of understanding of the impact of trauma on complainants, or how such impact explains the challenges officers face in interviewing victims, such as memory gaps, inconsistent accounts, or delayed reporting, that can lead to inappropriate questioning. As a result, a review of UNMPD reports revealed that some officers were skeptical of victims' reports, and often UNMPD officers failed to conduct a follow-up investigation on information reported in the victim's initial report.

In addition, UNMPD officers, including some in command, exhibited a lack of understanding regarding the issues surrounding sexual, domestic and dating violence through their lack of familiarity with the parameters established by the FBI and International Association of Chiefs of Police on what constitutes an "unsubstantiated" case versus an "unfounded" case.[30] For example, one officer described a domestic violence victim as a "liar" when she recanted her story after returning home, not recognizing that she may have done so under threat, duress, or fear for her safety. A criminal complaint should not be unfounded as a result of the initial complainant interview or perceived complainant reaction to the sexual assault, as complainants of sexual assault may recant or decline prosecution for various reasons (e.g. fear of retaliation by the offender, concern about not being believed, hesitancy regarding the criminal justice system, and loss of privacy). A complainant's reluctance to participate is neither indicative of a false report nor reason to forego a strong, evidence-based investigation. Only after a full investigation shows that an offense was not committed or attempted may cases be coded as unfounded, as either baseless, if the case did not meet the elements of a crime or was improperly coded as a sexual assault; or false, if the evidence obtained through an investigation shows that a crime was definitively not committed or attempted.

Lastly, UNMPD officers noted that they are not trained and do not have the tools to process a crime scene for evidence. Currently, UNMPD must notify the Albuquerque Police Department

---

[30] The FBI defines "unfounded" as "a complaint that is determined through investigation to be false or baseless. In other words, no crime occurred…. the refusal of the victim to cooperate with prosecution or the failure to make an arrest does not unfound a legitimate offense. Also, the findings of a coroner, court, jury, or prosecutor do not unfound offenses or attempts that law enforcement investigations establish to be legitimate." *See* U. S. Department of Justice's Federal Bureau of Investigation's Criminal Justice Information Services Division's Uniform Crime Reporting Program Summary Reporting System User Manual (June 20, 2013), *available at*: https://www.fbi.gov/about-us/cjis/ucr/nibrs/summary-reporting-system-srs-user-manual. For additional information on classifying cases as unfounded, see the International Association of Chiefs of Police's Guidelines on Sexual Assault Incident Reports, available at http://www.theiacp.org/portals/0/pdfs/SexualAssaultGuidelines.pdf.

29

to have a crime scene processed, which can result in significant delay when that team is not immediately available.

## V.        Campus Climate

As described above, based on our analysis of sexual harassment complaints made to the University in the past six school years, focus group discussions, and interviews, the United States determined that incidents of sexual harassment, including sexual assault, created a hostile environment for affected students, as they were sufficiently serious that they interfered with or limited students' ability to participate in or benefit from the school's program. Affected students dropped classes; expressed fear of going to certain areas of campus; experienced negative mental health consequences, including post-traumatic stress disorder and suicidal ideation; lost scholarships; and in some cases withdrew from the University. Further, as explained above, gaps in procedures and training have prevented UNM from taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate the hostile environment, prevent its recurrence, and, as appropriate, remedy its effects.

More generally, many UNM students described significant concerns about campus climate, expressing unwillingness to report sexual harassment, including sexual assault, to UNM because they were afraid of retaliation, lack of a response by the University, or a negative response by the University. Students, faculty, staff, and community members expressed the view that the University approaches allegations of sexual assault with indifference or skepticism, and in some cases even levels blame upon the student experiencing the alleged assault. Indeed, in our interviews, University officials made several statements placing blame with students who are assaulted, reflecting a significant lack of understanding about the dynamics of sexual assault. One University official described "women putting themselves at risk [of sexual assault]." The same official specifically described a student who reported an assault as a "young woman who was very lonely, tended to be clingy, and would put herself in situations that led to her being victimized…she didn't have much insight into her behaviors." Community members told us they heard UNM administrators express similar sentiments at events in the community.

Some members of the campus community described a perception that UNM will not discipline alleged perpetrators, especially athletes, even after receiving multiple complaints about the same alleged perpetrator. One UNMPD officer stated that the administration did not respond when campus police presented evidence of a pattern of sexual harassment and retaliation by certain student athletes. A number of students reported being harassed by a group of student athletes after making a sexual harassment complaint to the University against one of their teammates, and that UNM did little to address their safety concerns. This view was also reflected in interviews conducted by Pilgrim & Associates at the request of the University. For example, one student who decided not to press charges against her ex-boyfriend told Pilgrim that "she was scared of retaliation because football is very petty with stuff like that. She thinks they would definitely 'do stuff like they did with the girl that reported the rape [by members of the football team]'…. She has seen retaliation occur against the alleged victim of the football rape accusations…. She saw on Instagram the football players posting pictures of the three guys saying something like 'that girl is going to get what's coming to her.'"

30

Students, faculty, staff, and community members also expressed a belief that UNM's approach to sexual assault is driven primarily by concerns about image-building and protecting high-profile students, rather than fostering a safe and healthy climate. In describing this perception, many pointed to the University's efforts to build its athletics program and to promote athletics in conjunction with a "party" culture; for example, the University has a partnership with "United We Rage" to host tailgates where students consume substantial amounts of alcohol prior to athletic events on campus. Students also expressed frustration about insufficient communication from the administration following high-profile alleged incidents of sexual assault, and attributed that lack of communication to concerns about image.

Prior to the launch of this investigation, UNM very rarely made public statements denouncing or expressing concern about student safety in response to sexual assault allegations against UNM students. During one high-profile case involving student athletes, UNM did not release a single media report or message from the administration affirming that it took allegations of sexual assault seriously or that it condemned the type of behavior alleged. The University's lack of public communication in response to these serious and widely-reported allegations of assault left students with the perception that UNM was indifferent to these allegations. One student told Pilgrim & Associates that UNM's response "was a slap on the wrist. The coaching staff and the athletic department acted like nothing happened…The week after the news broke out, the football player was on campus and was rolling around like nothing happened. The football player was on Twitter saying things like "I'm free, they'll never hold me down."

UNM was similarly silent after a high-profile case involving an alleged sexual assault at a fraternity. Ultimately, UNM suspended the fraternity for serving alcohol to minors, without referencing the allegations of sexual assault. Students, including members of fraternities and sororities, told us that UNM's response led them to believe that the school either condoned or was dismissive of the alleged sexual assault. In a different case, a UNM fraternity expelled a member after conducting its own extensive investigation into allegations of sexual assault. Fraternity members reported frustration at seeing the expelled member openly walking around campus, stating that the fraternity "did the right thing" despite fears of "being publicly labeled the rape frat." These students told us they perceived UNM as unwilling to hold the student accountable because it would tarnish the school's reputation.

By contrast, UNM has swiftly issued public statements responding to allegations against persons not affiliated with the school. For example, after a series of gropings on campus by a non-UNM student in 2013, the UNM President released a message stating that "recent attacks on two female students on campus are deeply disturbing to me. As the president of this university and as one who also lives on campus with my family, I am committed to doing everything in my power to ensure that safety continues to be a top priority. I understand that the frequency of these incidents over the past two weeks may be a source of anxiety and also may raise questions about what we are doing to try to prevent such events from happening. Your safety is of the utmost importance to the University."

Lastly, students and staff reported that the University does not adequately engage student groups to ensure that it is meeting the needs of its diverse campus community. Religion, race and ethnicity, sexual orientation, disability and gender identity – among other characteristics – can

affect how students address and respond to sexual harassment, including their willingness to make an official report.  UNM's efforts to prevent, address and respond to sexual assault should take account of and include students from diverse backgrounds.  For example, LGBTQ students report that the University's messaging around sexual harassment, including sexual assault, uses a heterosexist frame; UNM does not have a counselor trained or competent to help LGBTQ individuals at the faculty/staff counseling center; and LGBTQ students have been left out of some University efforts to improve responses to sexual harassment.[31]  Further, OEO has received very few complaints of sexual harassment from members of the LGBTQ community, even though LGBTQ Resource Center staff told us that some of the 3,000 visits they receive annually do involve complaints of sexual harassment, including sexual assault.[32]  LGBTQ staff are not required to report sexual assault to OEO and keep reports confidential unless a student requests otherwise.  The relatively few reports received directly by OEO suggests that members of the LGBTQ community may be unaware of or uncomfortable reporting to OEO – an inference that was supported by our interviews with students.[33]

When UNM created the SMART and the Presidential Task Force, only the Women's Resource Center ("WRC") was engaged in the original development of SMART, while the WRC and LGBTQ Resource Center were both invited to participate on the Presidential Task Force. Members of numerous other campus community groups – including African American Student Services, Indian American Student Services and El Centro de la Raza – said they were not able to engage with SMART or the Presidential Task Force to ensure that the sexual harassment policies, procedures and practices reflect the specific needs of these communities.

## VI.    Title IX Coordinator

While UNM has taken a number of steps to bring itself into compliance regarding its Title IX coordinator, further action is needed to notify all students and employees of the name or title and contact information of the coordinator and providing the Title IX Coordinator with adequate training.  Further, as UNM has designated its Coordinator to coordinate the implementation and administration of procedures for resolving Title IX complaints, including educating the school community on responsible employees' obligations to report a complaint alleging sexual harassment, the coordinator must do more to clarify reporting responsibilities and ensure that responsible employees have a clear understanding of what constitutes sexual harassment, including sexual assault, and each employee's duties and obligations under the various policies.

---

[31]  Starting fall of 2015, UNM invited the LGBTQ Center to participate on UNM's Sexual Misconduct and Assault Response Team, and recognized the LGBTQ Center as a confidential reporting center in the new Sexual Violence and Sexual Misconduct Policy. However, the LGBTQ Center does not serve on the Title IX or LoboRESPECT Committee, so their voices will not be considered in development and assessment of Title IX policies and procedures.

[32]  Members of the LGBTQ community experience high rates of sexual, domestic and interpersonal violence.  *See* Ctrs. for Disease Control and Prevention, Nat'l Ctr for Injury Prevention and Control, National Intimate Partner and Sexual Violence Survey: 2010 Findings on Victimization by Sexual Orientation 2 (2013), *available at*: http://www.cdc.gov/violenceprevention/pdf/nisvs_sofindings.pdf (noting that 44 percent of lesbian women, 61 percent of bisexual women, 26 percent of gay men and 37 percent of bisexual men have experienced rape, physical violence, and/or stalking by an intimate partner.)

[33]  While not the focus of our investigation, multiple UNM personnel reported discrimination against LGBTQ faculty and staff members as well as harassment on the basis of sexual orientation.

UNM must also devise a system to effectively communicate information on its Title IX enforcement among the many components on the campus.

### 1.    UNM Does Not Adequately Identify Its Title IX Coordinator

Through the duration of our investigation, the University designated the Director of OEO as the Title IX Coordinator.[34]   However, contrary to federal law and guidance, some of UNM's various policies and procedures pertaining to sexual harassment, including UNM's adjudication policies, do not accurately identify the Title IX Coordinator.  Some policies correctly identify the current Title IX Coordinator by name; others state that the Director of OEO is the Title IX Coordinator, which is not currently true.  Further, the policies are inconsistent in describing the role and duties of the Coordinator, and some fail to provide the contact information required by regulations.[35]  As a result, almost no students or faculty are even aware that UNM had a Title IX Coordinator because the information is not readily or clearly available.  For example, the SHP does not mention the Title IX Coordinator in the introduction, instead only referencing the position as an aside in section 3.1: Reporting Responsibilities: "the University relies on its employees to notify the University's Title IX Coordinator of all disclosures of sex discrimination, sexual harassment, and sexual violence against students."[36]  The words "Title IX Coordinator" are not hyperlinked to the webpage containing the current Coordinator's contact information.  Persons seeking the Title IX Coordinator's information in the SHP cannot easily ascertain the identity, office affiliation or contact information of the Coordinator.  By contrast, the SVSMP identifies the Title IX Coordinator by name and office affiliation and includes a hyperlink to a page of the OEO website that provides the Title IX Coordinator's name, contact information, and her duties and responsibilities.  This Title IX Coordinator webpage on the OEO website meets all the requirements of Title IX.  However, the information is only easily accessible from the S VSMP or for people who already know that the Title IX Coordinator information would be included on the OEO website.  Moreover, relying on hyperlinks prevents anyone who may be accessing the policies in hard copy form from getting information about the Title IX coordinator.

### 2.    UNM Does Not Adequately Train Its Title IX Coordinator Regarding Title IX Compliance Obligations

UNM does not require nor set forth a process for the Title IX Coordinator to engage in regular and timely review of federal law and guidance regarding Title IX.  The Title IX Coordinator has not keep abreast of federal updates regarding Title IX compliance.  Notably, the University's Sexual Assault Policy, which was in effect until May 2015, was not compliant with the US

---

[34]  In August of 2015, UNM removed the Title IX Coordinator duties from the Director of OEO and assigned them to Heather Cowan, a compliance manager in the OEO who oversees Title IX investigations conducted by the OEO office.  It is unclear whether this is a one-time event or formal change, and whether Title IX Coordinator will be an independent position.  As the change was made after June 30, 2015, the United States does not have the information to assess whether any duties Ms. Cowan may still retain regarding the Title IX investigation process has or could create a potential conflict of interest.

[35]  28 C.F.R. § 54.135(a).  As of September 15, 2015, the Office of Equal Opportunity Discrimination Claims Procedure still identifies the Director of OEO as the Title IX Coordinator.  UNM will need to correct this inaccuracy.

[36]  The Reporting Responsibility section was only added to the SHP on May 21, 2014.  Prior to that date, the sexual harassment policy was devoid of any mention of the Title IX Coordinator.

Department of Education's 2011 guidance on Title IX.  In fact, prior to April 19, 2015, UNM was unaware that a process existed for colleges and universities to be officially informed of new federal guidance.  When the Department of Education released its 2011 Dear Colleague Letter a UNM employee outside OEO brought it to the Title IX Coordinator's attention.  After learning of the 2011 Dear Colleague Letter, the Title IX Coordinator established a Title IX Compliance Committee, but did not call meetings for months at a time and did not undertake a compliance review or update of the University's sexual harassment policies.  UNM did not update its sexual harassment policy to reflect federal guidance until 2015.

### 3.    UNM Does Not Adequately Identify or Train Its Responsible Employees

UNM has designated its Title IX Coordinator to provide training on school policies related to sexual harassment to make sure that UNM employees are aware of their rights and obligations under Title IX.  However, UNM's policies provide conflicting information regarding who constitutes a responsible employee with an obligation to inform the Title IX Coordinator or OEO of a report of sexual harassment, including sexual assault.  Moreover, UNM has not effectively communicated the reporting requirements of those designated as responsible employees.  The new SVSMP states that all UNM faculty and staff, except those individuals employed by or associated with SHAC, Counseling, Assistance & Referral Services, or the UNM Advocacy Center, as "responsible employees" who are required to inform OEO of any report of sexual harassment, sexual violence or sexual misconduct.  By contrast, the SHP identifies not all staff, but only faculty, administrators, and supervisors as "required to engage in appropriate measures to prevent violations of this policy and promptly notify OEO."

While Title IX does not dictate which university employees have Title IX reporting obligations, guidance from the U.S. Department of Education's Office for Civil Rights ("OCR") defines responsible employee as "any employee: who has the authority to take action to redress sexual violence; *who has been given the duty of reporting incidents of sexual violence or any other misconduct by students to the Title IX coordinator or other appropriate school designee*; or whom a student could reasonably believe has this authority or duty."[37]  Once a university has designated responsible employees, the failure of an identified responsible employee to make such a report constitutes a violation of Title IX. The conflicting language of the SVSMP and SHP regarding responsible employees is likely to confuse employees attempting to determine whether they have reporting obligations.  Individuals who consult the SHP may not understand that, under the SVSMP, staff members who do not have supervisory duties still have reporting obligations.

UNM does not provide sufficient notice of or training on sexual harassment policies and procedures to its faculty and staff.  While the University requires faculty and staff to participate in annual online training, faculty and staff report that the focus of this training is on the importance of not sexually harassing others in the workplace.  This type of training is also necessary, but faculty and staff reported that they receive no training on how to identify sexual harassment; what to do if a student reports a sexual assault; the designation and duties of

---

[37] *See* Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties at 13, *available at*: http://www.ed.gov/about/offices/list/ocr/docs/shguide.html (Jan. 19, 2001).

responsible employees to report; how the University will investigate or respond to the report; or where the faculty or staff member can direct the student for help or support.

During the 2014-15 school year, OEO developed training regarding Title IX reporting obligations, which includes information on where responsible employees must direct reports. However, the United States' investigation revealed that a number of UNM employees, including those who have always been designated responsible employees, have never received training about – and are thus unaware of – their reporting obligations. Faculty and staff reported that they did not know whether they were responsible employees required to report incidents that were reported to them; would not know what to do if a student reported a sexual assault to them; and did not know who to call. A number of graduate students and staff members stated that they brought complaints of sexual harassment to their department chairs or supervisors, respectively, who appeared to have done nothing to report or remedy the situation, nor was the evidence that the information was passed on to OEO. Further, faculty and staff who themselves experienced alleged sexual harassment, including sexual assault, also report a great deal of confusion about UNM's sexual harassment policies and procedures. As of November 18, 2015, the only employees required to attend training on identifying and reporting sexual harassment, including sexual assault, are the 219 individuals employed as residential advisors, academic advisors and Athletics Department staff.

In addition, UNM provides no training for graduate students, who often serve dual roles as employees and students. Most graduate students indicated that they did not know they had the option of reporting to OEO, nor did they understand that in the context of their teaching role, they might have an obligation to report sexual harassment to OEO.

The lack of information regarding who constitutes a responsible employee has resulted in UNM not receiving information about sexual harassment, including sexual assault, on campus in a systematic and comprehensive manner. For example, prior to May 2014, UNMPD, members of whom are responsible employees, received a number of complaints of sexual assault of UNM students, including one complaint against a student accused of two additional sexual assaults against different complainants. Neither the DoS nor OEO appear to have received that report or to have conducted an investigation. Further, in 2013, there were four complaints of drug-facilitated sexual assaults affiliated with UNM sororities and fraternities. Students remember discussing all of the incidents with a UNM official who has reporting obligations, and a sorority sent out an email discussing a possible serial assaulter. However, there is no evidence that this information was passed on to OEO. As a result of these failures to report, UNM failed to adequately respond to known allegation of sexual harassment, prevent their recurrence, and provide sufficient supports and remedies to the complainants to redress the harm.

Further, while the United States focused its investigation on sexual harassment involving students, information we collected showed that UNM lacks understanding regarding the purpose and scope of Title IX. For example, in a report issued in October 2015, UNM incorrectly noted that claims of sex-based discrimination against employees are not covered by Title IX, as "Title

IX protections cover only students."[38]  During the course of its investigation, the United States heard from a number of current and former employees in academic and services departments who identified hostile environments due to sex-based discrimination and an indifferent response by the administration to complaints.

## VII.    Conclusion

We acknowledge and appreciate the commitment of the University to prevent and address sexual harassment, including sexual assault, and the steps UNM has taken to date in furtherance of that commitment.  To fully comply with Title IX, the University must take additional specific steps to:

1.    Provide comprehensive and effective training to all students, faculty, and staff that gives notice of the University's prohibition on sexual harassment, including sexual assault; information about reporting options, duties and obligations; details on where to go for help or assistance; and information on grievance procedures and potential outcomes;

2.    Revise the University's policies, procedures, and investigative practices to provide a grievance procedure that ensures prompt and equitable resolution of sexual harassment and sexual assault allegations;

3.    Adequately investigate or respond to all allegations by students who have alleged sexual harassment, including sexual assault, and/or allegations of retaliation for reporting sexual assault or sexual harassment;

4.    Take prompt and effective steps to eliminate a hostile environment, prevent its recurrence, and address its effects; and

5.    Ensure that the individuals designated to coordinate its Title IX efforts receive adequate training and coordinate these efforts effectively.

We hope to continue working with UNM in an amicable and cooperative fashion to resolve our outstanding concerns.  We hope that you will give this information careful consideration and that it will assist in advancing productive discussions that have already been initiated with the University.

---

[38]  UNM acknowledged to the United States that the report "incorrectly states that the protections of Title IX of the Educational Amendments of 1972 only cover students. The Office of Equal Opportunity does not share this view." However, the fact that individuals tasked with internally reviewing sexual harassment investigations are not aware that Title IX covers employees is evidence of UNM's lack of understanding and failure to train responsible parties as to the scope of the statute.

Please contact us to inform the United States whether the University is interested in working cooperatively to resolve this matter. We know that you will give this letter careful consideration and review, and we look forward to speaking with you in the very near future. If you have any questions regarding this letter, please contact Torey Cummings at (202) 305-4204 or Colleen Phillips at (202) 307-6548.

Sincerely,

Shaheena Simons, Chief
Educational Opportunities Section
Civil Rights Division
U.S. Department of Justice

Damon Martinez
United States Attorney
District of New Mexico
U.S. Department of Justice

PLAINTIFF'S EXHIBIT 7



**YEAR OF THE RAM**
Rio Rancho nips Mayfield
SPORTS >> D1

NEW MEXICO'S LEADING NEWS SOURCE
# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM
$1.00
Copyright © 2014, Journal Publishing Co.

SATURDAY
DECEMBER 6, 2014
FINAL ★★★★

**HOLIDAYS & FAMILIES**
Find joy celebrating with new members, traditions



Ulysess Johnson, 9, scratches Ziggy's nape. Ulysess is a member of Alamosa Elementary School's Cat Club.

## ROLLING WITH ZIGGY

*Disabled kitten finds cool friends — and new wheels — at Alamosa Elementary*

Ziggy was acting like a cat when I showed up. Which is to say that Ziggy, who is in fact a cat, was not inclined to roll about with a harness in her student-made suspension walker, no matter how much cajoling I expended. She had better things to do than appease a human like me.

But the kids in Ms. Victoria Yarborough's eighth-grade service class at Alamosa Elementary School in Southwest Albuquerque were happy to oblige, giving a gentle push to the colorful contraption they devised to help the three-legged, paraplegic and aloof (to me) kitten get around.

"It's OK," said Kenadee Hill, 8and a third-grader. "She likes

See DISABLED >> A4

**UpFront**
Joline Gutierrez Krueger

# Ex-APD officer gets 90 days for fatal crash

## Judge gives Adam Casaus maximum sentence for careless driving

Former Albuquerque police Sgt. Adam Casaus is handcuffed and taken out of court after he was sentenced to 90 days in jail by State District Judge Richard Knowles. Casaus is escorted by Deputy Gerard Barela, left, past Casaus' attorney, John D'Amato. Casaus was convicted in September of careless driving in connection to the crash that killed 21-year-old Ashley Browder and injured her younger sister, Lindsay.

**BY RYAN BOETEL**
JOURNAL STAFF WRITER

The outcome was no surprise, but emotions still ran high during Friday's sentencing hearing for former Albuquerque police Sgt. Adam Casaus, who caused the wreck that cost the life of a young Rio Rancho woman.

Casaus was handcuffed and whisked out of District Court on Friday afternoon to immediately start serving three months in jail.

He was convicted in September of careless driving after a trial in connection with the February 2013 collision that killed 21-year-old Ashley Browder and seriously injured her younger sister, Lindsay. Casaus was charged with reckless driving and faces nine years in prison but a jury convicted him of a lesser charge and

See EX-APD >> A4


**ASHLEY BROWDER:** Had recently moved to NM

Lindsay Browder, whose sister Ashley, 21, was killed in the February 2013 collision, called Casaus "a piece of human garbage" and "a pathetic man for his claim that she might have caused the crash."

# State Police investigating dropped case

## 2011 report on alleged child rape never got to DA's Office

Copyright © 2014 Albuquerque Journal

**BY PATRICK LOHMANN**
JOURNAL STAFF WRITER

Two New Mexico State Police employees are the subjects of an internal investigation to determine how a girl's allegations in 2011 that she was sexually abused by a relative went nowhere, allowing the suspect to allegedly sexually abuse another young girl, according to State Police Chief Pete Kassetas.

Kassetas outlined the case in an interview Thursday morning after repeated Journal inquiries into what came of the 2011 allegations against Michael Marchese, 44, of Belen, who is now facing a number of child rape and other charges for alleged acts committed after 2013.


**MARCHESE:** Facing child rape and other charges

Kassetas, who became NMSP chief in August 2013, said he has "lost sleep" over his agency's failure in 2011.

"This is one of the most troubling cases I've seen," he said. "... The reality is, somewhere in the system, what was supposed to happen in 2011 didn't."

The chief also said the department is looking to overhaul its system that tracks calls for service and police reports to implement more "cross checks" and prevent cases from being forgotten.

The two alleged victims are now in state custody, he said.

In a State Police report detailing the most recent allegations, officers wrote

See NEW MEXICO >> A2

# City may get ice skating rink in plaza by Christmas

*Synthetic ice would be used and skaters would pay a small fee*

**BY DAN McKAY**
JOURNAL STAFF WRITER

An outdoor ice rink on Civic Plaza?

Yes, the mayor is serious about the idea, and it could happen by Christmas.

Gilbert Montaño, Mayor Richard Berry's chief of staff said the city is working hard to bring a small ice rink to the plaza in the next few weeks. The idea would be to try it out through March to gauge interest.

The rink would have synthetic ice. It would cover an area a little larger than the fountain that already rests on the plaza.

Montaño said the goal is to capitalize on Albuquerque's good weather and the space available Downtown, drawing more people into the city core.

"We're excited," he said. "We're very close to making this a reality."

Skaters would pay a small fee, perhaps a dollar or two, covering the cost of operations, he said.

See CITY >> A4

# DOJ to investigate UNM's sex assault response

*Inquiry triggered by 'multiple complaints'*

**BY MIKE BUSH**
JOURNAL STAFF WRITER

The U.S. Department of Justice has opened an investigation into the University of New Mexico's response to allegations of sexual assaults and sexual harassment, citing what it called "multiple complaints" about UNM.

Campus officials were taken by surprise Friday and said they were disappointed because of all the new programs the school had implemented.

The university received a phone call about 8 a.m. advising that an announcement would be forthcoming. A formal letter from the DOJ later in the day included a request for information.

"The Department of Justice has received complaints regarding the University of New Mexico's response to alleged sexual harassment, including sexual assault," the letter states.

In 2013, the university received 11 reports of sexual assaults on campus. This year, so far, there have been eight

See DOJ >> A2




Dean of Students Tomás Aguirre talks about the DOJ inquiry into UNM's response to student complaints about sexual assault and harassment. Dianne Anderson UNM's director of communications, is at right.

**INSIDE**

| | |
|---|---|
| ALFOE | C4 |
| BRIDGE | B4 |
| BUSINESS | B1 |
| CLASSIFIEDS | C1 |
| COMICS | ENTERTAIN |
| CROSSWORDS | B4, C4 |
| DEAR ABBY | B4 |
| HOROSCOPE | B4 |
| LOTTERY | A2 |
| METRO & NM | A4 |
| MOVIES | ENTERTAINER |
| OBITUARIES | C1 |
| TV | ENTERTAINER |
| WEATHER | C8 |




**MICHAEL McDONALD**
AN EVENING OF HOLIDAY AND HITS
**DECEMBER 19**
ISLETA resort • casino
(505) 724-3800 | isleta.com

# DOJ to investigate UNM's sex assault response

## Inquiry triggered by 'multiple complaints'

**BY MIKE BUSH**
JOURNAL STAFF WRITER

The U.S. Department of Justice has opened an investigation into the University of New Mexico's response to student allegations of sexual assaults and sexual harassment, citing what it called "multiple complaints" about UNM.

Campus officials were taken by surprise Friday and said they were disappointed because of all the new programs the school had implemented.

The university received a phone call about 8 a.m. advising that an announcement would be forthcoming. A formal letter from the DOJ later in the day included a request for information.

"The Department of Justice has received complaints regarding the University of New Mexico's response to alleged sexual harassment, including sexual assault," the letter states.

In 2013, the university received 11 reports of sexual assaults on campus. This year, so far, there have been eight.



ROBERTO E. ROSALES/JOURNAL

**Dean of Students Tomás Aguirre talks Friday about the DOJ inquiry into UNM's response to student complaints about sexual assault and harassment. Dianne Anderson UNM's director of communications, is at right.**

See **DOJ** >> **A2**

# DOJ to investigate UNM's sex attack response

## From PAGE A1

The letter from the Justice Department's Civil Rights Division was initiated in part under a law that proscribes sexual harassment on campuses that receive federal funds.

"We have reached no conclusions regarding whether the University of New Mexico has violated these statutes," the letter said. "To permit us to make a full assessment, we request that the University provide information and documents that will assist the Department in evaluating the allegations and the University's policies, procedures and practices for responding to reports of sexual harassment, including sexual assault."

The university has until Jan. 9 to respond.

Jack Fortner, president of the Board of Regents, said he welcomes the DOJ investigation.

"I don't see it as a bad thing," he said. "The fact is, it will provide us with some valuable input. It never hurts to get

outside opinions. An investigation from the DOJ can't be all bad."

UNM President Bob Frank, noting that the investigation is apparently based on student complaints, said the university has made great strides in the past two years in developing a proper response to such allegations.

"UNM has made substantial progress," he said in an interview. "We take this with the utmost of seriousness. We don't believe we are a university out of control."

UNM was rocked by allegations earlier this year that two Lobo football players and another man raped a student. After a lengthy investigation, prosecutors declined to bring charges. The attorney for one of the suspects showed reporters cellphone videos of the encounter that showed the alleged victim's active and apparently willing participation. Her lawyer later said the woman could not remember what happened for several hours and believes she was drugged.

Dean of Students Tomás



ROBERTO E. ROSALES/JOURNAL

**Life goes on as usual Friday for University of New Mexico students, at the time unaware that campus practices and policies on sexual assault and harassment are under investigation by the Department of Justice.**

Aguirre, meeting with reporters, said he was extremely disappointed by the investigation, especially in light of "all the hard work by so many people over the past year."

UNM is asked to provide extensive documentation including grievance proce-

dures on sexual misconduct, the student code, the Student-Athlete Conduct Code, information on individual complaints and alleged perpetrators for the past four years, guidelines on alcohol and drug use by students, policies on campus safety, agreements

## To contact investigators

Call the Department of Justice at (855) 856-2048, a telephone line specifically set up for the UNM investigation.

Or, contact the department online at http://community.unm@usdoj.gov.

with local law enforcement agencies on sexual harassment, conduct involving fraternities and sororities and other documentation.

Over the past year, UNM has taken a number of steps to deal with sexual assaults and harassment, including:

▪ A Presidential Task Force on Sexual Violence that resulted in a Sexual Molestation and Assault Response Team. Members include UNM resource centers — the Women's Resource Center, the LGBTQ Center and ethnic centers, Student Health and

Counseling, the Rape Crisis Center and the UNM Police Department.

▪ The creation of LoboRE-SPECT, a student-centered advocacy, response and education campaign.

▪ With guidelines from the DOJ's Office of Civil Rights, an educational outreach training on sexual violence that was presented to more than 10,000 students this semester.

▪ Formed a Provost's task force to streamline the various departments that address different aspects of laws dealing with violence against women.

▪ A new Sexual Violence and Misconduct Policy that includes clear statements that victims and accused have equal rights during investigations and the disciplinary process.

▪ Requested an independent assessment to gauge attitudes and experiences regarding sexual assault in the UNM community. The University Counsel just received the assessment and is reviewing the recommendations.

PLAINTIFF'S EXHIBIT

8

**Dallas rallies**

The Cowboys push past the Lions to advance in the NFL playoffs

SPORTS >> B1

**Sticker shock**

Major overhaul of jobless insurance program could hit small businesses with hefty increases

BUSINESS OUTLOOK

**It's not too la**

in Ne

still get a vaccine

METRO & NM >> D1

NEW MEXICO'S LEADING NEWS SOURCE

ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.00

Copyright © 2015, Journal Publishing Co.

ESTABLISHED 1880

MONDAY JANUARY 5, 2015

FINAL ★★★★

# DOJ's probe of UNM is second in nation

*School may learn from investigation of sexual assaults at U. of Montana*

Copyright © 2015 Albuquerque Journal

BY MIKE BUSH
JOURNAL STAFF WRITER

Without warning, U.S. Justice Department lawyers telephoned the University of New Mexico one morning last month to say it was opening an investigation into how the university responds to allegations of sexual assault and harassment.

It is only the second time such an investigation of a university has been launched by the DOJ. The previous one occurred at the University of Montana.

In the 8 a.m. phone call to UNM officials, a follow-up letter and a news release, the DOJ would only say the investigation by its Civil Rights Division was sparked by "multiple complaints" from students.

UNM officials, from President Bob Frank on down, insisted they had no idea why the campus is under investigation. They point to a number of proactive moves by UNM in recent years that are designed to make reporting sexual harassment and assaults — and follow-up developments and investigations — easier on the victim.

Meanwhile, the University of Montana investigation, begun in May 2012, came after an independent investigation already had found the university had major problems with the way it handled sexual assault cases.

The federal investigation lasted a year and ended with an agreement calling for a number of changes.

While UNM remains in the dark about what brought on its investigation, the Montana experience may provide insight as to what UNM can expect.

UNM's Dean of Students Tomás Aguirre said he was encouraged by the DOJ report on the UM investigation.

"They tell you what you're doing right, as well as those areas that may need improvement," he said, adding that such an "objective evaluation" by neutral observers only can be beneficial.

See DOJ PROBE >> A2

# Program lets veterans train assistance dogs

GREG SORBER/JOURNAL

**Norman Landry puts a vest on Gunner as they start training at Dogwood Therapy as part of the 2nd Judicial District Veterans Court program. Veterans are training the young Labradors and other breeds as assistance dogs for other veterans.**

## Vets Court offers a mission along with rehabilitation

Copyright © 2015 Albuquerque Journal

BY SCOTT SANDLIN
JOURNAL STAFF WRITER

New year, new start on life.

For Norman Landry, a 67-year-old Vietnam vet, that means helping train a service dog for a fellow veteran in need. And, if all goes well, avoiding prison time.

A fledgling program in the Veterans Court at 2nd Judicial District Court gives vets like Landry — who have landed in trouble with the law because of trauma associated with combat — a mission to help train service dogs. Veterans Court is a post-plea program that allows veterans who qualify and meet certain requirements to obtain a conditional discharge at its conclusion.

The dog-training program, which started in August, is for participants in Veterans Court who volunteer, are screened and make a six-month commitment to work with the dogs.

Landry was among the half-dozen men in the first group training dogs. He was charged in January 2013 with kidnapping and battery on a police officer after he said he snapped, blacked out and woke up in jail. He entered an Alford plea — a plea of guilty while maintaining one's innocence — and was accepted in Veterans Court.

Ginger Varcoe, the Veterans Court coordinator, said although many programs use service dogs, this is the first to have veterans train dogs for other veterans.

"I foresee it as something that's just going to grow," she said, noting that it includes therapeutic aspects and giving back, all within the legal system.

The dog-training program officially was launched in

See VETS >> A3

**Antonio Cano, left, Norman Landry and Luis Sandoval work with their assistance dogs at Dogwood Therapy.**

SOURCE: ALBUQUERQUE POLICE DEPARTMENT

**The suspect in Saturday's shooting of an APD officer is said to be white or a light-skinned Hispanic, in his late 20s or early 30s.**

# APD names officer shot; suspect is still at large

Lapel camera footage released but shooter's face is blurry

BY RICK NATHANSON
JOURNAL STAFF WRITER

The Albuquerque police officer who was shot by a still-at-large suspect early Saturday during a routine DWI stop has been identified as Lou Golson, a 31-year veteran of the department.

**GOLSON: Has been with APD for 31 years**

Golson was listed in stable condition at University of New Mexico Hospital after surgery, APD Chief Gorden Eden said during a Sunday afternoon press briefing.

Eden also confirmed that the suspect's gun was recovered at the scene and that the SUV the suspect was driving had been stolen the previous day from a local car lot.

Police declined to release any information concerning the type of handgun used by the suspect or say how many times the weapon had been fired.

Golson's lapel camera "captured the entire incident from start to finish," Eden said. "The video lasts just seconds. Officer exits his vehicle, he approaches the (suspect's) vehicle, shots are fired, the officer returns fire and the suspect flees. It happens very, very quickly."

Eden said there was "no indication at this time" if any of the shots returned by Golson struck the suspect, who is described as white or a light-skinned Hispanic, in his late 20s or early 30s, and about 6 feet tall. He was wearing a blue jacket, blue jeans and a blue baseball cap. He fled on foot north along San Mateo.

Because of poor lighting, the resolution of the lapel camera video is not clear enough to

# DOJ's probe of UNM is second in nation

*School may learn from investigation of sexual assaults at U. of Montana*

Copyright © 2015 Albuquerque Journal

**BY MIKE BUSH**
JOURNAL STAFF WRITER

Without warning, U.S. Justice Department lawyers telephoned the University of New Mexico one morning last month to say it was opening an investigation into how the university responds to allegations of sexual assault and harassment.

It is only the second time such an investigation of a university has been launched by the DOJ. The previous one occurred at the University of Montana.

In the 8 a.m. phone call to UNM officials, a follow-up letter and a news release, the DOJ would only say the investigation by its Civil Rights Division was sparked by "multiple complaints" from students.

UNM officials, from President Bob Frank on down, insisted they had no idea why the campus is under investigation. They point to a number of proactive moves by UNM in recent years that are designed to make reporting sexual harassment and assaults — and follow-up developments and investigations — easier on the victim.

Meanwhile, the University of Montana investigation, begun in May 2012, came after an independent investigation already had found the university had major problems with the way it handled sexual assault cases.

The federal investigation lasted a year and ended with an agreement calling for a number of changes.

While UNM remains in the dark about what brought on its investigation, the Montana experience may provide insight as to what UNM can expect.

UNM's Dean of Students Tomás Aguirre said he was encouraged by the DOJ report on the UM investigation.

"They tell you what you're doing right, as well as those areas that may need improvement," he said, adding that such an "objective evaluation" by neutral observers only can be beneficial.

See **DOJ PROBE** >> **A2**

# DOJ probe of UNM's handling of sex assaults is 2nd in U.S.

From PAGE 1

## Montana case

In Montana, the U.S. Department of Education's Office for Civil Rights — normally the only federal agency that would investigate university policy and practices — joined the DOJ investigation.

The investigation was prompted by reports of numerous sexual assaults on the 15,000-student campus in Missoula, the largest in the state. Several of the alleged perpetrators were university football players.

In an effort to fulfill its Title IX obligations, the university previously had hired a former Montana Supreme Court justice for an independent look at the reports. During that investigation, between September 2010 and December 2011, the university received seven additional reports of student-on-student sexual assaults.

The independent report in January 2012 concluded that the University of Montana had "a problem with sexual assault on and off campus and

needs to take steps to address it to insure the safety of all students as well as faculty, staff and guests."

Three months later, the DOJ opened its investigation.

Women at UM who reported being sexually assaulted or harassed "were unfairly belittled, disbelieved or blamed for speaking up about what had been done to them," said Roy Austin, a deputy assistant attorney general with the Civil Rights Division, when the investigation was completed.

In one case in early 2012, UM waited a week to tell city police about two students who had reported being sexually assaulted on the same night by the same man. That man fled the country before police were notified.

An "anything goes" and "boys will be boys" attitude was rampant, according to the report.

The UM settlement was not unlike the agreement the DOJ reached with the Albuquerque Police Department this year regarding the use of deadly force by officers. Like APD, UM agreed to make a number

of changes.

Foremost was the retention of an experienced "equity consultant" to evaluate and recommend revisions to the university's policies, procedures and practices for preventing, investigating and remediating sex-based harassment.

The consultant was to develop and provide training mandated by Title IX and, with UM, develop at least one annual "climate survey" to evaluate the university's sex-based harassment policies, procedures and practices based on those surveys.

## Why UNM?

So what sparked the investigation at UNM?

In 2012, four sexual assaults were reported to campus police. In 2013, there were 11. As of Dec. 5 this year, the day the DOJ announced its investigation, there were eight reports of sexual assaults.

Some UNM officials have speculated that one high-profile case that arose this year may be at least partially responsible for the federal investigation. In April, a female

student said she was raped by three men, two of whom were Lobo football players.

A lawyer representing the three men described the investigation as "botched" and "bungled," but the university is standing behind the police work.

The woman who brought the charges later changed her story, saying she couldn't remember exactly what happened. Her lawyer said someone may have slipped her a drug.

The three men say their reputations are now tainted by their arrests. They placed the blame squarely on the shoulders of the UNM police investigation and said they intend to sue.

The three men and their attorney said they did not contact DOJ seeking an investigation.

Last year, the **Journal** interviewed two UNM students and a former student who said they were raped on campus or near-by and were treated with callousness by university officials and practices. One report was from more than 10 years ago, and the other two were from

2013 — but their criticisms of UNM were consistent.

The mother of one student said "a horrible situation (was) made worse by the way it was handled. The initial report to UNM police was OK, but it turned very callous after that.

... There were those at UNM who said they would do things to help, but it was up to my daughter to make it happen, and I don't think she was in a state to do that."

At the time, UNM officials declined to address specific allegations.

But since last year, a team of UNM officials — including Aguirre — have been working to fine-tune the policies, practices and procedures the university would follow in dealing with allegations of assault and harassment. And it wants to make sure the university is doing all it can and should to abide by applicable law, protect victims, and see to it that justice is done.

Whatever the reason for the DOJ's decision to look into UNM practices, campus officials clearly were blind-sided by the Dec. 5 announce-

ment. Meeting with reporters that afternoon, Aguirre again and again expressed his disappointment.

That was on a Friday. By the following Wednesday, he had softened his stance to welcome the investigation.

Still, university officials find it frustrating to be kept in the dark as to why the DOJ is holding their feet to the fire in the first place. In its letter to UNM, the department said it had reached no conclusion about whether UNM had violated a provision of the Civil Rights Act of 1964 or Title IX of the Education Amendments of 1972, the statutes that give it investigative authority.

The department requested that UNM provide substantial documentation — data and information that took more than five pages to list. UNM is working on getting the documentation together. Because the campus is closed for winter break between semesters, the DOJ advised UNM that it would be flexible regarding the original strict Jan. 9 deadline.

Classes resume Jan. 12.

Case 1:20-cv-00651-KWR-JMR Document 149 Filed 02/21/25 Page 97 of 298

NEW MEXICO'S LEADING NEWS SOURCE

# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.00  Copyright © 2015, Journal Publishing Co.

**FRIDAY**
**FEBRUARY 20, 2015**
FINAL ★★★★

PLAINTIFF'S EXHIBIT 9




COURTESY OF KOAT-TV
Dr. Christopher Driskill, a Hobbs OB-GYN, sits in the audience during a meeting Thursday of the New Mexico Medical Board.

## Doc who had sex with patients going back to work

*Medical Board allows Hobbs OB-GYN to return to practice but won't expunge his record*

Copyright © 2015 Albuquerque Journal

**BY COLLEEN HEILD**
JOURNAL INVESTIGATIVE REPORTER

The New Mexico Medical Board on Thursday allowed a Hobbs OB-GYN to go back to work, but it denied his request to erase from the public record the "salacious" charges of sex and drinking that led to the emergency suspension of his medical license last year.

Dr. Christopher Driskill, 42, was ordered to participate in a "professional boundaries" class, attend a 12-step program, undergo psychotherapy and have no further contact with former patients with whom he had "affairs."

He also must be accompanied by a chaperone when he meets with patients, agree to be monitored, and return within a year to a California-based program for sexual addiction for a one-week follow-up. He has been evaluated and treated there over the past two months.

Still up in the air Thursday was whether Driskill, who is president-elect of the New Mexico Medical Society, will become the organization's president in a few months.

According to the constitution of the society, which is the leading professional organization for New Mexico physicians,

See **DOC** >> **A4**



# ALBUQUERQUE'S **PAST** COMES TO LIFE

New $4 million exhibit uses sights, sounds — even smells — to breathe life into city's history

Copyright © 2015 Albuquerque Journal

**BY OLLIE REED JR.**
JOURNAL STAFF WRITER

This isn't your grandfather's history exhibit.

You won't find regiments of fixed military uniforms or rooms of frontier furniture or rows of obsolete farm implements — although there is a sampling of all that.

You will find Chester Nez, the late Navajo code talker, telling you how he prayed the traditional prayers of his people to help him endure the horrors of World War II.

You'll zip along Central Avenue, catching snatches of conversation from the Frontier Restaurant as you whip by. You'll smell the fresh, hot coffee and cherry pie served at Albuquerque's razed, but fondly remembered, Alvarado Hotel.

This is the Albuquerque Museum of Art and History's new, $4.4 million "Only in Albuquerque" exhibit, which opens to the public March 3. With this exhibit, which features four galleries titled Resourceful, Innovative,

See **NEW** >> **A2**



The "Only in Albuquerque" exhibit includes four themed galleries titled Spirited, Innovative, Resourceful and Courageous. Gallery exhibits include interactive opportunities, animated storybooks and theaters. Displays from the museum's previous history exhibit, including a conquistador and his armored steed, have been incorporated into the new exhibit. Another display includes Tiwa Indians.

PHOTOS BY
ADOLPHE PIERRE-LOUIS/JOURNAL

## LEGISLATURE 2015

# Spaceport: Gateway to the future or white elephant?

*Senate committee advances proposal to get rid of it*

**BY SUSAN MONTOYA BRYAN**
THE ASSOCIATED PRESS

SANTA FE — New Mexico lawmakers on Thursday debated the merits of Spaceport America and whether its futuristic hangar, its nearly 2-mile-long runway and the 18,000 acres that surround it will offer a return on taxpayers' nearly quarter-billion-dollar investment.

Sen. George Muñoz, D-Gallup, said lawmakers have a responsibility to ask the question, and that's why he introduced a measure that calls for pulling the plug and selling the spaceport.

"As a senator, we represent the entire state, and we don't want to hurt one portion or another, but we have to watch our tax dollars," he told

See **SPACEPORT** >> **A2**

**Inside and online**
For more Legislature coverage, go to **A3, B1** and **ABQjournal.com**

# No bull: Some 'Holy cow!' moments

The Journal editorial board meets with all sorts of people on issues that are important to them and to the community. The reason people request those meetings is to explain to my colleagues and me their point of view. We, in turn, find their input helpful in coming up with our positions on issues, which we present to our readers daily through unsigned editorials that represent the institutional position of the newspaper.

These meetings tend to be serious and productive, but some of them

See **NO BULL** >> **A4**


**UpFront**
Dan Herrera

---

**INSIDE**

BRIDGE        B5    HOROSCOPE    B5
BUSINESS      B1    JOBS-AUTO    A3
CLASSIFIEDS   C4    LOTTERY      A2
COMICS        D6    METRO & NM   C1
CROSSWORD B5, D4    MOVIES       VENUE
ODD ABBY      B5    OBITUARIES   C3
EDITORIAL     B    SPORTS       D1
WITCH         B4    WEATHER      D5

WRAPHONLINE 823-1111

6 42565 00010 1


# Ex-student sues UNM over alleged rapes

*Woman claims school failed to follow federal law in conducting investigation*

Copyright © 2015 Albuquerque Journal

**BY MIKE BUSH**
JOURNAL STAFF WRITER

The former University of New Mexico student who last spring accused two Lobo football players and another man of rape sued the university Thursday, claiming numerous violations of federal law and repeating previous allegations against the three men and implicating at least one other Lobo.

In her suit, Courtney Spencer says UNM officials — including athletics department football coaches and administrators, the Title IX sexual assault investigator and Title IX coordinator — failed to conduct proper, appropriate and timely investigations as the federal law requires, and that the department sought a "desired outcome" of those investigations.

In the copy of the suit obtained by the Journal, the plaintiff's name was blacked out. However, it was used in a response to the suit from UNM. The Journal's policy is not to identify the victim of an alleged rape unless a lawsuit is filed.

Citing a lack of sufficient evidence, District Attorney Kari Brandenburg in August dismissed

See **EX-STUDENT** >> **A4**

# Ex-student sues UNM over alleged rapes

*Woman claims school failed to follow federal law in conducting investigation*

Copyright © 2015 Albuquerque Journal

**BY MIKE BUSH**
JOURNAL STAFF WRITER

The former University of New Mexico student who last spring accused two Lobo football players and another man of rape sued the university Thursday, claiming numerous violations of federal law and repeating previous allegations against the three men and implicating at least one other Lobo.

In her suit, Courtney Spencer says UNM officials — including athletics department football coaches and administrators, the Title IX sexual assault investigator and Title IX coordinator — failed to conduct proper, appropriate and timely investigations as the federal law requires, and that the department sought a "desired outcome" of those investigations.

In the copy of the suit obtained by the **Journal**, the plaintiff's name was blacked out. However, it was used in a response to the suit from UNM. The **Journal**'s policy is not to identify the victim of an alleged rape unless a lawsuit is filed.

Citing a lack of sufficient evidence, District Attorney Kari Brandenburg in August dismissed

See **EX-STUDENT** >> A4

# Ex-student sues UNM over alleged rapes

From **PAGE A1**

charges against the three accused men. The three, who all along have insisted on their innocence, have since threatened to sue the university for what they say was a botched investigation by UNM police.

In her lawsuit, Spencer says UNM administrators failed to conduct an independent investigation — parallel to the police investigation — as required by Title IX law, which prohibits discrimination in education based on sex.

The suit concedes that "UNM accommodated Plaintiff somewhat with her course work after the rapes," but took no disciplinary action against the two accused Lobos until April 22, nine days after the alleged crimes occurred and after the two men were arrested.

Furthermore, according to the suit, "No efforts were made to reign in ... unconsented video recordings circulating on the internet, or even locate and obtain them as evidence from male students."

UNM issued a brief statement Thursday afternoon, saying it received a letter Jan. 20 from an attorney for Spencer giving notice of a claim against UNM and her intent to file a lawsuit.

"As of today, no lawsuit has been served, so we have not had an opportunity to review it," the statement says.

"UNM takes sexual violence

allegations very seriously. The University's primary concern is the safety and well-being of its students, as well as ensuring that there are fair processes in place for all involved."

Spencer's suit claims that in May of last year, when she was in the process of moving out of her dorm residence, "a car load of football players pulled up alongside Plaintiff on one of her few visits to campus .... There was no accountability by UNM administrators, no action by Title IX personnel, and no commment by the athletics department or coaches regarding the verbal harassment from the car load of players."

In fact, the suit continues, four weeks went by after Spencer reported the rapes before UNM's Office of Equal Opportunity, or OEO, acknowledged receiving her written complaint.

"No excuse was provided for the more than four week delay in beginning the investigation from when it learned of the sexual assaults on April 13," the suit states.

The suit also insists that Spencer was the likely victim of a date rape drug, although that allegation did not come up for several months after her initial complaint.

According to the suit, the OEO refused to allow her to present evidence "of any kind" that she had been drugged. That, the complaint continues, "in addition to alcohol which

together altered her mental state, precluding her ability to consent to sexual activity."

The OEO also refused to accept testimony that would account for her "total memory loss, and conduct," the suit contends.

Moreover, according to the complaint, the OEO ignored a video clip of the three men originally charged with rape announcing that a gang rape is "comin soon."

The suit accuses the Athletics Department of improperly communicating with members of the OEO investigative team, including Bryan Brock, the Title IX coordinator. The Athletics Department, the suit says, was seeking a "desired outcome of the investigation, timing the specific release of detailed press reports of 'the boys being back on the team,'" with the district attorney's decision not to prosecute.

The suit goes on to say that Heather Cowan, UNM's Title IX sexual assault investigator, should have been trained on how to conduct such an investigation.

"If so trained," the suit contends, "Heather Cowan deliberately disregarded any such training she had received while conducting the investigation."

Brock also should have had that kind of training, the suit says, but upon "information and belief, he had no such training at all."

Spencer is represented by Albuquerque attorneys Brad Hall and Lisa Ford.

In December, the U.S. Justice Department opened an investigation into how the university responds to allegations of sexual assault. Investigators said their move was prompted by complaints from at least two students, but it is unknown if Spencer was one of them.

The suit says it is "unclear whether the OEO investigation was a 'whitewash' to protect athletes in a major sport at a major university, or a 'whitewash' to protect male students 'just being boys.'"

George Anthony Bleus, an attorney representing the three men, in December said they would be filing a lawsuit against the university for the way UNM police conducted the criminal investigation.

Bleus said police investigators failed to go after or obtain crucial evidence — videos, the vehicle in which the crime supposedly took place, and a weapon Spencer alleged was used by one of the accused.

The attorney said the three men's reputations had been destroyed, and damages were in order.

A UNM spokeswoman said no suit had been filed as of Thursday.

Spencer's suit says she suffered tremendously and seeks an unspecified amount of damages.

NEW MEXICO'S LEADING NEWS SOURCE

# THE SUNDAY JOURNAL

ABQJOURNAL.COM

$2.00    Copyright © 2016 Journal Publishing Co.



APRIL 10, 2016

**FINAL** ★★★

PLAINTIFF'S EXHIBIT

**10**

## TITLE IX AT UNM

# Sex assault, harassment reports triple

### Officials say rise due to increased education

**FIRST OF TWO PARTS**

As UNM awaits the results of a Department of Justice investigation into how it handles sexual assault cases, the **Journal** obtained records showing the number of Title IX reports filed the past two years.

Copyright © 2016 Albuquerque Journal

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

The number of sexual harassment and assault reports filed at the University of New Mexico tripled from 2014 to 2015, but university administrators attribute the increase to educating students and employees about what qualifies as sexual harassment and encouraging them to report violations.

Records obtained by the **Journal** show that 138 people filed Title IX reports in 2015 with UNM's Office of Equal Opportunity, up from 46 reports in 2014.

Fifty-two of the reports filed in 2015 were for sexual assault and 72 were for sexual harassment. Investigations resulted in one person being fired, two people being suspended and one person being expelled.

The 2015 total is higher than peer institutions University of Colorado Denver, which saw 42 reports in 2015, and New Mexico Sate University, with 19 reports. UC Denver and NMSU have student enrollments between 15,000 and 20,000 students, while UNM's was roughly 27,300 as of fall 2015.

Heather Cowan is the UNM administrator in charge of making sure the school complies with the federal law that prohibits discrimination based on sex at the nation's colleges.

She said the increased reporting is positive because it shows people are aware Title IX is an option to report discrimination. It doesn't necessarily

See **SEX** >> **A4**

## Critics say [...] can stifle fr[...]

### They contend federal regulations go too far

Copyright © 2016 Albuquerque Journal

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

University of New Mexico officials say the recent increase in federal Title IX reports shows more people are aware of the issue of sexual discrimination and violence, but free speech advocates say that complying with Title IX can stifle free speech protected by the First Amendment.

In late 2015, the free speech advocacy group Foundation for Individual Rights in Higher Education blasted UNM for its "respectful campus" policy. FIRE says part of that policy "substantially restricts freedom of speech."

The policy follows Title IX

See **CRITICS** >> **A4**

# CASHING IN ON TICKETS

### Fees tacked onto fines bankroll court programs — from anti-DWI classes to jury paychecks

Copyright © 2016 Albuquerque Journal

**BY MAGGIE SHEPARD**
JOURNAL STAFF WRITER

That simple $10 parking ticket in Albuquerque, if neglected, will suck $107 from your wallet, $77 of it in court fees.

That's bad news for you, but a cash windfall for six projects and programs ranging from Metro Court construction cost to jury paychecks to classes for domestic violence offenders.

Additional programs are funded with fees from a traffic citation, such as a speeding ticket — for which the lowest fine is $20 and court costs are $65-$85. The traffic ticket fees go to fund teen courts, anti-DWI classes and a program for people with a brain injury.

While the fees are collected just one case at a time, the total isn't small change for

See **FEES** >> **A6**

Officer Kevin Branham issues a $10 parking citation to a car on Marquette Avenue NW in Albuquerque on Friday.

MARLA BROSE/JOURNAL

## PARKING TICKETS — BY THE NUMBERS

| Enforcement budget for the city's Parking Division in the 2015 fiscal year: | Revenue brought in from parking tickets in 2015: | Number of tickets written 2013-15: | Percentage of total parking tickets 2013-15 unpaid and sent by the city to Metro Court: | Those unpaid parking tickets in 2013-15 generated potential court fees of: |
|---|---|---|---|---|
| **$4.2 million** | **$698,471** | **142,742** | **42%** | **$5,194,035**<br>Not all were collected. |

Sources: Albuquerque Department of Municipal Development, Bernalillo County Metropolitan Court, Administrative Office of the Courts

## TITLE IX AT UNM

# Sex assault, harassment reports triple

## Officials say rise due to increased education

**FIRST OF TWO PARTS**

As UNM awaits the results of a Department of Justice investigation into how it handles sexual assault cases, the **Journal** obtained records showing the number of Title IX reports filed the past two years.

Copyright © 2016 Albuquerque Journal

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

The number of sexual harassment and assault reports filed at the University of New Mexico tripled from 2014 to 2015, but university administrators attribute the increase to educating students and employees about what qualifies as sexual harassment and encouraging them to report violations.

Records obtained by the **Journal** show that 138 people filed Title IX reports in 2015 with UNM's Office of Equal Opportunity, up from 46 reports in 2014.

Fifty-two of the reports filed in 2015 were for sexual assault and 72 were for sexual harassment. Investigations resulted in one person being fired, two people being suspended and one person being expelled.

The 2015 total is higher than peer institutions University of Colorado Denver, which saw 42 reports in 2015, and New Mexico Sate University, with 19 reports. UC Denver and NMSU have student enrollments between 15,000 and 20,000 students, while UNM's was roughly 27,300 as of fall 2015.

Heather Cowan is the UNM administrator in charge of making sure the school complies with the federal law that prohibits discrimination based on sex at the nation's colleges.

She said the increased reporting is positive because it shows people are aware Title IX is an option to report discrimination. It doesn't necessarily

See **SEX** >> **A4**

# Sex assault, harassment re

From **PAGE A1**

mean, she said, there has been an uptick in discrimination on campus. Other UNM officials are inclined to agree with her.

Caitlin Henke, the interim director of UNM's resource center, said students and employees now have a clearer sense of what constitutes sexual assault. "Sexual violence has been a pervasive problem on this college campus and college campuses everywhere for a really long time," Henke said. "We're in a culture shift. We're all acknowledging this is happening."

The university is awaiting the results of a Department of Justice investigation into how UNM handles cases of sexual assault and harassment.

## The numbers

Title IX of the federal Civil Rights Law was adopted in 1972 and states individuals should be free from discrimination based on gender in all education programs or activities that receive federal financial assistance. Many people associate the law with gender equality in college athletics, but, in recent years, it's been used as a tool to address sexual harassment on college campuses.

Cowan said UNM has been trying to teach students and employees about Title IX and the protections it offers against gender discrimination.

Sexual assault and harassment cases make up the majority of Title IX complaints filed with the university. Other Title IX complaints include dating violence, which is harassment that takes place between two people dating, and sexual exposure, cases like flashing or sharing nude photos of a person without their permission.

Title IX violations include everything from off-color comments that offend to stalking to rape, and they include any interaction between anyone with ties to the university, even off campus.

Title IX defines sexual harassment as any unwanted sexual attention, physical or otherwise, that interrupts a student's "learning environment."

In a few cases, a student might be suspended or expelled following the university's investigation. Such discipline doesn't require the same level of proof as a criminal investigation. In



ROBERTO E. ROSALES/JOURNAL

**UNM students walk to class on campus in November 2015. University officials say a three-fold jump in reports of sex assault or harassment at UNM is due to increased education about Title IX.**

other cases, Cowan's department will often have an "educational conference," or basically a talk with students, when they do something crude or stupid, but not necessarily offensive — say, drawing penises on a chalkboard, as happened in one instance.

A majority of the sexual assault reports are dismissed due to a lack of information; 39 of the 52 sexual assaults reports were dismissed because Cowan's department didn't have enough information to pursue the case. For example, a victim might not know the identity of the alleged attacker. At that point, the case closes.

On the other end of the spectrum, the university expelled one person and suspended another who resigned following a sexual assault investigation.

Of the 72 sexual harassment cases, 25 were dismissed due to insufficient information.

Sixteen of the remaining cases resulted in educational conferences; eight cases were closed because investigators didn't find evidence of a Title IX violation; 10 cases were referred to the Dean of Students Office, the Office of the Provost or the Human Resources Department for further review; and four people were banned from campus.

One person was suspended and another person was fired.

The university redacted any details of the accusations and all names, as well as whether the accused or alleged victims were students, staff or faculty. The

university said it withheld the information that could be used to reveal personal details about students in compliance with the Family Educational Rights and Privacy Act.

## Report requirement

Title IX requires those in positions of authority, professors or administrators, to report probable instances of sexual harassment they hear about on campus. For example, if a professor overhears students talking about a probable rape, that professor must report what he or she heard to Cowan. At that point, her office reaches out to the person involved. But the alleged victim often does not want to file a report.

"We say we have a process and we want to talk to you. Also, if you don't want to talk to us, that's your right," Cowan said. "Frequently, they don't respond to us. Or, if they respond, they say, 'I don't want to talk to you.'"

Some students, Cowan said, don't want to deal with the emotional trauma associated with reporting sexual assault or harassment.

For those who file a report, Cowan and other administrators are able to provide resources the alleged victim wouldn't have received, such as where to go for counseling, health care or changes to their class schedule.

Coming Monday: A look at the changes UNM has implemented to increase awareness of Title IX.

NEW MEXICO'S LEADING NEWS SOURCE

# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.00   Copyright © 2016, Journal Publishing Co.

ESTABLISHED 1880

SATURDAY
APRIL 23, 2016
FINAL ★★★★

PLAINTIFF'S
EXHIBIT

**11**

# Report: Intel Rio Rancho won't be s[hut down]



MARLA BROSE/JOURNAL

*Firm expected to announce which facilities will close, who will be laid off*

**BY KEVIN ROBINSON-AVILA**
JOURNAL STAFF WRITER

Intel's Rio Rancho plant does not appear to be facing closure in the company's attempts to restructure and slash about 12,000 jobs worldwide, according to a new report

in the Oregonian newspaper on Friday.

Rio Rancho could, however, be impacted by some of Intel's upcoming layoffs. The newspaper said the company will tell employees by Monday which of its global facilities will face closure, and by next Friday, it will inform individual employees if they are slated for layoff.

The newspaper reported that

Intel Corp. CEO Brian Krzan told employees last Tuesday that the company is not closing any of its manufacturing sites as part of efforts to retool. Specifically, Krzanich said Intel "won't leave its aging facility in New Mexico," according to the Oregonian.

The newspaper said those comments come from an internal communication at Intel that were described to the Oregonian.

els
of Intel's public announcement on Tuesday that it plans to cut its global workforce by about 11 percent.

The company has so far declined to discuss the restructuring plan's impact on specific sites, including New Mexico.

On Friday, Intel New Mexico spokeswoman Natasha Martell

See **REPORT** >> A2

---

## SEC seeks BernCo Treasurer records

### Subpoena calls for items back to 2009

Copyright © 2016 Albuquerque Journal

**BY DAN MCKAY**
JOURNAL STAFF WRITER

Federal regulators this week ordered Bernalillo County to turn over financial and investment documents kept by the Treasurer's Office.

County officials say the subpoena from the U.S. Securities and Exchange Commission comes after the county sold investments at a $17 million loss in 2014 to avoid the possibility of even steeper losses and to ensure there was enough cash on hand to pay bills.

The restructuring of the investment portfolio was itself a response to a report by outside consultants and concerns among county commissioners that the Treasurer's Office had tied up too much of the county's cash in long-term investments that were losing value.

But the subpoena doesn't make it clear what triggered the inquiry, county officials said.

The subpoena, they say, seeks documents going back to roughly 2009, covering the tenure of County Treasurer Manny Ortiz and his predecessor, Patrick Padilla. Both

See **SEC** >> A4

---

## A REAL HOOT AT ABQ SCHOOL



Three's a crowd of young owls in a nest Friday morning on the Albuquerque Academy campus. New Mexico is home to 14 species of "typical" or "true" owls, such as the whiskered screech owl, the great horned owl or the elf owl, as well as one species of barn owl.

JIM THOMPSON/JOURNAL

---

## DOJ hits UNM on sexual assault policies

### University says report is not an accurate portrayal

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

Federal investigators in a letter released Friday accused the state's flagship university of failing to adequately respond to incidents of sexual assault and harassment — the bottom line in a report that the

University of New Mexico said was not an accurate portrayal of the university.

The report made public Friday by U.S. Attorney Damon Martinez and the Department of Justice Civil Rights Division is the result of a highly unusual 16-month federal investigation.

"Campus sexual assault and sexual harassment are civil rights issues," Martinez said. "They are primarily perpetrated

See **UNM's** >> A2



**Online**

See a timeline of UNM's responses to the issue at ABQjournal.com

---

## Police captain kills ex, then self

### Attempt by witness to talk officer down fails

**BY NICOLE PEREZ**
JOURNAL STAFF WRITER

Authorities say an off-duty police captain from Silver City shot and killed his estranged girlfriend, then killed himself Thursday in an afternoon of bloodshed unusual for the small southwest New Mexico town.

The woman, 31-year-old Nikki Bascom, was the nursing director at Hidalgo Medical Center and leaves behind two children: a 6-year-old daughter and a 13-year-old son.

"She was so very smart and was incredibly strong-willed to become all that she could be, as a mother, daughter, sister, and nurse," her sister-in-law Ezmia Bascom said Friday evening. "She is loved by so many, always has been and always will be."

State Police Sgt. Elizabeth Armijo said Silver City police Capt. Marcello Contreras, 41, had been going through a separation from Nikki Bascom. He is the father of her 6-year-old, according to family.

She was at a friend's house in the 1300 block of Serinna Court, which is in a middle-class, suburban neighborhood in the hills near Silver High School, when Contreras arrived around 4 p.m. with a gun, Armijo said.

Bascom was sitting in a car in the driveway, and her friend went to talk to Contreras. Contreras pointed a

See **POLICE** >> A4

# DOJ hits UNM on sexual assault policies

## University says report is not an accurate portrayal

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

Federal investigators in a letter released Friday accused the state's flagship university of failing to adequately respond to incidents of sexual assault and harassment — the bottom line in a report that the University of New Mexico said was not an accurate portrayal of the university.

The report made public Friday by U.S. Attorney Damon Martinez and the Department of Justice Civil Rights Division is the result of a highly unusual 16-month federal investigation.

"Campus sexual assault and sexual harassment are civil rights issues," Martinez said. "They are primarily perpetrated

See **UNM'S** >> **A2**



**Online**

See a timeline of UNM's responses to the issue at ABQJournal. com

# UNM's assault response hit

From **PAGE A1**

against women and undermine their basic rights. When perpetuated against students, sexual assault and sexual harassment deny them the right to live and learn in a safe educational environment."

UNM officials didn't address specifics in the report, but they did question it.

"While we respect the efforts of the DOJ, we believe its report is an inaccurate and incomplete picture of our university," UNM President Bob Frank said. "Even so, we receive it in a spirit of cooperation and pledge to continue our campuswide improvements to combat this complex issue."

The DOJ acknowledged in the 37-page document that UNM has worked to improve its response to reports of sexual assault and harassment, including revamping policies and creating a student advocacy center, but Martinez said more is needed to ensure that the university complies with federal anti-discrimination laws.

UNM reported 19 sex-related offenses in 2014, 10 in 2013 and four in 2012, according to an annual security report.

During the investigation by the DOJ's Civil Rights Division, the university provided documentation of its sexual assault and harassment policies and campus safety and police investigations to the Justice Department in January 2015. In April 2015, DOJ investigators came to the main campus to interview students and employees.

UNM officials said they tried, even before the DOJ announced its investigation, to change the way it deals with sexual assault and harassment.

Those efforts included a university-commissioned review, announced in September 2014, of UNM's sexual misconduct policies. That group presented its findings in January 2015. They found that administrators and students were either unfamiliar with or confused by the university's policies.

The report, in part, led the university to adopt a new sexual misconduct policy in May 2015.

University officials also launched an advocacy center — LoboRespect — for stu-



MARLA BROSE/JOURNAL

**UNM President Robert Frank responds to the U.S. Department of Justice's findings regarding UNM's response to reports of sexual assaults and harassment on campus during a Friday news conference at the university. The investigation lasted almost 16 months.**

> **"**
> ... WE BELIEVE ITS (DOJ'S) REPORT IS AN INACCURATE AND INCOMPLETE PICTURE OF OUR UNIVERSITY.
> **"**
>
> **ROBERT FRANK**
> UNM PRESIDENT

dents to confidentially report incidents of sexual assault or harassment.

## DOJ criticisms

The DOJ, after reviewing thousands of pages of policy, along with administrative complaints and police reports, leveled criticisms at what it called the university's at times overlapping or confusing policies that could discourage students from reporting cases of harassment. The report says UNM failed to publicize the processes for reporting sexual harassment.

The university's internal administrative process of dealing with sexual assault or harassment cases, which is handled by the Office of Equal Opportunity, was accused of inadequate investigations.

In one case, the DOJ said a woman reported she was choked during an assault. Her medical records, which OEO had copies of, from the same day showed "redness and bruising" on her neck. The investigator wrote, "Complainant herself reported strangulation, but the report did not demonstrate that evidence of such was found," the report says.

Heather Cowan, the university administrator in charge of these investigations, said she couldn't speak to specific cases mentioned in the report.

The report also said administrators influenced the OEO investigation process. The report charged that "top-level administrative offices" said to get an investigation "done" because one case was in the media.

Frank denied that assertion.

"Findings based on anonymously supplied information make it impossible for us to respond to particular allegations in the report," Frank said.

Cowan said her office has never been pressured to rush an investigation, but she did say administrators have questioned her office about the status of cases.

The DOJ also said the Office of Equal Opportunity took too long to complete its investigations. In one case, the report says, a student withdrew from the process because the investigation was taking too long and the "emotional toll was too great."

Students also told investigators, the report said, that they expressed an "unwillingness" to report sexual assault or harassment because they feared UNM would retaliate or do nothing. The DOJ report also found that UNM police officers received "inconsistent and intermittent training" in dealing with sexual assault and harassment.

Some officers were also accused of treating those reporting sexual assaults in an "insensitive and humiliating manner."

Kevin McCabe, chief of UNMPD, disagreed with those characterizations. He said his detectives do receive training in handling sexual assault cases.

And though UNM officials don't agree with some parts of the report, they want to get started with meetings with the DOJ quickly.

"We want to get it done and get it done as soon as possible," Frank said.



PLAINTIFF'S
EXHIBIT

**12**

**GOLDEN!**

SPORTS >> D1

rio 2016

NEW MEXICO'S LEADING NEWS SOURCE

# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.00    Copyright © 2016, Journal Publishing Co.

WEDNESDAY
AUGUST 10, 2016

FINAL ★★★★

---

## PRC decision

Ruling expected
next week on
Facebook-PNM
case **B1**



---

# Gov. directs agencies to cut spending

### Reductions of at least 5% ordered by Martinez

**BY DAN BOYD**
JOURNAL CAPITOL BUREAU

SANTA FE — In the latest round of New Mexico budgetary belt-tightening, Gov. Susana Martinez has directed executive branch agencies to come up with ways to trim at least 5 percent in spending from their approved budgets — and immediately begin implementing them.

The two-term Republican governor gave the directive via a memo and in a meeting Tuesday with Cabinet secretaries. All departments under her control were given the directive, including the Public Education Department and the Human Services Department.

Some state agencies already had their budgets slashed earlier this year, and the new spending reductions could affect hiring practices, approved overtime levels, employ-

---

# Pro cycling dreams shattered, but teen's recovery miraculous



Nathan Barkocy, right, enjoys a reunion of sorts this week with cycling coach Stephen Williamson, left, and TLC Development teammate Adam Brugge. The three were on a training ride in January in the South Valley when Barkocy and Williamson were struck by a car, severely injuring Barkocy.

MARLA BROSE/JOURNAL

Oh, how he could fly, his limber legs powering the wheels of his bicycle so deftly it seemed at any moment he might rise from the road.

Every day, Nathan Barkocy



**Joline Gutierrez Krueger**

took him from his home near Wyoming and Constitution NE to Placitas, about 30 miles away, then up along the back road high into the Sandias, an ascent of more than 4,000 feet. "I loved the hills. You will

---

# UNM prof suspended again after complaints

### Investigation will look into sexual misconduct claims

**BY CHRIS QUINTANA**
JOURNAL STAFF WRITER

A return to the classroom has been cut short for a University of New Mexico anthropology professor accused of violating the school's policies on sexual misconduct.

UNM administrators on Tuesday suspended Cristobal Valencia for the second time based on new complaints, after an earlier suspension based on a report that included a finding of improper touching and that also said he appeared to cultivate female students for possible sexual relations.



**VALENCIA:** New sexual complaints investigated

"The suspension will remain in place while the new complaints are investigated by the appropriate authorities, or until the case is resolved," a UNM news release stated. "His suspension is an emergency short-term action taken as a precaution to prevent any risk of harm to others, and was based upon the seriousness of the allegations."

Valencia will be suspended with pay. He was scheduled to teach an undergradu-

# OP-ED

Online letters
Submit through the Journal's website (no email) at http://www.abqjournal.com/letters

WEDNESDAY, AUGUST 10, 2016 | ALBUQUERQU



*Despite limited progress, the university still has a long way to go to ensure its campuses are safe*

# UNM must apologize for inaction

BY MAY SAGBAKKEN
EXECUTIVE DIRECTOR, RAPE CRISIS CENTER OF CENTRAL NEW MEXICO

AND KIM ALABURDA
EXECUTIVE DIRECTOR, NEW MEXICO COALITION OF SEXUAL ASSAULT PROGRAMS

It's time for the University of New Mexico to tell the truth about its handling of sexual assault on campus.

Yes, as UNM President Robert Frank said in his recent guest column in this paper, it is true that the University of New Mexico has made strides toward addressing the sexual assault crisis on campus.

Those steps include trainings on sexual assault reporting and prevention; new policies and procedures to resolve complaints in a more fair and timely manner; and updating its Office of Equal Opportunity policies, and hiring two new investigators and an intake staffer.

But, while these things may be true, they are only part of the truth.

It is time that we start telling the whole truth — not just the parts that help parents feel better about sending their children and their hard-earned money to the University of New Mexico.

We need to also tell the hard truths that will keep those students safe on campus.

That is why, while we thank Frank and the university for what they have done, we are compelled to publicly hold them accountable for what they have not done.

Simply put, UNM has not:

■ Accepted responsibility for findings in the Department of Justice report.

■ Moved quickly enough to ensure that students, staff and faculty have the information they need to report sexual assault.

■ Allocated enough resources to the Advocacy Center for it to be effective.

■ Been transparent with its response to the Department of Justice.

■ Involved all the stakeholders necessary to ensure the successful implementation of positive changes.

What's more, UNM in general and Frank in particular have treated the safety of students and ending sexual assault on campus as an afterthought.

The truth is that, without the U.S. Department of Justice intervening, the university would not have taken any action. Sexual assault and harassment, which have been rampant on campus for decades, would have continued to be the norm. Parents would still be dropping their kids off at the dorms thinking that they would be safe and protected, when they absolutely were not.

The truth is that the university was dragged kicking and screaming into making the limited reforms they have made. And they did so in a private process that effectively muted community partners, outside organizations, campus organizations, faculty and survivors.

And the truth is that neither the university nor Frank has ever apologized to victims, parents, students, staff, faculty or families for allowing this problem to persist for so long or for the cavalier attitude with which the university dismissed and downplayed sexual violence.

Don't misunderstand us: Progress has been made.

But, as we said, that is just part of the truth.

The whole truth is that, until all of the hard work is undertaken and every student is safe to learn and grow on campus, UNM's work will not be done.

No news conference or carefully prepared guest column can distract from the hard truth that UNM has only just begun to address these deep, systemic problems.

Very soon, another round of parents will drop their sons and daughters off for their freshman year at the University of New Mexico. When they drive away from the dorms, those parents will naturally be worried. They'll worry about their child making new friends; they'll worry about their child eating well and doing their laundry; they'll worry about their child's future.

But no Lobo parent should have to add to that list the worry about whether their child will be protected from sexual violence.

And that is the truth.

---

# Duke City h
# program he

*Wellness resources, onsite clinics, provider requirements paying off*

BY MARY SCOTT
DIRECTOR OF HUMAN RESOURCES, CITY OF ALBUQUERQUE

The city of Albuquerque is in year four of a five-year "Better Health" strategic plan to develop a culture of health and wellness, and measure those results.

While heredity plays a part in whether a person develops a chronic condition such as diabetes, hypertension or heart disease, many risk factors for these diseases can be controlled. Poor diet, tobacco use, lack of exercise and skipping recommended screenings can turn a risk factor into an illness.

Those who do have chronic illnesses that manage their work schedules and their health as one affects the other.

Creating a healthy workforce isn't just a good thing to do. There is a monetary benefit to taxpayers when city employees take fewer sick days and use emergency services only for a true medical emergency. By educating our nearly 6,000 employees to get involved in proven health and wellness initiatives, we can report that our city of Albuquerque workforce is healthier and more productive–saving taxpayers multiple millions in health care related costs since 2012.

In fact, a few weeks ago the city of Albuquerque was recognized as a Gold Level Recipient of the American Heart Association's "Fit-Friendly Worksites" recognition program. This award recognizes employers for efforts in building a healthier workplace.

The city and our Human Resources Department are extremely honored to be recognized with this award for the fourth year in a row. While the national average shows 5 to 6 percent increases in medical insurance premiums each year for the last two years, the city of Albuquerque had no rate increase during the same period. We are saving taxpayers' money by managing costs and chronic conditions through innovative approaches.

We are the first employer in the state of New Mexico to put clinical performance measures in our contracts with health care providers. Our data-driven approach is responsible for the

unmatche

We wer tify major our health – the chr mentioned improvem ally requir our health $500,00 if to improv measures.

In additi penalties, ings are c Insurance sion to inc quality fo viding an taxpayers.

Our hea must track is in comp health reg take a proa contact the person bac

Another money and been the M ter. The ci is the firs Mexico to clinical c at various oped wit Health Pla tively help dependen chronic co been an in so membe a relation health ca educate t wellness r

A chron cult for an When a pe more than Poor healt family wit tors' visit pharmacy tion. Build force isn't and cents. important and suffer ees and th must care they are u

The city been instr oning valu and impr health care Mexico Co care Value Resources as chairma

Since M Berry set t the health shared dec empowere make smar decisions quality of l

*Despite limited progress, the university still has a long way to go to ensure its campuses are safe*

# UNM must apologize for inaction

**BY MAY SAGBAKKEN**
EXECUTIVE DIRECTOR, RAPE CRISIS CENTER OF CENTRAL NEW MEXICO

**AND KIM ALABURDA**
EXECUTIVE DIRECTOR, NEW MEXICO COALITION OF SEXUAL ASSAULT PROGRAMS

It's time for the University of New Mexico to tell the truth about its handling of sexual assault on campus.

Yes, as UNM President Robert Frank said in his recent guest column in this paper, it is true that the University of New Mexico has made strides toward addressing the sexual assault crisis on campus.

Those steps include trainings on sexual assault reporting and prevention; new policies and procedures to resolve complaints in a more fair and timely manner; and updating its Office of Equal Opportunity policies, and hiring two new investigators and an intake staffer.

But, while these things may be true, they are only part of the truth.

It is time that we start telling the whole truth — not just the parts that help parents feel better about sending their children and their hard-earned money to the University of New Mexico.

We need to also tell the hard truths that will keep those students safe on campus.

That is why, while we thank Frank and the university for what they have done, we are compelled to publicly hold them accountable for what they have not done.

Simply put, UNM has not:

■ Accepted responsibility for findings in the Department of Justice report.

■ Moved quickly enough to ensure that students, staff and faculty have the information they need to report sexual assault.

■ Allocated enough resources to the Advocacy Center for it to be effective.

■ Been transparent with its response to the Department of Justice.

■ Involved all the stakeholders necessary to ensure the successful implementation of positive changes.

What's more, UNM in general and Frank in particular have treated the safety of students and ending sexual assault on campus as an afterthought.

The truth is that, without the U.S. Department of Justice intervening, the university would not have taken any action. Sexual assault and harassment, which have been rampant on campus for decades, would have continued to be the norm. Parents would still be dropping their kids off at the dorms thinking that they would be safe and protected, when they absolutely were not.

The truth is that the university was dragged kicking and screaming into making the limited reforms they have made. And they did so in a private process that effectively muted community partners, outside organizations, campus organizations, faculty, staff and survivors.

And the truth is that neither the university nor Frank has ever apologized to victims, parents, students, staff, faculty or families for allowing this problem to persist for so long or for the cavalier attitude with which the university dismissed and downplayed sexual violence.

Don't misunderstand us: Progress has been made.

But, as we said, that is just part of the truth.

The whole truth is that, until all of the hard work is undertaken and every student is safe to learn and grow on campus, UNM's work will not be done.

No news conference or carefully prepared guest column can distract from the hard truth that UNM has only just begun to address these deep, systemic problems.

Very soon, another round of parents will drop their sons and daughters off for their freshman year at the University of New Mexico. When they drive away from the dorms, those parents will naturally be worried. They'll worry about their child making new friends; they'll worry about their child eating well and doing their laundry; they'll worry about their child's future.

But no Lobo parent should have to add to that list the worry about whether their child will be protected from sexual violence.

And that is the truth.

PLAINTIFF'S EXHIBIT

13



NEW MEXICO'S LEADING NEWS SOURCE

# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.50

**TUESDAY**
**SEPTEMBER 25, 2018**
**FINAL** ★★★★

# CYFD cites improvements to foster care system

### Agency responds after lawsuit claims system is broken

Copyright © 2018 Albuquerque Journal

**BY COLLEEN HEILD**
JOURNAL INVESTIGATIVE REPORTER

On the heels of a new highly critical federal lawsuit filed by

advocates for children, officials at the New Mexico Children, Youth and Families Department say they have improved the state's foster care system in recent years.

Without addressing the specifics of the 95-page proposed class-action lawsuit filed Saturday by 13 children and two New Mexico nonprofit agencies, CYFD officials pointed out strides made in

foster care since December 2015.

"When it comes to foster care, we are continuously working to improve the system overall," CYFD spokesman Henry Varela said. "Although we have not yet been served nor had the opportunity to review this lawsuit, we have made much progress" in the areas of foster care mentioned in the lawsuit.

The proposed class-action lawsuit alleges that CYFD has failed

to recruit, license and train an adequate number of people needed to ensure safe, supportive homes for foster youth, resulting in children being repeatedly uprooted and cycled in and out of short-term emergency placements, which sometimes includes government offices.

It also alleges that the state has failed to provide foster children with adequate mental and behavioral health treatment,

creating more trauma for the already vulnerable abused or neglected children.

Varela said CYFD has had a net gain of 258 foster parents over the past three years, or a total of 1,325 people, as of August 2018, compared with December 2015, when the state had 1,067 foster parents.

He said the agency has 100

See **CYFD** >> A2

---

# FBI: Crime up in ABQ in 2017



GREG SORBER/JOURNAL

District Attorney Raúl Torrez talks about recent crime trends after the release of 2017 data from the FBI's annual Crime in the United States Report. Although crime was up in ABQ and New Mexico in 2017, Torrez said it has been declining since then.

## DA points out a downward trend that started a year ago

Copyright © 2018 Albuquerque Journal

**BY ELISE KAPLAN**
JOURNAL STAFF WRITER

For several years, the FBI's Crime in the United States report has presented an increasingly bleak look at violence and theft in Albuquerque and in New Mexico.

And 2017 continued the trend.

Last year, like the year before, the state had the country's highest per capita rate of property crime and the second-highest per capita rate, after Alaska, of violent crime (not including the District of Columbia).

According to the annual report released Monday by the FBI's Uniform Crime Reporting program, the number of violent crimes — murder, rape, robbery and aggra-



---

# Woman settles for $200K in UNM suit

*Case involved allegations of rape by 2 football players, CNM student*

Copyright © 2018 Albuquerque Journal

**BY JESSICA DYER**
JOURNAL STAFF WRITER

The state negotiated a $200,000 settlement with a woman who accused the University of New Mexico of mishandling her high-profile rape case involving Lobo football players, newly released records show.

Courtney Spencer sued UNM in federal court, alleging the institution inadequately responded to her report that two then-Lobo football players and another man had gang-raped her in April 2014 when she was a freshman at the university.

The men were never prosecuted. Then-District Attorney Kari Brandenburg said there was "insufficient evidence to prove guilt beyond a reasonable doubt."

Spencer filed her civil lawsuit against UNM's Board of Regents

See **WOMAN** >> A14

# Woman settles for $200K in UNM suit

*Case involved allegations of rape by 2 football players, CNM student*

Copyright © 2018 Albuquerque Journal

**BY JESSICA DYER**
JOURNAL STAFF WRITER

The state negotiated a $200,000 settlement with a woman who accused the University of New Mexico of mishandling her high-profile rape case involving Lobo football players, newly released records show.

Courtney Spencer sued UNM in federal court, alleging the institution inadequately responded to her report that two then-Lobo football players and another man had gang-raped her in April 2014 when she was a freshman at the university.

The men were never prosecuted. Then-District Attorney Kari Brandenburg said there was "insufficient evidence to prove guilt beyond a reasonable doubt."

Spencer filed her civil lawsuit against UNM's Board of Regents

See **WOMAN** >> **A14**

# Woman settles for $200K in UNM suit, records show

From **PAGE A1**

in February 2015, claiming violations of federal Title IX law in how UNM treated her case. Meanwhile, the three men also sued UNM, claiming it botched the investigation, which they contended should have proven their innocence.

According to the resulting settlement agreement with Spencer, the New Mexico Risk Management Division and Spencer settled "to avoid the time, expense and uncertainties of litigation." The document stipulates that UNM denies Spencer's allegations of wrongdoing.

Spencer signed the settlement in June 2016, though the details have remained unknown to the public.

However, the Risk Management Division released the agreement last week in response to a formal public records request by the Journal.

The department had denied a similar request by the Journal in 2017, citing the pending litigation from the three men.

State law keeps such settlement records confidential until 180 days after all related litigation has concluded.

In their suit, then-UNM football players Crusoe Gongbay and SaQwan Edwards and Central New Mexico Community College student Ryan Ruff claimed the UNM Police Department investigation had violated their civil rights. That case did not end until earlier this year, when they voluntarily dismissed the final claim. A federal judge had already dismissed most of their complaints.

It is unclear how much UNM itself paid toward the $200,000 settlement with Spencer.

Risk Management did not respond to an email asking that question on Monday, while a UNM spokeswoman said she could not immediately provide a figure.

Spencer's case dominated headlines for months after she reported that the three men raped her in the early morning of April 13, 2014, following a party, though the men maintained they were innocent. Spencer's attorney subsequently claimed she had been drugged by someone at some point prior to the alleged incident.

All three men were arrested on rape charges, and UNM suspended Gongbay and Edwards from the football team. But the charges were dropped in June, and football coach Bob Davie and former athletic director Paul Krebs decided in August 2014 to reinstate Gongbay and Edwards.

Spencer's suit called UNM's response "clearly unreasonable," alleging that a UNM Office of Equal Opportunity investigation was not thorough and had not concluded when UNM allowed the accused football players back on the team. She also alleged the Athletic Department improperly communicated with the office and that some OEO staff lacked proper training. The suit also claimed Spencer faced a "hostile educational environment" due to UNM's "deliberate indifference," and she ultimately left campus.

In its own court filing, UNM denied it violated the law in Spencer's case and said that it met all its legal obligations and "acted promptly and equitably" in response to Spencer's allegations.

The Journal asked UNM for comment on the Spencer settlement; the university did not provide one.

But Spencer's attorney, Brad Hall, said Title IX is "worth fighting for."

"Title IX represented a unique set of rights for individuals, with very specific damages against an institution. This settlement did not involve any claims against any alleged perpetrators. Nor did this Federal civil claim have anything to do with standards of proof in State criminal cases," Hall said in a written statement. "This settlement allowed Ms. Spencer to move forward at the time, and was I think a good framework for everyone to evolve."

Student complaints about UNM's handling of sexual misconduct cases prompted the U.S. Department of Justice to launch an investigation in December 2014. It's unclear if Spencer was among the complainants. But the investigation led to a 2016 settlement agreement that compelled UNM to revamp its related policies and procedures and bolster training.



**Competing plans**

Flying Star's owners, their creditors have differing ideas on how to handle the chain's reorganization

**BUSINESS >> B1**

**Not yet set**

Fans haven't made a commitment to Lobo football

**SPORTS >> D1**



PLAINTIFF'S
EXHIBIT

**14**

NEW MEXICO'S LEADING NEWS SOURCE

# ALBUQUERQUE JOURNAL

ABQJOURNAL.COM

$1.00   Copyright © 2016, Journal Publishing Co.

**SATURDAY**
**JULY 30, 2016**

**FINAL** ★★★

# ART can start

## Judge refuses to halt ABQ's new bus-rapid-transit system



GREG SORBER/JOURNAL

The city plans to use electric buses, such as this one, for the Albuquerque Rapid Transit project. A federal judge on Friday denied a preliminary injunction that would have prevented the city from starting construction on the project.

**BY DAN MCKAY**
JOURNAL STAFF WRITER

A federal judge on Friday refused to order a halt to Albuquerque's plan to build a bus-rapid-transit system down the middle of Central Avenue.

In a late-night decision, U.S. District Judge Kenneth Gonzales denied a motion for a preliminary injunction that would have prevented Mayor Richard Berry's administration from starting construction on the $119 million project.

Work could begin as early as Wednesday, city attorneys told the judge.

Gonzales said he wasn't convinced that it's in the public's interest to stop the project — called Albuquerque Rapid Transit — and he noted that the mayor and a City Council majority favor the project.

"Completing the ART project on time will address existing safety concerns sooner and save the public money due to construction delays," he said in a 14-page opinion.

The judge expressed mixed personal feelings about the project, but he said it was his job to apply the law objectively, regardless of the political debate.

Granting a preliminary injunction, he said, requires meeting strict legal standards.

"If or when the ART project is constructed and put into operation, there may be a day when I will utilize it and fully realize everything the system now is envisioned to be: a speedy, convenient, environmentally smart transportation system that,

See **JUDGE** >> A2

# Air Force aiming for new nuke missiles

*Kirtland center commander asks for proposals for ICBMs, cruise missiles*

**BY ROBERT BURNS**
AP NATIONAL SECURITY WRITER

WASHINGTON — Advancing what could become a near-total rebuild of the U.S. nuclear weapons arsenal, the Air Force on Friday solicited industry proposals to build a new fleet of land-based nuclear missiles as well as replacements for its air-launched nuclear cruise missile force.

The two projects are part of a broader modernization of the nuclear arsenal expected to cost hundreds of billions of dollars over 30 years.

"This request for proposals is the next step to ensuring the nation's ICBM leg of the nuclear triad remains safe, secure and effective" said Maj. Gen. Scott Jansson, commander of the Air Force Nuclear Weapons Center, which is headquartered at Kirtland Air Force Base. The two-story building that houses the center was established at Kirtland 10 years ago.

The plans have broad support in Congress, although some, including Sen. John McCain, R-Ariz., have questioned the need to replace all three "legs" of the nuclear triad — the submarines, long-range bombers and land-based missiles that were developed by the Pentagon during a Cold War arms race with the Soviet Union.

The Air Force operates two of the three legs of the nuclear arsenal — the bombers and the

See **AIR FORCE** >> A5

# Slain security guard didn't have license

# UNM to consider requiring freshmen to live on campus

*President says benefits include better safety and academic performance*

Copyright © 2016 Albuquerque Journal

help them stay in school, but one that could significantly increase their cost of attending UNM.

A regent's finance committee is set to consider the plan at a Monday meeting. Administrators say

lege and university administrators nationwide regarding the benefits of living on campus."

The average cost of room and board at UNM runs about $9,500 annually. Tuition runs about

from 2015. University housing has room for about 475 additional students, so administrators say there's room for growth.

If approved by the finance committee, the measure would

# UNM serious about sexual assault issue

*Administration aims to boost prevention, improve response*

**BY ROBERT G. FRANK**
PRESIDENT, UNIVERSITY OF NEW MEXICO

Sexual assault is arguably the most disturbing issue on our college campuses nationwide. At UNM, it has become a primary focus over the past few years, beginning with some high-profile cases involving our students, and culminating in a Department of Justice review of our policies and procedures.

I am keenly aware of the pain surrounding this complex issue, and I want to assure you that having a safe campus that addresses the concerns in as sensitive a manner as possible while providing a fair process for all is of utmost importance to me and my administration.

As we pursue our discussions with the DOJ, we are moving aggressively ahead with major changes in our campuswide response, based on information the report provided and other national authorities. In fact, we have been actively working to improve how we handle these cases since before the DOJ review began and have made strong advances just within the past year, after that review had ended.

Still, no matter how much progress we make, or how many resources we offer, it cannot minimize or mitigate the trauma of a sexual assault.

Even one rape is one too many! What we can do is strive to make the response faster and fairer, in an attempt to not cause further suffering.

We understand that an investigation itself, which can require repeated recounting of what happened, impersonal gathering of evidence and time-consuming processes, can be traumatizing. That is why we continue to work diligently to educate and train our campus community to try to prevent sexual assault from happening and to deal with it as sensitively as possible when it does.

Here are just a few highlights of recent changes that will provide better Response, Education, Support, Prevent, Empower, Consent and Train — or as we sum it up in our acronym, LoboRESPECT:

- Opening of the LoboRESPECT Advocacy Center;
- Additional positions and staffing in the Office of Equal Opportunity, which investigates Title IX cases including sexual assault and harassment;
- Updated and consolidated policies including an overarching sexual misconduct policy;
- Additional and continued training campuswide;
- An independent, scientific campus climate survey of nearly 3,000 UNM students (to be released soon);
- Increased collaboration among all campus entities dealing with sexual assault reporting, advocacy, training or safety.

These are continuing steps forward, and may need to be tweaked as we work with the DOJ to complete an agreement on how we will specifically address this serious concern. I pledge that we are cooperating fully in the process with the DOJ and will work conscientiously to adopt their recommendations.

What I ask of all of you — staff, faculty, advocates, students, parents, alums, lawmakers, community members — is to join with us in this effort. Step up in your area of impact, your world of influence. Learn more about what is available and how to access it, then use that knowledge to help prevent and respond to sexual assault around you.

Our students rally to "Protect the



*Police departments are forcing college kids to work as C.I.s in exchange for leniency in their own cases*

# Scared youths can pay price in War on Drugs

This is the time of year parents start worrying about back-to-school stuff. For those with college-age kids who will soon go off to live by themselves, there's an extra bit of preparation to think about.

You may not realize it, but police departments across the country, especially those near colleges and universities, often "flip" students caught with even a tiny amount of marijuana and recruit them into the ranks of "confidential informant."

At some universities, there is a wide circle of these student-tipsters who have all been made to promise to turn in other campus drug users in exchange for leniency in their own narcotics case.

Here's how it works.

Narcotics officers, working on information from one of these C.I.s approaches a particular student, asks to search their room and, when they find the expected evidence of drug use, they haul the student to the stationhouse.

He or she fails to notice that the officer hasn't actually placed them under arrest. If they had been, the student would be told about his or her rights to an attorney and to remain silent. The scared kid doesn't realize that the threat of a decades-long prison term is just a tactic to get them to talk.

Sitting in a bleak interrogation room, being questioned by a stern-looking officer and worrying about what mom or dad will say if they find out, these first-timers are desperate to grasp at any solution to their dilemma.

Then the answer is presented: Wear a wire and turn in other students willing to sell you drugs.

While on the hot seat, the student is told they may not tell anyone that they are part of the C.I. squad. They are often made to sign a document promising to turn in as many as 10 other students.

Now for the other side.

Police working these details will tell you this is a bona fide tool in the ongoing War on Drugs. Who better, they say, to make a monitored buy from a drug-dealing student than another student? When asked if all this drama isn't a bit of overkill for a small amount of marijuana, the officer will likely answer that the law is the law. Marijuana is legal in only four states and the District of Columbia, and it is likely not legal on your



*Crime and Justice*

**DIANE DIMOND**

increasing their drug bust rates and qualifying for more federal funds, these kids die on the job.

It happened in 2008 to a Florida State graduate named Rachel Hoffman. She had been caught with drugs — twice. The last time Rachel had five ounces of pot, and ecstasy and Valium pills. She agreed to C.I. recruitment to avoid prison time.

Rachel agreed to wear a wire, carry $13,000 in cash, 1,500 ecstasy pills, some crack cocaine and a gun to a meeting with two known drug dealers.

The location was a public park and some 20 officers, including one in a DEA plane overhead, were on hand to protect her. When the location was changed at the last minute, officers lost contact with Rachel. Her body was found in a ditch 48 hours later.

In November 2013, a North Dakota State College of Science scholar named Andrew Sadek was confronted by members of a local police task force with evidence that he had earlier made two small pot sales — $20 and $60 worth — to an undercover student.

Andrew had never been in trouble before but, once in the interrogation room, threatened with "40 years in prison and a $40,000 fine," Sadek agreed to flip. The interrogation video shows he was encouraged to find dealers who offered heavier drugs than marijuana.

Six months later, the 20-year-old's body was found in the Red River bound to his rock-filled backpack, a gunshot wound in his head.

While those are extreme cases, these campus recruitments have been widespread, at the University of Alabama, the University of Massachusetts at Amherst, the University of Wisconsin-Whitewater and others.

Last year, it was reported that the narcotics squad near the University of Mississippi recruited about 30 C.I.s, most of them students. One, named Greg, told "60 Minutes" he was forced to inform after a friend left a package in their room for a second friend to pick up. Student #2 entrapped Greg's voice on a recording. The package contained LSD.

To the families of college kids setting out to start their own lives, do them a favor. Cut out this column and send it with them

# Burping student gets no legal relief from appeals court

*Official overreach in Albuquerque school should be curbed, but is a federal lawsuit the best way?*

**BY NOAH FELDMAN**
BLOOMBERG VIEW

Is fake burping in gym class enough to get a seventh-grader arrested? Yes, according to a federal appeals court, which granted immunity to the kid's family after the 13-year-old was hauled off to juvenile detention in handcuffs.

The officer's action was based on a New Mexico misdemeanor law that makes disrupting school activities a crime. In a 94-page opinion, the court backed the arrest, saying the law didn't forbid arresting someone for burping.

One judge on the panel wrote a pungent, four-page dissent explaining why that reasoning is wrong. But determining the correct outcome here is a little tricky. The arrest was clearly absurd. Yet it isn't clear that the remedy for every stupid arrest is a federal lawsuit.

The incident behind the case took place in May 2011. It began when a student at the Cleveland Middle School in Albuquerque — known in court documents as F.M. — interrupted physical education class by fake burping repeatedly. (You can't make this stuff up.) The teacher sent F.M. into the hall, but he continued to interrupt by poking his head back into the classroom and burping some more.

In more innocent times, this might have merited a trip to the principal's office. Instead, the teacher called the "school resource officer," Arthur Acosta, an officer in the Albuquerque Police Department assigned to the school.

F.M. denied burping — some things never change — but Acosta brought him to the school's office and made him sit in a chair while he went to get his computer from his car.

When Acosta returned, he told F.M. that he was placing him under arrest for committing the misdemeanor of violating New Mexico's school disruption law, which says:

"No person shall willfully interfere with the educational process of any public or private school by committing or threatening to commit or incite others to commit any act which would disrupt, impair, interfere with or obstruct the lawful mission, processes, procedures or functions of a public or private school."

The officer told the school principal, who suspended F.M. for the day and called F.M.'s mother, though without reaching her. The officer then brought F.M. to his police car, patted him down, handcuffed him, and took him to the juvenile detention facility.

F.M. was released later that afternoon into his mother's custody.

If you're steaming at this point in the story, you're not alone. F.M.'s mother sued the principal, an assistant principal and the police officer. The basis for her claim was false arrest in violation of F.M.'s

A section 1983 suit in vindication of constitutional rights is a special legal beast. To proceed against a public official, a plaintiff needs to show that the official acted in violation of clearly established law. Almost all officials sued under section 1983 assert what is called "qualified immunity." That means if their actions were in line with what any reasonable official would have believed lawful, the suit ends.

The defense raised by the police officer and principals was simple. The New Mexico law under which F.M. was arrested makes it a crime to disrupt school procedures. F.M.'s burping disrupted class to the point where teaching and learning could no longer occur. It was therefore reasonable to arrest him pursuant to the law.

A federal district court found in favor of the school officials and police officer. The mother's appeal focused on the police officer alone.

The U.S. Court of Appeals for the 10th Circuit again held for the officer. It said that the arrest of the student counted as "arguable probable cause." In particular, the three-judge panel held 2-1 that it wasn't clearly established under the state law that you couldn't arrest a child for burping in class.

Here things got a little technical. The panel said there was no case on file explicitly interpreting the law to exclude such petty interruptions.

In his stinging dissent, Judge Neil Gorsuch pointed out that there was a precedent dating back to 1974, State v. Silva, holding that trivial interference doesn't count as a crime, and that there must be "a more substantial, more physical invasion" of school operations as well as proof that the student more "substantially interfered" with the "actual functioning" of the school.

The panel replied formalistically that the Silva case was interpreting a different statute, one that governs colleges rather than schools. Gorsuch rejoined that the language in the two laws was identical, and it should make no difference that the case was about the college statute rather than the school statute.

On the whole, I think Gorsuch got the better of the legal argument. But the panel's judgment had some logic behind it, too: the desire not to make a school dispute into a federal case.

The deeper question is how to resolve incidents of official overreach like this one. The appeals panel was trying to keep the issue out of the courts altogether. Gorsuch wanted the court to resolve it.

Perhaps the best outcome is for the case to get enough publicity that such episodes don't recur.

Noah Feldman, a Bloomberg



PLAINTIFF'S
EXHIBIT

15

# Agreement

### between

### The United States Department of Justice

### and

### The Board of Regents of the University of New Mexico

## Introduction

The United States Department of Justice, Civil Rights Division, Educational Opportunities Section, and the United States Attorney's Office for the District of New Mexico (collectively, "DOJ" or the "Department"), received and investigated complaints that the University of New Mexico ("UNM" or the "University") failed to adequately respond to allegations of sexual assault of students. On April 22, 2016, DOJ issued a Letter of Findings on the University's compliance with Title IV of the Civil Rights Act of 1964 ("Title IV"), 42 U.S.C. § 2000c-6, which prohibits discrimination based on sex, among other bases, by public colleges and universities, and Title IX of the Education Amendments of 1972 ("Title IX"), as amended, 20 U.S.C. §§ 1681–1688, and its implementing regulations, 28 C.F.R. pt. 54, which prohibit sex discrimination by recipients of federal financial assistance. (See Exhibit A.)

The Department and the University enter into this Agreement to address the University's obligations under federal civil rights laws to address sexual harassment,[1] including sexual violence,[2] which creates a hostile environment for students affected by such harassment, and to provide clear and consistent procedures for reporting, investigating, and responding to such conduct.[3]

The Department recognizes that throughout its investigation into this matter, the University has taken significant and proactive steps to strengthen its prevention of and response to sexual harassment and assault on campus. (See Exhibit B, "UNM's June 2nd Letter to DOJ.")

The Department acknowledges that the University has, in good faith, initiated some of the actions described below prior to execution of this Agreement.[4] The University agrees to comply with the requirements of this Agreement starting on the date signed and to maintain compliance for the duration of this Agreement.

---

[1] University Administrative Policy 2730 ("Sexual Harassment") defines sexual harassment as unwelcome conduct of a sexual nature. There are two typical types of sexual harassment which violate University policies: quid pro quo and hostile environment (examples of each are provided in Policy 2730).

[2] Sexual violence is defined in University Administrative Policy 2740 as physical sexual acts perpetrated against a person's will or when a person is incapable of giving consent (for example, due to the student's age or use of drugs or alcohol, or because an intellectual or other disability prevents the student from having the capacity to give consent). A number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, sexual abuse, and sexual coercion. Sexual violence can be carried out by school employees, fellow students, students from other schools, or third parties.

[3] See 20 U.S.C. §§ 1681–1688, and its implementing regulations, 28 C.F.R. pt. 54; and the legal standards discussed in the Department of Education's Office of Civil Rights in the Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties (Jan. 19, 2001); and its subsequent interpretive documents: the Dear Colleague Letter on Sexual Violence (Apr. 4, 2011), and "Questions and Answers on Title IX and Sexual Violence" (Apr. 29, 2014).

[4] DOJ's acknowledgement does not connote agreement that UNM's proactive measures, as implemented, meet the requirements of this Agreement or bring the University into complete compliance with Titles IV and IX.

## Terms of the Agreement

To resolve the concerns identified by the Department in its Letter of Findings, the University will take action designed to eliminate and prevent sexual harassment, including sexual violence, that creates a hostile environment in its education programs and activities, and in compliance with Title IV, Title IX, and Title IX's implementing regulations. To that end, the University will make all necessary and appropriate revisions to its policies, procedures, and practices regarding campus sexual harassment, including sexual violence; take appropriate and immediate steps to investigate or otherwise determine what occurred when it has actual or constructive knowledge of sexual harassment; and mitigate the effects of sexual harassment of students that has created a hostile environment, including taking prompt and effective steps reasonably calculated to end the sexual harassment, eliminate  any hostile environment that may arise, prevent its recurrence, and, as appropriate, remedy its effects.[5]  In return, DOJ will not initiate litigation regarding its Title IX and Title IV findings raised as of the date of this Agreement, provided the University continues its efforts and implements the provisions of this Agreement in good faith and subject to the terms in Section VII below.

I.    **DEFINITIONS**

    A.   "Student" means all students who have a regular physical presence on campus and are enrolled in a degree-granting program for six credit hours or more per semester. This definition does not include students taking all of their classes exclusively on-line,[6] students taking classes in non-degree or non-credit status, or students taking classes in the University's Extended Learning or other community learning programs.

    B.   "Sexual harassment" includes all forms of sexual harassment defined in University Administrative Policies 2730 and 2740.

    C.   "Days" refers to calendar days. If a deadline falls on a weekend, holiday recognized by either the Department or the University, or during the University's Winter Break period, that deadline will be extended to the first regular business day following that weekend day, holiday, or the end of the Winter Break.

---

[5] Title IV, Title IX, and Title IX's implementing regulations protect students from prohibited discrimination and do not restrict the exercise of any expressive activities or speech protected under the U.S. Constitution. When a school works to prevent and redress discrimination, it must respect the free-speech rights of students, faculty, and other speakers. Title IX and Title IV protect students from sex discrimination; they do not regulate the content of speech. The Department recognizes that the offensiveness of a particular expression as perceived by some students, standing alone, is not a legally sufficient basis to establish a hostile environment under Title IX and Title IV. While working to meet the requirements of this Agreement, UNM should also review the Department of Education's July 28, 2003, Dear Colleague Letter on the First Amendment, http://www.ed.gov/ocr/firstamend.html, and October 26, 2010, Dear Colleague Letter on harassment and bullying, http://www.ed.gov/ocr/letters/colleague-201010.html.

[6] Should a student who takes all of their classes exclusively on-line change their status such that the student has a regular physical presence on campus, that student will then qualify as a "student" as defined in this Section.

D. "Supportive measures" include interim supportive academic measures such as academic accommodations or changes in residential assignment, and appropriate supportive safety measures, such as no contact directives or temporary suspensions.

E. "Attendant materials" help implement and disseminate information about University policies and include, but are not limited to, websites, brochures, handouts, and other materials designed with the purpose of informing the public about such policies.

II.    **POLICIES AND PROCEDURES**

A. To clarify what conduct constitutes sexual harassment prohibited by University policy and students' options for reporting sexual harassment, including sexual violence, the University will review all relevant policies, procedures, and attendant materials for consistency and clarity, and will amend, rescind, or insert cross-references as necessary. The University will ensure its policies, procedures and related attendant materials consistently and accurately:

   1. Define sexual harassment and explain when such harassment rises to a level that violates University policy (e.g., hostile environment, quid pro quo); and

   2. Provide clear and detailed information on reporting, including: (a) a description of how, where and to whom to report sexual harassment; (b) an explanation of when reports are confidential, and when they constitute notice to the University, thereby triggering a requirement that the University respond; (c) how to report under each option; and (d) the consequences of each reporting option. The University will include details on anonymous and/or confidential reporting and on how to report a crime to law enforcement for criminal justice response.

B. The University will ensure that its procedures provide for adequate, reliable, prompt, and impartial investigation, adjudication (where appropriate), and appeal (where applicable) of all complaints of sexual harassment, including an equal opportunity for the parties to present witnesses and other evidence. To this end, the University will review and revise its procedures and any attendant materials as follows:

   1. Revise its updated Office of Equal Opportunity ("OEO") Discrimination Claims Procedure ("DCP") to provide an explanation of what OEO considers in making a final determination of whether a complaint of sexual harassment violates University policies, including (a) a description of what types of evidence may be obtained by OEO or offered by witnesses, and (b) an explanation of how such evidence is considered in making the final determination;

   2. Revise the DCP to provide detailed information for complainants and respondents regarding their rights under OEO's processes, including the rights of complainants and respondents as defined in University Administrative

4

Policy 2740;[7] and expectations/options for complainants and respondents as the investigation proceeds;

3. Revise the DCP to provide a statement that OEO will independently and impartially investigate and adjudicate sexual harassment complaints without intervention or involvement by University administrators, unless such administrators are specifically tasked with responsibilities in the adjudication process;

4. Revise the DCP to provide a prompt and reasonable timeframe for any appeals process allowed under University policy, to ensure that a finding of a violation of University policy is timely and effectively shared with the appropriate sanctioning body; and

5. Review the Student Grievance Procedure against the DCP to ensure both clearly and consistently reflect each other's processes and procedures.

C. To ensure that University procedures provide for adequate, reliable, prompt, and impartial investigation, adjudication (where appropriate), and appeal (where applicable) of all complaints of sexual harassment, the University will develop written internal protocols for the implementation of the DCP.[8] These written protocols will:

1. Require OEO investigators to, where feasible, conduct in-person interviews with material witnesses to a complaint before providing any witness with another witness' written statement;

2. Establish a timeframe after witness interviews for OEO investigators to follow up on collecting relevant evidence identified by witnesses, including statements, pictures and videos published through social media, and information from cell phones, including but not limited to text messages, photos, and videos;

3. Define parameters for granting or denying an extension of time during any part of OEO's investigation procedure when such extension is requested by the complainant, the respondent, law enforcement or the OEO investigator, in a way that minimizes the negative impact of such delays on OEO investigators' ability to timely collect evidence or provide supportive measures;

4. Establish when and how OEO must consider, as relevant evidence, additional complaints of sexual harassment against a single respondent that arise prior to

---

[7] All policy number references in this Agreement refer to the text of policies in place as of the date this Agreement is signed.

[8] See 28 CFR 54.135(b).

or during the course of an investigation, including complaints of additional harassment or violations of no-contact orders;

5. Establish how OEO will consider power dynamics in complaints by students against faculty and staff, including when a respondent is both a student and school employee;

6. Require that investigators equally assess the credibility of all witnesses and explain the basis for their assessment in the letters of determination;

7. Establish a process by which OEO will receive relevant information from the University of New Mexico Police Department ("UNMPD"), and seek to receive information from the Albuquerque Police Department, the Bernalillo County Sheriff, and the Bernalillo County District Attorney;

8. Establish a procedure for OEO investigators to report, and an appropriate office to effectively respond to, any contact made by UNM administrators or other non-OEO employees during the pendency of the investigation and adjudication of a complaint that could be perceived as creating bias or partiality; and

9. Establish a time frame for OEO investigators to communicate with the complainant and respondent to keep them timely informed as to the investigation, adjudication, and appeals processes.

D. To ensure that the University effectively eliminates any hostile environment created by sexual harassment, prevents its recurrence, and remedies its effects, the University will establish written internal protocols regarding communications about its response to allegations of sexual harassment, including:

1. A process by which the OEO and Dean of Students Office ("DoS") will share information regarding complaints of third party retaliation and respond as appropriate;

2. Criteria for and a process by which the OEO and the DoS will determine appropriate supportive measures during the grievance investigation and adjudication process; [9]

3. A process by which the OEO and the DoS will convey information regarding pending investigations, supportive measures, or findings of a violation of University policy to necessary campus entities, which may include but not be

---

[9] The appropriateness of a supportive measure will be determined at the discretion of the OEO, DoS or other University body with jurisdiction over such issues.

limited to UNMPD, residential life, athletics, and any applicable academic departments.

E.  To ensure that the University consistently responds promptly and equitably to all allegations of sexual harassment of or by students of which it had actual or constructive knowledge, the University will:

   1.  Revise  the University's procedures for tracking electronically all alleged sexual harassment incidents (including any written or verbal complaints) to produce a spreadsheet that includes: the date and nature of the complaint; the name of the complainant or that the complaint was anonymous; the name of the person(s) who received the complaint or made the report; the name(s) of the respondent; whether OEO opened an investigation or its reason for declining to investigate; the name(s) of the person(s) assigned to investigate the complaint, issue any supportive measures, and issue disciplinary action (where relevant); the supportive measures issued, if any; the date of every major step of the investigation and adjudication process, including interviews of material witnesses, extensions of time granted, and issuance of preliminary and final findings; communications regarding all major steps to complainant and respondent; the dates of any appeals and their findings; and a summary of the findings at the initial, hearing, and appeal stages, including any actions taken on behalf of the alleged victim and any disciplinary or other actions taken against the respondent;

   2.  Ensure that OEO retains all records and supporting written documentation related to any incident of alleged sexual harassment for the duration of this Agreement, including but not limited to: any written report or complaint; any written statements of the student(s) alleging harassment and/or person(s) reporting the alleged harassment; interview notes; any evidence submitted or collected; any records of correspondence, whether written, in person or by phone, with the complainant and respondent, their representatives, or other potential witnesses in a matter; existing documentation of any prior incidents of discrimination or harassment involving the student(s) subject to harassment or the alleged harasser(s); actions taken on behalf of the alleged subject of harassment; actions taken with respect to the respondent, including any temporary measures; records of any discipline or proposed discipline; records of findings communicated to the parties; and records of any appeals;

   3.  Establish a process for the Title IX Coordinator to regularly review (a) all reports of conduct that may constitute sexual harassment, including UNMPD police reports, to ensure that all alleged incidents that involved possible sexual harassment were properly identified as such; and (b) all files and reports related to the investigation, adjudication, appeal, and sanctions of allegations of sexual harassment to ensure they were responded to appropriately and in accordance with the requirements of University policies and procedures, Title IV, and Title IX and its implementing regulations. The Title IX Coordinator

will follow up as appropriate with any UNM employee(s) who could improve their identification of or response to sexual harassment.

F.    On or before December 1, 2016, the University will submit to the Department for review and approval any initial proposed revisions of its policies, procedures, and attendant materials related to sexual harassment (including identification of which policies, if any, will be rescinded), and (with respect to the University Administrative Policies), if necessary, review of any subsequent substantive changes after the policies and procedures have gone through UNM's notice and comment process. These revisions will reflect the requirements of the Agreement and relevant federal law. If the Department chooses to provide comments on the University's proposed revisions, the Department will do so within 30 days of receipt. The University will incorporate the Department's comments unless there is disagreement, in which case the University and the Department will work together in good faith to resolve the disagreement. If the parties are unable to agree on the revisions within 30 days of the Department providing notice of any concerns, the Department may pursue relief under the enforcement provisions of Section VIII below.

G.    Once the University revises its policies, procedures and attendant materials related to sexual harassment under the terms above, the University will not substantively modify those policies, procedures or protocols during the period of the Agreement without the approval of the Department under the process set forth in Section II.F.

H.    By August 1 of each year covered by this agreement, the University will submit the spreadsheet identified in section II.E.1 for review, and will maintain all other documents identified in II.E.2 to be produced to the Department for review within 30 days of a request.

## III.    NOTICE OF POLICIES AND PROCEDURES

A.    No later than 30 days after final execution of each revised or new policy or procedure, the University will provide all students and employees with written notice regarding the revised or new policy or procedure regarding sexual harassment and the procedures for resolving sexual harassment complaints required by Sections II.A-B. The University, at a minimum, will publish revisions of University Administrative Policies in the "News" section on the UNM Policy Office website and in the UNM News Minute. The University will also include links to all relevant policies and procedures in the Student Pathfinder Handbook, including but not limited to OEO's DCP.

B.    By the start of each academic year, the University will review and update the LoboRESPECT website to ensure it provides information consistent with any revised policies and procedures, and contains clear and consistent information identifying which policies and procedures govern the investigation, adjudication, appeal and sanctioning processes.

**IV.      TRAINING**

A.  Training for Students

1.  The University currently provides in-person interactive training on sexual harassment to incoming students through its New Student Orientation program and offers it to the University community on an ad-hoc basis throughout the year.[10]

As part of this Agreement, the University will revise and enhance its training programming to provide in-person interactive training to all students by the close of the monitoring period described in this Agreement. Such programming will include information regarding prevention of sexual harassment and the University's policies and procedures regarding the reporting, investigation, and adjudication of Title IX complaints. The University will ensure that the training: (a) informs students of the University's prohibitions against sexual harassment as provided in University policy, the University's prohibition against retaliation, and the University's commitment to preventing and addressing sexual harassment; (b) educates students on what type of conduct constitutes sexual harassment that violates University policy; (c) informs students as to how and to whom they can report allegations of sexual harassment and retaliation; and (d) provides a general overview of Title IX, the rights it confers on students, the resources available to students who have experienced sexual harassment and retaliation, and the Department's role in enforcing Title IX and other laws prohibiting sex discrimination.

a.  The training will use evidence-based curricula and methodologies, which emphasize interaction with participants and use of fact patterns from Title IX claims generally publicly known through national media dissemination (but do not involve current or past students, faculty, or staff at the University of New Mexico) to generate discussion and disseminate facts about sexual harassment. The training will include opportunities for discussion and interaction.

b.  These sessions will emphasize: issues around consent in sexual interactions; the criminal, academic, housing, athletic, and student-record-related consequences related to committing sexual harassment and/or retaliation that violates University policy; the role of alcohol and drug use in incidents of sexual harassment, including how such use relates to consent and what constitutes incapacitation that prevents

---

[10] The in-person interactive training that the University provides its incoming students in the New Student Orientation program is titled "the Gray Area." DOJ will determine whether the Gray Area complies with these requirements as part of the monitoring component of this Agreement.

consent from being given; clear examples of what types of actions may constitute prohibited sexual harassment under University policy, and what may provide the basis for a complaint under the DCP; how bystanders can help; and when off-campus misconduct falls within the University's policies and the DCP.

2. By February 1, 2017, the University will establish the necessary infrastructure to allow it to provide the in-person interactive training described in this Agreement on an ongoing basis.

3. Starting February 1, 2017, the University will issue notices to all current students that those who have not taken the in-person interactive training described in this Agreement through New Student Orientation or another campus opportunity will be required to take such training prior to the end of the Fall 2017 academic semester.

   a. The University will ensure that all students currently enrolled in graduate programs at UNM have received training by December 31, 2017.

   b. The University may exempt from this training requirement all students graduating from their degree granting programs at the end of the Spring 2017 semester. However, the University must ensure that those students graduating from their degree granting programs at the end of the Spring 2017 semester who will be starting a new University degree granting program for six credit hours or more at any point following the close of the Spring 2017 semester will be required to take the in-person interactive training prior to starting or at the beginning of their graduate program.

4. Starting in the 2017-2018 academic year, the University will provide the in-person interactive training described in IV.A.1 to all students who are new to the University. This training will be mandatory for all students new to the University starting in the 2017-2018 academic year (including freshmen, new graduate students, and incoming transfer students).

5. Starting in the 2017-2018 academic year and continuing through the end of this Agreement, the University will ensure that all continuing students who have already received the in-person interactive training then receive annual online training on sexual harassment pursuant to the requirements below.

   a. The online training will emphasize: issues around consent in sexual interactions; the criminal, academic, housing, athletic, and student-record-related consequences related to committing sexual harassment that violates University policy, and retaliation; the role of alcohol and drug use in incidents of sexual harassment, including how such use

relates to consent and what constitutes incapacitation that prevents consent from being given; clear examples of what types of actions may constitute prohibited sexual harassment under the University policy, and what may provide the basis for a complaint under the University's grievance procedures; how bystanders can help; and when off-campus misconduct falls within the University's policies and grievance procedures.

    b.  The online training will be interactive.[11]

    c.  Individuals taking classes at the University exclusively online in a degree granting program will be required to take the online training in their first semester of enrollment and annually thereafter, so long as they are enrolled for one or more credits during the academic year.

6.  The University may develop a system whereby individuals may request waiver of the training(s) requirement. The waiver system will be reviewed by the Department prior to implementation.

7.  All training will include participant evaluations, which UNM will analyze to determine ongoing effectiveness of training. The University will develop a system for monitoring training to ensure that every student required to do so as provided in this Section participated in the trainings described in this Section subject to allowance of waiver approved by the Department or reasonable limitations for which the University supplies an explanation.

B.  Training for Responsible Employees

1.  By December 31, 2016, the University will provide training to all University staff and faculty that it designates as responsible employees, including but not limited to members of the UNMPD. This training will explain the University's responsibilities under Title IX to address allegations of sexual harassment and how employees should respond to reports of sexual harassment. The training will include:

    a.  Clear examples of what types of actions may constitute sexual harassment, and what may provide the basis for a complaint under to the University's grievance and other procedures;

    b.  Information regarding the University's policies and grievance procedures for Title IX complaints;

---

[11] The University has already purchased interactive online training modules. DOJ will determine whether the training complies with these requirements as part of the monitoring component of this agreement.

c. Information relevant to informing complainants of their right to file a Title IX complaint with the school and a criminal complaint with campus and community law enforcement and how to do so;

d. Which employees are responsible employees under University policy, the reporting requirement of all responsible employees, where and to whom reports of sexual harassment should be made, and any consequences for failure to report;

e. Information as to where victims of sexual harassment may seek help and assistance on campus; and

f. Information regarding the University's Title IX Coordinator, including role, responsibilities, and contact information.

2. Each responsible employee will be required to complete the training annually. The University will maintain a system for monitoring training to ensure that every responsible employee of the University participated in the training required by this Section.

3. The training will include participant evaluations, which UNM will analyze to determine ongoing effectiveness of the training.

4. By December 1 of each year covered by this Agreement, the University will ensure that the Title IX Coordinator and all employees directly involved in processing, investigating, adjudicating, responding to appeals, and/or sanctioning complaints of violations of University policies through the DCP regarding allegations of sexual harassment have received Title IX training(s). The training(s) must be in-person and cover:

a. The University's policies and grievance procedures for Title IX complaints;

b. The University's responsibilities under Title IX and Title IV to address allegations of sexual harassment, including how to recognize and appropriately respond to allegations and complaints; and

c. For the Title IX Coordinator and all individuals who investigate complaints of sexual harassment prohibited by Title IX and Title IV: how to conduct and document adequate, prompt, reliable, and impartial Title IX investigations. Training should focus on a trauma-informed approach, and must also include how to identify, collect, weigh and analyze evidence, including witness statements and forensic evidence, such as SANE and medical reports, information on consent and the role drugs or alcohol can play in the ability to consent, and how to assess credibility. Training may be provided using a train-the

12

trainer model (e.g., at least one employee attends outside training by experts in the field and coordinates in-house training).

5. Beginning with the 2016-17 academic year, the University will ensure that all employees new to the University employed in positions identified by the University as "responsible employee" as provided in Sections IV.B.1 and 4 complete the training required in this Section III.B within thirty (30) days of their employment start date.

6. For all training provided to employees by the University, UNM will also develop a plan to evaluate and monitor the effectiveness of such training.

C. Training for UNMPD

1. By December 1, 2016, UNMPD will ensure that all UNMPD officers who respond to or investigate allegations of criminal sexual assault and domestic violence have received training on evidence-based, trauma-informed investigative techniques. Training will include the neurobiological effects of trauma on the brain, how to identify drug- and alcohol-facilitated criminal sexual assault, effective report writing and evidence gathering. Training should also include information on how to recognize and eliminate implicit and explicit gender bias in policing.

2. By December 1, 2016, UNMPD will also establish a written protocol for all UNMPD officers who respond to or investigate allegations of criminal sexual assault to receive training at least annually on investigating criminal sexual assault and domestic violence to ensure all officers are aware of current best practices.

3. All training will include participant evaluations, which UNM will analyze to determine ongoing effectiveness of trainings.

V.    **TITLE IX COORDINATOR**

The University will review all policies, the DCP, and attendant materials to ensure they consistently identify the Title IX Coordinator's name or title, office address, email address, and telephone number as required by Title IX at 28 C.F.R. § 54.135(a) in all places where that information is published.  Additionally, the University will ensure that all published notices of nondiscrimination with the Title IX Coordinator's information are consistent with the requirements of Title IX at 28 C.F.R. § 54.140.

VI.    **EDUCATIONAL CLIMATE**

A. The University will take steps to eliminate any hostile environment that it identifies for students reporting sexual harassment (e.g. by providing academic services, counseling, escort services, and changing housing assignments and scheduling for

classes, dining services, etc.). Each semester the University will document, on an internal spreadsheet, any steps it takes to address a student's environment, including the nature and duration of any such steps.

B. The University, using evidence-based methodology and validated questions, will continue to conduct one or more annual climate surveys for all students to: 1) assess students' attitudes and knowledge regarding what constitutes prohibited sexual harassment and retaliation; 2) gather information regarding students' experience with sexual harassment while attending the University; 3) determine whether students know when and how to report such harassment; 4) gauge students' comfort level with reporting sexual harassment; 5) identify any barriers to reporting; 6) assess students' familiarity with the University's outreach, education, and prevention efforts to identify which strategies are effective; and 7) solicit student input on how the University can encourage reporting of prohibited sexual harassment and retaliation, and better respond to such reports.

1. The annual climate surveys will be administered in the Fall semesters of 2017 and 2018 to all students, and will allow for respondents to answer the survey anonymously.

2. By December 1, 2016, the University will submit its proposed climate survey and assessment methodology to the Department for review, and if changes are proposed, shall resubmit for review before conducting.

C. By February 1, 2017, the University will implement a monitoring program to assess the effectiveness of its efforts to prevent and address sexual harassment and retaliation and to promote a non-discriminatory school climate. The monitoring program should include an assessment of the effectiveness of its prevention and response efforts as they relate to the University's diverse population, e.g. Limited English Proficiency, LGBTQI, and Native American students. By February 1, 2017, the University will submit a monitoring plan to the Department for review. The monitoring program shall include an annual assessment of the effectiveness of its anti-harassment efforts and submission of the assessment to the Department as required by Section VII.E. The assessment will be completed by June 30, 2017, and then at the conclusion of each academic year for the life of this Agreement, and include:

1. A review of student climate surveys (see Section VI.B) to determine: where and when sex-based harassment occurs; deficits in students' knowledge of what constitutes sexual harassment that violates University policy, where to report it, and the results of reporting to different resources; barriers to reporting sexual harassment; and recommendations for how the University can better encourage reporting of and improve its response to complaints;

2. A review of all reports of sexual harassment and the University's responses to such reports, particularly with respect to: whether such reports were

14

adequately, reliably, promptly, and impartially investigated and resolved; how many resulted in a finding of violation of University policy and (where applicable) the disciplinary action taken; the University's actions to remedy the effects of any hostile environment and retaliation that occurred; how many reports involved particular groups of students or staff (e.g., first-year students, athletes, members of fraternities or sororities, or academic advisors) or particular patterns of behavior (e.g., drug- or alcohol-facilitated assault); whether any individuals engaged in repeat misconduct; and if so, the University's actions to prevent the repeated misconduct and remedy its effects;

3. Detailed data on the number of sexual harassment reports received by the University, whether the University investigated each report, and, if investigated, the findings, the sanctions imposed (if applicable) and the dates of all relevant events in each report, including but not limited to the date of the complaint and the date findings were communicated to the complainant and respondent;

4. Evaluation and analysis of the data collected, including an assessment of any changes in the number or severity of reported incidents of sexual harassment, particularly among subgroups of students or staff (e.g., first-year students, athletes, members of fraternities or sororities, or academic advisors);

5. Conclusions derived from the monitoring program implemented under Section VI.C;

6.  Any recommendations received from community members and stakeholders, including members of law enforcement, that are gathered for the annual assessment; and

7. Any recommendations by the University for improving its sexual harassment response and prevention programs, and timelines for the implementation of the recommendations.

## VII.     REPORTING PROVISIONS

A. Policies, Procedures and Protocols

The University will provide the Department all documents and information identified in provisions II.A-F in accordance with the timelines set forth above.

B. Notice of Revised Policies and Procedures

Within 45 calendar days after providing notice  to students and employees of the newly amended or revised policies and the DCP, the University will provide the Department with documentation that it has implemented Section III of this

Agreement, including copies of any written notices issued to all students and employees regarding the new Title IX procedures; a description of how the notices were distributed; links to the webpages where the revised Pathfinder and University policies are located; and a link to its webpage(s) where the revised DCP is located.

C.  Training

By December 1, 2016, the University will provide to the Department, for review and approval, the training materials and agendas to be used in the trainings conducted pursuant to Sections IV.A and B. The University will also provide information describing the expertise and experience with regard to Title IX of the person or persons conducting the training pursuant to Sections IV.B and C of this Agreement. If the Department chooses to provide comments on the proposed training or trainers, it will do so within 45 days of receipt of the materials.

By September 30, 2017, and by June 30th of each subsequent year covered by this Agreement, the University will provide information regarding the content and recipients of each student training provided pursuant to this Agreement.  This information must include:

1.  Copies of all agendas used at such training sessions;
2.  Copies of the training materials distributed at student trainings;
3.  Electronic access to any training provided through other media;
4.  The dates and duration of each student training session held that was required by this Agreement; and
5.  The number of students who have yet to participate in the online or in-person training required by Section III.A with an explanation for how the University will ensure that they receive the training, subject to the limitations and conditions approved by the Department as described in this Agreement.

By September 30, 2017, and by June 30th of each subsequent year covered by this Agreement, the University will provide the Department with a list of any University employee, by name and job title, who missed any training required by Sections IV.B and C of this Agreement during the past calendar year, and information as to how each employee will receive the training.

D.   Title IX Coordinator/Notice of Nondiscrimination

By December 1, 2016, the University will provide the Department with a report documenting the actions it has taken to comply with the provisions of Section V above.

E. Educational Climate

By September 30, 2017, and by June 30th of each subsequent year covered by this Agreement, the University will provide the Department with a report documenting its follow-up efforts with complainants as required by Section VI.A.

By September 30, 2017, and by September 30th of each subsequent year covered by this Agreement during which a climate survey was conducted, the University will provide the Department with a report documenting that the annual climate survey has been conducted, and including the cumulative results of the survey questions, summaries of comments provided in the survey, the University's analysis of the survey results, and proposed actions based on that analysis and the survey information.

By September 30, 2017, the University will provide the Department with a copy of its annual assessment of the effectiveness of its sexual harassment response and prevention programs, including any proposed recommendations for improving said programs. The Department will notify the University in writing if it has any objections to the assessment's proposed recommendations.

On June 30th of each year covered by this Agreement, the University will provide the Department with a copy of its annual assessment of the effectiveness of its sexual harassment response and prevention programs, including any proposed recommendations for improving said programs. The Department will notify the University in writing if it has any objections to the assessment's proposed recommendations. If at any other time the University seeks to improve its sexual harassment response and prevention programs in ways that contradict a term of this Agreement, it will provide the Department with immediate written notice of the proposed improvement(s) and need not wait until it submits its annual assessment.

## VIII.    ENFORCEMENT

A.  The Department may enforce the terms of this Agreement, Title IX, Title IV, and all other applicable federal laws.

B.  If the University, despite its good faith efforts, anticipates that it will be unable to meet any timeline set forth in this Agreement, it will immediately notify the Department of the delay and the reason for it. The Department may provide a reasonable extension of the agreed timeline.

C.  If the Department determines that the University has failed to comply with the terms of this Agreement or has failed to comply in a timely manner with any requirement of this Agreement, it will so notify the University and will attempt to resolve the issue(s) in good faith with the University. If the Department and the University are unable to reach a satisfactory resolution of the issue(s) within 60 days of providing notice to the

University, the Department may initiate civil enforcement proceedings in federal court.

D. The University understands that the Department will monitor this Agreement until it determines that the University has fulfilled the terms of this Agreement and is in compliance with Title IV, Title IX, and the implementing regulations at 28 C.F.R. Part 54, which were at issue in its investigation.

E. The University further understands that the Department retains the right to evaluate the University's compliance with this Agreement, including the right to conduct site visits, observe trainings, interview University staff and students (including *ex parte* communications with students and University employees other than University administrators), and request any relevant additional reports or data, including the investigative reports and files of OEO and UNMPD, as are necessary for the Department to determine whether the University has fulfilled the terms of this Agreement and is in compliance with federal law.

F. By signing this Agreement, the University agrees to provide data and other information in a timely manner in accordance with the reporting requirements of this Agreement. To ensure compliance with this Agreement, the Department may require additional monitoring reports or the ability to inspect data or other information maintained by the University as determined necessary by the Department.

## IX.    TERMS AND TERMINATION

A. This Agreement will be in effect for three (3) full academic years and will not terminate until at least 60 days after the Department has received all reporting related to the 2018-2019 school year required by this Agreement.

B. For the duration of this Agreement, the University, including OEO and UNMPD, is expected to preserve documents, including electronically stored information, used to compile the above-referenced reports, and agrees to make such documents available for inspection by the Department upon request.

C. This Agreement has binding effect on the parties, including their principals, administrators, representatives, successors in interest, and their legal representatives.

D. If any part of this Agreement is for any reason held to be invalid, unlawful, or otherwise unenforceable by a court of competent jurisdiction, such decision shall not affect the validity of any other part of the Agreement.  Furthermore, the University and Department shall meet within fifteen (15) days of any such decision to determine whether the Agreement should be revised or supplemented in response to the court's decision.

E. This Agreement is for the purpose of voluntarily resolving an issue and is not, and will not be construed as, an admission of liability, fault, or wrongdoing of any kind by the University.

18

F.  This Agreement will not bar any individual from pursuing a complaint under Title IX against the University.

Signatures of the Parties to the Agreement:

Robert G. Frank, President                                    Date: 10.07.16
Office of the President
University of New Mexico

Damon Martinez                                                Date: October 17, 2016
United States Attorney
District of New Mexico
U.S. Department of Justice

Shaheena Simons, Chief                                        Date: 10-17-2016
Educational Opportunities Section
Civil Rights Division
U.S. Department of Justice

19

PLAINTIFF'S
EXHIBIT

**16**

# ALBUQUERQUE POLICE DEPARTMENT

400 ROMA AVE NW
ALBUQUERQUE, NM 87102
Phone: 505 768-2020

Printed on: **Friday, June 08, 2018 2:43:24 PM**

## General Information

| Agency APD | Case No 16-98541 | Supplement No 0000 | Reported Date 10/18/2016 | Reported Time 11:00 | Incident No 162920696 | Clr Code 42 | Rpt/Incident Typ FORCE RAPE |
|---|---|---|---|---|---|---|---|

| Location 6401 CONSUELO POINT ST NE | City ALBUQUERQUE | ZIP Code 87111 | Beat 533 | Area FH | Sector 53 | Map Coordinates 1568232 /1511443 |
|---|---|---|---|---|---|---|

| From Date 10/14/2016 | From Time 15:30 | To Date 10/14/2016 | To Time 16:00 | Member#/Dept ID# P5426 | 2nd Member#/ID# |
|---|---|---|---|---|---|

| Entered By P5426 | Review Member# P2891 | RC Status FR | RC Status Date 11/04/2016 | RC Status Time 13:40:45 |
|---|---|---|---|---|

| Assignment FSB | 2nd Assignment | Assignment FSB | Fast Track? N | Property? N |
|---|---|---|---|---|

## Offense

| # Offenses | Offense/Incident | Description | Complaint Type | AC | Use | Bias | Loc | #Pr | MOE | Act | Weapon/Force | IBRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 30-9-11 | CRIMINAL SEXUAL PENE | D | C | A | 88 | 20 | | | N | 40 | 11A |

## Summary Narrative

| TEXT |
|---|
| ON 10-18-16, JOY VANMETER, RESPONDED TO THE FAMILY ADVOCACY CENTER TO REPORT THAT SHE WAS SEXUALLY ASSAULTED BY A FRIEND ON 10-14-16 |

## Persons Summary (Non-Confidential)

| Juve? | Person Code | Pers No | Type | Name(Lst,Fst M) | Race | Sex | DOB |
|---|---|---|---|---|---|---|---|
| Adult | VIC | 1 | Individual | VANMETER,JOY | W | F | 1982 |
| Adult | SUS | 2 | Individual | BRIGGS,MICHAEL | W | M | /1969 |

## Victim (Person) VANMETER JOY

| Person Code VIC | Pers No 1 | Type Individual | Name(Lst,Fst M) VANMETER,JOY | Race W | Sex F | DOB /1982 | Age 34 |
|---|---|---|---|---|---|---|---|

| Juvenile? N | Height 509 | Weight 140 | Hair Color BRO | Eye Color |
|---|---|---|---|---|

| Gen Appearance | | Build | Hair Description | | Facial Features | | Deformity |
|---|---|---|---|---|---|---|---|

| Speech | | Demeanor | | Mask | | Glasses | | Body Clothing | |
|---|---|---|---|---|---|---|---|---|---|---|

| Weapon Type | | Caliber | | Barrel Length | | Finish | |
|---|---|---|---|---|---|---|---|

| Res Status R | | OFN_INVL | | To Age | |
|---|---|---|---|---|---|

## Addresses

| Type | Address | City | State | ZIP Code |
|---|---|---|---|---|
| Home | 2713 BEL AIR DR NE | ALBUQUERQUE | NM | 87110 |

## Id Numbers

| Type | ID No | OLS |
|---|---|---|
| OL | ▓▓▓▓ | NM |

## Phone Numbers

| Phone Type | Phone No |
|---|---|
| Home | (505)382-4795 |

## Suspect: BRIGGS,MICHAEL

| Person Code SUS | Pers No 2 | Type Individual | Name(Lst,Fst M) BRIGGS,MICHAEL | Race W | Sex M | DOB ▓▓/1969 | Age 47 |
|---|---|---|---|---|---|---|---|

| Juvenile? N | Height 509 | Weight 150 | Hair Color BRO | Eye Color HAZ |
|---|---|---|---|---|

| Gen Appearance | | Build | Hair Description | | Facial Features | | Deformity |
|---|---|---|---|---|---|---|---|

| Speech | | Demeanor | | Mask | | Glasses | | Body Clothing | |
|---|---|---|---|---|---|---|---|---|---|---|

| Weapon Type | | Caliber | | Barrel Length | | Finish | |
|---|---|---|---|---|---|---|---|

| Res Status R | | OFN_INVL 1 | | To Age | |
|---|---|---|---|---|---|

## Addresses

| Type | Address | City | State | ZIP Code |
|---|---|---|---|---|
| Home | 6401 CONSUELO POINT ST NE | ALBUQUERQUE | NM | 87111 |

## Id Numbers

| Type | ID No | OLS |
|---|---|---|
| SS | ▓▓▓▓ | |
| OL | ▓▓▓▓ | NM |

## Phone Numbers

| Phone Type | Phone No |
|------------|----------|
| Home | (505)259-1984 |

## Narrative

| Narrative |
|-----------|
| On October 18th, 2016, at approximately 1100 hours, while serving as the on call Sex Crimes detective, I was advised of a female subject requesting to file a report reference an alleged sexual assault.<br><br>I contacted victim Joy Vanmeter in a designated interview room. Joy stated that on 10-14-14, she was sexually assaulted by a friend named Michael Briggs while at Michael's residence.<br><br>A full investigation into this incident will follow. See APD supplemental reports for further details. |

End of document

# ALBUQUERQUE POLICE DEPARTMENT

400 ROMA AVE NW
ALBUQUERQUE, NM 87102
Phone: 505 768-2020

Printed on: **Friday, June 08, 2018 2:44:52 PM**

## General Information

| Agency APD | Case No 16-98541 | Supplement No 0001 | Reported Date 03/22/2017 | Reported Time 00:01 | Incident No 162920696 | Clr Code 42 | Rpt/Incident Typ FORCE RAPE |
|---|---|---|---|---|---|---|---|

| Location 6401 CONSUELO POINT ST NE | City ALBUQUERQUE | ZIP Code 87111 | Beat 533 | Area FH | Sector 53 | Map Coordinates 1568232 /1511443 |
|---|---|---|---|---|---|---|

| From Date 10/14/2016 | From Time 15:30 | To Date 10/14/2016 | To Time 16:00 | Member#/Dept ID# P5426 | 2nd Member#/ID# |
|---|---|---|---|---|---|

| Entered By P5426 | Review Member# P2891 | RC Status FR | RC Status Date 05/08/2017 | RC Status Time 11:55:19 |
|---|---|---|---|---|

| Assignment FSB | 2nd Assignment | Assignment FSB | Fast Track? N | Property? N |
|---|---|---|---|---|

## Offense

| # Offenses | Offense/Incident | Description | Complaint Type | AC | Use | Bias | Loc | #Pr | MOE | Act | Weapon/Force | IBRS |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 30-9-11 | CRIMINAL SEXUAL PENE | D | C | A | 88 | 20 | | | N | 40 | 11A |

## Modus Operandi

| Gang Act? | Gang Name | Property Targeted | Physical Evidence | Method of Entry | Point of Entry |
|---|---|---|---|---|---|
| Premise Type | Entry Location | Oddity | Alarm | Suspect Action | Crime Code(s) | Hate Crime Date |

## Narrative

| Narrative |
|---|

**Albuquerque Police Department Supplemental Narrative Report**

**Person's Information:**

**REF: Michael Briggs- Suspect**
ADD: 6401 Consuelo Point St NE Albuquerque, NM 87111
DOB: ▓▓▓-1969
SS#: ▓▓▓▓▓▓▓
Phone: (505) 259-1984

**REF: Joy Vanmeter- Victim**
ADD: 2713 Bel Air Dr NE Albuquerque, NM 87110
DOB: ▓▓▓▓1982
Phone: (505) 382-4795

**REF: Michael Ellis- Interviewed (Joy's husband)**
ADD: 2713 Bel Air Dr NE Albuquerque, NM 87111
DOB ▓▓▓▓-1979
Phone: (505) 382-4796

**REF: Paige Briggs- Interviewed (Michael Briggs' ex-wife)**
ADD: 11205 Woodmar Ln NE Albuquerque, NM 87111
DOB ▓▓▓-1973
Phone: (505) 414-0705

**REF: Zachary Ives- Michael Briggs' attorney**
ADD: 924 2nd St NW Albuquerque, NM 87102
Phone: (505) 899-1030

**Personnel Involved:**

**Case Agent:**
Detective Daniel Spinks #5426
Criminal Investigations Bureau
Violent Crimes Division/Sex Crimes Unit

**Assisting Detective:**
Detective Amanda Wild #5338
Criminal Investigations Bureau
Violent Crimes Division/Sex Crimes Unit

**Evidence:**

Joy Vanmeter's SANE kit.
DNA buccal swab provided by Michael Briggs.
Audio recordings of interviews with Joy Vanmeter.
Audio recording of interview with Michael Ellis.
Video recording of DNA buccal swab collection from Michael Briggs.
Audio recording of interview with Paige Briggs.
Audio and video recordings of interview with Michael Briggs.
Video recorded while transporting urine sample.

**Synopsis:**

Joy Vanmeter alleges that on October 14th, 2016, Michael Briggs sexually assaulted her
while she was in the shower at his residence and intoxicated to the point that she was
incapable of consenting to these acts.

**Investigation:**

**October 18th, 2016 1100 hours**

While serving as the on call detective for the Sex Crimes Unit, I was advised of a female sexual assault victim requesting to file a police report.

I met with Joy Vanmeter in a designated interview room at the Family Advocacy Center (FAC). An advocate from Rape Crisis was also present for this interview, at Joy's request.

Joy stated that she has been friends with Michael Briggs for approximately two and one half years. Joy and Michael met in a Master's Degree program at the University of New Mexico. They now both work in the same department at UNM in the Health Sciences Center. Joy works in the Department of Orthopedics in the research division. Michael does not directly supervise Joy at work but he is higher ranked in the office than she is and is responsible for the approval of various projects Joy works on.

Joy and Michael have never had a romantic relationship but Joy did consider him a close friend. Joy advised that they used to text each other nearly daily and would meet for drinks after work once or twice a month.

On 10-14-16, Joy and Michael met at the Matanza Beer Kitchen, located at 3225 Central Ave E for drinks around 1400 hours. Joy and Michael each had two beers while at the bar.

Michael and Joy were talking about work and family issues while at the bar. Michael told Joy about having recently moved into a new house after getting a divorce from his wife, Paige Briggs. Joy advised that she considers Paige a friend. Joy made a comment about Michael showing her his new house sometime and he suggested they leave the bar and go to his residence. Joy told Michael that she did not have to be home until 1800 hours that night and they left the bar. Michael gave his address to Joy (6401 Consuelo Point St NE) and they took separate cars. Joy suggested they purchase beer to consume at Michael's residence and he told her that he had Blue Moon in his refrigerator at home.

When Joy arrived at Michael's residence, he already had two pint glasses filled with beer. Michael showed Joy around the house while she drank her beer. There was nothing unusual about this drink, according to Joy.

After finishing her first beer, Michael went into the kitchen to pour her another. Joy walked into the kitchen while Michael was doing this and saw him pouring orange juice into the pint glass with the beer. The juice was being poured from a name brand orange juice container and was pulpy.

Joy took a few sips from this beer and got up to use the bathroom. While in the bathroom, Joy experienced a "Hot flash" and suddenly felt nauseous. Joy vomited while in the bathroom and returned to a living room couch with Michael after. Joy found the level of intoxication she was experiencing to be very strange considering she had only consumed three full beers to this point (Two at the bar and one at Michael's house). Joy advised she has only felt more intoxicated than she felt in that moment twice in her life and had consumed much more alcohol on those occasions.

Joy went back and forth between the living room and the bathroom to vomit two additional times. After vomiting for the third time, Joy told Michael that the room was spinning and

she started to convulse. Joy returned to the bathroom and vomited again. Michael followed her into the bathroom and offered her water. Michael also brought her a toothbrush.

Joy brushed her teeth while in the bathroom and vomited again after doing so. Joy brushed her teeth a second time and walked back to the living room and sat on the couch with Michael.

Joy remembers Michael touching her leg while on the couch and him telling her that she was going to be ok. Joy got up again and vomited in the bathroom for a sixth time.

Michael met Joy in the hallway outside of the bathroom and suggested that she take a shower. Joy advised that she was not thinking clearly at this point and thinks she asked Michael if she was "Stinky." Joy did not otherwise respond to Michael's suggestion that she get in the shower.

At this point in our interview, Joy started to sob and told me that she is unsure of the chronological order of the following events.

Michael walked Joy into the bathroom off the master bedroom. Joy was leaning on the bathroom counter when Michael started to untie the straps that were holding her dress up. Joy described time as moving very slowly while this was going on and advised she was having trouble processing what was happening. Joy stated that before she was able to comprehend Michael untying her dress, it was already untied and falling off of her.

Michael bent over and pulled down Joy's slip, pantyhose and underwear. Michael then helped Joy walk into the shower. Michael unclipped her bra at some point and it fell off her while getting into the shower.

Michael had already turned the shower water on and directed the nozzle at Joy's hair once she was in the shower. Michael moved her hair under the water while standing outside the shower. Joy vividly recalled the way Michael was staring at her while she was in the shower and described him as having "A look of approval." Joy stated that the way Michael was looking at her "Alarmed me."
At some point, Michael asked Joy if he could get in the shower with her. Joy, who was struggling to maintain her balance while in the shower and holding onto the glass shower door, does not remember verbally responding to Michael but does remember thinking to herself "He wants me to say yes, this isn't something I do." Michael removed his own clothing and got into the shower with Joy.

In the shower, Michael started kissing Joy. Joy advised that she did not react at all when Michael kissed her and recalled thinking to herself "Am I supposed to kiss him back?" Joy described the sensation of being incapable of moving her mouth in that moment.

In the shower, Michael kissed Joy's neck and chest and sucked on one of her nipples. Joy's eyes were closed while this was happening. Joy remembers opening her eyes at some point and realizing that Michael was no longer standing in front of her. Joy looked down and saw that Michael was kneeling in the shower in front of her and forcing oral sex on her. Joy described having very little sensation while this was going on and did attempt to reach down to pull Michael back to his feet. Joy also had the slight sensation of Michael's fingers being forced into her vagina. Joy described this as Michael thrusting his fingers in and out of her vagina. While Michael's fingers were in her vagina, Joy advised that she was thinking to herself that she needs to get home.

Joy does not remember getting out of the shower and her next clear memory is of sitting on the edge of Michael's bed wearing only her underwear. Michael suggested that she contact her husband to tell him she is too drunk to drive home. Joy tried to text her husband at 1943 hours but sent the text to the wrong person. (Joy deleted this text message from her phone but is going to try and recover it and will provide it to me at a later time.)

Michael eventually agreed to drive Joy home. Michael drove Joy's vehicle after she gave him directions to her house. Joy advised that she does not remember most of the drive home but does remember Michael asking her "How are we going to handle this" when they were getting close to her house. Joy told Michael she had to vomit again. Joy opened the car door and vomited on the street.

At her house, Joy's husband and four year old daughter were waiting on the front porch for her. Michael had to help Joy from the vehicle to her house and remembers Michael telling her husband something to the effect of "Joy's had too much to drink." Michael walked away from the house and used Uber to get a ride home.

Joy's husband left the residence with their daughter, leaving Joy home alone. Joy advised that she has no additional memories until waking up on the floor of their living room around 2220 hours that night.

Joy disclosed this sexual assault to her husband the following morning. He was initially upset with Joy partially due to a fight they had Friday morning before Joy left for work. After Joy told him about everything that happened however, he was apologetic for his initial reaction and is now being very supportive of Joy. Reference my tagged audio recording of this interview for further details.

**October 18th, 2016 1000 hours**

I reviewed Joy's SANE report. Joy's statement to the SANE nurse was similar to the statement she gave me. Multiple bruises to both of Joy's legs were documented by the nurse.

Three different genital injuries were also observed including linear tears and an abrasion. Reference the attached SANE report for further details.

**October 20th, 2016 1415 hours**

I spoke with Joy's husband, Michael Ellis, over the phone. Michael stated that on the morning of October 14th, he and Joy argued about a play he is currently performing in. In the play, Michael kisses another woman as part of the performance. That morning, Joy saw an advertisement for the play featuring a picture of Michael kissing his cast mate on the cheek. Joy became upset upon seeing this photo. Michael also advised that Joy has been battling bouts of depression and this too played into how upset she was that morning.

Later that morning after Joy left for work, she sent Michael text messages asking him how he would like it if she was kissing other men and specifically asked him how he would like it if she were to kiss Michael Briggs, knowing that she was planning on having drinks with him that afternoon.

Michael was expecting Joy to return home before 1800 hours Friday evening because he had to leave at that time to make it to his performance that night. At 1810 hours, Michael

texted Joy to advise her he was going to take their daughter Chloe to his mother's house and then go to his play. A few minutes later, Michael heard his dog barking and looked outside to see Joy stumbling along the sidewalk towards their residence. Michael Briggs was standing near Joy's vehicle which was parked on the street. Michael Briggs yelled at Michael Ellis "She's not doing very good" and then walked away from their residence.

Joy walked unsteadily up their driveway with her car keys in her hand. Michael told Joy he was leaving with Chloe. Joy, who was not making much sense as she spoke, tried to tell Michael she was ok to care for Chloe. Michael took Joy's car keys so she would not attempt to drive and left with Chloe.

The following morning, Joy told Michael about what she remembered from the day prior. Michael's account of what Joy told him was the same as what Joy told me during our interview on 10-18-16. Michael did add that since talking with me, Joy remembered seeing a red chunk of something in the toilet after vomiting at Michael's residence. She found this strange because she had not eaten anything resembling this that day. Reference my tagged audio recording of this interview for further details.

**October 25th, 2016 0830 hours**

Joy responded to the FAC and advised she was unable to retrieve the text messages she sent from Michael's house on 10-14-16. Joy signed a Permission To Search form to allow me to try and recover the deleted text messages at the New Mexico Regional Computer Forensic Lab (NMRCFL).

**0930 hours**

I took Joy's phone to the NMRCFL. The lab was unsuccessful in recovering any text messages from Joy's phone due to the standard encryption software that is installed on Apple IPhone's.

**1100 hours**

I spoke with Michael Briggs over the phone. Michael advised that he wants to speak with an attorney before deciding on whether or not to provide a statement regarding this case. I provided Michael with my contact information and this case number.

**1300 hours**

Joy returned to the FAC to retrieve her phone. Joy also texted the friend she accidentally texted on 10-14-16 to see if he still had the text message Joy sent. This friend was able to text Joy a copy of the original text message. The message is time stamped 7:53 PM (5:53 PM Albuquerque time) and states "On my way!" That copy has been printed and included with this report.

**October 28th, 2016 0830 hours**

I received a call from Laura Buchs with UNM's Office of Equal Opportunity. Laura advised that Joy disclosed details of this incident to her and requested a copy of the original police report. Laura's office is in charge of the internal investigation regarding Joy's allegation against Michael.

I e-mailed a redacted copy of the original report to Laura. Laura further advised that her

office is delaying their internal investigation into this matter until I have had the opportunity to speak with Michael Briggs, if he chooses to provide a statement. Laura requested that I contact her either after interviewing Michael or after learning that he will not be providing a statement regarding this case.

**November 1st, 2016 0930 hours**

I faxed a request to the New Mexico Scientific Laboratory Division (SLD) to be sent a copy of Joy Vanmeter's toxicology report.

**November 17th, 2016 1330 hours**

I met with Michael Briggs at his attorney's office, located at 924 2nd St NW, for the purpose of collecting a DNA buccal swab from him. Michael's attorney, Zack Ives, was also present. Michael agreed to provide the sample and did so as I instructed him on how to do it. A Permission To Search Form was also signed by Michael after I explained that he has the right to deny me taking the sample. Reference my tagged audio recording of this interaction for further details.

**1400 hours**

After tagging Michael's DNA buccal swab into evidence, a Service Request form was forwarded to the APD Crime Lab requesting that Joy's SANE kit be processed and compared to the DNA sample provided by Michael Briggs.

**November 22nd, 2016 1100 hours**

Joy called me to advise that she received a letter from Michael Briggs' attorney stating that he is filing a "No Contact Order" against Joy on Michael's behalf. Joy also told me about a conversation with an unnamed co-worker who told Joy that Michael once "Hit on her" as well. According to Joy's co-worker, Michael never touched her inappropriately but Joy got the feeling that she might have been reluctant to disclose anything further.

Joy also advised that she is concerned about a computer that was present in Michael's bedroom and the possibility that he recorded this incident with the computers built in camera. According to Joy, the positioning of the computer would have allowed the camera a view into the bathroom where this occurred. Joy advised that while she was in the bathroom, Michael briefly stepped out into his bedroom for no apparent reason and is concerned he could have been manipulating his computer during this time. Reference my tagged audio recording of this conversation for further details.

After speaking with Joy, I called Laura Buchs at the UNM Office of Equal Opportunity to see if any additional complaints have been filed against Michael. Laura advised that after becoming aware of Joy's allegation, she checked Michael's name through her database to see if other allegations have been made against him. No prior allegations were located.

**December 8th, 2016 0945 hours**

I spoke with Michael Briggs' ex-wife, Paige Briggs, over the phone. Paige advised that she met Michael in 1998 and that they married in 2000. Michael and Paige separated in 2006 but did not become legally divorced until 2015. Paige described their divorce as amicable and was due to a lack of chemistry between them.

Amongst the words Paige used to describe Michael, she advised he is "Mellow, kind, loving, level headed and an amazing father."

I explained to Paige that I am investigating an allegation of sexual assault and asked her if Michael had ever been forceful with her or anyone else, to the best of her knowledge. Paige seemed genuinely surprised by this and advised that Michael is a very respectful and safe lover and that he is very passive when it comes to initiating sexual intercourse. According to Paige, Michael never pressured her into doing anything she did not want to do. Paige further explained that Michael never engaged in any behavior that she would consider to be deviant and stated that he never expressed a desire to record their sex acts. Paige further speculated that Michael would have been uncomfortable with the idea or recording their sex acts.

Paige never saw Michael use drugs, recreational or otherwise during their relationship. Paige also advised that Michael rarely consumed alcoholic beverages and she never knew him to abuse alcohol.
Paige considers Michael a close friend to this day and advised they talk with each other regularly. Reference my tagged audio recording of this interview for further details.

**December 13th, 2016 1200 hours**

Zachary Ives, Michael Briggs' attorney, e-mailed me seventeen attachments containing text messages exchanged between Joy and Michael. The message exchange starts on October 14th (The day Michael allegedly sexually assaulted Joy) at 1205 hours. Michael texted Joy "Is it 2:30 yet?" Joy replied "Yup let's go drinking." Joy then goes on to tell Michael about having seen a picture of her husband in the paper being kissed by a female actress in the play he is performing in. Joy included a copy of the picture she saw in the text exchange between her and Michael.

Joy then texts Michael "So you are my last "work" meeting today" to which Michael responds "Indeed." Joy and Michael agree via the text exchange to meet at 1400 hours for drinks.

At 2018 hours on 10-14-16, Michael texted Joy "Are you ok?" Joy responded at 2219 hours by replying "Dude, I have never had a reaction to less than 4 beers like that. I'm so sorry." Michael then states "I feel awful, I'm sorry about that too." Joy responds "Totally my fault" to which Michael replies "You had an accomplice." Later in the message exchange, Joy asked Michael "So how bad was it when we got to my house?" Michael responded "It wasn't great" and later added "I didn't say much other than you weren't feeling well and I needed to make sure you got home safely."

The following morning at 0915 hours, Michael texted Joy "Hi, how are you feeling?" Joy's response was "Better than last night, how are you doing? Michael later responds "How are things on the home front?" Joys states "I don't know, he hasn't spoken to me and he hasn't been home. So that's probably not good." Joy then asks "He didn't say anything to you yesterday did he?" Michael's response was "No, not at all. I gave him the keys and that was it." Michael then asked Joy "What are you going to say? Besides drank too much." Joy then stated "I have no idea. Haha I had 3 beers! Who gets sick on 3 beers? It's lame." Michael responded "Good question :) I had 4." Joy then stated "And you were just fine. I really hope I didn't make a mess in your home sorry if I did." Joy later hypotheses that the reason she got sick was because she had not eaten anything that day since having an English Muffin at 0700 hours that morning.

Joy later tells Michael "Just so you know, that was a first for me. Never done that before." Michael responded "I didn't think it was the norm. I've know you better than that." Joy then stated "I'm hoping I don't have to explain anything", to which Michael replied "Just explain that you got really sick and you didn't want to go home like that so you decided to clean up, but when you realized time it was the only option to get you home. You'll know what to say."

Michael texted Joy again on the morning of October 16th "Good morning, how are things." Joy did not respond to this message. Michael texted again on the morning of October 17th "Good morning. Are you ok?" Joy responded with "It's a insanely busy Monday! I was just emailing you actually." Michael texted Joy a few times after this but Joy stopped responding to his messages. Reference the attached text messages for further details.

**1430 hours**

Michael Briggs and his attorney responded to the Main for an interview. This interview was conducted in a designated interview room and Michael's attorney was present for the entire interview. Prior to starting, I advised Michael of his Miranda Rights. Michael stated that he understands his rights and wants to speak with me regarding this allegation.

Michael advised that upon the completion of a college class he and Joy took together, they started meeting for drinks periodically after work. They would always meet at Matanza Bar and always drank "Marble Reds". Michael advised they usually had two beers each and talked about work and life while at the bar.

Michael considered Joy a close friend and disclosed intimate details about his life with her including the loss of a child and his divorce from his ex-wife. Joy in turn shared very personal information with Michael including the fact she once had an abortion. Joy also talked with Michael about different sexual experiences she had in college and admitted to Michael that her husband wanted to have an "Open relationship", which Michael understood to mean that Joy and her husband could have sex with other people while still married. Michael initially thought Joy might be telling him this because she thought of him as a potential sexual partner but later learned Joy was adamantly against the idea of having an "Open marriage."

Michael knew that Joy was upset with her husband about the performance he was in and specifically about having to kiss a female actress in the play. Michael described Joy as "Very jealous" with regards to her husbands continued involvement in this production. Michael advised that Joy also talked about divorcing her husband on three different occasions with him.

At Matanza Bar on October 14th, Michael could not recall specifically what he and Joy talked about but did remember Joy requesting to see his new house. Michael agreed to show Joy his house after drinks. Michael also recalled Joy telling him that her husband was spending the night at his mother's house that night due to a fight they had earlier that day.

Joy and Michael each consumed two "Marble Reds" at the bar but no food. Michael estimated they were there for about two hours and then left in separate cars to meet at his house.

Michael estimated that he arrived at his residence only one or two minutes before Joy and ran in to make sure everything was clean. Michael gave Joy a tour of his house upon her arrival and then poured Joy a beer in his kitchen while she sat on a couch in his living

room. Michael advised that Joy did not watch him pour the beverage but would have had a view into the kitchen from where she was sitting. Michael could not recall Joy asking him about the orange juice in the beer.

Michael and Joy both drank their beer and talked for approximately the next hour. Michael advised that although the conversation was not flirtatious in nature, he felt like there was some flirtation going on. Michael described the way Joy sat on his couch with her shoes off, close to and facing him. The thought also crossed Michael's mind when she asked to see his house at the bar that Joy was flirting with him. Michael admitted that he thought a sexual encounter with Joy was a possibility.

After Joy finished her beer, Michael offered her another one. Joy accepted and asked Michael where the bathroom was. Michael went into the kitchen to pour two more beers while Joy went into the bathroom. Michael advised that Joy seemed fine prior to going into the bathroom.

Joy was in the bathroom for two or three minutes and told Michael about vomiting upon coming out. Michael did not hear Joy vomiting. Joy appeared to Michael to be embarrassed. Michael retrieved a toothbrush for Joy and she returned to the bathroom to brush her teeth. When Joy was done, she joined Michael on the couch and they continued to talk, specifically about what they were planning on doing with their degrees. Michael drank another beer while they talked but Joy did not.

Michael advised that after vomiting the one time, Joy did not appear to be sick again while with him. Michael also did not observe any signs of intoxication while Joy was at his residence. Michael further advised that he was also not feeling the effects of the alcohol he had consumed due to how slow he was drinking. Michael estimated that he was averaging about one beer an hour.

While talking with Joy on the couch, Joy mentioned that she was smelling vomit in her hair and told Michael that she needed to get the smell out. Michael offered to let Joy use his shower and she accepted, telling Michael "That's a good idea." Michael asked Joy if she was sure and she advised she was.

Michael led Joy to the bathroom attached to his master bedroom. Upon walking into the bathroom, Joy started to untie the dress she was wearing while Michael was standing in the bathroom with her. This prompted Michael to ask Joy if he could join her in the shower. Joy then smiled at Michael and said "Sure."

Michael stepped out of the bathroom and undressed in his bedroom closet. Upon returning to the bathroom, Joy was already in the shower running water over her head. Michael got into the shower with Joy and started kissing her on the mouth. Michael advised that this progressed to "French kissing", which he described as having his tongue in Joy's mouth while her tongue was in his mouth. Michael recalled Joy having her hands around his neck and shoulders while they kissed.

Michael started kissing Joy's neck and down her chest. Michael then crouched down in front of Joy and started kissing her vagina. Michael described this as awkward due to the shower water running down Joy's body and into his face. Michael advised that he does not think his mouth or tongue ever penetrated Joy's vagina. When I asked Michael if anything else penetrated Joy's vagina, such as his penis or fingers, he stated "No, absolutely not." I asked Michael what Joy was doing while he was crouched in front of her. Michael advised that Joy did not react at all, positively or negatively.

While explaining to Michael that the buccal swabs collected from him are going to be compared to swabs taken from inside Joy's vagina, Michael admitted that his tongue and fingers might have been inside Joy's vagina while in the shower with her but he could not specifically remember.

Michael stood back up due to the water running into his face and continued to kiss Joy on the mouth. Joy then told Michael that she needed to be home by 1800 hours and got out of the shower. Michael previously thought time was not an issue because Joy's husband was going to be at his mother's house that night. Michael described Joy as looking "Nervous and flustered" at this time and admitted that he too was nervous and flustered. Michael estimated that they spent between four and five minutes total in the shower.

Joy and Michael each got dressed after the shower and did not discuss what had happened. Joy asked Michael if he would drive her home. Michael assumed Joy was asking due to not feeling well and offered to drive her home in his vehicle. Joy advised that he would have to drive her car because her husband needed to use the car at 1800 hours. Michael agreed to drive Joy's vehicle.
Michael drove Joy home in her car. Michael described the drive as awkward and advised they did not talk during the approximate twenty minute drive.

Upon arriving at Joy's house, Michael observed Joy's husband and daughter standing on the front porch. Michael told Joy's husband that Joy was not feeling well and handed him the keys to Joy's car. Joy walked past her husband without saying anything and went into her house. Michael does not remember Joy's husband saying anything to him or Joy and described him as "Not looking happy." Michael then walked for several blocks and called for an Uber to drive him home.

Michael stated that Joy walked into her residence without assistance and further advised that other than telling him she vomited, Joy never appeared intoxicated to him while they were together. Reference my tagged audio recording of this interview for further details.

**December 14th, 2016 1300 hours**

I received a phone call from Ryan Villa. Ryan advised that he is representing Joy at an upcoming restraining order hearing. Ryan requested copies of the text messages that were furnished to me by Zachary Ives. After speaking with Joy over the phone and verifying that she wanted Ryan to have the text messages, I e-mailed copies of the text messages to Ryan.

Ryan also told me about a toxicology expert he has worked with in the past who tests human hair for signs of drug facilitated sexual assaults. Ryan referred me to Cynthia Morris-Kukoski. Cynthia works for the Federal Bureau of Investigation (FBI) as a toxicologist.

**December 15th, 2016 1100 hours**

I spoke with Cynthia Morris-Kukoski over the phone. After briefing Cynthia on this case, she advised that the FBI lab in Quantico Virginia could assist by testing the already collected urine sample, if there was a sufficient amount of the sample left. Cynthia went on to explain that hair testing could be done if a urine sample had not been collected but advised that urine testing gives them the best chance of detecting ingested narcotics. Cynthia also explained that the equipment her lab has access to could possibly detect

narcotics that the equipment at SLD may not be able to detect. Cynthia requested that I check with SLD to see how much urine they have left from Joy's original sample.

**1500 hours**

I spoke with Edna Flippin at SLD. Edna advised that Joy's urine sample has not been tested yet and that they have approximately 50ml of sample. I requested that Joy's sample not be tested and advised Edna of my intentions to have the FBI lab test the sample.

**December 28th, 2016 1000 hours**

I spoke with Cynthia again to advise her of how much urine was available for testing. Cynthia stated that 50ml was sufficient for the tests she does and provided me with instructions on how to ship the sample to her lab.

**1300 hours**

I met with Edna at SLD. Edna provided me with Joy's urine sample, which was contained within a small box that was sealed with evidence tape. I signed a "Receipt of Sample" form and was provided a copy of the form by Edna. That copy has been included with this report.

**1330 hours**

I took Joy's urine sample to the FedEx located at 1501 Renaissance Bl NE and shipped it to the FBI lab in Quantico Virginia. A copy of the FedEx shipping receipt has been included with this report. Additionally, I activated my on body video recording device when I met with Edna at SLD and did not turn it off until my transaction at FedEx was complete. A copy of that video has been tagged into evidence.

**March 15th, 2017 1400 hours**

I received a shipment from the FBI containing what was left of Joy's urine sample after they completed their testing.

I was advised by both APD Crime Lab supervisor Michael Sullivan and SANE Clinical Coordinator Gail Starr that urine samples are typically destroyed after testing due to the fact they do not remain testable for very long. As such, I instructed the APD Crime Lab to dispose of the remaining sample.

**March 21st, 2017 0900 hours**

I received a copy of Joy's toxicology report from the FBI Crime Lab. Joy's urine sample was positive for the following substances:

Diazepam, Nortiazepam, Temazepam, Oxazepam Sertraline and Norsertraline. Joy previously advised that she takes Diazepam and Sertraline. Nortiazepam, Temazepam and Oxazepam are all active metabolites of Diazepam.

Nothing was found in Joy's urine sample that she did not advise she takes. GHB was not

tested for due to the time delay between the alleged assault and the collection of the urine sample. Reference the included FBI laboratory report for further details.

**Conclusion:**

Joy Vanmeter advised that while at Michael Briggs' house, she became extremely sick after drinking a beer he provided to her and suspects an unknown narcotic was added to the drink. Joy further alleges that Michael sexually assaulted her while she was in his shower and incapable of giving her consent due to her intoxication level. Michael seemingly acknowledged that Joy was intoxicated by driving her home from his residence after this alleged incident.

Michael Briggs acknowledged having a sexual encounter with Joy in his shower but denied "Drugging" her beer. Michael did initially dispute penetrating Joy's vagina but later admitted he possibly did after I explained how we locate DNA on people to him. Michael admitted that Joy became sick while at his residence but disputes that Joy was as sick as she described for me during her interview. Michael advised that he drove Joy home that night because she asked him to and he assumed she was still not feeling well.

This completed investigation has been forwarded to the District Attorney's Office for review.

End of document

PLAINTIFF'S
EXHIBIT

**17**

1

==TRANSCRIPTION OF AUDIO-RECORDED==
==INTERVIEW OF JOY VANMETER==

==October 18, 2016==

REPORTED BY:

    ANNE DEHON, CCR #263
    Bean & Associates, Inc.
    201 Third Street NW, Suite 1610
    Albuquerque, New Mexico 87102
    (505) 843-9494

JOB NO:  621N



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000428

2

1      DETECTIVE SPINKS:  This is Detective Spinks.
2  Today is Tuesday, October the 18th, 2016.  The time
3  is 10:45 hours.  I'm at the FAC with Joy VanMeter
4  who came in today to file a police report.
5      Off the record, Joy, we kind of talked about
6  why you're here today.  You've indicated that you
7  were the victim of a sexual assault.  What I would
8  ask for you to do is just kind of start at the
9  beginning, you know, whatever it is that happened,
10  and just tell me a story about what happened to
11  you.
12      MS. VANMETER:  Okay.  So on Friday, the
13  14th, a friend of mine, coworker, colleague, met at
14  Matanza at around 2:00.  We were getting a couple
15  of beers.  This is a normal occurrence.  We do it
16  maybe once or twice a month.  We've known each
17  other for the last, oh, two-and-a-half years.  We
18  went through a master's program together, so -- and
19  we work in the same department, so it's very common
20  for us to get together, talk about people we know,
21  chat and whatnot.
22      We had two beers, both of them were Marble
23  Reds, at Matanza, and, within that time frame, we
24  talked about a number of things pertaining to work,
25  you know, my husband, our kids.  He has kids.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

BRIGGS.000429

3

1  have kids.

2       He just bought a house and moved in within

3  the last week and was telling me about it, and I

4  said, you know, sometime you should show me your

5  house.  It would be great to see it.  And he said,

6  well, how much time do you have right now?  I don't

7  have anything planned for the rest of the day.  And

8  I said, well, I have 'til 6:00.  I have to be home

9  at 6:00 because my husband is in a play and I have

10  to watch our four-year-old tonight.

11       He said, well great, let's go.  We'll go

12  over there and I'll show you around the house.  I

13  said, that's great.  So I asked him, you know, do

14  you want -- do you want me to pick up a couple of

15  beers so we can have a beer at your house?  He

16  said, no, I have Blue Moon, don't worry about it.

17  I said, okay.

18       I was perfectly fine after those two beers.

19  Two beers does not affect me.

20       DETECTIVE SPINKS:  Sure.

21       MS. VANMETER:  He gave me his address and

22  kind of told me how to get there because I don't

23  have like a GPS thing that I follow on my car or

24  anything.

25       So I arrive at his house, which is in High

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000430

15

1  what I was going to tell my husband, and I said I

2  had no idea.  And he wrote me back and said, just

3  tell him you got really sick and that you needed to

4  take a shower to clean up before you went home.

5          DETECTIVE SPINKS:  Uh-huh.  Do you have

6  those text messages?

7          MS. VANMETER:  No.

8          DETECTIVE SPINKS:  They've been deleted?

9  Okay.

10          MS. VANMETER:  But we can recover -- I'm

11  hoping that we can recover them.

12          DETECTIVE SPINKS:  Absolutely.  And if

13  you're not able to and you can be without your

14  phone for -- I could always make an appointment.

15  Usually -- normally, we kind of like leave the

16  phone there and they do it in a day or two, but if

17  I make an appointment, they might be able to get

18  your phone back to you in three or four hours.

19          MS. VANMETER:  Okay.

20          DETECTIVE SPINKS:  So like we could meet

21  here.  I could grab the phone, run it there and

22  then just meet with you somewhere else and then

23  return the phone to you --

24          MS. VANMETER:  That's fine.

25          DETECTIVE SPINKS:  -- if you're not able to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000442

53

1  ends up driving you home.  What kind of a car does

2  he drive?

3          MS. VANMETER:  He drove me in my car.

4          DETECTIVE SPINKS:  Oh.  How did he get home?

5          MS. VANMETER:  He said he Uber'd.

6          DETECTIVE SPINKS:  Okay.  What kind of car

7  do you have?

8          MS. VANMETER:  Chevy Cavalier, red.

9          DETECTIVE SPINKS:  Okay.  He assisted you to

10 the porch where your husband was with your

11 daughter.  Was there any interaction between him

12 and your husband?

13         MS. VANMETER:  All I heard him say was,

14 she's not doing so well, while holding my shoulder.

15         DETECTIVE SPINKS:  To your husband?

16         MS. VANMETER:  Yeah, and he's holding my

17 shoulders and he's pushing me in front of him.  And

18 I don't know when he did that.  I don't know if I

19 walked from the car to the porch or if he had

20 walked me to the porch.  My husband was walking out

21 the door at that time.  My husband left.  He said

22 that he saw this guy walking up the street when he

23 left.

24         DETECTIVE SPINKS:  Michael?

25         MS. VANMETER:  Yeah.  It's very complicated

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000480

55

1  you were texting, your husband isn't home yet.

2          MS. VANMETER:  He didn't come home that

3  night.

4          DETECTIVE SPINKS:  Okay.  Why didn't he come

5  home?

6          MS. VANMETER:  He was pissed off at me --

7          DETECTIVE SPINKS:  Okay.

8          MS. VANMETER:  -- for -- he and I had argued

9  beforehand.  He had thought I had gone out and

10  gotten trashed as a retaliation.

11          DETECTIVE SPINKS:  Oh, you had been arguing

12  before this?

13          MS. VANMETER:  Yes.

14          DETECTIVE SPINKS:  Okay.  Gotcha.  Okay.

15  When did you do your S.A.N.E. exam?  I don't have

16  it.

17          MS. VANMETER:  Sunday.

18          DETECTIVE SPINKS:  Okay.

19          MS. VANMETER:  I went to the mental health

20  clinic on Saturday --

21          DETECTIVE SPINKS:  Okay.

22          MS. VANMETER:  -- at UNM and saw them and

23  they are the ones who referred me to S.A.N.E.

24          DETECTIVE SPINKS:  Gotcha.  When did you

25  disclose to Michael about what had happened?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1-800-669-9492

BRIGGS.000482

56

```
1         MS. VANMETER:  Saturday.
2         DETECTIVE SPINKS:  How did that go?
3         MS. VANMETER:  The first time not so well,
4  so I called -- asked my girlfriend to call me.  She
5  called me in the morning.  I talked to her.  She
6  said -- she suggested that I actually go talk to
7  someone who knew about this stuff because she
8  suspected something.
9         DETECTIVE SPINKS:  Uh-huh.
10        MS. VANMETER:  I called up another one of my
11 friends who lives in town because he had been
12 drugged in college.  He also is preparing for med
13 school and is very familiar with a lot of things.
14 And he's also one of my good friends that I go
15 drinking with and so he had seen me after one beer,
16 two beers, three beers, seven beers, and so I trust
17 his evaluation on my functioning after drinking.
18        DETECTIVE SPINKS:  Sure.
19        MS. VANMETER:  And so he met me at like
20 10:00 Saturday morning, and I told him everything,
21 and he said you are never drunk after three beers.
22 He said, I've seen you when you have a lot to eat,
23 I've seen you when you have nothing to eat, I've
24 seen you after seven beers, and you're not that
25 drunk after seven beers.  And he said everything
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

BRIGGS.000483

57

1  you just described to me is very similar to what I

2  went through.  And so after talking to him and

3  feeling like I wasn't insane, I tried to text my

4  husband that I thought I had been drugged, and his

5  response was, sorry.  And I told him, yeah, me too,

6  so I really don't think I want to have any contact

7  with this guy anymore.

8          DETECTIVE SPINKS:  Uh-huh.

9          MS. VANMETER:  I'm really uncomfortable

10  around him and I certainly don't trust him anymore,

11  and that's when he started questioning whether or

12  not something had happened.

13          DETECTIVE SPINKS:  Okay.

14          MS. VANMETER:  And I said, well, he

15  certainly tried.  He goes, well, did you

16  reciprocate?  And I said, no, I did not

17  reciprocate.  And then he wouldn't talk to me for a

18  little while.  And then in a few hours -- I asked

19  him if I could call him, and he said, no, I'm busy.

20          And so a few hours later, I said, I really

21  want -- I really want to talk to you about this.

22  And I called him and I explained it to him.  And he

23  got very upset generally, not necessarily at me,

24  although he was very angry and he yelled at me

25  about something else, not this.  And then we just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000484

58

1    argued a little bit, and I said, you just don't
2    seem to care about this at all.   And we hung up and
3    then he called back and he said, I'm sorry, I want
4    you to file a police report.
5            DETECTIVE SPINKS:  Okay.
6            MS. VANMETER:  And that's when I told him I
7    was not ready to file a police report.
8            DETECTIVE SPINKS:  Sure.
9            MS. VANMETER:  I didn't know how I wanted to
10   handle anything.  I didn't know how I felt about
11   everything.
12           And so he came home.  I called -- I have a
13   counselor that I see.  My husband and I are in
14   couples counseling, which has been very beneficial
15   for us.  We have a lot of external stressors in
16   addition to three kids and jobs and me finishing
17   grad school.
18           DETECTIVE SPINKS:  Uh-huh.
19           MS. VANMETER:  And so like we called them
20   for support.  My therapist suggested that I file a
21   report.  I said, I'm not ready.  I met with my
22   husband and we talked about it.  At that point in
23   time I was pretty much at a breaking down point and
24   he took me to MHC --
25           DETECTIVE SPINKS:  Okay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000485

PLAINTIFF'S
EXHIBIT

18

Audio Transcription of Interview

**1**

```
 1                TAPED INTERVIEW OF MICHAEL BRIGGS

 7        TAPED INTERVIEW OF MICHAEL BRIGGS
 8
 9           INTERVIEW DATE:  December 13, 2016
10
11
12
13
14  INTERVIEW TAKEN BY:
15     DETECTIVE DANIEL SPINKS
       DETECTIVE AMANDA WILD
16
17
    APPEARANCE ON BEHALF OF MICHAEL BRIGGS:
18
       ZACHARY ARTHUR IVES, ESQ.
19     ZACH IVES LAW
       P.O. Box 27469
20     Albuquerque, New Mexico  87125-7469
       (505)257-3787
21     zach@zachiveslaw.com
22
    TRANSCRIBED BY:
23
       THERESA E. DUBOIS, RPR, CSR #29
24     ALBUQUERQUE COURT REPORTING SERVICE, LLC
       P.O. Box 56787
25     Albuquerque, New Mexico  87187
```

**3**

```
 1  to remain silent.  Anything you say can be used against
 2  you in a court of the law.  You have the right to have an
 3  attorney present while we ask you questions.  If you
 4  cannot afford an attorney, one will be appointed for you
 5  free of charge.  If you agree to answer questions today,
 6  you have the right to stop answering questions and leave
 7  at any time.
 8      A.    Okay.  Thank you.
 9      Q.    With your rights in mind, do you still want to
10  talk to me today?
11      A.    Absolutely.
12      Q.    Okay.
13      A.    And I'd just like to say, I appreciate when you,
14  you know, contacted me that day, you understand that I,
15  you know, was very willing to come forward and talk to you
16  right away, but, obviously, I think it's in my best
17  interest to have an attorney.
18      Q.    Yeah.  And I'm never going to put you in a
19  position where you're doing something you're not
20  comfortable with.
21      A.    Okay.
22      Q.    So, you know, if at any point, you know, you're
23  done answering questions, you guys have the right to walk
24  out.
25      A.    Okay.
```

**2**

```
 1         (Taped Interview of Michael Briggs)
 2         DETECTIVE SPINKS:  If you fall down, I'm
 3  going to laugh before I help you get up.
 4         DETECTIVE WILD:  Please join in.
 5         INTERVIEW BY DETECTIVE SPINKS
 6         DETECTIVE SPINKS:  Okay.  So, you know, we've
 7  had numerous conversations about the case and, you know,
 8  (inaudible).  So I'm going to forego formalities; I know
 9  we're kind of on a time crunch here.  You need to be out
10  by about 3:45; is that right?
11         MR. IVES:  Yeah.  Yeah, I just need to be
12  back to my office by 4, so, you know.
13         DETECTIVE SPINKS:  So don't let me ramble on
14  too much.  So if we reach a time when you need to go, just
15  let me know.
16         MR. IVES:  Okay.
17      Q.   (BY DETECTIVE SPINKS)  With that being said,
18  obviously, you're here of your own accord.
19      A.    Yes, sir.
20      Q.    You're able to leave at any point.  You're with
21  your attorney.  That being said, because we are in a
22  police station, I still have to go over your Miranda
23  rights with you just like you see on TV.
24      A.    I see.
25      Q.    It's just kind of our policy.  You have the right
```

**4**

```
 1         DETECTIVE WILD:  We do need to escort you
 2  out, though.
 3         MR. IVES:  Yeah, I couldn't walk out on my
 4  own.
 5      Q.    (BY DETECTIVE SPINKS)  No, I know.  That's the --
 6  that's the plan.  We'll get you guys totally turned
 7  around.
 8      A.    Okay.
 9      Q.    So at Mr. Ives' request, I did provide him with a
10  list of some of the questions that I might be asking
11  today.  Have you had a chance to review that list?
12      A.    We -- we reviewed them.  We didn't -- I haven't
13  discussed them with him at all.
14      Q.    Okay.  And that's okay if you did.  I was just
15  wondering if you had seen it.
16      A.    Okay.  Right.
17      Q.    I don't have a script in front of me.  Obviously,
18  I have the case file for a few different things like that
19  so far, including the text messages you provided me today.
20         Thank you for that.
21         MR. IVES:  You're welcome.
22      Q.    (BY DETECTIVE SPINKS)  So I'll reference my notes
23  a little bit.  I'll take some notes as you're talking.
24  Mainly, I'm going to rely on my audio recording later when
25  I'm writing my report.
```

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

**5**

1    A.    Okay.

2    Q.    So I kind of want to start with your relationship

3 with Joy.

4    A.    Okay.

5    Q.    Just kind of start, you know, how did you guys

6 meet?  What was your relationship like before whatever

7 happened happened?

8    A.    Okay.  So we've been part of the -- I met her

9 during the executive MBA program.  I had known of her

10 previously before we entered the program in 2014 -- yeah,

11 so 2014 is when we started the program.  And I had known

12 of her prior to that because she had worked at a -- at a

13 mind research network that we had collaborated with, so I

14 had seen her around.  So when she was in my cohort, I knew

15 of her.  I didn't know her personally.

16    Q.    Uh-huh.

17    A.    We were in the program for two years together;

18 just colleagues, classmates.  I honestly didn't interact

19 with her much over the two-year period.  It wasn't until

20 on our last day of school when we finished our exams, we

21 all -- a big, large group of us -- pretty much the whole

22 cohort went out to have drinks afterward.

23    Q.    Okay.

24    A.    And we spent the entire day and evening as a

25 group.  And Joy and I kind of spent most of the evening,

---

**6**

1 kind of hit it off in terms of --

2    Q.    Okay.

3    A.    -- talking, because we have -- we both work at

4 the University of New Mexico and we have, you know,

5 similar -- we know similar people and things like that.

6 So that's how that started.  We -- I'd say following

7 after, you know, that night, she had texted me and asked

8 if I could help her with a project at work -- a

9 construction project.  And I said, sure, you know,

10 anything, let me help you out.  And we worked a little bit

11 on that.  I helped her out.  And at that point she asked

12 me, she said, hey, would you like to go get a beer?  And,

13 sure, that sounds great.  And we went and we had a beer.

14 That continued -- that was, I'd say, late July, early

15 August -- all the way up until --

16    Q.    Of this year?

17    A.    Of this year, yeah, very recently, the last two

18 months.  We went out, I'm going to say, four or five times

19 to have beers.  So it was kind of a routine.  We'd say,

20 you know, do you want to get a beer?  Sure.  Where do you

21 want to meet?  And we always met at Matanza, which is a

22 brewery -- a micro brewery on Central.

23    Q.    It's right next to Kelly's.

24    A.    Exactly.

25    Q.    We like Kelly's.

---

**7**

1    A.    Okay.  So, yeah, that's where our first time we

2 went out, we went to Kelly's.

3    Q.    Oh, okay.

4    MR. IVES:  They have super beer at Kelly's.

5    DETECTIVE SPINKS:  No way.

6    MR. IVES:  That was my first -- my first job

7 after college.

8    DETECTIVE SPINKS:  You know they have new

9 ownership now.  It's not quite as good as it used to be.

10    MR. IVES:  Yeah.

11    A.    So that was our routine.  We'd go, we'd have

12 beers, we'd talk about life.  You know, we -- over that

13 time we got to know each other very well.  We shared

14 intimate stories about each other.  I shared with her that

15 I lost my first son.  My first son passed away.  So just

16 to give you the detail of intimacy that we had, she shared

17 with me that she had an abortion.  So we had a very open

18 and honest relationship and friendship.  I'd call it

19 friendship.

20    That continued for a while.  She -- as time went,

21 I got to know more about her, got to know more about her

22 situation with her husband.  I had -- I had explained to

23 her that I had gone through a divorce during the MBA

24 program.  And it was a very challenging situation,

25 obviously, to go through a divorce while working on our

---

**8**

1 Master's.  She shared with me she -- that there were two

2 or three times that she and her husband talked about

3 getting a divorce as well during that time.  So I had --

4 we had that in common, and we talked a lot about that.

5    So, from my perspective, we had a very strong

6 friendship based on a lot of common struggles.

7    Q.    (BY DETECTIVE SPINKS)  Sure.

8    A.    Personal -- personal struggles.  And we've built

9 what I thought was a, you know, bond.

10    Q.    Uh-huh.

11    A.    And so, that's really the background about --

12 about Joy and myself.

13    Q.    Okay.  So let's kind of jump in to October 14th.

14    A.    Okay.

15    Q.    That's when I think the day that Joy is alleging

16 that something happened.

17    A.    Yes.

18    Q.    So why don't we just start with your interactions

19 with Joy on the 14th, and just kind of tell me a story

20 about everything that you remember happening that day.

21    A.    Okay.  We -- she was off that afternoon, and we

22 had planned on meeting that afternoon, you know, probably

23 after 2 or 3.  And I texted her -- I believe the text

24 messages start, you know, on that, and say, are you -- are

25 you available?  Yeah.  Let's meet now.  So we ended up

Interview of Michael Briggs
12/13/16

**Audio Transcription of Interview**

---

9

1  meeting at approximately 2:00.  We met at Matanza.  And
2  we -- we ordered a couple of beers and we just talked like
3  we normally do, nothing unusual.
4      Q.  Okay.
5      A.  Probably we drank one beer -- and I know 30
6  minutes, or within an hour or so, she -- we had ordered
7  another beer.  And she said, so when do I get to see your
8  new house?  Because I had recently moved to a new house.
9      Q.  Okay.
10     A.  I said, anytime, anytime you'd like, just, you
11 know, let me know.  And she said, what about now?  And I
12 said, sure, you know.  Fine.  We continued to -- at that
13 point the beers came, and we continued to have a second
14 beer at this point.  And we continued talking, just
15 general -- I don't recall the specifics, about life, work,
16 you know, general things.  And she said, let's go.  And I
17 said, okay.
18         And we paid the tab and I gave her my address to
19 my house.  I live up in the far Northeast Heights, up in
20 High Desert.
21     Q.  Okay.
22     A.  And so I gave her my address and we -- and I
23 walked one way to the parking lot and she walked to get
24 her car.  And it probably took me 25, you know, 30 minutes
25 to get up there.  I got there before she did, and, you

---

10

1  know, I waited for her.  And when she got there, I said,
2  would you like to see the house?  And I gave her a tour of
3  the house.  It's two stories.  I showed her the view of
4  the mountain, showed her the view of the city and where's
5  my kids' rooms are, my son and my daughter, showed her
6  their rooms.  We went down, and I offered her a beer.  And
7  I poured her a -- I got a chilled glass out of the freezer
8  and poured her -- it was a Blue Moon -- is typically what
9  I drink.  I poured her a Blue Moon and poured myself a
10 Blue Moon.  We went and sat on the couch, and had a
11 conversation for a long time.  I mean, I would say it was
12 probably within an hour or so, we continued talking for
13 about an hour.
14         When we finished those beers, I got up and said,
15 would you like another beer?  And she said, sure.  So I
16 got up, went to get us -- went to get us a beer.  She went
17 into the bathroom.  She was in the bathroom for longer
18 than usual, I would say.  You know, I would expect her to
19 come right back out, and she didn't come right back out.
20         And she came out, you know, a few minutes
21 later.  And she said, I just threw up.  I was like, are
22 you all right?  She was, like, yeah.  And I didn't think
23 anything was wrong.  She just threw up.  I was like, wow.
24 And I said, so, here, let me get you some water.  So I
25 gave her water.  And I had my beer, and we went back down

---

11

1  to sit down.  And she was embarrassed, and I sensed that.
2  And I said, would you like to brush your teeth.  And she
3  said, yeah, if you don't mind.  So I went and got her one
4  out of my bathroom, I got her a toothbrush.  She went back
5  into the bathroom and brushed her teeth.
6          I went back out -- I was back out on the couch,
7  sitting around, waiting, and she came back and sat down
8  with me.  We continued to have a conversation.  We talked
9  about -- at that point I remember we were talking about
10 work and her career growth because she was, like, okay,
11 what are we going to do with our MBAs now.  And she is a
12 program specialist at UNM, and she thinks now with her
13 Master's she can grow into management.  And we talked
14 about that some more.
15         She, at one point, complained about having, you
16 know, the smell of vomit -- puke in her hair.
17     Q.  Sure.  Sure.
18     A.  And she said, I need to wash my hair and, you
19 know, get this puke out.  And I suggested to her, I said,
20 you can take a shower.  And she said, that's a good idea.
21 You know, are you sure?  And she said, yeah, that's a good
22 idea.  So we proceeded to go into my bathroom and she
23 proceeded to undress herself.  And I said -- I looked at
24 her, and I said, can I join you?  And she kind of brightly
25 smiled and said, sure.  And so, she had undressed herself.

---

12

1  I went -- I had started the shower because it takes a
2  while for the hot water to go.
3      Q.  Sure.
4      A.  So I had started the water and she had her -- she
5  had entered -- entered the shower.  And I walked into
6  my closet which is just right next to it, and I undressed.
7  And I joined in the shower at that point.  And Joy and I
8  made out.  I would consider it making out.  We kissed.
9      Q.  Okay.
10     A.  Yeah.  And we were in there for a few minutes,
11 and she said, you know, she said, I've got to go.  I've
12 got to go.
13     Q.  Okay.
14     A.  And I said, okay.  Why?  And she said, I have to
15 be home by 6.  My husband wants the car.  I have to be
16 home by 6.  At that point, that was kind of a surprise to
17 me, and I was like, okay.  I turn off the shower, she
18 got -- I gave her a towel.  I went and I went in the -- in
19 my closet and I started to get dressed.  She dried off and
20 she got dressed.  And that's when we, you know, went into
21 the kitchen, and grabbed her stuff.  And she asked, you
22 know, can I give her a ride home.  And I said, absolutely.
23         I was going to give her a ride home in my car.
24 And she said that her husband needed the car at 6 -- at
25 6:00.  I said, fine, no problem, I can drive you home.

---

13

1 And I took her home.  So I proceeded -- we drove home.
2 And I drove her home, she gave me directions to her house.
3 When we arrived, I said, where do you want me to park, in
4 the back here?
5     Q.    Sure.
6     A.    And she said, no, it doesn't matter.  And she
7 pointed to her house, and she said, just pull up right
8 here.  And I pulled up, and her husband holding his --
9 their four-year-old daughter, was out on the porch.
10    Q.    That had to be difficult.
11    A.    It was awful.
12    Q.    Yeah.
13    A.    It was awful.  And we got out, she jumped -- she
14 got out of her car, walked straight into her house.  She
15 had her pantyhose and her high heels on, and wet hair.
16 And she walked right by her husband and her daughter, and
17 right into the house.  I walked up to her husband and
18 said, you know, Joy wasn't feeling well and I wanted to
19 make sure she got home safely, handed him the keys and
20 walked away.  And I walked several blocks and I got an
21 Uber.  And that was the events.
22    Q.    Okay.
23    A.    And you have the text messages.
24    Q.    Yeah.
25    A.    Would you like me to talk about those or do you

14

1 have questions?
2     Q.    Well, I had a few questions about them.
3     A.    Okay.
4     Q.    Let me -- let me just kind of go back and just
5 recap your story and maybe ask for some clarification on a
6 few points and then we can go into the text messages a
7 little bit further, if that's okay with you.
8     A.    Absolutely.
9     Q.    Okay.  So you guys were intimately close with
10 each other, I mean, discussing the loss of a child and for
11 her discussing abortion.  Was there anything ever romantic
12 between you guys, whether it be an actual romance,
13 perceived romance, anything you guys talked about, a
14 future, or anything like that?
15    A.    I would say it was more leaning -- it was more
16 leaning toward flirtation as opposed to romance.
17    Q.    Okay.  Describe the flirtation for me.
18    A.    Okay.  I would say the second time that we had
19 met, she had talked about her husband wanting -- wanting
20 an open marriage.
21    Q.    Her husband wanted --
22    A.    Her husband wanted an open marriage.
23    Q.    And what did you take that to mean?
24    A.    Well, initially, I was kind of like, oh, okay.  I
25 kind of was thinking that she was suggesting that she was

15

1 okay with that.
2     Q.    Well, I mean "open" in regard to?
3     A.    Oh, having extramarital affairs.
4     Q.    Okay.
5     A.    And I thought --
6     Q.    I thought that's what you meant, I just wanted to
7 make sure.
8     A.    Okay.  Yes, that's what I had thought that she
9 meant.
10    Q.    Okay.
11    A.    And we had talked about that.  And that had been
12 an ongoing issue in their relationship, that he wanted to
13 have this open marriage, and she didn't.  She didn't feel
14 comfortable with that.  And so we talked about that.
15          I'm sorry.  What was the --
16    Q.    Well, with regard to the --
17    A.    Oh, with regard to the flirtation?
18    Q.    Yeah.  I mean, was she -- with regard to the open
19 marriage, was she insinuating that maybe you could be a
20 viable sexual partner for her?  Where was that going?
21    A.    I took it toward that.
22    Q.    Okay.
23    A.    She did clarify that in our discussions, though,
24 that she -- they never pursued that because she was not
25 okay with it.

16

1     Q.    Okay.
2     A.    And then, so that -- at that point I was like,
3 you know.  And she had talked about, you know, a lot about
4 the -- the relationship of her husband and the other
5 actress in this play.  And it was a big -- she had a lot
6 of problems with that.  She was very jealous about that.
7 And we talked about that often, about the jealousy there.
8     Q.    What was -- why was she jealous?
9     A.    Well, because they were kissing.  She had to go
10 see him every night on stage, and see them kissing, and it
11 was just a problem for her.  And we had talked about that.
12    Q.    Did she suspect there was anything else going on
13 or --
14    A.    I don't know.
15    Q.    Nothing that she brought to your attention?
16    A.    Nothing that she brought up to me, no.
17    Q.    What about any infidelity on her husband's part?
18 Was that ever brought to your attention?
19    A.    Not to my attention.
20    Q.    Okay.
21    A.    Just the -- kind of the jealousy.  She did
22 indicate on the Friday -- the 14th, earlier, that they
23 were having problems again, and that he was staying with
24 his mom that night.
25    Q.    Okay.

17

1    A.    She said, so...

2    Q.    When did she tell you that?

3    A.    That was -- I believe it was when we were at the
4 bar.

5    Q.    Oh, okay.  So it wasn't a text message exchange?

6    A.    No.

7    Q.    Or anything like that?

8    A.    No.

9    Q.    Okay.  And she said that her and -- and his name
10 is Michael, too.

11    A.    Right.

12    Q.    I've been kind of referring to him as "Mr. Ellis"
13 and you as "Mr. Briggs."

14    A.    Sure.  She texted me before accidentally that,
15 you know, Michael about fixing a pipe, and then she's
16 like, oops, the wrong Michael.

17    Q.    So it was your understanding that Mr. Ellis was
18 staying with his mother that night because of some marital
19 issue they were having?

20    A.    Yes.  she told me that, yes.

21    Q.    Okay.

22    A.    And that's why time didn't seem to be of an
23 essence when we were at my house.  Up until the fact that
24 she told me that she needed to be home by 6 because he
25 needed the car.

18

1    Q.    And the first time you heard that was at your
2 house?

3    A.    Correct.

4    Q.    All right.  Okay.  And just to kind of summarize
5 that point, there was no -- there was romantic interest on
6 her part toward you before the 14th?

7    A.    Other than -- I would say flirtation more so than
8 romance.

9    Q.    Right.  But no -- no prior incidents?

10    A.    No.

11    Q.    No conflicts?

12    A.    Exactly, no.

13    Q.    All right.  And that's all I was trying to --

14    A.    I was, like, well, what is romance?

15    Q.    Right.

16    A.    I didn't know what you...

17    Q.    You know, we're all adults.  You know, I've been
18 married for 12 years now.  I always tell my wife, it's
19 okay to window shop, as long as I don't buy the
20 merchandise, you know, so, no problems there.

21        Okay.  So at the bar how did Joy seem?  Did she
22 seem troubled?  Joyful -- or joyful.  Was she happy, I
23 mean?

24    A.    She seemed energetic.

25    Q.    Energetic, okay.

19

1    A.    Yeah.

2    Q.    And whose idea was it for -- to go back to your
3 place and take a tour of the house?

4    A.    It was Joy's.

5    Q.    Okay.

6    A.    She asked me, she said, when am I going to get to
7 see your new house?

8    Q.    Okay.

9    A.    And then, subsequently, when -- you know, she
10 said, let's go.  And she was ready to go.

11    Q.    And it's -- it looks like you accounted for two
12 alcoholic beverages at the bar?

13    A.    Yes, sir.

14    Q.    Was that for you and her?

15    A.    I had two, she had two.

16    Q.    Right.  Okay.  Yeah.  And do you know what you
17 guys were drinking?

18    A.    We always would drink Marble Red.

19    Q.    Oh, okay.  So two Marble Reds for both of you?

20    A.    Correct.

21    Q.    And forgive me, I'm not a beer connoisseur.  Is
22 that unusually high alcohol content or --

23    A.    I think micro brews tend to probably be a little
24 bit more on the high side.

25    Q.    Okay.

20

1    A.    We'd always -- every time we've gone previously,
2 like I say, I believe it's four of five times that we'd
3 gone, we had always had two beers; one occasion, we had
4 three beers.

5    Q.    Okay.

6    A.    And there was never any time where I thought she
7 was -- you know, that we were impaired where we couldn't
8 drive.

9    Q.    Okay.

10        DETECTIVE WILD:  Were they talls or shorts?

11        MR. BRIGGS:  They were the short.

12        DETECTIVE WILD:  The 16?

13        MR. BRIGGS:  Yeah.  I believe that's the
14 standard.  Is that the pint?

15        DETECTIVE WILD:  Uh-huh, yeah.

16    Q.    (BY DETECTIVE SPINKS)  Yeah, a pint is the
17 smaller one.

18    A.    Yeah, we had pints, yes.

19    Q.    Okay.  Okay.

20        MR. IVES:  I can verify that.

21        MR. BRIGGS:  Yeah, you used to be a brewer,
22 right?  We've got an expert here.

23        DETECTIVE WILD:  I was going to say, let's
24 refer to the expert here.

25        MR. IVES:  I don't want to be a witness.

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

21

1    DETECTIVE WILD:  Don't try to interrogate
2 yourself.
3    Q.   (BY DETECTIVE SPINKS)  Okay.  So you got to
4 your -- you give her your address, and she's driving her
5 car, and you're driving your car.  You get back to your
6 place first.  How -- how much sooner are you there than
7 her?
8    A.   I would say just about, I mean, a couple of
9 minutes, max.
10    Q.   Okay.
11    A.   I went in my house, and made sure that things
12 were put away.
13    Q.   Sure.  Oh, yeah.
14         And so, the sequence of events after she arrived
15 at your house was you gave her a tour of the house first
16 before you poured her a beer.  And then you guys kind of
17 sat on the couch and enjoyed the beer?
18    A.   Yes, sir.
19    Q.   Am I getting that right?
20    A.   Yes.
21    Q.   Okay.  And it was a Blue Moon?
22    A.   It was a Blue Moon.
23    Q.   Okay.  Anything mixed with the Blue Moon?
24    A.   A smidgeon of orange juice.
25    Q.   A smidgeon of orange juice, okay.  Did -- was Joy

---

22

1 present when you were preparing the beverage in the
2 kitchen?
3    A.   She might -- I have an open area -- I have my
4 kitchen, and then there's an open area to the -- the
5 living room, so I believe she was in the living room when
6 I was in the kitchen, you know, but it was open.
7    Q.   And she had a view into the --
8    A.   Yes.
9    Q.   The reason I bring it up is Joy had indicated to
10 me the orange juice in the Blue Moon was kind of new to
11 her.  And she mentioned something about asking what you
12 were putting in the beer.  Do you recall having that
13 conversation with her?
14    A.   I don't.
15    Q.   Okay.  That's fine.  So she -- both of you were
16 at the couch drinking your beers.  And is it -- is it just
17 a bottle each or did you split a bottle?
18    A.   One bottle each.
19    Q.   One bottle each.
20    A.   Yes, sir.
21    Q.   Okay.  And I think you said maybe it was about an
22 hour that is took to consume?
23    A.   Right.
24    Q.   Do you remember any of the conversation you guys
25 had in that hour?

---

23

1    A.   Part of it was, we had talked a little bit more
2 about, you know, our MBA program and so forth.  I remember
3 talking specifically about a work issue.  We were both
4 involved -- she's involved with fetal tissue, and I
5 oversee some of the fetal tissue, for the newspaper, we
6 talked a little bit about that.  Talked about -- a lot, I
7 mean it was over an hour.
8    Q.   Right, yeah.
9    A.   I don't recall all of the specifics.
10    Q.   Fair enough.
11    A.   Right.
12    Q.   You know, why would you?
13    A.   Right.
14    Q.   Up until now, it's just a normal day, right?
15    A.   Exactly.
16    Q.   Was the conversation ever flirtatious in nature?
17    A.   You know, I felt -- she was up on the couch with
18 her shoes off, and you know, her feet kind toward me,
19 and I was kind of -- I was close with her.
20    Q.   Sure.  I mean, just reading the writing on the
21 wall, she's complaining about her husband, she's texted
22 you the struggle of him kissing another girl, it's
23 obviously a sore spot for her.  Now you guys are alone at
24 your house, there's alcohol involved.  I mean, it seems
25 flirtatious to me.  And I just, you know --

---

24

1    A.   That was -- absolutely.  As soon as she asked to
2 go to my house --
3    Q.   Yeah.
4    A.   -- I had taken that as, okay, that was a sign
5 that she was flirting with me, that she --
6    Q.   Sure.  Were you into her?
7    A.   Absolutely.  I have the -- I preface this:  prior
8 to these accusations, I have the utmost respect for Joy.
9 I think that she's a wonderful person.  You know, I
10 question her motives with this.
11    Q.   With the reporting, you mean?
12    A.   Yes, sir.
13    Q.   Okay.  Yeah, and as do we.  I mean, we -- we do
14 this service with anybody.  If we take everything at
15 surface value.
16    A.   Right.
17    Q.   You know, that's kind of the point of coming in
18 and setting some of this straight.
19         Okay.  So I mean, I guess like in your mind --
20 and don't let me put words in your mouth -- if I -- if I
21 have it backward, just tell me.  But you were kind of
22 thinking maybe something could happen as far as maybe a
23 sexual encounter with Joy?
24    A.   Absolutely.
25    Q.   Was it ever -- was it ever spelled out?  Did she

---

25

1 ever tell you --

2    A.    No.

3    Q.    -- she wanted something to happen?

4    A.    No.

5    Q.    She talked about divorce with her husband.  Did

6 you feel like there was anything imminent, something that

7 was going to happen?

8    A.    I did.  When she said that they were having

9 problems and that it got to the point where he was staying

10 with his mom.  She said -- because I asked, how is it

11 going?  She said, well, just so you know, he's staying at

12 his mom's tonight, so that --

13    Q.    Oh, okay.

14    A.    -- was an indication of, yes, there.

15    Q.    Of how well things were going?

16    A.    Right.  Not well.

17    Q.    All right.  Okay.  So a beer over the next hour

18 at your house?

19    A.    Yes, sir.

20    Q.    A Blue Moon with a little bit of orange juice.

21 No other hard alcohol in that, or anything?

22    A.    No.

23    Q.    Okay.  You asked her if she wanted another one,

24 and she agreed.  And then you got up to go --

25    A.    Pour us two others.

26

1    Q.    And that's when she walks -- or --

2          (Inaudible due to multiple speakers.)

3    A.    She went in the bathroom.  She said, where's your

4 bathroom, and she went in to my side bathroom, which is

5 right next to the kitchen.

6    Q.    Oh, okay.  And how did she seem in the moments

7 leading up to that?

8    A.    She was fine.  I mean, she didn't -- I honestly

9 thought she was just going to use the restroom.

10    Q.    Sure.  She didn't appear sick?

11    A.    No, no.

12    Q.    No complaints of nausea or --

13    A.    No.

14    Q.    I think you guys submitted that she seemed like

15 she was in there longer than what she should have been --

16 or it seemed unusually long.  How long do you think that

17 was?

18    A.    Two or three minutes.

19    Q.    Okay.  Were you back in the living room by now

20 with --

21    A.    Well, I was kind of -- I was just in the kitchen,

22 kind of wait -- waiting, expecting her to come out and,

23 you know, hand her the beer -- the Blue Moon.  So we kind

24 of met in the hallway when she came out.

25    Q.    Okay.  And then she told you then that she had

27

1 vomited?

2    A.    She said, yeah, I vomited.  She said, yeah, I

3 just threw up.  I was like, oh, wow.  Okay.  Sorry.  Are

4 you okay?  And I offered -- you know, that's when I

5 offered to get her water.  I said, do you need something

6 to eat, you know.

7    Q.    Yeah.  Did she take you up on your offer?

8    A.    She didn't.  I said, well, I've got a -- I had

9 just moved in, I hadn't been there very long so my kitchen

10 was not fully stocked.  I said, here, I've got some

11 protein bars, some, you know, sandwich meat.  She said,

12 no, I'm fine.

13    Q.    Okay.  What about the second beer, did she drink

14 anything out of that glass?

15    A.    There was only one.  I had poured mine -- I don't

16 recall whether I poured both beers, but she didn't have a

17 second beer.

18    Q.    She didn't have a second beer?

19    A.    She -- no, she had water.  I gave her water

20 instead.

21    Q.    Okay.  Did you drink your beer?

22    A.    I did.

23    Q.    Okay.  So this would be number four for you?

24    A.    This was number four.

25    Q.    Okay.  And four over -- if I'm doing the math

28

1 right -- over three hours?

2    A.    It was definitely over three hours, approximately

3 three-and-a-half hours.

4    Q.    Okay.  So I mean, that's not a lot of alcohol.

5 How were you feeling?

6    A.    I was feeling fine.  I have always known that I

7 can have one beer per hour and feel that I'm okay.

8    Q.    That's a good ratio.  Okay.  So you guys end up

9 back on the couch, I'm assuming that you're drinking your

10 beer at this point and she's drinking water?

11    A.    Yes, sir.

12    Q.    And how long was it that you were sitting on the

13 couch before she made a comment about her hair being

14 stinky, or smelling like puke, whatever it is that she

15 said?

16    A.    Right.  Probably 20, 30 minutes, I don't recall

17 the exact amount of time.  It was -- it was a good amount

18 of time because we had continued talking for a while.

19    Q.    Sure.  Was it long enough for you to finish your

20 beer, just as a point of reference?

21    A.    Yeah, it was, actually.

22    Q.    Okay.

23    A.    I had almost finished my beer.

24    Q.    Okay.  And that's when you offered to allow her

25 to use your shower?

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

29

1    A.    Right.

2    Q.    Okay.  What did she say when you -- when you made

3 that offer?

4    A.    She said, that's a good idea.

5    Q.    Okay.  And were -- did you have to lead her to

6 the shower?

7    A.    Yes.

8    Q.    Was it in the bathroom she had previously gone

9 in?

10    A.    No, that was -- that's just a toilet and sink.

11    Q.    Like a half bath?

12    A.    A half bath, yes, sir.

13    Q.    Okay.

14    A.    So we walked into my back bedroom.

15    Q.    Okay.  Yeah, you mentioned the closet.

16    A.    Yeah.

17    Q.    And you showed her the way, obviously?  Or did

18 she know where to go because of the tour?

19    A.    No, I walked her in.

20    Q.    Okay.  Do you remember what she was wearing that

21 day?

22    A.    She was wearing a dress, pantyhose and high

23 heels.  She had taken her high heels off, but I think it

24 was a blue dress.

25    Q.    Just a blue dress?

30

1    A.    Yeah.

2    Q.    Okay.  So you lead her to the bathroom.  When she

3 walked into the bathroom, I mean, did she close the door

4 behind her or did she say anything to you?

5    A.    No, it's a pocket door.

6    Q.    Okay.

7    A.    So we walked in and she started to undo her

8 dress.  And at that point I said, can I join you, and she

9 said, sure.

10    Q.    Okay.

11    A.    And that's when I went in and I turned on the

12 shower.  And at that point she was completely undressed

13 and she walked into the shower.

14    Q.    Okay.  And so she made no attempts to -- attempts

15 for privacy as she's unrobing?

16    A.    No.

17    Q.    You were standing in the bathroom with her and

18 she's --

19    A.    Yes.

20    Q.    I mean, her dress, is it like zippered in the

21 back or how was she taking her dress off?  If you

22 remember.  If you don't, that's fine.

23    A.    I just remember that she had like a tie thing.

24    Q.    Okay.  Okay.  And when you asked her if you could

25 join her in the shower, what state of undressing was she

31

1 in?  Was the dress off at this point?

2    A.    She was in the process of undoing her dress.

3    Q.    Okay.  So it's apparent to you at this point that

4 she's not --

5    A.    She wasn't shy.

6    Q.    -- or bashful?

7    A.    No.

8    Q.    Okay.  Was she wearing any undergarments under

9 her dress?

10    A.    Other than the pantyhose, that was it.  That was

11 all I recall.

12    Q.    Okay.  You don't remember if she had like a bra

13 on?

14    A.    No.  Honestly, I didn't pay any attention,

15 because I was -- I had turned to go turn the shower on,

16 and then at that point she was undressed.

17    Q.    Okay.  So when you turned back around, was she

18 fully nude at that point?

19    A.    Yes, sir.

20    Q.    Or was she taking the pantyhose off?

21    A.    Well, I don't recall the specifics of that.

22    Q.    Okay.  Fair enough.  So you walked out of the

23 bathroom into your closet to --

24    A.    Yeah, so just point of reference is, this is the

25 shower, and my closet is right here.

32

1    Q.    Okay.

2    A.    And so I just stepped in my closet and I took off

3 my clothes and then walked right back in.

4    Q.    Okay.  And where was Joy when you walked back

5 into the bathroom?

6    A.    She was washing off her hair.

7    Q.    Okay.  So you got in with her at that point?

8    A.    Yes, sir.

9    Q.    Is there any conversation going on between you

10 guys?

11    A.    No.  No.

12    Q.    Okay.  So what happens next?

13    A.    I get in and I kiss her and make out.

14    Q.    Okay.

15    A.    We French kissed for -- you know, we French kiss.

16 And I kiss her -- I kiss her all over.

17    Q.    Okay.  And just for clarification, French kissing

18 would imply your tongue is in her mouth?

19    A.    Yes.

20    Q.    Her tongue is in your mouth?

21    A.    Yes.

22    Q.    Okay.

23    A.    We both -- we engaged in French kissing together,

24 yes.

25    Q.    Okay.  And you kiss her all over.  Where else did

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

**33**

1 you kiss her?

2     A.   I kissed her on her neck, I kissed her down her

3 breast and I kissed down her stomach and around her

4 vagina.

5     Q.   Okay.  So you kiss around her vagina.  Were you

6 at this point performing oral sex on her or --

7     A.   I wouldn't call it a sexual act -- oral sex.  I

8 was down there -- the reason I remember this is the water

9 was right in my face and it was --

10     Q.   Right.

11     A.   -- it was actually kind of awkward in the way I

12 was.  I kind of felt weird, stupid, the way I was.

13     Q.   Sure.

14     A.   And so I immediately went back up and started

15 kissing her up her chest and around her neck again and

16 started kissing.  And again, this was probably a few

17 minutes -- three or four minutes, when she said, I've got

18 to go.

19     Q.   Okay.  And of the three or four minutes you guys

20 were in the shower, how long were  you -- how long was

21 your mouth at her vagina?

22     A.   Oh, I mean, not long at all.  I mean.  Let's see.

23 I mean, I went and I kissed her, you know, I was down

24 there.

25     Q.   Sure.  Yeah.

---

**34**

1     A.   Not for very long.

2     Q.   Okay.  Was it just like one kiss and back up

3 or --

4     A.   Yes, I would classify it as that.

5     Q.   Okay.  Did you ever -- did your tongue ever go

6 inside of her vagina?

7     A.   No, on the exterior.  I kissed her, like, on the

8 exterior of her vagina.

9     Q.   Sure.  Okay.  Did anything else ever go inside of

10 her vagina?

11     A.   No.

12     Q.   Meaning fingers, penis?

13     A.   Absolutely not.

14     Q.   Okay.  Did Joy ever perform any sex acts on you?

15     A.   No, she did not.

16     Q.   Okay.  When you were -- when you're at level with

17 her vagina, are you on your knees or are you just kind of

18 crouching?

19     A.   I was kind of crouching.

20     Q.   Just kind of crouching, okay.  What was Joy doing

21 while you were doing that?

22     A.   Standing there.  You know, she didn't -- didn't

23 give any sign one way or the other.  She was just standing

24 there.

25     Q.   Okay.  Did she have her hands on you, if you

---

**35**

1 recall?

2     A.   I don't recall.

3     Q.   You don't recall, okay.

4     A.   She had her -- like her hands on me when we were

5 kissing, or, you know, like, you know.

6     Q.   Right.  Okay.  And then you sit back, you

7 continue to kiss her for how much longer do you think?

8     A.   Not very long.  Not very long.

9     Q.   Okay.  And you said that at this point -- was it

10 at this point that Joy said, oh, I have to be home at 6?

11     A.   Yes.

12     Q.   That was in the shower?

13     A.   She said, I've got to go.  And I stopped, and I

14 was like, okay.  She said, I've got to go.  And I was like

15 -- she says, I have to be home by 6.  And I was like, it's

16 almost 6.  It's like, okay.  And that -- that was the

17 first I had known that she had a time that she needed to

18 be home, and I was surprised.

19     Q.   Okay.  And Joy was able to dress herself after

20 the shower?  She was able to dry herself off first?

21     A.   Right, yes.

22     Q.   Okay.  Didn't need any assistance getting

23 dressed --

24     A.   No.

25     Q.   -- or anything?

---

**36**

1     A.   Not at all.

2     Q.   Okay.  So how does -- how does Joy seem to you at

3 this point with regard to her level of intoxication?  I

4 mean, she was just fine?

5     A.   She didn't appear intoxicated to me, at all.  At

6 this point she seemed more like, oh, shit, I've got to get

7 home.  She seemed a little bit nervous and flustered.

8     Q.   Right.

9     A.   And I was like -- so was I.  At this point it was

10 almost 6:00, and she's, you know, expecting to be home.

11 And this is like a 30-minute, you know, 20-minute drive

12 that we're talking about.

13     Q.   Okay.  So other than the fact that she vomited,

14 were there any other signs of intoxication that you saw?

15     A.   No, none.

16     Q.   And you didn't see her vomit?  Did you hear her

17 vomiting?

18     A.   No, I had no idea until she told me.

19     Q.   Okay.  Did you smell vomit?

20     A.   No.  And she was very self-conscious about it,

21 and I was trying to put her at ease.  I'm like, no, you're

22 fine.  You know, even though, I said, here, brush your

23 teeth, you're fine.  Don't worry about it.

24     Q.   Okay.  And she -- she asked you to drive her

25 home?

---

**37**

1    A.    Yes.

2    Q.    Why do you think she -- I mean, that seems like

3 an unusual request if she wasn't, like, showing any signs

4 of intoxication.

5    A.    Yeah.

6    Q.    Why do you think she asked you to drive?

7    A.    Well, because, I mean, we had been drinking.  I

8 think that, you know, my whole thing, in terms of the

9 time, I felt that she probably felt that she may not have

10 been in the best condition to drive.

11    Q.    Okay.  Fair enough.  I mean, at this point,

12 technically, you've had more to drink than she has, right?

13 I mean you've already finished your fourth beer and she

14 only had the three.  Okay.

15          Was there any back and forth about the ride

16 home, like, no, or --

17    A.    Well, we talked about me driving her home in my

18 car.  I said, well, I'll give you a ride home, and I have

19 no problem doing that.  And she says, no, Michael needs

20 the car.  I said, okay, I guess I could drive your car

21 home.

22    Q.    Okay.  So you drive her home.  How did she seem

23 on the ride home?

24    A.    Very -- it was quiet.  It was, you know, having

25 some awkward silence.

**38**

1    Q.    Sure.

2    A.    At this point I was trying to think about how I

3 am going to manage when we get to her house and she has

4 wet hair.

5    Q.    Right.

6    A.    And I'm dropping her off, and I was dreading

7 that.

8    Q.    Okay.  And in the text -- was it in the text

9 messages that you reference handing her car keys to her

10 husband?

11    A.    Yes.

12    Q.    Okay.  What, if any interaction, do you remember

13 having with her husband when you took Joy home?

14    A.    Just when he was standing there with his daughter

15 in his arms, I walked up to him and as I was walking up to

16 him, and Joy had walked into the house, I said, Joy's not

17 feeling well, I wanted to make sure she got home safely.

18 He said, where are the keys?  I handed him the keys and I

19 turned and I walked away, and that was it.

20    Q.    Okay.  Did he say anything to you?

21    A.    Nothing.

22    Q.    Nothing, okay.

23    A.    Other than, where the keys, when I handed

24 them to him.

25    Q.    Oh, okay.  Did he look upset, surprised?

**39**

1    A.    Yes.  He didn't look happy.

2    Q.    Okay.  He didn't -- that was the only

3 conversation you had, was where are the keys?

4    A.    Yes.

5    Q.    Okay.

6          DETECTIVE SPINKS:  Any questions?

7          DETECTIVE WILD:  Yes.  You know me.

8          DETECTIVE SPINKS:  That's why I had to...

9          INTERVIEW BY DETECTIVE WILD

10    Q.    (BY DETECTIVE WILD)  So I'm getting that you

11 didn't get the chance to sit in on the interview with her?

12    A.    Yes.

13    Q.    You have kids?

14    A.    Yes, sir.  I mean, yes, ma'am.

15    Q.    How old?

16    A.    I have an 11-year-old daughter and a 12-year --

17 and a 13-year-old son.

18    Q.    Where were they?

19    A.    They were at their mom's house.

20    Q.    Oh.  So you guys --

21    A.    We split time.

22    Q.    -- split?

23    A.    This was my week -- this was happening on my week

24 off.

25    Q.    Oh, so you got to have a social life?

**40**

1    A.    Yes.

2    Q.    Okay.  I understand, having children, you don't

3 get that very often.

4    A.    Huh-uh.

5    Q.    So she comes over to your house, and you're

6 saying you're getting the vibe that she's kind of

7 interested, but she had told you prior that she was not

8 okay with an open relationship?

9    A.    She said she was not okay with an open

10 relationship, meaning that they were both aware that each

11 other were with other people.

12    Q.    Tell me more about that.

13    A.    Well, that -- I mean, that's what I would --

14 that's what she talked about in terms of having an open

15 relationship where they could both willfully see other

16 people and engage in having extramarital affairs with

17 other people.

18    Q.    But she said she was not okay with that?

19    A.    She told me she was not okay with having an open

20 marriage.

21    Q.    Okay.  So on this date when she's over at your

22 house, tell me more about how you're interpreting these

23 mixed signals, because I mean you have a woman who clearly

24 stated, no, I'm not wanting a relationship, but now here I

25 am in your front room, drinking a beer?

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

41

1    A.    Right.  I wouldn't call it an open marriage.  I
2  think I would call it that she was having an affair.  We
3  had talked about initially -- the open marriage was back
4  in early August.
5    Q.    Okay.  So some time --
6    A.    Right, before we had really had gotten in to
7  knowing each other.  So we had developed a pretty close
8  relationship, with flirtation, during that time.
9    Q.    Tell me more about that flirtation.
10   A.    Well, we talked about her -- we talked a lot
11 about her sex with other people in colleges -- in college.
12 She talked a lot about sex, and how she put their friends
13 and so forth, and forming good relationships with people
14 and really not bond.  And a lot of it, I kind of related
15 to, okay, that's -- she's kind of doing that with me.
16   Q.    Okay.  Tell me more.  Was there any physical
17 touching?
18   A.    No.
19   Q.    Did you guys ever hug?
20   A.    Yes.  Every day -- every time after we'd met for
21 beers, we'd give each other a hug.
22   Q.    Okay.  Any other physical?
23   A.    No.
24   Q.    What about any kind of other flirtatious besides
25 just talking about sex?

42

1    A.    No, not physically.
2    Q.    Not physically, okay.  So she comes back, she's
3  sitting on -- she kicks off her shoes.  She's in high
4  heels, I totally understand --
5    A.    Right.
6    Q.    -- the curse.  She sits down, she's getting
7  relaxed.  How close are you guys?
8    A.    I'd say like about where Zach is, and her feet
9  were up on the couch, like this, and I was kind of facing
10 her, so about this close.
11   Q.    In your personal bubble?
12   A.    Yes.  Absolutely.
13   Q.    Somewhere we can touch?
14   A.    Yes.
15   Q.    Tell me about how you guys were interacting.
16   A.    Having a normal conversation.
17   Q.    Nothing giving you the indication that she's
18 wanting more from you that night?
19   A.    Not over -- no, not overtly.  It was -- it was
20 having good conversation.
21   Q.    Okay.
22   A.    She didn't make a move on me, no.
23   Q.    No?  So she gets up, she goes to the bathroom.
24 She's there for -- what is -- I mean, my husband, he takes
25 five minutes; me, I take five seconds.  There's a huge

43

1  difference.  What is "Unreasonable" to you?
2    A.    More than a minute.  I just thought, you know,
3  that she had gone in there to --
4    Q.    Go to the bathroom?
5    A.    -- go to the bathroom.  It was a little bit
6  longer than unusual, I was, you know.
7    Q.    Had she gone in there previously?
8    A.    No.  No.
9    Q.    So this was the first time?
10   A.    Yes.
11   Q.    Okay.  You'd been meeting for how long for
12 drinks?  Had she gone up and excused herself at the bars?
13   A.    No.  At this point it had just been a few hours,
14 but she had not.
15   Q.    But previously -- at previous times that you guys
16 had hung out?
17   A.    No.
18   Q.    Had you ever seen her get sick before?
19   A.    No.  No, and usually we would go to the bathroom
20 before we left, like, you know, before we left the
21 restaurant, because she'd have to pee before she left.
22   Q.    Okay.  How much time would pass?
23   A.    A few hours -- a couple of hours.
24   Q.    Okay.  How much time between -- you guys both go
25 to the bathroom, do you guys meet immediately back out

44

1  together, or do you have to wait for her?
2    A.    About the same time.
3    Q.    Okay.  Had she indicated to you any changes of
4  her medications or any problems in anything like that?
5    A.    None.
6    Q.    Had she been telling you that she had been
7  feeling sick?
8    A.    No.
9    Q.    In the weeks prior?
10   A.    No.
11   Q.    No indication of anything changing?
12   A.    Nothing.
13   Q.    How was her demeanor?  Was she happy?
14   A.    She was fine.  It was nothing -- nothing out of
15 the ordinary.
16   Q.    Okay.  I don't know her, I've never met her.
17   A.    Okay.
18   Q.    So you're going to have to -- you're going to
19 have to kind of tell me who she is.
20   A.    She is a -- she is a --
21   Q.    All I know is what is in black and white.
22   A.    She is an outgoing, energetic person.
23   Q.    Okay.
24   A.    She's not much different than me in terms of our
25 demeanor.  You know, we're kind of similar, I would say.

45

```
 1    Q.    So there was kind of an attraction?
 2    A.    Yes.
 3    Q.    Similar?
 4    A.    Yes.
 5    Q.    So you guys are sitting there, you come back, and
 6 you're handing her her fourth beer, but she doesn't --
 7    A.    I didn't hand her a beer, no.
 8    Q.    Okay.
 9    A.    I didn't hand her her fourth beer.
10    Q.    Okay.
11    A.    They were in the -- they were on the counter.
12 And that's when she came out, and I filled up a water for
13 her.
14    Q.    Okay.  And she came out.  How close is the
15 bathroom from where you were in the kitchen?
16    A.    Just -- maybe just beyond where you are, 10 feet,
17 5 feet.
18    Q.    Okay.  So you can hear pretty much what's going
19 on?
20    A.    Oh, yeah, it was like right there.  I mean, you
21 could see the living room and the bathroom were right
22 there.
23    Q.    And you didn't hear her being sick or anything?
24    A.    No.
25    Q.    Did you hear the toilet flush?
```

46

```
 1    A.    No, I wasn't paying attention.
 2    Q.    Okay.  So she could have been sick, but you were
 3 just distracted?
 4    A.    I just didn't pay attention.
 5    Q.    Okay.  So you hand her water.  And how long
 6 between the water and you guys -- does she get sick again
 7 or --
 8    A.    No.  To my knowledge, she didn't get sick again.
 9    Q.    That was the only time?
10    A.    That was the only time.  She -- so she went in
11 the bathroom twice, the second time was to brush her
12 teeth.
13    Q.    Okay.  And she comes back out and she can smell
14 it on her hair.  Us chicks are that way, man.
15    A.    Right.
16    Q.    Get me around a cigarette, and I'm like, aah, I
17 can smell it for a week.  So she can smell it, you can't.
18 Trust us, us women, we have noses.  Ask him.
19          DETECTIVE SPINKS:  Yeah.
20    Q.    (BY DETECTIVE WILD)  If there's a fire in the
21 East Mountains, I can smell it from here.  She can smell
22 it.  You offer, do you want to take a shower?
23    A.    She ask -- she was concerned about the smell and
24 I figured she wanted -- she said, I need to wash this
25 smell out of my house -- out of my hair.
```

47

```
 1    Q.    Out of her hair.  And you said, do you want to
 2 take a shower?
 3    A.    Yeah, exactly.  Do you want to take a shower.
 4    Q.    Okay.  So tell me more about how that proceeded
 5 into your room.
 6    A.    She said, okay.  And we both got up and she
 7 followed me into the bathroom.
 8    Q.    Okay.  How was she walking?
 9    A.    Fine.
10    Q.    Did she appear to have to use the walls or
11 anything?
12    A.    Not at all, no.
13    Q.    Okay.  How was -- I mean, you've been around her
14 enough, how was her conversation?  Did she appear
15 intoxicated?
16    A.    No.  No.  At no point did she appear intoxicated.
17    Q.    So was her conversation -- you said there was not
18 a whole lot, okay.  You walk into the bathroom, she starts
19 undressing.  Okay?  Does she -- how is her mannerisms?
20 Does she kind of stop, like are you leaving the bathroom?
21    A.    No, she -- we walked in, and she immediately just
22 started undressing.
23    Q.    Okay.  So at this point you guys are just
24 friends, she's at your house.  What's giving you the
25 indication that she's wanting you to join her in the
```

48

```
 1 shower?
 2    A.    I asked her.
 3    Q.    Okay.  But I mean, that's a bold -- a bold
 4 question to ask.  You're in the room, there's -- there's
 5 been no kissing, there's been no foreplay, there's been no
 6 additions, and it's like, hey, can I join you in the
 7 shower?
 8    A.    Yes, that's how it happened.  I made an
 9 assumption and I asked her --
10    Q.    Okay.
11    A.    -- can I join you.
12    Q.    And what was her response?
13    A.    She said, sure.
14    Q.    She said, sure?
15    A.    She said, sure.
16    Q.    Okay.  And then that's when you proceeded to turn
17 the water on, went to the closet, got undressed, went back
18 in?
19    A.    Yes, ma'am.
20    Q.    Where is she standing at?
21    A.    She was standing to -- here's the shower, and she
22 was standing here.  And I walked in to go in the closet,
23 and she walked in and got in the shower, and then I walked
24 in and joined her in the shower.
25    Q.    Okay.  Tell me more about how she was reacting at
```

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

49

1 that time.

2    A.    She was just standing there.  She had washed --

3 by the time I got in there, she -- her hair was wet, she

4 had rinsed off her hair.

5    Q.    Okay.

6    A.    And I just -- I stood in front of her and closed

7 the door and leaned in and kissed her.

8    Q.    Okay.  Tell me more about the kiss.

9    A.    It was -- it was a -- it started out as a normal

10 kiss and became what I would consider more passionate,

11 French kissing.

12    Q.    Okay.  Who kind of took it to that next level?

13    A.    I did.

14    Q.    You did.  Okay.  So you took it one step up?  She

15 didn't pull away?

16    A.    No, she kissed me back.  We kissed together.

17    Q.    Okay.  What was she doing with her hands?

18    A.    I don't -- I don't -- they were around -- I mean,

19 we were together.

20    Q.    Okay.  Was she touching any part of you?

21    A.    She was touching me, but not like, you know.

22    Q.    Not sexually?

23    A.    It's not sexual, no.

24    Q.    Okay.  And that's when you proceed to kiss down?

25    A.    Right.

50

1    Q.    And then awkward, shower -- sorry, shower sex can

2 be awkward.  You work your way back up --

3    A.    Right.

4    Q.    -- and that's when she's like, whoa, hold on?

5    A.    Well, I worked my way back up and we started

6 kissing again, and started kissing her neck again.  And

7 that's when she said, you know, I've got to go.

8    Q.    Okay.  Tell me about how -- how that went.  Tell

9 me more about how she presented that.

10    A.    It was sudden:  I've got to go.  And I was like,

11 what?  And she's like, I've got to go.  And I -- I was

12 taken aback.  I'm like, okay.  And you're like, you know.

13 And she said, I need to be home by 6, and I was like,

14 okay.

15    Q.    So the way you did it seemed almost panicked.  Is

16 that how she came across?

17    A.    This was kind of a surprise, like, I need to go.

18 It wasn't like --

19    Q.    What am I doing?

20    A.    Yeah, it wasn't like -- well, no, it was

21 realizing that, okay, I need to get home.

22    Q.    Okay.  That's how you interpreted it?

23    A.    Yeah.

24    Q.    And not like, oh, crap --

25    A.    No.

51

1    Q.    -- what the heck am I doing?

2    A.    No, not that at all.  It was like I need -- I was

3 supposed to be home by 6:00.

4    Q.    Okay.  Did she say anything, okay, let's finish

5 this up some other time?  I have to get home?

6    A.    No.  No.

7    Q.    Any other sexual banter?  I mean, you guys were

8 talking sex earlier, and previous relationships.  Did she

9 say, you know, hey, anything else?  You know, I'd really

10 love to continue where we left off, but I need to get

11 home?  Any --

12    A.    Not that I recall, no.

13    Q.    Okay.  So this just was a change of dynamics, and

14 hey, I've got to go?

15    A.    Yes.

16    Q.    Who gets out of the shower first?

17    A.    I -- I don't recall.  With the way she was

18 standing, more than likely she did.

19    Q.    Okay.  So she gets out --

20    A.    You know, I'd imagine -- you know, the shower is

21 here, and the door, you know, so I would imagine she

22 stepped out.

23    Q.    I'm glad you did this, because in my head --

24 there's blond on my head, I know -- but my brain is

25 actually visualizing what's going on.  Okay?  So I'm

52

1 putting together the little pieces on here.  Trying to

2 understand how -- what you're telling us, and how's she's

3 telling us, got so far, like this.

4    A.    Right.

5    Q.    Okay?  Because a lot of times, it's just a

6 misunderstanding; your perception and her perception,

7 right?

8    A.    Right.  Right.

9    Q.    So we're trying to piece them together.  And

10 that's why I'm trying to understand how --

11    A.    Right, I understand.

12    Q.    -- we went from sitting over, BS'ing, having a

13 beer, to, hey, can I join you in the shower?

14    A.    Right.

15    Q.    That's a huge leap.

16    A.    I mean, this is my work husband, and I'm sorry,

17 I'm not joining him in the shower.  Besides the fact that

18 his wife would kill me and my husband would kill him.

19    A.    Right.

20    Q.    So there's that small hesitation of where --

21 where we went from point A to point B.

22    A.    Right.

23    Q.    And that's why I'm trying to get you to help me

24 understand -- because that's where my movie in my head,

25 comes to a halt right here.

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

53

1    A.    Right.

2    Q.    Of everything else, picture perfect.  That is all
3 making sense, it's all fine and dandy.  Now we're getting
4 to -- to the shower scene, and we went "doop, doop."  Does
5 that make sense?

6    A.    I get it.

7    Q.    I need you to help me fill in that gap.

8    A.    I don't -- I don't understand the gap, though.  I
9 mean, I've explained to you that when we went into the
10 shower -- went into the bathroom, and she was going to
11 enter the shower, and I asked her, can I join you.  That
12 was my move, to say, okay, is that -- are you comfortable
13 with this.

14    Q.    Okay.  Had you ever told her in the past that you
15 were interested in her sexually?

16    A.    It was very obvious in terms of our back and
17 forth with each other.

18    Q.    See, that's what I'm trying to -- you're
19 generalizing, yeah, it was flirtatious.  You're not
20 filling me in on -- on the "flirtatious."  Because, to me,
21 obvious is not what's leading the procession of, okay now
22 I'm undressed and I'm down there kissing her vagina.  See
23 the difference?  That's where I'm asking, is -- if she was
24 so free to talk to you about the sex she had in college,
25 her relationships and everything else, and then she gets

---

54

1 out of the shower and has got to go, the flirtatious was
2 off, right?

3    A.    I -- it didn't -- she didn't appear upset with me
4 at all at that point.

5    Q.    Okay.  So there's no upset --

6    A.    No.

7    Q.    -- it's just panic?

8    A.    It wasn't pan -- I wouldn't call it panic.  It
9 was like recognizing the time, that I need to get home.

10    Q.    Okay.  So you're in the shower, you go down to
11 the vaginal area of the female's part's a little
12 different.  Some of us have outies.  When you say the
13 outer lips, are we talking about the labias?

14    A.    Again, technically, yes, I would say the
15 exterior.

16    Q.    The exterior lips?

17    A.    Yes.

18    Q.    Okay.  So you didn't French kiss?

19    A.    The vaginal area?

20    Q.    Uh-huh.

21    A.    No.

22    Q.    Okay.  So it was lips to lips, so to speak?

23    A.    It was lips, yeah, it was -- yes.  Meaning, I
24 don't recall the exact details of it, but I know it wasn't
25 like it was -- I wasn't giving -- performing oral sex on

---

55

1 her.

2    Q.    Okay.  The reason why I ask is because she did
3 have a sexual assault exam done.

4    A.    Okay.

5    Q.    Okay.  And we have injuries in that area.  She's
6 claiming she didn't have sex with her husband prior.

7    A.    Okay.

8    Q.    Okay?  So we're trying to piece together if the
9 tongue wasn't there, the fingers weren't there, what the
10 heck's going on?

11    A.    Okay.  I don't know.  I would have no reason to
12 expect to have any type of anything on her from our
13 interactions.

14    Q.    From your interactions?

15    A.    Right.

16    Q.    So if there was anything that took place, it
17 wasn't from your guys's interactions?

18    A.    Correct.

19    Q.    Okay.  So that's clear.

20          You guys get out of the shower, how is she
21 dressing?  Is she stumbling?

22    A.    No.  And I didn't watch her get dressed because I
23 was also getting dressed at the same time.

24    Q.    In your closet?

25    A.    In my closet, which is right, you know, pretty

---

56

1 close, but I was getting dressed and she was getting
2 dressed.

3    Q.    Okay.  Did you hear her fall down anywhere?

4    A.    No.

5    Q.    Did you hear her stumbling anywhere?

6    A.    No.

7    Q.    Did you hear her get sick?

8    A.    No.

9    Q.    Okay.  So she gets dressed.  How does the whole
10 transportation get going?

11    A.    She says, can you give me a ride home.

12    Q.    Okay.  So you're assuming husband's gone?  Or are
13 you thinking the husband's home now?

14    A.    Well, when she said that she needed to get home
15 because her husband needed the car, that was the first
16 indication, and I was like, her husband's home, waiting
17 for the car.

18    Q.    Okay.  So she needs to get home to get the
19 husband the car.  So now you're like, oh, crap, I have to
20 confront the husband?

21    A.    Right.

22    Q.    Okay.  But you have to have that, oh, crap?

23    A.    At this point I was -- I was -- it was a very --
24 you know, my thoughts were not good.  It was like, this is
25 going to be really bad.

---

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

**57**

1    Q.    Okay.  So she gets into the passenger seat?

2    A.    Yes.

3    Q.    You drive her vehicle?

4    A.    I do.

5    Q.    Okay.  How far away does she live?

6    A.    Twenty-five minutes or so.  I'm up -- I'm way up

7 on Tramway and Academy, and she's down near UNM, Carlisle

8 area -- Carlisle and Candelaria area.

9    Q.    A lot of stoplights?

10    A.    Yeah.

11    Q.    Okay.  How is she acting during this drive?

12    A.    We're -- we're quiet.  I mean, I was -- you know,

13 I had my hand on -- I put my hand on her knee and, you

14 know.  And we kind of didn't say a whole lot.  It was -- I

15 don't recall talking a lot with her.  We talked.  She told

16 me how to get to her house.

17    Q.    Okay.  So she went from talking before the

18 shower, to a little bit concerned?  Quiet?  Withdrawn?

19    A.    I would say -- I think it was a little bit -- I

20 would -- I would say it was quiet.  I think both of us

21 were like, we are about to -- I'm about to drop her off at

22 her house and she's got wet hair, and how are we going to

23 explain this.

24    Q.    Okay.

25    A.    I think both -- that was what's going through my

---

**58**

1 mind.  You know, I'm just like, hey, you know what.  And I

2 asked her when we were getting close, I said, you know,

3 what do you want me to do?  Should I park down the street

4 and then you drive in?  And she said, it doesn't matter.

5 I was like, are you sure?  She said, yeah.  And she just

6 shook her head and she said, it doesn't matter.

7          And I was like, okay.  And I was like, well,

8 where do we go?  And she said, just right up here.  And

9 that's when I pulled up and her husband walked out

10 immediately.

11    Q.    Okay.  Now, tell me more about that.

12    A.    So we pull up and I was like, oh, I just -- I

13 couldn't believe I'm in this situation.  I get out, walked

14 up, and Joy immediately -- she puts her head down and she

15 walked straight into that house, past her son -- or her

16 husband and daughter.  And I walk up and I said, Joy

17 wasn't feeling well.  I just wanted to make sure she got

18 home okay.  And I handed him -- he says, well, where are

19 the keys?  And I handed him the keys, and that was it.

20 That was the interaction.  Then I walked away.

21    Q.    Where did you go?

22    A.    I walked about two -- two blocks and I called

23 Uber.

24    Q.    Okay.  So reviewing the text messages, I mean,

25 like I said, everything seems pretty -- hey, I can't

---

**59**

1 believe I messed up your house.

2    A.    Right.

3    Q.    Did you ever see any signs in her bathroom --

4    A.    No.  And I told her, I was like, no, not at all.

5 She was -- she had -- she was embarrassed.  And I told

6 her, I always try and make her feel at ease, saying, you

7 know, you were fine.  I didn't -- I never saw you throw

8 up, so I didn't think there was -- you know, I wasn't

9 judging her by that.  And there was no signs of anything,

10 you know, so I was, like, no, it's okay.  Don't worry

11 about it.

12    Q.    Why do you think she would be making these

13 statements?

14    A.    I think it had to do with the next day when her

15 husband got home, she didn't know what to say.  She put

16 it -- I don't know.  I was absolutely -- you know, I don't

17 know.  I have no reason to understand why she would accuse

18 me of that.

19          FURTHER INTERVIEW BY DETECTIVE SPINKS

20    Q.    (BY DETECTIVE SPINKS)  And just reviewing the

21 conversation you guys had in the aftermath, everything

22 seemed pretty copacetic until -- what was it, the

23 following Monday or so -- the conversational tone kind of

24 changes.

25    A.    Right.

---

**60**

1    Q.    And her responses become very short and to the

2 point, saying, I'm busy, Monday.  (Inaudible.)  It was

3 actually --

4    A.    Right.

5    Q.    You know, you asked her a couple of times, how is

6 your day, and it didn't seem like you were getting a

7 response from her.  What do you think changed?

8    A.    Well, so at that point, you know, Joy is my

9 friend.

10    Q.    Right.

11    A.    And I was concerned about how things were going

12 to go with her relationship with her husband.  And that

13 was really a bad situation that I felt that I was in, you

14 know, having to face her husband was awful.

15    Q.    Uh-huh.

16    A.    So I was just checking in on her.  And then,

17 yeah, you know, nothing -- nothing happened.  I was like,

18 hey -- because there was times we would text previously,

19 where I wouldn't hear from her for a couple of days and

20 that was normal.

21    Q.    Sure.  Okay.

22    A.    But then it wasn't until on -- let's see.  That

23 was Wednesday.  You know, when I didn't hear anything more

24 from her, and I just stopped.  I just stopped and I was

25 like, okay, you know, that's the end of that.

---

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

61

1  Q.   Okay.  Just a few things we want to go over in
2  the text messages.  You mentioned something -- or excuse
3  me.  She says, I'm 99 percent sure that I'm not going out
4  tomorrow.  What was that about?
5  A.   She had asked me to go out the next night.  I
6  didn't -- I forgot to mention that.
7       DETECTIVE WILD:  When?
8  Q.   (BY DETECTIVE SPINKS)  That's okay.  Yeah, when
9  did you guys talk about that?
10  A.   At the bar.
11       DETECTIVE WILD:  Okay.
12  Q.   (BY DETECTIVE SPINKS)  And what was that supposed
13  to be?
14  A.   She said, hey, I'm going out tomorrow night with
15  a friend, you should join me.  I was like, great.
16  Q.   Okay.  You said you were going to -- was it like
17  a coworker?
18  A.   Like a girlfriend of hers.
19  Q.   Okay.  And so this would have been Saturday night
20  that she was planning on going out?
21  A.   Right.  Right.
22  Q.   Okay.  Okay.  There was just one other thing.
23  Oh, when she -- at any point was she, like, unaccounted
24  for in your house?  And the reason I ask is, I mean, you
25  guys have -- you and Joy have similar recollections to the

---

62

1  events leading up to arriving at your house.  You guys
2  both -- even -- if I remember correctly, she even
3  mentioned drinking a Marble Red at the bar -- or drinking
4  two Marble Reds.  Because everything seemed to line up
5  perfectly up until the point when you guys arrive at your
6  house.
7       She recalls you getting there before her.  And
8  it's her recollection that you had the drink already
9  poured when she got there, and that you handed her the
10  drink.  And then, upon finishing that drink, she recalls
11  you, you know, pouring the second drink.  She seems to
12  remember seeing you pouring something else into the cup,
13  which you had told her, oh, this is orange juice, it goes
14  good with Blue Moon.
15       Where you -- where your stories start to deviate,
16  and there's a little variation, she recalls being sick
17  multiple times at your house, not just the one time that
18  you -- that she reported to you.
19  A.   Right.
20  Q.   She -- when I went back and counted in my
21  interview notes, she recalled being sick at least eight
22  different times while at your house.
23  A.   No.  Absolutely -- I mean, in terms of, she was
24  in the bathroom by herself two times:  the first time and
25  then the other time to brush her teeth.  In terms of the

---

63

1  number, how many times she vomited, I wouldn't know that.
2  But certainly she didn't go into the bathroom eight times.
3  Q.   Well, and her account was that she vomited that
4  one time, she came back to the couch and talked to you
5  some more.  She felt sick again, got up again, vomited
6  again.  She said it was after the third time that she
7  vomited that you offered her the toothbrush.  She said in
8  the middle of brushing her teeth, she got sick and vomited
9  again so she brushed her teeth a second time.
10  A.   I didn't know about that.
11  Q.   She said she vomited immediately upon getting out
12  of the shower, that there was a toilet right next to the
13  shower, that she vomited into that.  She said she vomited
14  on the ride home, that she had to open the car door real
15  fast and vomit.
16  A.   No.
17  Q.   I mean, she -- her statement was that she was
18  just, I mean, it sounded like she was dying, just vomiting
19  all over the place.  Is there any chance that she vomited
20  more than the one time that she reported to you?
21  A.   There was a chance that she could have vomited
22  the second time when she was in the bathroom.  I don't
23  know.  And none of that other stuff happened at all.
24  Q.   Meaning?
25  A.   She did not vomit in the toilet in front of me,

---

64

1  and she did not vomit in her -- in my -- in her car at
2  all.
3  Q.   Okay.
4       DETECTIVE WILD:  Did you guys have to stop on
5  the way back --
6  A.   No.
7       DETECTIVE WILD:  -- to her house to vomit?
8  A.   No, no.
9       DETECTIVE WILD:  Did she ever say she was
10  still feeling sick?
11  A.   No.
12  Q.   (BY DETECTIVE SPINKS)  I mean, even reading the
13  texts messages, the fact that she references, you know,
14  I'm sorry if I, you know -- how did she describe it?
15  A.   Made a mess of your house.
16  Q.   Yeah.  I mean it sounds like she's apologizing
17  for more than just vomiting one time in your toilet.  You
18  know what I mean?
19  A.   Right.  Well, that's why I was like, of course
20  not.  I mean, she, you know, I think I -- no, not at all.
21  Q.   Okay.  The other thing that I gathered from the
22  text messages was she asked you, so how bad was it when we
23  got to my house.  Why do you think she asked you that?
24  A.   Because she walked immediately -- she just put
25  her head down and walked right into the house.  And I had

---

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

**65**

1  to engage with her husband and daughter.

2      Q.   Okay.  Do you think she overheard any of that

3  interaction?

4      A.   No.  It was -- I mean, if that -- I mean, it

5  was -- it was a good little walk, because, you know, it

6  wasn't like I was in her driveway, I was on the street.

7  And we walked up, and as I was walking up, she had walked

8  across her yard into her -- into her front door.

9      Q.   Gotcha.  Okay.  You -- your next text message at

10  about 8:18, and you asked her if she was okay.  And she

11  didn't respond back until two hours and one minute later,

12  at 10:19.  She says, dude, I've never had a reaction to

13  those beers like that.  I'm so sorry.  Thank you for all

14  your help.

15          Have you had any conversations with Joy outside

16  of these text messages since this happened?

17      A.   No.

18      Q.   Okay.  Joy is reporting that she was so

19  intoxicated that night, that when she got home, she has

20  like a memory lapse, a time gap, between 6 p.m. and

21  10 p.m.  Did you get the impression at all that she was

22  intoxicated enough to explain that?  Why she wouldn't have

23  any recollection of what happened between getting home and

24  waking up on the floor of their living room at 10:00?

25      A.   No.  No.

---

**66**

1      Q.   Did you ever get the impression that she was any

2  more intoxicated than she had been at any point during

3  your bar trips, previous to that night?

4      A.   No.  No.  We'd drink three Marble Reds

5  previously.

6      Q.   Well, had you ever seen her vomit before?

7      A.   No.

8      Q.   Or had you ever known of her vomiting before?

9      A.   No.

10      Q.   Okay.

11          FURTHER INTERVIEW BY DETECTIVE WILD

12      Q.   (BY DETECTIVE WILD)  Did you guys have anything

13  to eat?

14      A.   No.

15      Q.   No munchies or --

16      A.   No.

17          MR. IVES:  I noticed in the text messages,

18  she said all she had to eat all day was some toast.

19          DETECTIVE SPINKS:  Yeah, I saw that.

20          FURTHER INTERVIEW BY DETECTIVE SPINKS

21      Q.   (BY DETECTIVE SPINKS)  Even in her interview she

22  confirmed that, she had mentioned that she was drinking

23  kind of on an empty stomach, but.

24          Okay.  So, I mean, obviously, you have a very

25  different version of events than what she has.  I mean,

---

**67**

1  what she's alleging is that in the shower, you were

2  performing cunnilingus on her, meaning your tongue was

3  inside of her vagina.  She's alleging that your fingers

4  were inside of her vagina, digital penetration.  She does

5  have injuries that are consistent with digital

6  penetration.  There is -- she has three small tears that

7  are fairly deep inside of her vagina, that the nurse

8  documented, swabbed for DNA.

9      A.   Okay.

10      Q.   And photographed.  Is there any chance at all

11  that your DNA is going to come out of those?  Because what

12  the tear does, is the tear is a perfect little breeding

13  ground to collect DNA.

14      A.   Right.

15      Q.   And they swab right into there, and those are the

16  swabs that we're going to compare to the buckle sample

17  that you provided a few weeks ago.  Would there be any

18  reason why we would find your DNA within those tears?

19      A.   When I first told -- when I met with Zach --

20          MR. IVES:  Don't tell them about our

21  conversations.

22          MR. BRIGGS:  Oh, okay.

23      A.   You know, I told him -- you know, I was trying to

24  figure this out.  I was like, we were making out and my

25  hands were on her, but I -- I absolutely don't recall

---

**68**

1  having digital penetration.

2      Q.   (BY DETECTIVE SPINKS)  Okay.  And there's --

3  there is a difference -- a small difference between not

4  recalling something and could it have happened.  Is there

5  any chance that you just don't recall that your fingers

6  were inside of her vagina?

7      A.   There's a chance that I don't recall my fingers

8  being inside -- inside of her.

9      Q.   And when do you think that would have happened?

10      A.   Well, while I was going -- when we were making

11  out.

12      Q.   While you were still standing or while --

13      A.   Yeah, while we were standing.

14      Q.   While you were standing?

15      A.   Yeah.

16      Q.   Okay.  With regard to that, you know, the tears

17  that we see are typically caused by one of two things:

18  either somebody is being too rough, sometimes it can be

19  because of long fingernails.  But more commonly than not,

20  it's because someone is not properly aroused yet.  There's

21  just no -- there's no self-lubrication, and so those tears

22  happen.

23          Do you have any recollection whatsoever of

24  whether or not Joy appeared aroused while you were, for

25  lack of -- I mean, while you were down on her?

---

Interview of Michael Briggs
12/13/16

Audio Transcription of Interview

---

69

1    A.   Right.  I don't -- I didn't hear her, you know,
2 like moaning or like holding me down or, you know.
3    Q.   Okay.  Was there any indication from Joy that she
4 was enjoying what was going on in the shower, verbal or
5 otherwise?
6    A.   There was no indication that she wasn't.
7    Q.   All right.
8    A.   Yeah.
9    Q.   What about -- you said there was no moaning.  Was
10 she -- was she drawing you closer to her?
11    A.   She was when we initially -- when we first
12 started kissing, sure, yeah.
13    Q.   Did -- I mean, you know, when you initially
14 started kissing her, did her demeanor change when you went
15 down on her, or when you -- when you crouched in front of
16 her?  Did you -- did you notice any changes in her --
17    A.   No.
18    Q.   -- demeanor or behavior at that point?
19    A.   No, not at all.
20    Q.   Did she seem uncomfortable about what you were
21 doing?
22    A.   Not to -- no, not to my knowledge at that time,
23 no.
24    Q.   Okay.
25    A.   No, I was -- I was the one who was kind of

70

1 uncomfortable.
2    Q.   Sure.
3    A.   You know, with the water in my face and so forth.
4    Q.   Okay.  And I think I had asked you this earlier.
5 But you guys haven't had any phone conversations?  The
6 only conversations you've had since --
7    A.   Were these text messages.
8    Q.   -- were the text messages.
9    So you guys never talked about things that she
10 was and was not comfortable with happening?
11    A.   Right, no.
12    Q.   Meaning, you know, she never told you, I was okay
13 with the kissing, but I didn't want you to do anything --
14    A.   No.  I mean, the only -- the one thing, I mean, I
15 thought that from my point is, she was acknowledging that,
16 you know, in her text messages, like that was the first
17 time -- just so you know, that was the first time.  I've
18 never done something like this.
19    Q.   Right.  Right.
20    A.   And I was like, you know, I knew that.  I knew
21 that she had talked to me about that previously.
22         DETECTIVE SPINKS:  Okay.  Did you have
23 anything else?
24         DETECTIVE WILD:  No.
25    Q.   (BY DETECTIVE SPINKS)  Yeah.  I don't want to

71

1 keep you.  I know you've got an appointment.  Is there
2 anything that you would like to add before we conclude?
3 Anything you think I should know?
4    A.   No.  I think I've covered it all.
5    Q.   Okay.  Both of you have my cards.  If anything
6 else comes up, don't hesitate to let me know.  If you feel
7 like there's something you need to add to the statement,
8 because my -- my part in this is basically done now.  I'm
9 going to type up your interview and I'm going to send it
10 to the DA's office.  Chances are they're going to wait
11 until the DNA results come back from the lab before they
12 make any decision about what they're going to do.
13    A.   Okay.
14    Q.   I hate to speak for them because I never have a
15 real good sense of how they're going to proceed, whether
16 or not they're going to, you know, charge somebody or not.
17 So it might just very well come down to what the DNA
18 shows, you know.  You've indicated that there could be an
19 explanation for why your DNA might be there.
20    A.   Yeah, so there -- it would not surprise me.  I
21 mean, we were intimate.
22    Q.   Sure.
23    A.   Okay?  And that's why I, you know, I said, yeah,
24 I'll give you a DNA sample.  I was with her.
25    Q.   Right, right.

72

1    A.   I acknowledged that.
2    Q.   Okay.  What about saliva, because they do check
3 separately for saliva.  Do you know -- do you think we
4 could find your saliva on those deep swabs that they took?
5         MR. IVES:  I mean, how would he -- how would
6 you --
7    A.   I don't --
8         MR. IVES:  I'm just going to say how would he
9 know?  He's not a DNA scientist or a forensic scientist.
10         DETECTIVE SPINKS:  I guess my --
11         MR. IVES:  So that's a tough question to
12 answer, for him --
13         DETECTIVE SPINKS:  I get that.
14    Q.   (BY DETECTIVE SPINKS)  And maybe for more
15 clarification, you're not 100 percent sure on whether or
16 not you have had your fingers inside of her vagina.  When
17 you were kissing her vagina, are you 100 percent sure that
18 you didn't have your tongue inside the vagina as well?
19    A.   I am not 100 percent sure.
20    Q.   Okay.  And that's all, I'm just --
21    A.   I don't recall all of the specifics about that
22 other than --
23    Q.   Okay.
24    A.   -- we made out.  What I would consider, we made
25 out, we had -- and it was very brief.

---

**73**

1  Q.  Okay.

2  A.  Okay.  And, you know, I did -- I went down on

3 her --

4  Q.  Right.

5  A.  -- in terms -- and I kissed her down there, yes.

6  Q.  Okay.  Okay.  Anything else that either of you

7 want to add?

8        MR. IVES:  Not right now.

9        DETECTIVE SPINKS:  If anything comes up.

10       MR. BRIGGS:  Yeah.

11      MR. IVES:  Yeah, we know how to reach you.

12 And if you have questions, I know you had a chance to look

13 at the texts, but --

14       DETECTIVE SPINKS:  Yeah.

15      MR. IVES:  -- maybe as you go through this

16 more, if you have questions trying to interpret those --

17       MR. BRIGGS:  Yeah, I mean...

18       MR. IVES:  -- or if you need more

19 information, we're happy to give that.

20      DETECTIVE SPINKS:  Perfect.  And I need to

21 talk to Joy about the texts.  And she was concerned about

22 it, too, because they weren't on her phone, or if she had

23 deleted them, or whatever.

24       MR. IVES:  Right.

25      DETECTIVE SPINKS:  So I do want to go over

**74**

1 them with her, too, and that might lead to more questions.

2       MR. IVES:  Sure.

3      DETECTIVE SPINKS:  You know, maybe next time

4 we can just do a conference call, if there's further

5 questions, or we could just do something a little less

6 formal.

7      MR. BRIGGS:  Yeah.  And, you know, the

8 important -- I felt horrible that I had dropped her off

9 with wet hair and, you know, in front of her husband.

10 That's, you know, really, in terms of my responses to

11 that, was in regard to that, so this was -- it was a

12 horrible experience.

13      DETECTIVE SPINKS:  Right.  And I -- you know,

14 I can -- I can't relate, I haven't been in your shoes, but

15 I can sense the uncomfortableness that has been going on.

16      MR. BRIGGS:  Right, okay.

17      DETECTIVE SPINKS:  I don't have anything

18 further.

19      DETECTIVE WILD:  No, I don't either.

20      MR. IVES:  Thank you guys for being mindful

21 of the time.

22      DETECTIVE SPINKS:  Sure.

23       (Interview concluded.)

24

25

**75**

1     TAPED INTERVIEW OF MICHAEL BRIGGS

2

3

       REPORTER'S CERTIFICATE

4

   I, THERESA E. DUBOIS, RPR, CSR #29, DO HEREBY

5 CERTIFY that on December 13, 2016, the Interview of

6 MICHAEL BRIGGS was tape-recorded, that I did transcribe in

7 stenographic shorthand the tape-recording set forth

8 herein, and the foregoing pages are a true and correct

9 transcription to the best of my ability.  The tape was

10 good quality.

11   I FURTHER CERTIFY that I am neither employed by

12 nor related to nor contracted with (unless excepted by the

13 rules) any of the parties or attorneys in this matter, and

14 that I have no interest whatsoever in the final

15 disposition of this matter.

16

17

18

19

20     THERESA E. DUBOIS, RPR
       New Mexico CCR #29
       License Expires:  12/31/2019

21

22

23

24

25

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

<div align="center">

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
</div>

**PLAINTIFF'S EXHIBIT**

**19**

MICHAEL BRIGGS,

        Plaintiff,

vs.                                    Case No. 1:20-cv-00651 MLG-JMR


THE UNIVERSITY OF NEW MEXICO, a
public university, THE BOARD OF
REGENTS OF THE UNIVERSITY OF NEW
MEXICO, GARNETT STOKES, individually
and in her official capacity, PAUL B. ROTH,
individually and in his official capacity,
DOROTHY ANDERSON, individually and
in her official capacity, LAURA VELE
BUCHS, individually and in her official
capacity, and KEVIN GLICK, individually and
in his official capacity,

        Defendants.


<div align="center">

ORAL AND VIDEOTAPED DEPOSITION OF MICHAEL S. BRIGGS

Thursday, July 6, 2023
9:04 a.m.
STIFF, GARCIA AND ASSOCIATES, LLC
500 Marquette Avenue, Northwest, Suite 1400
Albuquerque, New Mexico 87102
</div>


        PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE
this deposition was:

TAKEN BY:      KATHY L. BLACK, ESQ.
               ATTORNEY FOR DEFENDANTS

REPORTED BY:   CHRISTOPHER R. SANCHEZ, CCR, CSR
               New Mexico CCR No. 217
               California CSR No. 12448
               WILLIAMS & ASSOCIATES, LLC
               317 Commercial St., NE, Suite G-101
               Albuquerque, New Mexico 87102
               (505) 843-7789
               www.williamsnm.com


<div align="center">

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789
</div>

1   lawsuit and this lawsuit, I understand that there was -- the

2   Department of Justice had serious concerns about how the

3   University of New Mexico handled allegations of sexual assault.

4           Q.   Do you have knowledge that they specifically had

5   concerns about male students and sexual misconduct against

6   female students?

7           A.   That's my understanding.

8           Q.   Have you read the -- there's two documents that

9   were related to the DOJ investigation.  One was a findings

10  document issued by the DOJ.  I think it was in -- I don't

11  exactly remember the date, but I think it was in early 2016.

12  Have you read that document?

13          A.   I read that document shortly after the OEO

14  investigation against me started, but I have not read it since.

15          Q.   Okay.  So there was the findings document and

16  then there was an agreement, I understand it, between the

17  university and the Department of Justice.  Have you read

18  that?

19          A.   I have not.

20          Q.   Did you meet Joy VanMeter at any time prior to

21  the Executive MBA program?

22          A.   Not to my knowledge.  Or I should say, not to my

23  recollection.

24          Q.   Okay.  And when did the Executive MBA program

25  begin?

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                              Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                              July 06, 2023

| | | |
|---|---|---|
| 1 | A. | I believe it was the summer of 2014. |
| 2 | Q. | What did that program entail?  I'm looking for, |
| 3 | like, how often did you meet? |
| 4 | A. | We met every Friday and Saturday for two years. |
| 5 | Q. | And the program, as I understand it, ended in the |
| 6 | summer of 2016. |
| 7 | A. | Yes.  Our last day was July 30th, 2016. |
| 8 | Q. | How were you selected for the EMBA program? |
| 9 | A. | I applied for it. |
| 10 | Q. | Was that something that was open to all employees |
| 11 | at UNM? |
| 12 | A. | It was open to anyone inside and out of the |
| 13 | university. |
| 14 | Q. | I see.  And UNM paid for it? |
| 15 | A. | I applied for a scholarship. |
| 16 | Q. | And that scholarship -- you got a scholarship? |
| 17 | A. | I did receive a scholarship. |
| 18 | Q. | From the university? |
| 19 | A. | From the university, yes. |
| 20 | Q. | Do you know if Joy VanMeter was on a |
| 21 | scholarship? |
| 22 | A. | I do not. |
| 23 | Q. | Do you know what job Joy VanMeter had with the |
| 24 | Department of Orthopedics? |
| 25 | A. | To the best of my recollection, she was a program |

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

1   forth, but never really got to know the other team members that
2   well because we were always focused either on class or working
3   with our teams.  So there really wasn't an opportunity to
4   really get to know and hang out with others within the program
5   since we were kind of busy with our work lives, our lives and
6   our schooling.
7              But in July, at the end of the program -- and
8   when I specifically say July 30th when we went out, Joy and I
9   sat next to each other at the bar and we got to talking and
10  just got to know each other a lot more and didn't realize that
11  we seemed to have some things in common.  You know, I think
12  that it was nice to get to know her better.  She sat across
13  from me for two years, but it was interesting that, you know,
14  during that afternoon I felt like I got to know her a lot more.
15             And then we just stayed in touch over a few
16  months and started communicating, started meeting routinely for
17  beers, and, you know, I felt that we started to develop a very
18  close relationship, friendship.
19        Q.   Were you interested in a romantic relationship
20  with her?
21        A.   At first I did not think that that was a
22  possibility, but as we continued to meet, I certainly felt that
23  there was a possibility for a romantic involvement.
24        Q.   And you knew she was married.
25        A.   She indicated that she was married.

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

```
 1   moved to California?

 2            A.    I did.

 3            Q.    And it was rented out?

 4            A.    No.

 5            Q.    No?  You just kept it?

 6            A.    I kept it.

 7            Q.    And you said that you rented the home in

 8   California.  It was owned by Chapman?

 9            A.    Correct.

10            Q.    Good.  I just want to make sure I understand.

11   Well, like I said, I pulled them off of Zillow, so I thought it

12   might help us talk about it.  So let's kind of focus on things

13   that happened before you and Ms. VanMeter went to the home,

14   okay?

15            A.    Okay.

16            Q.    There are a lot of documents in this case and

17   they all seem to say that you met at Matanza that afternoon.

18   Is that correct?

19            A.    That's correct.

20            Q.    And that's October 14th of 2016.  You met at

21   around 2:00?

22            A.    Around 2:00, yes.

23            Q.    And whose idea was it to have a drink that day?

24            A.    I believe we talked about it mutually previously.

25   I don't recall the specifics of who initiated the actual
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

1    meeting that day.  I don't recall.

2           Q.   But as you said earlier, it wasn't uncommon to go

3    to Matanza?

4           A.   No.  It was a routine thing.  I know that it was

5    routine.

6           Q.   Do you recall how many beers you drank that day

7    at Matanza?

8           A.   It was approximately one-and-a-half.

9           Q.   And Ms. VanMeter how many did she have?

10          A.   Approximately one-and-a-half.

11          Q.   So you left with beer in the glass?

12          A.   We did.

13          Q.   All right.  What was Joy VanMeter wearing that

14   day, do you recall?

15          A.   All I recall is that she was wearing a dress.

16          Q.   What type of dress?  Can you describe it a little

17   more?

18          A.   Probably three-quarter-length with a wrap-around.

19          Q.   So it literally was a wrap-around dress.  It

20   wraps around and ties.

21          A.   Well, I think it was a dress that had a tie to

22   it, but I don't recall the specifics of it.

23          Q.   Did it have a zipper in the back?

24          A.   I do not recall.

25          Q.   Do you recall the color?

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

```
1              A.   I believe it was blue.

2              Q.   Do you recall her wearing any jewelry?

3              A.   I don't recall.

4              Q.   Would you say that she was dressed in a sexually

5    suggestive manner that day?

6              A.   I would not know how to characterize that.  She

7    looked like she normally would look.

8              Q.   Had she come from the office?

9              A.   She had.  Well, I don't know.  I don't know where

10   she came from.

11             Q.   Did you see any bruises on her legs?

12             A.   I did not.  I was not looking for bruises on her

13   legs.

14             Q.   What were you wearing that day?

15             A.   I don't recall.  I believe it would have been

16   slacks and a dress shirt.

17             Q.   Is that what you typically wore to the office?

18             A.   Yes.

19             Q.   Even on a Friday?

20             A.   On Friday I generally wore jeans.  So if it was a

21   Friday, there was a chance that I was wearing jeans.

22             Q.   Understood.  Okay.  So my understanding of what

23   occurred that day is that there was a discussion at Matanza

24   about the fact that you had just purchased a new home.  Is that

25   right?
```

**WILLIAMS & ASSOCIATES -- COURT REPORTING SERVICE**
505-843-7789

BRIGGS vs. UNIVERSITY OF NEW MEXICO, et al.                    Michael S. Briggs
Case No. 1:20-cv-00651 MLG-JMR                                July 06, 2023

 1          A.    That's correct.

 2          Q.    Whose idea was it to go visit the home?

 3          A.    It was Joy's.

 4          Q.    And my understanding is then you left -- as you

 5    say you had a drink-and-a-half, you left some beer in the

 6    glass, and then you each drove in your own personal cars to

 7    your home.  Is that correct?

 8          A.    Correct.

 9          Q.    I live in High Desert, so I know it takes a

10    little while to get up there from down near UNM.

11          A.    Correct.

12          Q.    Okay.  Do you remember what kind of car she

13    drove?

14          A.    It was a red sedan, older model.

15          Q.    And what kind of car did you have at that time?

16          A.    A Ford Fusion.

17          Q.    Were the cars parked at UNM or were they parked

18    at the bar or --

19          A.    They were both parked at the bar.

20          Q.    Okay.  Did she follow you or did you find your

21    house some other way?

22          A.    I gave her my address and we both went our own

23    routes, I believe.  She did not follow me.

24          Q.    All right.  Let's turn to Exhibit Number 1, which

25    is the Albuquerque Police Department report on the events of



PLAINTIFF'S
EXHIBIT

**20**
_____

==TRANSCRIPTION OF AUDIO-RECORDED
TELEPHONIC INTERVIEW OF MICHAEL ELLIS==

REPORTED BY:

      ANNE DEHON, CCR #263
      Bean & Associates, Inc.
      201 Third Street NW, Suite 1610
      Albuquerque, New Mexico 87102
      (505) 843-9494

JOB NO:  621N

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



**B**EAN & **A**SSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

BRIGGS.000499

2

```
 1          MR. ELLIS:  Hello.
 2          DETECTIVE SPINKS:  Hey, is this Michael?
 3          MR. ELLIS:  This is.
 4          DETECTIVE SPINKS:  Hey, this is Detective
 5  Spinks.  How are you?
 6          MR. ELLIS:  Good.  How are you doing?
 7          DETECTIVE SPINKS:  Hey, I'm good.  Sorry,
 8  I'm running a little late.  My last interview went
 9  a little long today.
10          MR. ELLIS:  No worries.
11          DETECTIVE SPINKS:  Is now a good time?
12          MR. ELLIS:  Yeah, perfect.
13          DETECTIVE SPINKS:  Cool.  And like I said, I
14  don't think this is going to take very long.  I
15  just had a couple of questions for you.
16          MR. ELLIS:  Okay.
17          DETECTIVE SPINKS:  So, as part of my
18  investigation, I'll be looking to add to the report
19  anybody who has knowledge of, you know, what
20  happened to Joy.  And as her husband, I'm sure that
21  she talked to you about what happened that
22  afternoon --
23          MR. ELLIS:  Uh-huh.
24          DETECTIVE SPINKS:  -- early evening,
25  whatever it was.  So can you just kind of recap
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000500

3

```
 1   what she told you happened?
 2          MR. ELLIS:  Yeah.  So -- and do you want
 3   like -- when do you want the timeline to start,
 4   from the time that she got home?
 5          DETECTIVE SPINKS:  Like, well --
 6          MR. ELLIS:  That morning?
 7          DETECTIVE SPINKS:  Well, did anything --
 8   normally what I would say is just whatever it seems
 9   like was significant.  Like if you had knowledge of
10   something before she got home or if something
11   significant happened before she left the house,
12   just whatever seemed significant to you.
13          MR. ELLIS:  Okay.  You know, so, you know,
14   she and I had had fight a that day, starting about
15   midday.
16          DETECTIVE SPINKS:  Uh-huh.
17          MR. ELLIS:  And I think she probably told
18   you what that was about.
19          DETECTIVE SPINKS:  She didn't go into a lot
20   of detail about it.  Could you just maybe fill in
21   the blanks about what you guys were arguing about?
22          MR. ELLIS:  Yeah.  So, you know, I had been
23   in a play, and in the play I had to kiss a girl and
24   it irritated her.  It bothered her.  And so -- and,
25   you know, I had been doing this play for a little
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000501

4

1  while, you know, so this argument was not a new

2  argument.  But that morning she had seen -- there

3  was a promotional picture of the play in one of the

4  free newspapers out there, and it was a picture of

5  this girl kissing me on the cheek and it pissed her

6  off.

7         DETECTIVE SPINKS:  Okay.

8         MR. ELLIS:  And so she was upset about that.

9  And then, you know, kind of throughout the day

10  she -- she and I didn't have much contact, but she

11  told me -- she texted me like, I don't know, around

12  midafternoon or so saying that she was going to go

13  out to drinks with this guy Michael.

14         DETECTIVE SPINKS:  Uh-huh.

15         MR. ELLIS:  And that's not atypical.  She

16  goes out and grabs a beer or two or something after

17  work sometimes with friends, and this guy was one

18  of them.  So I said, fine, whatever.  And then I

19  said, you know, just, please, be home by 6:00

20  because I have to be at the theater at 6:30.

21         And then I didn't hear from her, didn't hear

22  from her, didn't hear from her, and then finally at

23  6:10 I texted her and I said, you know, it's 6:10

24  and you aren't home.  You know, I'm going to be --

25  I'm taking our daughter Chloe with me to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

BRIGGS.000502

5

1  theater.  You know, I'm going to have my dad come

2  pick her up and I'm going to be staying at my mom's

3  house tonight because I was pissed that she was

4  late, you know, and we had been arguing and stuff

5  all day and I figured it was better just to go stay

6  at my mom's house.

7          DETECTIVE SPINKS:  Sure.

8          MR. ELLIS:  And so, within like a minute or

9  two of me actually sending that text, the dog

10  starts barking, which is what he does when somebody

11  is in the front yard.  And I see Joy's car parked

12  not in our parking lot but just kind of adjacent to

13  our parking lot, and Joy is staggering up the

14  driveway.  And then this guy Michael is behind her,

15  kind of by the car.  And he had -- you know, it

16  looked as though he had driven her home.

17          And I thought she was just shit-faced drunk.

18  Her hair was wet.  Her clothes -- you know, she had

19  the dress on that she left, you know, in that

20  morning, and she could barely -- she could barely

21  walk up the driveway.  Michael said to me, hey,

22  she's not doing very good, and I said, thank you,

23  and then -- because I had planned to go stay at my

24  mom's house, I went in and grabbed my bags and came

25  back out.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000503

6

1          You know, and they were all in the front

2     room.  I went in to grab my bags, and by the time I

3     kind of got there she was sort of by the door.  She

4     had made it all the way up to the door.  And I

5     grabbed her keys, actually, out of her hand.  I

6     grabbed the car keys out of her hand, and she

7     started trying to tell me to leave Chloe there, and

8     she wasn't making a lot of sense.  She was like --

9     her speech was kind of slurry.  She was like, I'm

10    fine to watch her.

11         She couldn't really stand on her own.  She

12    was propped up -- she was propping herself up on

13    one of our chairs that she had there leaning

14    against, and her legs looked like they were just

15    kind of dangling behind her.  And by the time I had

16    kind of -- by the time she had walked through the

17    door and I had taken her keys from her, because I

18    didn't want her driving --

19         DETECTIVE SPINKS:  Uh-huh.

20         MR. ELLIS:  -- and all that, I came out and

21    Michael was gone.  He was nowhere to be seen.

22    Chloe was crying.  You know, I had picked her up

23    and I didn't really say -- I didn't say much to Joy

24    because I was upset, and I just kind of had, you

25    know, the baby and all of our bags in the car.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000504

7

1  came out, looked for the car.  Michael was nowhere

2  to be seen.  Put the kid in the car, slammed the

3  door, and then I left.  And as I was pulling out, I

4  saw him walking up the block on another -- on

5  Claremont, which is the street directly north of

6  us, you know, talking on his cell phone.  That's

7  the last I saw of him.

8           And like I said, I just figured -- I figured

9  Joy was really drunk because I've seen her -- you

10  know, I've seen her really, really drunk before,

11  and this was a little bit different.  And, you

12  know, she didn't -- I had never seen her quite like

13  this.

14           DETECTIVE SPINKS:  Uh-huh.

15           MR. ELLIS:  So -- so then we did not really

16  talk.  I spent the night with the baby at my mom's

17  house.  You know, we didn't really talk until

18  midday, and she was texting things and she was

19  like -- she texted me and said, I think I was

20  drugged last night.  She said, you know, I'm glad

21  you took Chloe.  I think I was drugged last night.

22           And I was like, sorry, like I didn't know,

23  you know, what to say.  And I was still kind of mad

24  and I couldn't tell if she was kind of being -- if

25  she was just like, you know, using hyperbole or



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000505

8

1  something.

2          And so finally she started texting me, like

3  I can't remember this, I can't remember that.  I'm

4  like, wait, wait, hold on.  So I actually called

5  her, and what she told me -- she started kind of

6  running through the timeline of events.  And what

7  she told me on the phone was basically that they

8  had gone to this restaurant in Nob Hill, Matanza.

9  She had two beers over the course of a few hours,

10  and then they both drove to his house in separate

11  cars.  And he had beaten her there, and he kind of

12  met her at the door with -- or he met her with a

13  beer in his hand in a glass that had orange juice

14  in it.  And -- you know, beer and orange juice.

15          And she's like, wow, that was fast.  And she

16  said that he was like giving her a tour, and they

17  were drinking a beer as he was giving her a tour of

18  their house.  And then what she told me was that

19  they were just chatting on the couch and just about

20  home buying stuff, you know, and then -- and

21  whatever else, just kind of chitchat.  And then all

22  of a sudden she got to go to the bathroom and

23  puked.  Well, she was peeing, actually, and then

24  she turned around and threw up.  And then she's

25  like, okay, that was weird.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000506

9

1      She came back out and they started
2  chitchatting again, and then -- as she described
3  it, you know, things kind of got confusing to her
4  and the room started spinning and she kept getting
5  up and having to go to the bathroom to throw up.
6      And this had happened a couple of times, and
7  then finally she said that he walked into the
8  bathroom while she was throwing up and she said,
9  you know, you need to go -- you need to go find
10  somebody to hang out with that can -- that can
11  handle their liquor better.  She said, I've never
12  gotten this sick off of three beers before.
13      DETECTIVE SPINKS:  Uh-huh.
14      MR. ELLIS:  And she doesn't quite remember
15  what he said.  He kind of laughed it off like, ha,
16  ha, no big deal, I understand.  And then she said
17  that things got very confusing.  And she had thrown
18  up on her dress, and he said, here, let me help
19  you -- let me help you with this.
20      And then he turned on the shower and took
21  her dress off.  And she never told me at what point
22  he took his clothes off, but at one point he was
23  fully naked according to her.
24      DETECTIVE SPINKS:  Uh-huh.
25      MR. ELLIS:  She said that he forced her up

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000507

10

1  against like the counter where the sink is and

2  started kissing her and putting his fingers inside

3  her.

4          DETECTIVE SPINKS:  Okay.

5          MR. ELLIS:  And what she described to me is

6  she was trying to swipe his hand away and she

7  couldn't.  She was trying to tell him to stop, but

8  she wasn't sure if it was just thoughts coming out

9  or if it was words.  And she remembers thinking

10  that this was all very strange.

11          He got her in the shower at some point.  He

12  at some point in there said, you know what will

13  make you feel better is if you brush your teeth,

14  and gave her a toothbrush and then somehow she said

15  that, you know, she told him, I have to get home to

16  my daughter, I have to get home.

17          And so he kind of -- she said that, while

18  she was in the shower, he was looking at her like

19  he was very pleased with himself.  Once she

20  finally got -- well, once she got out of the shower

21  she said that he dried off her hair in a very --

22  the only way I can describe it is sort of a

23  fetishistic, possessive way, like it wasn't how you

24  would dry somebody's hair, but there was something

25  kind of -- I don't know about a ritual about it,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



**BEAN
& ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
e-mail: info@litsupport.com

BRIGGS.000508

13

1  the driveway.

2      DETECTIVE SPINKS:  Okay.

3      MR. ELLIS:  He kept his distance.  He did

4  not -- he didn't -- he made it -- he never even

5  made it halfway up the driveway to the house when I

6  was outside, and then he just like snuck out of

7  there.

8      So that's pretty much -- so this is what she

9  told me on the phone, this business of the red

10 thing that she remembered this morning, him pushing

11 her up -- up to the porch.  She also remembered

12 that later and told me later.

13     But, anyway, when we had had -- on Saturday

14 when she kind of described events to me on the

15 phone, you know, that's basically what she said.

16 And I started to freak out and I got mad, and I was

17 like, you know, this happened because you were

18 pissed at me and you did, you know, whatever.  I

19 kind of was a dick and lost my cool a little bit.

20 And then -- and I said, you know, whatever, like we

21 need a break or something like that.

22     And I hung up and I texted her a little bit

23 later and I started to -- I forget if I texted her

24 or called her or something later in the afternoon

25 because I was just planning on keeping Chloe with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000511

14

1  <mark>me again at mom's house for the night on Saturday.</mark>
2  And I started to talk to her and she was like
3  really agitated and I started to fear for her life.
4  I was afraid that she was going to hurt herself,
5  and I was afraid that she was going to get, you
6  know, the spare set of car keys and drive somewhere
7  and I didn't know where it was going to go.
8        So, when I got home -- you know, I panicked
9  and I drove home from my mom's house and I found
10 her in the house.  I convinced her to stay.  Found
11 her in the house.  She was a wreck.  And that's
12 when I took her to the MHC.  And that was maybe
13 5:00 or so on Saturday afternoon.
14       And then I had to go again to this play at
15 6:00, and I didn't see her again until Saturday
16 night, I guess.  And in the meantime the doctor had
17 called me and kind of gave me a rundown of what all
18 was going on with her.  So that's kind of -- that's
19 kind of the events as I remember them over the
20 weekend.
21       DETECTIVE SPINKS:  Okay.  So -- and just --
22 I mean, pretty much what you're telling me is
23 matching up with everything that Joy and I talked
24 about in our interview.  Just for some
25 clarification, when you initially -- when you first

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000512

42

```
 1          MR. ELLIS:  Gotcha.  All right.
 2          DETECTIVE SPINKS:  While I got you on the
 3  phone here, let me ask you one more thing.
 4          MR. ELLIS:  Yeah.
 5          DETECTIVE SPINKS:  And, again, this is me
 6  playing devil's advocate because, if this were to
 7  go to trial, this would definitely come up.  So,
 8  with regard to you and your wife's argument and she
 9  was upset with you about kissing this other girl in
10  the play -- and that's not something she mentioned
11  to me in the interview.  I knew you guys had an
12  argument.  I don't know what it's about.  But I
13  could easily see that the defense argument is going
14  to be that she was just trying to, you know, get
15  even --
16          MR. ELLIS:  Right.
17          DETECTIVE SPINKS:  -- and maybe things went
18  further than she wanted but that she put herself in
19  that situation.  Is there anything in your wife's
20  past or anything that your wife has -- during your
21  argument, would you have any reason to believe that
22  she purposefully put herself in that position even
23  if it did go further than she wanted?
24          MR. ELLIS:  Absolutely not.
25          DETECTIVE SPINKS:  Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000540

44

1  going on between us at all.  You know, since --

2  again, and I'll just go ahead and come out and say

3  it.  One of the things that -- because you're going

4  to end up reading all of her text messages anyway,

5  and this was kind of our concern.  And I do

6  understand that this is something that the defense

7  could discover and so just to kind of preempt any

8  of that, one of the things that bothered her -- two

9  things were going on and this will be corroborated

10  by the MHC medical report.  One, she was having a

11  major depressive episode, which I don't know if she

12  disclosed that to you or not.

13          DETECTIVE SPINKS:  Something like that,

14  so --

15          MR. ELLIS:  Yeah.  And what the psychiatrist

16  at the MHC told me was that it was -- you know, it

17  was something inside her head that she was not --

18  you know, she was not -- she's not in control over

19  it.  It's brain chemicals making her -- making her

20  pissed off or whatever and making her unable to

21  deal with stress.

22          And then my kissing this girl was a

23  stressor.  Immediately prior to my doing this play,

24  there was a big kind of tumultuous event with her

25  own mother.  She was supposed to move in here with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000542

45

1  us and she didn't, so she was all screwed up.  Then

2  I take this play on.  I'm kissing this girl and her

3  brain chemicals are off so she gets really upset

4  and kind of fixates on me kind of kissing this

5  girl.

6         And she asked me in some text messages to

7  me, you know, like how would you feel -- things

8  like how would you feel if I went and kissed some

9  guy from work?  And she even said, how would you

10  feel if I went and kissed Michael?  You know, I'm

11  going and having a beer with him.  How would you

12  feel if I did that?

13         DETECTIVE SPINKS:  Sure.

14         MR. ELLIS:  And I said, don't do this,

15  you're being -- basically, you're being a shithead.

16  And she's like, no, there's no feelings there, but

17  it would be the equivalent.  You would feel the

18  same as me --

19         DETECTIVE SPINKS:  Sure.

20         MR. ELLIS:  -- if that's how -- if that's

21  what happened.  And to read those text messages you

22  might think, oh, well, here she's implicating

23  herself that she's going to go like anger fuck this

24  guy, you know, just to get back at her husband for

25  kissing this girl and all this.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

49

1 Friday he said, you look really nice today, is what

2 he told her, and she said that was the first time

3 he had ever complimented her appearance or anything

4 like that.

5       DETECTIVE SPINKS:  Uh-huh.  So, I mean, your

6 original concern was about those text messages.  I

7 mean, I will explain to both of you, and while I

8 have you on the phone I'll explain it to you now,

9 Joy has to sign a permission to search form before

10 I can take it.  Those -- I mean, those messages

11 that you were describing could be considered

12 exculpatory, so I would be obligated to provide

13 those to -- as part of my report.

14       So, in other words, the DA would know they

15 exist while they're trying to make the decision

16 whether or not to file charges against him.

17       MR. ELLIS:  Okay.

18       DETECTIVE SPINKS:  I say that only because I

19 don't want that to come out later and, you know,

20 you be under the impression that I'm just getting

21 rid of anything that doesn't directly link, you

22 know, Joy and Mr. Briggs.

23       MR. ELLIS:  Okay.

24       DETECTIVE SPINKS:  I would have to include

25 those.  But I say that with, you know, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


DEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000547

50

```
 1  disclaimer that our case certainly wouldn't be
 2  resting on that.  I feel like, even if Joy admitted
 3  that she went to his house because she was mad with
 4  you and, you know, had every intention of kissing
 5  him just to get back at you, that things
 6  obviously -- you know, and we can prove through a
 7  lot of the behavior that day that things went
 8  further than what she wanted it to and there was
 9  obviously no consent for how far it went.
10          MR. ELLIS:  Okay.
11          DETECTIVE SPINKS:  So I wouldn't -- as far
12  as, you know, the case goes, I would not spend too
13  much time worrying about things that were texted
14  back and forth between you guys, but I would be
15  obligated at the very least to provide them to the
16  DA so that they can consider that when they're
17  trying to decide if they're going to file a charge
18  against him.
19          MR. ELLIS:  Okay.
20          DETECTIVE SPINKS:  And just knowing that,
21  you guys certainly don't have to give me permission
22  to go through the phone.  I do think that the text
23  messages that I'd be most interested in are things
24  like she told me that she tried to text you and
25  sent like a garbled mess of a message to somebody
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BRIGGS.000548



*Office of Equal Opportunity*

PLAINTIFF'S
EXHIBIT

**21**

January 5, 2017

**Michael Briggs**

Sent via email to: *abqbriggs@gmail.com*

**Re:  Investigative Issues (OEO# I-2016-11-66)**

Dear Mr. Briggs:

On December 14, 2016, you were notified a complaint had been filed against you and the Office of Equal Opportunity (herein OEO) had accepted jurisdiction of the concerns raised.  This correspondence is to provide notice of the allegation raised against you.

DISCRIMINATION BASED ON: Sex/Gender

ALLEGATION:
   *1)  On or about October 14, 2016, you subjected Joy Van Meter, UNM Staff, to unwanted sexual contact.*

APPLICABLE UNIVERSITY POLICY:
   • University Policy #2740 Sexual Violence and Sexual Misconduct

This policy can be found on the UNM Policy Office website at http://policy.unm.edu/university-policies/index.html.

We welcome the opportunity to speak with you in person, and as a reminder, you are welcome to bring any support person you would like with you.  Please let us know if you have any questions, additional information, or if you want to discuss any of this.  You can reach me at 505-277-5251 or laurabuchs@unm.edu.

Sincerely,

Laura Vele Buchs
EEO Compliance Specialist

*cc:  file*

PLAINTIFF'S
EXHIBIT

**22**

 **UNM**

OFFICE *of* EQUAL OPPORTUNITY

Received

FEB 2 8 2017

Office of Equal Opportunity

February 17, 2017 (Edited February 24, 2017)

Michael Briggs

Sent via email to: *MBriggs@salud.unm.edu*

**Re:  Investigative Issues (OEO# I-2016-11-66)**

Dear Mr. Briggs:

This correspondence is to confirm and ensure we understand your verbal responses to the allegations of sexual assault.

When you spoke with Laura Vele Buchs (Vele Buchs), EEO Compliance Specialist, Office of Equal Opportunity (OEO), on January 26, 2017, she reviewed this Office's investigative procedure, your rights and responsibilities, confidentiality, and the University's anti-retaliation policy.  You brought your legal counsel with you and chose not to respond to the allegations at that time.  You, and your attorney, met again with Vele Buchs, on February 3, 2017, at which time you made a verbal statement in response to the allegations.

This Office will record your version of the events regarding the allegations raised as outlined below.  <u>If we have missed something, or incorrectly recorded any aspect of your report, please let us know immediately.</u>

Please return this letter confirming you agree the OEO has recorded your version of the events regarding the allegations raised against you as outlined below.  **Please return this letter with your signature no later than five (5) working days of the date of this letter. This office will move forward with an investigation of the allegations without your signed response should you not respond.**  If you need an extension for good cause, please let me know.

Please let us know if you have any questions, additional information, or if you want to discuss any of this. You can reach me at 505-277-5251 or laurabuchs@unm.edu.

Sincerely,

*Laura H. Buchs*

Laura Vele Buchs
EEO Compliance Specialist

cc: *file*

OEO# I-2016-11-66
February 17, 2017

Michael Briggs (herein Respondent), Executive Research Operations Officer, Office of Research, Health Science Center (HSC), described events regarding the allegations of subjecting Joy Van Meter (Complainant), Program Specialist, Department of Orthopedics, to unwanted conduct of a sexual nature as outlined below.

- Respondent and Complainant have known each other for a little over two years. They met as students in the UNM Executive MBA Program from which they graduated in July 2016.
- Respondent does not oversee any work Complainant does and has no direct involvement in Complainant's work or role on campus. Anything related to research that would affect Complainant goes through a committee with whom Respondent has no influence.
- Near the end of July 2016, before they graduated, Respondent and Complainant met on HSC Plaza and stopped to talk. Complainant mentioned she was doing a construction project for her department and Respondent said he could put her in touch with people who could be helpful because he has worked with them in the past. Respondent has no authority over Complainant's construction project and his assistance was not part of his official job responsibilities.
- Respondent reported he and Complainant were "just general classmates." The last day of class, July 30, 2016, everyone from the program went out together. As they were leaving Complainant and her husband gave Respondent a ride to his car.
- Respondent and Complainant formed a "closer friendship" with time. They met in early August on a Friday afternoon for beers and then continued to meet another 4-5 times on Friday afternoons at Matanza New Mexico Local Craft Beer Kitchen for beers. Most of the time Complainant initiated the contact that led to them meeting. They spent 2-3 hours together each time they met at Matanza and both consumed the Marble Red. Most of the time they only had two beers each; on one occasion they stayed longer and had three beers each.
- During these social meetings at Matanza, Respondent and Complainant started confiding in each other and shared intimate details of their lives. Respondent had gotten divorced during the program and Complainant shared she and her husband almost got divorced several times while they were in the MBA program.
- On October 14, 2016, Complainant and Respondent met at Matanza at 2:00 pm. Complainant talked more about her marital troubles. She was struggling with jealousy because her husband was an actor and see would continually see him kissing actresses in plays. Complainant asked when she got to see Respondent's new house, and Respondent said, "Anytime," and reported he was "surprised by the request." At this point in their conversation, their second beers had arrived, they each consumed "about half the second beers within 3-5 minutes of receiving them," and Complainant said, "Let's go now." They left Matanza at 2:50 pm without finishing their second beers.
- Respondent reported it was about a 20 minute drive to his house from Matanza and he arrived first, at approximately 3:15 pm. Upon arrival, Respondent "cleaned up a little bit." When Complainant arrived, 2-3 minutes later, he gave her a tour of the house and then asked if Complainant wanted a beer, to which Complainant replied, "Yes." Respondent poured two Blue Moon beers and added orange juice. At approximately 3:30pm, Respondent and Complainant

OEO# I-2016-11-66
February 17, 2017

took their beers and went to sit on the couch in the living room, where they remained for
approximately one hour, talking and finishing their beers.

- Respondent asked if Complainant wanted another beer, to which she replied, "Yes," and then
asked Respondent where the bathroom was located. Respondent pointed Complainant toward
the bathroom and then went into the kitchen and poured two more beers. Complainant was in the
bathroom for "a while, about 2-4 minutes," during which time Respondent checked his phone
messages. Complainant came into the kitchen and told Respondent she had vomited in the
bathroom. Respondent gave Complainant water and drank one of the beers he had poured.
Respondent reported Complainant did not want any food.

- Respondent and Complainant went back to sit on the couch and were talking. Complainant
complained about the "taste of vomit in her mouth" and Respondent offered for her to brush her
teeth. Respondent went to the master bedroom to get a toothbrush and brought it out to
Complainant. Complainant went into the guest bathroom, located right next to the living room
and kitchen area, to brush her teeth while Respondent waited on the couch.

- Complainant came out and talked with Respondent again. Complainant appeared self-conscious
about having vomited at Respondent's house. Respondent reassured her that it "wasn't a big
deal." Complaint and Respondent continued to talk for close to another hour while he finished
his beer; from approximately 4:45 pm – 5:45 pm. Complainant was drinking water.
Complainant remained "uncomfortable," and complained about the "smell." She had gotten
some vomit on herself. Respondent offered to Complainant that she could take a shower, which
she accepted.

- Respondent took Complainant into the master bedroom because the guest bathroom she had used
to brush her teeth did not have a shower. As they walked into the bathroom, Complainant started
to untie her dress. At that point, Respondent asked, "Can I join you?" Complainant got a "wry
smile" on her face and said "Yes." Respondent went to turn on the shower because it takes a
couple minutes to get hot. Complainant had undressed herself and stepped into the shower.
Respondent went to his closet next to the shower and took off his shoes and clothes. When he
returned, Complainant was washing her hair and he stepped into the shower.

- Respondent kissed Complainant and she "responded"; they "made out." Respondent kissed
Complainant "all over" her body – "lips, neck, breasts, belly and her vagina". Respondent
"touched [Complainant's] body in terms of affectionately hugging her, moving [his] hands up
and down her thigh and breasts." After Respondent had been in the shower with Complainant
for a "few minutes," she said, "I gotta go." Respondent was surprised and said, "What?"
Complainant told him, "I gotta go. I have to be home by 6:00 pm." Respondent reported this
was the "first he knew Complainant had to be home." Respondent said, "Okay," and turned off
the water.

- Respondent and Complainant got dressed in the bathroom; it was close to 6:00 pm. Respondent
asked Complainant if she wanted to blow dry her hair, which she declined because of the time.
Complainant told Respondent it was important for her to get home by 6:00 pm because her

OEO# I-2016-11-66
February 17, 2017

husband had to leave for his play at 6:00 pm. Respondent "assumed [Complainant] needed to get home to take care of her daughter when her husband left."

- Respondent went into the kitchen after getting dressed. Complainant came into the kitchen and asked Respondent to drive her home. Complainant indicated they (Complainant and her husband) only had one car and her husband needed it to get to work. Respondent knew Complainant's husband was not staying at home that night because Complainant had told him they had a fight and her husband was going to stay at his mother's house. Respondent offered to drive Complainant's car and take an Uber home. Respondent "assumed" Complainant wanted a ride home because she had been drinking and was feeling rushed to get the car home by 6:00 pm.

- Complainant "navigated" Respondent to her house. When they got close to Complainant's house, Respondent asked if she wanted him to "park here and disappear." Complainant said, "No, it doesn't matter," and told him to drive to her house.

- When they arrived at her house, around 6:15 pm, Complainant told Respondent to park on the street and then she "bee-lined to the house"; Complainant immediately got out of the car, headed across the yard towards the front door of the house with her head down, and did not acknowledge her husband or Respondent. Respondent walked up the sidewalk and gave Complainant's husband her keys. Complainant's husband was holding his daughter. Respondent told Complainant's husband, "She's not feeling well and I wanted to make sure she got home okay." Respondent immediately left, walked a couple blocks, and then logged in to get an Uber at 6:20 pm.

- Respondent reported Complainant had wet hair and was holding her panty hose and shoes in her hand. Respondent felt terrible about the situation because there was no way to not see it "for what it was[1]." Respondent stated, "It was awful for her and him and everyone."

- Later that night (October 14, 2016) Respondent sent Complainant a text. He thought "everything was fine." He also sent her a text in the morning the day following (October 15, 2016). Complainant asked about how her husband was when Respondent dropped her off at home. Respondent said, "It wasn't good." Respondent told Complainant to explain to her husband she was not feeling well and she cleaned up before coming home (to explain the wet hair, panty hose and shoes).

- Respondent had "no idea what was going on, but thought [Complainant] and her husband were working it out." A week later, Respondent heard from Albuquerque Police Department (APD) a police report of criminal allegations had been filed. Respondent was "shocked."

- Respondent hired an attorney, who negotiated with Complainant's attorney a restraining order with no findings or admittance of wrong doing. No hearing was held.

- Respondent denies drugging Complainant.

- Respondent has been cooperative with law enforcement. Respondent believes Complainant reported to law enforcement Respondent had to carry her into the house, but Complainant's

---

[1] Respondent described "for what it was" as having engaged in sexual activity.

OEO# I-2016-11-66
February 17, 2017

husband reported to law enforcement Complainant walked into the house on her own and
Respondent gave him her keys.[2]

- Respondent provided screenshots of text communications between him and Complainant from
July 30, 2017 to October 19, 2017.


**I, Michael Briggs (Respondent), hereby certify I have read the above information and confirm I agree my responses to the allegations the Office of Equal Opportunity is investigating are as specified above.**


_____                    Date  _2/27/17_
Respondent Signature


_____

[2] Respondent did not have a copy of Complainant's and/or her husband's statement to APD. Respondent's attorney indicated Respondent learned this information through her law partner, who was told of the "discrepancy between the statements" by an APD detective.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

PLAINTIFF'S
EXHIBIT

**23**

**JOY VAN METER (aka VANMETER)**

    Plaintiff/Counter-Defendant

v.                                                      No. 1:-CV-00970

**MICHAEL BRIGGS,**

    Defendant/Counter-Plaintiff

## <u>PRELIMINARY REPORT OF EXPERT WITNESS DAMON FAY</u>

I am a retired Sergeant of the Albuquerque Police Department. My final tour of duty was as a Sergeant of Advanced Training at the APD Academy. To that, I was responsible for the advanced training staff that oversaw, monitored and conducted In-Service and specialized training for police personnel. The Albuquerque Police Department Police Academy is one of seven academies throughout the state that provides training for other agencies and regional departments. Additionally, I reviewed and constructed training course curriculum and career development programs.

My staff and I were charged with the police department's commitment to a continuous process of training for APD and New Mexico State Law Enforcement Standards. While at the Academy, I was a citywide supervisor (one of three) for Police Officer Involved Shooting and In-Custody Death Investigation teams. Prior to that, I was a Field Sergeant with a field force that took calls for service and responded to emergencies. I was the Area Command back-up Violent Crimes supervisor. I was Crisis Intervention trained and I was the Area Command Crisis Intervention Training Coordinator. I have conducted administrative/personnel investigations in the police arena.

Prior to this I was a Homicide/Violent Crimes Detective for 14 years. It was in the Homicide Unit that I investigated the homicides of adults and children, deaths of a suspicious nature, un-reconciled deaths, civilian use of self-defense and deadly force and police officer use of lethal and less-lethal force as well as in-custody death and injury. I have testified in Metropolitan, State and Federal courts as an expert in areas of homicide investigations, pattern injury identification, Officer-Involved Shooting investigations, In-Custody deaths and police Use-of-Force.

Page 2/Fay Report

I am a professional law enforcement instructor and consultant, specializing in basic and advanced knowledge, skills and abilities of the law enforcement officer. I have instructed throughout New Mexico and nationwide for more than 20 years. I am a staff instructor for Police Training Services, Inc. This company delivers high quality training for the law enforcement officer and their agencies. My curriculum vitae is enclosed with this report.

I am familiar with aspects of police work. I have successfully worked for, and retired honorably from, the Albuquerque Police Department after more than 24 years of service. I've spent an additional 13 years as an APD Reserve Officer. I keep current in national trends, standards and issues relevant to the law enforcement arena. As an active Reserve Officer with the Albuquerque Police Department, I am current in all areas of qualification and certifications necessary to maintain the Certification and Commission with the New Mexico Law Enforcement Academy and the Albuquerque Police Department. I am a currently licensed NM State Firearms Instructor qualified to teach civilians courses for their state Concealed Carry License. I have taught more than 525 civilians and honorably separated law enforcement officers to this end. I have co-authored a book titled, Contact Weapons: Lethality and Defense (2004) that explores injury that causes death and self-defense counter-measures to avoid fatal injury. I am a law enforcement qualified instructor for Ground Control and Intermediate Use of Force. I teach civilians self-defense skills as well.

Most recently, in 2019, I conducted an evaluation and training block to the Albuquerque Police Department Violent Crimes section, all investigative teams and their related supervisors and commanders at the contract request of the Mayor of Albuquerque and the Chief of Police. The evaluation and training were toward the investigations, analysis and conclusions of violent crime cases and their necessarily related quality in presentation for prosecution.

My opinions are based upon my knowledge, training, research and experience with the standards of training and skills from nationally accredited procedures and policies.

---

I have been requested to review certain materials and express opinions concerning the investigation of an encounter that had both disputed and undisputed facts and circumstances. The culmination was of certain findings in the administrative venue of the University of New Mexico. The primary actors were employees; Joy Vanmeter and Michael Briggs.

I reviewed numerous materials that included:

Complaint and Answer and Counterclaim submitted in both New Mexico State Court and United States District Court

Interviews of Vanmeter, Briggs, Ellis et al

APD Police Report of October 18, 2016 and subsequent supplements

Audio recordings of primary witnesses

Page 3/Fay Report

SANE Report

Depositions of Vanmeter, Ellis, Gonzales, Dillenback

USDOJ Letter to President Robert G. Frank-April 22, 2016 Re: Title IX and Title IV
Investigation of University of New Mexico

Field Notes of OEO Investigator Vele Buchs

Preliminary Letter of Determination (hereafter PLOD) from Vele Buchs and Cowan

Letter of Garnett S.Stokes in the Reversal of Conclusion (OEO)

Necessarily related letters from Healthcare Providers

## <u>ANALYSIS OF EXPERT WITNESS</u>

From the events focused upon, stemming from the afternoon and into the evening of October 14,
2016, Joy Vanmeter presented to SANE nurse(s), Rape Crisis Center and the Albuquerque Police
Department to report a sexual assault. The named suspect was Michael Briggs. The necessary
medical examination in these matters took place and related samples were taken. Injury or areas
unremarkable were noted and all of the cogent information was noted in the medical report.
Similarly, the on-call detective for Sex Crimes, Daniel Spinks was dispatched and began a
preliminary investigation of Criminal Sexual Penetration, NMSA 30-9-11.

Joy Vanmeter was at the APD and Community Family Advocacy Center on October 18, 2016.
She had already been examined via SANE. She was interviewed by Detective Spinks that day.
She would later file a complaint by way of the UNM Office of Equal Opportunity (OEO) and be
interviewed by Investigator Laura Vele Buchs on October 27, 2016. Vele Buchs notified Michael
Briggs on December 14, 2016 of the complaint. He would present for interview, accompanied by
legal counsel on January 26, 2017. Investigations from the criminal aspect and the UNM
administrative action would be taking place variously throughout the time. However, the
criminal suspect interview of Briggs took place on November 17, 2016, about 30 days after the
initial report.

After the SANE nurse report, relevant toxicology and DNA swabbing review, along with
multiple interviews and digital cellphone text examination, Detective Spinks would submit his
report, with no arrest made, to the Office of the District Attorney, 2nd Judicial District for review
and screening. He would later be supplied a letter of declination from ADA David Waymire. The
DA's Office declined prosecution due to insufficient evidence.

Page 4/Fay Report

By the termination of the OEO investigation, the same amount of evidence would have been available. That is, multiple witness interviews recorded, toxicology results, DNA forensic evidence determination, records from medical and health providers and most importantly, both inculpatory and exculpatory evidence.

There were no barriers to collect evidence with a compliant witness(es) and suspect.

However, at the OEO level, their power is inadequate with the inability to compel testimony, seize records or compel them being brought forth. This case did not employ UNM Police Department in a parallel investigation.

Police are taught that there are three types of evidence; Physical, Circumstantial and Testimonial. The inclusion of all three provides the best opportunity for the triers of fact, a judge and jury or administrators, to reach intelligent conclusions as to guilt or innocence. The same evidence is sought in administrative investigations. There is no constructive difference. Direct, Circumstantial and Statistical evidence is sought by the EEOC investigator. In both venues, circumstantial evidence can arrive at different conclusions by different viewpoints.

Police are taught that the underpinning of all encounters leading to a criminal case is the ethic: First make the case, *then* make the arrest—In that order. Always.

 In all matters of administrative actions this applies. The term arrest is used euphemistically. Arrest signifies a type of enforcement action that presents the 'suspect' to a final determination. There are administrative 'arrests' that take the form of relief from duty or leaves of absence, leave with or without pay or outright termination, etc. Be it criminal or administrative, the stakes of a significant change in someone's life are viewed as high.

The investigation of this case by way of the OEO was largely one of character. And history.

There was a lack of DNA or its attendant Touch-Transfer DNA that would have provided physical evidence of contact. The additional investigation absolutely required in the DNA match event was *how* the DNA got there. In this case, the allegation was one of consensual or non-consensual.

There was the revelation by way of test result that there were drugs found from the urine sample at the time of the SANE examination. They were prescription drugs all indicated that Joy Vanmeter takes. They were Diazepem, Nitrazepem, Temazepem, Oxazepem, Sertraline (Zoloft) and Noradrenaline. Strangely, this issue, along with the consumption of about four beers was not part of any case analysis.

Determined as well was PTSD-Post-Traumatic Stress Disorder. This issue, important and life-threatening in possibility, was never incorporated in the OEO investigation. It is never drawn out as to whether this event was the causation or there could have been the emergence of PTSD from several traumatic events that Vanmeter would later reveal; domestic violence in her home as a

Page 5/Fay Report

young girl, the sexual assault of her mother or her own previous case of sexual battery. There were no interviews of the health care providers.

Police are taught to think defense when conducting investigations. What might be revealed as a defense for the accused? If police can isolate one causation from another and assess true culpability, the complaining witness/survivor/victim would have additional evidence that would bolster their testimony. This is training for investigators that they must always seek and conduct an evidence driven investigation. The strength of a police case, any case, will always be revealed in the cross-examination.

The UNM OEO investigation lacked the necessary and vital recording of interviews. Without recording, there lacks the framing of the question and its intonation and the response with its intonation, nouns and verbs used. Its not always what someone says but how they say it. Without the questions recorded and delivered as a trained technique, there can be the emergence of the confabulation. This is a memory error whereby gaps and loss of memory are filled in and not always with the bad intent of the interviewee. It is the solidifying of the story where it may not exist prior. Vela Buchs provided only notes as answers and nothing more than paraphrasing. This is catastrophic to a case. Once the witnesses discern what that should be saying or the account they should be sticking to, the case is forever contaminated.

In the matter of a character witness named Catherine Pennick, there arose a grievous concern that she was told by Vela Buchs that Briggs 'admitted to wrong-doing.' Pennick says yes and Vela Buchs spoke of it as a technique to unbalance the witness that comes forward with a preformed story. It would be contamination nonetheless. Recording would have removed confusion.

Contamination of the primary witness with her husband present was a huge error. Vela Buchs had both present for the account of one. This contours testimony. And that is contamination for both. With Michael Ellis, Vanmeter's husband, present for the interview, his matching of cogent facts was inevitable. And it need not be dark hearted. A witness with the best of intentions doesn't have an answer for everything. If blanks are filled in, a memory error takes place and the confabulation is born. It is however, a blockade to the truth.

Police are taught that there are separate levels of proof as the facts and information of a case evolve. There is in ascending order: Suspicion, Reasonable belief, Probable Cause, Preponderance of Evidence and beyond a Reasonable Doubt

If a witness is told that they are already believed and that the investigators have enough, there is a reliance to stick with the story and everything will be alright. This is witness contamination as well. This establishes that the proof problem that investigators seek is already formed. It rarely is.

With two people, outside of a public eye, no uninvolved third party or surveillance cameras, there are limited means of gathering the unbiased account. Simply put, these cases are fraught

Page 6/Fay Report

with vagueness. Evidence ferrets that out. If it's gathered correctly and without contamination it bears the truth. One never fits their 'truth' to the evidence, the evidence fits the truth.

What follows are examples of flawed OEO analyses. They are only in part. Due to the preliminariness of this report, it is not a line-by-line treatise.

Re: OEO Report Analysis VI

Page 17 of 28 Paragraph 1: This outlays methodology assessing totality of the record. The record is not Vela Buchs recording at all. We are left with her notes as to response from the interviewee and not the question as posed. Her record is her paraphrasing. She cites the audio recording of police-conducted interviews of Vanmeter, her husband Ellis and Briggs. Her writing reflects the use of her notes.

Vela Buchs notes preponderance of evidence as the standard in her investigation. Preponderance is generally used as a civil standard as police have been taught. Police use probable cause to make an arrest since they are taught that is the criminal standard. Beyond a reasonable doubt is the standard for conviction. The problem of proof for Vela Buchs lies in the preponderance of evidence where circumstantial evidence is predominant. Circumstantial allows different conclusions to be drawn.

According to Dictionary.Law.com: The greater weight of the **evidence** required in a civil (non-criminal) lawsuit for the trier of fact (jury or judge without a jury) to decide in favor of one side or the other. This **preponderance** is based on the more convincing **evidence** and its probable truth or accuracy, and not on the amount of **evidence**.

Paragraph 3, Page 18: Vela Buchs weighing of Vanmeter's history of conversations with men regarding sex and juxtaposing it with flirtation possibility with Briggs. There is no known standard to weigh past imprecise situational talk and define it as un-flirtatious with a present-day flirt accusation and compare the episodes.

We are left with Vela Buchs trying to get into the subject's heads. She seems to weigh what she has concluded as the best evidence to confirm or deny belief.

Page 19, Paragraph 1: Vela Buchs weighs conversation between Vanmeter and the police in one case and her husband in another with what Vela Buchs finds as unreasonable belief by Briggs in yet another. She couches all of this into the sub-text of whether Vanmeter conveyed wanting sex. Strikingly, she had footnoted that Vanmeter, if she wanted to, had ample time prior to October 14, 2016 to do so. This analysis does not exemplify preponderance of evidence

Page 20, Paragraph continued from Page 19: "Complainant does not remember responding and believes she was unable to speak when Respondent asked her a question." Vela Buchs, for instance in this case, is completely inattentive to the effects of alcohol combined with Zoloft that

Page 7/Fay Report

may have been in her system. To this, the police did not effectively probe out the effects of alcohol, Zoloft alone, and alcohol and Zoloft together in normal or excessive dosing. No baseline was established. We are left with Vela Buchs believing Vanmeter since she can't remember responding and disbelieving Briggs who gave his memory along with her facial expression. One may not weigh any more than the other in reality but Vela Buchs makes the determination that without affirmative question and answers to each and every movement, Briggs is not credible.

By way of evidence in its physical aspects, nothing of substance was dealt with in the OEO report. Supporting physical evidence tells the story where a human may falter. The issue of behaviors is so heavily delved into by Vela Buchs as to reasonable, believable, not credible, etc., yet nothing about underlying drugs and alcohol which have direct application to the functioning of the brain.

Regarding Zoloft (Sertraline) alone with alcohol, and not factoring in the Valium family, there are known and recognized effects.

One such citation is listed.

> Medical News Today, <u>Zara Risoldi Cochrane, PharmD, MS, FASCP</u> , July 2, 2019 excerpted:
>
> Zoloft and alcohol both affect the way the brain functions.
>
> Alcohol is a depressant, meaning it reduces the activity of certain chemical messengers in the brain, known as neurotransmitters. Zoloft is a selective <u>serotonin</u> reuptake inhibitor (SSRI), meaning that it works by changing the brain's levels of a neurotransmitter called serotonin.
>
> Alcohol reduces neurotransmitter activity and lowers the amount of mental and physical arousal or stimulation. This can lead to the following effects:
>
> - a lack of muscle coordination, known as ataxia
> - decreased anxiety
> - lowered inhibitions
> - sleepiness or increased drowsiness
> - impaired memory
> - trouble thinking clearly
> - lowered perception of pain
> - euphoria
> - low blood pressure
> - reduced heart rate
> - death in cases of drinking too much alcohol

Page 8/Fay Report

> Zoloft also affects brain chemicals. While alcohol has effects on many neurotransmitters, Zoloft specifically affects the balance of serotonin in the brain. Serotonin is involved in regulating mood, behavior, and motivation.

Vela Buchs noted a number of these physical and cognitive effects self-ascribed by Vanmeter. Yet none of it is dealt with in the analysis. To the contrary, Vela Buchs gives credibility where none can be proven but only relied upon because it seems unreasonable to her.

Page 21 of 28, Paragraph 1" Vela Buchs draws attention to the evidence shows "no verbal or non-verbal cues…" She looks for this yet discounts Briggs description of Vanmeter's non-verbal cues as having any type of sufficiency. Vela Buchs relies upon "the absence of indicators."

In Paragraph 2: Comparison's from Vanmeter's history is constantly drawn upon by Vele Buchs as evidence of truth. She has compared past sex talk, feelings of attraction, alcohol consumption (only, not prescription drug use) and responsibility as a mother is brought up as parameters for the future truth in a matter such as this. When presented with the character referencing by co-workers, an ex-wife, etc., of Briggs, Vela Buchs brings none of that to bear in her analysis and conclusions as to his behaviors in this instance. If they are true viewpoints from the witnesses interviewed, then this situation is never dealt with in the analysis of Vela Buchs as being anomalous or statistically an outlier.

US-EEOC Investigator Policy, inspiring UNM-OEO investigators, look for direct, circumstantial and statistical evidence. The latter is probative toward pattern and practice. Vanmeter's pattern and practice are constantly weighed but not so with Briggs.

In the Credibility section (beginning Page 23 of 28) Vela Buchs cites differences in the number of times one would initiate contact over the other. She cites texts that she viewed all the while knowing Vanmeter had deleted entire bodies of texts from her phone. Vela Buchs was provided only what would later deal with those just before the incident. There is not enough sample to draw the conclusion that she did; that Briggs is not credible.

Upon the revelation that there was a witness available that could provide direct information as to Vanmeter's behavior, Zach Dillenback, there was no attendant interview conducted by Vela Buchs. It would be exculpatory.

Detective Daniel Spinks, alone or perhaps along with his Sergeant, made the decision to not arrest in this matter. That was a trained response where there is enough concern about what 'really' happened. Police make decisions about arrest based upon probable cause which is a 51% to 49% proposition. Simply put police are taught that PC is based upon this is probably a crime and this guy probably did it. Prosecutors have an added canon of not indicting or trying someone that they feel they do not have a belief in finding guilty beyond a reasonable doubt." This was a trained response to this case.

Page 9/Fay Report

Laura Vela Buchs, investigating toward preponderance of evidence uses a civil standard that is similar to police's use of probable cause. Her investigation does not support it. This investigation has so many departures from the techniques that are trained to criminal and civil investigators it does not show the revelation of a standard that could be used to effectively change a person's life. Something happened that night. After Vela Buchs' and the police investigation, we don't know that it rises to the level of an actionable crime.

The investigation amounts to confirmation bias. Investigators, if they have received competent training, are instructed against this and taught measures to avoid and eliminate confirmation bias.

Confirmation Bias is a mindset: Confirmation Bias is the tendency to perceive and accept information that seems to confirm our existing beliefs, while ignoring, forgetting, or explaining away information that contradicts our existing beliefs. It is a systematic bias that works relentlessly and often subtly to push us in the direction of a desired or preexisting conclusion or bias. Worse-it gives us a false sense of confidence in that conclusion. We think we are following the evidence, when in fact we are leading the evidence. (Steven Novella, MD. Academic Clinical Neurologist)

The Office of Equal Opportunity at the University of New Mexico, in the matter of Vanmeter and Briggs does not employ sound techniques as I have learned them, employed them and taught them throughout the United States to criminal, private and administrative investigators. The techniques have the capability of doing more harm than good in that they confuse, contaminate and confound the search for the truth. There are not enough indicators of reliability in the information gathered and produced into a Preliminary Letter of Determination and its subsequent Final Letter of Determination. The investigation was substandard. The lack of training, or more to the point, the lack of the application of training in the investigative arena contributed to the insufficiency of the investigative truth-seeking. The methods used were unsatisfactory.

I reserve the right to change or modify my opinions with the advent of new or previously unseen information or evidence.

Damon Fay                                                                                          01 October, 2019



PLAINTIFF'S
EXHIBIT
**24**



**Law Office of Ryan J Villa**

505.639.5709

505.433.5812 fax

ryan@rjvlawfirm.com

2501 Rio Grande Blvd NW Suite A

Albuquerque, NM 87104

January 2, 2018

**Via U.S. Mail and Email** (unmpres@unm.edu)

Chaouki T. Abdallah
MSC05 3300, Scholes Hall Suite 144
1 University of New Mexico
Albuquerque, NM 87131

> **Re:** *In the Matter of Joy VanMeter*, OEO# I-2016-11-66- Appeal of final
> determination

Dear Mr. Abdallah:

I have been retained by the Complainant in this matter, Ms. VanMeter. I am submitting this appeal on her behalf pursuant to Section IX of UNM's Office of Equal Opportunity Discrimination Claims Procedure. On December 12, 2017, OEO issued its Final Letter of Determination (FLOD) concluding as it did in its December 4, 2017 Preliminary Letter of Determination (PLOD) that although Respondent's conduct in subjecting Ms. VanMeter to unwanted and unwelcome sexual conduct constitutes sexual harassment as defined by UNM policy, the evidence did not demonstrate that Respondent objectively created a hostile work environment for Ms. VanMeter, and therefore there was no violation of policy.

On behalf of Ms. VanMeter, I submit that you should overturn this decision because this determination is not supported by the evidence. To the contrary, the evidence shows Respondent's conduct did objectively create a hostile work environment.

Ms. Vele Buchs, the OEO investigator who prepared the FLOD and PLOD, addresses 5 key points in the PLOD (pg. 17) that are required to find the respondent violated policy.

1) The conduct was reasonably perceived to be sexual in nature (confirmed pg 18);
2) The conduct was subjectively and objectively unwelcome (confirmed pg 20);
3) The conduct was known by a reasonable person to be unwelcome (confirmed pg 21);
4) The conduct was severe and/or pervasive (confirmed pg 27); and
5) The conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment.

Ms. Vele Buchs states in the conclusion of the PLOD (pg 27) that the first 4 of the 5 above criteria are met. However, the PLOD concluded the offensive work place was subjective, not objective. This conclusion is belied by the facts found and identified by OEO and therefore not

1

supported by the evidence. Pursuant to the appeal procedure, you can overturn a finding of the OEO if it is not supported by the evidence.

First, as acknowledged in the PLOD, a single incident of sexual assault can sufficiently alter the conditions of an individual's employment when the sexual conduct is such that it creates a hostile environment. PLOD at pg. 26. Here the Respondent holds a high-level position in the Office of Research within HSC and has worked at UNM for over a decade. PLOD at pg. 26. The OEO found that even though Respondent had no direct authority at the department level, his position at UNM affords him the opportunity to be influential at that level should he so choose. PLOD at 26. Here, Ms. VanMeter reported to the OEO that she was concerned about the influence Respondent had over others she worked with and the way in which she might be treated if the allegations came to light, given their relationships with Respondent and others. PLOD at pg. 26. The OEO found this concern reasonable and determined that someone similarly situated would feel the same. PLOD at 26. The OEO also found a similarly situated person to Ms. VanMeter would fear retaliation from employees who admired Respondent, particularly given his longevity and level of authority at UNM. PLOD at 26.

OEO also determined that Ms. VanMeter's mental health records demonstrate that after the incident she experienced "persistent anxiety, fear, anger, rage, and despair," and "her hypervigilance and hyperarousal, particularly at work, disrupt her feelings of safety and her ability to meet fundamental tasks." PLOD at 26. Ms. VanMeter's husband also reported having to drive her to work on most days, and reported that on occasions she experienced panic attacks in the car as they get closer to campus rendering her unable to work. PLOD at 26. Ms. VanMeter had an M lot parking permit which meant if she parked in the closest lot to her work place, she would have to walk by his office building at least twice a day.

The evidence found by OEO demonstrated that Ms. VanMeter missed a significant amount of work due to the incident, including to attend counseling. PLOD at 26. Ultimately, Ms. VanMeter applied for and was granted catastrophic leave, which was necessary as her counseling records demonstrate her symptoms were exacerbated while at work. PLOD at 26. Ms. VanMeter ultimately resigned. PLOD at 26. Thus, it is clear, contrary to the OEO's determination that the sexual assault altered the conditions of Ms. VanMeter's work environment such that it created a hostile work environment.

Although not included in the PLOD or FLOD, in a face-to face meeting between Ms. VanMeter and Ms. Vele Buchs, Ms. VanMeter shared that her decision to leave UNM on April 12 was due to the fact Dr. Deana Mercer, faculty head of research in the Orthopaedic department, brought up performance concerns since the October incident. Those concerns included but are not limited to: not monitoring the renovation project in person (lab is located in Fitz hall), maintaining detailed budget records, processing of necessary paperwork through SPO and HRRC, and arrival and departure times at work.

Ms. VanMeter explained the difficulty of working in the HSC area knowing she could run into Mr. Briggs at any time. Ms. VanMeter explained a number of specific issues stated in the PLOD (outlined on pg 26). At this time, Ms. VanMeter also asked for an accommodation to work off site to help with concentration and lower anxiety levels. It was requested by Dr. Mercer that if

2

Ms. VanMeter felt she could not complete her duties at the office, she should take leave time to handle any issues.

Accordingly, there were objective performance issues in the work place as a result of the October 14 incident. Clearly, Briggs' conduct of drugging and raping Ms. VanMeter was sufficiently physically threatening and traumatizing to create a hostile work environment. Moreover, Respondent's role at UNM clearly shows that Ms. VanMeter had a reasonable fear of his influence and of retaliation in the work place.

Sahar Freeman, a coworker of Ms. VanMeter's, who still works in a research position in the department of Orthopaedics, has since taken on many of Ms. VanMeter's previous duties including completing SPO and IRB/ HRRC work for the Orthopaedic department. When trying to resolve a research related question, she was old she would need to speak with Michael Briggs. Ms. Freeman was timely identified by Ms. VanMeter after the PLOD was issued as a person to be interviewed by OEO. She never was. She can speak to the fact that research personnel are referred to Michael Briggs even if he is not their direct supervisor.

Additionally, Ms. VanMeter felt physically threatened enough by Respondent to have a restraining order placed against him. He agreed to the restraining order as long as a clause was inserted that if he crossed paths with her at work, he would not be in violation because crossing paths is inevitable considering they work in close proximity. PLOD at 8, 9. This is objective evidence demonstrating a hostile work environment.

As discussed, "[a] single incident of sexual assault can sufficiently alter the conditions of an individual's employment when conduct is sufficiently physically threatening, humiliating, or offensive to create a hostile work environment." (PLOD pg. 26). Looking again at the facts, Ms. VanMeter had job performance issues brought to her attention by Dr. Deana Mercer. There was proximity in work environment where Ms. VanMeter's and Briggs' paths can cross causing Ms. VanMeter to change her walking route to her office and ultimately not leaving the office if possible (FLOD pg.1), Ms. VanMeter may have had to be in contact Briggs for a number of reasons as recommended by any of the research organizations (SPO, IRB/HRRC) as pointed out by Ms. Freeman's experience. After a severe sexual assault by a person of power and influence working in the same Health Sciences Center as Ms. VanMeter, to cross paths, correspond, or have to reach out to them is humiliating, offensive, and creates a hostile work environment.

For all of these reasons, I request you overturn the decision of the OEO as not supported by the evidence. The evidence clearly demonstrates an objectively hostile work environment was created for Ms. VanMeter because of Respondent's conduct. Thank you for your time and attention to this matter. Please send any correspondence regarding this matter to my attention.

Sincerely,

Ryan J. Villa

Cc: Joy VanMeter

3

PLAINTIFF'S
EXHIBIT

**25**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


JOY VAN METER

          Plaintiff/Counter-Defendant,

 -vs-                    NO:  1:18-cv-00970 RB/JHR


MICHAEL BRIGGS,

          Defendant/Counterclaimant.


            VOLUME 1

        DEPOSITION OF JOY VAN METER

                June 19, 2019
                9:09
                Suite 1500
                201  Third Street, Northwest
                Albuquerque, New Mexico

     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:


TAKEN BY:  TRAVIS JACKSON, ESQ.
           ATTORNEY FOR DEFENDANT/COUNTERCLAIMANT

REPORTED BY:  KENDRA D. TELLEZ
              CCR #205
              Kendra Tellez Court Reporting, Inc.
              302 Silver, Southeast
              Albuquerque, New Mexico  87102

44

1   have no -- I clean out my -- I clean out all of my

2   text messages and try to transfer all of my photos

3   as soon as possible.

4       Q.    So are you saying you deleted the text

5   messages between you and Zach Dillenback relating to

6   the problems you and your husband were having?

7       A.    I don't recall exactly what I texted him

8   and when, but, yes, I don't have them.  I did not

9   have them.

10       Q.    I'm asking whether you deleted them.

11       A.    Yes.

12       Q.    And I'm asking whether you deleted the

13   text messages between you and Casey Leonard related

14   to the problems that you and your husband were

15   having?

16       A.    And I don't recall if I actually sent to

17   them.  Most of the time I talk to Casey, it's via

18   phone if it's anything emotionally charged.

19   Generally, text messages with her are reserved for,

20   "Look what my neighbor planted in her yard.  It's

21   hideous."  So there is a chance that I texted her,

22   but I would have deleted them.

23       Q.    Okay.  And you're not able to produce the

24   communications you had with Nathan Horn because you

25   used Snapchat; is that correct?

48

1    A.    I don't think it was the Alibi, but it was

2  something like that, yes.

3    Q.    Okay.  And how did you come to see the

4  picture?

5    A.    There was a thing on the front of the

6  cover that said the Día de los Muertos, look up what

7  all the stuff you can do for the Día de los Muertos,

8  like the parade and everything.  It's just -- like

9  the Muertos Marigold stuff.

10          And so that's something my husband and I

11  had talked about going to several years in a row,

12  and I thought, "Well, that will be nice."  So I

13  opened it up to see what that information was, and

14  there was the picture.

15    Q.    And you opened that up on the morning of

16  October 14, 2016?

17    A.    Yes.

18    Q.    And did you have that publication at your

19  home?

20    A.    No.  It was at a work meeting.

21    Q.    Okay.  Did you and your husband have an

22  argument about the picture that day?

23    A.    Yes.

24    Q.    Did you have that argument by phone or by

25  text?  Or both?

49

1       A.      There was definitely text message.  I
2   can't recall if we had a phone conversation.
3       Q.      Do you and your husband primarily talk
4   about -- communicate by text?
5       A.      Yeah, primarily.
6       Q.      So can you please describe the text
7   argument that you had with your husband over the
8   picture?
9       A.      I think I sent him the photo and said,
10  "Look what I just came across."
11          And he said, "Oh, that's so awesome."
12          And then I got upset about how everywhere
13  I turned, there's pictures of him and her, and I
14  can't seem to get away from them.  And he got
15  defensive, and it escalated quickly.
16          And then -- and then we took -- we took
17  periodic breaks in the argument, but it went on.
18  And I can't -- I mean, I don't think there was
19  really much solid content other than the same things
20  that were given to you before.
21      Q.      Okay.  And I just want to make sure, so I
22  want to break it down a little bit, if that's okay.
23      A.      Okay.
24      Q.      When you say he got defensive, what kinds
25  of things did he say?

53

```
 1      Q.    Did you specifically refer to Mr. Briggs

 2  in terms of saying something like, "How would you

 3  feel if I kissed Michael Briggs?"

 4      A.    No.

 5      Q.    You never said -- you never asked him how

 6  he would feel if you -- if you kissed Michael

 7  Briggs?

 8      A.    No.  I do know he took it that way,

 9  though.

10      Q.    And do you have any of these text messages

11  between you and your husband?

12      A.    No.

13      Q.    Did you delete all of these text messages

14  between you and your husband?

15      A.    Yes.

16      Q.    When did you delete them?

17      A.    I think it was in November.  It was after

18  Detective Spinks had my phone.

19      Q.    How did you delete the text messages

20  between you and your husband arguing -- let me

21  retrack that.

22            So all of the text messages between you

23  and your husband on October 14, 2016, were deleted;

24  is that correct?

25      A.    Um-hmm.
```

57

```
 1        Q.    We'll go through that later.  I'm just
 2   trying to figure out -- so you had a group of texts
 3   between you and your husband on October 14, 2016?
 4        A.    Right.
 5        Q.    You and he were arguing about the picture
 6   that had come out showing him kissing this woman in
 7   the play?
 8        A.    Right.
 9        Q.    October 14, 2016, is an important day in
10   your life, correct?
11        A.    It is now.
12        Q.    And you deleted all of the text messages
13   between you and your husband from that day; is that
14   correct?
15        A.    Yeah.
16        Q.    My question is:  Did you make any attempt
17   to preserve those?  To print out?  Did you make
18   screenshots?  Did you save them on some other
19   device?  Did you do anything to save those in case
20   you needed them in the future?
21        A.    I didn't think I would.  I know that --
22   the screenshot that you're talking about.
23        Q.    So put aside the screenshot I'm talking
24   about.
25        A.    Okay.
```

58

1    Q.    I'm simply asking whether you took the

2  steps that I just mentioned to save any of those

3  texts between you and your husband on October 14,

4  2016?

5    A.    No.

6    Q.    Why did you turn your phone over to

7  Detective Spinks?

8    A.    He wanted the conversations between Briggs

9  and myself, and I had already deleted them.  So as

10  an attempt to get them back, I handed it over to

11  him.

12    Q.    And when did you delete the texts between

13  you and Briggs?

14    A.    Sometime on Saturday.

15    Q.    Do you mean Saturday, October 15, 2016?

16    A.    Yes.

17    Q.    Do you recall approximately what time that

18  day?

19    A.    Late morning.

20    Q.    Did you discuss deleting Mr. Briggs text

21  messages with anybody else?

22    A.    No.

23    Q.    Why did you delete your text messages with

24  Mr. Briggs on October 16, 2016 -- October 15, 2016?

25  I'm sorry.

1    Q.    And are you able to produce any of those

2    text messages?

3    A.    No.

4    Q.    And I think we covered this already, but I

5    just want to make sure we have a clean record.  You

6    deleted all of the text messages between you and

7    your husband on October 15th -- that you were

8    sending between you and your husband on October 15,

9    2016; is that correct?

10    A.    I deleted all of the text messages that

11    were sent in that timeframe, yes.

12    Q.    And how many text messages, roughly, did

13    you and your husband exchange on October 15, 2016?

14    A.    I think only like four or five.

15    Q.    And what was the content of your text

16    messages?

17    A.    I texted him to ask if I could talk to

18    him, and he said, "Now is not a good time."  And

19    that -- I think that happened a couple of times.

20    And then there was a phone call.

21    Q.    Okay.  And so describe to me what is

22    happening with you and your husband on October 15,

23    2016.

24    A.    He was at his mother's house with our

25    daughter.  And at this point in time, I am -- I have

127

 1  your Yahoo mail, for e-mails from Mr. Horn?

 2      A.    Yes, I did.  And Yahoo, yes.

 3      Q.    So just to conclude the books on that

 4  topic, have you ever deleted any text messages to or

 5  from Nathan Horn that relate in any way to your

 6  allegations of sexual assault?

 7      A.    Just this one.

 8      Q.    And why did you delete that one?

 9      A.    I cleaned out my phone, and I knew they

10  already had the picture that they needed, so I

11  didn't think it was important to keep it.

12      Q.    When you say clean out your phone, why do

13  you clean out your phone?

14      A.    Because I have limited storage, and the

15  phone stops working if I fill it up.

16      Q.    And you believe that deleting your text

17  messages opens up more storage?

18      A.    It does, especially if there's photos in

19  them, the thread.

20      Q.    Now, please turn to page 29 of Request for

21  Production Number -- look at Request for Production

22  Number 17.  Do you see it?

23      A.    Not yet.

24             MR. VILLA:  Page 17?

25      Q.    I'm sorry, top of page 30.  My fault.

176

1    Q.    And so the only thing he said during the

2    phone call is that he received a call from Briggs

3    and was calling to see if you were okay?

4    A.    Yeah.  Basically filled him in on what had

5    happened and that was -- he said sorry.  And then

6    like most people when they find out something like

7    this and they don't know how to act, "Well, we

8    should definitely get together sometime," and they

9    never call you back or talk to you again.

10    Q.    Have you ever been romantic with Mr.

11    Dillenback in any way?

12    A.    Like other than him grabbing my butt,

13    which I don't know that I would consider that

14    romantic?

15    Q.    I mean holding hands?  Hugging?  Kissing?

16    A.    No.

17    Q.    Have you ever engaged in sexual activity

18    with Mr. Dillenback?

19    A.    No.

20    Q.    All right.  Can you please turn to page 19

21    of the PLOD.  In the second paragraph, it looks to

22    me to be about seven or eight lines down, it

23    indicates that the, "Complainant reported to the

24    police that she and Witness 8 had a text

25    conversation during class where they rated their

225

1   try to come back to this exhibit.

2                    THE WITNESS:  Okay.

3                    MR. JACKSON:  I want do a 15-minute

4   break just to give everybody a chance to stretch.

5     (Recess was taken from 4:12 p.m. until 4:32 p.m.)

6        Q.    We are back on the record after taking a

7   break.  You understand -- Ms. Van Meter, is there

8   anything in your prior testimony that you want to

9   change?

10       A.    No, I don't think so.

11       Q.    Okay.  I want you to walk me step by step

12  kind of through the events of October 14, 2016.  And

13  so let's start on the morning of October 14, 2016,

14  at your home.

15       A.    Okay.

16       Q.    Are you and your husband arguing about him

17  kissing the woman at the play at this point?

18       A.    No.

19       Q.    When does that argument begin

20  approximately?

21       A.    Probably around 11:30 or 12:00 that day.

22       Q.    Okay.  And how long does that argument

23  continue for?

24       A.    We argue probably up -- to the best of my

25  recollection, probably like off and on for four

226

1   hours, three, four hours.

2      Q.    Okay.  And it's a Friday, correct?

3      A.    Yes.

4      Q.    And did you and Mr. Briggs have plans to

5   meet for drinks before Friday?

6      A.    Yes.

7      Q.    And how far in advance had you made those

8   plans?

9      A.    I don't recall.  I knew it was before

10  Wednesday or right -- like by Wednesday that week.

11     Q.    And how did the two of you make plans to

12  go drink?

13     A.    We would either text or if we had seen

14  each other, like if we -- "Okay, how about next time

15  this place or this time," but mostly it was via

16  text.

17     Q.    And how long had you scheduled that

18  particular day's meeting?

19     A.    I don't know.

20     Q.    Okay.  And then you and Mr. Briggs

21  exchanged some text messages before you went for

22  drinks; is that correct?

23     A.    Yes.

24     Q.    Did you send him the picture of your

25  husband kissing that woman in the play?

MICHAEL ELLIS   7/16/2019

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**PLAINTIFF'S EXHIBIT**

**26**

JOY VAN METER,

            Plaintiff/Counter-Defendant,

 -vs-                              NO:  1-18-cv-00970 RB/JHR

MICHAEL BRIGGS,

            Defendant/Counterclaimant.

DEPOSITION OF MICHAEL ELLIS

JULY 16, 2019
9:05 a.m.
201 Third Street, Northwest, Suite 1500
Albuquerque, New Mexico 87102

     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:  TRAVIS G. JACKSON
           ATTORNEY FOR DEFENDANT/COUNTERCLAIMANT

REPORTED BY:  Julianne L. Beatty, CCR-RPR-CRR
              Kendra Tellez Court Reporting, Inc.
              302 Silver, Southeast
              Albuquerque, New Mexico  87102

MICHAEL ELLIS    7/16/2019

46

1    the argument had something to do with curtains and -- and

2    that's about all I recall.

3        Q.    And were there times when you would take a

4    timeout?

5        A.    Uh-huh.

6        Q.    And where would you go when you took a timeout?

7        A.    Same thing; either to another room, maybe take a

8    drive, go to a coffee shop.  And, once or twice, go spend

9    the night at my mother's house.

10       Q.    And when you -- which times did you go spend the

11   night at your mother's house as part of a timeout?

12       A.    The only time that I recall was on the Friday that

13   she was assaulted.

14       Q.    And so you took a timeout on that Friday to go

15   spend the night at your --

16       A.    Correct.

17       Q.    -- at your mother's house?

18       A.    Correct.

19       Q.    And tell me about the events that led up to the

20   time that you took a timeout to spend the night at your

21   mother's house.

22       A.    She and I had been arguing consistently about the

23   play that I was in at the NHCC; wherein, I had to kiss a

24   woman onstage.  We had had the argument -- sort of the same

25   argument that it made her uncomfortable, and I didn't, at

47

1   the time, understand why that made her uncomfortable.  So we

2   had had that argument several times.  And on that Friday

3   afternoon, I decided to take a timeout.  I didn't want to

4   have that argument again.  So I decided to go stay the night

5   at my mom's.

6        Q.    And were you going to take your daughter Chloe

7   with you to your mom's that evening?

8        A.    No.

9        Q.    So you said you had been consistently fighting

10  about you kissing this woman in the play.  When did you

11  first start arguing about you kissing this woman in the

12  play?

13       A.    I believe it was in September during -- when we

14  were still rehearsing.

15       Q.    Do you know the name of the woman that you kissed

16  during the play?

17       A.    Uh-huh.  Her name was Megan Gomez.

18       Q.    Did you know Ms. Gomez before this play?

19       A.    No.

20       Q.    So between September and that Friday,

21  October 14th, 2016, how many times, approximately, did you

22  and your wife fight about you kissing this woman in the

23  play?

24       A.    I don't remember the amount of times.

25       Q.    Was it more than three times?

MICHAEL ELLIS    7/16/2019

48

1    A.    Yes.

2    Q.    Was this the biggest fight that you were having at

3    this time period?

4    A.    Yes.

5    Q.    Was it the biggest fight you'd ever had during

6    your marriage?

7    A.    I would say so.

8    Q.    So can you walk me through it a little bit?  And

9    so tell me, how does the fight start.  How does she become

10    aware that you're kissing this woman in the play?

11    A.    Well, initially, because she read the script when

12    I got the script.  So she knew about it from the beginning.

13    And then as rehearsals proceeded, you know, and we started

14    to block the kissing and block the scenes where that

15    happened, she was aware of it too.

16    Q.    Would she go to the rehearsals?

17    A.    No.

18    Q.    And how did she bring up the fact that it bothered

19    her that you were kissing this woman in the play?

20    A.    Fairly straightforward, actually.  Kind of just

21    like that, This bothers me.  And sometimes she would be,

22    like I say, straightforward about it.  Other times she might

23    be a little bit more elliptical, just in terms of, you know,

24    referencing instead of the kiss directly like, a scene where

25    that kiss might happen in a conversation.

MICHAEL ELLIS    7/16/2019

49

1    Q.    Do you know why your wife was so bothered by you

2  kissing this woman in the play?

3    A.    At the time I did not.  Which was why we were

4  having an argument.

5    Q.    Do you know why now?

6    A.    I do.

7    Q.    And why was she upset about you kissing this woman

8  in the play?

9    A.    Because I wasn't listening to her feelings about

10  it.  I was very much involved in how much fun I was having

11  doing theater.  Because as I had said, I'd taken a long

12  break from theater, and I'd come back to it.  And it was

13  even more exciting because I was getting paid.

14    Q.    And you were a lead, right?

15    A.    I was a lead.  I was at the NHCC; it was exciting.

16  So I was caught up in the fun that I was having doing

17  theater again, and I was not really listening to her or her

18  feelings and reservations about -- about the kissing scenes.

19  And that upset her.

20    Q.    Did you guys communicate about this argument by

21  text?

22    A.    I believe so.

23    Q.    And how many times did you and your wife exchange

24  texts about you kissing a woman in the play?

25    A.    I can't recall.

MICHAEL ELLIS    7/16/2019

80

1    A.    So it was over the course of that text

2  conversation.  I was driving our daughter to the zoo.  And

3  so it was somewhere in, like, late midday, early afternoon

4  that I began getting these texts from her.  And I just --

5  you know, in there I just said, You know what?  I'm going to

6  my mom's house tonight.

7       I had my play that night, so I said, you know, I need

8  to leave by such and such a time, you know.  And please be

9  home to watch Chloe, and that's that.  So it was -- it

10  was -- I decided to take the timeout en route to the zoo.

11    Q.    And you told her you were going to take the

12  timeout?

13    A.    Yeah.

14    Q.    At any point during your text message did she tell

15  you, How would you like -- How would you feel if I did

16  something like this to you, or something to that effect?

17    A.    She did, yeah.

18    Q.    What did she say?

19    A.    Something like, How would you -- how would you

20  like it if I kissed Mr. Briggs.

21    Q.    And she told you that she was going to have drinks

22  with him that afternoon?

23    A.    Yes, which was not uncommon.

24    Q.    And so she was -- how did you respond when she

25  asked, How would you like it if I did this with Mr. Briggs?





PLAINTIFF'S
EXHIBIT
**27**

## OFFICE OF THE DISTRICT ATTORNEY
### SECOND JUDICIAL DISTRICT
### STATE OF NEW MEXICO

**KARI E. BRANDENBURG**
DISTRICT ATTORNEY

April 14, 2017

Joy Vanmeter
2713 Bel Air Dr. N.E.
Albuquerque, NM 87110

RE: State v. Michael Briggs, DA# 2017-01992-1

Dear Ms. Vanmeter:

I am writing to notify you that the District Attorney's Office has received and conducted a thorough review of the facts, interviews, statements and evidence as to the reported sexual assault reported October 18, 2016, with the listed suspect of Michael Briggs. Thank you for reporting this matter to law enforcement. Unfortunately, the District Attorney's Office is declining to pursue criminal prosecution of this matter. There is insufficient evidence to meet the very high burden required in a criminal case to prove the allegations beyond a reasonable doubt.

I realize that receiving this news can be very difficult and distressing. I would like to offer you my contact information so that if you would like, you can contact me to better understand how your case was handled, why the decision to not pursue criminal charges was made, and what options and resources are available moving forward in the future. I am enclosing some materials which may be of assistance to you which are provided to us by the New Mexico Coalition of Sexual Assault Programs.

If you have any questions, please feel free to contact me.

Sincerely,

DAVID L. WAYMIRE
Deputy District Attorney
Violent Crimes Division
520 Lomas Blvd. N.W.
Albuquerque, NM 87102
505-222-1255
dwaymire@da2nd.state.nm.us

**Juvenile Division**   5100 Second St. NW
(505) 222-1160    Albuquerque, NM 87107
FAX: (505) 241-1160

**Main Office**    520 Lomas Blvd. NW
(505) 222-1099    Albuquerque, NM 87102
FAX: (505) 241-1100   1st Floor
FAX: (505) 241-1200   2nd Floor
FAX: (505) 241-1299   3rd Floor

**Metro Division**   520 Lomas Blvd. NW
(505) 222-1079    4th Floor
FAX: (505) 241-1000  Albuquerque, NM 87102



**PLAINTIFF'S EXHIBIT**

**28**

|  |  |
|---|---|
| Sorenson Case#: | SF064234 |
| Client Case #: | 16-0098541_G2 |

**Date: February 08, 2018**

Report #: R154586

## Forensic Case Report

**TO:**  **Albuquerque PD Metro Forensic Science Center**
**Attn: Ms. Jennifer Elwell**
**5350 2ND Street, NW**
**Albuquerque, NM 87107-4011**

**Offense:** Criminal Sexual Penetration

**Case Names:**
Joy Vanmeter - [Victim]

### Evidence Received:

| Sorenson Item # | Agency Item # | Description |
|---|---|---|
| 1 | 78 | Cervical Swabs |
| 2 | 78 | Vaginal Swabs |
| 3 | 78 | Mons Pubis and Labia Majora Swabs |
| 4 | 78 | Oral Swabs |
| 5 | 78 | Thong |
| 6 | 78 | Reference - Joy Vanmeter |

### Results Conclusions and Opinions:

#### Item 1.0 (Cervical Swabs)
Screening for the presence of male DNA was negative.

#### Item 2.0 (Vaginal Swabs)
Screening for the presence of male DNA was negative.

#### Item 3.0 (Mons Pubis and Outer Labia Majora Swabs)
Screening for the presence of male DNA was negative.

#### Item 4.0 (Oral Swabs)
Screening for the presence of male DNA was negative.

#### Item 5.0 (Thong)

#### Item 5.1 (Inside Front Crotch Area)
Screening for the presence of male DNA was negative.

#### Item 6.0 (Reference - Joy Vanmeter)
This item was not analyzed.

Sorenson 🜊 Forensics®

**Sorenson Case#:  SF064234**

**Client Case #:    16-0098541_G2**

**Date: February 08, 2018**

**Notes:**

All submitted items, slides and DNA extracts generated during the course of examination will be returned to the submitting agency.

Respectfully submitted,

Kristine Carmen

Forensic DNA Analyst I

## *PATIENT HISTORY FORMS*

**PLAINTIFF'S EXHIBIT**

**29**

Tobacco:

None (never smoked), Ready to change: No.  (Last Updated: 05/24/2017 09:03:55 MDT by Martinez, Latricia)

Document Type
Date of Service:       5/24/2017 09:02 MDT
Document Status:     Auth (Verified)

**Family History Form Entered On:  05/24/2017 09:02 MDT**
**Performed On:  05/24/2017 09:02 MDT by Martinez, Latricia**

**Family History**
Family History
*Birth Defects :*  Brother
*ETOH/Drug Abuse :*  Father
*Mental Illness :*  Mother
*Breast Cancer :*  Maternal Grandmother, Paternal Grandmother

Martinez, Latricia - 05/24/2017 09:02 MDT

## *POINT OF CARE TESTING FORMS*

Document Type
Date of Service:       10/15/2016 19:01 MDT
Document Status:     Auth (Verified)

**Point of Care Testing Form UH Entered On: 10/15/2016 19:01**
**Performed On: 10/15/2016 19:01 by Crozier, Michael W**

**POC Urine Drug Test**
*Internal Quality Control POC COC :*  Yes
*POC COC Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC OPI :*  Yes
*POC OPI Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC MET :*  Yes
*POC MET Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC THC :*  Yes
*POC THC Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC AMP :*  Yes
*POC AMP Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC BZO :*  Yes
*POC BZO Unine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC BAR :*  Yes
*POC BAR Urine Drug Test :*  Negative (medical screening use only)
*Internal Quality Control POC MTD :*  Yes

Report ID: ▮▮▮▮
Print Dt/Tm: 3/25/2019 10:20 MDT

Patient: ▮▮▮▮▮▮
DOB: ▮▮▮▮▮
MRN: ▮▮▮▮

Briggs_Dr. Romo000001

## POINT OF CARE TESTING FORMS

POC MTD Urine Drug Test : **Negative (medical screening use only)**
Internal Quality Control POC OXY : **Yes**
POC OXY Urine Drug Test : **Negative (medical screening use only)**

Crozier, Michael W - 10/15/2016 19:01

## MEASUREMENTS

**Measurements**

| | | Units |
|---|---|---|
| Collected Date | 5/24/2017 | |
| Collected Time | 08:49 MDT | |
| Charted By | Martinez,Latricia | |
| Procedure | | Units |
| Height | 175 | cm |
| Weight | 65.0 | kg |
| Body Mass Index | 21.22 | kg/m2 |

## VITAL SIGNS

**Vital Signs**

| | | | Units |
|---|---|---|---|
| Collected Date | 5/24/2017 | 10/15/2016 | |
| Collected Time | 08:49 MDT | 17:30 MDT | |
| Charted By | Martinez,Latricia | LeClair,Jennifer Ann | |
| Procedure | | | Units |
| Temperature | 36.9 | 37.0 | DegC |
| Temp Site | Temporal | - | |
| Respiratory Rate | - | 18 | br/min |
| Respiration | 14 | - | /MIN |
| Pulse Sitting | 74 | 65 | bpm |
| Systolic Sitting | 102 | 151 " | mmHg |
| Diastolic Sitting | 64 | 97 " | mmHg |
| BP Site | Right Arm | - | |
| Cuff Size | Regular Cuff | - | |
| Pain Reported by Patient | No | Yes | |

## PAIN

**Pain Assessment**

| | | Units |
|---|---|---|
| Collected Date | 5/24/2017 | |
| Collected Time | 08:49 MDT | |
| Charted By | Martinez,Latricia | |
| Procedure | | Units |
| Numeric Pain Scale | 0 = No pain | |

## RESPIRATORY

**Oxygen Therapy & Oxygenation Information**

| | | | Units |
|---|---|---|---|
| Collected Date | 5/24/2017 | 10/15/2016 | |
| Collected Time | 08:49 MDT | 17:30 MDT | |
| Charted By | Martinez,Latricia | LeClair,Jennifer Ann | |
| Procedure | | | Units |
| Oxygen Saturation | 98 | - | % |

Report ID:   94238125
Print Dt/Tm:  3/25/2019 10:20 MDT

Patient:
DOB:
MRN:

Briggs_Dr. Romo000082

PLAINTIFF'S
EXHIBIT

**30**

## Laura Vele Buchs

| | |
|---|---|
| **From:** | Laura Vele Buchs |
| **Sent:** | Tuesday, April 03, 2018 3:45 PM |
| **To:** | Richard Larson; Paul B Roth M.D. |
| **Cc:** | Chamiza Pacheco de Alas; Laura Vele Buchs; Francie Cordova |
| **Subject:** | OEO Case Referral for Sanctioning |
| **Attachments:** | PLOD.MichaelBriggs.pdf; FLOD.MichaelBriggs.pdf; Closure.MichaelBriggs.pdf; PresidentOverturnDecision.VanMeterBriggs.pdf |
| **Importance:** | High |

Dear Richard Larson:

The OEO is referring this matter to you for sanctioning purposes.  Please find attached documents regarding the determination and outcome of appeal for OEO Case #I-2016-11-66.  In this matter, the Office of the President overturned the OEO's determination and found Michael Briggs violated UNM policy.

If after reviewing these documents you have any questions, please feel free to contact Francie Cordova, OEO Director, at 277-5251 or fcordova3@unm.edu.

Respectfully,

*Laura Vele Buchs* (she/her/hers)
EEO Compliance Manager
Office of Equal Opportunity
University of New Mexico
oeo.unm.edu
Phone: (505) 277-5251
Fax: (505) 277-1356
@oeounm

1

7-1 LIMS (Rev. 5-16-16)                    UNCLASSIFIED                    **#160098541**



## FBI Laboratory

2501 Investigation Parkway
Quantico, Virginia 22135

4940 Fowler Road
Redstone Arsenal, Alabama 35898

### LABORATORY REPORT

PLAINTIFF'S EXHIBIT

**31**

To:  Dan Spinks
Detective
Albuquerque Police Department
625 Silver Ave SW Suite 200
Albuquerque, NM 87102

Date: March 8, 2017

Case ID No.: 95A-HQ-2117151 – 3

Lab No.: 2016-03987-2

Communication(s):    December 28, 2016

Agency Reference(s):  16-0098541

Subject(s):

Victim(s):

Discipline(s):    Chemistry - Toxicology

FBI Laboratory Evidence Designator(s):

Item 1          Liquid urine sample from Joy Vanmeter

This report contains the results of the toxicology examinations.

**Results of Examinations:**

The Item 1 urine from Joy Vanmeter was tested with the following results:

| Analyte | Result | Note(s) |
|---|---|---|
| Benzodiazepines | Item 1 = Diazepam, nordiazepam, temazepam, and oxazepam were qualitatively identified. | 1, 4 |
| Antihistamines | Item 1 = Not detected | 1 |
| Cannabinoids (marijuana; $\Delta^9$-THC metabolite) | Item 1 = Not detected | 2 |
| Opioids | Item 1 = Not detected | 1 |
| Cocaine and metabolites | Item 1 = Not detected | 1 |
| Over-the-counter, prescription and illicit drugs | Item 1 = Sertraline and norsertraline were qualitatively identified. | 3, 5 |

Page 1 of 3

UNCLASSIFIED

UNCLASSIFIED

#160098541

**Notes:**

1  Analysis was performed using supported liquid extraction (SLE) followed by ultra performance liquid chromatography/high resolution mass spectrometry (UPLC/HRMS).

2  Analysis was performed using immunoassay.

3  This analysis consisted of two drug screens.  The first screen targeted alkaline drugs such as antihistamines, antidepressants, opioid analgesics, methamphetamine and other stimulants. Analysis was performed using solid phase extraction (SPE) followed by gas chromatography/mass spectrometry (GC/MS) and liquid chromatography/tandem mass spectrometry (LC/MS/MS). The second screen targeted acidic and neutral drugs such as barbiturates, seizure medications, and some non-steroidal anti-inflammatory drugs. Analysis was performed using liquid/liquid extraction (LLE) followed by GC/MS.

4  Benzodiazepine confirmation was performed using enzymatic digestion and SPE followed by LC/MS/MS.

5  Alkaline drugs were confirmed using SPE followed by LC/MS/MS.

**Limitations:**

The FBI Laboratory has performed screening in this case for numerous drugs, some of which are only indicated by a general drug class above.  Drug dosages, drug metabolism rates, and laboratory detection limits for drugs and metabolites vary.  For questions about whether or not a specific drug or drug metabolite would have been detected in this analysis, please contact the examiner issuing this report.

The Item 1 urine specimen was not tested for GHB (gamma hydroxybutyrate) or ethanol, two drugs commonly associated with drug-facilitated sexual assaults due to time that elapsed between the alleged event and the collection of the item 1 urine sample. These drugs are rapidly metabolized and excreted from the body and are typically not detected beyond eight to twelve hours post-ingestion.

The FBI Laboratory does not routinely quantitate drugs in urine except for ethanol and gamma hydroxybutyrate (GHB).

Page 2 of 3

2016-03987-2

UNCLASSIFIED

Briggs_APD000023

UNCLASSIFIED                    #160098541

**Remarks:**

Pursuant to a telephone conversation between Detective Dan Spinks and Forensic Examiner Cynthia L. Morris-Kukoski, on February 23, 2017, Joy Vanmeter's SANE report listed the following medications: sertraline, mvi (mvi=multivitamin), and diazepam prn (prn = as needed).

Diazepam is a schedule IV controlled benzodiazepine marketed under the brand name Valium® or as a generic equivalent. Diazepam is a central nervous system depressant used to treat seizures, relax muscles, and is used as a sedative. Nordiazepam, temazepam, and oxazepam are active metabolites of diazepam. However, temazepam is also a schedule IV controlled substance marketed under the brand name Restoril® or as a generic equivalent. Oxazepam is also a schedule IV controlled substance marketed under the brand name Serax® or as a generic equivalent.

Sertraline is a prescription medication marketed under the brand name Zoloft®. It is used in the treatment of depression. Norsertraline is an active metabolite of sertraline.

For questions about the content of this report, or the status of your submission, please contact Forensic Examiner Cynthia L. Morris-Kukoski at (703)632-7838.

The evidence will be returned under separate cover.

This report contains the opinions and interpretations of the issuing examiner(s) and is supported by records retained in the FBI files.

The work described in this report was conducted at the Quantico Laboratory.

Cynthia L. Morris-Kukoski, PharmD, DABAT, FAACT
Chemistry Unit

2017 MAR 31    AM 11:42

Page 3 of 3

2016-03987-2

UNCLASSIFIED

Briggs_APD000024

## Laura Vele Buchs

**PLAINTIFF'S EXHIBIT**

**32**

**From:**      Francie Cordova
**Sent:**      Wednesday, December 14, 2016 12:46 PM
**To:**        Laura Vele Buchs
**Subject:**   FW: Michael Briggs

**From:** Kevin McCabe
**Sent:** Wednesday, December 14, 2016 10:34 AM
**To:** Francie Cordova
**Subject:** RE: Michael Briggs

Francie we did not find anything on Michael Briggs

**From:** Francie Cordova
**Sent:** Wednesday, December 14, 2016 8:53 AM
**To:** Kevin McCabe
**Subject:** RE: Michael Briggs

Hi Chief McCabe:

The DOB is 3/17/79. Please let me know if you find anything.

1

## Laura Vele Buchs

| | |
|---|---|
| **From:** | Laura Vele Buchs |
| **Sent:** | Wednesday, December 14, 2016 8:50 AM |
| **To:** | Francie Cordova |
| **Cc:** | Laura Vele Buchs |
| **Subject:** | UNMPD Case Search on MB |

I found Michael Brigg's date of birth on the restraining order: 3-17-79.  Please ask McCabe for UNMPD case search.  Thanks.

*Laura Vele Buchs*
EEO Compliance Specialist
Office of Equal Opportunity
University of New Mexico
oeo.unm.edu
Phone: (505) 277-5251
Fax: (505) 277-1356
@oeounm



 **UNM**

*Office of Equal Opportunity*



PLAINTIFF'S
EXHIBIT

**33**

December 12, 2017

Michael Briggs

*Sent via e-mail to:* Molly Schmidt Nowara, Attorney, *molly@ginlawfirm.com*

**Final Letter of Determination (OEO# I-2016-11-66)**

Dear Mr. Briggs:

Please be advised this correspondence provides the final determination by this office in the above-referenced claim.

The record shows on December 4, 2017, Complaint, via her attorney, provided a response to the Preliminary Letter of Determination (PLOD). Complainant submitted in response to OEO's PLOD the following:

- Complainant requested, via her attorney, the OEO interview Complainant's former supervisor and two colleagues regarding "their observations concerning [Complainant's] behavior or work performance as a result of (or post) this incident."[1]  Complainant's supervisor corroborated the subjective impact the reported incident had on Complainant's work performance and her "fear of running into [Respondent]" on campus. Complainant's supervisor, however, did not provide any objective evidence of Respondent interfering in Complainant's work environment/performance. Complainant's supervisor had no knowledge of Respondent influencing the differing proposed costs for the lab project, of Complainant "running into" Respondent at any time on campus after the reported incident, and of Complainant needing to meet directly with Respondent in order to complete the responsibilities of her position. Complainant's supervisor reported Complainant had to meet with a variety of people who worked within the Office of Research, but she did not know that Complainant ever had to meet directly with Respondent.
- Complainant asserts, via her attorney, Respondent being carbon copied on "emails, letters, and memos" she received "made [her] work life very difficult after the incident and she found it harder to perform her job."[2]

---

[1] Email sent from Ryan Villa (Villa), Complainant's attorney, dated December 4, 2017. The OEO interviewed Complainant's former supervisor on December 7, 2017. Complainant had previously provided the information regarding the two incidents for which she wanted the OEO to interview her colleagues. These incidents were considered and noted in the PLOD.
[2] Email sent from Villa to the OEO, dated December 4, 2017.

Final Letter of Determination (OEO# I-2016-11-66)
December 12, 2017

- Complainant, via her attorney, asserts, "The order of protection has an exception for incidents that occur at work such as if [Respondent] ran into [Complainant] on site. Because [Respondent] knew this was a possibility and had occurred, they asked for this exception. In addition, due to the order, [Respondent] had to be removed from several email threads in which he was cc'd or a recipient."[3]

Respondent did not submit any new information in response to the PLOD. Respondent asserts the OEO is biased in its analysis, does not have jurisdiction of the matter, and OEO's determination should not be referred to Human Resources.

The supplemental information Complainant submitted in response to the PLOD, summarized above, is not sufficient to overcome OEO's finding that there is no objective evidence to show Respondent unreasonably interfered in Complainant's work environment. As such, the supplemental information Complainant submitted is insufficient to overcome OEO's determination that the preponderance of the evidence does not demonstrate Respondent subjected Complainant to sexual harassment in violation of University policy.

Therefore, the determination in the Preliminary Letter of Determination is unchanged.

**FINDINGS:**

**NO POLICY VIOLATION** with regard to the claim Respondent subjected Complainant to sexual harassment that unreasonable interfered with her work environment.

**CONCLUSION:**

The facts revealed in the course of the investigation do not substantiate, more likely than not, Respondent subjected Complainant to sexual harassment in violation of University Policy #2740 Sexual Violence and Sexual Misconduct and University Policy #2720 Equal Opportunity, Non-Discrimination, and Affirmative Action.

**RECOMMENDATIONS:**

The investigative file should be closed.

**RIGHT TO APPEAL:**

The finding in this matter is subject to review by the President and Board of Regents. Notice of an appeal must reach the President's office within five (5) business days of the receipt of this letter of determination.

**NOTICE**

Please be advised that it is contrary to University of New Mexico policy and federal and state civil rights law to retaliate against any person and/or employee for having filed or participated in a

---

[3] Email sent from Villa to the OEO, dated December 6, 2017.

2 of 3

Final Letter of Determination (OEO# I-2016-11-66)
December 12, 2017

discrimination investigation.  This provision includes any witnesses who provided information during the investigation.


Laura Vele Buchs
EEO Compliance Manager

Heather Cowan
Title IX Coordinator


Francie Cordova
Director

*cc: File*

PLAINTIFF'S
EXHIBIT

**34**



## GARCIA IVES NOWARA

**Molly Schmidt-Nowara**
924 Second Street NW, Suite A
Albuquerque, NM 87102
505.899.1030
molly@ginlawfirm.com
www.ginlawfirm.com

<u>**VIA ELECTRONIC MAIL**</u>

December 6, 2017

Laura Vele Buchs
EEO Compliance Manager
laurabuchs@unm.edu

Dear Ms. Vele Buchs:

I write in response to your Preliminary Letter of Determination in OEO#I-2016-11-66. We agree with your conclusion there was no policy violation connected to the allegations in this matter. However, we strongly disagree with your conclusion that a preponderance of the evidence suggested that the Complainant's version of events is true. Given that there is a finding of no policy violation, we believe the appropriate steps in this matter would be dismissal of the Complaint and that it not be forwarded to any other parties.

Mr. Briggs, as he has consistently and credibly done throughout this investigation, categorically denies that the sexual contact he had with the Complainant was improper. The sexual activity was consensual. Moreover, we again reiterate our concern that the OEO has extended its jurisdiction in this matter beyond its natural conclusion. This was not a work-related incident, Mr. Briggs did not work with the Complainant, and the Complainant does not work at UNM anymore. Contrary to your findings, Mr. Briggs had verbal consent to join the Complainant in the shower, and non-verbal cues suggesting consent when the two began to kiss. As soon as the Complainant indicated she needed to go home, the two immediately stopped with the consensual sexual contact and preceded to get dressed. Thus, your analysis that Mr. Briggs should have inferred there was not consent is without merit.

We also believe it is important for your report to include specific reference to the Complainant's inconsistencies regarding her drinking on the day in question. It is my understanding that the Complainant told the detective she had four beers, but she also stated she had three. Moreover, Mr. Briggs never saw her physically vomit and he did not understand her to have vomited multiple times—just one time. The two continued to have another hour-long conversation after she had

1

initially vomited and brushed her teeth.  She never appeared impaired to the point of slurred speech. She drank water, while Mr. Briggs had another beer. It is also our understanding, based on witness testimony, that the Complainant sent a text message to a friend that she would not be able to go out later that night.  That text message was sent after 5:00 PM, according to the witness.  This was also the time that the complainant testified she was not coherent and did not remember activity leading up to getting into the shower. But the objective evidence shows she was aware of the time and her schedule. This is not consistent with a person who was profoundly impaired.

Mr. Briggs submits that the Complainant did indeed undress herself, and she also took off her own pantyhose. She was able to stand on her own and get into the shower on her own initiative. She was also able to dress herself after the shower. At no time did Mr. Briggs find her impaired to the point of staggering or with the inability to speak. Also, according to text message - while inadvertently sent to her friend, and not her husband, she was able to text "I'm on my way!".  This action further demonstrates she was coherent and aware of the situation and time.


The parties' text messages the following day also suggest that the Complainant understood that the two parties had engaged in consensual contact and was worried about what her husband would say.  "I hope I don't have to explain anything", and "Just so you know, that was a first - never done that before" suggest that she was aware of what transpired. The two kept up a normal exchange of texts with each other the next day, and there was not any suggestion that Mr. Briggs had done anything inappropriate.  It was not until she had to confront her husband that her recollection of events changed. The Complainant's regret for what transpired does not mean that Mr. Briggs engaged in misconduct.

Finally, we must raise what we believe is evidence of bias in the investigation. It is my understanding that you told Mr. Brigg's former supervisor (Catherine Penick) that "Mr. Briggs admitted to wrong-doing".  This statement is categorically false (Mr. Briggs has always maintained his innocence in these matters), violated the confidentiality promised to the parties, and suggests that the review of the evidence in the case was not impartial. On this basis alone, we ask the Complaint be dismissed and your report not further disseminated in any manner.

Thank you for your attention to these matters.

Very truly yours,

Molly Schmidt-Nowara

Copies to:

Michael Briggs
Francie Cordova
Heather Cowan

THE UNIVERSITY OF
**NEW MEXICO.**

PLAINTIFF'S
EXHIBIT

**35**

## **DISCIPLINARY ACTION FORM**

| | | | |
|---|---|---|---|
| Employee Name: | Michael S. Briggs | UNM ID: | 100631705 |
| Department: | HSC VP for Research | Position Title: | Executive Research Ops Officer/Div |
| Date: | 6/6/2018 | Method of Delivery: | Hand-Delivered |
| Level of Discipline: | NCA for Discharge | Reason for Discipline: | ☐ Attendance ☒ Behavior ☐ Performance |

You are being given this Notice of Contemplated Action (NCA) for Discharge for unprofessional and unacceptable behavior; specifically, creation of a hostile work environment in violation of UNM Policy.

The Office of Equal Opportunity (OEO) conducted an investigation into complaints that on October 14, 2016, you subjected a female UNM employee to non-consensual sexual conduct in violation of University Administrative Policies 2740 (Sexual Violence and Sexual Misconduct) and 2740 (Equal Opportunity, Non-Discrimination and Affirmative Action) (OEO#I-2016-11-66). OEO issued its Preliminary Letter of Determination (PLOD) on December 4, 2017 (**Attachment A**), and its Final Letter of Determination (FLOD) on December 12, 2017 (**Attachment B**) which determined no policy violation. On complainant's appeal of OEO's determination, UNM President Garnett Stokes found your actions resulted in a hostile work environment for the complainant and reversed OEO's determination (**Attachment C**). OEO, thereafter, issued a Memo (**Attachment D**) informing you of the president's decision and, on April 13, 2018, OEO issued an Amended FLOD (**Attachment E**). Based on the investigation and the outcome of the appeal to the President, OEO's FLOD has been updated and the OEO findings; therefore, stand.

The OEO investigation (PLOD and FLOD) and subsequent appeal decision determined that:

1. The preponderance of evidence showed that the October 14, 2016 conduct complained of was reasonably perceived to be sexual in nature.
2. The evidence showed more likely than not the October 14, 2016 sexual activity was subjectively unwelcome and would be objectively unwelcome to a person in the same or similar situation as complainant.
3. The evidence showed more likely than not a reasonable person in the same or similar situation would have known the October 14, 2016 sexual activity was unwelcome, and therefore, you should have known the sexual conduct was unwelcome.
4. The evidence showed more likely than not the unwelcome sexual activity in question was severe in nature.
5. The preponderance of evidence showed the reported events on or about October 14, 2016, subjectively created a hostile work environment for the complainant.
6. The evidence showed that although you had no direct authority over complainant at the department level, your position at UNM afforded you the opportunity to be influential at the department level if you had so chosen.
7. It is reasonable that someone in the same or similar situation as complainant would be concerned about your potential negative influence on her work environment and with those with whom she worked.
8. It is reasonable that a person in the same or similar situation as complainant would fear retaliation from employees who "love" you, particularity considering your longevity and level of authority.

THE UNIVERSITY OF
NEW MEXICO.

9. The evidence and findings by OEO regarding your potential influence over complainant in the workplace, demonstrated a reasonable person could find you and complainant worked in close proximity to one another after the occurrence of the unwelcome sexual conduct on October 14, 2016.

10. A reasonable person could find the close proximity between you and complainant in the workplace after the occurrence of the unwelcome sexual conduct on October 14, 2016, created an objectively hostile work environment for complainant.

11. Your actions on October 14, 2016, ultimately resulted in a hostile work environment for complainant in violation of University policy.

You knew or should have known that your behavior was unacceptable and violated University policy. Most recently, over the last five (5) years, you completed:

2017 Intersections Training on November 9, 2017

2016 Intersections Training on October 31, 2016

2015 Preventing Sexual Harassment on October 2, 2015

2014 Preventing Sexual Harassment on January 7, 2015

2013 Preventing Sexual Harassment on January 8, 2014

Your actions constitute proper cause for Discharge in accordance with University Administrative Policy (UAP) 3215, Performance Management (**Attachment F**).

Your actions as determined by the OEO are a violation of the following (**Attachment G**):

- UAP 2720, Prohibited Discrimination and Equal Opportunity
- UAP 2730, Sexual Harassment *(This policy was in effect between August 9, 1988 and February 26, 2018. On or about February 26, 2018, it was rescinded and incorporated into UAP 2740)*
- UAP 2740, Sexual Violence and Sexual Misconduct

Per University policy, some violations, even if they only occur once, are of such a serious nature that they justify discharge. It is my belief that the violations described herein and the impact on the complainant are of such a serious and egregious nature that an accelerated disciplinary process is warranted. Therefore, your discharge is being considered. Until a decision has been made, you will be ineligible to be considered for future employment opportunities at the University. If you are ultimately discharged, you will be ineligible for rehire at the University of New Mexico.

You have the right to respond to these charges before I make a final determination. This response is an opportunity for you to tell me your position, defenses, and any information you feel I should know before I make a final decision. You may respond in writing and/or you may meet with me to provide your response orally. If you choose to respond in person, you may have a representative of your choosing attend the meeting and/or respond on your behalf. In order to respond in person, you will need to request this meeting in writing within five (5) working days of receipt of the notice. You will have ten (10) calendar days from receipt of this notice to respond in writing or in person to the contemplated action. Following receipt of your response, if any, I will consider all information available to me and issue a final decision to you in writing.

Sincerely,

Paul B. Roth, MD, MS
EVP and Chancellor for Health Sciences

**THE UNIVERSITY OF NEW MEXICO**

I accept delivery of this notice. My signature does not indicate acceptance or concurrence with any action taken against me.

_____          ____6/6/18_____
Michael S. Briggs                                        Date

Attachments:

- Attachment A – OEO Preliminary Letter of Determination dated December 4, 2017
- Attachment B – OEO Final Letter of Determination dated December 12, 2017
- Attachment C – President's response to Appeal of OEO Case No. I-2016-11-66 dated March 29, 2018
- Attachment D – OEO memo dated April 3, 2018, notifying Respondent of President's decision overturning OEO's determination
- Attachment E – OEO Amended Final Letter of Determination dated April 13, 2018
- Attachment F – UAP 3215, Performance Management
- Attachment G – UAP 2720, Prohibited Discrimination and Equal Opportunity and UAP 2740, Sexual Violence and Sexual Misconduct

Cc:    Department file
        Personnel file

 **POLICY OFFICE**

<span style="color:blue">NCA: Attachment G</span>

## Administrative Policies and Procedures Manual - Policy 2720: Prohibited Discrimination and Equal Opportunity

**Date Originally Issued: 09-27-1991**
**Revised: 12-13-1991, 01-15-2007, 05-21-2014, 02-26-2018**

Authorized by RPM 2.3 ("Equal Opportunity and Affirmative Action for Employees and Students")
Process Owner: Director, Office of Equal Opportunity

Note: This policy was formerly numbered UAP 3100.

## 1. General

The University of New Mexico is committed to providing a safe and inclusive environment that draws on the diversity of its members. The University prohibits discrimination, harassment, or related retaliation based on protected class (as defined in Section 2) in any educational and work environment. It is critical to this commitment that anyone who experiences, witnesses, or is aware of such discrimination , harassment, or retaliation report the behavior pursuant to Section 9 below.

The University is committed to providing equal opportunities and accessibility to individuals with disabilities. Consistent with federal and state law, individuals with disabilities are entitled to access, support, reasonable accommodation, and academic adjustments.

The University is committed to protecting rights during pregnancy and provides necessary accommodations to students and employees (faculty, staff, and student employees) affected by pregnancy or childbirth in the same manner as other individuals unable to work or participate in their work or education because of their physical condition.

The University is committed to providing reasonable accommodation for the religious beliefs and practices of its students and employees.

The University is committed to fostering an environment of inclusiveness that respects an individual's preferred form of self-identification, including a name other than a legal first name and preferred pronoun. This policy prohibits gender-based discrimination, including discrimination based on gender-identity or expression and affirms the right of individuals to use the gender-specific facilities consistent with their gender identity.

The University is committed to inclusive excellence and diversity and seeks to take advantage of the rich backgrounds and abilities of everyone. The University, as an equal opportunity/affirmative action employer, complies with all applicable federal and state laws regarding nondiscrimination and affirmative action. It makes good faith efforts to recruit, hire, and promote qualified women, minorities, individuals with disabilities, and veterans.

The Office of Equal Opportunity (OEO) is the independent, impartial, and neutral campus entity designated to ensure compliance with this policy and other polices that apply to civil rights. The OEO reports directly to the University President to maintain optimal independence and impartiality. The OEO investigative process can be accessed here .

## 2. Definitions

1. "Protected class" means those personal traits or characteristics, statuses, and/or beliefs that are defined by applicable law and policy as protected from discrimination or harassment including age, ancestry, color, ethnicity, gender, gender identity (including gender expression), genetic information, national origin, physical or mental disability, pregnancy, race, religion, serious medical condition, sex, sexual orientation, spousal affiliation, and veteran status.

2. "Discrimination" prohibited by this policy means conduct based on a protected class that excludes an individual from participation in, denies the individual the benefits of, treats the individual differently than similarly-situated individuals who are not in the protected class or otherwise adversely affects a term or condition of an individual's employment, education, living environment, or participation in a University program or activity.  Differential treatment and harassment that creates a hostile environment based on an individual's membership in a protected class are types of discrimination prohibited by this policy.

3. "Differential treatment" occurs when people, whether an individual or a group, are treated differently than similarly-situated individuals who are not in their protected class because of their membership in the protected class.

4. "Harassment" prohibited by this policy is unwelcome conduct based on a protected class and can include, but is not limited to, slurs or epithets, graphic or written statements, or other behavior that may be physically threatening, harmful, or humiliating.  Harassment violates this policy when it creates a hostile environment, as defined below.

5. "Sexual harassment" or "sexual misconduct" – See UAP 2740 ("Sexual Misconduct") for definitions.

6. "Hostile environment" exists when harassment is sufficiently serious (i.e., severe, pervasive, or persistent) and objectively offensive so as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities; or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment. Mere offensiveness is not enough to create a hostile environment.  In determining whether harassment has created a hostile environment, consideration will be made not only as to whether the conduct was unwelcome to the person who feels harassed, but also whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive.  Harassment that creates a

 **POLICY OFFICE**

NCA: Attachment G continued

## Administrative Policies and Procedures Manual - Policy 2740: Sexual Misconduct

**Date Originally Issued: 05-15-2015**
**Revised: 02-26-2018**

### General

The University of New Mexico prohibits discrimination on the basis of sex (including gender, sex stereotyping, gender expression, and gender identity). Sexual harassment, which includes acts of sexual violence, is a form of sex discrimination. Sex discrimination is a violation of Title VII of the Civil Rights Act of 1964; Title IX of the Educational Amendments of 1972; and the New Mexico Human Rights Act, NMSA 1978, Sections 28-1-1 to 28-1-7, 28-1-7.2, 28-1-9 to 28-1-14. Intimate partner violence includes physical, sexual, or psychological harm.

For the purposes of this policy, sexual harassment, sexual violence, and intimate partner violence are collectively referred to as "sexual misconduct." Sexual misconduct subverts the mission of the University and threatens the careers of students and employees.

As more fully described in Section 5, this policy applies to allegations of sexual misconduct made by or against a student, staff, or faculty member that occur within the course of a UNM program or activity or have continuing adverse effects on campus, regardless of where the alleged activity occurred. If the circumstances giving rise to the allegations are related to UNM's programs or activities, this policy may apply regardless of the affiliation of the parties. The University is committed to responding promptly and fairly to every allegation of sexual misconduct.

Sexual misconduct may be committed by anyone, including a stranger, an acquaintance, a friend, or someone with whom the victim is involved in an intimate or sexual relationship. Individuals who have experienced sexual misconduct are encouraged to report what happened to law enforcement and to seek assistance from any of the campus resource offices or community resources listed in Section 9 of this policy. A report of sexual misconduct will be taken seriously and addressed in accordance with UNM policies and procedures. The University's Title IX Coordinator , who oversees institutional compliance with UNM policy related to sex discrimination (including sexual misconduct), is located in the Office of Equal Opportunity (OEO). See Section 9 for contact information. For more information on discrimination related to sex and other protected categories, see UAP 2720 ("Prohibited Discrimination and Equal Opportunity") .

This policy includes information for students, staff, and faculty on resources available following an act of sexual misconduct, UNM responses, education and prevention programs, and possible disciplinary sanctions.

## 1. Definitions of Sexual Misconduct

The components of sexual misconduct—sexual harassment, sexual violence, and intimate partner violence—are defined below.

### Sexual Harassment

Sexual harassment is unwelcome conduct of a sexual nature. Sexual harassment covered by this policy generally falls into one of two categories: quid pro quo and hostile environment. Conduct of a sexual nature becomes a violation of this policy when:

- submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment or academic advancement (**quid pro quo**);

- submission to or rejection of such conduct by an individual is used as the basis for employment decisions or academic decisions affecting such individual (**quid pro quo**); or

- unwanted conduct of a sexual nature is sufficiently serious (i.e., severe, pervasive, or persistent) and objectively offensive as to deny or limit a person's ability to participate in or benefit from the University's programs, services, opportunities, or activities; or when such conduct has the purpose or effect of unreasonably interfering with an individual's employment (**hostile environment**).

Mere offensiveness is not enough to create a hostile environment. Although repeated incidents increase the likelihood that harassment has created a hostile environment, a serious incident such as a sexual assault, even if isolated, can be sufficient.

In determining whether harassment has created a hostile environment, consideration will be made not only as to whether the conduct was unwelcome to the person who feels harassed, but also whether a reasonable person in a similar situation would have perceived the conduct as objectively offensive. Also, the following factors will be considered:

**Table of Contents**

1. Definitions of Sexual Misconduct

2. Reporting Sexual Misconduct

3. Consent

4. Amnesty from Disciplinary Action for Students

5. Off-Campus Conduct

6. Retaliation

7. Disclosure of Information

8. Rights of the Parties

9. Resources Following an Act of Sexual Misconduct

10. Interim Measures

11. Procedures to Follow if you Experience Sexual Violence

12. Educational Programs

13. Investigation and Disciplinary Procedures

14. UNM Branch Campus Information

 OFFICE OF THE PRESIDENT

PLAINTIFF'S
EXHIBIT

**36**

March 29, 2018

**VIA U.S. MAIL AND EMAIL** ryan@rjvlawfirm.com

Ryan J. Villa, Esq.
Law Office of Ryan J. Villa
2501 Rio Grande Blvd. NW Suite A
Albuquerque, NM 87104

Re: Appeal of OEO Case No. I-2016-11-66

Dear Mr. Villa:

I am writing in response to your client's (Complainant's) appeal of OEO's December 12, 2017 determination that the accused party's (Respondent's) conduct did not subject Complainant to an objectively hostile work environment and, therefore, did not violate University Administrative Policies 2720 or 2740 on the grounds this determination is unsupported by the facts. In accordance with Section IX of OEO's Discrimination Claims Procedure, I have considered your appeal. Specifically, I have carefully reviewed your appeal submission and OEO's Preliminary Letter of Determination ("PLOD") and Final Letter of Determination ("FLOD"), as well as relevant UNM policy. For purposes of Complainant's appeal, I have accepted OEO's unchallenged factual findings as true.

Based on my review of the PLOD, the undisputed facts demonstrate the October 14, 2016 outing was not work-related because it occurred outside the workplace and was not planned for the purpose of carrying out work-related functions. These facts, as well as OEO's finding that Respondent was not Complainant's direct supervisor or in her supervisory chain, support OEO's ultimate conclusion that the sexual misconduct at issue did not itself constitute a hostile work environment in violation of UNM policy. Because, however, OEO did not expressly find that the October 14, 2016, incident itself was not work-related, I remand this discrete issue to OEO and, consistent with the undisputed facts of this matter and finding described above, direct the office to amend the FLOD to clarify the October 14, 2016 incident itself was not work related.

Further, other findings made by OEO in the PLOD/FLOD, including that Respondent's position afforded him opportunity to be influential at the department level if he so chose and that a reasonable person in Complainant's position would have feared retaliation and his potential negative influence in her work environment, demonstrate Complainant and Respondent worked in close proximity with one another. I, therefore, believe a reasonable person also could find working in close proximity to Respondent post-October 14, 2016, created an objectively hostile work environment for Complainant based on the sexual misconduct at issue and in violation of UNM policy. Therefore, I also remand this discrete issue OEO with the following instructions:

Reverse its conclusion that the incident did not create a hostile work environment on the grounds a reasonable person could not find Respondent interfered with Complainant's work environment post-October 14, 2016; and determine the Respondent's actions resulted in a hostile work environment for Complainant in violation of University Administrative Policies 2720, 2730 and 2740.

Section IX of OEO's Discrimination Claims Procedure and the Regents' Policy 1.5 (Appeals to the Board of Regents) allow for appeal to the Board of Regents, which must be received within thirty (30) days from the date this decision.

Sincerely,

Garnett S. Stokes
President

cc:    Francie Cordova, Director, OEO
       Molly Schmidt-Nowara, Counsel to Respondent

PLAINTIFF'S
EXHIBIT

37

**Gail A Case**

| | |
|---|---|
| **From:** | vanmeterellis@gmail.com |
| **Sent:** | Friday, September 15, 2017 3:30 PM |
| **To:** | Gail A Case |
| **Subject:** | Resignation |

Good afternoon Gail,

Please consider this email my formal resignation as project specialist from the department of orthopaedics at UNM, effective end of business September 7th, 2017.

Thank you,

Joy

UNM000252

**PLAINTIFF'S EXHIBIT**

**38**

---

**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2            FOR THE DISTRICT OF NEW MEXICO
 3 JOY VAN METER
 4          Plaintiff/Counter-Defendant,
 5   -vs-              NO:  1:18-cv-00970 RB/JHR
 6
   MICHAEL BRIGGS,
 7
            Defendant/Counterclaimant.
 8
 9        DEPOSITION OF ZACHARY DILLENBACK
10              August 23, 2019
11              1:09 p.m.
                Suite 1500
12              201 Third Street, Northwest
                Albuquerque, New Mexico
13     PURSUANT TO THE FEDERAL RULES OF CIVIL
   PROCEDURE, this deposition was:
14
15 TAKEN BY:  TRAVIS JACKSON, ESQ.
           ATTORNEY FOR COUNTERCLAIMANT BRIGGS
16
   REPORTED BY:  KENDRA D. TELLEZ
17                CCR #205
                  Kendra Tellez Court Reporting, Inc.
18                302 Silver, Southeast
                  Albuquerque, New Mexico  87102
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1              EXHIBITS
 2 EXHIBIT        DESCRIPTION
 3 105    Excerpt from Vol. 1 of Va
          Deposition
 4
   106    Excerpt of Emilia Vigil, MA,      37
 5        Deposition
 6 107    Excerpt from Vol. 1 of Van Meter's   42
          Deposition
 7
   108    Excerpt from Vol. 1 of Van Meter's   52
 8        Deposition
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

---

**Page 2**

```
 1              APPEARANCES
 2 For the Plaintiff:
 3   LAW OFFICE OF RYAN J. VILLA
     2501 Rio Grande Boulevard, Northwest
 4   Suite A
     Albuquerque, New Mexico 87104
 5   richelle@rjlawfirm.com
     BY: RICHELLE ANDERSON, ESQ.
 6
 7 For the Counterclaimant Briggs:
 8   JACKSON LOMAN STANFORD & DOWNEY, P.C.
     Suite 1500
 9   201 Third Street, Northwest
     Albuquerque, New Mexico 87102
10   travis@jacksonlomanlaw.com
     meghan@jacksonlomanlaw.com
11   BY: TRAVIS JACKSON, ESQ.
12 For the Defendant Briggs:
13   DEGRAAUW LAW FIRM, P.C.
     Suite 302
14   316 Osuna Road, Northeast
     Albuquerque, New Mexico 87107
15   Drew@dglawfirmpc.com
     BY: J. ANDREW DeGRAAUW, ESQ.
16
17       INDEX            PAGE
18 ZACHARY DILLENBACK
19 Examination By Mr. Jackson        4
   Examination By Ms. Anderson      62
20 Examination By Mr. Jackson       72
21 Certificate of Completion of Deposition  76
22 Witness Signature/Correction Page      78
23
24
25
```

---

**Page 4**

```
 1            ZACHARY DILLENBACK
 2 having been first duly sworn, testified as follows:
 3            EXAMINATION
 4 BY MR. JACKSON:
 5   Q.   Good morning, Mr. Dillenback.  As I
 6 explained, my name is Travis Jackson.  I represent
 7 Michael Briggs in a lawsuit filed by Joy Van Meter.
 8 Her counsel is here as well.
 9        Can you please state your name for the
10 record.
11   A.   Zachary Dillenback.
12   Q.   Have you ever been deposed before?
13   A.   No.
14   Q.   Do you understand the testimony you
15 provide today is subject to the penalty of perjury?
16   A.   Yes.
17   Q.   Okay.  Just to be clear, the testimony you
18 give during this deposition is subject to the same
19 rules that would apply in a courtroom, and any
20 failure to tell the truth may have consequences.  Do
21 you understand that?
22   A.   Yes.
23   Q.   In order to make sure we have a clear
24 record, please let me know if you don't understand
25 the questions that I ask.  Sometimes I can be a fast
```

---

**Page 21**

1  Meter met at the bar after school for drinks, what
2  topics did you discuss?
3      A.  Just life, work, what we wanted to do with
4  our -- I guess with our lives and careers and that
5  sort of thing.
6      Q.  Sure.  Did she ever discuss her marriage
7  with you?
8      A.  Not particularly.  On occasion we'd talk
9  about just raising kids, and I know she -- her
10  husband had kids from a previous relationship, so
11  sometimes we'd discuss that.
12     Q.  Okay.  Did she ever talk about any
13  problems she was having in her marriage with you?
14     A.  No, not that I recall.
15     Q.  Did she ever talk to you about potentially
16  getting divorced from her husband?
17     A.  No.
18     Q.  Did she ever talk to you about sex?
19     A.  I don't believe so, no.
20     Q.  Did she ever talk to you about her and her
21  husband having an open marriage?
22     A.  I think she talked about the concept.  I
23  don't know that she -- that she ever engaged.
24     Q.  What did she tell you?
25     A.  Just that they considered the concept of

---

**Page 22**

1  an open marriage.
2          And I guess on the previous question
3  for -- the question about sex, I mean, so on
4  occasion she'd ask, I guess, my, I guess, intimate
5  life.
6      Q.  What do you mean?  Tell me about that.
7      A.  I mean, if we talked about sex, I would --
8  she would sometimes ask who I was dating.
9      Q.  Okay.
10     A.  That's all.  But, no, I can't recall if
11  we've ever talked about her sex life.
12     Q.  When she talked to you about the concept
13  of having an open marriage, what did she tell you?
14     A.  I think, more or less -- I think sometimes
15  how -- I think that they may have been talking about
16  the concept of it and whether it could be done.  But
17  I don't know if they really went behind it or
18  engaged in it or tried it or anything like that.
19     Q.  Did she tell you that she was interested
20  in having an open marriage?
21         MS. ANDERSON:  Objection, form.
22         Go ahead.
23     A.  I don't recall if she said -- I think it
24  was more conceptual.
25     Q.  No, I understand that she was discussing

---

**Page 23**

1  the concept of being in an open marriage.  What I'm
2  trying to understand is, did she tell you that she
3  would like to be in an open marriage, or did she
4  tell you she didn't want to be in an open marriage?
5          MS. ANDERSON:  Objection, form.
6      A.  I'm not sure she said either way, that she
7  wanted to or didn't want to.
8      Q.  Did she ever tell you that her and her
9  husband had agreed to be in an open marriage?
10     A.  I don't recall that.
11     Q.  Did she ever talk to you about whether her
12  and her husband had engaged in relationships outside
13  of their marriage?
14     A.  I can't recall that she did.
15     Q.  Did Ms. Van Meter ever indicate to you
16  that she might be interested in having a romantic
17  relationship with you?
18     A.  I don't think she did.
19     Q.  Did she ever indicate to you that she
20  might be interested in having a sexual relationship
21  with you?
22     A.  No, she did not.
23     Q.  Did your relationship with Ms. Van Meter
24  ever develop into anything more than friendship?
25     A.  No.

---

**Page 24**

1      Q.  You understand that your testimony today
2  is under oath, don't you?
3          MS. ANDERSON:  Objection, form.
4      A.  Yes, I do.
5      Q.  Did you ever kiss Ms. Van Meter?
6      A.  We kissed one time.
7      Q.  When I asked whether your relationship
8  with Ms. Van Meter ever developed into anything more
9  than friendship, that wasn't true, was it?
10         MS. ANDERSON:  Objection, form.
11     A.  Well, there is that one kiss, that one
12  time.
13     Q.  All right.  Tell me about the one kiss,
14  the one time.
15     A.  It was one of the times we had met.  We'd
16  had a couple of drinks, and when we were walking to
17  the car, we kissed.  It was very short.  And I don't
18  think we meant for it to happen, and we stopped it,
19  and we went our own ways.  It never happened again.
20     Q.  And who initiated the kiss?
21     A.  I don't recall.  I think we -- I think we
22  both just kind of did it.
23     Q.  And you indicated that you were in the
24  parking lot of the bar where you had met for drinks;
25  is that correct?

**33**

1  Salzburg was really just a day trip.
2    Q.  Okay.  So did you stay overnight in just
3  Munich and Prague, is that what you're saying?
4    A.  That's correct.
5    Q.  Okay.  It was about a two-week trip?
6    A.  Yeah.
7    Q.  My understanding is that on this trip, you
8  and Ms. Van Meter shared a room; is that correct?
9    A.  That's correct.
10    Q.  And did you share a room on both legs of
11  the trip, both the Munich and the Prague --
12    A.  Yes.
13    Q.  -- portions of that trip?  How did that
14  come about?
15    A.  The decision to share a room?
16    Q.  Yes.
17    A.  I think it was really two factors, by that
18  far -- well, not everyone goes on the trip.  So
19  maybe like a third of the -- if it's a 30-student
20  cohort, only about a third end up going, roughly, if
21  I recall.
22    Q.  Okay.
23    A.  She and I were comfortable with one
24  another, having worked so much together and just
25  being friends, and just by default, I think, we were

**34**

1  less comfortable with the other people who weren't
2  already paired up who were going on the trip.  So it
3  was either we could room together, or room with
4  someone both of us I don't think ever cared to stay
5  with, or shell out a lot more money for a single
6  room.
7    Q.  Did any of the other participants in the
8  international residency program share a room?
9    A.  Yeah.
10    Q.  Who shared rooms, that you recall?
11    A.  A couple of them brought their significant
12  others.
13    Q.  Okay.
14    A.  And there were a couple -- there's at
15  least one who actually did just pay for a single
16  room, then a couple just buddied up.
17    Q.  That's what I'm trying to figure out, who
18  are these students who decided to buddy up?
19    A.  I'm trying to think.  You want names?
20    Q.  Yes, please.
21    A.  I think Brandon and Silas, although I
22  think that did not -- I think that didn't go well
23  halfway through, and then Brandon and James ended up
24  in a room.  A lot of people had their -- I mean,
25  going to Europe, they brought their significant

**35**

1  others.  I don't know the exact pairings of the
2  other people that ended up going.
3    Q.  Can you identify any other pairings that
4  involved a female and a male student?
5    A.  No.
6    Q.  Were there any?
7    A.  No, not that I recall.
8    Q.  And did you and Ms. Van Meter decide to
9  share a room before or after the kiss at Twin Peaks?
10    A.  I believe it was after.
11    Q.  Who suggested that you and Ms. Van Meter
12  share a room in Europe?
13    A.  I think I did.
14    Q.  And you indicated that there were two
15  different legs to the trip.  What hotel did you stay
16  at in Munich?
17    A.  I don't remember the name of it.  Or the
18  one in Prague.
19    Q.  Okay.  And how were the -- how were the
20  rooms laid out?
21    A.  I believe the one in Munich had a king
22  bed, and I think we had -- I think there were
23  doubles in Prague, if I recall correctly.
24    Q.  Sometimes in European hotels, the
25  bathrooms aren't in the actual room.  You have to

**36**

1  share the bathroom down the hall with the rest of
2  the -- with another group.  Did you have bathrooms
3  in your hotel rooms?
4    A.  Yes, we had our own.
5    Q.  Some people call that an en suite.  But
6  you did have bathrooms in your hotel rooms?
7    A.  Yes.
8    Q.  And you said that the hotel room in Munich
9  only had a king bed.  Did you and Ms. Van Meter
10  share that bed?
11    A.  Yes.
12    Q.  Did Ms. Van Meter ever get dressed or
13  undressed in front of you when you shared a room in
14  Europe?
15    A.  No.
16    Q.  How would that happen?
17    A.  She would use the bathroom, or we weren't
18  in the same room when -- or in the room together
19  when that was happening.
20    Q.  And you said that the other room had two
21  doubles that were separated in the room; is that
22  correct?
23    A.  If I recall correctly.
24    Q.  Okay.  Did you ever push those beds
25  together, or did they stay separate?

57

1    Q.    So you never really discussed --
2    A.    No.
3    Q.    -- either the complaint to the police or
4  the complaint to UNM?  You don't have any
5  information about that at all?
6    A.    No, I -- I haven't been contacted, other
7  than the subpoenas I got.
8    Q.    Okay.  Did Michael Briggs try to influence
9  how you might testify at all?
10   A.    No.  It was just that one call for two
11 minutes.  I don't think he even knew what was going
12 on at that point.
13   Q.    Had you ever discussed with Ms. Van Meter
14 that she might be a witness in the UNM
15 investigation?
16   A.    I'm sorry?  That who might be a witness?
17   Q.    Sorry, let me back out, because you're
18 operating from less than complete information.
19        So I'll represent to you that there was an
20 investigation by the Albuquerque Police Department
21 into Ms. Van Meter's claims, and she also initiated
22 an investigation at the University of New Mexico.
23 So sometimes I may talk about the APD investigation;
24 sometimes I may talk about the UNM investigation.  I
25 realize that you may not have information about

58

1  those, but I want to find out what information, if
2  any, you have.  Okay?
3    A.    Okay.
4    Q.    Were you ever contacted by the Albuquerque
5  Police Department to provide any information
6  relating to the APD investigation?
7    A.    No.
8    Q.    Are you aware that Mr. Briggs was never
9  charged with any crime, and that the District
10 Attorney's Office declined to prosecute him?
11   A.    In -- the only thing -- I think Natasha,
12 is it?  When I talked to her about scheduling this,
13 all I knew is that this was civil, and the criminal
14 had -- I didn't know the results of it, but it was
15 done.
16   Q.    Sure, okay.  And so you weren't involved
17 at all in the criminal investigation?
18   A.    No.
19   Q.    Okay.  So as I represented to you, there's
20 also a separate UNM investigation, and there's also
21 this lawsuit, and they're all connected in some
22 ways.  I apologize, because I know it's confusing,
23 so I'll try to be as clear as I can.
24        Did anyone ever contact you about
25 providing information as part of the UNM

59

1  investigation?
2    A.    No.
3    Q.    At UNM, they have a department called the
4  Office of Equal Opportunity; OEO, we sometimes call
5  it.  And I'll represent to you that OEO investigates
6  claims of sexual harassment and other types of
7  employment issues, primarily.  Did anyone from UNM's
8  OEO ever contact you about providing information for
9  UNM's investigation?
10   A.    No.
11   Q.    Did you ever talk to a woman named Laura
12 Vele Buchs about providing information regarding
13 Ms. Van Meter's claims against Michael Briggs?
14   A.    No.
15   Q.    So just to be clear, no one from UNM ever
16 contacted you about their investigation?
17   A.    No.
18   Q.    Did you ever decline to participate in
19 UNM's investigation of Ms. Van Meter's claims
20 against Michael Briggs?
21   A.    No.
22        MR. JACKSON:  How about we take a
23 quick break, and I think I'm going to try to speed
24 things up and get you out of here, if we can.
25   (Recess was taken from 2:25 p.m. until 2:33 p.m..)

60

1        MR. JACKSON:  We're back on the
2  record after taking a brief break.
3    Q.    Mr. Dillenback, we've taken a brief break.
4  Is there anything about your testimony earlier today
5  that you want to change or correct?
6    A.    No.
7    Q.    Okay.  I just have a few more questions,
8  and then I'll pass you to Ms. Van Meter's lawyer,
9  since she can ask you any questions that she may
10 have.
11        So during the course of the day, we've
12 gone through a number of excerpts from depositions
13 that talk about you aggressively and drunkenly
14 attempting to have sex with Ms. Van Meter in Europe
15 and you engaging in unwanted touching of her.  Do
16 you understand what I'm talking about?
17   A.    Yes.
18   Q.    Do you take sexual assault seriously?
19   A.    Yes.
20   Q.    How does it feel to be accused of
21 improperly touching a woman?
22        MS. ANDERSON:  Objection, form and
23 foundation.
24   A.    It feels terrible.  And, you know, I guess
25 I don't know what else to say about it.  In Europe,

**Travis G. Jackson**

PLAINTIFF'S
EXHIBIT

**39**

| | |
|---|---|
| **From:** | Ryan Villa <ryan@rjvlawfirm.com> |
| **Sent:** | Thursday, June 20, 2019 3:37 PM |
| **To:** | Travis G. Jackson; Meghan Stanford; Natasha Wesenberg |
| **Cc:** | Richelle Anderson |
| **Subject:** | VanMeter- potential corrections to testimony |

Travis,

I wanted to alert you to three corrections Ms. VanMeter intends to make to her deposition testimony when it resumes:

1. During the time in which Ms. VanMeter and her husband had an open relationship, she kissed Mr. Dillenback.

2. Ms. VanMeter made a video for her husband in which she was engaged in masterbation.

3. Ms. VanMeter and her husbad asked Mr. Horn whether he wanted to engage in a threesome with them, and he declined.

Thank you.


**Ryan J. Villa**

**The Law Office of Ryan J. Villa**
2501 Rio Grande Blvd NW Suite A
Albuquerque, NM 87104
Office: 505-639-5709
Fax:   505-433-5812
Email: ryan@rjvlawfirm.com

PLAINTIFF'S
EXHIBIT

**40**

JOY VAN METER VOL. I

277

1          DEPONENT SIGNATURE/CORRECTION PAGE

2              If there are any typographical errors to
   your deposition, indicate them below:
3

4  PAGE   LINE

5  82    17   Change to  My → Mind

6  83    6    Change to  My → Mind

7  180   6    Change to  My → Mind

8  192   16   Change to  Kahootz

9              Any other changes to your deposition are
   to be listed below with a statement as to the reason
10 for such change.

11 PAGE  LINE  CORRECTION          REASON FOR CHANGE

12 96    14   Clarification that "I think only 4 or 5" is an estimate, not guaranteed.

13 97    16-24  I was later shown a picture of text exchanges. that Michael texted me first on Saturday.

14 98    23   I told him that was not ok. I never said it was ok to call the cops

15 176   16   Yes   The kissing incident was remembered after the fact and reported to Travis Jackson

16 200   7    We also invited a man to join us for sex once. It never happened

17         I, JOY VAN METER, do hereby certify that I have
   read the foregoing transcript of my testimony on
18 ___8/23/19___ and it is a true and correct record
   of my testimony given at that time, except as to any
19 corrections submitted.

20

21

22 ___8/23/19___      _____

23 DATE SIGNED          JOY VAN METER

24

25

KENDRA TELLEZ COURT REPORTING, INC.
505-243-5691

#2

JOY VAN METER VOL. I    6/19/2019

277

```
 1              DEPONENT SIGNATURE/CORRECTION PAGE
 2              If there are any typographical errors to
 3    your deposition, indicate them below:
 4    PAGE   LINE
 5    201  11     Change to  Mind
 6    201  13     Change to  My → Mind
 7    244  14     Change to  South West Orthopaedic Trauma Association
 8    _____   Change to  _____
 9              Any other changes to your deposition are
10    to be listed below with a statement as to the reason
      for such change.
11    PAGE  LINE  CORRECTION          REASON FOR CHANGE
12    200  17   After remembering kissing Zach, Ryan Villa emailed Trav
                                                        to correct this
13    218  17   Nods head → No   clarification.         statement
14    _____
15    _____
16    _____
17        I, JOY VAN METER, do hereby certify that I have
      read the foregoing transcript of my testimony on
18    8/23/19_____  and it is a true and correct record
      of my testimony given at that time, except as to any
19    corrections submitted.
20
21
22    8/23/19_____        _____
23    DATE SIGNED              JOY VAN METER
24
25
```

KENDRA TELLEZ COURT REPORTING, INC.
505-243-5691



PLAINTIFF'S
EXHIBIT

**41**

Compliance Office - Main Campus

May 16, 2019

Travis G. Jackson
Jackson Loman Stanford & Downey
Via Email: travis@jacksonlomanlaw.com

Quentin Smith
Sheehan & Sheehan, P.A.
Via Email: qs@sheehansheehan.com

Re: UNM Peer Hearing re: Michael Briggs; statement of issues to be heard by the Peer Hearing Panel; objections by the Parties

Counsel,

On February 6, 2019, the Compliance Office – the University department tasked with administering its peer hearing process for staff under University Administrative Policy ("UAP") 3215: Performance Improvement – solicited statements of the issues from the Parties to help frame the issues for the Peer Hearing Panel ("the Panel") to consider[1]. The Parties submitted their proposed statements of the issues via email on February 21, 2019 (Complainant) and February 22, 2019 (Respondent). The Parties thereafter submitted written objections and positions regarding those statements of the issues on March 26, 2019 (both Parties), April 8, 2019 (Complainant), April 18, 2019 (Respondent), and May 6, 2019 (Complainant)[2]. On May 7, 2019, the Panel met to discuss the Parties' positions on the statements of issues and their respective objections. This letter constitutes the Panel's identification of the statement of the issues it will consider at the June 4 and 6, 2019 hearing and its decisions regarding the objections the Parties raised.

<u>Statement of the Issues</u>

Complainant identified five issues in his February 21, 2019 email for the Panel to consider:

1. Whether Complainant's conduct violated UAP 2720: Prohibited Discrimination and Equal Opportunity;
2. Whether Complainant's conduct violated UAP 2730: Sexual Harassment;
3. Whether Complainant's conduct violated UAP 2740: Sexual Violence and Sexual Misconduct;
4. Whether Complainant's conduct constitutes proper cause for discharge pursuant to UAP 3215; and
5. Whether Respondent violated Complainant's Constitutional due process rights.

Respondent's February 22, 2019 email identified two issues for consideration:

---

[1] Bienstock, Robert E., "How to Run a UNM Hearing" at 20.
[2] Respondent submitted further objections on May 9, 2019; however, because the Panel met to discuss the positions of the Parties on May 7, 2019, objections submitted thereafter were not considered.

1. Did Complainant subject Ms. Van Meter to unwelcome conduct of a sexual nature in violation of UAP 2720, 2730, and/or 2740? and
2. If so, does said conduct qualify as proper cause for discharge pursuant to UAP 3215?

As an initial matter, it must be emphasized that the Panel is not a judicial body endowed with the authority to determine whether or not the United States Constitution, New Mexico Constitution, or any federal or state statute has been violated. Rather, its sole charge is to weigh the evidence to determine whether it is more likely than not that the conduct in question occurred, and if so, whether such conduct provides just and proper cause for the discipline issued. With this in mind, because it is not endowed with the authority to determine whether an individual's Constitutional due process rights have been violated, the Panel will not consider Complainant's fifth identified issue.

As to the remaining four issues, the Parties do not significantly differ[3]. The Parties identify the same four University policies as governing the Panel's consideration. The Parties similarly frame the issues in terms of whether Complainant engaged in conduct in violation of three of those policies, and whether such violations (if true) provided just and proper cause for Complainant's discharge from employment. Where the Parties differ is in the descriptive specificity of Complainant's alleged conduct.

For simplicity's sake, and in consideration of the Parties' respective positions, the Panel identifies the following as the statement of the issues it will consider at the June 4 and 6, 2019 hearing:

1. Whether Complainant engaged in conduct that violated UAP 2720, 2730, and/or 2740; and
2. If so, whether such conduct constitutes just and proper cause for discharge from employment as required by UAP 3215.

<u>Objections of the Parties</u>

The Parties' respective objections submitted on March 26, 2019 primarily take issue with whether the Panel is empowered to consider whether Complainant's Constitutional rights were violated. As this issue has already been addressed, this section will focus on addressing the Parties' remaining objections and/or procedural requests as identified in the correspondence dated April 8, April 18, and May 6, 2019.

1. Appointment of an independent hearing officer

There are no policy or procedural provisions that support the appointment of an independent hearing officer to hear and determine non-union staff disciplinary matters. The Panel therefore denies this request.

2. Objection to time restriction

The Panel has allotted two days for the hearing. The Panel commits to make every effort to ensure that both Parties have an equal amount of time within that two-day time frame to present their respective cases.

3. Attorney representation

---

[3] In its March 26, 2019 letter, Respondent states that it does not object to Complainant's recitation of the first four issues to be considered.

Exhibit A to UAP 3215 (Peer Hearing Procedure) clearly provides that, while the Parties may bring an advisor with whom they may freely consult throughout the hearing, the advisor may not speak for a Party unless the panel decides that said Party needs such assistance. The Panel has received insufficient justification to make an exception to this prohibition and allow either Party's attorney to speak for them. The request by both Parties to have their attorneys advocate on their behalves during the hearing is therefore denied.

4.   Order of presentation

Complainant will present his case first, and Respondent will present his case thereafter. The Parties will each be allowed a ten-minute opening statement at either the beginning of the hearing or, upon their election, at the beginning of their presentment. At the close of the hearing, the Parties may present post-hearing briefs summing up the evidence submitted and their respective arguments regarding the significance thereof. If the Parties submit post-hearing briefs, such briefs must be submitted to the Panel via email to the Compliance Office no later than close of business on the tenth working day after the Panel makes the transcription of the hearing available to the Parties, with submissions to each other the following day. A Party not submitting a brief will not be penalized for electing not to do so; however, the Panel's consideration will be limited to the information presented in the opposing Party's brief and that submitted at the hearing.

5.   Scope of review/limitation on evidence

There are no limitations in University policy or procedure regarding the type and scope of evidence that the Parties may submit for consideration. Rather, University procedure only provides that both Parties must provide a copy of the evidence they wish to rely on to the Compliance Office ten working days before the hearing. This includes a list of witnesses the Parties wish to present as well as copies of the documents they intend to rely on. The procedure provides, "The Panel may exclude evidence only in special situations, such as evidence that is very personal and not very relevant, or when there are many witnesses testifying to the same thing." The Parties may not present documentary or testimonial evidence that they do not disclose prior to the hearing as provided in that procedure, with limited exception.

6.   Standard and burden of proof

Complainant bears the burden of proof by a preponderance of the evidence.

7.   Time distribution

The Parties will be allotted an equal amount of time to present their respective cases. The Compliance Office will track the Parties' use of their allotted time within reason.

8.   Opening and closing statements

As provided above, the Parties will each be allotted a ten-minute opening statement at either the opening of the hearing or at the beginning of their presentment. Also as provided above, the Parties may elect to present a post-hearing brief. The Parties will not be allowed to object during testimony, but may argue the weight and relevance of the evidence in post-hearing briefing should they elect to so submit.

Regarding cross examination: the Parties may cross examine each other's' witnesses; however, the Panel reserves its right to dictate the method, means, and content of cross examination to ensure that it is not used as a tool to intimidate, harass, or traumatize a witness. If a Party believes that any particular witness may be especially susceptible to intimidation, harassment, or traumatization through cross-examination, that Party should notify the Panel of the same in its witness list presented ten days prior to the hearing. That Party should also briefly describe the reason for the concern to ensure that the Panel has sufficient time and information to consider whether and to what extent to limit or modify the method, means, or content of cross examination in advance of the hearing.

9. Availability of and cross-examination of witnesses

While the Panel has the authority of the Board of Regents with regard to compelling cooperation from current University employees and students, it does not have subpoena or other power over individuals who are no longer employed or enrolled at the University. With that in mind, the Panel will make reasonable efforts to assist the Parties in locating witnesses. To assist it in making these efforts, the Panel requests that the Parties provide a general statement of the nature of the testimony the proposed witness will provide at the hearing to ensure that the Panel's efforts are not futile. Such statement should be included in the Parties' witness lists to be presented ten working days prior to the hearing.

10. Electronic presentation of evidence

All documentary evidence the Parties wish to rely on should be presented in hard copy form.

11. Transcription/video recording of hearing

The Panel will arrange for a transcriptionist to record the hearing and will make copies of the transcription available to the Parties. No other recording method will be accommodated.

12. Rule of exclusion

The Panel will exclude all witnesses from the hearing who are not currently testifying. Party representatives may remain throughout the hearing.

13. Form of decision

As provided in University procedure, the Panel will issue its decision in writing. Such decision will include findings of fact, conclusions, and recommendations, if any. The Panel's decision will be made by a simple majority.

14. Administrative appeal

Regents Policy 1.5 provides, "Faculty, staff, or students affected by a decision of the administration, faculty, student government, or hearing board may appeal the decision to the Board of Regents." Whether a Party has a different or further avenue to appeal a Panel decision would require the Panel to make conclusions beyond the limits of University policy.

Sincerely,

<u>Mark Emmons</u>
Mark Emmons, Associate Dean, CULLS, Panel Chair

<u>Bobbi J Jaramillo</u>
Bobbi J Jaramillo, Department Administrator, Pediatrics, Panel Member

<u>Malisa Kasparian</u>
Malisa Kasparian, Strategic Project Director, Continuing Education, Panel Member

PLAINTIFF'S
EXHIBIT

42

| | |
|---|---|
| **From:** | Rob Burford |
| **To:** | Quentin Smith; Travis G. Jackson |
| **Cc:** | Gianna M Mendoza; Kevin G Gick; Elizabeth Albright; Meghan Stanford |
| **Subject:** | RE: Peer Panel Friday Meeting Outcome |
| **Date:** | Friday, September 13, 2019 9:32:05 AM |

Good Morning,

I am writing in follow-up to your question below about Michael Ellis and the request for a modified cross-examination of him. After a conference call yesterday afternoon with the Panel Members, they have decided to allow a modified cross-examination for Mr. Ellis in the same manner as that which will be provided to Joy Van Meter. Due to space constraints, this will be done via skype, where both Mr. Ellis and Ms. Van Meter will testify from a remote location that Respondent should arrange. Respondent should also ensure that Mr. Ellis and Ms. Van Meter are not in the same room while they are testifying and do not discuss their testimony with each other. During testimony, both will be visible to all parties; however, they will not be able to see Complainant or his advisor. In order to facilitate this, I will need to know both individuals' skype contact information for when the time comes for these two individuals to be interviewed during the Peer Hearing.

Additionally, it would be helpful to know when Ms. Van Meter and Mr. Ellis will be called as witnesses, so we can make sure we have the technology on our side set.

Sincerely,

Rob Burford

---

**From:** Quentin Smith <qs@sheehansheehan.com>
**Sent:** Tuesday, September 10, 2019 4:35 PM
**To:** Rob Burford <rburford@unm.edu>; Travis G. Jackson <travis@jacksonlomanlaw.com>
**Cc:** Gianna M Mendoza <giamendoza@salud.unm.edu>; Kevin G Gick <KGick@salud.unm.edu>; Elizabeth Albright <ealbright@unm.edu>; Meghan Stanford <meghan@jacksonlomanlaw.com>
**Subject:** RE: Peer Panel Friday Meeting Outcome

Mr. Burford,

Thank you for your email. The Panel did not specifically address UNM's request for modified cross-examination of Michael Ellis, who Joy Van Meter's husband. Is the Panel's silence on the matter intended to communicate that the Panel has decided not to permit modified cross-examination of Mr. Ellis and that Mr. Briggs himself will be permitted to cross-examine Mr. Ellis and while in the same room? Or, can we expect the Panel to issue a separate decision on the issue?

Sincerely,

Quentin

---

**From:** Rob Burford [mailto:rburford@unm.edu]

**Sent:** Tuesday, September 10, 2019 10:45 AM
**To:** Quentin Smith; Travis G. Jackson
**Cc:** Gianna M Mendoza; Kevin G Gick; Elizabeth Albright; Meghan Stanford
**Subject:** Peer Panel Friday Meeting Outcome

Good Morning All,

I wanted to write to inform the parties of the decisions that the Peer Panel has made regarding the Peer Hearing coming up next week. As a reminder, this hearing is scheduled from 9 a.m. until 4 p.m. September 16th, 18th and 20th in the President's Conference Room, which is Room 141 Scholes Hall. There will be an appropriate lunch break during each of these days we have the hearing.

On Friday afternoon two of the three panel members met to discuss a number of questions that have been brought forward by the parties. The third panel member was able to review and acknowledge what was discussed on Friday and is in agreement with what the other panel members had decided, which is the following:

1. The Panel recommends that each party may only bring one advisor to the peer hearing.
2. The Panel recommends that cross examination of the individual identified as Complainant in the OEO investigation (Joy Van Meter) be allowed but modified as follows:
   a. Ms. Van Meter is a fact witness and not a party; therefore, she is not allowed to monitor testimony or be present in the hearing unless she is testifying.
   b. Ms. Van Meter will testify from a remote location and will provide testimony via either Skype (or similar remote video viewing program) or telephonically; if via remote video, only the Panel and Ms. Van Meter will interact – Ms. Van Meter will not see or interact with Mr. Briggs.
   c. Cross-examination questions by Mr. Briggs will be submitted in writing to the Panel, and the Panel will decide whether to ask the question posed; if the question is to be asked, the Panel will ask it.
3. The Panel recommends the following with regard to documentary evidence submitted before the hearing and testimonial evidence submitted at the hearing:
   a. The documentary evidence submitted by the parties will be provisionally admitted as facially authentic, but the Panel will hear testimony regarding its relevance and weight.
   b. The Panel will decide whether documentary and testimonial evidence are cumulative and will decide whether and to what extent to accept such cumulative evidence.
   c. Testimony submitted by either party regarding either Mr. Briggs' or Ms. Van Meter's past sexual history will not be allowed or considered.
   d. Character evidence will not be considered.
4. The Panel recommends that all witnesses identified by both parties in the witness lists submitted on or before August 30, 2019 be allowed to testify, but cautions the parties to manage witness testimony so that they do not supercede the time allotted to each party to present their respective cases.
5. The Panel recommends that the total time for the hearing be split equally, allotting for brief breaks and lunch breaks each day of the hearing. The Compliance Office will arrange to keep time to ensure that no party's allotted time is unduly prejudiced by the other party's presentment, such as during cross-examination.
6. The Panel recommends that each party present a brief opening statement at either the beginning of the hearing or prior to their presentation of their cases.
7. The Panel recommends that the hearing room be set up such that the Panel is seated on one end of the conference table, that they are flanked on either side by the Compliance Office and Office of University Counsel, that the parties sit facing each other on the long sides of

the table, and that the court reporter, witness, and Office of Equal Opportunity observer sit on the opposite end of the table from the Panel.

The Panel Members have been provided the information from the exhibits presented and will additionally have hard copies of these exhibits for the Peer Hearing.  Please let me know if you have any questions about the upcoming Peer Hearing or what the Peer Panel has decided above.

Sincerely,


Rob Burford
Director of Compliance
141 Scholes Hall
(505)277-3979
rburford@unm.edu

PLAINTIFF'S
EXHIBIT

**43**

SHEEHAN & SHEEHAN, P.A.
Attorneys at Law  |  Est. 1954

Dan E. Gershon

Carli M. Marshall

Jeremiah L. Ritchie

Quentin Smith

Barbara G. Stephenson

Eleanor C. Werenko

Of Counsel
Briggs F. Cheney
Ann Maloney Conway
Lawrence J. Horan
Wendy E. York

Founders
Pat Sheehan (1918 - 2010)
Timothy M. Sheehan (Retired)

6001
Suite
Albuquerque, NM 87110

PO Box 271
Albuquerque, NM 87103

Tel  505.247.0411
Fax  505.842.8890

SheehanSheehan.com

December 5, 2019

**VIA EMAIL**

Travis Jackson
travis@jacksonlomanlaw.com

Meghan Stanford
meghan@jacksonlomanlaw.com

Natasha Wesenberg
natasha@dglawfirmpc.com

> Re:  *Van Meter v. Briggs*, D.N.M. No. 1:18-CV-00970-RB-JHR
>      Pending Discovery Matters

Dear Counsel:

This letter is being sent on behalf of the Board of Regents of the University of New Mexico ("UNM"). Please consider it to be a good-faith attempt to address and/or resolve several outstanding discovery matters in the above-referenced case.

**Motion to Compel UNM Records**

While my client and I disagree with much of the characterization of events set forth in the Motion to Compel UNM Records [Doc. 97], I will only address the history of communications between the parties as necessary to try to resolve the outstanding issues. As I understand the Motion to Compel UNM Records, there are three categories of documents your client is seeking to have compelled:

**Emails Between UNM Officials** – The suggestion in the Motion to Compel UNM Records that UNM has been uncooperative in producing emails between its employees relating to Ms. Van Meter's report of sexual assault by your client is simply not true. UNM has been and remains willing to produce emails requested once the parties reach agreement on acceptable search parameters, but the parameters provided by Mr. Briggs (25 email accounts with 18 search terms) came back with nearly 40,000 emails. Many of those emails are likely to be attorney-client privileged and/or contain work product, and the vast majority of those emails are likely to be nonresponsive to the subpoenas that were served. Over two months before the filing of the Motion to Compel UNM Records, on September 13, 2019, Associate University Counsel, Gianna Mendoza, sent a letter to Meghan Stanford informing her that the search parameters

EXHIBIT

212

KENDRA TELLEZ COURT REPORTING, INC.

Letter to Counsel for Michael Briggs
December 5, 2019
Page 3

    2)  Narrow the date range for each of those email accounts to the period of time in which the individuals had any actual involvement or role in the OEO investigation, the appeal of the OEO investigation, and/or the sanctioning decision. Here are the time parameters that UNM proposes along with the reason for the proposal:

| Email Account | Date Range | Reason |
|---|---|---|
| Dorothy Anderson | 4/3/18 - 8/27/18 | Ms. Anderson was only involved in the sanctioning process, which was undertaken from the date of the OEO referral for sanctioning on April 3, 2018, until the date the NFA for Discharge was issued on August 27, 2018. |
| Francie Cordova | 10/26/16 - 8/27/18 | Ms. Cordova was involved in the OEO investigation, which commenced on October 26, 2016, and had some participation in the sanctioning process that culminated in the NFA for Discharge issued on August 27, 2018. |
| Heather Cowan | 10/26/16 – 8/27/18 | Same reason as the proposed timeframe for Ms. Cordova. |
| Richard Larson | 4/3/18 – 4/19/18 | Dr. Larson was only involved in the sanctioning process from the date of the OEO referral for sanctioning on April 3, 2018, until he recused himself from the sanctioning process on April 19, 2018. |
| Paul Roth | 4/3/18 – 8/27/18 | Same reason as the proposed timeframe for Ms. Anderson. |
| Garnett Stokes | 3/1/18 – 3/29/18 | President Stokes was only involved in the appeal from the OEO decision, which had been filed prior to her start date at UNM on March 1, 2018, until she issued her decision on the appeal on March 29, 2018. |
| Joy Van Meter | 10/26/16 – 9/7/17 | Ms. Van Meter made her complaint to the OEO on October 26, 2016, and she resigned from her position at UNM effective September 7, 2017. |
| Laura Vele Buchs[2] | 10/26/16 – 4/3/18 | Ms. Vele Buchs was involved in the OEO investigation, which commenced on October 26, 2016, until the date of the OEO referral for sanctioning on April 3, 2018. |

[2] Ms. Vele Buchs left her employment at UNM effective July 2, 2018. Unfortunately, her email account was deleted pursuant to UNM's regular record retention policy. For purposes of this proposal, the UNM IT Department will run the search, but I am alerting you ahead of time that there will not be any emails that can be produced from Ms. Vele Buchs' email account other than those that were in the OEO Investigation File already produced. UNM believes that most, if not all, emails from Ms. Vele Buchs' email account that would be responsive to the subpoenas were included in the OEO Investigation File.

Letter to Counsel for Michael Briggs
December 5, 2019
Page 6

We are still waiting to receive the dates of availability for President Stokes and Dr. Larson, and we will follow up with their dates of availability as soon as we can. Please coordinate with counsel for Ms. Van Meter to let me know which depositions you would like to set and for which dates. Given the dynamic nature of their respective schedules, though, I can only ask them to keep a hold on those dates through the close of business on December 9, 2019, so please get back to me before then with your preferences. I will also accept the deposition subpoenas on behalf of each of these officials.

**Subpoena Received from Ms. Van Meter**

Finally, on December 3, 2019, I received the attached subpoena from Ryan Villa requesting the production of "the written decision of the Peer Review panel concerning the termination of Michael Briggs, and any post-hearing briefing submitted to the panel prior to the decision." Given the positions in court filings that your client has taken regarding the relevancy of the process that resulted in his termination from UNM, I would presume your client would not oppose the production of the documents being requested by this subpoena. Please confirm as such, and UNM will expeditiously produce the documents requested.

Thank you in advance for your attention to this letter, and please get back to me as soon as you can.

Sincerely,

SHEEHAN & SHEEHAN, P.A.

By: Quentin Smith

QS/19026/dmr

Enclosure

Copy: Ryan Villa (via email)

FRANCIE CORDOVA   1/14/2020

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

PLAINTIFF'S
EXHIBIT

**44**

JOY VAN METER

       Plaintiff/Counter-Defendant,

 -vs-              NO:  1:18-cv-00970 RB/JHR

MICHAEL BRIGGS,

        Defendant/Counterclaimant.

**VIDEO DEPOSITION OF FRANCIE CORDOVA**

       January 14, 2020
       9:03 a.m.
       Suite 1500
       201 Third Street, Northwest
       Albuquerque, New Mexico

     PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:


TAKEN BY:  TRAVIS JACKSON, ESQ.
         ATTORNEY FOR DEFENDANT/COUNTERCLAIMANT

REPORTED BY:  KENDRA D. TELLEZ
          CCR #205
          Kendra Tellez Court Reporting, Inc.
          302 Silver, Southeast
          Albuquerque, New Mexico  87102

FRANCIE CORDOVA   1/14/2020

44

1    I will do that occasionally with some of these

2    cases.  And then for supervisory purposes, to sort

3    of observe the Title IX coordinator in these

4    interactions.

5        Q.    Did you express an opinion on what you

6    believed the appropriate discipline was during this

7    meeting with Dr. Larson?

8        A.    No.  We never weigh in on the sanction.

9        Q.    What was discussed during this meeting

10   with Dr. Larson?

11       A.    My recollection is that that was not a

12   meeting to discuss the actual sanction.  It was a

13   meeting to discuss the Title IX requirements, which

14   I just described as what -- the sanction must be

15   appropriate and consistent and the sanction must

16   stop the behavior, remedy its effect, and prevent

17   its recurrence and what that meant.  And there were

18   some procedural issues discussed as well.  I don't

19   remember discussing a specific sanction.

20       Q.    What were the procedural issues that were

21   discussed during your meeting with Dr. Larson?

22       A.    How an investigation is conducted, what it

23   meant, that the President had overturned our

24   decision.  That's what I recall it . . .

25       Q.    Did Dr. Larson express during this meeting

FRANCIE CORDOVA   1/14/2020

45

1  that he felt he did not have enough information to

2  make a decision?

3     A.    I think he expressed that he was confused

4  by the President's flipping of our decision.  I

5  think Laura issued two subsequent documents.  One

6  had indicated that the President had overturned

7  OEO's decision and what that meant and one that

8  indicated that the behavior had occurred outside the

9  work context, which he wanted some clarification of

10 what those two documents meant, is my recollection.

11    Q.    Did Dr. Larson ask OEO to provide any

12 evidence in support of its determinations?

13    A.    I don't know.  Typically that you -- OEO

14 does provide the sanctioner with the information.

15 So if he didn't -- hadn't gotten it at that point,

16 then he might have, but that's typical.

17    Q.    It's typical that OEO will provide the

18 evidence that supports its determination to the

19 individual that's deciding discipline?

20    A.    Yes.

21              MR. SMITH:  Object to the form.

22    Q.    Did you understand my question?

23    A.    I do.  Yes, it is typical that we will

24 provide the PLOD, the FLOD, the draft report, and

25 any attachments that were used in making the

FRANCIE CORDOVA    1/14/2020

46

1   determination.

2       Q.    Okay.  And do you recall whether

3   Dr. Larson asked for the attachments to the PLOD?

4       A.    I don't recall.

5       Q.    And if he had requested the attachments to

6   the PLOD, what would you have recommended?

7       A.    That he get them.

8       Q.    Do you recall -- during this -- withdraw

9   that.  Ask a better question.

10          During this meeting with Dr. Larson that

11  occurred after the President overruled OEO's initial

12  determination, did Dorothy Anderson express an

13  opinion on what the appropriate discipline would be?

14      A.    I don't recall that occurring.  I believe

15  there was some discussion about range of sanctions.

16      Q.    During this meeting with Dr. Larson, did

17  anyone provide him with any documents to review

18  relating to the investigation or discipline of

19  Michael Briggs?

20      A.    I don't remember if anybody gave him a

21  document at the meeting.  I -- I want to say no, but

22  I can't be a hundred percent sure about that.

23      Q.    Okay.  Did you take notes during that

24  meeting?

25      A.    I don't think so.

```
                                                    1
 1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF NEW MEXICO
 2
 3 JOY VAN METER
 4        Plaintiff/Counter-Defendant,
 5  -vs-               NO:  1:18-cv-00970 RB/JHR
 6
   MICHAEL BRIGGS,
 7
          Defendant/Counterclaimant.
 8
 9    VIDEO DEPOSITION OF DOROTHY ANDERSON
10              January 6, 2020
11              9:02 a.m.
                Suite 1500
12              201  Third Street, Northwest
                Albuquerque, New Mexico
13
    PURSUANT TO THE FEDERAL RULES OF CIVIL
14 PROCEDURE, this deposition was:
15 TAKEN BY:  TRAVIS JACKSON, ESQ.
        ATTORNEY FOR DEFENDANT/COUNTERCLAIMANT
16
   REPORTED BY:  KENDRA D. TELLEZ
17              CCR #205
                Kendra Tellez Court Reporting, Inc.
18              302 Silver, Southeast
                Albuquerque, New Mexico  87102
19
20
21
22
23
24
25
```

```
                                                    2
 1                APPEARANCES
 2 For the Plaintiff:
 3   LAW OFFICE OF RYAN J. VILLA
     2501 Rio Grande Boulevard, Northwest
     Suite A
 4   Albuquerque, New Mexico 87104
     ryan@rjlawfirm.com
 5   BY:  RYAN J. VILLA, ESQ.
 6
 7 For the Counterclaimant Briggs:
 8   JACKSON LOMAN STANFORD & DOWNEY, P.C.
     Suite 1500
 9   201 Third Street, Northwest
     Albuquerque, New Mexico 87102
10   travis@jacksonlomanlaw.com
     BY:  TRAVIS JACKSON, ESQ.
11
12 For the Defendant Briggs:
13   DEGRAAUW LAW FIRM, P.C.
     Suite 302
14   316 Osuna Road, Northeast
     Albuquerque, New Mexico 87107
15   natasha@dglawfirmpc.com
     BY:  NATASHA WESENBERG, ESQ.
16
17 For the University of New Mexico:
18   STELZNER, WINTER, WARBURTON, FLORES, SANCHEZ &
     DAWES, P.A.
19   Suite 200
     302 8th Street, Northwest
20   Albuquerque, New Mexico 87102
     qsmith@stelznerlaw.com
21   BY:  QUINTIN SMITH, ESQ.
22 and
23   OFFICE OF UNIVERSITY COUNSEL
     1 University of New Mexico
24   Albuquerque, New Mexico 87131
     GIAMENDOZA@SALUD.UNM.EDU
25   BY:  GIANNA M. MENDOZA, ESQ.
```

```
                                                    3
                            PLAINTIFF'S
                            EXHIBIT

                              45

 1                INDEX
 2 DOROTHY ANDERSON
 3   Examination By Mr. Jackson
     Examination By Mr. Villa
 4   Examination By Mr. Jackson             258
 5   Certificate of Completion of Deposition  262
 6   Witness Signature/Correction Page       264
 7     CONFIDENTIAL PORTIONS OF TRANSCRIPT
 8       Page 148, line 11 through page 150 line 5
 9                EXHIBITS
10 EXHIBIT        DESCRIPTION          PAGE
11   172   HR organizational chart       56
12   173   UNMH organizational chart     62
13   174   DOJ letter 4/22/2016          78
14   175   Agreement DOJ and UNM            92
15   176   UNM-DOJ Two-Year Progress Report   96
16   177   Policy 2720 revised 5/21/2014     99
17   178   Policy 2720 revised 2/26/2018    102
18   179   Policy 2730 revised 5/21/2014    105
19   180   Policy 2730 revised 2/26/2018    107
20   181   Policy 2740 5/15/2015           108
21   182   Policy 2740 revised 2/26/2018    110
22   183   Policy 3215 revised 2/20/2015    172
23   184   Policy 3215 revised 6/11/2018    175
24   185   PLOD 12/4/2017                 179
25   186   FLOD 12/12/2017                181
```

```
                                                    4
 1                INDEX          PAGE
 2   187   Villa letter 1/2/2018          182
 3   188   Stokes letter 3/29/2018        183
 4   189   Disciplinary Action Form 6/6/2018   184
 5   190   Jackson letter 7/3/2018        188
 6   191   Disciplinary Action Form 8/9/2018    201
 7   192   Photograph of chart            206
 8   193   UNM Disciplinary Considerations and   215
           Guidelines
 9
     194   Computer Document Properties     224
10
     195   E-mails                        226
11
     196   Disciplinary Action Form 8/27/2018    231
12
     197   Subpoena                       232
13
     198   E-mail 9/14/2018 with attachments    237
14
15
16
17
18
19
20
21
22
23
24
25
```

21

1    Q.   So 1990 to 2007, 17 years?
2    A.   Okay.
3    Q.   That goes sufficiently back in time to
4  cover the field.  How would you describe your -- the
5  functions of your job as the VP for HR UNM?
6    A.   I manage all of the HR functions for the
7  University.  It's primarily related to -- to staff
8  employees, but it does cross over a little bit to
9  faculty and also to students.  So when I talk about
10  the HR functions, it's benefits and wellness and
11  retirement.  And in that role, we support faculty
12  and some students and also staff.  Then we also have
13  an employee organizational development team that's
14  responsible for training.  That group also supports
15  faculty and staff.
16        I have an HR IT Department that provides
17  technical support, and primarily focused on staff.
18  And we also have an HR business function that's
19  responsible for the finances associated -- we have a
20  self-funded health insurance plan and pretty complex
21  funding, so they support that.  Also have a
22  Compensation and Classification Department function
23  that's solely responsible for staff positions.  And
24  then I have an Employee and Labor Relations Unit
25  that supports employee and labor relations for

22

1  staff.  **Also have a Client Services Unit that helps**
2  **with the progressive discipline and with hiring and**
3  **termination of employees.  They -- they support that**
4  **role.  And then I have a couple of Transactional**
5  Units that help with the processing of actions and
6  also a service center that help with walk-in and
7  assisting employees.
8    Q.   Okay.  I have a bunch of follow-up
9  questions.
10    A.   Okay.
11    Q.   That was a lot of information all at one
12  time.  So let me break that down a little bit, if
13  that's okay?
14    A.   Um-hmm.
15    Q.   So it sounds like you are fully
16  responsible for the HR function overseeing staff; is
17  that correct?
18    A.   Yes.
19    Q.   You said that there -- that you
20  sometimes -- certain HR functions for faculty but
21  not always.  Who is the primary -- who serve as the
22  primary HR officer for faculty?
23    A.   It's a department called OFAS.  It's the
24  Office of Faculty and Academic Services, and that
25  reports directly to the Provost.

23

1    Q.   So does OFAS handle all HR issues that
2  relate to faculty?
3    A.   I don't know exactly.  They hire --
4  they -- they manage primarily the -- the hiring
5  transactions.  Much of the faculty function is
6  governed by the faculty handbook, and so there's a
7  Senior Vice Provost that's actively involved in that
8  also.  There's the director of HR within OFAS that
9  handles the hiring of individuals and processing
10  their requests, but it's kind of a split
11  responsibility.
12    Q.   Okay.  So the director of HR for OFAS
13  doesn't report to you, correct?
14    A.   Correct.
15    Q.   It's just an independent division at UNM;
16  is that --
17    A.   Correct.
18    Q.   And it reports directly to the Provost,
19  not to you?
20    A.   Excuse me, let me clarify that.  It
21  reports to the Senior Vice Provost who reports to
22  the Provost.
23    Q.   I may be confused with all of these
24  titles.  You have to bear with me.  And, really, all
25  I'm trying to -- to establish is that faculty HR

24

1  function is mostly separate from you?
2    A.   Correct.  The one area that would be
3  included under my umbrella is the benefits.
4    Q.   Okay.  And that seems to be a significant
5  portion of what your department does, is the
6  benefits; is that correct?
7    A.   Definitely significant portion, but much
8  of what we do is a significant portion of it.
9    Q.   Okay.  So do you handle all the benefits
10  for all of staff, students, and faculty?
11    A.   Yes.
12    Q.   So in terms of health insurance, are you
13  the agency that provides health insurance for staff,
14  students, and faculty?
15    A.   Yes.
16    Q.   And except for managing the benefits, do
17  you have any other involvement in employment issues
18  that may come up with faculty?
19    A.   Nothing related to employment issues.  We
20  handle some of the training for faculty.  The EOD,
21  it's Employee Organizational Development, we can
22  offer support with that unit also, but that's
23  primarily training.
24    Q.   What about discipline?  Are you involved
25  in the discipline of faculty?

49

1    A.   I would have to go back and look.  I don't
2    recall what other policies I've commented on.
3        Q.   Okay.  And where would you look?
4        A.   My e-mail.
5        Q.   And would you have the same -- so I'll
6    just ask the question and we'll see where it goes.
7    Between -- I think it was October 14, 2016, I'm
8    sorry, have you ever communicated about any proposed
9    change to UNM policy related to sexual assault?
10       A.   Same response, I'd have to go back and
11   check.
12       Q.   And we would look at your e-mail; is that
13   correct?
14       A.   Yes.
15       Q.   Does your office ever issue memos
16   explaining why it's doing something relating to
17   policies?
18       A.   Not typically.
19       Q.   Okay.  And will your office sometimes put
20   their comments in line in the Word document itself
21   and send the Word document and say, "Our proposed
22   comments and changes" in the document?
23       A.   So just to clarify, the -- your -- your
24   question is:  If I have a Word document that's a
25   policy change and I have a strike-through or an

50

1    addition, do I comment within the Word document why
2    I'm making the changes?
3        Q.   Yes.
4        A.   I -- periodically, yes, I would do that.
5        Q.   Okay.  And where are the drafts of
6    those -- where are the versions for a document with
7    your comments saved?  Where would those be?
8        A.   It would be, one, my e-mail or the
9    recipient of the individual I was sending it to.
10       Q.   And are those documents stored on UNM's
11   servers also?
12       A.   I would expect that they would be.
13       Q.   Okay.  And how -- how does -- how's that
14   work?  I don't know how UNM's secure system works.
15   Do you have a server that is specific to HR
16   Division?
17       A.   No.  I think it's specific to the
18   University, so it's managed by our central IT.
19       Q.   Okay.  And do you have a -- a directory
20   that's specific to HR?
21       A.   I wouldn't know.
22       Q.   Who would know?
23       A.   CIO, our chief information officer.
24       Q.   Is there anybody within your division who
25   handles technology?

51

1        A.   Yes.
2        Q.   Who is that?
3        A.   Kevin Stevenson.
4        Q.   Other than e-mails and maybe comments
5    within a Word document, is there anywhere else where
6    we might look to see what your division's position
7    is on proposed policy changes?
8        A.   No.
9        Q.   As the VP of HR, are your job
10   responsibilities limited to UNM's main campus?
11       A.   No.
12       Q.   And are you responsible for the HR
13   function at all of the branches and satellites for
14   the University of New Mexico?
15       A.   For staff, yes.
16       Q.   Okay.  And does that include the Health
17   Sciences Center?
18       A.   Yes.
19       Q.   So just to be clear, you're the top HR
20   official to staff at both UNM's main campus and UNM
21   Health Sciences Center, correct?
22       A.   Yes.
23       Q.   So my understanding is that the Board of
24   Regents have recently removed some of the
25   organizational separations between the Health

52

1    Sciences Center and main campus.  I don't need you
2    to comment on that.  All I want you to -- to ask is,
3    as the VP for HR, have you always been responsible
4    for oversight of employment matters on both UNM's
5    main campus and UNM Health Sciences Center?
6        A.   Yes.
7        Q.   Okay.  So from 2014 until now, that was
8    always your function?
9        A.   Yes.
10       Q.   Does the UNM Health Sciences Center employ
11   its own HR staff?
12       A.   Yes, they have employees that assist with
13   HR functions within their departments, but
14   ultimately, those responsibilities and the final
15   decision roll up to HR, central HR.
16       Q.   Okay.  So if I say "central HR," you will
17   know what I'm talking about?
18       A.   Yes.
19       Q.   And you're in charge of central HR,
20   correct?
21       A.   Yes.
22       Q.   And so UNM Health Sciences Center might
23   employ different people within departments who
24   handle HR functions, but they ultimately report to
25   you; is that correct?

53

1    A.    No.  They typically report to the
2 department, but prior to taking any action, then
3 they would route it through Client Services or the
4 consultant.
5    Q.    Okay.
6    A.    So they facilitate responses, but they
7 don't approve them.
8    Q.    Okay.  I think you said earlier that your
9 Client Service Division handles discipline,
10 termination, those types of things, right?
11    A.    Correct.
12    Q.    And when you -- when you say they handle
13 that, what do you mean?  Do they investigate those?
14 Do they weigh in on decision making?  What is their
15 role?
16    A.    They work with the supervisor.  So once a
17 department or a supervisor thinks there's been an
18 infraction, all of the departments have an HR
19 consultant assigned to them.  So they would reach
20 out to their HR consultant, talk about the issue,
21 their concern.  The HR consultant would give them
22 guidance regarding policy that possibly was
23 violated, due process that an employee might be
24 entitled to.  They may help them revise or review
25 drafts for letters of improvement or written

54

1 warnings.  And they assist them with those types of
2 decisions.
3    Q.    Were any of the staff within the Client
4 Services Division who handle discipline and
5 termination assigned to Mr. Briggs' claim?
6    MR. SMITH:  Object to the form.
7    A.    So was an HR consultant assigned to the
8 Michael Briggs complaint?
9    Q.    Yes.
10    A.    No.
11    Q.    Why not?
12    A.    Because of the -- the level of the
13 employees involved, OEO brought the complaint
14 directly to me.  It was a high level employee
15 reporting up to Dr. Larson, and it was also very
16 sensitive, the nature of the complaint.  The issue
17 was -- also included Dr. Roth.  So based on that
18 high level and the sensitivity, I chose to work
19 directly with the department.
20    Q.    When you say "the department," what do you
21 mean?  OEO?
22    A.    No.  With OEO and also with the -- the
23 Chancellor's office.
24    Q.    Has there ever been a complaint at UNM
25 before where it bypassed the Client Services team

55

1 and you decided to work directly with the
2 department?
3    A.    Yes.
4    MR. SMITH:  Object to the form.
5    Q.    And which case was that?
6    A.    There was a case involving a former
7 President, Frank, that I was directly involved in.
8 There was a case involving a head football coach,
9 Bob Davie, that I was involved in.  There was a case
10 involving the head soccer coach that I was involved
11 in.
12    Q.    What was the name of that soccer coach?
13    A.    Pardon?
14    Q.    What was the name of that soccer coach?
15    A.    Jeremy Fishbein.
16    Q.    Are there any other cases in which you
17 became directly involved?
18    A.    Those are the only ones that come to mind,
19 but there could be others.
20    Q.    And those cases, no one from your Client
21 Services team was assigned to work with those
22 departments; you decided to work directly with those
23 departments?
24    A.    An individual may have been assigned to
25 that department, but in this instance, I chose to

56

1 work directly with the department.
2    Q.    And how do you decide when you're going to
3 work directly with a department?
4    A.    Typically, it's a high level position.
5 It's also a -- something that may be of public
6 interest, sensitive nature.
7    Q.    And do you have discretion to decide when
8 you're going to become directly involved in employee
9 complaints?
10    A.    Yes.
11    Q.    All right.  I'm going to mark as Exhibit
12 Deposition Exhibit 172 something I printed off the
13 internet.
14    (Exhibit 172 Marked for Identification.)
15    Q.    Have you seen this document before?
16    MR. JACKSON:  Gionna, I'm going to
17 apologize.  I did not make enough copies.
18    MS. MENDOZA:  No problem.
19    Q.    Have you seen this document before?
20    A.    Yes.
21    Q.    What is this document?
22    A.    Organizational chart for my division.
23    Q.    Okay.  Do you review these before they go
24 out?
25    A.    No.

113

1 policies that have been violated, you review the
2 policies. Is that fair?
3 **A. Yes.**
4 Q. Okay. So you were reviewing this policy
5 for that purpose?
6 **A. Correct.**
7 Q. I don't want you to disclose
8 attorney/client communications, but I do want to
9 know who participates in a preparation of the Notice
10 of Contemplated Action. Because I assume Dr. Roth
11 didn't write that himself. Is that true?
12 **A. Correct.**
13 Q. Do you write that?
14 **A. In this specific instance?**
15 Q. Um-hmm.
16 **A. Actually, in this instance, I reached out**
17 **to Mike Brown.**
18 Q. Okay.
19 **A. He's the -- at that point in time, he was**
20 **the director over Client Services. So since I don't**
21 **typically write Notice of Contemplated Actions --**
22 **they typically come to me for approval -- I asked**
23 **him to assist in that first draft. And then after**
24 **we had a first draft, then I would take an**
25 **opportunity to review it. Since the sanction was**

114

1 **termination, we also asked the legal counsel to**
2 **review. And then I shared a copy with Dr. Roth so**
3 **that he could review and ensure that he agreed.**
4 **Our initial involvement is to ensure that**
5 **it's complying with policy, that we have notice**
6 **periods in there, due process, some of the standard**
7 **language.**
8 Q. Did Dr. Roth make any revisions to the
9 letter?
10 **A. I can't recall. There was one that he**
11 **made revisions on, and it was either the**
12 **Contemplated Action or the Final Action, but I don't**
13 **recall which one.**
14 Q. How would I determine what changes he made
15 to the letter?
16 **A. E-mail.**
17 Q. Okay. And so you called on Mike Brown
18 because he probably had experience writing those
19 types of notices before; is that right?
20 **A. Correct.**
21 Q. Okay. You said at the time, he was the
22 director of Client Services, but now he's not,
23 right?
24 **A. Correct.**
25 Q. Was he demoted?

115

1 **A. He stepped down to a lower position.**
2 Q. Voluntarily?
3 **A. Yes.**
4 Q. What was the reason for that?
5 **A. A decision he made.**
6 Q. Okay. He wasn't disciplined?
7 **A. No.**
8 Q. Okay. And it wasn't a job performance
9 issue?
10 **A. A little bit of a job performance issue.**
11 Q. Was it your decision to demote him, or did
12 he make that all by himself?
13 **A. He made that decision.**
14 Q. Did his job performance evaluation have
15 anything related to do with the investigation or
16 discipline of Michael Briggs?
17 **A. No.**
18 Q. Okay. So you are -- I just want to bring
19 us up to speed on where we are --
20 **A. Sure.**
21 Q. -- in the chronology of things. So as
22 best you can recall, you receive a notice from OEO
23 in the spring of 2018 . . .
24 **A. Yes.**
25 Q. -- that a decision has been reached in the

116

1 Michael Briggs investigation, correct?
2 **A. Correct.**
3 Q. And then you decide that you're going to
4 become involved because it's potentially a high
5 profile termination, correct?
6 **A. Correct.**
7 Q. So then you consult with Dr. Roth,
8 Dr. Larson about potential discipline, correct?
9 **A. Yes. And I believe legal counsel was also**
10 **involved in that meeting.**
11 Q. And at the time, who was the legal counsel
12 who participated in the meeting on discipline?
13 **A. Gionna Mendoza.**
14 Q. Was there only one meeting or were there
15 multiple meetings?
16 **A. There were multiple meetings regarding**
17 **this case with various individuals.**
18 Q. Okay. There's a lot there. How many
19 meetings?
20 **A. I couldn't tell you exactly.**
21 Q. And if I wanted to figure out how
22 many meetings there were, would I need to look at
23 your calendar?
24 **A. I think we would find the bulk of the**
25 **meetings on my calendar. Again, based on the**

DOROTHY ANDERSON    1/6/2020

117

1  confidential nature of the situation, some of my
2  meetings maybe didn't indicate exactly the reason.
3  Again, I just -- my calendar is shared with various
4  individuals in my office.
5      Q.   Okay.
6      A.   So even though they may be aware of the
7  meetings, I don't know if it would tell you exactly
8  all of the dates, the attendees, any of that type of
9  information.
10     Q.   Would your e-mail help confirm when the
11 meetings were?
12     A.   I don't know if it would be any better.
13 It may have been phone calls.  E-mail and calendar
14 would be the best.
15     Q.   Okay.  Two meetings?  Were there at least
16 two meetings?
17     A.   Does this include meetings with Michael
18 Briggs or preparation or --
19     Q.   Oh, boy.  Good question.  So after you
20 receive -- let's just go through it step by step,
21 can we?  So after you receive the notice from OEO
22 that there is -- they closed their file and they're
23 going to discipline -- this is the finding on
24 Michael Briggs, I assume you have a first meeting?
25     A.   Yes.

118

1      Q.   Who is at that first meeting?
2      A.   The best of my recollection would be
3  myself, Gionna, Richard Larson, Dr. Roth, and
4  Chamiza.
5      Q.   And what is Chamiza's full name, I forget?
6      A.   Alas . . .
7      Q.   There's a lot to it, I know there is.
8      A.   Yes.
9      Q.   And she's essentially the . . .
10     A.   Alas de Pacheco, perhaps.  Alas Pacheco?
11          MR. SMITH:  I think that's Pacheco de
12 Alas.
13          THE WITNESS:  Oh, that may be.
14          MR. JACKSON:  I'm not going to hold
15 anybody to it.
16     A.   Pacheco de Alas, yes.
17     Q.   And she's -- I don't want to call her the
18 assistant to Chancellor, but something like that?
19     A.   Similar to a chief of staff --
20     Q.   Okay.
21     A.   -- is her current title.
22     Q.   So there's you, Ms. Mendoza, Dr. Larson,
23 Dr. Roth, and I'm going to call her Chamiza because
24 otherwise, I'll murder her last name, not
25 intentionally.  Other than those five people, did

119

1  anybody else attend this first meeting?
2      A.   Not that I recall.
3      Q.   And do you recall when that first meeting
4  occurred?
5      A.   Shortly after receiving the notice from
6  OEO.  I would guess early April.
7      Q.   And did you have a second meeting
8  regarding OEO's determination as to Michael Briggs?
9      A.   The next meeting that I can recall is --
10 included myself and Richard Larson; representatives
11 from OEO; Title IX officer, Heather Cowan, I
12 believe; and then Francie Cordova, OEO director.
13     Q.   At that meeting, did any Office of
14 University Counsel attend?
15     A.   Not that I recall, no.
16     Q.   And no Dr. Roth at the second meeting?
17     A.   No, not that I recall.
18     Q.   Anybody else attend that second meeting?
19     A.   Not that I recall.
20     Q.   And when-abouts did you have that second
21 meeting?
22     A.   Shortly after the subsequent -- the
23 previous meeting.
24     Q.   And I'm not sure I -- do you mean within
25 days or weeks or . . .

120

1      A.   Within days.
2      Q.   And what -- what was the purpose of the
3  second meeting?
4      A.   To discuss sanctioning based on the
5  findings of the OEO report, to discuss our -- our
6  role, that of myself and Dr. Larson.
7      Q.   What did you tell Dr. Larson during that
8  second meeting?
9      A.   That our role was to sanction, that we had
10 received findings from OEO and we'd received an
11 appeal, the results of an appeal from the President,
12 Stokes, and based on their findings, that our role
13 was to determine the appropriate discipline or
14 sanction based on what was identified.
15     Q.   And how did Dr. Larson respond to that?
16     A.   He had lots of questions.  He had
17 questions about the investigation and how it had
18 transpired, had questions on whether or not it was
19 accurate and thorough.  And at that point in time, I
20 reminded him that it wasn't our role to determine
21 the investigation or to revisit; that our role
22 simply was to sanction, that the findings had been
23 presented to us, and that our role was to determine
24 what the appropriate sanction was based on the
25 offense.

121

1    Q.    So your understanding of the sanction is
2    that you don't revisit the facts, you just apply
3    those facts and discipline the employee?
4    A.    Yes.
5    Q.    And so -- what if the University
6    subsequently receives information that is different
7    from the facts that they developed during the
8    investigation?  Do you just ignore that?
9            MR. SMITH:  Object to the form.
10    A.    There's an appeal process that individuals
11    can utilize.
12    Q.    And my question isn't with whether or not
13    somebody can file an appeal.  I'm aware of that.  I
14    think the Department of Justice's letter talks about
15    how typically the UNM process can be.
16        My question to you really is:  During the
17    sanctioning part of your process, what if you're
18    presented with facts that were different from or not
19    known during the investigation, what do you do about
20    that?
21            MR. VILLA:  Form and foundation.
22    Sorry, Travis.  Form and foundation.
23            MR. SMITH:  Object to the form.
24    A.    I'm not considering other facts.  I'm not
25    looking for those.  They're not presented to me, so

122

1    that isn't even something that I contemplate.
2    That's not brought to my attention.  My sole role is
3    to look at those findings.
4    Q.    And so if a person who's subject to
5    discipline presents new evidence at that stage, do
6    you disregard that evidence?
7    A.    I knew that there would be a subsequent
8    opportunity for the individual to bring forward
9    those -- that new evidence, if you will, that there
10    would be a peer hearing, if he elected to go that
11    route, where additional facts could be brought
12    forward.
13    Q.    And that's not my question.  My question
14    to you was:  If that evidence is presented to you
15    during the sanctioning process, do you disregard it?
16    A.    I wouldn't have considered it.
17    Q.    Did you advise Dr. Larson that he could
18    not consider any new evidence?
19    A.    I don't remember advising Dr. Larson.  I
20    remember advising Dr. Larson that our role was to
21    sanction based on our findings.
22    Q.    Did Dr. Larson express to you concerns
23    that he thought OEO's investigation was unfair?
24            MR. SMITH:  Object to the form.
25    A.    I don't remember Dr. Larson indicating

123

1    that.  What I do remember is that Dr. Larson had had
2    a prior communication with Michael Briggs, and in
3    that communication, Michael Briggs raised questions
4    regarding the investigation.  And I thought it was
5    inappropriate for those to be considered at that
6    point in time.
7    Q.    Inappropriate for what to be considered at
8    that time?
9    A.    The items that Michael Briggs raised in --
10    in his e-mail to Dr. Roth and Dr. Larson.
11    Q.    I think you testified earlier that
12    Dr. Larson raised issues that he had about the
13    accuracy of the investigation.  That is what you
14    testified to, correct?
15            MR. SMITH:  Object to the form.
16    A.    But his concerns --
17    Q.    Um-hmm.
18    A.    -- were raised -- my understanding were
19    that his concerns were based on the e-mail that
20    Michael Briggs had sent him.
21    Q.    Okay.  My question to you is simply:  Did
22    he raise those concerns with you?
23    A.    He raised concerns on the investigation,
24    yes.
25    Q.    And what did -- what concerns did he

124

1    raise?
2    A.    That the investigation was flawed, that
3    there was a bias, that not all of the evidence was
4    considered.
5    Q.    Did he raise any other complaints with you
6    during your second meeting?
7    A.    Not that I remember.
8    Q.    And when he raised concerns with you that
9    the investigation was flawed, what did you tell him?
10    A.    I reminded him that it wasn't our job to
11    reconsider the investigation, that the investigation
12    had been completed, that the appeal process had gone
13    through, and that our job was to sanction.  That if
14    there were concerns, they could go to an additional
15    level, a peer hearing, and those could be brought
16    forward.
17    Q.    So you raised the possibility of a peer
18    hearing with Dr. Larson?
19    A.    I don't know if I specifically said peer
20    hearing.  I believe I said appeal process.
21    Q.    And when Dr. Larson raised concerns with
22    you that the OEO process was biased, what did you
23    say?
24    A.    OEO representatives were present, so I
25    don't remember exactly how I responded.  We had

125

1  Heather Cowan and also Francie Cordova, so I don't
2  remember exactly the response to -- again, my
3  general position was that our role was to sanction,
4  not to reweigh the evidence or the information that
5  was provided to us.
6      Q.   This wasn't a concern about the evidence;
7  this was a concern about bias, right?
8      A.   There were a significant -- there were --
9  different concerns that we had.
10     Q.   Well, the ones you identified were that
11 the investigation was flawed, the investigation was
12 biased, and that evidence was not considered.  Those
13 are the three things you identified.  Were there any
14 other concerns that Dr. Larson raised with you
15 during your second meeting?
16     A.   Not that I recall.
17     Q.   Okay.  So I'm just trying to go through
18 those one by one to see what your reaction or
19 response to his concerns were.  And so when he told
20 you that he thought that the OEO process had been
21 biased, how did you respond?
22     A.   Again, not my position to respond to.  I
23 have OEO representatives.  If he's questioning their
24 investigation, then it would be their place to
25 respond.

126

1      Q.   Okay.  So you didn't respond to that
2  concern?
3      A.   Not that I recall.
4      Q.   Okay.  And when he said that evidence
5  hadn't been considered, did he identify any evidence
6  for you?
7      A.   No.
8      Q.   Okay.  And how did you respond to his
9  concern that evidence hadn't been considered?
10     A.   I didn't.
11     Q.   Did OEO respond to that?
12     A.   I don't recall.
13     Q.   Okay.  Did you take notes during this
14 meeting?
15     A.   No.
16     Q.   And what was -- at the end of this
17 meeting, how did it come out that Dr. Larson was
18 recusing himself from the disciplinary process?
19     A.   No, not at that point, he didn't.
20     Q.   Did Dr. Larson recuse himself at some
21 future point?
22     A.   Yes.
23     Q.   And did he communicate to you that he was
24 recusing himself?
25     A.   He had a -- he had an e-mail communication

127

1  with the OEO office, and in -- that
2  communication, he had concerns and requests around
3  information that he wanted and -- he wanted to look
4  at and consider.  And the OEO office, Heather Cowan,
5  I believe, responded that she had concerns based on
6  his reaction and his questions about his ability to
7  be unbiased in his issuing of the sanction.
8      Q.   And were you copied on the e-mails back
9  and forth between Richard Larson and OEO?
10     A.   I received a copy at some point.  I don't
11 remember exactly when.  I received -- I was copied,
12 I was added to the cc at some point.  I believe it
13 was initially from Dr. Larson, but I don't know for
14 sure.
15     Q.   Okay.  And is that e-mail exchange one of
16 the e-mails that you provided to Ms. Mendoza back in
17 October/November?
18     A.   Yes.
19     Q.   What information did Dr. Larson ask for in
20 that e-mail?
21     A.   I don't remember exactly what he
22 requested.
23     Q.   Did he ask for evidence?
24     A.   I don't remember.
25     Q.   I have to look at the e-mail to know what

128

1  he said?
2      A.   Yes.
3      Q.   Did OEO produce any of the information
4  that Dr. Larson requested?
5      A.   I think we'd have to look at the e-mail
6  and -- and make that determination.
7      Q.   Do you know whether they produced any
8  evidence?
9      A.   I don't.
10     Q.   Okay.  But the e-mails back and forth
11 between Dr. Larson and OEO that you were copied on
12 would show us what he was requesting, whether they
13 agreed to provide it?
14     A.   It would definitely show us what he was
15 requesting via e-mail, yes.
16     Q.   Okay.  When you went back and searched
17 through your e-mails or e-mails that might be
18 responsive to the subpoenas that my office issued,
19 you identified that as one of the e-mails that was
20 relevant?
21          MR. SMITH:  Object to the form.
22     A.   I assume I would have provided it.  I
23 provided all the documents that I could find in
24 response to your request.
25     Q.   And I don't have that e-mail.  That hasn't

129

1   been produced to me.
2   **A.   Oh.**
3   Q.   So that's why I'm asking where it's at.
4   **A.   Hmm.**
5   Q.   All right.  Before I get off this topic --
6       MR. SMITH:  And it's noon and you're
7   changing topics.  Do you want to break for lunch?
8       MR. JACKSON:  I think I have just
9   about ten more minutes.  Is that all right?
10      MR. SMITH:  Yeah, that's fine with
11  me.
12      What do you want to do?  Do you want to
13  continue or do you want to go break for lunch?
14      THE WITNESS:  My preference would to
15  break for lunch, if that's okay with you.
16      MR. JACKSON:  That's fine.  We'll
17  break for lunch.
18      VIDEOGRAPHER:  The time is 11:58 a.m.
19  We are off the record.
20  (Recess was taken from 11:58 a.m. until 12:52 p.m.)
21      VIDEOGRAPHER:  The time is 12:52 p.m.
22  We are back on the record.
23      MR. JACKSON:  Okay.  We are back on
24  the record during the deposition of Dorothy Anderson
25  after taking a brief lunch break.

130

1   Q.   Ms. Anderson, during the break, did you
2   have the opportunity to talk to your lawyers?
3   **A.   I did.**
4   Q.   Is there anything about your testimony
5   earlier today that you'd like to change?
6   **A.   Yes.  Earlier I testified that I had**
7   **produced documents in response to a subpoena.  I'd**
8   **like to clarify that I did produce documents to OUC.**
9   **It wasn't specifically to Gionna Mendoza.  It was to**
10  **her office, and I don't know if it was in response**
11  **to a litigation hold or to a subpoena.  I just**
12  **remember producing those documents.  So the exact**
13  **timeframe would need to be clarified.**
14  Q.   And how would we clarify when you produced
15  these documents to the Office of University Counsel?
16  **A.   E-mails should have that record, and my**
17  **assistant may also have a record of that.**
18  Q.   My assistant is walking behind the screen
19  about to bring me some documents.  And what
20  documents did you provide to University counsel?
21  **A.   As I recall, it was all of my e-mail**
22  **related to the Michael Briggs case.**
23  Q.   So you conducted a search of your inbox --
24  or e-mail --
25  **A.   Yes.**

131

1   Q.   -- system to identify all of the e-mails
2   that related to the Michael Briggs complaint; is
3   that right?
4   **A.   Yes.**
5   Q.   And when did you conduct that search?
6   **A.   I don't remember exactly when I did that.**
7   **I know there was a litigation hold early on, and I**
8   **may have started compiling them at that point in**
9   **time.  I also had a couple of staff members that**
10  **were involved, so I also requested that they compile**
11  **any documents they had.**
12  Q.   And who -- which staff members did you
13  request compiling documents they had?
14  **A.   Michael Briggs' case was also -- Mike**
15  **Brown provided documents that he had, as I recall.**
16  **And then I have a strategic support manager in my**
17  **office, and I may have asked her to preview the**
18  **Notice of Contemplated Action.  She's amazing with**
19  **grammar and all of that, so she doesn't check**
20  **content, she checks format.**
21  Q.   Sure.  And what's her name?
22  **A.   Amber Bailey.**
23  Q.   I'm sorry, I missed the last name.
24  **A.   Bailey, B-A-I-L-E-Y.**
25  Q.   And did you request anybody else -- that

132

1   anybody else within the UNM Division of Human
2   Resources search their e-mails for e-mails that
3   might relate to Michael Briggs?
4   **A.   No.  Those were the only individuals that**
5   **I involved.**
6   Q.   Okay.  And you said that you conducted
7   your own search; is that correct?
8   **A.   Yes.**
9   Q.   And you collected a group of e-mails that
10  related to Michael Briggs?
11  **A.   Yes.**
12  Q.   And you provided those e-mails to the
13  Office of University Counsel?
14  **A.   Yes.**
15  Q.   How did you provide those?
16  **A.   As I recall, on a flash drive.**
17  Q.   Okay.  Now, did you walk the flash drive
18  over there or did somebody do that for you?
19  **A.   My admin assistant would have.**
20  Q.   Okay.  So you don't know who at the Office
21  of University Counsel received your flash drive of
22  e-mails?
23  **A.   Not right offhand, I don't.**
24  Q.   Did you ever talk to anybody at the Office
25  of University Counsel about the flash drive of

197

1  offhand?

2  **A.  3215.**

3  Q.  Dr. Roth expressed to you that he didn't
4  want to fire Mr. Briggs, he wanted to do something
5  less than that, correct?

6  **A.  He had concerns with that level of**
7  **discipline, yes.**

8  Q.  Okay.  And I understand that he had
9  concerns.  What I'm specifically asking is:  He
10  wanted to reduce the discipline, correct?

11  **A.  Yes.**

12  Q.  And you didn't agree with that, correct?

13  **A.  I told him I could consider it.  So when**
14  **we -- when we reached an agreement, if you will,**
15  **with the 90-day suspension, yes, I could approve**
16  **that, so I could support that.**

17  Q.  Okay.  So the 90-day agreement was a
18  compromise between you and Dr. Roth --

19  **A.  Correct.**

20  Q.  -- correct?  You wanted Mr. Briggs fired,
21  right?

22  **A.  I felt that that was the appropriate**
23  **sanction.**

24  Q.  And Dr. Roth did not want him fired,
25  correct?

198

1          MR. VILLA:  Form.

2          MR. SMITH:  Object to the form.

3  Q.  Well, did Dr. Roth tell you that he didn't
4  want him fired?

5  **A.  I don't -- I don't think he did.  I don't**
6  **think he ever said, "I don't want him fired."  I**
7  **think he was torn.  I think this was a long-term**
8  **employee.  I think he wanted to contemplate**
9  **something less.**

10  Q.  Sure.  And I'll ask him what he wanted.
11  What I'm trying to understand is what he told you.
12  Because he's telling you that he wants some
13  discipline less than termination, correct?

14  **A.  Yes.**

15  Q.  And you're telling him you want
16  termination, correct?

17  **A.  Yes.**

18  Q.  And so you two tried to work out some
19  compromise that was less than termination, correct?

20  **A.  Correct.**

21  Q.  Okay.  And my question is:  If he wants to
22  reduce the termination to something less than
23  termination -- if he wants to reduce the discipline
24  to something less than termination, does he need
25  your approval to do that?

199

1  **A.  Yes.**

2  Q.  Okay.  And I think when you were -- you
3  said a lot there, so I'm going to try to go back and
4  touch on parts of it.  Okay?  So you said that you
5  reached out to OEO to ask them if they could approve
6  some sort of intermediate discipline, correct?

7  **A.  Correct.**

8  Q.  And did you talk to Heather Cowan or did
9  you e-mail with Heather Cowan?

10  **A.  I don't remember.**

11  Q.  We need to check the e-mails to find out
12  how that communication was made?

13  **A.  Correct.**

14  Q.  And the Title IX coordinator for UNM told
15  you that she could accept the discipline that was
16  less than termination, correct?

17  **A.  She could accept the discipline that we**
18  **were proposing.**

19  Q.  And what was the discipline that you were
20  proposing?

21  **A.  The 90-day suspension, a 15 percent**
22  **reduction in pay, and a removal of any supervisory**
23  **authority.**

24  Q.  And so based on your communication with
25  Dr. Roth and Heather Cowan, you determined that was

200

1  an appropriate discipline?

2  **A.  We felt that it made -- met our**
3  **responsibility of ensuring that it didn't occur**
4  **again, having a remedy.  So, yeah, we felt like it**
5  **was appropriate.**

6  Q.  Okay.  And so I understand that you wanted
7  termination and others didn't.  And so -- is that
8  correct?

9          MR. SMITH:  Object to the form.

10  Q.  Well, you wanted to terminate Mr. Briggs,
11  correct?

12  **A.  I felt that termination was the**
13  **appropriate discipline.**

14  Q.  Dr. Roth didn't want to terminate him,
15  correct?

16  **A.  He was looking for a lesser than**
17  **termination, yes.**

18  Q.  And you came up with this compromise where
19  there was a 90-day suspension, 15 percent reduction
20  in pay, and a demotion, correct?

21  **A.  Yes.**

22  Q.  And collectively, you-all decided that
23  that would be an appropriate discipline, correct?

24  **A.  In exchange for a settlement agreement,**
25  **yes.**

205

1  "What would that settlement look like?  What would
2  it" --
3      So we said, "Some of the things that we
4  would anticipate would be the 90-day, the demotion,
5  and the removal of the -- reduction in pay."  And I
6  said, "But it would be something that would be
7  happen -- have to happen between our legal counsel."
8      Q.   And I think I understand that process that
9  you're going to let the lawyers handle trying to
10 resolve --
11     A.   Sure.
12     Q.   -- a potential legal dispute, right?
13     A.   Correct.
14     Q.   And so I guess what I'm trying to
15 understand is, you had already agreed with Dr. Roth
16 and Dr. -- and Heather Cowan that you would -- you
17 could live with this sort of discipline, correct?
18     A.   Yes.
19     Q.   So why not just impose it instead of
20 firing him?
21     A.   Because terminating him was the right
22 thing to do.  Terminating him based on what he did
23 to our employee was the right thing to do.  And the
24 findings, for me, it was a compromise.  It wasn't
25 something I wanted to do.  We had an employee that

206

1  left the University.
2      Q.   What did you want to do?
3      A.   I wanted to terminate him.
4      Q.   And you did, right?
5      A.   Ultimately, he was terminated, yes.
6      Q.   All right.  You can set this aside for a
7  moment.
8          I'll mark as Deposition Exhibit 192, a bad
9  picture of --
10     A.   Oh.
11     Q.   -- of a chart that I think you used for
12 the peer review hearing.
13     (Exhibit 192 Marked for Identification.)
14     A.   Peer hearing.
15     Q.   Have you seen this before?
16     A.   I have.
17     Q.   Can you tell me what this is?
18     A.   It was the mitigating and escalating
19 factors that we used when we were contemplating
20 sanctions for Michael Briggs.
21     Q.   Okay.  And we talked about that earlier,
22 how, at the time, you met with Dr. Roth in April of
23 2013, you talked to him about escalating -- or
24 somewhere around there.
25     A.   Not '13.

207

1      Q.   April of 2018, I'm sorry.  So when you
2  talked to Dr. Roth in April of 2018, you talked
3  about the escalating and mitigating factors,
4  correct?
5      A.   Yes.
6      Q.   Okay.  And so then you testified during
7  the peer review hearing this past November 2019,
8  correct?
9          MR. SMITH:  It was September.
10     Q.   September.  Take a drink of water real
11 quick.  Let me just push the reset button here.
12         You testified during the peer review
13 hearing, correct?
14     A.   Yes.
15     Q.   And as part of your testimony, you had
16 prepared in advance this poster, I don't know what
17 to call it, but this paper on an easel for
18 presentation during the peer review hearing,
19 correct?
20     A.   Correct.
21     Q.   And it's hard to read, so I'm going to go
22 through it just to make sure --
23     A.   Sure.
24     Q.   -- that I read it correctly.  And so does
25 this chart list all of the escalating and mitigating

208

1  factors that you considered when analyzing
2  appropriate discipline for Michael Briggs?
3      A.   Yes.
4      Q.   Okay.  And how do you know that these are
5  the factors that you considered when analyzing the
6  appropriate discipline for Mr. Briggs?
7      A.   How do I know?
8      Q.   Uh-huh.
9      A.   Because it was what I considered when I
10 was thinking about the discipline.  They were the
11 ones that were relevant to what occurred.
12     Q.   Okay.  And I think you testified earlier
13 that you prepared some sort of document that listed
14 those --
15     A.   Um-hmm.
16     Q.   -- and applied them to Mr. Briggs.  I'm
17 just wondering if this comes from that document?
18     A.   I think so.
19     Q.   Okay.  Because I don't -- I don't have the
20 document where you internally analyzed that.
21     A.   Okay.
22     Q.   All I have is this poster board.
23     A.   Sure.
24     Q.   And so I'd like to get a copy of whatever
25 document you prepared that analyzed these factors

**209**

1  and applied them to Mr. Briggs.
2  **A.  Okay.**
3  Q.  And so the first one, number 1, is -- does
4  that say, "Prior discipline"?
5  **A.  Yes.**
6  Q.  Okay.  And that's "X" as a mitigating
7  factor, correct?
8  **A.  Correct.**
9  Q.  The second one says?
10  **A.  "Employment longevity."**
11  Q.  Okay.  And you can't really see it, but it
12  looks like there's an "X" under mitigating for that
13  as well, correct?
14  **A.  Yes.**
15  Q.  And the next one, what would be number 3,
16  is?
17  **A.  "Pattern of similar offense."**
18  Q.  Okay.  And it looks to me there is a check
19  under mitigating factors for that, too, right?
20  **A.  Yes.**
21  Q.  So when analyzing how these factors might
22  apply to Michael Briggs, it looks like you
23  determined that there was no prior discipline, that
24  he'd had a longstanding job at UNM, and that there
25  hadn't been a prior pattern of similar offenses, and

**210**

1  those were all mitigating factors in his favor; is
2  that correct?
3  **A.  Yes.**
4  Q.  Okay.  And then the next seven factors
5  appear to go against him, and those are escalating
6  factors; is that correct?
7  **A.  Yes.**
8  Q.  So the first one says, "Severity"?
9  **A.  Correct.**
10  Q.  Does -- number 5 says, "Use of"?
11  **A.  Alcohol.**
12  Q.  "Alcohol/drugs"?
13  **A.  Um-hmm.**
14  Q.  And there's -- that's an escalating factor
15  for you, right?
16  **A.  Correct.**
17  Q.  There's "Power differential," number 6.
18  That's an escalating factor for you, correct?
19  **A.  Yes.**
20  Q.  There's -- number 7 is, "Directed at a
21  single individual"?
22  **A.  Um-hmm.**
23  Q.  And that's an escalating factor, correct?
24  **A.  Yes.**
25  Q.  Why is that an escalating factor, just out

**211**

1  of curiosity?
2  **A.  I don't know.  Just a -- a chart that**
3  we've used in the past versus a group.  I think
4  that's considered more severe if it's towards an
5  individual.
6  Q.  Okay.  8, "Grossly negligent," and that
7  has an escalating check next to it, correct?
8  **A.  Yes.**
9  Q.  Number 9, "Impact campus society," and
10  that has a --
11  MR. SMITH:  That's safety.
12  Q.  Oh, "Impact campus safety"; is that
13  correct?
14  **A.  Yes.**
15  Q.  And how did it impact campus safety, in
16  your mind?
17  **A.  Well, sexual misconduct that occurred off**
18  **campus and that it bled over to the workplace.**
19  Q.  How did it bleed over into the workplace?
20  **A.  Because of the -- their working**
21  **relationship, the fact that they were both working**
22  **at the Health Sciences Center, both involved in**
23  **research.**
24  Q.  And, oh, I understand why you might think
25  that impacted her, but this is impact campus safety.

**212**

1  So how -- how -- how did this alleged contact affect
2  campus safety?
3  **A.  His predatory behavior.  He took advantage**
4  **of nonconsensual sex after somebody had alcohol.**
5  **For me, that was a campus safety concern.**
6  Q.  And had you ever received any complaints
7  that he had engaged any kind of predatory conduct
8  towards any other UNM employee during his
9  longstanding career?
10  **A.  No.**
11  Q.  So based on this one off -- off-campus
12  event, you decided that his conduct would impact
13  campus safety?
14  **A.  Yes.**
15  Q.  And then number 10, "Creates a liability."
16  Do you see that?
17  **A.  Um-hmm.**
18  Q.  Who did -- who are you concerned with that
19  his conduct would create a liability for?
20  **A.  I think it could be either party, quite**
21  honestly.  I think he ended up in a place that he
22  could sue the University, which is why we're here.
23  And then also -- actually, that's not why we're
24  here, but -- and then also I think there was a
25  concern that Ms. Van Meter could also sue the

213

1 University. So I think his presence just creates a
2 liability for the University.
3    Q.    Okay. And did you ever discuss any
4 concern that Ms. Van Meter might sue the University
5 with any other official with UNM?
6    A.    No.
7    Q.    Is that, "Effect on individual's
8 employment"? Is that how I read that?
9    A.    Yes.
10    Q.    That's an escalating factor. So those are
11 all the factors that you considered when applying
12 discipline to Mr. Briggs, correct?
13    A.    Yes.
14    Q.    Are there any other factors that you
15 considered in terms of these escalating factors?
16    A.    No.
17    Q.    And so I know that you say that you
18 considered these at the time, and we've talked about
19 there being -- exists this documents where you
20 applied those to Mr. Briggs kind of internally?
21    A.    Um-hmm.
22    Q.    That you handed that to Dr. Roth, correct?
23    A.    Discussed it with Dr. Roth. I believe I
24 handed it to him.
25    Q.    Okay. I guess I'm just wondering how we

214

1 confirm -- so this is testimony you gave in 2019,
2 correct?
3    A.    Um-hmm.
4    Q.    Almost a year-and-a-half after you sat
5 down with Dr. Roth to discuss these factors,
6 correct?
7    A.    Right.
8    Q.    I'm just wondering how I can confirm that
9 these were the factors that you actually discussed
10 at the time that you made the decision?
11    A.    I don't know.
12    Q.    Okay. Would I need to see that -- I don't
13 want to call it a memo, because it's not necessarily
14 a memo --
15    A.    Correct.
16    Q.    -- but I don't know what else to call it.
17 The document where you analyzed how to apply this to
18 Michael Briggs.
19    A.    Okay.
20    Q.    Would that maybe help me confirm that you
21 applied these factors in 2018?
22    A.    Yes.
23    Q.    Okay. You can set that aside.
24          MR. JACKSON: We're getting close to
25 the end. How about we take a five-minute break. We

215

1 can only -- I think I only have about 20, 25 minutes
2 left.
3          MR. VILLA: Okay.
4          MR. JACKSON: We're off the record.
5          VIDEOGRAPHER: The time is 2:50 p.m.
6 We're off the record.
7    (Recess was taken from 2:50 p.m. until 2:59 p.m.)
8          VIDEOGRAPHER: The time is 2:59 p.m.
9 We are back on the record.
10    Q.    All right. We're coming back from a quick
11 break. During the break, Ms. Anderson, did you have
12 the opportunity to talk to UNM's lawyers?
13    A.    Yes.
14    Q.    Is there anything about any of the
15 testimony you've given today that you'd like to
16 change?
17    A.    No.
18    Q.    When we last left off, we were going
19 through the poster, that I call it, from the peer
20 review hearing. Do you know what I'm referring to?
21    A.    Yes.
22    Q.    And you talked about mitigating and
23 escalating factors. I'm going to mark as Deposition
24 Exhibit 193 this document.
25    (Exhibit 193 Marked for Identification.)

216

1    A.    Okay.
2    Q.    Have you seen this document before?
3    A.    It's from our website.
4    Q.    Again. Okay. And did you participate in
5 the creation of this document?
6    A.    My office created this, yes.
7    Q.    Okay. Do you know who in your office
8 created this document?
9    A.    Magdalena.
10    Q.    Okay. And do you know when this document
11 was prepared?
12    A.    No, not exactly.
13    Q.    And look at the second page of the
14 document that contains a number of escalating and
15 mitigating factors.
16    A.    Yes.
17    Q.    Did this document exist at the time that
18 you talked to Dr. Roth about escalating and
19 mitigating factors?
20    A.    Yes.
21          MR. SMITH: Is this a two-page
22 document?
23          MR. JACKSON: I think so. Looks like
24 somebody --
25          MR. SMITH: Because I've got about

**UNM** POLICY OFFICE

PLAINTIFF'S
EXHIBIT
**46**

## Administrative Policies and Procedures Manual - Policy 3225: Separation of Employment

**Date Originally Issued:** 07-01-1994
**Revised:** 05-08-1998, 09-25-2002, 03-01-2006, 08-01-2006, 01-01-2008, 05-15-2015, 05-02-2016, 12-12-2016

Authorized by RPM 6.1 "Performance Management"

Process Owner: Vice President for Human Resources

# 1. General

There are four (4) categories of separation of employment from the University: voluntary, death, involuntary for cause, and layoff. Outlined herein are the policies and procedures for recognizing and processing each type of separation of employment. This policy also describes the reemployment and benefit rights of employees being laid off.

# 2. Voluntary Separation

Voluntary separations include resignation, initiated by the employee or by mutual agreement between the employee and the University; retirement; and completion of the period of a contract or term appointment.

## 2.1. Resignation

An employee may elect to resign or leave the University voluntarily through mutual agreement with the University. The employee should submit a written resignation giving, except as noted in Section 2.4, two (2) weeks notice to his or her supervisor. For resignations by mutual agreement, the supervisor should obtain appropriate releases of any further obligation of the University as part of the written resignation. Resignations also occur when:

- An employee walks off the job.

- An employee is absent for three (3) consecutive work days without the supervisor's permission, except when an emergency precludes giving notice.  Work days are considered consecutive even when broken by normal non-working days such as holidays or weekends.

- An employee fails to return to work, within the prescribed time limits, following an authorized leave of absence.

## 2.2. Retirement

Employees may elect to retire after meeting the eligibility requirements; see UAP 3625 ("Retirement") . Employees should give, at minimum, four (4) weeks notice. The University Division of Human Resources will notify retiring employees of their options with respect to health insurance and other benefits.

## 2.3. Completion of Term Appointment

Certain employees are employed at the University under a term appointment agreement; see UAP 3200 ("Employee Classification") , Section 4. Employees hired for a term appointment will be separated from the University as of the specified date unless the supervisor notifies the employee that the appointment will be extended.

Certain administrators, designated by the President, are hired on periodic employment contracts. The two (2) week notice provision in Section 2.1 does not apply to contract employees. Terms, conditions, and notification requirements for employees hired under contract are described in UAP 3240 ("Contract Employees") .

# 3. Death

Upon the death of an employee, the department shall immediately notify the respective employment area and the Human Resources Service Center. The Human Resources Service Center will assist the next of kin in completing benefit forms, insurance claims, and other paperwork as appropriate, and provide a checklist to ensure that all necessary steps are taken. The department will work with the employment area to formally separate the employee.

# 4. Involuntary Separation

## 4.1. Separation During Probation

Any full-time or part-time employee may be separated from employment during the six (6) month probationary period (twelve [12] month probationary period for police command staff) with or without cause.

## 4.2. Discharge For Cause

An employee may be discharged for unsatisfactory performance, misconduct, or for other reasons deemed to constitute proper cause by the University. Under these circumstances, the employee must be given notice of the grounds constituting proper cause and an opportunity to respond verbally and/or in writing before the employee is separated for cause. Refer to UAP 3215 ("Performance Management") for additional information regarding separation for cause.

Employees discharged for cause are noted as ineligible for rehire and are advised in writing at the time of discharge.

## 4.3. Consultation with Division of Human Resources

A supervisor must consult with the Labor Relations staff at the Division of Human Resources before an employee is involuntarily separated from the University.

## 4.4. Notice of Separation

Supervisors must give employees two (2) weeks notice of the separation, except in exceptional cases where immediate separation is required for reasons of health and safety or the overriding interest of the University. Pay in lieu of notice may be given at the employee's straight-time pay rate when giving notice is not practical. Pay in lieu of notice is not appropriate in cases of discharge for serious infractions or discharge following suspension for serious infractions.

## 4.5. Appeal of Ineligible for Rehiring Designation

When an employee is designated as ineligible for rehire, the employee may submit a request to have the designation reconsidered.  Within 30 days of the employee receiving notice of the designation, the employee should send a detailed letter to the Vice President for Human Resources that sets forth the reasons for the reconsideration.  The Vice President for Human Resources will decide whether the employee should:

- retain the ineligible for rehire designation, or

- be restricted from obtaining certain positions, or

- be eligible for rehire.

# 5. Layoff