IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

———————————————

MICHAEL BRIGGS,

     Plaintiff,

    vs.                                               1:20-cv-00651 KWR/JMR

UNIVERSITY OF NEW MEXICO,
UNIVERSITY OF NEW MEXICO BOARD
OF REGENTS, GARNETT STOKES,
PAUL B. ROTH, DOROTHY ANDERSON,
LAURA VELE BUCHS, KEVIN GICK,

     Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court upon the following motions:

- UNM Defendants'[1] Motion to Dismiss and for Summary Judgment (Doc. 129);

- UNM Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 146); and

- Plaintiff's Opposed Motion for Leave to Identify Statistical Expert (Doc. 154).

This employment case stems from Plaintiff's termination from the University of New Mexico after he allegedly sexually assaulted a coworker, Joy Van Meter.[2]  Plaintiff asserts that

---

[1] The University of New Mexico ("UNM") Defendants include Defendants the University of New Mexico, the Board of Regents of the University of New Mexico ("BORUNM"), Garnett Stokes, Paul B. Roth, Dorothy Anderson, Laura Vele Buchs, and Kevin Gick.

[2] The parties name Mr. Briggs and Ms. Van Meter without using pseudonyms, and Mr. Briggs and Ms. Joy Van Meter proceed without anonymity.  *See, e.g., Vanmeter v. Briggs, et al.,* 1:18-cv-970 (D.N.M.). The Court will therefore do the same and will not use pseudonyms to refer to Mr. Briggs and Ms. Van Meter.  Ms. Van Meter is also alternatively referred to in the record as "Ms. Vanmeter." However, the parties in this case refer to her as "Ms. Van Meter", and the Court will do the same.  *See, e.g.,* Docs. 129, 148.

his termination in this case was motivated by his sex and therefore violated Title IX, Title VII, and the New Mexico Human Rights Act. Defendants seek summary judgment or dismissal as to the remaining claims in this case, including the Title IX claim, the Title VII claim, the New Mexico Human Rights Act claim, and the requests for injunctive and declaratory relief.

Having reviewed the record and the relevant law, the Court finds that Defendants' Motion to Dismiss and for Summary Judgment (Doc. 129) is well taken and therefore is **GRANTED**. As explained below, Plaintiff has failed to create a genuine dispute of material fact that his sex was a motivating factor in the adverse employment actions. Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence (Doc. 146) is **GRANTED IN PART** and **DENIED IN PART**. Finally, Plaintiff's Motion for Leave to Identify Statistical Expert (Doc. 154) is **DENIED** as moot.

## BACKGROUND

Plaintiff challenges the termination of his employment at UNM. UNM terminated his employment because, after several administrative proceedings, it concluded that he created a hostile work environment by sexually assaulting a coworker, Joy Van Meter. Plaintiff asserted the following claims in his Complaint:

Count I: Due Process Violation

Count II: Violation of Title IX, 20 U.S.C. § 1681

Count III: Discrimination in Violation of Title VII of the Civil Rights Act of 1964 and

New Mexico Human Rights Act

Count IV: Defamation

Count V: Tortious Interference with Employment/Prospective Business

Count VI: Breach of Implied Employment Contract

Count VII: Breach of Covenant of Good Faith and Fair Dealing

Count VIII: Negligent Hiring/Investigation

Count IX: Spoliation of Evidence

Count X: Request for Injunctive Relief

Count XI: Request for Declaratory Relief: 28 U.S.C. § 2201 and NMSA 1978 § 44-6-1

*See* Complaint, Doc. 1.

The Hon. James O. Browning issued an order dismissing most of the claims in this case on September 22, 2021. In that Order, Judge Browning:

- dismissed the due process claim under Count I;

- dismissed the Title IX claim against the individual Defendants under Count II. The Title IX claim against UNM and UNM Board of Regents remained;

- dismissed the New Mexico Tort Claims Act claims under Counts IV-IX; and

- dismissed the New Mexico Human Rights Act claim under Count III as to Defendant Gick.

Thus, the following claims remain and are at issue in this opinion:

- a Title IX claim (Count II) against UNM and the Board of Regents of the University of New Mexico;

- a Title VII claim against all Defendants, and a New Mexico Human Rights Act claim against all Defendants except Gick, under Count III;

- and requests for injunctive and declaratory relief under Counts X and XI.

## FACTS

**I.**     **<u>Alleged Sexual Assault</u>.**

Joy Van Meter, a coworker of Plaintiff Michael Briggs at the University of New Mexico, alleged that Plaintiff sexually assaulted her on October 14, 2016 during an off-campus social encounter. Mot. Summ. J., Doc. 129 at 4, ¶ 1.

Ms. Van Meter alleged that she and Plaintiff met at a bar, consumed alcohol, went to Plaintiff's house and consumed more alcohol before she became nauseated and dizzy, vomited several times, had balance and processing issues, and became confused. She alleged Plaintiff encouraged her to shower, disrobed her, entered the shower with her, and engaged in sexual activity, including oral sex and digital penetration. Doc. 129 at 4, ¶ 2, *citing* Preliminary Letter of Determination ("PLOD"), Doc. 129-2, at 3-5.[3] She alleged these acts were not consensual.

Plaintiff and Ms. Van Meter had known each other for over two years prior to this incident, and initially met while participating in UNM's Executive MBA program from which both had already graduated earlier that year. Pl.'s Resp., Doc. 148 at 12, ¶ r. At the time of the alleged sexual assault, they both worked at UNM.

On October 14, 2016, the two met at a restaurant. Doc. 148 at 13, ¶ s. Prior to this meeting, Ms. Van Meter and her husband argued because he kissed an actress while performing in a theater play. Doc. 148 at 13, ¶ t. The kiss was displayed on promotional material across campus. Her husband told officers that during the argument she said in a text message "something like, how would you - - how would you like it if I kissed Mr. Briggs?" Doc. 148 at 14, ¶ v. Defendants considered the argument and questioned Ms. Van Meter's husband about it as part of its investigation. Doc. 129-2 at 13-14. Both Ms. Van Meter and her husband deleted the text messages. Doc. 148 at 16, ¶ z.

---

[3] When citing to page numbers, the Court generally refers to the page numbers generated by CM/ECF at the top of the page, except where the Court cites to deposition page and line numbers.

While meeting with Plaintiff for drinks at the restaurant, Ms. Van Meter asked when she could see Plaintiff's new home, and they decided to drive separately to his home. Doc. 148 at 16, ¶ aa. At his home they talked for several hours and had two more beers. Doc. 148 at 16, ¶ bb.

Plaintiff admitted to UNM investigators that at some point Ms. Van Meter told him she had vomited in the bathroom. Doc. 148 at 16, ¶ cc, *citing* Doc. 149, Ex. 22 at 205. Plaintiff asserts he offered to let her use his shower to clean vomit from her hair. Doc. 148 at 16, ¶ cc. Plaintiff asserts that she undressed in front of him, and he asked if he could join her in the shower; he alleges she indicated yes. *Id.*

However, Ms. Van Meter told the Albuquerque Police Department, which the Defendants considered in their investigation, as follows. She asserted that she vomited at least six times and that Plaintiff took off her clothes while she was incapacitated. Doc. 157 at 20, *citing* Doc. 149 at 138-39. She denied that she invited Plaintiff into the shower with her. She stated that Plaintiff was staring at her while she was showering and joined her in the shower without her affirmative acquiescence. *Id.*[4]

Plaintiff asserts that he kissed Ms. Van Meter in the shower, and she reciprocated. Doc. 148 at 17, ¶ dd.  However, she told police that she never reacted when Plaintiff kissed her. APD Police Report, Doc. 149 at 138-39. Ms. Van Meter reported to police that Plaintiff forced oral sex on her, and that she felt Plaintiff's "fingers being forced into her vagina." Doc. 149, Exhibit 16 at 139-40. Ms. Van Meter's statement was confirmed by a Sexual Assault Nurse Examiner ("SANE") report considered by Defendants, which noted bruises on her legs and genital abrasions and tears. PLOD, Doc. 129-2 at 5 (reflecting Defendants considered the SANE report,

---

[4] There is some discussion in the record regarding how Ms. Van Meter became intoxicated after drinking approximately three to four beers.  She stated that she last ate at 7:00 a.m.  Moreover, there were prescription benzodiazepines in her system. She was not tested for GHB, therefore it was not ruled out whether she was drugged. Doc. 149 at 147-48.

which noted three distinct injuries consistent with the use of a finger); Doc. 149 at 140 (police report noting bruises, tears, and abrasions).  Plaintiff admitted that Ms. Van Meter did not react at all, positively or negatively to oral sex. Doc. 149 at 146.

Ms. Van Meter told Plaintiff that she had to be home by 6:00 p.m., and the two got dressed.  Doc. 148 at 17, ¶ ee.  The police report reflects that Ms. Van Meter remembered sitting on Plaintiff's bed in her underwear after showering, but she did not remember how she ended up on his bed. Doc. 149 at 140.  She also asserts that she told Plaintiff to contact her husband and to tell him she was too drunk to drive home.  *Id*.  She tried to text her husband to pick her up, but she texted the wrong person, a friend in Maine. *Id*. Ms. Van Meter told police that Plaintiff eventually agreed to drive her home in her vehicle. *Id.* Plaintiff asserts that Ms. Van Meter asked him to drive her home. He drove Ms. Van Meter home in her car, where her husband was waiting outside.  Doc. 148 at 17, ¶ ff.

When she got home, Ms. Van Meter's husband went to work and took their child with him. Her husband said she "was in no condition" to watch their daughter upon arriving home. Doc. 129-2 at 24. Ms. Van Meter and her husband did not talk about what happened until the morning of Saturday, October 15, 2016.  Doc. 148 at 17, ¶ hh.

She deleted all of the texts she exchanged with her husband the day after the alleged assault.  Doc. 148 at 18, ¶ ii.  She also deleted all of her text messages with Plaintiff.  *Id.* at ¶ ii-kk. However, some text messages between Ms. Van Meter and Plaintiff were recovered, and text messages between Ms. Van Meter and a friend were recovered and considered by Defendants. Doc. 129-2 at 17 (listing documentary evidence considered).

Ms. Van Meter went on Sunday, October 16, 2016 to a clinic at UNM for a SANE examination. Doc. 129-2 at 15. DNA tests were negative.  Doc. 148 at 18, ¶ ll. Drug tests were

positive for diazepam and its metabolites, for which Ms. Van Meter has a prescription. Doc. 149 at 147. They did not test for GHB because of a time delay. *Id.* APD investigated the alleged sexual assault but have not charged Plaintiff with a crime. Doc. 148 at 18, ¶ mm.

## II.     <u>DOJ investigation and alleged outside pressure</u>.

Between 2014 and 2018, there were multiple media reports criticizing UNM's handling of sexual assaults. Doc. 148 at 9, ¶ g.

In December 2014, the United States Department of Justice ("DOJ") initiated an investigation of UNM "after receiving complaints from multiple students alleging that UNM did not respond adequately to their reports of sexual assault." Doc. 148 at 9, ¶ h, *quoting* DOJ Letter of Findings, Doc. 149, Ex. 6. In order to comply with Title IX and not lose federal funding, DOJ asserted that UNM must promptly take measures, including to (1) "[r]evise the University's policies, procedures, and investigative practices to provide a grievance procedure that ensures prompt and equitable resolution of sexual harassment and sexual assault allegations"; (2) "[a]dequately investigate or respond to all allegations by students who have alleged sexual harassment, including sexual assault"; and (3) "[t]ake prompt and effective steps to eliminate a hostile environment, prevent its recurrence, and address its effects." Doc. 148 at 11, ¶ j, *citing* DOJ Letter, Doc. 149, Ex. 6. at 89.

In July 2016, UNM's then-President Bob Frank authored an opinion article in the Albuquerque Journal titled "UNM serious about sexual assault issue," and stated: "[s]exual assault is arguably the most disturbing issue on our college campuses nationwide. At UNM, it has become a primary focus over the past few years" and "we are moving aggressively ahead with major changes in our campus wide response." Doc. 148 at 11, ¶ k.

On October 17, 2016, UNM entered into an agreement with the DOJ that required, *inter alia*, that (1) UNM "make all necessary and appropriate revisions to its policies, procedures, and practices regarding campus sexual harassment, including sexual violence;" and (2) "[i]n return, DOJ will not initiate litigation regarding its Title IX and Title IV findings…." Doc. 148 at 11, ¶ l.

The DOJ Agreement required that UNM remain under federal supervision for three (3) years, during which time DOJ would monitor UNM's investigation of reports of sexual assault, and UNM was required to report "[d]etailed data on the number of sexual harassment reports received by the University, whether the University investigated each report, and, if investigated, the findings, [and] the sanctions imposed (if applicable) . . . ." Doc. 148 at 11-12, ¶ m.

The DOJ Agreement provided that: "[i]f the Department determines that the University has failed to comply with the terms of this Agreement or has failed to comply in a timely manner with any requirement of this Agreement, . . . the Department may initiate civil enforcement proceedings in federal court." Doc. 148 at 12, ¶ n. UNM was ultimately released from the agreement and no civil enforcement proceeding was filed.

After UNM signed the DOJ agreement, Ms. Van Meter reported to UNM that Plaintiff had sexually assaulted her. Doc. 148 at 12, ¶ o.

## III.    <u>Office of Equal Opportunity investigation and issuance of its Preliminary and Final Letters of Determination</u>.

Ms. Van Meter reported the alleged sexual assault to UNM's Office of Equal Opportunity ("OEO"), which investigated the allegations. Doc. 129 at ¶ 3. Ms. Vele Buchs was assigned as an investigator. *Id.* at ¶4. The investigation included obtaining and analyzing Ms. Van Meter's statement, Plaintiff's statement, the statements of seven other witnesses, text messages, a SANE

Report, an Albuquerque Police Department report, and other evidence. *Id.* at 4, ¶ 5, *citing* Doc. 129-2 at 2, 5, 8, 17.

Plaintiff does not dispute that sexual activity occurred. However, he asserts the sexual activity was consensual. Doc. 129 at 5, ¶ 6. The OEO noted that Plaintiff admitted to the following factual allegations: (a) he initiated the sexual conduct; (b) Ms. Van Metter was not touching him in a sexual manner; (c) Ms. Van Meter never indicated that she was enjoying he sexual activity; (d) she never stated that she wanted to have sex with Plaintiff; and (e) Plaintiff drove Ms. Van Meter home, because she had been drinking. Doc. 129 at 5, ¶ 7, *citing* Doc. 129-2 at 7, 19, 20.

According to UNM's Policy 2720 at § 2.2, harassment includes behaviors that "are sufficiently severe or pervasive to have the effect of unreasonably interfering with [a person's] … working conditions … by creating an intimidating, hostile, or offensive environment." Doc. 129 at 5, ¶ 8. UNM's Policy 2740, § 3 states that "[s]exual activity will be considered 'without consent' if no clear act or statement is given. Consent may not be inferred from silence, passivity or lack of active response alone." Doc. 129 at 5, ¶ 9. UNM's Policy 2730, § 2.2 includes rape, sexual assault, and sexual coercion as examples of sexual harassment. Doc. 129 at 5, ¶ 10. The record reflects that these policies were in effect at the time of the alleged sexual assault. Decl. of Francie Cordova, Doc. 129-1 at ¶ 6-8.

On December 4, 2017, the OEO issued a 28-page Preliminary Letter of Determination ("PLOD")[5] setting forth their findings and recommended disposition of the action, with an

---

[5] Plaintiff asserts that the Court may not consider statements in various reports produced in the disciplinary proceeding, including the PLOD, as they are hearsay. The Court disagrees, as the statements are not being considered for the truth of the matter asserted, or whether Plaintiff in fact sexually assaulted Ms. Van Meter. At issue here is UNM's employment decision and whether it appropriately investigated the alleged assault. The statements are offered to show the

opportunity to object. It concluded that Plaintiff subjected Ms. Van Metter "to unwelcome activity" which "was severe in nature", without evidence that Plaintiff asked if Ms. Van Meter wanted to engage in the sexual activity reported and without evidence that she was enjoying the sexual activity. Doc. 129 at 6, ¶ 11, *citing* Doc. 129-2 at 20, 27. The PLOD concluded that Plaintiff treated Ms. Van Meter's silence, passivity, and lack of response as consent in direct contravention of UNM's policy. Doc. 129 at 6, ¶ 12.

Moreover, the PLOD concluded that Plaintiff lacked the capacity to consent. PLOD, Doc. 129-2 at 27*; see also* Panel Decision, Doc. 129-10 at 6 ("the Panel agrees with OEO's finding that … Complainant did not have the capacity to consent to sexual activity and that you knew or should have known that by the circumstances of the encounter."); Disciplinary Action Form, Doc. 129-9 at 1 (also noting that OEO found Ms. Van Meter lacked capacity to consent).

Despite the PLOD's conclusion that Plaintiff violated UNM's consent policy and that Ms. Van Meter lacked capacity to consent to sexual activity, the PLOD found that "there is no objective evidence of unreasonable interference in [the accuser's] work performance and/or environment." Doc. 148 at 20, ¶ yy. The PLOD states that there was "No Policy Violation" because there was "not sufficient evidence to show more likely than not [that Mr. Briggs] subjected [Ms. Van Meter] to unwanted conduct of a sexual nature that unreasonably interfered

---

effect on the decision-makers' state of mind when they made the decision to terminate Plaintiff and to establish whether there are legitimate reasons for the termination. *See Zamora v. Bd. of Educ. for Las Cruces Pub. Sch.*, 553 F. App'x 786, 790 (10th Cir. 2014) (report was offered "to establish the effect it had on Superintendent Rounds' state of mind when he made the decision to terminate Zamora. In other words, the report was not offered to prove that Zamora did in fact sexually harass some employees or violate other policies; instead, the report was offered to demonstrate that Superintendent Rounds believed there were legitimate reasons for his decision to terminate Zamora's contract."); *see Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1434 (10th Cir. 1993) (holding that statements "offered to establish [defendant's] state of mind in making [an employment] decision[ ] and ... not offered for the truth of the matter asserted" are not hearsay).

with [her] work performance and work environment…." Doc. 148 at 21, ¶yy. The PLOD further states that while the sexual activity "had the subjective effective [sic] of creating a hostile work environment for [Ms. Van Meter]," there was no objective evidence of unreasonable interference with Ms. Van Meter's work environment. PLOD, Doc. 129-2 at 27. 14. Accordingly, the OEO's preliminary determination was that there was no violation of UNM's employment policies by Plaintiff. *Id.* at 28.

Both parties were permitted to respond to the OEO's preliminary determination. Ms. Van Meter submitted information in response to the PLOD, asserting that (1) Plaintiff was copied in emails, letters, and memoranda she received at work, which made her work life very difficult, and (2) the stipulated protection order excepted contact between the parties for incidental contact, implying there was a possibility that the parties would run into each other at work. Doc. 129 at 6, ¶ 13. Plaintiff stipulated to the protection order, including language that if the parties found themselves within 25 feet of each other at work, it would not be deemed a violation of that order. *Id.* at 6-7, ¶ 16.

On December 12, 2017, the OEO confirmed its preliminary determination in its Final Letter of Determination ("FLOD") and gave both parties five (5) business days to appeal that decision. Doc. 148 at 21, ¶ zz.

Despite a litigation hold, UNM deleted the email account of Ms. Vele Buchs, the investigator, after she left her employment with UNM. Doc. 148 at 20, ¶ ww. Dr. Larson, who was initially tasked with disciplining Mr. Briggs, also asserted that e-mails related to the disciplinary process were deleted. Doc. 148 at 20, ¶ xx.

Ms. Van Meter resigned from her employment at UNM months before these decisions, on September 15, 2017. Doc. 148 at 22, ¶ fff.

11

**IV.**    **President Stokes issues decision reversing OEO and finding a policy violation.**

Ms. Van Meter appealed OEO's determination that there was no policy violation to UNM's President, Dr. Garnett Stokes. Doc. 129 at 7, ¶ 18. On March 29, 2018, President Stokes reversed OEO's finding, reasoning in part that the evidence showed the parties "worked in close proximity with one another," which "created an objectively hostile work environment for [Ms. Van Meter] based on the sexual misconduct at issue," and such misconduct was "in violation of UNM policy." *Id.* at 7, ¶ 19.[6]

In reaching the conclusion that there was an objectively hostile work environment, President Stokes relied in part on the following evidence:

a. Although Plaintiff had no direct supervisory authority over Ms. Van Meter, his position at UNM gave him influence at her department level; therefore, an objective or reasonable person in Ms. Van Meter's position would fear retaliation or Plaintiff's negative influence on her work environment, Stokes Letter at 1 (Exh. A-7); and

b. The parties worked in close proximity to each other following the alleged sexual assault; therefore, an objective or reasonable person could find Ms. Van Meter was subjected to a hostile work environment based on the presence in her work environment of a person who sexually assaulted her. *Id.*

President Stokes noted as follows:

Further, other findings made by OEO in the PLOD/FLOD, including that Respondent's position afforded him opportunity to be influential at the department level if he so chose and that a reasonable person in Complainant's position would have feared retaliation and his potential negative influence in her work environment, demonstrate Complainant and Respondent worked in close proximity with one another. I, therefore, believe a reasonable person also could

---

[6] At certain times Plaintiff objects to consideration of statements in President Stokes's letter, while at others he asks the Court to consider the document. As explained above, the statements in the letter are not hearsay as they are not offered for the truth of the matter asserted. *Supra,* n.5.

find working in close proximity to Respondent post-October 14, 2016, created an objectively hostile work environment for Complainant based on the sexual misconduct at issue and in violation of UNM policy. Therefore, I also remand this discrete issue [to] OEO with the following instructions:

Reverse its conclusion that the incident did not create a hostile work environment on the grounds a reasonable person could not find Respondent interfered with Complainant's work environment post-October 14, 2016; and determine the Respondent's actions resulted in a hostile work environment for Complainant in violation of University Administrative Policies 2720, 2730 and 2740.

Doc. 129-8 at 1-2.

Plaintiff points out that "[t]he Department of Orthopedics [where Ms. Van Meter worked] is organizationally and physically separate from the Office of Research, where Mr. Briggs work[ed]." Doc. 148 at 22, ¶ eee, *citing* Pennick Aff., Doc, 148, Ex. 4 at 15-19, 22, 24, 25. "Ms. Van Meter [did] not work in the same building as Mr. Briggs." *Id.* Plaintiff further argues that "Mr. Briggs has no supervisory authority over Ms. Van Meter; she [was] completely outside of Mr. Briggs's chain of command at UNM." *Id.*

Dr. Stokes nevertheless found his presence created a hostile work environment. Defendants found that Plaintiff had influence in Van Meter's department; they were copied on the same emails, letters, and memos, which made it more difficult for her to perform her job; and it was determined there was a chance of the two running into each other. Doc. 129-2 at 26; Doc. 129-6 at 1, 2. Dr. Stokes instructed the OEO to reverse its determination and find that Plaintiff's actions "resulted in a hostile work environment for [Ms. Van Meter] in violation of University Administrative Policies 2720, 2730 and 2740." Doc. 129 at 8, ¶ 21

Plaintiff did not appeal the PLOD to President Stokes. Plaintiff submitted a letter disputing and challenging the fact findings against him in the PLOD, but acknowledged that there was no need for him to appeal the decision because UNM's investigator had ultimately found "No Policy Violation" and recommended closure of the file without further action. Doc.

148 at 21, ¶ aaa. Plaintiff was not provided with a copy of Ms. Van Meter's appeal, nor given any opportunity to respond to it before President Stokes issued a letter decision reversing the finding of "No Policy Violation" on March 29, 2018.  Doc. 148 at 21, ¶ ccc.

Policy 2740 provides that both the complainant and respondent "have equal rights to seek a discretionary review of OEO's determination through the Office of the President" but does not expressly provide for a right to *respond* to an appeal to the President. Doc. 129-4 at 8, § 8. After receiving the President's reversal, Plaintiff had the opportunity to appeal the decision to the Board of Regents but apparently did not do so. *Id.* (Policy 2740 sets forth right to appeal President's decision to Board of Regents); *see also* Doc. 157 at 11, 24 (noting that Plaintiff did not appeal to Board of Regents). Moreover, President Stokes's Letter, which was sent to Plaintiff's counsel, informed him of his right to appeal to the Board of Regents within 30 days of the decision. Doc. 129-8 at 2.  Although Plaintiff asserts he intended to appeal that decision, Plaintiff has not cited to evidence in the record to suggest he in fact appealed and Defendants ignored his appeal. *See, e.g.,* Doc. 148 at 42-43 (suggesting that Defendants ignored his request to appeal, but not citing to record in support of that assertion); Fed. R. Civ. P. 56(c)(1) (a party asserting a fact must support that assertion by citation to record); *Id.* (e)(1)-(4) (if a party fails to properly support a fact, the court may enter summary judgment or issue other appropriate order).

## V.    **Dr. Roth terminates Plaintiff's employment**.

After President Stokes made her decision, UNM then designated Mr. Briggs' immediate supervisor Dr. Richard Larson to impose discipline pursuant to its policies and practices. *See* Doc. 149 at 243, Ex. 30. Dr. Larson served as the Executive Vice Chancellor for UNM Health Sciences Center ("HSC") (the second highest position at UNM HSC) and Vice Chancellor for Research. Doc. 148 at 22-23, ¶ hhh. Dr. Larson recused from the disciplinary process. Dr. Larson

testified at a deposition and at the peer review hearing. He stated that he recused because (1) he did not receive the evidence or attachments supporting the findings in the PLOD; and (2) he believed he did not receive clear documentation setting forth the finding of policy violation, *i.e.*, whether Plaintiff was being disciplined for creating a hostile work environment or for sexual misconduct of a severe type. Dr. Larson Dep., Doc. 156-1 at 22:16- 23:5; 27:14-16; 28:18-25. He stated that he was concerned that "if I sanctioned him without clear documentation of what the finding was and what the violation was, that I would personally be liable to a suit from Mr. Briggs." Doc. 156-1 at 30:18-21. But the finding of the policy violation was in the PLOD, the FLOD, and Dr. Stokes's letter. The PLOD set forth in extensive detail the relevant factual findings, and Dr. Stokes's letter stated that Plaintiff's actions resulted "in a hostile work environment for Complainant in violation of University Administrative Policies 2720, 2730, and 2740." Doc. 149 at 260, Ex. 36.

UNM's normal practice and policy is to provide the evidence or exhibits relied upon in the PLOD. Doc. 148 at 23, ¶ kkk. While Dr. Larson was concerned that he did not receive the evidence or exhibits supporting the 28-page PLOD, he admitted that his role was not to reanalyze or reweigh the evidence that the OEO considered. Larson Dep, Doc. 151-2 at 22:9-23:5; 73:20- 21; 81:18-24.

After Dr. Larson's recusal, Dr. Paul Roth was appointed to discipline Mr. Briggs. *See* Doc. 129 at 8, ¶ 22, *citing* Disciplinary Action Form (Exh. A-8). Dr. Larson asserted that Chamiza Pacheco de Alas[7], the Chief of Staff to the Executive Vice President at UNM's Health Sciences Center, allegedly told Dr. Roth that she wanted to "cut [Plaintiff's] dick off." Doc. 149, Ex 2, Larson Dep. at ¶ 15.  However, Ms. Pacheco de Alas was not a decisionmaker, and

---

[7] She is also at various times referred to by the parties and in the record, including transcripts, as "Chamisa Pacheco" or "Chamisa Pacheco de Alas."

Plaintiff has not established her role in the decision-making process by citation to the record. Therefore, her statements are inadmissible hearsay and alternatively, irrelevant. Doc. 157 at 27; Doc. 171-1 *citing* Sept. 18, 2019 (Vol. II) Tr. at 203:13-15.[8]

Dr. Roth testified that although he was considering discipline short of termination, he ultimately concluded "that termination was the only viable option." Doc. 157, Ex C., Roth Dep. at 98:8-14. Dr. Roth concluded that Ms. Van Meter did not have the capacity to consent. Doc. 157 at 28. He concluded that "[i]t is my belief that the violations described herein and the impact on the Complainant are of such serious and egregious nature that an accelerated disciplinary process is warranted." Doc. 157 at 28.

Plaintiff asserts that the involvement of UNM's VP of Human Resources, Dorothy Anderson, in the disciplinary process was unusual, but does not cite to evidence which supports that assertion. Plaintiff asserts that the usual practice is to assign a human resources staff member from the Client Services Unit. Anderson Dep., Doc. 149, Ex. 45 at 285-287. However, instead of assigning one of her subordinates to advise on the case, Dorothy Anderson herself advised on the case. OEO brought the complaint directly to her due to the nature of the complaint and the fact that Mr. Briggs was a high-level employee. Doc. 157 at 28, *citing* Anderson Dep., Doc. 149, Exhibit 45, at 285-287. Anderson stated she had discretion to deal with the termination herself if

---

[8] Ms. Pacheco de Alas was not a decisionmaker in the any of the decisions, including (1) the OEO's PLOD; (2) Dr. Stokes's letter finding a hostile work environment; (3) Dr. Roth's disciplinary action, or (4) the Peer Review Panel. "An employee's statements are not attributable to his employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decision-making process affecting the employment action' at issue." *Johnson v. Weld Cnty., Colo*., 594 F.3d 1202, 1208–09 (10th Cir. 2010), *Jaramillo v. Colo. Judicial Dep't,* 427 F.3d 1303, 1314 (10th Cir.2005) (per curiam). Here, Plaintiff has not established or explained how Ms. Pacheco de Alas was involved in the decision-making process. He does not assert that she was involved in the drafting of the PLOD or FLOD, the issuance of discipline by Dr. Roth, or in the Peer Review Committee's three-day evidentiary hearing and decision.

an employee held a high-level position and it involved sensitive matters. Ms. Anderson identified three high profile investigations where she was similarly involved. Doc. 148 at 25, ¶ rrr.

Ms. Anderson admitted that she wanted to fire Plaintiff in part because she was concerned that Ms. Van Meter would sue UNM. Doc. 148 at 26, ¶ sss. Plaintiff asserts that Dr. Roth terminated Plaintiff at Ms. Anderson's urging. *See* Doc. 148 at 26, ¶ ttt. However, as explained above, Dr. Roth believed termination was appropriate and the only viable option.

Plaintiff asserts he was a longstanding exemplary employee, who from 2006 until 2019 received multiple pay raises, promotions, and positive performance reviews. Doc. 148 at 8, ¶ a-b. He asserts he never received any other complaint for any reason. Doc. 148 at 8, ¶ c. He has never been arrested, charged, or convicted of any crime, and was not arrested or charged in connection with the alleged sexual assault. Doc. 148 at 9, ¶ d.

UNM issued Plaintiff a Notice of Contemplated Action (NCA) for discharge. Doc. 129 at 8, ¶ 23 *citing* Disciplinary Action Form at 1 (Exh. A-8 to Cordova Decl.) (confirming that Plaintiff was "given a Notice of Contemplated Action (NCA) for Discharge for unprofessional and unacceptable behavior; specifically, creation of a hostile work environment in violation of UNM Policy"). Plaintiff submitted a written response to the NCA. Doc. 129 at 8, ¶ 24, *citing* Disciplinary Action Form at 1 (Exh. A-8 to Cordova Decl.) (confirming Plaintiff's submission of a response to the NCA). Dr. Roth ultimately terminated Plaintiff's employment. Doc. 129 at 8 ¶ 25.

**VI.**    **Peer Review Panel evidentiary hearing and decision.**

Plaintiff requested a peer review hearing to challenge his termination. Doc. 129 at 8, ¶ 26 *citing* Doc. 129-10, Nov. 13, 2019 Letter from Emmons, Jaramillo, and Kasparian to Plaintiff at 1 (Exh. A-9 to Cordova Decl.).

Defendants held a three-day hearing before a three-person panel (the "Peer Review Panel") during which Plaintiff had the assistance of counsel, called and cross-examined witnesses, offered documentary evidence, and submitted written, post-hearing briefs for the panel's consideration. Doc. 129 at 8, ¶ 27, citing Nov. 13, 2019 letter at 1 (Exh. A-9). However, counsel was not authorized to speak on Plaintiff's or Ms. Van Meter's behalf, and Plaintiff had to submit written cross-examination questions of Ms. Van Meter, to be asked by the panel. The panel issued its eight-page decision upholding the termination. Doc. 129 at 8, ¶ 28.

Plaintiff did not appeal any decision to the Board of Regents.

**LEGAL STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). As the Tenth Circuit has explained, "mere assertions and conjecture are not enough to survive summary judgment." *York v. AT&T*, 95 F.3d 948, 955 (10th Cir. 1996). To avoid summary judgment, a party "must produce specific facts showing that there remains a genuine issue for trial and evidence significantly probative as to any [material] fact claimed to be disputed." *Branson v. Price River Coal Co.*, 853 F.2d 768, 771-72 (10th Cir. 1988) (quotation marks and citations omitted).

"A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit. A dispute over a material fact is genuine if a rational jury could find in favor of the

18

nonmoving party on the evidence presented." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017) (quotation marks and citation omitted).

When making this determination, the Court keeps two principles in mind. First, while the Court must draw all "reasonable inferences … in the light most favorable to the non-moving party*," id*. at 1261, that party's "version of the facts must find support in the record," *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Second, the Court's role is not to weigh the evidence or decide any issues of credibility, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249, 255.

## DISCUSSION

## I.    <u>Motion to Strike Evidence.</u>

Defendants seek to strike evidence Plaintiff submitted to oppose summary judgment.  As explained below, the Court grants in part and denies in part Defendants' request.

Defendants generally assert that certain evidence presented by Plaintiff in his appendix (Doc. 149) should be stricken for the following reasons:

- Certain evidence was not disclosed by Plaintiff during discovery;

- The evidence is inadmissible, *see* Fed. R. Civ. P. 56(b)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); and

- Plaintiff presented a sham affidavit.

### A.    **The Court declines to strike Mr. Allen's declaration.**

Defendants move to strike the Declaration of Hubert Allen (Doc. 149, Ex. 1) and the First Declaration of Mr. Briggs (Doc. 149, Ex. 3).  In those declarations, they reviewed and

summarized the 371 disciplinary records produced by UNM regarding complaints of sexual misconduct or sexual harassment.

After various discovery disputes, in September and October 2024 UNM produced 371 files regarding its handling of complaints that UNM categorized as sexual misconduct or sexual harassment. Mr. Allen reviewed those files, and determined how many of those files (1) were investigated, (2) resulted in a finding of a violation of UNM policy, and (3) resulted in the imposition of discipline. He also counted how many respondents in each category were male or female. *See* Doc. 156 at 4; Allen Decl., Doc. 149 at 5. Plaintiff did the same.

Mr. Allen's declaration summarizes his review of the disciplinary records and performs basic arithmetic. He noted as follows. Of the 269 complaints made against male respondents, 126 (or 46.8%) were investigated by the OEO. Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by the OEO. Based on these numbers, Mr. Allen calculated that male respondents were investigated by the OEO at a rate of 6.8 times greater than female respondents. Doc. 14, Exhibit 1, at 4.

Moreover, after viewing each file, he noted that of the 269 complaints against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a policy violation against the female respondents. Two female respondents were referred for a hearing and the outcome was not clear from the records. Doc. 149 at 6. Plaintiff's declaration gave similar opinions.

Defendants assert that Mr. Allen's and Plaintiff's declarations should be excluded because they include expert testimony which was not disclosed as required under Rule 26(a). Plaintiff asserts that Mr. Allen is not testifying as an expert in his declaration, but instead merely

provides a Fed. R. Evid. 1006 summary or calculation. The Court agrees with Plaintiff and concludes that Mr. Allen does not present expert testimony in his declaration. The declaration expresses no expert opinions, but merely summarizes discovery produced by Defendants and applies grade-school mathematics. Defendants admitted that Mr. Allen simply engaged in basic arithmetic. This is lay testimony because the witness merely added or subtracted numbers and took an average. *See United States v. Hamaker*, 455 F.3d 1316, 1331 (11th Cir. 2006); *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005). "The Federal Rules of Evidence clearly permit the contents of voluminous writings to be presented in the form of a 'chart, summary, or *calculation.*'" *Bryant,* 432 F.3d at 1124, *quoting in part* Fed. R. Evid. 1006 (emphasis added). "Taking a simple average of … numbers, though technically a statistical determination, is not so complex a task that litigants need to hire experts in order to deem the evidence trustworthy." *Id.* "A mathematical calculation well within the ability of anyone with a grade-school education is, in our opinion, more aptly characterized as a lay opinion under Fed. R. Evid. 701." *Id.*

Defendants assert that the statistical analysis in the declaration is too basic to constitute adequate statistical analysis or to prove a gender bias. To the extent Defendants fault the affidavit for not going farther into more complex statistical analysis, that is not a basis to exclude the Rule 1006 summary. Rather, Defendants' argument is more appropriately considered as to whether Plaintiff presented sufficient evidence to create a genuine dispute of material fact. The Court will address that argument below.

Defendants alternatively assert that Mr. Allen's declaration should be excluded even if it is mere lay opinion testimony, as he was not disclosed as a witness in evidence as required under Rule 26(a) and (e), and his declaration was not disclosed. The Court concludes that any failure

to identify Mr. Allen in discovery as a witness who would provide a Rule 1006 summary was substantially justified or harmless and declines to exclude the evidence.

Federal Rule of Civil Procedure 37(c)(1) addresses a party's failure to disclose or supplement initial disclosures, providing that, "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "[T]he determination of whether a Rule 26(a) [or (e)] violation is justified or harmless is entrusted to the broad discretion of the district court." *Neiberger v. Fed Ex Ground Package Sys., Inc.*, 566 F.3d 1184, 1191–92 (10th Cir. 2009) (quoting *Woodworker's Supply, Inc.*, 170 F.3d at 993); *accord Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002). However, the Rule 37(c)(1) inquiry "depends upon several factors that a district court *should* consider in exercising its discretion." *Eugene S. v. Horizon Blue Cross Blue Shield of N.J.*, 663 F.3d 1124, 1129 (10th Cir. 2011) (emphasis added). These factors include: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." *Woodworker's Supply, Inc.*, 170 F.3d at 993; *quoted in HCG Platinum, LLC v. Preferred Prod. Placement Corp.*, 873 F.3d 1191, 1200 (10th Cir. 2017).

Moreover, where the exclusion of evidence "has the necessary effect of a dismissal" the court must "carefully explore and consider the efficacy of less drastic alternatives, ordinarily reserving the extreme sanction of dismissal for cases involving bad faith or willfulness or instances where less severe sanctions would obviously prove futile." *HCG Platinum, LLC*, 873 F.3d at 1206.

As to the first *Woodworker* factor, Defendants are not prejudiced or surprised by the lay testimony offered. Although Mr. Allen was not disclosed as a witness in discovery, he merely summarizes voluminous evidence produced by Defendants and provides a calculation using basic arithmetic. Mr. Allen's declaration summarizes and provides a calculation of 371 files produced by Defendants. This discovery was produced following extensive discovery disputes. Finally, the parties discussed the need for the discovery in light of Tenth Circuit published case law. Thus, Defendants were or should have been aware that the discovery they produced would be presented in this case as statistical evidence in a Rule 1006 summary. Moreover, Defendants do not assert in the motion to strike that they desire to present their own summary to correct an error in Plaintiff's summaries.

As to the second factor, Defendants do not argue that they need to take any action, or need additional time, to cure any prejudice. Mr. Allen's declaration is a summary of Defendants' discovery produced in September and October 2024. Defendants assert they would need to obtain their own expert rebuttal witness to any expert testimony by Plaintiff. But Mr. Allen and Plaintiff's declarations do not include any expert testimony. Moreover, given the extensive discovery proceedings regarding these disciplinary files, and the prior discussion of the relevancy of statistical evidence at discovery conferences, Defendants were aware that the disciplinary files would be presented in some statistical form or Rule 1006 summary. *See, e.g.,* Plaintiff's Response to Motion to Quash Subpoena, Doc. 101 (arguing that the disciplinary files were relevant).

As to the third factor, allowing the summaries would not further disrupt summary judgment. Defendants only seek exclusion, and do not assert that they need additional time to present their own summary.

Finally, Plaintiff did not act in bad faith or willfully. The evidence has been the subject of discovery proceedings since October 4, 2023. The discovery was partially produced by Defendants in September 2024, and fully produced by October 2024. Defendants filed their summary judgment motion on December 20, 2024. The declarations were signed on February 4, 2025 and February 5, 2025, and produced on February 6, 2025. Doc. 141. The Court believes this was a reasonable amount of time to review the 371 files and produce a summary or calculation.

Thus, after considering the *Woodworker* factors, the Court concludes that any failure to produce the Rule 1006 summary or Mr. Allen's lay opinion testimony summarizing Defendants' discovery was substantially justified or harmless. Therefore, the Court declines to exclude Mr. Allen's or Plaintiff's declaration.

### B.    Dr. Larson's Declaration.

Defendants move to strike Dr. Larson's affidavit as (1) it was never produced in discovery; (2) it is a sham affidavit; and (3) it contains inadmissible testimony. Dr. Larson was Plaintiff's direct supervisor at UNM, who praised Plaintiff in reviews and recused from the disciplinary process.

Defendants assert that Dr. Larsons' declaration is inconsistent with his prior deposition testimony and therefore should be stricken as a sham affidavit. Courts may disregard an otherwise proper affidavit if the court first determines that the affidavit's purpose is to create a sham issue of material fact. *Knitter v. Corvias Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). "Sham affidavits, though 'unusual,' arise when a witness submits an affidavit that contradicts the witness's prior testimony." *Id.,* citing *Law Co. v. Mohawk Const. & Supply Co.,* 577 F.3d 1164, 1169 (10th Cir. 2009).

"In determining whether an affidavit creates a sham fact issue, [the Court] consider[s] whether: '(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain.' " *Knitter*, 758 F.3d at 1218 n.3.

At the deposition, Dr. Larson was directly asked about three alleged concerns, that (1) the investigation was flawed (2) the investigation had been biased, and (3) there is evidence that had not been considered. Larson Dep., Doc. 156-1 at 28:7-12. Dr. Larson responded "**I think that's a misinterpretation of my concerns**." *Id.* at 28:15-16 (emphasis added). He went on to explain that he wanted a single document which sets out the findings and the policy violations. The Court finds that Dr. Larson's deposition directly contradicts his declaration because he expressly denied that he believed the investigation was flawed, biased, or there was evidence that was not considered. He was cross-examined during his earlier testimony, he had access to pertinent evidence at the time he was deposed, and his declaration does not correct any confusion. Therefore, to the extent the declaration contradicts his deposition testimony, the Court declines to consider it.

Plaintiff asserts that Dr. Larson's testimony did not contradict his declaration, but he is merely giving answers "more freely" now that he is no longer employed by UNM. *See* Doc. 156 at 16. A suggestion that Dr. Larson may not have given truthful answers because he was employed by UNM at the time is troubling and does not ease the Court's concern that he has presented a sham affidavit directly contrary to deposition testimony. *See Id.* ("Now that he is no longer employed by UNM, Dr. Larson's declaration more freely goes into detail about UNM's irregular process and Dr. Larson's concerns about bias….").

Therefore, the Court will not consider the portions of Dr. Larson's declaration which contradict his deposition testimony, such as statements that he believes the investigation was biased or flawed, or that all evidence was not considered. Alternatively, even assuming the Court considers Dr. Larson's declaration, the Court finds that it does not create a genuine dispute of material fact precluding summary judgment, as explained below.

      **C.      Newspaper articles.**

Defendants move to exclude various newspaper articles included in Plaintiff's appendix. Defendants assert they are inadmissible hearsay. However, Plaintiff does not appear to offer the newspaper articles for the truth of the matter asserted. Rather, he offers them to show the effect on UNM, i.e., that the newspaper articles pressured UNM to investigate and prosecute men. Therefore, the Court declines to strike the newspaper articles.

      **D.      Relevancy.**

Defendants seek to strike certain documents, arguing they are irrelevant. The Court declines to strike any specific evidence on the grounds of relevancy alone. Rather, whether Plaintiff's asserted facts and supporting evidence create a genuine dispute of material fact precluding summary judgment will be addressed below. *See Jones v. Barnhart*, 349 F.3d 1260, 1270 (10th Cir. 2003) (affirming district court's evidentiary ruling that denied a motion to strike an affidavit on summary judgment and instead "relied on the declarations to the extent that they contained relevant and admissible material, ignoring inadmissible and irrelevant statements").

**II.    <u>The Court enters summary judgment in favor of Defendants on Plaintiff's Title IX claim.</u>**

Defendants UNM and UNM Board of Regents move for summary judgment on Plaintiff's Title IX claim (Count II). At issue is whether Plaintiff's sex was a motivating factor in

his employment termination. As explained below, the Court concludes that Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in his termination. The Court therefore enters summary judgment in Defendants' favor.

Title IX of the Education Amendments Act of 1972 provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). To succeed on a Title IX claim, "a plaintiff must show: (1) that he or she was excluded from participation in, denied the benefits of, or subjected to discrimination in an educational program; (2) that the program receives federal assistance; and (3) that the exclusion from the program was on the basis of sex." *Seamons v. Snow*, 84 F.3d 1226, 1232 (10th Cir. 1996). "Where a Title IX plaintiff relies on indirect proof of discrimination, we apply the three-part burden-shifting framework announced in *McDonnell Douglas*." *Doe v. Univ. of Denver,* 1 F.4th 822, 829 (10th Cir. 2021); *see also Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017) ("The *McDonnell Douglas* framework applies" to "Title IX sex discrimination claims.").

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case for discrimination or retaliation by showing the university took adverse action against the plaintiff based on the plaintiff's sex. *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016) (sex discrimination claim); *Fye v. Oklahoma Corp. Commission*, 516 F.3d 1217, 1225 (10th Cir. 2008) (retaliation claim). The burden then shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Bird*, 832 F.3d at 1200. If the defendant satisfies this burden, "then summary judgment is warranted unless [the plaintiff] can show there is a genuine issue of material fact as to whether the proffered reason[ ] [is]

pretextual." *Id.* (quotations omitted). To prove pretext, the plaintiff "must produce evidence of weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the [university's] proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the [university] did not act for the asserted nondiscriminatory reasons." *Doe v. Univ. of Denver*, 1 F.4th 822, 829 (10th Cir. 2021) ("*Doe II*") (internal quotation marks omitted).

To determine if the plaintiff has established a prima facie case for discrimination, the Court must ask, "[c]ould a reasonable jury – presented with the facts alleged – find that sex was a motivating factor in the school's disciplinary decision?" *Id.* A plaintiff may use, but is not limited to, the "erroneous outcome" and "selective enforcement" frameworks to establish that sex was a motivating factor in the school's decision. *Id.*

Plaintiff's briefing focuses on the erroneous outcome test. "Under the "erroneous outcome" test, a plaintiff must set forth (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and sex bias." *Id.* at 830. "To satisfy the 'selective enforcement' test, a plaintiff must show that a similarly-situated member of the opposite sex was treated more favorably than the plaintiff due to his or her sex." *Id.* However, under either test, the fundamental question is whether Plaintiff's sex was a motivating factor in his employment termination.

Plaintiff argues that the Court should deny summary judgment on the same grounds identified in *Doe II*. In *Doe II*, the Tenth Circuit found that a male plaintiff had demonstrated that his sex was a motivating factor in his expulsion for allegedly committing sexual assault because he (1) showed that the investigation was "replete" with "egregious" procedural irregularities or deficiencies *along with substantial reasons to discount the alleged victim's allegations*, (2) plus

statistical evidence which demonstrated that the university treated men differently than women. *Doe v. Univ. of Denver*, 1 F.4th 822, 831–32 (10th Cir. 2021). Here, the Court concludes that Plaintiff has not demonstrated egregious procedural irregularities or deficiencies along with substantial reasons to discount Ms. Van Meter's allegations. Moreover, the statistical evidence is too generalized and simplistic to eliminate non-gender-based reasons for the discrepancies, or to show that UNM was biased against men.

### A.    Prima Facie Case

Plaintiff asserts that he has established a prima facie case – *i.e.*, that his sex was a motivating factor in his termination – for the following reasons:

- UNM was pressured by the DOJ to investigate and discipline sexual assault cases;

- There were procedural irregularities or deficiencies in the investigation and disciplinary proceeding;

- The outcome was erroneous (*i.e.,* Ms. Van Meter should not have been believed); and

- Statistical evidence demonstrates bias against male respondents.

As explained below, the Court rejects each of these arguments.

First, the DOJ letter and investigation did not expressly seek to protect women at the expense of men. Rather, it was facially neutral and focused on creating adequate procedures to protect sexual assault victims and investigate sexual assault respondents.

Second, Plaintiff has not demonstrated that there were substantial procedural irregularities or deficiencies in the investigation and disciplinary process. To the extent there were irregularities, they were not so substantial as to suggest bias, and do not shed doubt on the ultimate outcome.

Third, there are not substantial reasons to doubt Ms. Van Meter's story or the outcome of the disciplinary proceeding. Her story was consistent and supported by other evidence, and Defendants' conclusion that Plaintiff committed penetrative sexual assault because she was incapable of consenting was reasonable. It is not the Court's role to reweigh the evidence and come to a different conclusion.

Finally, Plaintiff's Rule 1006 summary or calculation of UNM disciplinary records is insufficient to demonstrate that UNM's disciplinary process as to Plaintiff was motivated by anti-male bias.

1.    <u>External pressure, such as the DOJ investigation and news articles, does not demonstrate gender bias</u>.

Plaintiff cites to certain evidence of external pressure, including (1) a DOJ Letter regarding its investigation of UNM's handling of sexual assaults, (2) news articles regarding sexual assaults at UNM, and (3) an agreement between the DOJ and UNM.

Evidence that a school felt pressure to conform with DOJ guidance does not provide evidence of gender discrimination, especially here where the pressure was facially gender-neutral. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1192–93 (10th Cir. 2020) ("*Doe I*"). "[S]uch evidence is insufficient in itself to support any inference that the school's actions in a particular case were motivated at least in part by gender bias." *Id.* Thus, *Doe I* concluded that outside "pressure [the university] felt to comply with its guidance cannot support his summary judgment burden unless combined with a particularized 'something more,' that would indicate that [the university's] decision in his particular case was based on his gender." *Id.* at 1193, *quoting in part Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 856 (7th Cir. 2019).

Here, there is nothing in the DOJ letter that suggests that UNM was pressured to specifically disfavor male respondents. The DOJ Letter and UNM's agreement with the DOJ are facially neutral. For example, they did not pressure UNM to do more to protect *women* or punish *men*, but rather asserted that UNM was not adequately investigating or addressing sexual assault generally. Even assuming the DOJ letter and agreement pressured UNM to act differently, pressure to investigate sexual assaults does not demonstrate that UNM acted with an anti-male bias rather than merely a pro-victim bias.

Plaintiff also cites to news articles regarding sexual assaults on the UNM campus. The exhibits provided by Plaintiff do not establish a gender-based motive in responding to allegations of sexual assaults. *See, e.g.,* Doc. 149, Ex. 7-14. The articles generally discuss sexual assaults, the DOJ's investigation, or specific cases and settlements brought by alleged sexual assault victims. But none of them suggest action be taken against men. There is nothing to suggest that news articles motivated anti-male action by Defendants. To the extent it did motivate action by Defendants, taking action to discipline sexual assaults or avoid lawsuits by alleged victims of sexual assault is not gender-based discrimination.

2.    Plaintiff has not demonstrated a likelihood that the outcome was erroneous.

Plaintiff asserts that the outcome was erroneous. In determining whether sex was a motivating factor in Plaintiff's termination, the Court may consider whether the outcome was erroneous and whether the evidence substantially favored Plaintiff. In *Doe I,* the Tenth Circuit assumed without deciding "that an inference of bias arises when an evaluator's decision in favor of one side lacks an apparent, evidence-based reason, and the evidence substantially favors the other side." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1197–98 (10th Cir. 2020). The *Doe I* court concluded that "investigators were not faced with a situation in which the evidence substantially

favored Plaintiff." *Id.* Evidence showing an erroneous outcome may include, but is not limited to, evidentiary weaknesses such as a motive to lie, strengths of the defense, procedural flaws affecting proof, or a reason to doubt the veracity of the charge. *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1298 (D.N.M. 2017).

Here, the evidence before UNM did not substantially favor Plaintiff. Rather, Defendants reasonably concluded that Plaintiff sexually assaulted Ms. Van Meter because she lacked the capacity to consent. Defendants' conclusion was clearly evidence based and was reasonable under the circumstances. It is not the Court's role to reweigh the evidence, or to decide whether Plaintiff sexually assaulted Ms. Van Meter. Rather, the Court simply concludes that Defendants' decision was well-supported in the record, and the evidence does not substantially favor Plaintiff.

In a 28-page decision, the PLOD, the OEO cited to the relevant evidence, made extensive findings of fact, and concluded that Ms. Van Meter lacked the capacity to consent and Plaintiff sexually assaulted her. In a subsequent letter, Dr. Stokes concluded that Plaintiff's actions violated UNM policy by creating a hostile work environment. Dr. Roth, in imposing discipline, also concluded that Ms. Van Meter lacked the capacity to consent to sexual activity. Finally, Plaintiff challenged his termination to the Peer Review Panel. The Peer Review Panel held a three day evidentiary hearing and issued an eight page decision. It similarly concluded that Ms. Van Meter lacked the capacity to consent to sexual activity and affirmed the Plaintiff's termination.

In reaching this conclusion, Defendants reasonably considered Ms. Van Meter's story, the police report, the SANE examination report and physical injuries, Plaintiff's factual admissions, text messages, and various other statements in deciding that she was not capable of consenting to sexual activity, as defined by UNM policy. Unlike in *Doe II*, Ms. Van Meter's

story was not inconsistent or incoherent. In *Doe II*, the Tenth Circuit noted that the alleged victim "told an array of inconsistent stories about the alleged incident." *Doe v. Univ. of Denver*, 1 F.4th 822, 833 (10th Cir. 2021) ("*Doe II*"). It also noted that "none of the witness accounts completely align with the story she told investigators." *Id.* That is not the case here. Ms. Van Meter's story was consistent and supported by corroborating evidence. Plaintiff presents his own story, but his story does not establish incoherencies or inconsistencies in Ms. Van Meter's story to the extent she should or must be disbelieved.

Plaintiff asserts that Ms. Van Meter was not credible or had motives to lie. Even assuming that were true, her story was supported by other evidence, including certain factual admissions by Plaintiff. Plaintiff admitted that she told him she had vomited, and that he drove her home because she was unwell. Doc. 149 at 145-46. Text messages demonstrated that Ms. Van Meter accidentally texted her friend in Maine to pick her up instead of her husband. Moreover, Plaintiff admitted to police that she did not react at all to oral sex. Doc. 149 at 144. A SANE report documented her physical injuries, including bruises to both of her legs as well as genital tears and abrasions. Doc. 149 at 140. When Ms. Van Meter arrived home, her husband observed that she was so intoxicated that he refused to leave their child with her, and instead took their child to work. This was sufficient under UNM policy to establish that Ms. Van Meter lacked the capacity to consent. The Peer Review Decision explained UNM's policy on consent as follows:

> OEO [the Office of Equal Opportunity] examines the record for other behavior like stumbling or otherwise exhibiting loss of equilibrium; slurred speech or word confusion; bloodshot, glassy or unfocused eyes; vomiting, especially repeatedly; being disoriented, or confused as to time or place; or loss of consciousness.

> Should the preponderance of the evidence in the record demonstrate that one or more such behaviors were objectively apparent at the time the alleged unconsented-to or unwelcomed sexual activity occurred, then the evidence may

> demonstrate that the respondent knew or should have known that the complainant
> was incapable of giving meaningful consent to sexual activity due to intoxication.

Peer Review Decision, Cordova Dec. Ex A-9, Doc. 129-10 at 3.  In her own version of events, many if not most of these indicia were present. But Plaintiff also admitted that she vomited and did not feel well enough to drive, which are reasonable indicia that she was not capable of consenting under UNM's written policy.

Plaintiff asserts that UNM's President, Dr. Stokes, unreasonably concluded that penetrative sexual assault may create a hostile work environment. As set forth in the Peer Review Panel's decision, UNM's policy expressly provides that "a single incident (such as sexual assault) may be so severe as to create a hostile environment."  Peer Review Decision, Doc. 129-10 at 2. President Stokes concluded that Plaintiff had an influential position, a reasonable person would have feared retaliation and potential negative influence in her work environment, Plaintiff was included on Ms. Van Meter's work emails and memoranda, and the parties worked in close proximity with one another. Dr. Stokes therefore found that an objectively hostile work environment was created based on the sexual misconduct at issue, in violation of policies 2720, 2730, and 2740. Doc. 129-8 at 1-2. To the extent Plaintiff asserts that the hostile work environment policy was not in effect at the time of the incident, the Court disagrees. The uncontroverted evidence demonstrates that this policy was in effect at the time of the incident. Cordova Dec., Doc. 129-1 at 1-2; *Id.,* Exhibit A-4, Doc. 129-5.

Plaintiff suggests that the Defendants relied upon policies which were updated after the alleged sexual assault. Plaintiff cites to the record suggesting that policies 2720 and 2740 were updated on February 26, 2018, but he does not cite to the record demonstrating any relevant differences between the two versions, nor has he presented any evidence that Defendants relied on updated portions of the policy to his detriment. Doc. 149 at 258. Rather, the OEO issued its

PLOD describing the policy violations on December 4, 2017, before the changes were made. Doc. 129-2 at 1.

In the disciplinary proceeding, Plaintiff asserted facts which he believes show that Ms. Van Meter was interested in sexual activity with him, such as meeting him at a restaurant, drinking with him, and going to his home to drink further. He asserts she positively responded when he kissed her. But UNM has a policy that "consent to one form of sexual activity does not imply consent to other forms of sexual activity." Doc. 129-4, § 3. Being friends with Plaintiff, drinking with him, and even kissing him (which is disputed) does not ultimately demonstrate that she had the capacity to consent to sexual activity with him.

Plaintiff points to Ms. Van Meter's alleged motivation to either engage in sexual activity with him or to cover up an alleged affair. He asserts that she argued with her husband before they met for drinks. Defendants considered these facts but concluded, based on the evidence, that Ms. Van Meter's fight with her husband and alleged motive to cover up an alleged affair did not establish that she had the capacity to consent to sexual activity. Under the circumstances, this determination is entirely reasonable.

Plaintiff also argues that the OEO ignored a drug test that disproved Ms. Van Meter's claims. The Court disagrees. The PLOD expressly addressed the drug test. It noted that she received medical attention 48 hours after the incident occurred, which means that the test could not conclusively determine whether she was drugged. PLOD, Doc. 129-2 at 8 n.9. The PLOD also considered the police report, which stated that "GHB was not tested for due to the time delay between the alleged assault and the collection of the urine sample." *Id.* To the extent Plaintiff asserts that the PLOD ignored negative DNA testing, Plaintiff eventually admitted to possibly penetrating the victim with his finger, and the SANE examination showed bruises to her

legs and injuries to her genitals. Doc. 149 at 140, 146. Thus, DNA testing was not essential to determining whether Ms. Van Meter was capable of consent.

Finally, Plaintiff's statements had some inconsistencies. He at first denied penetrating Plaintiff. Doc. 149 at 145. After being warned about DNA testing, he admitted he might have penetrated her. Doc. 149 at 146.

Thus, Plaintiff has not established an erroneous outcome, that the outcome was not supported by evidence, or that evidence substantially favored him.

3. <u>Plaintiff has not demonstrated substantial procedural irregularities or deficiencies which suggest bias or discriminatory intent.</u>

Plaintiff appears to argue that procedural irregularities or deficiencies in the investigation and disciplinary process create an inference of sex discrimination. He lists a variety of alleged procedural irregularities or deficiencies. The Court disagrees and concludes that Plaintiff has not demonstrated sufficient procedural irregularities or a one-sided investigation to create an inference of sex discrimination. *See, e.g., Doe v. Univ. of Denver*, 1 F.4th 822, 831 (10th Cir. 2021) (noting that evidence of a one-sided investigation, procedural irregularities, or bias, may establish sex discrimination). To the extent he has established irregularities or deficiencies, they generally do not cast doubt on the outcome.

Plaintiff asserts that he was not given the opportunity to respond to Ms. Van Meter's appeal of the Final Letter of Determination ("FLOD") to Dr. Stokes. However, as explained below, Plaintiff did have the opportunity to participate and present evidence (1) prior to the imposition of discipline, and (2) in the peer review panel's evidentiary hearings and review. He also apparently did not perfect appeals twice to the Board of Regents. Plaintiff had the opportunity to appeal President Stokes's decision to the Board of Regents. Doc. 129-4 at 8; Doc.

129-8 at 2 (notifying Plaintiff of the appeal policy to the Board of Regents). He was also informed of his ability to appeal the Peer Review Panel's to the Board of Regents. Doc. 149, Ex. 42 at 274-276.

Plaintiff asserts that Defendants ignored that Ms. Van Meter deleted text messages that were allegedly exculpatory. Doc. 140 at 137. He asserts that Defendants did not consider or find that intentional destruction of exculpatory evidence should weigh against Ms. Van Meter. Doc. 148 at 19, ¶ rr. However, Plaintiff and Ms. Van Meter provided text messages to the OEO, and the OEO considered them. Ms. Van Meter gave permission to the Albuquerque Police Department ("APD") to attempt to retrieve them from her phone. Doc. 141 at 108.

Notwithstanding the absence of certain messages, Defendants obtained various text messages as part of the investigation and concluded that the text messages were not exculpatory. The PLOD extensively considered text messages, including ones provided by Plaintiff. Doc. 129-2 at 2, 4, 5, 8, 10, 11, 13 14, 18, 19, 23, 25. The PLOD concluded that the text messages were not exculpatory and did not demonstrate that she had any sexual interest in Plaintiff. *Id.* at 19. Moreover, Defendants found the text messages supported her story that she was sick and did not remember what transpired when she arrived home. *Id.* at 25.

The APD Police Report described some of the text messages as follows. *See* Doc. 149, Exhibit 16 at 143. Ms. Van Meter asked Plaintiff "So how bad was it when we got to my house?" *Id.* at 143. Plaintiff responded "It wasn't great" and later added "I didn't say much other than you weren't feeling well and I needed to make sure you got home safely." *Id.* at 143. Moreover, Plaintiff stated "What are you going to say? Besides drank too much." *Id.* Defendants considered the text messages and the police report. Thus, Defendants reasonably found that the text

messages supported the victim's allegation that she got sick at Plaintiff's home, and was in an impaired state both at Plaintiff's home and when she arrived at her home.

Moreover, to the extent Ms. Van Meter and her husband deleted text messages related to their argument which were not recovered and submitted to Defendants, the OEO interviewed her husband about the argument and text messages, and her husband discussed the text messages with police. The OEO considered these interviews and reasonably concluded that Ms. Van Meter's argument with her husband did not establish that she had the capacity to consent to sexual activity. *See* Doc. 129-9 at 1.

Plaintiff asserts that Defendants ignored Ms. Van Meter's argument with her husband, in which she asked him how he would feel if she kissed Plaintiff. The argument started after she saw advertisements of her husband, who was acting in a theatrical production, kissing an actress. The OEO considered the argument and questioned Ms. Van Meter's husband about it. See Doc. 129-2 at 13-14. It noted that the statement was made in the heat of an argument, and did not show that she intended to participate in sexual activity with Plaintiff. Doc. 129-2 at 19. Ultimately, this fight did not convince Defendants that her story was fabricated. This was a reasonable conclusion, as her fight with her husband does not provide evidence that she was able to consent to sexual contact with Plaintiff. Defendants therefore appropriately considered this evidence. Even assuming she intended to kiss Plaintiff, under UNM's policy this does not bear on whether she had the capacity to consent to *further* sexual activity.

Plaintiff also asserts that Defendants failed to give weight to his allegation that Ms. Van Meter initiated meeting Plaintiff for drinks, that she agreed to go to his house, and that she offered to pick up beer on the way. He asserts that all of these suggest that she wanted to participate in sexual activity with him. The Court disagrees. None of this bears on whether

Plaintiff consented to, or had the capacity to consent to, sexual activity later in the evening. Defendants appropriately discounted the weight of this evidence. Doc. 129-9 at 1.

Plaintiff's remaining challenges do not change the analysis. He asserts that Ms. Van Meter's interview with Defendants should have been recorded. But Plaintiff has not cited to case law demonstrating that this is a procedural irregularity.

To the extent Plaintiff believes Defendants should have weighed in his favor a police officer's statement that it sounded like the victim was flirting with Plaintiff, such statement does not bear on whether Ms. Van Meter had the capacity to consent to sexual activity with Plaintiff. Doc. 148 at 38.

Plaintiff also asserts that the OEO failed to interview Mr. Dillenback, who had no information about the alleged sexual assault. The PLOD represents that Mr. Dillenback refused to interview with the OEO, but Mr. Dillenback alleges he was never contacted by the OEO. *See* Doc. 148 at 40, n.120, 121.  Mr. Dillenback had no knowledge of the alleged assault but testified in this case regarding Ms. Van Meter's prior sexual history. Plaintiff appears to assert that the OEO should have considered Ms. Van Meter's prior sexual history, or the Court should consider it. The Court fails to see how her sexual history bears on her capacity to consent with Plaintiff during the events in question in this case. Rather, there is generally a presumption that such evidence is not relevant. For example, under Federal Rule of Evidence 412(a), "evidence offered to prove that a victim engaged in other sexual behavior; or evidence offered to prove a victim's sexual predisposition" is not admissible.  Fed. R. Evid. 412(a).  Plaintiff does not explain how the evidence of her prior sexual history with others is admissible. Even assuming the victim's sexual history with others were admissible, it simply does not bear on her state of intoxication in this case. *See, e.g.*, *Chapman v. Carmike Cinemas*, 307 F. App'x 164, 172 n.2 (10th Cir. 2009)

(noting "we see no reason why Rule 412 should not be applied in summary judgment proceedings…."). In other words, whether Ms. Van Meter kissed Mr. Dillenback has no bearing on this case. Nor does Plaintiff present evidence that Ms. Van Meter submitted a prior false report to the OEO regarding any interaction with Mr. Dillenback which they should have considered.

Plaintiff asserts that Ms. Van Meter was dishonest in her deposition about whether she kissed Mr. Dillenback. In the deposition she said she did not kiss him, but the next day she submitted corrections. Doc. 149, Ex. 36 at 266. But that alleged dishonesty occurred in a deposition in a federal civil case *after* Plaintiff was terminated.[9] The Defendants did not err in not considering something which had not yet happened. Plaintiff does not assert that he brought this issue to the Peer Review Panel's attention. Doc. 148 at 39-40.

Plaintiff points to a statement by Dr. Larson, in which he asserts that Chamiza Pacheco de Alas, the Chief of Staff to the Executive Vice President at UNM's Health Sciences Center, allegedly told Dr. Roth that she wanted to "cut [Plaintiff's] dick off." Doc. 149, Ex. 2, Larson Dep. at ¶ 15. Defendants objected to the Court considering this statement on hearsay grounds. Plaintiff asserts that it is not hearsay as she is an employee of the Defendants. Doc. 157 at 27; Doc. 171-1 *citing* Sept. 18, 2019 (Vol. II) Tr. at 203:13-15. "An employee's statements are not attributable to [her] employer as a party-opponent admission in an employment dispute unless the employee was 'involved in the decision-making process affecting the employment action' at issue." *Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1208–09 (10th Cir. 2010), *Jaramillo v. Colo. Judicial Dep't,* 427 F.3d 1303, 1314 (10th Cir. 2005) (per curiam). Here, Plaintiff has not

---

[9] Plaintiff was terminated on August 27, 2018. Ms. Van Meter's deposition was taken on June 19, 2019. The next day Ms. Van Meter submitted corrections to the deposition stating that she kissed Mr. Dillenback. After Plaintiff was terminated, the Peer Review Panel held its hearing in September 2019 and issued its decision in November 2019.

established by citation to the record how Chamiza Pacheco de Alas was involved in the decision-making process. Ms. Pacheco de Alas was not a decisionmaker in the any of the employment decisions, including (1) the PLOD; (2) Dr. Stokes's letter finding a hostile work environment; (3) Dr. Roth's disciplinary action, or (4) the Peer Review Panel. Nor has he shown that she in fact influenced any of those decisions. Therefore, her statements are inadmissible hearsay.

Plaintiff's next theory is that the OEO concluded Ms. Van Meter would not engage in sexual activity with Plaintiff because she is a mother. But Plaintiff does not point to where in the record that conclusion was made. *See* Doc. 148 at 40. Rather, the PLOD considered the likelihood of Ms. Van Meter voluntarily becoming intoxicated when she was expected to care for her child that evening while her husband went to work.

To the extent Plaintiff points to inconsistencies in Ms. Van Meter's story, his summary judgment briefing does not adequately identify the alleged inconsistencies or show (by citation to the record) that her version was contrary to other witnesses' testimony. *See* Pl.'s Resp., Doc. 148 at 41. Even assuming there were inconsistencies or incoherencies, Defendants reasonably relied on other evidence. It is undisputed that she was unresponsive to oral sex; the SANE report noted physical evidence consistent with nonconsensual sexual assault; she vomited; she attempted to text her husband to pick her up but instead texted a friend in Maine; Plaintiff's own text messages suggest she drank too much; and she asked Plaintiff to drive her home as she could not drive herself. Moreover, her husband noted she was so intoxicated when she arrived that he would not allow her to watch their child while he went to work.

Beyond undermining Ms. Van Meter's story, Plaintiff attempts to show procedural irregularities by citing to Dr. Larson's Declaration that Defendants failed to follow their own policies in imposing discipline. Dr. Larson was Plaintiff's direct supervisor. He gave Plaintiff

exemplary reviews and ultimately recused from disciplining Plaintiff. A meeting was held between Dr. Larson and various administrators, including HR administrator Dorothy Anderson, to explain the process of sanctioning and to answer any questions he had about the case. Dr. Larson Dep., Doc. 156-1 at 27:14-16. At the meeting, Dr. Larson stated that (1) he did not have the exhibits and evidence used to support the findings in the PLOD and (2) he felt he did not have clear documentation setting forth the policy violation and the findings, as he did not know if he was sanctioning the matter for a hostile work environment or for sexual misconduct of a severe type. Doc. 156-1 at 27:20-28:1. He stated that his concern was that he did not have a document which set forth the finding. Dr. Larson Dep. at 28:18-25. He stated that he was concerned "if I sanctioned him without clear documentation of what the finding was and what the violation was, that I would personally be liable to a suit from Mr. Briggs." Doc. 156-1 at 30:18-21. He therefore asked for more documentation, noting: "I had decided that if I could not get clear documentation, I did not think it was appropriate for me to take on either an action or the legal risk of doing so." *Id.* at 31:2-5, 32:9-12. Defendants appear to admit that he should have been provided these documents. However, the PLOD and Dr. Stokes's letter when read together were clear regarding the findings and conclusions. Ultimately, the failure to provide the evidence to Dr. Larson underlying the 28-page PLOD does not demonstrate bias, especially since his disciplinary role was not to reweigh the evidence or come to his own conclusions regarding the violation of policy. *See* Roth Dep., Doc. 149 at 43.

Although Dr. Larson testified that he recused because he wanted to avoid legal liability, he stated that it did not mean that he believed the process was biased or flawed. Larson Dep., Doc. 146-2 at 28:2-16. He stated that his only concern was that he wanted a document that identified the findings against Plaintiff and the polices violated. *Id.* at 28:18-25. Dr. Larson

provided a new declaration after his employment ended with UNM, which states he believed the process was biased and unfair. However, as explained above, these statements are directly contrary to his deposition testimony and will not be considered. Larson Dep., Doc. 156-1 at 28:15-16.

Dr. Larson's declaration also states that he was misled into believing that Plaintiff did not contest the findings in the PLOD. Doc. 148 at 44. Defendants argue, and the Court agrees, that such statement does not change the analysis. Plaintiff did not appeal the PLOD's findings, and he admitted to certain factual allegations which could be construed as sexual assault.

Plaintiff also argues a procedural irregularity exists because Dr. Roth was pressured to terminate Plaintiff. After Dr. Larson recused, Dr. Roth was tasked with imposing discipline. Dr. Roth explained that he did not request the evidence underlying the PLOD's factual findings because his job "was not to reassess the investigation nor re-evaluate it, but simply take the results of the investigation and the appeal as fact and then come to a determination of what the disciplinary action should be." *See* Roth Dep., Doc. 149 at 43

Dr. Roth further stated that he met with administrators "to understand what my role was at that point in time and understanding the options that were available to me as far as sanctioning was concerned." Doc. 157-1 at Exhibit A at 4, Sept. 18, 2019 Tr. at 204:17-24. Dr. Roth testified that administrators believed that termination was the most reasonable option in response to the sexual assault of a fellow UNM employee. Doc. 149 at 44; Roth Dep. at 99:6-25. Administrators explained that similar cases resulted in termination and termination was the most reasonable option to remain consistent with university practice. Doc. 157-1, Exhibit A at 5, Sept. 18, 2019 Tr. at 207:4-19. He stated that he was considering lesser sanctions in light of Plaintiff's work history. Doc. 149 at 44, Roth Dep. at 99:6-25. He stated that he asked administrators to consider

an alternative discipline, which he believed they were willing to do. Doc. 149 at 49; Roth Dep. at 156:2-20.  But Dr. Roth testified that he concluded "that termination was the only viable option." Roth Dep. at 98:8-14.   Dr. Roth believed an accelerated disciplinary process was warranted given the serious and egregious nature of the policy violation by Plaintiff.  Doc. 157, Ex. A, Sept. 18, 2019 Tr. at 201:19-25.  He also noted that Plaintiff did not take any responsibility for his actions.  Doc. 149 at 50; Roth Dep at 159:5-7. Moreover, Dr. Roth concluded that the victim lacked the capacity to consent in part based on Plaintiff's factual admissions. Doc. 157-1, Exhibit A at 6, Sept. 18, 2019 Tr. (Vol. II) at 214:15-22. This process described by Dr. Roth in his testimony does not evidence such irregularities as to find bias or to doubt the outcome of the disciplinary proceeding.  On the contrary, the uncontroverted facts show that Defendants put a substantial amount of time, consideration, and process into deciding whether to terminate an employee in light of credible, well-substantiated evidence that he sexually assaulted a fellow employee.

Plaintiff next asserts that Defendant Anderson's involvement in recommending discipline to Dr. Larson and Dr. Roth was inappropriate. However, Ms. Anderson was the head of the labor relations staff, who *are* involved in recommending discipline.  Plaintiff points to no evidence that her involvement was unusual or that it violated policy. Moreover, Defendant Anderson pointed to other examples of her involvement in disciplining high-level employees, which shows that Plaintiff was not treated differently. Anderson Dep, Doc. 149, at 55:6-15; 56:2-10. Dr. Roth testified that he believed termination was appropriate, and he stated that Ms. Anderson advised him as to his role in the sanctioning process. Roth Dep., Doc. 157-1, 9/1/19 Tr., at 204:17-24, 195:20-23.

Plaintiff generally asserts the investigation was procedurally deficient because Defendants did not promptly collect or preserve evidence. Doc. 148 at 18, ¶ pp. But Plaintiff fails to assert what specific evidence was not collected. Moreover, the PLOD shows that Defendants collected and preserved evidence, including testimony and documentary evidence. PLOD, Doc. 129-2 at 3. To the extent he asserts Defendants did not *timely* investigate, he does not point to how any untimeliness passes doubt on the outcome of the investigation.

Plaintiff also criticized President Stokes's determination that the sexual assault, which happened outside of work, created a hostile work environment at the office. President Stokes set forth the evidence on which she based her decision. Doc. 129-6. Plaintiff held a high-level position which afforded him the opportunity to be influential at the department level. The OEO found it was reasonable that Ms. Van Meter would be concerned about Plaintiff's potential negative influence in her work environment, considering Plaintiff's longevity and level of authority at UNM. Doc. 129-2 at 25. Moreover, Plaintiff and Ms. Van Meter received some of the same emails, letters, and memorandum, which made her work life difficult after the assault. Doc. 129-6 at 1. Finally, Ms. Van Meter and Plaintiff agreed in a protection order that incidental contact would not constitute a violation of the order; the necessity of such an exception provides evidence that the parties worked in close proximity. Doc. 129-7 at 3, ¶ 4.

Plaintiff goes on to attack the next step of the disciplinary process, *i.e.*, the post-termination proceeding. Plaintiff challenged Dr. Roth's decision terminating him, which went to a post-termination hearing before a three-person Peer Review Panel. The Peer Review Panel held a three-day evidentiary hearing, heard testimony, and considered documentary evidence. It issued an eight-page decision, concluding that Ms. Van Meter lacked the capacity to consent. Plaintiff asserts that the post-termination proceeding was flawed or biased because (1) neither he

nor Ms. Van Meter were permitted counsel, (2) he had to provide written cross-examination questions to the panel, which would pose the questions to Ms. Van Meter; and (3) he had the burden of proof. Defendants prohibited counsel from speaking on behalf of both Ms. Van Meter and Plaintiff at the three-day hearing, but they were allowed to have the assistance of counsel during the hearing. Doc. 148 at 7, ¶ 11. Plaintiff did not assert in his response to the motion for summary judgment whether the panel prevented him from asking any questions, and which questions (if any) were unanswered. *See* Doc. 148 at 7-8.

In addition, switching the burden to Plaintiff in *post-termination* proceedings was not irregular given that he had the opportunity to be heard in pre-termination hearings, including the right to submit evidence, and he was terminated only if it was found by a preponderance of the evidence that he violated UNM policies. *Benavidez v. City of Albuquerque*, 101 F.3d 620, 627 (10th Cir. 1996) (switching burden to employee in post-termination proceeding was not a due process violation given prior pre-termination proceedings).

Plaintiff appears to assert that Defendants did not follow their progressive discipline policy because his exemplary performance reviews were not enough to overcome a finding of sexual assault. However, where (as here) "progressive discipline [is] entirely discretionary ..., the failure to implement progressive discipline is not evidence of pretext." *Timmerman v. U.S. Bank, N.A.*, 483 F.3d 1106, 1120 (10th Cir. 2007), *quoted in Montoya v. Jacobs Tech., Inc.*, 764 F. App'x 830, 835–36 (10th Cir. 2019). The disciplinary policy states that although the university normally uses a progressive discipline process, some violations may be of such a serious nature that immediate suspension or termination is appropriate, such as creating a hostile work environment, discrimination, sexual harassment, misconduct, and violation of university policies. Cordova Dec. Ex. A-9, Doc. 129-10 at 4. Defendants reasonably concluded that penetrative

sexual assault was severe conduct. Doc. 129-10 at 4. Dorothy Anderson explained to Dr. Roth that termination was reasonable, as Defendants terminated employees for similarly severe conduct.

To the extent Plaintiff *generally* cites to Damon Fay's expert report to show procedural irregularities in UNM's disciplinary process, such information does not change the result. Mr. Fay is a former police officer at the Albuquerque Police Department. Plaintiff does not cite to any *particular portions* of Fay's report to support a particular asserted fact or cite to it in his analysis to explain how it establishes a material fact, such as specific procedural irregularities or deficiencies. *See* Pl.'s Resp., Doc. 148 at 4, 18. A party must cite to "particular parts of material in the record" to support or contest a fact, Fed. R. Civ. P. 56(c)(1), and the Court need only consider the cited materials. Fed. R. Civ. P. 56(c)(3). Plaintiff does not address or explain how Mr. Fay's report creates a genuine dispute of material fact. *See* Doc. 148 at 34-46.

In sum, Plaintiff's arguments generally did not demonstrate a procedural irregularity or deficiency. To extent he did show an irregularity or deficiency, it was not substantial and does not cast doubt on the outcome of the proceedings.

4.    Plaintiff's summary is insufficient to rule out other, non-gender related reasons for alleged discipline disparities.

Finally, Plaintiff relies heavily on two declarations which summarize 371 disciplinary files as evidence that UNM is biased against men. The Court concludes that Mr. Allen's and Plaintiff's Rule 1006 declarations are insufficient to create an inference of gender bias, as they are too generalized or simplistic to eliminate obvious nondiscriminatory explanations for the disparity. "[A]t least in the discrimination context, the extent to which a discriminatory motive may be reasonably inferred from evidence of statistical disparity often depends on the evidence's

ability to eliminate obvious nondiscriminatory explanations for the disparity." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020) (*"Doe I"*), quoting *Luster v. Vilsack*, 667 F.3d 1089, 1094 (10th Cir. 2011); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1147 (10th Cir. 2009) (same); *Schulte v. Potter*, 218 F. App'x 703, 714 (10th Cir. 2007) (explaining that, where evidence "wholly fail[s] to eliminate nondiscriminatory explanations for" disparate treatment, "[i]t would be unreasonable to draw an inference of" intentional discrimination (internal quotation marks omitted)).

For example, in *Doe I,* certain statistical evidence failed to create an inference of gender bias as it failed to rule out other explanations for the disparate treatment. The *Doe I* statistics appeared to go beyond merely the number of complaints made against male or female respondents. Rather, it included statistical evidence regarding "the numbers of men and women expelled from [the university] for engaging in non-consensual sexual contact involving penetration." *Doe I,* at 952 F.3d at 1199.

Mr. Allen's declaration summarizes his review of the disciplinary records and performs basic arithmetic. He reviewed 371 disciplinary files which arose after allegations of sexual harassment or sexual misconduct. Of the 269 complaints made against male respondents, 126 (or 46.8%) were investigated by the OEO. Of the 102 complaints made against female respondents, 7 (or 6.9%) were investigated by the OEO. Based on these numbers, Mr. Allen calculated that male respondents were investigated by the OEO "at a rate 6.8 times greater than female respondents." Doc. 149, Exhibit 1, at 4.

Moreover, after viewing each file, he noted that of the 269 complaints against male respondents, 78 (or 29%) resulted in a finding of a policy violation against the male respondent. Of the 102 complaints made against female respondents, only 1 (or less than 1%) resulted in a

policy violation against the female respondents. However, only seven complaints were investigated against women. He notes that two of the complaints against women were referred to hearings, and he does not know the outcome of those hearings. Doc. 149, Exhibit 1 at 6. The declarations did not distinguish between employees and students.

Here, Plaintiff was accused of penetrative sexual assault of a fellow employee. However, Plaintiff's summary consists of general complaints for sexual misconduct or sexual harassment. Doc. 149 at 4, ¶ 3. The declarations do not define the phrase "sexual misconduct or sexual harassment." *Id.* It could involve a wide variety of less serious conduct, some of which is not actionable under Defendants' policies. Defendants clearly viewed the accusation, penetrative sexual assault, to be severe and worthy of investigation and discipline. As explained above, the summary does not provide details on how many of the complaints involved accusations of penetrative sexual assault or similarly severe conduct, the nature of the complaints, the reasons why complaints were investigated or not investigated, and the types of punishment for similarly severe charges. *See, e.g., Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020) (noting that data should eliminate non-discriminatory reasons for statistical disparities, such as "that male students on average ... committed more serious assaults"). Thus, it is unclear whether men and women were accused of similar conduct and whether similar conduct was similarly investigated and punished. For example, the Court cannot discern whether the complaints involved serious offenses like rape versus offenses involving inappropriate jokes or the failure to promote an employee. Without an accurate basis for comparison, the statistical evidence does not rule out non-discriminatory reasons for the statistical disparities. Therefore, it does not provide evidence of gender bias.

Alternatively, even assuming the statistics could provide some evidence of gender bias, this alone is not sufficient to establish a *prima facie* case or to establish that Defendants' legitimate business reason for the adverse action was pretextual. *Doe II* concluded that (1) statistical evidence of bias against men in disciplinary proceedings, (2) combined with an "egregious" investigation "replete" with procedural irregularities and strong reasons to doubt the alleged victim's story, created a genuine dispute of material fact defeating summary judgment. *Doe v. Univ. of Denver*, 1 F.4th 822, 831-32, n.13 (10th Cir. 2021). The Tenth Circuit noted that the irregularities in *Doe* II were greater than in *Doe I*, implying that the degree of irregularity matters. *Id.* at 832 n.13. Here, there were not substantial procedural irregularities or deficiencies, or substantial reasons to doubt the outcome of the disciplinary proceedings as in *Doe II*. Moreover, unlike in *Doe II*, the victim's story here is strongly corroborated by text messages, interviews, physical injuries, the SANE examination, and Plaintiff's own statements.

For all of these reasons, Plaintiff has not established a prima facie case for sex discrimination under the first step of the *McDonnell Douglas* burden-shifting framework.

**B.    Defendants had a legitimate business reason for terminating Plaintiff.**

The second step of the *McDonnell Douglas* framework requires the defendant "to articulate a legitimate, nondiscriminatory reason for the adverse action." *Bird v. W. Valley City*, 832 F.3d 1188, 1200 (10th Cir. 2016). Plaintiff does not appear to challenge that Defendants established legitimate business reasons for his termination. Defendants assert that there are facts supporting each decision in the process, including (1) the OEO's conclusion that the sexual activity was nonconsensual; (2) President Stokes's decision that the sexual assault created a hostile work environment; (3) Dr. Roth's termination decision; and (4) the Peer Review Panel's

affirmance. *See* Doc. 129 at 17-19. The Court agrees and concludes that Defendants have satisfied their burden by asserting nondiscriminatory reasons for terminating Plaintiff.

### C.    Plaintiff failed to show pretext.

Plaintiff bears the burden of showing that there is a genuine dispute of material fact as to whether the proffered reasons for the termination are pretextual. "A pretext argument requires the court to examine the facts as they appear to the person making the decision, to determine whether the employer honestly believed those reasons and acted in good faith upon those beliefs." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007) (internal quotation marks and citations omitted). "The plaintiff may establish pretext by showing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Bennett v. Windstream Commc'ns, Inc.*, 792 F.3d 1261, 1267 (10th Cir. 2015) (internal quotation marks omitted). Thus, the Court does not determine whether the Defendant's decisions were correct, rather only "whether the employer honestly believed its reasons and acted in good faith upon them." *Berry v. T-Mobile USA, Inc.*, 490 F.3d 1211, 1220 (10th Cir. 2007). Evidence of pretext often includes but is not limited to: (1) evidence that a defendant's stated reason was false; (2) evidence that a defendant was acting contrary to company policy; and (3) evidence that the plaintiff was treated differently from similarly situated employees. *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307–08 (10th Cir. 2017).

At this stage in the *McDonnell Douglas* analysis, whether Plaintiff in fact sexually assaulted Ms. Van Meter is not at issue. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir. 2000), *citing McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1129 (10th

Cir.1998) (finding that plaintiff failed to establish pretext where the defendant discharged plaintiff after conducting an investigation into a subordinate employee's allegations of sexual misconduct on the part of the plaintiff and believed the allegations to be true, even though plaintiff presented evidence to the district court that the allegations may have been false). "This court's function is not to second guess business decisions made by employers, and our inquiry is not whether [Defendants'] decision to fire [Plaintiff] was ultimately correct or wise." *Cillo v. City of Greenwood Vill.*, 739 F.3d 451, 463 (10th Cir. 2013) (internal quotation marks omitted), *quoted in Montoya v. Jacobs Tech., Inc.*, 764 F. App'x 830, 835 (10th Cir. 2019). "Evidence that the employer should not have made the adverse employment decision—for example, that the employer was mistaken or used poor business judgment—is not sufficient to show that the employer's explanation is unworthy of credibility." *Hiatt v. Colo. Seminary*, 858 F.3d 1307, 1316 (10th Cir. 2017) (brackets and internal quotation marks omitted). Rather, at issue is the sincerity of the employer's proffered belief for the termination. *See Berry v. T-Mobile USA, Inc*., 490 F.3d 1211, 1220 (10th Cir. 2007) ("[A]t issue is whether the evidence of Plaintiff's misconduct presented to [the decisionmakers] was so weak that a rational factfinder could infer that [the] expressed reason for terminating Plaintiff must have been pretextual.") (internal quotation marks omitted).

The Court extensively discussed the evidence presented in the summary judgment briefing in deciding whether Plaintiff stated a *prima facie* case. For the reasons stated above, which the Court incorporates herein, the Court also concludes that the record contains no evidence from which a reasonable fact finder could conclude that Defendants' stated reasons for terminating Plaintiff were pretextual.

First, as explained above, Plaintiff's evidence of external pressure from the DOJ and news articles was gender-neutral, and does not establish that Defendants' proffered reasons are pretextual.

Second, Plaintiff has not demonstrated an erroneous outcome in the various disciplinary proceedings. There is nothing to indicate weakness, implausibility, or inconsistencies in Defendants' reasons for firing Plaintiff.  Moreover, there is no reason to doubt the sincerity of Defendants' proffered belief for the termination, *i.e.,* that Ms. Van Meter lacked the capacity to consent to sexual activity, that Plaintiff sexually assaulted her, and such sexual assault created a hostile work environment. Ms. Van Meter's story was consistent and coherent, and her story was supported by other evidence, including certain factual admissions by Plaintiff, text messages, a SANE Report, and Ms. Van Meter's husband's testimony regarding her condition when she arrived home. Defendants reasonably relied on this other evidence, even assuming her story were inconsistent or incoherent. Although Plaintiff tells a different story, the record does not reflect that Defendants' decision was pretextual.  Moreover, as expressly stated in Policy 2730 and cited in the Peer Review Panel decision, a single severe act, such as sexual assault, may be sufficient to create a hostile work environment.

As discussed in detail above, Plaintiff has generally not demonstrated Defendants acted contrary to UNM policy or shown substantial procedural irregularities/deficiencies. To the extent he has demonstrated some irregularities or deficiencies, they do not cast doubt on the outcome of the disciplinary proceedings or show that the decisions were pretextual.

Finally, Plaintiff points to certain statistics to show he was fired for sexual assault because he is a man. As explained above, the statistics are too generalized to rule out non-gender related explanations for the disparities between investigations of men and women.  "[S]howing

disparate treatment—by demonstrating that the employer treated employees similarly situated to the plaintiff employee differently (i.e., more favorably)—is a particularly potent instrument to discredit an employer's allegedly legitimate reasons." *Dewitt v. Southwestern Bell Telephone Co.*, 845 F.3d 1299, 1311 (10th Cir. 2017). Here, as explained above, Plaintiff presents calculations regarding the number of men and women accused of, investigated for, and disciplined for, "sexual misconduct or sexual harassment." Allen Decl., Doc. 149 at 4, ¶ 3. But the declarations do not define what that phrase means, and it could include a wide variety of conduct ranging from rape to a compliment about appearance. Plaintiff has not demonstrated how many women were accused of penetrative sexual assault or similarly severe acts, or why those cases were not pursued. As explained in *Doe I,* Plaintiff has the burden of submitting statistical evidence which eliminates non-discriminatory explanations for statistical differences in the treatment of men and women. *Doe v. Univ. of Denver*, 952 F.3d 1182, 1194 (10th Cir. 2020). It is not clear from the calculations whether men and women were accused of similarly severe misconduct. Rather, the tables lump together general sexual misconduct or harassment which is not defined in the declarations. Thus, the statistics do not show that Defendants treated employees or students similarly situated to each other differently.

Even assuming Plaintiff's summaries show sex bias, as explained above, Plaintiff has not demonstrated substantial procedural irregularities or reasons to doubt the outcome of the disciplinary proceeding as in *Doe II. Doe v. Univ. of Denver*, 1 F.4th 822, 831-32, n.13 (10th Cir. 2021). The Court also notes that the totality of the evidence undermines Plaintiff's theory that he suffered discrimination because he is a man or that he was unfairly targeted by female

administrators.[10] The undisputed evidence instead shows he was given the benefit of the doubt before his termination. Plaintiff's direct supervisor – a high-level male employee who provided exemplary reviews – recused and is now willing to submit an affidavit to support his claim. Dr. Roth - another high-level male employee - explored the possibility of lesser sanctions before ultimately concluding that the credible, well-substantiated claim of penetrative sexual assault must result in termination. The Peer Review Panel included both men and women.

For these reasons, Plaintiff has not shown pretext under the *McDonnell Douglas* framework. Defendants are entitled to summary judgment in their favor on Plaintiff's Title IX claim (Count II).

## III.   Title VII claim (Count III) against individual Defendants is dismissed.

The individual Defendants assert that Plaintiff may not assert a Title VII claim against them, which Plaintiff now concedes. *Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1083 n.1 (10th Cir. 2007) ("Under long-standing circuit precedent, supervisors and other employees may not be held personally liable under Title VII."). Therefore, the Court dismisses the Title VII claim (Count III) brought against the individual Defendants.

## IV.   Title VII claim (Count III) against the entity Defendants for the same reasons as above.

Moreover, the Court enters summary judgment in the entity Defendants' favor on the Title VII claim, for the same reasons the Court enters summary judgment on the Title IX claim. Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in

---

[10] The Court is aware that a person may assert a discrimination claim even when the decisionmaker is of the same protected class. But Plaintiff theorizes in his brief that he was repeatedly targeted by *female* administrators because he was male. But the record shows that men also concluded that he sexually assaulted Ms. Van Meter because she was not capable of consenting.

his termination. Defendants asserted that his Title VII claim may be rejected for the same reason as his Title IX claim, specifically that there is no evidence of pretext to overcome Defendants' legitimate, nondiscriminatory reasons for his termination. Defs'. Mot. Summ. J., Doc. 129 at 24. Plaintiff did not specifically respond to this argument (*i.e.,* that the Title IX and Title VII claims can be addressed together).

As to his Title VII claim, Plaintiff asserts that he was terminated based in whole or in part on sex-based discrimination. Compl., Doc. 1 at ¶ 173 ("Defendants' termination of Plaintiff [was] based in whole or in part on sex-based discrimination"). Similarly, under his Title IX claim (Count II), Plaintiff alleged that he was discriminated against on the basis of his sex. Compl., Doc. 1 at ¶¶ 137, 142, 144.

"Title VII of the Civil Rights Act of 1964 prohibits employers from discriminating against an individual 'because of such individual's ... sex.'" *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017), *quoting in part* 42 U.S.C. § 2000e–2(a)(1). "Title IX of the Education Amendments Act of 1972 provides similar protections. It prohibits discrimination 'on the basis of sex' in educational programs or activities receiving federal funding." *Hiatt*, 858 F.3d at 1315, *quoting in part* 20 U.S.C. § 1681(a). "Courts have generally assessed Title IX discrimination claims under the same legal analysis as Title VII claims." *Gossett v. Oklahoma ex rel. Bd. of Regents for Langston Univ.*, 245 F.3d 1172, 1176 (10th Cir. 2001); *see also Roberts v. Colorado State Bd. of Agric.,* 998 F.2d 824, 832 (10th Cir.1993) (Title VII is "the most appropriate analogue when defining Title IX's substantive standards"); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1197 (10th Cir. 2020) (applying Title VII standards to Title IX issue).

In a case where an employee of the University of Denver challenged certain adverse employment actions on the basis of sex discrimination, the Tenth Circuit analyzed the Title VII

and Title IX claims together under the *McDonnell Douglas* burden-shifting framework. *Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017). The Court finds this approach useful here. As explained above, the Court concluded that Plaintiff failed to show that his sex was a motivating factor in his termination, or that Defendants' legitimate reasons for the termination were pretextual. Plaintiff has not identified any relevant distinction between the Title VII and Title IX claims, and the Court sees no relevant distinction here. Under these circumstances, the Court finds that the same extensive analysis above also applies to Plaintiff's Title VII claim. Therefore, the Court enters summary judgment and dismisses Plaintiff's Title VII claim (Count III) against Defendants UNM and UNM Board of Regents.

**V.    Court enters summary judgment on Plaintiff's NMHRA claim (Count III).**

Defendants assert that the Court should enter summary judgment on the NMHRA claim (Count III) for the same reasons the Court entered summary judgment on the federal claims, *i.e.*, that Plaintiff failed to show that Defendants' legitimate, non-discriminatory reason for firing Plaintiff was a pretext. Doc. 129 at 24. Defendants moved for summary judgment on behalf of both the entity and individual Defendants. Doc. 129 at 20 (noting there is no evidence that Defendants Vele Buchs's, Stokes's, Roth's, or the peer review panel's employment decisions were pretextual or weak, implausible, inconsistent, or incoherent); Doc. 129 at 24. Plaintiff did not respond or explain whether there are any relevant differences between the federal claims and the NMHRA claim which would preclude summary judgment.

The Tenth Circuit instructs that cases brought pursuant to the New Mexico Human Rights Act may be analyzed under the *McDonnell Douglas* burden-shifting framework where there is an absence of direct evidence of discrimination. *Perry v. Woodward*, 199 F.3d 1126, 1141 (10th Cir. 1999). New Mexico courts "look for guidance to interpretations of federal employment

57

discrimination law under Title VII." *Garcia v. Hatch Valley Pub. Sch.*, 2018-NMSC-020, ¶ 17, 458 P.3d 378, 384. Both the NMHRA and Title VII prohibit discrimination on the basis of sex. As in the federal claims, Plaintiff has the burden on summary judgment to present evidence that Defendants' nondiscriminatory reason for termination "was pretextual or otherwise inadequate." *Garcia*, 2018-NMSC-020 at ¶ 28.

Here, Plaintiff has not pointed to any relevant distinctions between the NMHRA claim and the federal claims which would preclude summary judgment for the reasons discussed above. As explained above, the Court concludes that Plaintiff has not carried his summary judgment burden and demonstrated pretext, nor has he demonstrated that his sex was a motivating factor in his termination. Defendants (except Defendant Gick) are therefore entitled to summary judgment on Plaintiff's NMHRA claim (Count III). Having determined Count III is not viable, the Court declines to reach Defendants' argument that the NMHRA claim should also be dismissed under the higher federal standard applicable to "reverse discrimination" cases.

**VI.    <u>Declaratory judgment and injunctive relief claims are dismissed</u>.**

Defendants assert that the Court should dismiss the injunctive and declaratory relief claims (Counts X and XI) if the remaining employment discrimination claims fail. Doc. 129 at 25. Plaintiff did not assert in his response that the claims should survive if his employment discrimination claims fail. Plaintiff did not allege any independent basis for declaratory relief separate from those which have already been dismissed. *Gutwein v. Taos Cnty. Det. Ctr.* *("TCDC")*, No. 1:15-CV-00672 RB-WPL, 2017 WL 3610532, at *9 (D.N.M. Feb. 24, 2017). Therefore, as explained below, the declaratory and injunctive relief claims are dismissed.

Under New Mexico law, the Declaratory Judgment Act is a special proceeding that grants the state district courts the "power to declare rights, status and other legal relations whether or

not further relief is or could be claimed." N.M. Stat. Ann. § 44-6-2 (1975). In an action seeking declaratory relief, the plaintiff must establish: "a controversy involving rights or other legal relations of the parties seeking declaratory relief; a claim of right or other legal interest asserted against one who has an interest in contesting the claim; interests of the parties must be real and adverse; and the issue involved must be ripe for judicial determination." *State ex rel. Stratton v. Roswell Indep. Sch.*, 806 P.2d 1085, 1096 (N.M. Ct. App. 1991) (quoting *Chronis v. State ex rel. Rodriguez*, 670 P.2d 953, 958 (N.M. 1983)).

Similarly, "the Declaratory Judgment Act does not provide an independent federal cause of action." *Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022), *citing Skelly Oil Co. v. Phillips Petrol. Co.*, 339 U.S. 667, 671–74 (1950) (describing "limited procedural purpose of the Declaratory Judgment Act"). It merely empowers a court "[i]n a case of actual controversy within its jurisdiction" to "declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." § 2201(a). In other words, the Act "enlarge[s] the range of remedies available in the federal courts," *Skelly Oil Co.*, 339 U.S. at 671, but it leaves "substantive rights unchanged," *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 509 (1959). Therefore, "[t]o maintain an action for a declaratory judgment, then, [Plaintiff] must assert a valid federal cause of action—one that exists independent of any request for declaratory relief." *Nero v. Oklahoma*, No. 22-6121, 2022 WL 14423872, at *2 (10th Cir. Oct. 25, 2022).

Here, the Court has dismissed all substantive claims for relief or entered summary judgment in Defendants' favor. As no independent controversy remains, Plaintiff is not entitled to the requested declaratory relief. *See Stratton*, 806 P.2d at 1096; *Chronis*, 670 P.2d at 958.

As to an injunction, such relief is a remedy, not an independent cause of action. Because all independent causes of action have been dismissed, the Court also rejects Plaintiff's claim for injunctive relief.

Thus, Counts X and XI for injunctive and declaratory relief are dismissed.

**VII.    Plaintiff's Motion for Leave to Identify Statistical Expert.**

Plaintiff moves for leave to identify Mr. Allen as an expert for use *at trial*. Doc. 154. Plaintiff does not seek leave to identify Mr. Allen as an expert for consideration in the summary judgment motion, although the Court has considered Mr. Allen's non-expert summary declaration as part of this proceeding. Because the Court grants the summary judgment motion, Plaintiff's request to designate a trial expert is denied as moot.

## CONCLUSION

For the reasons stated above, the Court finds that Plaintiff has not created a genuine dispute of material fact that his sex was a motivating factor in his termination from UNM, or that the reasons for his termination were pretextual. Therefore, the Court enters summary judgment in favor of the remaining Defendants and against Plaintiff on the remaining claims, the Title IX claim (Count II), the Title VII and the NMHRA claims (Count III), the request for declaratory relief (Count XI), and the request for injunctive relief (Count X).

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss and for Summary Judgment **(Doc. 129)** is **GRANTED** for the reasons described in this Memorandum Opinion and Order.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike Plaintiff's Summary Judgment Evidence **(Doc. 146)** is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Extension of Time to Respond to Defendants' Motion to Strike (**Doc. 150**) is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's Opposed Motion for Leave to Identify Statistical Expert For Use At Trial (**Doc. 154**) is **DENIED AS MOOT.**

/S/
KEA W. RIGGS
UNITED STATES DISTRICT JUDGE